SHANNON L. GUSTAFSON (SBN 228856)
sgustafson@lynberg.com
AMY R. MARGOLIES (SBN 283471)
amargolies@lynberg.com
ANITA K. CLARKE (SBN 321015)
aclarke@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite #1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendant, COUNTY OF SAN BERNARDINO,
ROBERT VACCARI, and JAKE ADAMS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.C., a minor by and through her guardian *ad litem* Maria Cadena, individually and as successor-in-interest to Hector Puga; I.H., a minor by and through his guardian *ad litem* Jasmine Hernandez, individually and as successor-in-interest to Hector Puga; A.L., a minor by and through her guardian *ad litem* Lydia Lopez, individually and as successor-in-interest to Hector Puga; and ANTONIA SALAS UBALDO, individually, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF CALIFORNIA; COUNTY OF SAN BERNARDINO; S.S.C., a nominal defendant; ISAIAH KEE; MICHAEL BLACKWOOD; BERNARDO RUBALCAVA; ROBERT VACCARI; JAKE ADAMS; and DOES 6-10, inclusive, <br><br> Defendants. | CASE NO. 5:22-cv-00949-KK-(SHKx) <br><br> *Assigned for All Purposes to:* <br> *Hon. Kenly K. Kato – Courtroom 3* <br><br> **COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION** <br><br> *[Filed Concurrently County Defendants' MSJ; Exhibits and Declarations; Proposed Judgment]* <br><br> Date:          March 20, 2025 <br> Time:          9:30 a.m. <br> Courtroom:  1 <br><br> *Trial Date: June 2, 2025* <br><br> *Complaint filed: 06/07/2022* <br> *FAC filed: 10/18/22* <br> *SAC filed: 01/13/23* <br> *TAC filed: 05/12/23* |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, Defendants COUNTY OF SAN BERNARDINO, SERGEANT ROBERT VACCARI, and DEPUTY JAKE ADAMS (collectively, "County Defendants"), pursuant to Central District Local Rule 56-1 and this Court's Standing Order hereby submit the following Separate Statement of Uncontroverted Facts and Conclusions of Law in support of their concurrently filed motion for summary judgment, or in the alternative summary adjudication:

### STATEMENT OF UNDISPUTED MATERIAL FACTS AND CONCLUSIONS OF LAW

| Def.'s SUF No. | Fact | Supporting Evidence |
|---|---|---|
| 1. | Deputy Adams went to the Academy from March to September 2018. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 5:24-25. |
| 2. | After graduation from the Academy Deputy Adams was assigned to the West Valley Detention Center for the San Bernardino County Sheriff's Department | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 6:1-3. |
| 3. | Deputy Adams was assigned to patrol starting May 2020 with the San Bernardino County Sheriff's Department. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 6:6-16. |
| 4. | From May through September 2020 Deputy Adams was in field training. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 6:6-16. |
| 5. | Sergeant Vaccari graduated from the Academy in 1997. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 10:8-14. |
| 6. | After graduation from the Academy | Clarke Decl. ¶ 10, Ex. U – |

2

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | Sergeant Vaccari was assigned to West Valley Detention Center for the San Bernardino County Sheriff's Department. | Vaccari Depo. 10:18-22. |
|---|---|---|---|
| 7. | Sergeant Vaccari went to patrol in 2000. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 10:21-11:3. | |
| 8. | Sergeant Vaccari was promoted to Sergeant in January 2012. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 11:4-7. | |
| 9. | On February 16, 2021, CHP received reports that a white Ford SUV was involved in a shooting with another vehicle on the freeway during the evening. | Clarke Decl. ¶ 11, Ex. V - Kee Depo. 14:6-9, 75:3-76:19; Clarke Decl. ¶ 12, Ex. W - Rubalcava Depo. 77:14-78:15; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 51:11-20. | |
| 10. | The Ford SUV had a funeral sticker on the back window. | Clarke Decl. ¶ 11, Ex. V - Kee Depo. 76:14-19; Clarke Decl. ¶ 12, Ex. W - Rubalcava Depo. 78:4-9; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 51:11-20. | |
| 11. | Sergeant Kee was the on-duty supervisor when the freeway shooting occurred. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 75:22-76:5. | |
| 12. | Kee spoke to the victim of the freeway shooting. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 75:22-76:5 | |
| 13. | The victim directed Kee's attention to the right passenger side door where | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 75:22-76:5 | |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | there was a bullet hole in the door | |
|---|---|---|---|
| | 14. | The bullet penetrated through the door and passenger seat. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 76:6-13 |
| | 15. | CHP were briefed regarding the shooting. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 76:25-77:14 |
| | 16. | The shooting was classified as a felony. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 76:25-77:14 |
| | 17. | Because the freeway shooting was classified as a felony, the officers were permitted to conduct a felony stop. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 76:25-77:14 |
| | 18. | A felony stop is when an officer orders the occupants out of the vehicle without approaching, and with the weapons drawn behind cover. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 77:15-24 |
| | 19. | CHP Officers Blackwood and Rubalcava located the vehicle and attempted a traffic stop on February 17, 2021. | Clarke Decl. ¶ 13, Ex. X - Blackwood Depo. 51:1-10; Clarke Decl. ¶ 12, Ex. W - Officer Rubalcava Depo. 23:21-24:6, 77:13-17; Clarke Decl. ¶ 11, Ex. V – Kee Depo. 14:6-9. |
| | 20. | Decedent briefly yielded to the right curb with Rubalcava and Blackwood behind him. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 77:13-17; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 51:1-10 |

**4**

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| 21. | When they attempted to contact Puga, Puga sped away and continued the pursuit. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 68:17-69:9 |
|---|---|---|
| 22. | The driver of the White SUV was later identified as Hector Puga. | Clarke ¶ 2, Ex. M – Third Amended Complaint (Dkt. 68) ¶ 25. |
| 23. | Hector Puga led CHP Officers Rubalcava and Blackwood on a pursuit. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 23:21-24:6; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 51:1-10; *see* Clarke Decl. ¶ 9, Ex. K – Blackwood MVARs Fragment 01. |
| 24. | Sergeant Kee later joined the pursuit of the white SUV. | Clarke Decl. ¶ 11, Ex. V - Kee Depo.17:14-24; 75:3-21. |
| 25. | At some point San Bernardino County Sheriff's deputies Sergeant Vaccari and Deputy Adams joined the pursuit of Mr. Puga. | Clarke Decl. ¶ 9, Ex. T - Adams Depo. 9:12-10:13; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 18:15-19:3. |
| 26. | CHP notified the Sheriff's Department through dispatch that there had been a shooting from the white SUV on the freeway. | Clarke ¶ 9, Ex. T – Adams Depo. 68:17-69:9; Clarke ¶ 10, Ex. U – Vaccari Depo. 18:23-19:3; Adams Decl. ¶ 5. |
| 27. | It was relayed to Adams and Vaccari in their patrol vehicles that there had been a shooting from the white SUV on the freeway. | Clarke Decl. ¶ 9, Ex. T – Adams 68:17-69:9; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 18:23-19:3; Adams |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | Decl. ¶ 5. |
|---|---|---|
| 28. | Vaccari and Adams were given information that Puga had a gun in the car. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 32:25-33:5; Clarke Decl. ¶ 9, Ex. T – Adams Decl. ¶ 5. |
| 29. | Due to the information that Puga had a gun in the car, Adams and Vaccari believed Puga did in fact have a firearm in the vehicle. | Clarke Decl. ¶ 10, Ex. U – Vaccari 32:25-33:9; Adams Decl. ¶ 5. |
| 30. | During the pursuit, no one entered or exited the vehicle, | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 68:17-69:9 |
| 31. | Because no one entered or exited the vehicle, Adams and Vaccari believed that the person involved in the shooting was still within the white SUV. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 68:17-69:9 |
| 32. | The pursuit terminated at the intersection of Peach Avenue and Catalpa Street in Hesperia, CA. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 10:14-18; Clarke Decl. ¶ 10, Ex. U – Vaccari 20:17-21 |
| 33. | The pursuit terminated because Puga's vehicle became disabled. | Clarke ¶ 18, Ex. L – Kee MVARS p1 38-38:45 |
| 34. | The pursuit ended just south of Catalpa Street. | Clarke Decl. ¶ 11, Ex. V - Kee Depo. 16:22-24. |
| 35. | The pursuit lasted approximately an hour. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 24:4-6 |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| 36. | The passenger of the vehicle complied with commands and was safely taken into custody. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 13:4-9 |
|---|---|---|
| 37. | Adams had a conversation with the passenger once she was out of the car. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 13:10-12 |
| 38. | The passenger did not know whether Puga had a gun or not. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 13:13-25 |
| 39. | Hector Puga refused to exit the vehicle for over an hour. | Clarke Decl. ¶ 12, Ex. W - Rubalcava Depo 27:14-19; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 24:5-11. |
| 40. | Numerous repeated commands were given for Hector Puga to exit the vehicle. | Clarke Decl. ¶ 11, Ex. V - Kee 19:10-13; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 23:15-24:14 |
| 41. | Puga behaved erratically and was agitated, asking to call his sister and his mom. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 54:25-55:7 |
| 42. | Puga wanted to have a cigarette. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 30:4-9 |
| 43. | Puga was yelling and cursing. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 30:4-9 |
| 44. | Puga was throwing miscellaneous items out of his vehicle window. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 54:25-55:7 |
| 45. | Puga was seen twisting and turning his body while he was in his vehicle. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 16:17-17:13 |
| 46. | Puga was reaching around in the | Clarke Decl. ¶ 9, Ex. T – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | vehicle | Adams Depo. 16:17-17:13 |
|---|---|---|---|
| | 47. | Puga was leaning over in his car. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 16:17-17:13 |
| | 48. | After approximately 50 minutes of Puga refusing to exit the vehicle, Puga's rear windshield was broken. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 27:25-28:2, 28:16-24; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 43:2-10; Clarke Decl. ¶ 11, Ex. V – Kee Depo. 20:22-25; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 28:22-24; Adams Decl. ¶ 8, Ex. L – Kee MVARs Pt. 1 at 38:48-1:4 and Kee MVARs Pt. 2 1:4-1:28 |
| | 49. | Puga's window was broken to deploy less lethal through it. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 27:25-28:2, 28:16-24, Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 42:20-43:1; Clarke Decl. ¶ 11, Ex. V – Kee Depo. 20:22-25; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 28:22-24 |
| | 50. | Because Puga would not exit the vehicle despite commands, Vaccari deployed pepper balls into the vehicle. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 27:25-28:4; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 42:20-43:1; Clarke Decl. ¶ 11, Ex. V – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | | Kee Depo. 22:1-6; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 14:22-16:2; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 27:1-9, 30:10-12 |
|---|---|---|---|
| 51. | | The pepper balls were used to make the vehicle's environment uncomfortable and force Puga to exit the vehicle | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 29:14-17; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 19:10-13; Clarke Decl. ¶ 11, Ex. V – Kee Depo. 20:18-21; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 14:22-16:2, 18:10-19:4; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 27:16-23 |
| 52. | | The effects of pepper balls on a person include runny nose. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 27:19-28:4 |
| 53. | | The effects of pepper balls on a person include coughing. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 18:10-18 |
| 54. | | The effects of pepper balls on a person include impaired eyesight. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 27:19-28:4 |
| 55. | | The effects of pepper balls on a person include an urge to get away from the pepper balls. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 27:19-28:4 |
| 56. | | Vaccari was positioned to the rear of Puga's vehicle along the passenger side of one of the CHP units. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 30:13-16 |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| 57. | Vaccari was in a position of cover behind an open door, when he deployed the pepper balls. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 30:17-21 |
|---|---|---|
| 58. | Kee was talking with Puga to attempt to get him out of the vehicle, however. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 30:25-31:18 |
| 59. | When Puga did not respond to Kee's attempt to get him out of the vehicle, Vaccari deployed pepper balls to attempt to get Puga to evacuate the vehicle. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 30:25-31:18 |
| 60. | During this period of over an hour, Puga would say he would come out of the vehicle but then would not exit. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 31:22-32:7 |
| 61. | Several times Puga opened the door and the officers would wait for Puga to come out. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 31:22-32:7; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 16:17-17:13 |
| 62. | Instead of Puga coming out though, he would stay in his vehicle and close the door. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 31:22-32:7; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 16:17-17:13 |
| 63. | As a result, more pepper balls were deployed. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 31:22-32:7; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 16:17-17:13 |
| 64. | Vaccari estimated he deployed | Clarke Decl. ¶ 10, Ex. U – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | between 120-150 pepper balls. | Vaccari Depo. 31:19-21 |
|---|---|---|---|
| 65. | | Kee estimated Vaccari deployed probably 100, at least 90 pepper balls. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 22:7-13 |
| 66. | | Blackwood estimated Vaccari deployed 100-150 pepper balls. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 58:19-59:7 |
| 67. | | Adams estimated Vaccari deployed approximately 75-100 pepper balls. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 15:21-16:2 |
| 68. | | The pepper balls were deployed in the span of 26 minutes. | Clarke Decl. ¶ 18, Ex. L – Kee MVARS Pt. 2 2:05-28:48 |
| 69. | | Sergeant Vaccari would deploy approximately a round of pepper balls. | Clarke Decl. ¶ 18, Ex. L – Kee MVARS Pt. 2 Part 2 2:05-28:48 |
| 70. | | Then Vaccari would give Puga time to comply before deploying more rounds. | Clarke Decl. ¶ 18, Ex. L – Kee MVARS Pt. 2; Kee MVARS Part 2 2:05-28:48 |
| 71. | | During this entire time, Vaccari gave commands to Puga to exit the car or more rounds would be fired. | Clarke Decl. ¶ 18, Ex. L – Kee MVARS Pt. 2 2:05-28:48 |
| 72. | | While the pepper balls were being deployed, Adams was behind Puga's vehicle, next to a CHP vehicle that was facing northbound behind Puga's vehicle | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 16:8-13 |
| 73. | | Adams was behind an open passenger side door of the CHP vehicle for cover. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 16:14-16 |
| 74. | | Puga made a statement indicating he | Clarke Decl. ¶ 13, Ex. X – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | | |
|---|---|---|---|
| | | was hurt by one of the pepper balls, or it was causing him pain. | Blackwood Depo. 15:3-6; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 32:14-18; Clarke Decl. ¶ 11, Ex. V – Kee Depo. 23:2-10 |
| | 75. | Puga's statement he was hurt by a pepper ball caused Vaccari to stop deploying pepper balls. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 32:19-24 |
| | 76. | Puga eventually exited the vehicle. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 36:15-17; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 33:10-12 |
| | 77. | Puga exited the vehicle through his vehicle's driver's side door. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 37:16-18 |
| | 78. | Puga did not have a shirt on. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 10:24-11:1; Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 51:20-21; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 16:3-4 |
| | 79. | Puga had baggy jeans. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 11:4-11 |
| | 80. | Puga was next to his driver's side door for approximately two minutes before moving to the front of his vehicle. | Clarke Decl. ¶ 18, Ex. L – Kee MVARs Pt. 2 at 40:41-42:08; Adams Decl. ¶ 9, Ex. L – Kee MVARs Pt. 2 at 40:41-42:08 |
| | 81. | Throughout this time period while | Clarke ¶ 13, Ex. X – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | Puga was at the driver's side, Puga put his hands up several times but then would put his hands down. | Blackwood 15:10-12; Clarke ¶ 10, Ex. U – Vaccari Depo. 34:7-9; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 21:2-16 |
|---|---|---|---|
| 82. | | While Puga was at the driver's side, Puga was given commands to keep his hands up. | Clarke Decl. ¶ 17, Ex. K – Blackwood MVARS Fragment 04 at 36:56 |
| 83. | | When Puga was at the driver's side, Puga was given commands to walk back towards the officers. | Clarke Decl. ¶ 17, Ex. K – Blackwood MVARS at 36:54, 37:31; Clarke Decl. ¶ 18, Ex. L – Kee MVARS Pt 2 41:14-41:52 |
| 84. | | Puga would not keep his hands up for an extended period of time. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 15:10-12; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 34:7-9; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 21:2-16 |
| 85. | | Rubalcava was behind his driver's side door under cover when Puga exited the vehicle. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 37:21-22 |
| 86. | | Adams was close to a CHP vehicle with cover when Puga exited the vehicle. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 20:6-14 |
| 87. | | Vaccari was behind the trunk of the CHP vehicle behind Puga's car. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 33:16-34:1 |
| 88. | | Puga was given multiple commands | Clarke Decl. ¶ 9, Ex. T – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | while he was next to his driver's side that he ignored. | Adams Depo. 21:10-12, 32:18-25 |
| 89. | The multiple commands included getting on the ground and keeping his hands raised. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 21:10-12, 32:18-25 |
| 90. | Rubalcava did not see Puga had a firearm while he was on the driver's side of his vehicle. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 38:5-16, 77:8-10 |
| 91. | Kee did not see Puga had a firearm while he was on the driver's side of his vehicle. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 24:4-17 |
| 92. | Blackwood did not see Puga had a firearm while he was on the driver's side of his vehicle. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 33:25-34:6 |
| 93. | Adams did not see Puga had a firearm while he was on the driver's side of his vehicle. | Clarke Decl. ¶ 9, Ex. T – Adams Depo 21:22-24 |
| 94. | Vaccari did not know whether Puga had a firearm on him when he exited the driver's side. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 33:13-34:6 |
| 95. | After a few minutes of being on the driver's side of his vehicle, Puga ran to the front of his vehicle in front of his vehicle's hood. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 39:18-23; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 22:13-15; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo.15:13-15; Clarke Decl. ¶ 10, Ex. U – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | Vaccari Depo. 35:8-10 |
|---|---|---|
| 96. | Puga faced south towards his own vehicle. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 43:21-24: Clarke Decl. ¶ 9, Ex. T – Adams Depo. 40:16-22; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 13:7-10 |
| 97. | Puga was near the middle of the hood but slightly closer to the driver's side. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 43:21-24: Clarke Decl. ¶ 9, Ex. T – Adams Depo. 40:16-22; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 13:7-10 |
| 98. | The front of Puga's vehicle was blocking the view of Puga's midsection down to his feet. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 41:2-9; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 63:23-64:3 |
| 99. | Kee gave Puga commands to keep his hands where they could see them. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 59:23-60:3 |
| 100. | The officers were unable to get Puga to comply and surrender. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 53:12-17 |
| 101. | The officers and deputies were unable to see Puga's waistband where Puga was positioned. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 53:12-17 |
| 102. | Puga had been at the front of his vehicle for several minutes before law enforcement approached. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 42:18-21; Clarke Decl. ¶ 10, Ex. U – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | Vaccari Depo. 46:2-6 |
|---|---|---|
| 103. | A helicopter was initially present and using its spotlights throughout the pursuit | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 37:6-7; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 12:3-13 |
| 104. | By the time the officers approached and the shooting began, the helicopter was not present. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 46:20-23; Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 87:19-23 |
| 105. | It was dark where Puga was standing. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 11:20-21; Clarke Decl. ¶ 11, Ex. V – Kee Depo. 46:20-23 |
| 106. | Kee and Rubalcava were to the left of the patrol vehicle to the southwest dirt area. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 18:11-21 |
| 107. | Kee and Rubalcava were approaching to the left-front corner of Puga's vehicle on the west side. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 41:5-7; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 37:5-11 |
| 108. | While they were approaching, Kee told Puga to put his hands up to where they can see them. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 42:2-6 |
| 109. | Commands were consistently given for Puga to keep his hands up. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 32:5-10 |
| 110. | Adams and Vaccari approached by crossing between Puga's and CHP's | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 29:7-14 |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | vehicles. | |
|---|---|---|---|
| 1 | 111. | Adams and Vaccari moved eastward to gain a better view of Puga. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 29:7-14 |
| 2 | 112. | Adams and Vaccari approached on the passenger side of Puga's vehicle. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 26:17-20; Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 18:11-21; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 46:2-6 |
| 3 | 113. | Adams was in front of Vaccari. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 27:8-14 |
| 4 | 114. | Adams had his Glock 17, 9mm drawn. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 31:24-32:4 |
| 5 | 115. | The CHP officers were approaching Puga at a similar pace, just on the other side of Puga's vehicle. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 27:15-21 |
| 6 | 116. | There was no discussion between CHP and the Sheriff's Department about how to approach Puga when he was in front of his vehicle. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 28:3-19; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 36:16-25 |
| 7 | 117. | CHP discussed amongst themselves that Rubalcava and Kee would approach Puga and handcuff him. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 30:13-18 |
| 8 | 118. | Adams and Vaccari formulated a plan to move to the east side of Puga's vehicle when they could no longer see Puga's hands when he was at the | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 25:12-22; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 39:6-20 |

**17**

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | front of his vehicle. | |
|---|---|---|---|
| | 119. | The extent of Adams' and Vaccari's plan was to merely gain a better view of Puga. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 25:12-22; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 39:6-20 |
| | 120. | Adams and Vaccari used Puga's vehicle passenger side as cover. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 40:21-25 |
| | 121. | Adams and Vaccari determined that upon approach, Vaccari would arm himself with the less lethal launcher. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 40:1-16; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 25:23-26:4 |
| | 122. | Vaccari was armed with the less lethal launcher to have a less lethal option available. | Clarke Decl. ¶ 10, Ex. U – Vaccari 40:1-16; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 25:23-26:4 |
| | 123. | Adams and Vaccari determined that upon approach, Adams would be armed with his firearm. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 31:18-32:2 |
| | 124. | Adams was armed with the firearm in the event deadly force was needed. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 31:24-32:4 |
| | 125. | As Adams and Vaccari approached on the passenger side, Puga's hands were overhead. | Jason Decl. ¶¶ 14-15, Ex. D and E; Adams Decl. ¶ 6, Ex. J – Mangerino Video |
| | 126. | Vaccari remained with his 40mm less-lethal shotgun targeting Puga. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 50:25-51:10 |
| | 127. | As Adams and Vaccari approached, Adams saw Puga's arms lower from | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 44:6-8; |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | | |
|---|---|---|---|
| | | overhead to his waistband. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 64:4-7; Clarke Decl. ¶ 9, Ex. T – Adams 36:2-11; Jason Decl. ¶ 14 – Ex. D, ¶ 16 – Ex. F, ¶ 19 – Ex. I |
| | 128. | As the officers were approaching, Puga lowered his hands. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 44:6-8; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 64:4-7; Jason Decl. ¶ 14 – Ex. D, ¶ 16 – Ex. F, ¶ 19 – Ex. I |
| | 129. | Adams and Vaccari were on the passenger side of Puga's vehicle on the dirt shoulder when they first heard shots. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 41:1-13 |
| | 130. | Adams saw Puga's hands dive into his waistband area and withdraw a gun. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 36:2-11; Jason Decl. ¶ 16 – Ex. F, ¶ 17 – Ex. G, ¶ 19 – Ex. I |
| | 131. | Adams heard shots from what he believed was the firearm Puga had drawn. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 46:23-47:4; 49:2-10 |
| | 132. | Adams believed the shots he heard were from Puga firing at him from the gun that he had drawn. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 46:23-47:4; 47:10-14; 49:2-10 |
| | 133. | Adams fired upon Puga. | Clarke Decl. ¶ 9, Ex. T – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

|  |  | Adams Depo. 36:2-11 |
|---|---|---|
| 134. | Vaccari was slightly behind Adams. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 27:4-11 |
| 135. | Vaccari had the same view of Puga as Adams. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 27:12-14; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 41:1-8 |
| 136. | Vaccari observed Puga pull a firearm. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 64:4-12 |
| 137. | Vaccari heard gunshots. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 40:21-41:5 |
| 138. | Vaccari did not fire his firearm. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 42:17-21, 50:22-51:10 |
| 139. | Vaccari was unsure if the less lethal made contact with Puga. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 52:1-6 |
| 140. | Within seconds of the first shot being fired, Puga turned to run in a northwest direction. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 21:16-20; Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 48:13-18, 51:3-6; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 42:7-9; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 50:11-14 |
| 141. | Puga had a gun when he was running. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 83:10-19; Clarke Decl. ¶ 11, Ex. V – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | |
|---|---|---|
| | | Kee Depo. 65:25-66:4; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 38:8-11; Jason Decl. ¶ 17 – Ex. G, ¶ 18 – Ex. H |
| 142. | Puga did not drop his while he ran. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 83:10-19, 85:13-16; Clarke Decl. ¶ 11, Ex. V – Kee Depo. 65:25-67:4; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 38:8-11; Jason Decl. ¶ 17 – Ex. G, ¶ 18 – Ex. H |
| 143. | Puga did not make any gestures that he was surrendering. | Clarke Decl. ¶ 12, Ex. W – Rubalcava 85:17-19 |
| 144. | While Puga was running, he turned back towards the officers with his firearm in his hand. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 38:8-11 |
| 145. | Puga fell down in the dirt shoulder, chest-down. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 38:11-24; Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 57:6-8; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 43:11-13, 54:1-2 |
| 146. | Once Puga was no longer a threat, Adams ceased firing his weapon. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 51:25-52:4 |
| 147. | Because Puga had a gun in his hands | Clarke Decl. ¶ 12, Ex. W – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | | |
|---|---|---|---|
| | | and he was running towards a residential area where he could hold people hostage after he was involved in the shooting, he was considered a threat. | Rubalcava Depo. 86:23-87:8 |
| 148. | | Puga running still armed was able to turn around and fire within less than one half second. | Clarke Decl. ¶ 16, Ex. AA – Jason Rebuttal Report pgs. 2-3 |
| 149. | | Puga running still armed could point the handgun over his shoulder and fired backwards. | Clarke Decl. ¶ 16, Ex. AA – Jason Rebuttal Report pgs. 2-3 |
| 150. | | Puga running still armed could point the handgun around his torso and fire backwards. | Clarke Decl. ¶ 16, Ex. AA – Jason Rebuttal Report pgs. 2-3 |
| 151. | | Puga was still breathing when the officers approached. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 57:6-8; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 55:23-56:9; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 54:6-9 |
| 152. | | The officers still did not see where Puga's gun went because he did not drop it while he was running. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 86:2-4; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 52:18-22; Clarke Decl. ¶ 11, Ex. V – Kee Depo. 85:1-4 |
| 153. | | Puga had fallen on his hands in a | Clarke Decl. ¶ 9, Ex. T – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | prone position. | Adams Depo. 56:12-21 |
|---|---|---|---|
| 154. | | Officers continued to give verbal commands to Puga to gain compliance. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 56:12-21 |
| 155. | | Vaccari deployed the taser twice in case there was another element of force or a threat posed by Puga. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 56:22-57:15 |
| 156. | | The taser made Puga's body lock twice, indicative the taser was having an effect on Puga. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 57:23-58:10; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 55:1-17, 56:20-22 |
| 157. | | Puga was then handcuffed by Rubalcava. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 58:6-7, Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 26:15-18; Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 56:23-25; Clarke Decl. ¶ 9, Ex. T – Adams Depo. 58:20-23 |
| 158. | | Puga was then rolled over. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 58:8-9 |
| 159. | | Puga's firearm was found under Puga. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 89:22-90:1 |
| 160. | | Puga's firearm had a shiny slide on the top of it. | Clarke Decl. ¶ 11, Ex. V – Kee Depo. 89:22-90:1, Jason Decl. ¶ 18, Ex. H |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| 161. | The gun was tucked under his stomach. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 86:10-16 |
| 162. | His arms were underneath him. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 47:9-13 |
| 163. | The pistol that was found underneath Puga was a PMF (Personally Manufactured Firearm) or "ghost gun." | Haag ¶¶ 19-20; Clarke Decl. ¶ 11, Ex. V – Kee Depo. 89:22-90:1 |
| 164. | The pistol next to Puga had a partially removed magazine. | Haag Decl. ¶ 20 |
| 165. | A fired 9m cartridge was found next to the pistol. | Haag ¶ 19 |
| 166. | The autopsy of Puga revealed he had 10 gunshot wounds. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 21:19-20 |
| 167. | Puga's cause of death was identified as being the gunshot wound to the mid-left back. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 7:1-5; 9:2-11:14 |
| 168. | The bullet that caused the death entered through the mid-left back | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 9:2-4 |
| 169. | The bullet travelled through skin and soft tissue, ultimately getting lodged in soft tissue of the left upper chest. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 9:22-10:6 |
| 170. | The bullet then travelled through the rib cage. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 9:22-10:6 |
| 171. | The bullet then travelled pierced the left lung. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 9:22-10:6 |
| 172. | The bullet then travelled through the | Clarke Decl. ¶ 14, Ex. Y – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | front part of the rib cage. | Jong Depo. 9:22-10:6 |
|---|---|---|---|
| 173. | | The bullet ultimately got lodged in soft tissue of the left upper chest. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 9:22-10:6 |
| 174. | | This bullet travelled back to front, angled left to right, and upward. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 10:25-11:2 |
| 175. | | This mid-back bullet was fatal. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 11:13-14 |
| 176. | | The mid-back bullet was fatal because it went through the lung and created a defect wherein air could not move into the chest cavity. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 11:13-21, 21:23-24:3 |
| 177. | | Additionally, when the bullet hit the lung, blood went into the chest cavity which compressed the lung and created difficulty for the body to oxygenate blood. | Clarke Decl. ¶ 14, Ex. Y – Jong Depo. 11:13-21, 21:23-24:3 |
| 178. | | The bullet identified by the coroner as being the fatal shot was removed from the chest cavity. | Haag ¶ 14 |
| 179. | | The removed bullet from the fatal shot was a fully expanded 5.56 mm (.223 caliber) rifle bullet. | Haag ¶ 14 |
| 180. | | Only Sergeant Kee and Officer Blackwood were armed with firearms that deployed .223 caliber rifle bullets. | Haag ¶ 11 |
| 181. | | Because only Kee and Blackwood had | Haag ¶ 14 |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | |
|---|---|---|
| | .223 caliber rifle bullets, the fatal wound that caused Puga's death was fired by either Kee or Blackwood. | |
| 182. | Deputy Adams is therefore excluded as having caused the fatal injury. | Haag ¶ 15 |
| 183. | Deputy Adams firearm used 9mm ammunition. | Clarke Decl. ¶ 9, Ex. T – Adams Depo. 31:18-32:2; Haag Decl. ¶ 11 |
| 184. | Only two 9mm bullets were recovered from Puga during the autopsy. | Haag ¶ 16 |
| 185. | The 9mm bullets were associated with gunshot wounds to the right flank and left thigh. | Haag ¶ 16 |
| 186. | The wounds to the right flank and left thigh were identified as non-fatal per the coroner. | Haag ¶ 16 |
| 187. | These bullets both ricocheted before striking Puga. | Haag ¶ 17 |
| 188. | Because of the general upward flight path of ricocheted bullets and general wound path, these wounds were sustained prior to Puga falling to the ground. | Haag ¶ 18 |
| 189. | Maria Cadena is the mother to minor L.C. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo 11:23-12:20 |
| 190. | Cadena testified that Cadena and | Clarke Decl. ¶ 15, Ex. Z – |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | Hector Puga were not in a relationship by the time Plaintiff L.C. was born. | Cadena Depo. 12:21-13:2, 25:17-19 |
|---|---|---|---|
| 191. | | L.C. was born in 2013. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 12:19-20 |
| 192. | | Puga was not listed as the father on L.C.'s birth certificate. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 34:16-21 |
| 193. | | Puga was not listed on L.C.'s birth certificate because Puga did not want to be responsible for L.C. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 34:19-35:1 |
| 194. | | Puga did not have an issue with another person being listed on the certificate as the father. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 34:19-35:1, 37:24-38:2 |
| 195. | | Cadena never let Puga see Plaintiff L.C. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 26:6-10 |
| 196. | | Cadena did not get along with Puga | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 27:14-17 |
| 197. | | She was concerned about his drinking if he were to be around L.C. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 27:21-23 |
| 198. | | Cadena was also concerned about his verbally abusive behavior. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 35:16-23 |
| 199. | | Throughout L.C.'s life up to the incident, Puga only spoke to L.C. about 3 times. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 28:21-24 |
| 200. | | L.C. never received anything from Puga. | Clarke Decl. ¶ 15, Ex. Z – Cadena Depo. 38:13-16 |
| 201. | | There were no plans for L.C. to see Puga in the future prior to Puga dying. | Clarke Decl. ¶ 15, Ex. Z – Cardena Depo. 29:6-8 |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| 202. | The Estate of Hector Javier Puga submitted his tort claim to the County of San Bernardino on November 23, 2021. | Clarke Decl. ¶ 4, Ex. O – Estate of Puga Tort Claim |
| 203. | Antonia Salas Ubaldo submitted her tort claim to the County of San Bernardino on November 23, 2021. | Clarke Decl. ¶ 5, Ex. P – Ubaldo Tort Claim |
| 204. | I.H. submitted the tort claim to the County of San Bernardino on November 23, 2021. | Clarke Decl. ¶ 6, Ex. Q – I.H. Tort Claim |
| 205. | A.L. submitted the tort claim to the County of San Bernardino on November 23, 2021. | Clarke Decl. ¶ 7, Ex. R – A.L. Tort Claim |
| 206. | L.C. submitted the tort claim to the County of San Bernardino on November 23, 2021. | Clarke Decl. ¶ 8, Ex. S – L.C. Tort Claim |
| 207. | The tort claim from the Estate of Hector Javier Puga alleges on "February 17, 2021, at approximately 1:42 a.m., California Highway Patrol officers and County of San Bernardino sheriff's deputies encountered Mr. Puga on a street in Hesperia, California.  In a populated, residential area, officers and deputies fired approximately 31 shots at Mr. Puga, thereby using excessive force | Clarke Decl. ¶ 4, Ex. O – Estate of Puga Tort Claim |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | | |
|---|---|---|---|
| | | against him.  The shots struck three innocent bystanders and fatally wounded Mr. Puga.  At the time of the shooting and other undiscovered uses of force, Mr. Puga did not pose an immediate threat of death or serious bodily injury to any person.  After the shooting, the involved officers and deputies failed to timely summon medical attention for or provide medical aid to Mr. Puga, thereby further contributing to the injuries and death.  As a result of the shooting and other uses of force, Mr. Puga endured severe pain and suffering, and lost his life and earning capacity.  At all relevant times, the involved officers and deputies were acting under color of state law and in the course and scope of their employment with the State of California and County of San Bernardino, respectively." | |
| 208. | | The tort claim from Antonia Salas Ubaldo alleges on "February 17, 2021, at approximately 1:42 a.m., California Highway Patrol officers | Clarke Decl. ¶ 5, Ex. P – Ubaldo Tort Claim |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

1    and County of San Bernardino

2    sheriff's deputies encountered Mr.

3    Puga on a street in Hesperia,

4    California.  In a populated, residential

5    area, officers and deputies fired

6    approximately 31 shots at Mr. Puga,

7    thereby using excessive force against

8    him.  The shots struck three innocent

9    bystanders and fatally wounded Mr.

10   Puga.  At the time of the shooting and

11   other undiscovered uses of force, Mr.

12   Puga did not pose an immediate threat

13   of death or serious bodily injury to

14   any person.  After the shooting, the

15   involved officers and deputies failed

16   to timely summon medical attention

17   for or provide medical aid to Mr.

18   Puga, thereby further contributing to

19   the injuries and death.  As a result of

20   the shooting and other uses of force,

21   Mr. Puga endured severe pain and

22   suffering, and lost his life and earning

23   capacity.  At all relevant times, the

24   involved officers and deputies were

25   acting under color of state law and in

26   the course and scope of their

27   employment with the State of

28

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | California and County of San Bernardino, respectively." | |
|---|---|---|---|
| | 209. | The tort claim from I.H. alleges on "February 17, 2021, at approximately 1:42 a.m., California Highway Patrol officers and County of San Bernardino sheriff's deputies encountered Mr. Puga on a street in Hesperia, California. In a populated, residential area, officers and deputies fired approximately 31 shots at Mr. Puga, thereby using excessive force against him. The shots struck three innocent bystanders and fatally wounded Mr. Puga. At the time of the shooting and other undiscovered uses of force, Mr. Puga did not pose an immediate threat of death or serious bodily injury to any person. After the shooting, the involved officers and deputies failed to timely summon medical attention for or provide medical aid to Mr. Puga, thereby further contributing to the injuries and death. As a result of the shooting and other uses of force, Mr. Puga endured severe pain and | Clarke Decl. ¶ 6, Ex. Q – I.H. Tort Claim |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | | |
|---|---|---|---|
| | | suffering, and lost his life and earning capacity. At all relevant times, the involved officers and deputies were acting under color of state law and in the course and scope of their employment with the State of California and County of San Bernardino, respectively." | |
| | 210. | The tort claim from A.L. alleges on "February 17, 2021, at approximately 1:42 a.m., California Highway Patrol officers and County of San Bernardino sheriff's deputies encountered Mr. Puga on a street in Hesperia, California. In a populated, residential area, officers and deputies fired approximately 31 shots at Mr. Puga, thereby using excessive force against him. The shots struck three innocent bystanders and fatally wounded Mr. Puga. At the time of the shooting and other undiscovered uses of force, Mr. Puga did not pose an immediate threat of death or serious bodily injury to any person. After the shooting, the involved officers and deputies failed to timely | Clarke Decl. ¶ 7, Ex. R – A.L. Tort Claim |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | summon medical attention for or provide medical aid to Mr. Puga, thereby further contributing to the injuries and death.  As a result of the shooting and other uses of force, Mr. Puga endured severe pain and suffering, and lost his life and earning capacity.  At all relevant times, the involved officers and deputies were acting under color of state law and in the course and scope of their employment with the State of California and County of San Bernardino, respectively." | |
| 211. | | The tort claim from L.C. alleges on "February 17, 2021, at approximately 1:42 a.m., California Highway Patrol officers and County of San Bernardino sheriff's deputies encountered Mr. Puga on a street in Hesperia, California.  In a populated, residential area, officers and deputies fired approximately 31 shots at Mr. Puga, thereby using excessive force against him.  The shots struck three innocent bystanders and fatally wounded Mr. Puga.  At the time of | Clarke Decl. ¶ 8, Ex. S – L.C. Tort Claim |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | | |
|---|---|---|---|
| | | the shooting and other undiscovered uses of force, Mr. Puga did not pose an immediate threat of death or serious bodily injury to any person. After the shooting, the involved officers and deputies failed to timely summon medical attention for or provide medical aid to Mr. Puga, thereby further contributing to the injuries and death.  As a result of the shooting and other uses of force, Mr. Puga endured severe pain and suffering, and lost his life and earning capacity.  At all relevant times, the involved officers and deputies were acting under color of state law and in the course and scope of their employment with the State of California and County of San Bernardino, respectively." | |
| | 212. | Pepper balls are not mentioned in any of the tort claims. | *See* Clarke Decl. ¶ 4, Ex. O – Estate of Puga Tort Claim; Clarke Decl. ¶ 5, Ex. P – Ubaldo Tort Claim; Clarke Decl. ¶ 6, Ex. Q – I.H. Tort Claim; Clarke Decl. ¶ 7, Ex. R – A.L. Tort Claim; Clarke |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | |
|---|---|---|
| | | Decl. ¶ 8, Ex. S – L.C. Tort Claim |
| 213. | Tasers are not mentioned in any of the tort claims. | *See* Clarke Decl. ¶ 4, Ex. O – Estate of Puga Tort Claim; Clarke Decl. ¶ 5, Ex. P – Ubaldo Tort Claim; Clarke Decl. ¶ 6, Ex. Q – I.H. Tort Claim; Clarke Decl. ¶ 7, Ex. R – A.L. Tort Claim; Clarke Decl. ¶ 8, Ex. S – L.C. Tort Claim |
| 214. | Neighbor Tammy Goodson saw Puga withdraw a gun from his waistband. | Clarke ¶ 19, Ex. BB – Goodson Depo. 26:10-17 |
| 215. | Neighbor Edward Mengerino testified he saw smoke coming from Puga's hand giving him the impression Puga had a gun. | Clarke ¶ 20, Ex. CC – Edward Mangerino Depo. 35:2-36:3 |
| 216. | Sergeant Kee saw Puga withdraw the firearm. | Clarke Decl. ¶ 11, Ex. V Kee Depo. 82:14-24; |
| 217. | Sergeant Vaccari saw Puga withdraw the firearm. | Clarke Decl. ¶ 10, Ex. U – Vaccari Depo. 64:4-12 |
| 218. | Officer Rubalcava saw Puga withdraw a firearm. | Clarke Decl. ¶ 12, Ex. W – Rubalcava Depo. 79:11-13 |
| 219. | Officer Blackwood saw Puga had a firearm in his hand. | Clarke Decl. ¶ 13, Ex. X – Blackwood Depo. 53:14-16 |
| 220. | Plaintiffs never set forth any claims about the use of pepper balls and/or | Clarke Decl. ¶ 2, Ex. M - TAC |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| | | | |
|---|---|---|---|
| | | tasers nor did they set forth that any pre-shooting tactics were the basis of their claims. | |
| | 221. | Plaintiffs state in ¶ 47 of the TAC "On information and belief, DECEDENT did not pose an immediate threat of serious bodily injury or death to anyone at the time of the shooting. OFFICER DEFENDANTS and DEPUTY DEFENDANTS were not faced with an immediate or imminent defense of life situation and had less than lethal alternatives available to subdue DECEDENT and to take DECEDENT into custody." | Clarke ¶ 2, Ex. M – TAC (Dkt. 68) |
| | 222. | Plaintiffs state in ¶ 106 of the TAC "Police officers, including Defendants, have a duty to use reasonable care to prevent harm or injury to others. This duty includes using appropriate tactics, giving appropriate commands, giving warnings, and not using any force unless necessary, using less than lethal options, and only using deadly force as a last resort." | Clarke ¶ 2, Ex. M – TAC (Dkt. 68) |

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

| 223. | The TAC sets forth that deputies should have utilized less lethal alternatives to take Puga into custody. | Clarke ¶ 2, Ex. M – TAC ¶¶ 47, 106 (Dkt. 68). |
|---|---|---|

# CONCLUSIONS OF LAW

## I.  EXCESSIVE FORCE

In general, all claims of excessive force, whether deadly or not, should be analyzed under the objective reasonableness standard of the Fourth Amendment as set forth in *Lombardo v. City of St. Louis*, 594 U.S. 464, 467 (2021), *County of Los Angeles v. Mendez*, 581 U.S. 420, 428 (2017), *Scott v. Harris*, 550 U.S. 372, 381-85 (2007), *Graham v. Connor*, 490 U.S. 386, 397 (1989), and *Tennessee v. Garner*, 471 U.S. 1, 7-12 (1985).  The objective reasonableness of such conduct is assessed by balancing the nature and quality of the intrusion on Fourth Amendment rights against the government's countervailing interest in the force used.  *Estate of Aguirre v. County of Riverside*, 29 F.4th 624, 628 (9th Cir. 2022) quoting *Graham*, 490 U.S. at 396; *see Mendez*, 581 U.S. at 427 ("[D]etermining whether the force used to effect a particular seizure is reasonable requires balancing of the individual's Fourth Amendment interests against the relevant government interests." (internal quotation marks omitted) (quoting *Graham*, 490 U.S. at 396)).

In assessing "whether an officer's actions were objectively reasonable, we consider: '(1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion.'" *Williamson v. City of Nat'l City*, 23 F.4th 1146, 1151 (9th Cir. 2022) (quoting *Rice v. Morehouse*, 989 F.3d 1112, 1121 (9th Cir. 2021)). "Our analysis must make 'allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is

necessary in a particular situation.'" *Williamson*, 23 F.4th at 1151.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396; *see Kingsley v. Hendrickson*, 576 U.S. 389, 397 (2015) ("A court must make this determination from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight."); *see also Demarest v. City of Vallejo*, 44 F.4th 1209, 1226 (9th Cir. 2022) ("[A]n 'officer's use of force cannot be deemed excessive based on facts that he [or she] reasonably would not have known or anticipated.'").  Further, the "analysis is not static, and the reasonableness of force may change as the circumstances evolve." *Hyde v. City of Willcox*, 23 F.4th 863, 870 (9th Cir. 2022); *see also Andrews v. City of Henderson*, 35 F.4th 710, 715 (9th Cir. 2022) ("The detectives' interest in using significant force against Andrews is undermined by their knowledge that he was unarmed; his lack of any aggressive, threatening, or evasive behavior; and the detectives' failure to provide any prior warning or consider less intrusive alternatives before forcibly tackling him to the ground.").  An officer's subjective intent or motivation is not relevant to the reasonableness inquiry.  *See Graham*, 490 U.S. at 397; *Shafer v. County of Santa Barbara*, 868 F.3d 1110, 1116 (9th Cir. 2017).

In assessing the governmental interest in the use of force, the jury should consider the three non-exclusive factors set forth by the Supreme Court in *Graham v. Connor*.  *See Williamson*, 23 F.4th at 1153.  The three *Graham* factors are: (1) the severity of the crime at issue; (2) whether the individual posed an immediate threat to the safety of the officers or others; and (3) whether the individual was actively resisting arrest or attempting to evade arrest by flight.  *Graham*, 490 U.S. at 396; *Seidner v. de Vries*, 39 F.4th 591, 599 (9th Cir. 2022); *see also Estate of Aguirre*, 29 F.4th at 628 (describing the second *Graham* factor as "the level of immediate

COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION

threat [the individual] posed to the officer or others"). The Ninth Circuit has repeatedly emphasized that "the most important *Graham* factor" is whether the individual posed an immediate threat to the safety of the officers or others. *Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 692 (9th Cir. 2023) (characterizing the threat to the officer as "minimal and quickly mitigated" when officer was standing momentarily behind an operational vehicle); *see, e.g.*, *Mattos v. Agarano*, 661 F.3d 433, 441 (9th Cir. 2011) (en banc). The importance of this second *Graham* factor was highlighted by the Ninth Circuit when it held that the immediacy of the threat of a person pointing a replica gun at officers outweighed the bulk of *Graham* factors favoring the person fatally shot. *Estate of Strickland v. Nevada County*, 69 F.4th 614, 621-22 (9th Cir. 2023) (distinguishing the case from other replica/toy gun cases on the basis that in those cases the persons holding the toy/replica guns did not point it at officers and the courts' analysis did not hinge on the misidentification of the gun).

Peace officers may reasonably use deadly force whenever they have "probable cause to believe that [a] suspect poses a threat of serious physical harm, either to the officer or to others." *Tennessee v. Garner*, 471 U.S. 1, 11 (1985). The Ninth Circuit has emphasized that, as a matter of common sense, an armed suspect represents the paradigm threat to officer safety. *See*, *Smith v. City of Hemet*, 394 F.3d 689, 704 (9th Cir. 2005) (en banc) ("[W]here a suspect threatens an officer with a weapon…, the officer is justified in using deadly force."); *see also*, *Watkins v. City of San Jose*, 2017 WL 1739159, at *8 (C.D. Cal 2017) (citing *Smith v. City of Hemet* with approval). Indeed, "where the totality of the circumstances could cause a reasonable police officer to conclude ***that a suspect is reaching for a gun***, the officer's use of deadly force in self-defense is justified." *Baldridge v. City of Santa Rosa*, 1999 WL 66141, at *7 (N.D. Cal.1999); *see*, *Reynolds v. County of San Diego*, 858 F.Supp. 1064, 1072 (S.D. Cal.1994) (citing cases that "support the general principle that an officer may reasonably use deadly force when he or she confronts an armed suspect in close

1  proximity whose actions indicate an intent to attack."), remanded on other grounds,

2  84 F .3d 1162 (9th Cir. 1996); *accord Wilkinson v. Torres*, 610 F.3d 546, 553 (9th

3  Cir. 2010) ("'the Fourth Amendment does not require omniscience,' and absolute

4  certainty of harm need not precede an act of self-protection.") (citation omitted).

5      Consistent with these principles, courts have repeatedly held that an actionable

6  threat justifying the use of deadly force when a suspect even appears to reach for a

7  potential gun. *See*, *Estate of Moppin-Buckskin v. City of Oakland*, 2010 WL 147976,

8  at *4 (N.D. Cal. 2010) ("The officers shot Mr. Moppin only after he failed to come

9  toward them, as ordered, dropped his hands and then made a movement toward his

10  waist area as though reaching for a weapon.  All three officers who could see Mr.

11  Moppin unequivocally thought that he was reaching for a gun and feared for their

12  safety.  Therefore, in this case, the test for objective reasonableness is met."); *Foster*

13  *v. City of Fresno*, 392 F.Supp.2d 1140, 1157 (E.D. Cal. 2005) (where suspect "moved

14  his arm down toward his waistband area…a reasonable officer in Officer Cornelison's

15  position would have believed that [the suspect] posed an immediate threat of serious

16  harm.   Officer Cornelison's application of deadly force was thus objectively

17  reasonable.").

18      Case law is clear that when Decedent reached for his waistband and withdrew

19  a gun, as was the case here, Defendants were justified in shooting.  *Cruz v. City of*

20  *Anaheim*, 765 F.3d 1076, 1079 (9th Cir. 2014).  "[F]or a judge ruling on the officers'

21  motion for summary judgment, this translates to a different question: Could any

22  reasonable jury find it more likely than not that Cruz *didn't* reach for his waistband?"

23  *Id.* at 1079 (emphasis in original).  "It would be unquestionably reasonable for police

24  to shoot a suspect in Cruz's position if he reaches for a gun in his waistband, or even

25  if he reaches there for some other reason." *Id.* at 1078.  "Given Cruz's dangerous and

26  erratic behavior up to that point, the police would doubtless be justified in responding

27  to such a threatening gesture by opening fire." *Id.*

28

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

II.    **PLAINTIFFS' FOURTH CLAIM FOR SUBSTANTIVE DUE PROCESS**

Under the due process clause of the Fourteenth Amendment, liability is found only if the plaintiff can show that police conduct "shocks the conscience." *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998). For the aforementioned reasons, Plaintiffs have no evidence Deputy Adams' use of force was not objectively reasonable, therefore, they cannot establish their actions met the more heightened shocks the conscience standard. *See*, *Moreland v. Las Vegas Metro. Police Dep't.*, 159 F.3d 365, 371 (9th Cir. 1998), as amended (Nov. 24, 1998) ("[I]f the district court correctly determined [the officer]'s actions were objectively reasonable, it follows that his conduct did not offend the more stringent standard applicable to substantive due process claims."); *Gausvik v. Perez*, 392 F.3d 1006, 1008 (9th Cir. 2004) (same).

"[W]here a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a ***purpose to harm*** unrelated to legitimate law enforcement objectives." *A.K.H. by and through Landeros v. City of Tustin*, 2014 WL 12672480, at *6–7 (C.D. Cal. 2014). "Where, [ ] the officers did not have time to deliberate, a use of force shocks the conscience only if the officers had a "purpose to harm" the decedent for reasons unrelated to legitimate law enforcement objectives." *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014). "'Legitimate law enforcement objectives [include] arrest, self-defense, or the defense of others." *Fewell v. California*, 2017 WL 6043080, at *6 (C.D. Cal. 2017) (internal quotation omitted).

"The 'shocks the conscience' standard is applied to evaluate whether the actions of law enforcement during situations that require quick decision-making— such as a traffic stop—were driven by a purpose to harm that is unrelated to legitimate law enforcement objectives. This standard is particularly stringent and requires showing that the officers' actions were directed intentionally to cause harm, rather

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

than merely acting negligently or unreasonably." *Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022) (internal citations omitted). "We apply the purpose-to-harm standard when officials were required to make "repeated split-second decisions" about how best to respond to a risk, such as during a high-speed car chase or when confronting a threatening, armed suspect." *Peck v. Montoya*, 51 F.4th 877, 893 (9th Cir. 2022) citing Porter, 546 F.3d at 1139 (citation omitted); *see, e.g., Lewis*, 523 U.S. at 853–54; *Hayes v. v. Co. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013); *Karam v. City of Burbank*, 352 F.3d 1188, 1194 (9th Cir. 2003) (explaining that "speculation as to…improper motive does not rise to the level of evidence sufficient to survive summary judgment.").

Further, for Plaintiffs to establish a claim for interference with a familial relationship, they must prove that Defendants actually interfered with their relationship to decedent. U.S. Const. Amend. XIV, § 1; *Kelson v. City of Springfield*, 767 F.2d 651, 654 (9th Cir. 1985), overruled on other grounds by *Daniels v. Williams*, 474 U.S. 327 (1986); *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987). The 9th Circuit "recognized that parents have a Fourteenth Amendment liberty interest in the companionship and society of their children. *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). To state a claim for loss of familial association, a plaintiff must show that official conduct "'shocks the conscience' ***in depriving family members of a liberty interest in the companionship and society*** of a family member." *Estate of Chivrell v. City of Arcata*, 694 F.Supp.3d 1218, 1231 citing *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010).

As was aptly stated in *Caban v. Mohammed*, 441 U.S. 380, 397 (1979), "Parental rights do not spring full-blown from the biological connection between parent and child. They require relationships more enduring." In the context of parent-child relationships specifically, the Supreme Court has emphasized that the rights of parents are a counterpart of the responsibilities they have assumed: "the mere

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

1  existence of a biological link does not merit equivalent constitutional protection."
2  *Lehr v. Robertson*, 463 U.S. 284, 261 (1983).  Judicially enforceable Fourteenth
3  Amendment interests require enduring relationships reflecting an assumption of
4  parental responsibility and "stem[ ] from the emotional attachments that derive from
5  the intimacy of daily association, and from the role it plays in promoting a way of life
6  through the instruction of children." *Id.*

7  ### III.    QUALIFIED IMMUNITY

8  Qualified immunity protects peace officers "from liability for civil damages
9  insofar as their conduct does not violate clearly established statutory or constitutional
10  rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457
11  U.S. 800, 818 (1982).  It "is an immunity from suit rather than a mere defense to
12  liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).

13  There is no precedent that indicates a deputy cannot fire upon a person who
14  suddenly withdrew his firearm and has not vocalized their surrender in any way.  *See*,
15  *Reynolds v. County of San Diego*, 858 F.Supp. 1064, 1072 (S.D. Cal. 1994) ("[A]n
16  officer may reasonably use deadly force when he or she confronts an armed suspect
17  in close proximity whose actions indicate an intent to attack.  In these circumstances,
18  the Courts cannot ask an officer to hold fire in order to ascertain whether the suspect
19  will, in fact, injure or murder the officer.").

20  Moreover, "[i]t is ***the plaintiff*** who bears the ***burden*** of showing that the rights
21  allegedly violated were clearly established." *Shafer v. Cty. of Santa Barbara*, 868
22  F.3d 1110, 1118 (9th Cir. 2017) (emphasis added).  In order to discharge this burden,
23  a Section 1983 plaintiff must point to case law that states "a clearly established rule
24  prohibiting the [public employee] from acting as he did . . . [i]n the ***circumstances***
25  ***presented*** to the [employee]." *Saucier v. Katz*, 533 U.S. 194, 209 (2001) (emphasis
26  added).  "This requires a high 'degree of specificity'" (*District of Columbia v. Wesby*,
27  138 S.Ct. 577, 590 (2018))(citations omitted), inasmuch as qualified immunity is a

28

**COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION**

"fact-specific, highly contextualized" inquiry. *Hamby v. Hammond*, 821 F.3d 1085, 1092 (9th Cir. 2016); *see*, *White v. Pauly*, 137 S.Ct. 548, 552 (2017) ("As this Court explained decades ago, the clearly established law must be 'particularized' to the facts of the case."); *Sharp v. County of Orange*, 871 F.3d 901, 911 (9th Cir. 2017) ("Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert these [public employees] *in this case* that *their particular conduct* was unlawful.") (italics original); id. at 917 ("Plaintiffs point only to cases that establish the general framework for evaluating how much force is constitutionally excessive. . . But that is not enough to defeat a qualified-immunity defense.").

In *Alford v. Humboldt County*, 785 F.Supp.2d 867, 872, 877-79, the Court found deputies entitled to qualified immunity for using chemical agents to evacuate a barricaded suspect potentially armed with a lethal weapon.

Deputies are not required to wait and see what a suspect will do before using a taser to apprehend him. *See*, *Spencer v. Pew*, 117 F.4th 1130, 1139 (9th Cir. 2024) ("But even taking as true that Spencer told the officers that his hands were 'locked up,' we cannot say that every reasonable officer, considering the objective circumstances concerning the nature and length of Spencer's non-compliance, would have taken his statements at face value."); *accord Winterrowd v. Nelson*, 480 F.3d 1181, 1184 (9th Cir. 2007) (noting that an officer need not "unduly credit[ ]" a suspect's claim that he is "physically unable to comply with a request"). The law did not require Defendants to wait to see what action Plaintiff may take next. *See*, *Wilkinson*, 610 F.3d at 553 ("'the Fourth Amendment does not require omniscience,' and absolute certainty of harm need not precede an act of self-protection.") (citation omitted). Rather, in such a situation, with lives on the line, the authorities cited above readily permitted the non-lethal uses of force employed by Defendants to end the unabated threat presented by Plaintiff. *See*, *Spencer*, 117 F.4th at 1140 ("Even taking the evidence in the light most favorable to Spencer, his objective actions made it very

COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION

difficult for the officers to handcuff him, resulting in an extended struggle and multiple uses of various types of force (a stomach punch, head strikes, and taser shots) that each could reasonably be thought to be likely to reduce Spencer's non-compliance with being handcuffed."); *see also*, *Hughes v. Rodriguez*, 31 F.4th 1211, 1222 (9th Cir. 2022) (affirming summary judgment, reasoning that use of force was proportional to the "threats to the safety of [the officers], as reasonably perceived by the responsible officials on the basis of the facts known to them"). Given the threat of Decedent while he still had his firearm, there is not clearly established law Vaccari could not use a taser to secure Puga.

## IV.    STATE CLAIMS

### A. WRONGFUL DEATH DAMAGES

Plaintiffs cannot recover for wrongful death against the deputies who did not cause the death. *Lopez v. City of Los Angeles*, 196 Cal.App.4th 675, 682, 688 (2011) (four officers fired upon suspect and the Court held the officers who did not fire the fatal shot were not liable for negligence or wrongful death).

### B. FAILURE TO ALLEGE LESS LETHAL AND NEGLIGENT TACTICS IN THEIR TORT CLAIM OR THE TAC

Compliance with the tort claim presentation requirements is a condition precedent to suit and the failure to comply bars suit for money damages. Cal. Gov. Code § 945.4; *see e.g.*, *DiCampli-Mintz v. County of Santa Clara*, 55 Cal.4th 983, 991 (2012). The requirements are mandatory and strict compliance is required. *Wood v. Riverside Gen. Hosp.*, 25 Cal. App 4th 1113, 1119 (1994). Gov. Code § 910 requires: "the facts constituting the causes of action pleaded in the complaint must substantially correspond with the circumstances described in the claims as the basis of the plaintiff's injury." *Connelly v. State of California*, 3 Cal.App.3d 744, 743 (1970). Where there has been an attempt to comply but the compliance is defective, the test of substantial compliance controls. Under this test, the court must ask whether sufficient

information is disclosed on the face of the filed claim "to reasonably enable the public entity to make an adequate investigation of the merits of the claim and to settle it without the expense of a lawsuit." *City of San Jose v. Superior Court*, 12 Cal.3d 447, 456 (1974). The doctrine of substantial compliance, however, cannot cure total omission of an essential element from the claim or remedy a plaintiff's failure to comply meaningfully with the statute. *Hall v. City of Los Angeles*, 19 Cal.2d 198 (1941); *Loehr v. Ventura County Community College Dist.*, 147 Cal.App.3d 1071, 1082-83 (1983). Gov. Code § 910 provides that the claim should state the "date, place, and other circumstances of the occurrence or transaction which gave rise to the claim asserted." "[T]he purpose of these statutes is 'to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.'" *Connelly v. County of Fresno*, 146 Cal.App.4th 29, 38 (2006) quoting *Stockett v. Assoc. of Cal. Water Agencies Joint Powers Ins. Authority*, 34 Cal.4th 441, 446 (2004).

It is well-settled Plaintiffs may not use an opposition to a motion for summary judgment as a "procedural second chance to flesh out inadequate pleadings," amending their complaint to add claims they had ample time to allege. *Newton v. American Debt Services, Inc.*, 75 F.Supp.3d 1048, 1063 quoting *Wasco Prods., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006).

## C. THE REASONABLENESS OF FORCE DISPOSES WITH STATE CLAIMS

Should the Court determine there was no excessive force as a matter of law, Plaintiff's state law claims also must fail. *See, e.g,. Moore v. City of Berkley*, 2016 WL 6024530, at *7 (N.D. Cal. 2016) ("In California, state law claims for wrongful death and battery at the hands of the police rise and fall with federal Section 1983 claims. [Citations]. The same is true for a Bane Act claim, which requires a civil rights violation 'by threat, intimidation, or coercion.' [Citation]. Because the arrest

COUNTY DEFENDANTS' SEPARATE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, OR IN THE ALTERNATIVE SUMMARY ADJUDICATION

and use of force did not violate Moore's Fourth Amendment rights, all three claims fall away."); *Donaldson v. United States*, 2018 WL 1089986, at *13 (S.D. Cal. 2018) ("As with negligence, claims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims.") (citations omitted); *Sorgen v. City & County of San Francisco*, 2006 WL 2583683, at *9 (N.D. Cal. 2006) ("[T]he law governing Plaintiff's state law claim for assault and battery/excessive force is the same as that used to analyze Plaintiff's [federal] claim for excessive force . . . Accordingly, Plaintiffs' claim of battery under state law fails for the same reasons [as his federal claim]…."); *Watkins v. City of San Jose*, 2017 WL 1739159, at *20 (N.D. Cal., 2017) ("The California Court of Appeal has held that a determination that an officer's use of deadly force is objectively reasonable under § 1983 precludes negligence, assault, and battery claims.") (citations omitted); *Susag v. City of Lake Forest*, 94 Cal.App.4th 1401, 1412-1413 (2002) ("[I]t appears unsound to distinguish between Section 1983 and state law claims arising from the same alleged misconduct.").

### D. THERE IS NO EVIDENCE COUNTY DEFENDANTS' TACTICS WERE NEGLIGENT

There is no evidence that any tactics by the County Defendants were outside of the realm of reason given the actions of Puga. *Brown v. Ransweiler,* 171 Cal. App. 4th 516, 537-538 (2009) ("As long as an officer's conduct falls within the range of conduct that is reasonable under the circumstances, there is no requirement that he or she choose the 'most reasonable' action or the conduct that is the least likely to cause harm and at the same time the most likely to result in successful apprehension of a violent suspect, in order to avoid liability for negligence"); *see Golick,* 82 App. 5th at 1148 ("'In volatile situations, one can always argue that the arrival of police officers caused incremental increase in tension at the scene, and thus increased the risk of injury occurring, and whenever tragedy ensues one can argue that a different police

1   response would have produced a better outcome.  But this sort of speculative, after-

2   action critique falls short" in subjecting an officer to tort liability for negligence).

3

4

5

6   DATED:  February 20, 2025              **LYNBERG & WATKINS**
                                          A Professional Corporation
7

8

9                                  By: */s/ Anita K. Clarke*
                                      **SHANNON L. GUSTAFSON**
10                                     **AMY R. MARGOLIES**
                                       **ANITA K. CLARKE**
11                                     Attorneys for Defendant,
                                       COUNTY OF SAN BERNARDINO
12                                     ROBERT VACCARI, and JAKE ADAMS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                    **48**