# EXHIBIT T

00252

```
 1                   UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA    )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
 5   J.B., a minor by and through his     )
     guardian JONATHAN WAYNE BOTTEN, SR., )
 6                                        )
                     Plaintiffs,          )
 7                                        )
                     vs.                  ) Case No.
 8                                        ) 5:22-CV-00949-JGB-KK
     STATE OF CALIFORNIA; COUNTY OF SAN   )
 9   BERNARDINO; ISAIAH KEE; MICHAEL      )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,  )
     inclusive,                           )
11                                        )
                     Defendants.          )
12   _____)

13

14

15

16         REMOTE VIDEOCONFERENCE DEPOSITION OF

17                      JAKE ADAMS

18              TUESDAY, NOVEMBER 12, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  116769
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 2

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    JONATHAN WAYNE BOTTEN, SR.; TANJA          )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and        )
5    J.B., a minor by and through his           )
     guardian JONATHAN WAYNE BOTTEN, SR.,       )
6                                               )
                Plaintiffs,                     )
7                                               )
                vs.                             ) Case No.
8                                               ) 5:22-CV-00949-JGB-KK
     STATE OF CALIFORNIA; COUNTY OF SAN         )
9    BERNARDINO; ISAIAH KEE; MICHAEL            )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT      )
10   VACCARI; JAKE ADAMS; and DOES 1-10,        )
     inclusive,                                 )
11                                              )
                Defendants.                     )
12   _____)

13

14

15

16          The remote videoconference deposition of JAKE ADAMS,

17   taken on behalf of the Plaintiffs, beginning at 10:10 a.m.,

18   and ending at 12:27 p.m., on Tuesday, November 12, 2024,

19   before Jinna Grace Kim, Certified Stenographic Shorthand

20   Reporter No. 14151.

21

22

23

24

25

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 3

```
 1   APPEARANCES OF COUNSEL:

 2

     For the Plaintiffs:
 3
             LAW OFFICES OF DALE K. GALIPO
 4           BY:  DALE K. GALIPO, ESQ.
             BY:  HANG D. LE, ESQ.
 5           21800 Burbank Boulevard, Suite 310
             Woodland Hills, California 91367
 6           Tel:  818-347-3333
             Fax:  818-347-4118
 7           E-mail:  dalekgalipo@yahoo.com
             E-mail:  hle@galipolaw.com
 8

 9   For the Defendants:

10           DEPUTY ATTORNEY GENERAL
             BY:  DIANA ESQUIVEL, ESQ.
11           1300 I Street, Suite 125
             P.O. Box 944255
12           Sacramento, California 94244
             E-mail:  diana.esquivel@doj.ca.gov
13

14           LYNBERG & WATKINS
             BY:  SHANNON L. GUSTAFSON, ESQ.
15           1100 W. Town & Country Road, Suite 1450
             Orange, California 92868
16           E-mail:  sgustafson@lynberg.com

17

18   Also Present:  Plaintiffs (previously stated on the record)

19

20

21

22

23

24

25
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

|    |                                         |                          | **Page 4** |
|----|-----------------------------------------|--------------------------|------------|
| 1  | INDEX                                   |                          |            |
| 2  | WITNESS:                                |                          | PAGE       |
| 3  | JAKE ADAMS                              |                          |            |
| 4  |   BY: MR. GALIPO              |                          | 5          |
| 5  |                                         |                          |            |
| 6  | EXHIBITS                                |                          |            |
| 7  | MARKED FOR IDENTIFICATION               |                          | PAGE       |
| 8  | Exhibit 1                               | Photograph               | 23         |
| 9  | Exhibit 8                               | Photograph 1500          | 30         |
| 10 | Exhibit 9                               | Photograph 1557          | 30         |
| 11 | Exhibit 10                              | Photograoh 1499          | 31         |
| 12 | Exhibit 11                              | Video Clip COSB009200    | 72         |
| 13 |                                         |                          |            |
| 14 |                                         |                          |            |
| 15 |                                         |                          |            |
| 16 |                                         |                          |            |
| 17 |                                         |                          |            |
| 18 |                                         |                          |            |
| 19 |                                         |                          |            |
| 20 |                                         |                          |            |
| 21 |                                         |                          |            |
| 22 |                                         |                          |            |
| 23 |                                         |                          |            |
| 24 |                                         |                          |            |
| 25 |                                         |                          |            |

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 5

```
 1                         CALIFORNIA

 2                  TUESDAY, NOVEMBER 12, 2024

 3                         10:10 A.M.

 4                       JAKE ADAMS,

 5    called as a witness on behalf of the Plaintiffs, having been

 6    first duly sworn remotely via videoconference, was examined

 7    and testified as follows:

 8                       EXAMINATION

 9    BY MR. GALIPO:

10        Q.   Can you please state your name.

11        A.   Jake Adams, A-d-a-m-s.

12        Q.   Are you able to hear okay so far?

13        A.   Yes, sir.

14        Q.   Okay.  Keep your voice up mainly for the court

15    reporter.  She has to take all the words you're saying down.

16    So your voice is just a little soft, but I think if you keep

17    your voice raised slightly, it will help us all.

18             Okay?

19        A.   Yes, sir.

20        Q.   Who do you currently work for?

21        A.   Currently for San Bernardino Sheriff's Department.

22        Q.   What is your current assignment?

23        A.   Currently assigned to the Hesperia Station.

24        Q.   When did you go to the police academy?

25        A.   In 2018 from March to September.
```

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 6

1      Q.   And where were you initially assigned after the

2   academy?

3      A.   West Valley Detention Center.

4      Q.   What time period were you there?

5      A.   From 2018 until 2020.

6      Q.   At that point were you assigned to patrol?

7      A.   Yes, sir.  In May of 2020 I was assigned to patrol

8   at the Hesperia Station.

9      Q.   Did you have a period of field training?

10     A.   I did.

11     Q.   How long was that for, approximately?

12     A.   Approximately 15 weeks, 16 weeks.

13     Q.   So would that take us to like September,

14   approximately, of 2020?

15     A.   Yes, sir.  I believe it was towards the end of

16   August or early September.

17     Q.   I'm assuming you graduated from high school?

18     A.   Yes, sir.

19     Q.   Did you play sports in high school?

20     A.   Yes, sir.

21     Q.   What did you play?

22     A.   Played baseball and soccer and football.

23     Q.   What positions did you play in baseball?

24          MS. GUSTAFSON:  I'm going to object as relevancy on

25   this line of questioning.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 9

1    A.    Being no other separate facts or circumstances

2    around it, I -- what would have to happen is more on the

3    situation, sir.

4    **Q.    The previous individuals that you saw with guns in**

5    **their hand, did you shoot any of those individuals?**

6    A.    I've only been in one -- involved in one lethal

7    force encounter which is the one that occurred on February

8    17, 2021.

9    **Q.    On the date of the incident, were you partnered up**

10   **in a vehicle or solo in a vehicle?**

11   A.    I was solo in a vehicle, sir.

12   **Q.    And were you part of the vehicle pursuit?**

13   A.    Yes, sir.

14   **Q.    And do you know where your vehicle was in line**

15   **during the vehicle pursuit?**

16   A.    During the pursuit there were multiple turns and

17   avenues taken throughout the city, and I was not part of the

18   initial pursuit.

19        But when one of the deputy's vehicle became

20   disabled, I was able to join the pursuit as it already had

21   been going on.  At that point in time I was directly behind

22   my supervisor at that time which was also behind two CHP

23   vehicles.

24   **Q.    Who was your supervisor at the time?**

25   A.    Sergeant Vaccari.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 10

1    Q.   And once you got in that position behind Sergeant

2    Vaccari, how much longer did the pursuit go on?

3    A.   I don't have the call log in front of me.

4         I would have to estimate which I could be off on a

5    number.  I know there is specifics of when I joined in, we

6    would be able to see on a call log.

7         So I don't want to misspeak.

8    Q.   Okay.  I am entitled to an estimate.

9         It's not a big deal.  You can even give a range if

10   you're comfortable.  You know, 15 to 30 minutes, whatever

11   your're comfortable with.  It's only an estimate.

12   A.   Sure.  If I had to guess, sir, or estimate, it was

13   somewhere between 20 minutes and an hour, approximately.

14   Q.   And where did the pursuit come to an end?

15   A.   At the intersection of Peach Avenue and Catalpa

16   Street in the City of Hesperia.

17   Q.   Do you know when way Peach runs?

18   A.   Yes, sir, I do.

19   Q.   Which way?

20   A.   It is a north and south street through the City of

21   Hesperia.

22   Q.   And was the vehicle, the suspect vehicle, a white

23   vehicle?

24   A.   Yes, sir.

25   Q.   And do you recall what type of vehicle it was

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 11

1  generally?

2      A.   I believe it was a Ford Expedition, sir.

3      Q.   And did that vehicle when it finally came to a stop,

4  was it on Peach facing generally northbound?

5      A.   Yes, sir.

6      Q.   And then there was some CHP units somewhere

7  positioned behind it?

8      A.   Yes, sir.

9      Q.   And was the vehicle you were in that day a white

10 vehicle?

11     A.   Yes, sir.

12     Q.   And do you recall what type of vehicle you were

13 in?

14     A.   Marked Sheriff's Ford Explorer.

15     Q.   And was your vehicle and Sergeant Vaccari's vehicle

16 more or less side-by-side, if you recall?

17     A.   At the end of the pursuit, sir?

18     Q.   Yes.

19     A.   Yes, sir.  They were side-by-side.

20     Q.   And it was dark outside at the time?

21     A.   Yes, sir.

22     Q.   And it's my understanding having reviewed some of

23 the materials, the statements, taken some of the other

24 depositions, that Mr. Puga was in the white vehicle for some

25 period of time after it came to a stop there.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Jake Adams on 11/12/2024

Page 12

1          Is that your recollection as well?

2     A.   Yes, sir.

3     Q.   Was there a helicopter overhead at some point?

4     A.   Yes, sir.  The helicopter was overhead for a period

5     of time throughout the end of the pursuit or through the

6     pursuit as well as through the end.

7          But they were not there through the duration or

8     through the ending of the incident that occurred that day.

9     Q.   So if I'm understanding what you're saying, the

10    helicopter was present during the pursuit, and after the

11    pursuit came to an end, but it left at some point before the

12    shooting; is that correct?

13    A.   Yes, sir, that's correct.

14    Q.   Did you see any guns in the vehicle, the white

15    suspect vehicle during the pursuit?

16    A.   I was not able to see inside of the vehicle during

17    the pursuit, sir.

18    Q.   Were any shots fired during the pursuit that you're

19    aware of?

20    A.   Not that I'm aware of.

21    Q.   Did you have an understanding as to how many people

22    were in the vehicle?

23         MS. GUSTAFSON:  Objection.  Vague as to time.

24         You can answer.

25    BY MR. GALIPO:

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Jake Adams on 11/12/2024

Page 13

1    Q.    During the pursuit.

2    A.    During the pursuit I was not aware of how many

3    people may have been inside of the vehicle.

4    Q.    At some point did it come to your attention that

5    there was more than one person in the vehicle?

6    A.    Yes, sir.

7    Q.    And at some point was a female either taken out, or

8    did she exit the vehicle?

9    A.    Yes, sir.

10    Q.    Did you have any conversation with the female after

11    she exited the vehicle?

12    A.    Yes, sir.

13    Q.    Can you tell me about that, please.

14    A.    Yes.  She exited the vehicle and was given commands

15    to walk back towards deputies, and I made contact with her,

16    placed her in handcuffs, patted her down for weapons, and I

17    asked her if anybody else was inside the vehicle, and she

18    told me Mr. Puga was inside.

19        She referred to him as Hector.  She wasn't sure on

20    his last name.  I also asked her if there were other weapons

21    inside the vehicle and if there was anything for me to know

22    about, and she said she didn't know.

23        And she informed me that she -- he wanted to call

24    his wife, and he was a new father.  That was about the extent

25    of the conversation I had with her.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 14

1    Q.   Did you communicate any of that conversation to any

2    of the other officers on-scene?

3        A.   I told my supervisor the suspect's name, and we were

4    unsure of the last name and unsure of any weapons inside the

5    vehicle.

6        Q.   I take it since you didn't have the last name, you

7    were unable to run a criminal history; is that a correct

8    statement?

9        A.   I think due to the dynamic nature of the situation

10   and being involved in a high-risk traffic stop, it

11   was probably the primary reason I was unable to or chose not

12   to step aside and run a criminal history on Mr. Puga at that

13   time.

14       Q.   So at some point was it decided that pepper balls

15   would be used to try to see if that would assist getting him

16   out of the car?

17       A.   Yes, sir.  It's true.

18       Q.   And who did you have that discussion with?

19       A.   I was not privy to that discussion or part of that

20   decision making process.  I would say it was made by my

21   supervisor.

22       Q.   And do you know who ended up deploying the pepper

23   balls?

24       A.   I do know.

25       Q.   And who was that?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Jake Adams on 11/12/2024

Page 15

```
 1       A.   My supervisor, Sergeant Vaccari.

 2       Q.   And I'm assuming that for the pepper balls to be

 3   effective, they have to get into the car.

 4            So was there some attempt at some point to break a

 5   window?

 6       A.   There was, sir.

 7       Q.   And who did that, if you know?

 8       A.   One of the CHP officers utilized a less-lethal bean

 9   bag round in attempt to break the windows on the side of the

10   vehicle.

11       Q.   And eventually, was a window broken?

12       A.   Yes, sir.

13       Q.   Which window was it, you if know?

14       A.   Back windshield was broken.

15       Q.   And at that point was the female already out of the

16   car?

17       A.   Yes, sir.

18       Q.   And were pepper balls then deployed in the

19   vehicle?

20       A.   Yes, sir.

21       Q.   Do you have any estimate as to how many pepper balls

22   were deployed in the vehicle?

23       A.   My estimate -- I know I -- during my original

24   statement I think I estimated approximately 75 to a 100.

25            I haven't gone back to get an exact amount, nor do I
```

00265

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 16

1   know.  So I probably would say it's still an estimate that I

2   have till this day.

3       Q.   And do you have an estimates to over what period of

4   time the pepper balls were deployed from the first one to the

5   last one?

6       A.   I would estimate over a period of 30 to 45 minutes,

7   probably.

8       Q.   Where were you positioned, and there may be multiple

9   positions, during the deployment of the pepper balls?

10      A.   During the deployment of pepper balls, I was next to

11  the -- behind the suspect vehicle, but next to the CHP

12  vehicles that were still facing northbound behind the suspect

13  vehicle.

14      Q.   When you say next to, were you like on the passenger

15  side, for example?

16      A.   Yes.  The passenger side behind the open door.

17      Q.   And were you able to make any observations of

18  Mr. Puga inside the vehicle before he got out?

19      A.   Yes, sir.  During while watching the vehicle and

20  maintaining observation of it, I could see that Mr. Puga was

21  twisting and turning his body, reaching around, leaning over,

22  reaching back at different periods of time.

23           And at one point I could remember seeing him reach

24  from the driver side where he was seated, reach across, and

25  pull the passenger -- the front passenger door which had been

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

1    left open when the female exited, he pulled that door closed.

2    He had at different times opened and closed the driver's door

3    during the deployment of pepper balls.

4              So I could see his general movements of going

5    side-to-side and twisting and turning.  And going back, when

6    I was able to see that, one, from my position like I just

7    mentioned next to the CHP vehicles, there was two, and if

8    memory serves me correctly, I remember going from, you know,

9    one to the other just getting from one passenger side of one

10   to the either driver side or passenger side of the other.

11             I don't know how many times because he had moved

12   around, but I was able to still try to again best point of

13   observation I could.

14       Q.    Did you ever hear Mr. Puga say anything in the car

15   before he exited?

16       A.    Yes.  A lot of it was inaudible to me.

17             I couldn't make out exactly what he was saying.

18             I was not positioned closest to the vehicle, nor was

19   I directly engaged in communication with him.  But I could

20   hear him talking back and forth or trying to shout back and

21   forth while commands were being given during that period of

22   where he was still inside the vehicle.

23       Q.    Could you make any words out that he said?

24       A.    Yes.  In different times he -- I think he had asked

25   for to call his wife either with phone numbers or numbers

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 18

1  trying to be given, and at one point in time he was shouting

2  that he had been hit with the pepper ball in the head or the

3  face.

4           Different things of that nature.  I don't remember

5  exactly what his statements were verbatim, though.

6       Q.   Okay.  Did you ever see anything on his face or head

7  that was consistent with him being struck by pepper balls in

8  the face?

9       A.   Not that I recall.

10      Q.   Did you ever hear any coughing or anything like that

11  coming from the car after the deployment of the pepper

12  balls?

13      A.   Yes.  I remember hearing coughing.

14      Q.   Based on your training is that consistent at least

15  with one of the potential effects from the pepper balls?

16      A.   That's one of the effects.  It doesn't necessarily

17  make it effective, but that can be one of the effects of

18  pepper balls.

19      Q.   Do you have training with respect to the pepper

20  balls?

21      A.   Yes, sir.

22      Q.   And based on the training what are some of the

23  intended effects or effects of pepper balls?

24      A.   The intended effect is to create a distraction for

25  and gain compliance through the pain given to the --

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 19

1  someone's ability to see and breathe comfortably so that

2  they -- so they can comply, get them out of the environment,

3  detain them as they needed, and then remove them from that

4  environment so they can see and breathe more clearly.

5      Q.   And so I have some familiarity with pepper spray.

6           Is it some of the similar effects, the burning of

7  the skin, the tearing up of the eye, the effect on the mucous

8  membranes, et cetera?

9      A.   Yes, sir.

10      Q.   Was there some tactical plan that you were aware of

11  of what steps were going to be taken once, if and when

12  Mr. Puga exited the vehicle?

13      A.   No.  I don't think there was a tactical plan fully

14  formed and put together.  I think when the pursuit came to an

15  end, the officers, myself, and my supervisor gained positions

16  of best the cover we could while trying to control the

17  situation.  These situations tend to be very dynamic, and we

18  needed to be able to, one, maintain observations of the

19  suspect as well as there was communication going on with the

20  suspect as well as being able to attempt to try to

21  communicate amongst ourselves as well.

22      Q.   Were you taking a position of cover during some of

23  this time frame?

24      A.   Yes, sir.

25      Q.   And where were you taking a position of cover?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Jake Adams on 11/12/2024

Page 20

```
 1      A.   Behind the open doors of the patrol vehicles behind

 2   the suspect vehicle, sir.

 3      Q.   Once Mr. Puga exited the vehicle on the driver side,

 4   were you able to see him from your position?

 5      A.   Yes, sir.

 6      Q.   And were you behind the open passenger door of the

 7   CHP vehicle at that point?

 8      A.   When he exited I don't recall if I was behind the

 9   passenger side of the CHP vehicle or the secondary vehicle

10   which would have put me behind the driver's side door, but it

11   was next to the CHP vehicle.

12      Q.   But you recall being close to a CHP vehicle and

13   somewhere with cover?

14      A.   Yes, sir.

15      Q.   And do you have an estimate as to how long

16   approximately Mr. Puga was on the driver's side of the

17   vehicle before he went to the front?

18      A.   I think my best estimate would be approximately

19   somewhere between five or ten minutes.

20      Q.   And were you watching him continuously during that

21   time frame?

22      A.   Yes, sir.

23      Q.   During that time frame did he make any comments, if

24   you recall, about his eye?

25      A.   I don't recall exactly what was said while he was
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 21

1   outside the vehicle.

2        Q.   Do you recall anything that he said when he was on

3   the driver's side of the vehicle even if it's not exact to

4   the effect?

5        A.   I remember him saying something to the effect of he

6   was -- he was getting out or he's listening, or my hands are

7   up.  But that was during the time where he would raise his

8   hands up and then he would lower them back down.

9             But, no, I don't recall exactly what he said.

10       Q.   Was he being given some commands to put his hands up

11   when he was on the driver's side?

12       A.   Yes, sir.

13       Q.   And at times were his hands up?

14       A.   At various times he would put his hands up, but then

15   he would put them down.  They were never up for an extended

16   period of time.  He was not compliant at any point in time.

17       Q.   What is the longest period of time you recall him

18   having his hands up?

19       A.   I don't know because the situation was so dynamic.

20             I don't know that I could even give a reasonable

21   guess of how long the hands were up.  I don't, sir.

22       Q.   During the time he was on the driver's side of the

23   vehicle, did you ever see a weapon in his hands?

24       A.   Not during that time, sir, no.

25       Q.   Did you ever see a weapon on his person during the

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 22

1   time he was on the driver's side of the vehicle?

2       A.   Not during that time, sir.

3       Q.   Did you ever hear him verbally threaten to harm any

4   of the officers?

5       A.   I don't recall hearing anything like that, sir.

6       Q.   Did you ever hear him verbally threaten to harm

7   himself?

8       A.   I don't recall hearing anything like that, sir.

9       Q.   When he was on the driver's side of the vehicle, was

10  there any tactical communications between the officers as to

11  what the next steps would be?

12      A.   Not that I'm aware of, no.

13      Q.   At some point did he go to the front of the

14  vehicle?

15      A.   Yes, sir.

16      Q.   And where were you, if you recall, when Mr. Puga

17  went to the front of the vehicle?

18      A.   I believe when he went to the front of the vehicle,

19  I was on the driver's side of the CHP vehicle that was on the

20  most east side of the street, the second vehicle where I

21  could see through the broken back window and through the

22  windshield.  And I could see a portion of the torso of

23  Mr. Puga, his head, and his hands when he would raise it

24  up.

25      Q.   When he was in the front of the vehicle?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 25

1   BY MR. GALIPO:

2       Q.   After Mr. Puga went to the front of the vehicle, was

3   there any discussion about a tactical plan at that point?

4       A.   Not that I'm aware of.  I know there were two

5   sergeants on-scene, and I know they had a consistent level of

6   communication amongst themselves.  I was close enough to see

7   them next to each other and hear them talking, but I couldn't

8   make out what they were saying.

9            There never was never a formal plan put together or

10  we all got together and communicated what everybody's going

11  to with x, y, and z.

12      Q.   Was any specific tactical plan ever communicated to

13  you?

14      A.   Just prior to the end of the incident before the

15  shooting occurred, my supervisor, Sergeant Vaccari and I,

16  formulated a plan to move to the east side of the vehicle

17  because we could no longer see the suspect's hands, and he

18  was out of the vehicle.

19           And so our plan was to move ourselves out of our

20  current positions and to a position where we can have better

21  observations on the suspect.

22           That was our level of plan there, sir.

23      Q.   Okay.  And between you and your sergeant, was one of

24  you designated less-lethal?

25      A.   Yes, sir.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Jake Adams on 11/12/2024

Page 26

1    Q.   And who was that?

2    A.   Sergeant Vaccari, sir.

3    Q.   And do you know what type of less-lethal he had?

4    A.   He had a 40-millimeter munitions less-lethal.

5    Q.   Did you yourself have a Taser on you?

6    A.   I did, sir.

7    Q.   What type of Taser was it?

8    A.   I don't know the exact model.  It's a standard

9    issued San Bernardino Sheriff's Department Taser that we are

10   all issued and carry on our Sam Brownes.

11       Q.   Do you recall if the Taser that you had was such

12   that you could fire a cartridge, and if you needed to fire a

13   second cartridge, you can do that without loading a new one

14   in, or whether you had to load a second cartridge in?

15       A.   The Taser I had is capable of firing two cartridges

16   without having to go through a reload process.

17       Q.   Were you aware at the time frame that you and your

18   sergeant were approaching on -- I take it the passenger side

19   of the white car would have been your approach?

20       A.   That's correct, sir.

21       Q.   Were you aware that the CHP officers during that

22   time frame were also approaching?

23       A.   Yes, sir.  I could see them also moving slightly

24   north, and they were moving on to the -- I want to say the

25   west side of the vehicle, and we were on the east side.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 27

1          So that they can also gain a better line of sight or

2    observation of the suspect's hands and movement while he was

3    in front of the vehicle.

4       Q.   Between you and your sergeant in your approach on

5    the east side, I think the passenger side would be the east

6    side of the vehicle?

7       A.   That's correct, sir.

8       Q.   Do you recall who was first and who was behind

9    between you and your sergeant as you started your approach?

10      A.   I would have been just in front of my supervisor,

11   sir.

12      Q.   Okay.  So Sergeant Vaccari would have been slightly

13   behind you?

14      A.   That's correct.

15      Q.   And did you have a sense between yourself and the

16   CHP officers who was further north as the approach was going

17   on?

18      A.   I think we were in similar positions, give or take a

19   few feet, but we were approaching in a walking pace similar.

20           I don't know if I was more north or if they were

21   more north of position.

22      Q.   And could you tell how many CHP officers were

23   approaching, whether it was one or more than one?

24      A.   I do not know, sir.

25      Q.   Was there any discussion you heard about someone

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

1  being designated the tasing or Taser officer?

2      A.   Between me and my sergeant, or between CHP, sir?

3      **Q.   Either between you and your sergeant or CHP, any**

4  **discussion you heard related to that?**

5      A.   I'm not aware of any discussions with CHP.

6          As far as the Taser was cornered, I do know that my

7  sergeant and I briefly discussed the possibility of a Taser.

8  If memory serves me correctly, I mentioned that it might be a

9  viable option because the suspect did not have a shirt on, so

10  the possibility of it being effective, the Taser darts being

11  able to get into the torso and skin was likely.

12          However, as we discussed it as quickly as we could

13  while we still trying to make observations of the current

14  situation, we decided that the 40-millimeter was a better

15  option because we did not need to be as close to the suspect

16  in case there was a lethal-force encounter that was

17  presented.

18          And so the Taser was talked about, and then decided

19  that it was not the best option.

20      Q.   I take it for the Taser to be effective, the probes

21  need to make contact with the skin?

22      A.   Yes, sir.

23      Q.   So one of your thoughts was that since he didn't

24  have a shirt, at least the clothing would not be an

25  impediment to his upper body?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 29

```
 1      A.   At least not to the upper body if the dart was make

 2   contact, sir.

 3      Q.   Do you know what the distance is, those cartridges

 4   are, whether they're 21 feet or 25 feet?

 5      A.   I believe max effective distance for the Taser is 25

 6   feet, sir.

 7      Q.   Do you know approximately where you started the

 8   approach from with your sergeant, whether it was the area you

 9   indicated earlier behind the open door or somewhere else?

10      A.   I believe we -- I believe it was that same position

11   of the open door on the passenger side of the CHP patrol

12   vehicle that was closest to the suspect vehicle, but we

13   crossed that front of the other CHP vehicle when we moved

14   eastward to gain better observation of the suspect.

15      Q.   Okay.  I can't remember what exhibit number we're up

16   to from the prior depositions.

17           MR. GALIPO:  I thank it was -- Hang?

18           MS. LE:  I think we stopped at 7.

19           MR. GALIPO:  7.  Okay.

20           Does that sound right, Shannon or Diana?

21           MS. GUSTAFSON:  I was not at Sergeant Kee's.

22           So I don't know if you did any exhibits at that

23   depo.

24           MS. ESQUIVEL:  I have 7 as being Plaintiff's 0241,

25   cell phone video, and that being our last exhibit.
```

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 30

```
 1              MR. GALIPO:  Thank you, Diana.

 2              So I want to mark Exhibit 8, and I think it's Bates

 3      stamp ending in 1500.

 4              (Exhibit 8 was marked for identification.)

 5              MR. GALIPO:  And I would like to mark as Exhibit 9,

 6      a photo with Bates stamp ending in 1557.

 7              (Exhibit 9 was marked for identification.)

 8              MR. GALIPO:  And we'll see if we can put Exhibit 8

 9      first, it ends in 1500.

10      BY MR. GALIPO:

11          Q.   Can you see that on your screen?

12          A.   Yes, sir.

13          Q.   And does that appear to be the passenger side of the

14      suspect vehicle?

15          A.   Yes.

16          Q.   And the door is open in this photo, but at the time

17      of your approach, was the door opened or closed?

18          A.   I don't specifically recall.  I believe the door --

19      I don't want to misspeak.  I don't specifically recall,

20      sir.

21          Q.   All right.

22              MR. GALIPO:  Can we put up Exhibit 9, please.

23      BY MR. GALIPO:

24          Q.   This also shows a portion of the white vehicle; is

25      that correct?
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 31

1      A.   Yes, sir.

2      Q.   And if my angles are right, is this looking like

3   northwest?

4      A.   Yes, sir.

5           MR. GALIPO:  And lastly, if we can find Exhibit 1499

6   or I should say Bates stamp 1499 we'll mark as Exhibit 10.

7           (Exhibit 10 was marked for identification.)

8   BY MR. GALIPO:

9      Q.   Are you able to see this on your screen as well?

10     A.   Yes, sir.

11     Q.   And this shows a portion of the CHP vehicle that you

12  were at initially?

13     A.   That's correct.

14     Q.   Okay.

15          MR. GALIPO:  Thank you, Hang.

16          We'll get back to those in a little bit.

17  BY MR. GALIPO:

18     Q.   So as you're approaching on the passenger side if

19  I'm understanding correctly, your sergeant is slightly behind

20  you?

21     A.   Yes, sir.

22     Q.   And do you have anything in your hands?

23     A.   Yes, sir.

24     Q.   What do you have in your hand?

25     A.   I had my firearm which is a Glock 17, sir.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 32

```
 1        Q.   What caliber is it?

 2        A.   9-millimeter.

 3        Q.   Are you right-handed or left?

 4        A.   Right-handed, sir.

 5        Q.   As you were approaching, did you hear any commands

 6   being given to Mr. Puga?

 7        A.   I knew there were consistent commands for Mr. Puga

 8   to keep his hands up and to walk back towards the CHP

 9   officers.  The hands up commands were repeated extensively

10   and that that's ongoing.

11        Q.   And did you hear those type of commands being given

12   by the CHP officers as you were approaching?

13        A.   I don't recall exactly what was being said during my

14   approach.

15        Q.   Did you give any command at any time during your

16   approach to Mr. Puga?

17        A.   No, sir.  Not that I recall.

18        Q.   Did you ever hear anyone tell him to get down on the

19   ground?

20        A.   Yes.  That was said to Mr. Puga.

21             I know it started when he exited the vehicle and was

22   getting to the driver side of the vehicle.  He was told to

23   keep his hands up.  I believe he was told to get on the

24   ground, walk backwards towards the CHP officers.

25             I do believe that was said.
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 36

```
 1   fired before I fired.
 2       Q.   Were you looking at Mr. Puga when you heard the
 3   shots starting?
 4       A.   Yes, sir.
 5       Q.   And did you ever see any muzzle flash coming from
 6   Mr. Puga?
 7       A.   When I approached on the east side of the vehicle,
 8   Mr. Puga looked at me, and I saw his hands dive down into his
 9   waistband area.  I don't know if it was waistband or pockets.
10   And I saw a gun, and then I heard shots, and then I returned
11   fire.
12       Q.   I think my question was, did you ever see any muzzle
13   flash coming from Mr. Puga?
14       A.   At what point in time, sir?
15       Q.   When he was in front of the vehicle before you
16   fired?
17       A.   When I saw the gun and heard the shots, I did not
18   specifically see a muzzle flash at that point in time.
19       Q.   Is one of the documents that you reviewed in
20   preparation for the deposition your statement or interview
21   you gave?
22       A.   Yes, sir.
23       Q.   And when was the last time you reviewed that?
24       A.   This past weekend, sir.
25       Q.   Do you recall in your statement indicating you heard
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 38

1          It happened within a couple of seconds.  After I saw

2   the gun and heard the shots, I remember ducking and having to

3   step over a high curb that was right there and having to

4   return fire.

5          Q.    And then your second volley of shots, how many did

6   you fire in your second volley?

7          A.    I fired four rounds at that time, sir.

8          Q.    And was Mr. Puga still running away at that point?

9          A.    Yes, sir.  Also, during that time as he was running,

10  I remember seeing the gun again as he turned towards me and

11  the other officers.

12         Q.    Which hand did you see the gun in?

13         A.    I believe it was his right hand, sir.

14         Q.    And how far was he from you when you fired your

15  first volley of shots?

16         A.    I'm going to have to estimate.  I didn't do any of

17  the measurements.

18         I would estimate he was probably between 15 to 25

19  feet away during my first volley.

20         Q.    How about your second volley, what would you

21  estimate the distance?

22         A.    I would estimate he was probably from 10 to 20 or 25

23  feet further.  So maybe somewhere between 25 to 40 feet away

24  from me at the time.

25         Q.    And how about your third volley, what would you

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 40

1      Q.   Okay.

2           MR. GALIPO:  I think we're making a lot of progress.

3           Is this a good time for a ten-minute break for

4   everyone?

5           MS. GUSTAFSON:  Sure.

6           MR. GALIPO:  Okay.  I'll come back in about ten

7   minutes if that's good for everybody.

8           THE WITNESS:  Thank you, sir.

9           (Recess taken.)

10          MR. GALIPO:  Back on the record.

11          Could we put Exhibit 8 back up please, Hang.

12          MS. LE:  Sure.

13  BY MR. GALIPO:

14     Q.   Are you able to see that on your screen?

15     A.   Yes, sir.

16     Q.   So when you approached the vehicle prior to the

17  shooting, where was Mr. Puga situated in terms of the front

18  of the vehicle?

19     A.   He was in front of the vehicle facing south closest

20  to the driver's side headlight.  I don't know if he was

21  standing directly in front of the lights, but he was more

22  towards the driver's side of the vehicle.

23     Q.   And you don't recall if the door was open or not?

24     A.   I think the door was closed because I know he had

25  closed it.  I think -- I think the door was closed, but I

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 41

1   could be wrong.

2       Q.   As you approached, was any part of this vehicle

3   blocking your view of portions of Mr. Puga's body?

4       A.   Yes, sir.  One, that's partly why I think the door

5   was closed because I don't recall seeing the door obstructing

6   my line of sight, but the part of Mr. Puga's mid section

7   around his stomach area and all the way down to his feet were

8   obstructed by the front of the vehicle from where I was

9   positioned.

10      Q.   So could you essentially see him from the chest

11  up?

12      A.   Yes, sir.

13      Q.   And do you know where -- I'm assuming you were

14  approaching on the asphalt?

15      A.   Yes, sir.

16      Q.   And do you know where you were in relation to the

17  vehicle when you heard the initial shots?

18      A.   I believe I was near the center, center line of the

19  vehicle between the front passenger door and the rear

20  passenger door somewhere in those couple feet close to the

21  curb line.

22          And I don't know if you could see, but that curb is

23  elevated, and that's when after when after when I approached

24  and Mr. Puga reached down and came up and I saw the gun and

25  heard shots, I had to step over the curb line before

JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Jake Adams on 11/12/2024

Page 46

1    were talking about the end of the driver's door and the start

2    of the passenger door which essentially would be the mid

3    point or the B-pillar we were just talking about.

4             Is that fair?

5    A.   Yes, sir.

6    Q.   And you say, "I saw the suspect jerk his hand down

7    and up, and when it came up, I remember yelling get on the

8    ground."

9             Do you see that?

10   A.   Yes, sir.

11   Q.   "And almost simultaneously I remember hearing

12   gunshots."

13            Do you see that?

14   A.   Yes, sir, I do.

15   Q.   And then you say, "It looked like when he pulled his

16   arm up, it looked like he was facing me."

17            Do you see that portion of your response?

18   A.   Yes, sir.

19   Q.   So when you first heard the gunshots, was he facing

20   in your direction, or was that after you heard the initial

21   shots?

22   A.   I'm sorry.  Can you say it again?

23   Q.   Sure.  When you first heard the gunshots, was

24   Mr. Puga facing in your direction, or did he face in your

25   direction after you heard the initial shots?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 47

1    A.   It looked like he was facing me; I saw the gun and

2    heard gunshots.  That situation unfolded very rapidly, and

3    all of those things were going on almost what felt like from

4    what I remember to be simultaneously.

5    Q.   And you indicate here on Line 20 that you remember

6    yelling, "Get on the ground," and it sounds like almost

7    immediately after that you heard the gunshots; is that

8    fair?

9    A.   Yes, sir.

10   Q.   And then you saw Mr. Puga at some point running

11   northbound; is that right?

12   A.   After the first shots were fired, and I was

13   returning fire, yes, Mr. Puga was running in a northwestern

14   direction.

15   Q.   And I just want to make sure I'm understanding the

16   chronologically because you referenced I think both in your

17   statement and your testimony today, that at some point you

18   either stepped over a curb or almost tripped on a curb or

19   something like that; is that correct?

20   A.   Yes, sir.

21   Q.   But am I correct that you didn't fire any shots

22   until after you stepped over the curb?

23   A.   I believe that's accurate, sir.

24   Q.   Okay.  So did Mr. Puga go out of your view for some

25   period of time when you were going over the curb?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 49

```
 1   BY MR. GALIPO:

 2       Q.   So when you fired your first volley of shots,

 3   Mr. Puga was running northbound; is that correct?

 4       A.   I think he was -- after he pulled the gun up and I

 5   heard the shots and I saw the gun, when I made the decision

 6   to return fire, he was still in front of that vehicle.

 7            I couldn't tell if he was moving or not.  I think

 8   it's likely, you know, that he had started to move

 9   northbound.  I think that's a fair statement on the chain of

10   events there.

11       Q.   Right.  Do you remember in your interview saying

12   that he had started running northbound before you fired?

13       A.   I don't specifically recall that.

14       Q.   Is that accurate, though, that he started running

15   northbound before you started firing?

16            MS. GUSTAFSON:  Objection.  Asked and answered.

17            Go ahead.

18            THE WITNESS:  To the best of my knowledge, I saw the

19   gun; I heard shots; he was facing me; when I returned fire he

20   was still in front of the vehicle.  I don't know that I can

21   sit here today and tell you if I specifically remember him

22   being just in front of the vehicle or if he had actually

23   started his movement northbound.

24            I know he had started moving northbound.  I don't

25   know when I pulled the trigger if he had started that
```

00287

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 50

1  direction or not, but I believe that's true.

2  BY MR. GALIPO:

3      Q.  Okay.  So you kind of were in a different position

4  for your second volley of shots; is that true?

5      A.  Yes, sir.

6      Q.  Where were you positioned during your second volley

7  of shots?

8      A.  I had moved closer to the passenger side of the

9  vehicle in attempt to gain some level of cover while still

10  engaged in returning fire with Mr. Puga.

11      Q.  And was Mr. Puga running towards the northwest

12  corner of that intersection when you fired your second volley

13  of shots?

14      A.  Yes, sir.

15      Q.  And then after he got to the northwest corner, you

16  think you fired another three rounds?

17      A.  When I fired my last volley, Mr. Puga was still --

18  well, I think he had reached the northwest corner and was

19  headed in more of a direct northern north direction I should

20  say instead of directly towards the house that's on that

21  corner the way he had started to run straight north.

22      Q.  So when you fired your first volley of rounds,

23  Mr. Puga would have been on the asphalt?

24      A.  Yes, sir.

25      Q.  And when you fired your second volley of rounds, he

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 51

1  would have been on the asphalt?

2      A.   Yes, sir.

3      Q.   And when you fired your last volley, he would have

4  been on the dirt area?

5      A.   I don't know specifically where he would have been

6  standing or where he would have been running for my last

7  three.  It would have been near where those two on that

8  excuse me -- on that north corner.  I don't know if he had

9  actually gotten to the dirt, or if he was on the dirt when

10  I had fired that last volley.

11      Q.   But if I'm understanding you, he was running

12  northwest on your second volley of shots and more due north

13  on your last volley?

14      A.   Yes, sir.

15      Q.   And at some point did you see him go to the

16  ground?

17      A.   Yes, sir, I did.

18      Q.   And were any shots fired if you know when he was on

19  the ground?

20          MS. GUSTAFSON:  By anyone or by him?

21          MR. GALIPO:  By anyone.

22          THE WITNESS:  Did I -- are you asking if I knew that

23  then or now?

24  BY MR. GALIPO:

25      Q.   Let's break it down.  Let's go back to then.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 52

1          After he went to the ground, from your perspective

2    did you think it was necessary to fire anymore shots?

3        A.    I stopped firing my weapon when I no longer saw

4    Mr. Puga posing a threat.

5        Q.    Was that after he went to the ground?

6        A.    Yes, sir.

7        Q.    I'm wondering, did you fire any shots, if you know,

8    after he went to the ground?

9        A.    I don't know.  And I don't believe so.

10          I believe my last round fired were when he was still

11    standing.

12        Q.    It sounds like you're not a 100 percent sure; is

13    that fair?

14        A.    Correct.  I mean that situation was very dynamic,

15    and it was a lot going on.  To know exactly when my last

16    trigger pull was versus when Mr. Puga went to the ground, it

17    would have been very close in time from when what happens.

18        Q.    After he went to the ground, could you see any gun

19    in his hands?

20        A.    Immediately or after approaching the suspect?

21        Q.    Immediately.

22        A.    No, sir.  Not at that time.

23        Q.    And did you think it was appropriate from your

24    perspective to keep shooting him once he was on the ground

25    and you couldn't see a gun?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 55

1    Q.   Did you approach Mr. Puga at some point after all

2    the shots had ended?

3    A.   Yes, sir, I did.

4    Q.   Did you hear some screaming coming from the

5    residence at the northeast corner?

6    A.   Yes, sir, I did.

7    Q.   And at some point did you become aware that some

8    innocent bystanders were struck by gunfire?

9    A.   I do recall hearing somebody saying somebody had

10   been shot.  I did not know who.  I did not know exactly

11   where, but it did sound like it was coming from the residence

12   on the northeast corner.

13         But I overheard that as I was approaching the

14   suspect, and I never made contact again for clarification by

15   anybody at that residence.

16   Q.   When Mr. Puga was running northwest, were you firing

17   generally in a northwest direction?

18   A.   Yes, sir.

19   Q.   One of your concerns, obviously, being in a

20   residential neighborhood with a lot of shots being fired is

21   innocent people potentially being struck; is that fair?

22   A.   Yes, sir.

23   Q.   And when you approached Mr. Puga, did you notice his

24   chest cavity rising still, and it appeared initially he was

25   still alive?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 56

```
 1        A.    Upon initial approach, I did not there was a rise

 2   and fall of the chest cavity.  That did not last very long.

 3   When medical arrived I would say within approximately one

 4   minute from the time shots were fired, Mr. Puga did show

 5   obvious signs of death.

 6        Q.    But you initially believed he was alive because you

 7   could see him still breathing; is that fair?

 8        A.    Yes.  Initially, that was -- he was still able to

 9   breathe.

10        Q.    And after that he was tased two times, wasn't he?

11        A.    After what, sir?

12        Q.    After you saw him still breathing, initially.

13        A.    Yes, sir.  When we approached, we saw the rise and

14   fall of the chest cavity as he was faced-down.  We attempted

15   several more verbal commands to gain compliance.  When he had

16   fallen, he had fallen on his hands in a prone position.

17             And so that's why we were giving the verbal

18   commands, and then at that point in time because there was no

19   imminent lethal force threat posed towards us, we used a

20   less-lethal option of a Taser in hopes to gain compliance at

21   that time.

22        Q.    You're saying there was no lethal or no imminent

23   threat when he was down on the ground as you described?

24             MS. GUSTAFSON:  Objection.  Misstates the testimony.

25             Go ahead.
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 57

1              THE WITNESS:  When I approached Mr. Puga on the

2    northwest corner, he was lying faced-down with his hands

3    concealed underneath his body.

4    BY MR. GALIPO:

5        Q.   Right --

6        A.   I --

7        Q.   Go ahead.  I'm sorry.

8        A.   I was saying from my perspective, although I had

9    stopped firing my gun and I didn't see immediate reason to

10   engage with lethal force, there were still an element of

11   non-compliance from Mr. Puga being that we had just seconds

12   before been involved in a lethal force encounter, it was

13   less-lethal option was given in case there was going to be

14   another element of force given or a threat posed by

15   Mr. Puga.

16       Q.   And whose decision was it, if you know, to tase

17   him?

18       A.   I believe it was Sergeant Vaccari that used his

19   Taser on the suspect.

20       Q.   And could you tell whether the probes struck

21   Mr. Puga?

22       A.   I believe they did, sir.

23       Q.   And did you see his body lock up like during the

24   five-second cycle?

25       A.   Yes, sir.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Jake Adams on 11/12/2024

Page 58

```
 1        Q.    And is that how the Taser's intended to be used
 2   based on your training?
 3        A.    Yes, sir.
 4        Q.    And was there a second Taser deployment or
 5   reactivation, if you know?
 6        A.    There was a second activation of the Taser.
 7        Q.    Was that for a second five seconds?
 8        A.    I believe it was, sir.
 9        Q.    And did his body lock up again?
10        A.    I believe it did, sir.
11        Q.    And did you believe from your perspective that
12   Mr. Puga was still alive when he was tased?
13        A.    I was not able to check vital signs or anything at
14   that time when he was tased.  I know prior to that I had seen
15   the rise and fall of the chest cavity as we approached.
16   Whether or not that status remained the same when the Taser
17   was deployed or not, I'm not certain.
18        Q.    And did someone handcuff Mr. Puga, if you know?
19        A.    Yes, sir.
20        Q.    And do you know what officers handcuffed him?
21        A.    I don't recall exactly which officer, but I believe
22   it was a CHP officer that applied the handcuffs to
23   Mr. Puga.
24        MR. GALIPO:  Hang, can you put up Page 39 of the
25   deputy's statement, please.
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 68

1   question to ask for me to answer a hypothetical with him

2   you're using the term just running away without seeing a gun

3   when we know there had been a shooting from this vehicle from

4   the suspect in question prior to the pursuit that we're now

5   in a residential area to where the suspect was headed towards

6   residences which could pose additional dangers towards the

7   community.

8           So I don't think that I can -- that hypothetical

9   doesn't sit well.  I can't answer that question, sir.

10  BY MR. GALIPO:

11      Q.   Okay.  I'm just wondering, was your mind frame at

12  the time that if he got out of the vehicle and started

13  running away, it would be appropriate to shoot him, whether

14  you saw a gun or not?

15      A.   I don't think that blanket statement is true or

16  accurate in any way, sir.

17      Q.   Okay.  And how did you know necessarily that he was

18  the one involved in that prior incident as opposed to someone

19  else?

20           I understand the vehicle description, but how did

21  you know it was him, and not someone else?

22      A.   So as the situation unfolded, CHP notified Sheriff's

23  Department through dispatch communication which was relayed

24  to us in our patrol cars that there had been a shooting from

25  that vehicle in the freeway.  CHP attempted to make contact

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 69

1   of that vehicle which turned in to a pursuit which came into

2   our city.

3           At no point in time did anybody else enter or exit

4   that vehicle as far as we knew.  When the pursuant came to an

5   end, one person exited the vehicle, and then as the standoff

6   continued, the only other known occupant of that vehicle

7   exited, and then later on that same individual reached down

8   towards his waistband or pocket area, reached downward, came

9   up with a gun, shots were fired, and I returned fire.

10      Q.   Okay.  Let's lastly look at Page 72 of your

11  statement.  And I think we've talked about this a little bit.

12           Looking at your response on Line 15, you're talking

13  about the passenger side of the vehicle blocking some of your

14  view from his chest down.

15           Do you see that?

16      A.   Yes, sir.

17      Q.   And then you're asked whether you saw any muzzle

18  flash, and you again confirm that you did not, at least from

19  Mr. Puga; is that correct?

20      A.   That's correct.

21      Q.   And you were also asked whether Mr. Puga said

22  anything, and you indicated nothing was said.

23      A.   Yes, sir.

24      Q.   Okay.

25           MR. GALIPO:  Thank you, Hang.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

```
 1                        CERTIFICATE

 2                            OF

 3          CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  November 12, 2024.

23                            _____

24                            Jinna Grace Kim, CSR No. 14151

25
```