# EXHIBIT U

00298

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4    JONATHAN WAYNE BOTTEN, SR.; TANJA     )
      DUDEK-BOTTEN; ANNABELLE BOTTEN; and   )
 5    J.B., a minor by and through his      )
      guardian JONATHAN WAYNE BOTTEN, SR.,  )
 6                                          )
                   Plaintiffs,              )
 7                                          )
                   vs.                      ) Case No.
 8                                          ) 5:23-CV-00257-JGB-SHK
      STATE OF CALIFORNIA; COUNTY OF SAN    )
 9    BERNARDINO; ISAIAH KEE; MICHAEL       )
      BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10    VACCARI; JAKE ADAMS; and DOES 1-10,   )
      inclusive,                            )
11                                          )
                   Defendants.              )
12    _____)

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                    ROBERT VACCARI

18            THURSDAY, NOVEMBER 14, 2024

19

20

21

22

23    Reported Stenographically By:

24    Jinna Grace Kim, CSR No. 14151

25    Job No.:  112656
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 2

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                   Plaintiffs,             )
 7                                          )
                   vs.                      ) Case No.
 8                                          ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                   Defendants.             )
12   _____)

13

14

15

16          The remote videoconference deposition of ROBERT

17   VACCARI, taken on behalf of the Plaintiffs, beginning at

18   10:04 a.m., and ending at 12:04 p.m., on Thursday, November

19   14, 2024, before Jinna Grace Kim, Certified Stenographic

20   Shorthand Reporter No. 14151.

21

22

23

24

25
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 3

```
 1   APPEARANCES OF COUNSEL:

 2
     For the Plaintiffs:
 3
             LAW OFFICES OF DALE K. GALIPO
 4           BY:  DALE K. GALIPO, ESQ.
             BY:  HANG D. LE, ESQ.
 5           21800 Burbank Boulevard, Suite 310
             Woodland Hills, California 91367
 6           Tel:  818-347-3333
             Fax:  818-347-4118
 7           E-mail:  dalekgalipo@yahoo.com
             E-mail:  hle@galipolaw.com
 8

 9   For the Defendants:

10           DEPUTY ATTORNEY GENERAL
             BY:  DIANA ESQUIVEL, ESQ.
11           1300 I Street, Suite 125
             P.O. Box 944255
12           Sacramento, California 94244
             E-mail:  diana.esquivel@doj.ca.gov
13

14           LYNBERG & WATKINS
             BY:  SHANNON L. GUSTAFSON, ESQ.
15           1100 W. Town & Country Road, Suite 1450
             Orange, California 92868
16           E-mail:  sgustafson@lynberg.com

17

18   Also Present:  Plaintiffs (previously stated on the record)

19

20

21

22

23

24

25
```

00301

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

```
                                                              Page 4
 1                            INDEX

 2   WITNESS:                                          PAGE

 3   ROBERT VACCARI

 4      BY: MR. GALIPO                                 5

 5      BY: MS. ESQUIVEL                               63

 6

 7                          EXHIBITS

 8   MARKED FOR IDENTIFICATION                         PAGE

 9   Exhibit 1              Photograph                 21

10   Exhibit 2              Photograph                 22

11   Exhibit 3              Video Clip                 58

12   Exhibit 4              Video Clip                 60

13   Exhibit 11             Video Clip                 61

14

15

16

17

18

19

20

21

22

23

24

25
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 5

```
 1                          CALIFORNIA

 2                  THURSDAY, NOVEMBER 14, 2024

 3                         10:04 A.M.

 4                       ROBERT VACCARI,

 5   called as a witness on behalf of the Plaintiffs, having been

 6   first duly sworn remotely via videoconference, was examined

 7   and testified as follows:

 8                         EXAMINATION

 9   BY MR. GALIPO:

10       Q.   Can you please state your name.

11       A.   Robert Vaccari, V-a-c-c-a-r-i.

12       Q.   Are you able to hear me okay so far?

13       A.   Yes.

14       Q.   If you have any trouble hearing me at my time, will

15   you please let me know?

16       A.   Yes.

17       Q.   And your voice is good right now.

18            Try to keep it up if you can just so the court

19   reporter can hear all your words.

20            Okay?

21       A.   Yes.

22       Q.   I usually go about an hour and take a break, but if

23   you need to take break at any time before that, you just let

24   me know and we'll take a break at that time.

25            Okay?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 10

```
1     A.   Yes.

2     Q.   And what year did you do that in?

3     A.   1987.

4     Q.   Did you go to any college after high school?

5     A.   No.

6     Q.   Any military experience?

7     A.   No.

8     Q.   When did you first go to the academy?

9     A.   I went to the academy for some reserve training, I

10   believe in 1993, but that fell by the way side, but I wasn't

11   actually going to the academy until 1997, the full-blown

12   Sheriff's Academy.

13    Q.   And did you graduate from the academy in 1997?

14    A.   Yes.

15    Q.   What type of work were you generally doing before

16   you went to the academy?

17    A.   I was a photographer.

18    Q.   And after graduating from the academy, where were

19   you first assigned?

20    A.   West Valley Detention Center.

21    Q.   And what time frame were you there?

22    A.   From 1997 to approximately April of 2000.

23    Q.   And where were you assigned at that time?

24    A.   To Apple Valley Sheriff's Station.

25    Q.   So you had a patrol assignment as of that time?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 11

```
 1      A.   Yes.

 2      Q.   And then you would have had some field training?

 3      A.   Yes.

 4      Q.   Now, at some point you were promoted to sergeant?

 5      A.   Yes.

 6      Q.   And when was that, approximately?

 7      A.   January of 2012.

 8      Q.   And before being promoted to sergeant, were you

 9 essentially or generally assigned to patrol?

10      A.   No.

11      Q.   What other assignments did you have?

12      A.   When I was promoted to detective, I worked as a

13 detective at the Barstow Station and at the Apple Valley

14 Station.  In addition to being a station detective, I also

15 worked as a watch commander.  They'll have the detectives or

16 corporals cover watch commander duties.

17           And I also worked Specialized Investigations as a

18 detective.

19      Q.   And then after becoming a sergeant, were you

20 assigned back to the jails for some period?

21      A.   Yes.

22      Q.   And what period was that?

23      A.   From 2012 until sometime in 1013.

24      Q.   And then were you assigned back to patrol as a

25 sergeant, a patrol sergeant?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 18

1    Q.    What is that, generally?

2    A.    Would you also consider that sympathetic fire?

3    **Q.    Yes.  I think that's more or less synonymous.**

4    A.    Okay.  One officer sees a threat and potentially

5    starts firing his gun, and other officers that may not see

6    the same threat fire because of the firing by the first

7    officer.

8    **Q.    And are officers generally trained to be aware of**

9    **that concept and try to avoid contagious or sympathetic**

10   **fire?**

11              MS. GUSTAFSON:  Objection.  Speculation.

12              You can answer.

13              THE WITNESS:  Yes.  To be aware that the -- exist.

14   BY MR. GALIPO:

15        **Q.    Okay.  So let's talk a little bit about this**

16   **incident.**

17              **I understand there was a vehicle pursuit at some**

18   **point; is that correct?**

19        **A.    Yes.**

20        **Q.    And were you involved in part of the vehicle**

21   **pursuit?**

22        **A.    Yes.**

23        **Q.    And what was your involvement in the vehicle**

24   **pursuit?**

25        **A.    California Highway Patrol asked for our assistance**

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 19

1   when the vehicle left.  They were pursuing a vehicle, and it

2   had left the freeway and traveled into the City of

3   Hesperia.

4       Q.   And at some point did you observe this vehicle?

5       A.   Yes.

6       Q.   And generally, where was the vehicle when you first

7   observed it?

8       A.   I believe on Peach Avenue in Hesperia.

9       Q.   And was the vehicle stopped or moving when you first

10  saw it?

11      A.   It was moving.

12      Q.   And how much time passed from you first seeing the

13  vehicle to the vehicle coming to a stop?

14      A.   It would be an estimate on my part.

15           Half an hour to 45 minutes.

16      Q.   And during that time frame, to your knowledge, were

17  any shots fired either from the vehicle or at the vehicle?

18      A.   I don't know of any shots that were fired.

19      Q.   In other words, did you hear any shots, or was there

20  any report over the radio of shots?

21      A.   No.

22      Q.   Was there any report of seeing a gun inside the car

23  during the pursuit?

24      A.   No.

25      Q.   Did you have any information as to how many

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 20

```
 1   individuals were in the vehicle?

 2       A.   No.

 3       Q.   Did you know the names of anyone in the vehicle?

 4       A.   No.

 5       Q.   And was it your understanding that the primary units

 6   in the pursuit were CHP units?

 7       A.   Yes.

 8       Q.   And then the Sheriff's units were following

 9   behind?

10       A.   Yes.

11       Q.   And were you in a white unit or vehicle at the

12   time?

13       A.   Yes.

14       Q.   And was Deputy Adams also in a separate white

15   unit?

16       A.   Yes.

17       Q.   At some point the pursuit came to an end or the

18   vehicle stopped?

19       A.   Yes.

20       Q.   And was that also on Peach?

21       A.   Yes.

22       Q.   And would it have been facing northbound?

23       A.   Yes.

24       Q.   I want to show you a couple of photos that we showed

25   in the other depositions, and I think they will hopefully
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 23

 1      Q.   And was it your understanding that one of them was

 2  the sergeant for the CHP officers?

 3      A.   Yes.

 4      Q.   Did you learn at some point that there were two

 5  people in the vehicle?

 6      A.   Yes.

 7      Q.   And that one of them was a female?

 8      A.   Yes.

 9      Q.   Had you had training before with high-risk felony

10  stops?

11      A.   Yes.

12      Q.   Had you participated as either a sergeant or a

13  patrol officer in high-risk felony stops before?

14      A.   Yes.

15      Q.   And is that a situation where generally the law

16  enforcement units position themselves at a position of some

17  advance, and the officer stay behind cover behind the open

18  doors and issue a series of commands hoping that the

19  occupants of the vehicle would follow the commands?

20      A.   Yes.

21      Q.   And there could be commands like, throw the keys out

22  the window, show us your hands, open the door from the

23  outside, get out, hands up, hands on the back of your head,

24  walk backwards, things like that?

25      A.   Yes.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 24

1      Q.   Was that ever attempted, to your knowledge, in this

2   situation?  In other words, were the officers initially

3   behind cover when they were issuing commands?

4      A.   Yes.

5      Q.   And who was issuing the commands initially, if you

6   recall?

7           And if you don't recall their names, it's okay.

8           You can tell me whether it was a CHP officer or

9   yourself or whatever applies.

10     A.   Thank you.  I don't know any of the CHP officer's

11   names, but it was CHP.

12     Q.   Now, I take it one of the goals was to get the

13   occupants out of the vehicle?

14     A.   Yes.

15     Q.   And at some point did the female come out of the

16   vehicle?

17     A.   Yes.

18     Q.   And was that before the pepper balls were

19   deployed?

20     A.   Yes.

21     Q.   And did you have any conversation with the female

22   when she came out?

23     A.   I did not.

24     Q.   Where was the female placed if you recall after she

25   came out of the vehicle?

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 27

```
 1        Q.   At some point were you considering the use of pepper
 2   balls?
 3        A.   Yes.
 4        Q.   Did you have some experience with the use of pepper
 5   balls?
 6        A.   Yes.
 7        Q.   And would that include getting someone out of a car
 8   if they didn't want to come out?
 9        A.   It could be used for that function.
10        Q.   Could it also be used like if someone's in a room
11   and doesn't want to come out, for example?
12        A.   Yes.
13        Q.   And I take it you have training with respect to
14   pepper balls?
15        A.   Yes;
16        Q.   And what is the intended effect of pepper balls?
17             I take it to make the environment uncomfortable?
18        A.   Yes.
19        Q.   And based on the training, what is the effect of
20   pepper balls on most individuals?
21        A.   Depending on how they react to the -- it's more like
22   a pepper spray powder inside of the ball.  When it's released
23   it could have various effects on an individual.
24        Q.   And what are some of the effects that are trained?
25        A.   I've seen individuals have absolutely no response to
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 28

1    the pepper balls or the powder that's inside the pepper balls

2    as to runny nose.  They can't see, and they want to get away

3    from whatever the powder is inside that or the pepper

4    spray.

5        Q.    Is some of the training that they could have the

6    sensation of their skin burning?

7        A.    I don't recall specifically anything about the skin

8    burning.  It's usually nasal, eyes, mouth.

9        Q.    And how about the perception of difficulty

10    breathing, do you know if that's part of the training?

11    A.    Yes.

12        Q.    And a pepper ball deployment versus pepper spray

13    deployment or OC spray, is that similar?

14        MS. GUSTAFSON:  Objection.  Vague.

15        You can answer.

16        THE WITNESS:  Depending on the application, yes, it

17    can have similar effects.

18    BY MR. GALIPO:

19        Q.    I take it to use pepper balls, there has to be some

20    way for them to get inside the vehicle?

21    A.    Yes.

22        Q.    So if all the window are up, you have to see if a

23    window could be broken somehow?

24    A.    A window would have to be open, yes.

25        Q.    Whose decision was it, if you know, to use the

00312

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 30

```
 1   pepper ball launcher, there was air cylinders for it, and

 2   then there was plastic that looks like test tubes of glass

 3   breaker pepper balls -- not pepper balls -- glass breaker

 4   balls for the pepper ball launcher.

 5           They were labeled with glass breaker on them.

 6   Q.   And is that what was used?

 7   A.   Yes.

 8   Q.   And was that successful in breaking the glass?

 9   A.   Yes.

10   Q.   And then who was actually deploying the pepper balls

11   into the vehicle?

12   A.   I was.

13   Q.   And where were you positioned when you were

14   deploying them?

15   A.   To the rear of the white Expedition alongside the

16   passenger side of one of the CHP units.

17   Q.   Were you in a position of cover or semi-cover when

18   you were deploying the pepper balls?

19   A.   Yes.

20   Q.   And would that be behind an open door?

21   A.   Yes.

22   Q.   And over what period of time would you estimate you

23   were deploying pepper balls into the vehicle?

24   A.   At least 30 minutes.

25   Q.   And do you have any estimate as to how many pepper
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 31

1    balls you deployed?

2            Maybe you can give me a total, or tell me, you know,

3    you would do it every, you know, three to five minutes, in

4    volleys, or whatever it was?

5        A.    Yes.  It was -- there would be communication.

6            We would ask Hector to get out of the vehicle.

7            Either myself or the CHP, I believe it was the

8    sergeant that was doing the talking to them, and when we

9    wouldn't get a response, I would introduce the pepper balls

10   into the car.

11           I can't say they were at a timed interval like every

12   three minutes, but there would be several minutes that would

13   pass, and I would shoot between five and twelve pepper balls.

14           With the pepper ball launcher, not every pop you

15   hear from a trigger pull yields a pepper balls coming out.

16   Its feeding system is just okay.  So sometimes I may have

17   pulled the trigger a dozen times, and I might have only got

18   six or seven balls that actually fired out of the gun.

19       Q.    How many pepper balls do you think were deployed

20   altogether by you?

21       A.    An estimate, between 120 and 150, maybe.

22       Q.    And at some point I take it after 15 or 20 minutes

23   of the pepper ball deployments, there was still no luck

24   initially with Mr. Puga coming out of the vehicle?

25       A.    He didn't physically come out of the vehicle, but he

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 32

1 would tell us that he was coming out of the vehicle.

2         I can't recall at exactly at what points in time,

3 but he would open the door, close the door.  He would tell us

4 he was coming out of the vehicle.  We would give him an

5 opportunity to come out of the vehicle.  He wouldn't come

6 out, and then we would introduce more or I would introduced

7 more pepper balls into the vehicle.

8     Q.   At some point did you hear him coughing or any other

9 sounds that told you it may be having some effect?

10     A.   I believe I did hear coughing, but I don't know

11 specifically where that was coming from.  It could have been

12 one of the CHP members that were near the car as pepper balls

13 dust was leaving the vehicle, but I did hear coughing.

14     Q.   Did you ever have the impression that one of the

15 pepper balls may have struck him in the face or head?

16     A.   Only based on what Mr. Puga said.

17     Q.   And what did he say in that regard?

18     A.   "You shot me in the eye."

19     Q.   And after he said that did you deploy any additional

20 pepper balls?

21     A.   No.

22     Q.   After he said that, you stopped with the pepper ball

23 deployments?

24     A.   Yes.

25     Q.   And did you believe that Mr. Puga was armed with a

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 33

```
 1   firearm?

 2            MS. GUSTAFSON:  Vague as to time.

 3   BY MR. GALIPO:

 4       Q.   When he was in the car?

 5       A.   That was the initial call we were given information

 6   to.

 7       Q.   And is that what you believed when he was in the

 8   car?

 9       A.   Yes.

10       Q.   Now, he eventually got out of the car; is that

11   correct?

12       A.   Yes.

13       Q.   And for some period of time he was on the driver's

14   side of the vehicle?

15       A.   Yes.

16       Q.   Where were you positioned when Mr. Puga first got

17   out of the vehicle?

18       A.   Behind the CHP unit.

19       Q.   Behind that open driver's door or open passenger

20   door?

21       A.   I believe I was standing behind the trunk.

22       Q.   And do you know if that was the CHP unit that was in

23   the southbound lane or the one that was in the northbound

24   lane?

25       A.   The one closest to the driver's side of his vehicle.
```

00316

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 34

1           So southbound lane.

2       Q.    Okay.  And when Mr. Puga got out of the vehicle, did

3    you still think that he possibly had a firearm on his

4    person?

5       A.    We were going to treat him as though he had a

6    firearm until we knew he didn't.

7       Q.    Did you ever see him put his hands up when he was on

8    the driver's side of the vehicle?

9       A.    I believe he did.

10      Q.    Was he given commands at any time to put his hands

11   up?

12      A.    I can't recall if he did it voluntarily or if he was

13   given some type of commands by the CHP to put his hands up.

14      Q.    At some point did you hear an exchange between

15   Mr. Puga and the CHP sergeant where Mr. Puga was concerned

16   that he was going to be shot?

17      A.    Yes.

18      Q.    And did you hear the CHP sergeant assure him words

19   to the effect that he wasn't going to be shot?

20      A.    Something to that effect, but it was also based on

21   Mr. Puga's compliance.

22      Q.    And at some point after Mr. Puga expressed a concern

23   for being shot, do you recall him going to the front of the

24   vehicle?

25      A.    In regards to him saying he had concerns for being

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 35

1  shot, I believe he said it when he was standing outside of

2  the driver's side door.  I don't know if there was additional

3  statements made by him when he got to the front of the

4  vehicle.

5       Q.   Okay.  Do you remember something about him saying

6  that he thought he heard a click or something like that?

7       A.   I do remember him saying that.

8       Q.   Okay.  In any event at some point, you recall him

9  going to the front of the vehicle?

10      A.   Yes.

11      Q.   And when he went to the front of the vehicle, do you

12  recall if the driver's door of the vehicle was open or

13  closed?

14      A.   Closed.

15      Q.   Do you recall if the passenger door on the vehicle

16  was open or closed?

17      A.   I only have recollection of that based on my review

18  of the video.

19      Q.   And what did the video indicate in that regard?

20      A.   That at some point while we were dealing with

21  Mr. Puga alone in the car, he opened the passenger door of

22  the vehicle.

23      Q.   Do you know if that door could have remained open

24  when the female got out?

25      A.   It was closed.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 36

1    Q.   You recall it was closed at that point?

2    A.   From the video.

3    Q.   I see.

4    A.   I was only on the driver side of the vehicle.

5         I didn't have any knowledge at the actual incident,

6    I didn't have knowledge of whether the female had closed the

7    door when she exited fairly early on in the incident, but

8    after watching the video, the door opens.

9    Q.   Okay.  So based on that, it's your current belief

10   that Mr. Puga somehow opened that door at some point?

11   A.   Yes.

12   Q.   And when Mr. Puga was in the front of the vehicle,

13   you're still treating him as if he has a firearm until it's

14   shown that he didn't?

15   A.   Correct.

16   Q.   At some point was there some discussion between you

17   and the CHP sergeant as to whether or not you should approach

18   Mr. Puga when he was in front of the vehicle?

19   A.   No.  Not between myself and the CHP sergeant.

20   Q.   Was there any joint tactical plan that was

21   communicated between yourself and the CHP sergeant as to how

22   to handle the situation now that he was in front of the

23   vehicle?

24   A.   No.  There was not any discussion of a tactical plan

25   between us, between us and the CHP sergeant.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 37

1    Q.   Did you overhear any discussion between the CHP

2    sergeant and the CHP officers as to what they were going to

3    do?

4    A.   No.

5    Q.   Did you have any understanding as to whether they

6    were going to try to approach or not?

7    A.   When Mr. Puga moved to the front of his vehicle, it

8    became more of a dynamic situation.  The CHP sergeant and one

9    of the CHP officers moved towards the shoulder of Peach on

10   the west side, and I believe that was to get a better view of

11   him while he was at the front of the vehicle.

12   Q.   During some of the time that Mr. Puga was in the

13   vehicle, was there an airship overhead?

14   A.   During some of the time, yes.

15   Q.   And was the helicopter using its spotlight?

16   A.   I don't remember.

17   Q.   Were you aware this was a residential

18   neighborhood?

19   A.   Yes.

20   Q.   And you were aware there were residences on the four

21   corners?

22   A.   Yes.

23   Q.   And did you ever consider tactically by way of PA

24   system or otherwise to alert the people of the potential harm

25   or to have them evacuated?

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 39

1          I don't know.  The only thing I can generally recall

2    that would have been in their area was the telephone pole,

3    but I never went over and stood in that position to look and

4    see if they had any cover or concealment from where I

5    remember them.

6          Q.    How about yourself, did you have any discussion with

7    Deputy Adams as to what you wanted to do in terms of Mr. Puga

8    being in front of the vehicle at that point?

9          A.    Yes, I did.

10         Q.    Can you please tell me about that.

11         A.    I felt like we needed to come off an avenue of

12   escape.  He was standing upright.  He was at the front of his

13   vehicle.  He was mobile.  He had the entire engine

14   compartment which is very good cover from his vehicle.

15              And he also had in addition to the front of his

16   vehicle, he had the passenger side engine compartment he

17   could use for cover and concealment along with the entire

18   passenger side of the vehicle.

19              So I wanted to move over on to the passenger side of

20   the vehicle to cut off any avenues of escape.

21         Q.    And did you want to be able to have some cover as

22   you were doing that?

23         A.    We were going to use the best cover we could.

24         Q.    And what was that?

25         A.    The passenger side of his vehicle.

00321

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 40

1      Q.    And you had the 40-millimeter at that point?

2      A.    Yes.  That was the weapon system I chose.

3      Q.    Was there an earlier discussion about possibly using

4    the Taser?

5      A.    I was hypothetically just thinking outloud when I

6    was talking with Adams.  Mr. Puga wasn't wearing a shirt at

7    the time which makes a very good target for the use of a

8    Taser.

9            However, you have to be pretty close to him, and I

10   didn't want to get that close to him to use the Taser.  So I

11   thought that the -- I chose the 40-millimeter because of its

12   overall effective range.  It could be used much closer safely

13   than the bean bag shotgun, and it had the ability to shoot

14   over a greater -- over a same distance as the bean bag

15   shotgun.  So I felt like the 40-millimeter gave me the most

16   options.

17     Q.    But some of the less-lethal options that you at

18   least thought about would include the Taser, the bean bag

19   shotgun, and the 40-millimeter; is that fair?

20     A.    At that point, yes.

21     Q.    At some point as you were approaching, did you hear

22   shots?

23     A.    Not as I'm approaching.

24     Q.    Did you hear shots at some point?

25     A.    Yes.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 41

1      Q.   And where were you in relation to the white vehicle

2    when you first heard the shots?

3      A.   I would say we were on the passenger side of the

4    white Expedition on the dirt shoulder probably where the

5    passenger side door was.

6      Q.   When you say we, are you referring to yourself and

7    Deputy Adams?

8      A.   Yes.

9      Q.   So when you say you're at the passenger side door, I

10   know there is two doors on the passenger side.

11          Are you talking about the rear door on the passenger

12   side?

13     A.   I would say the front door.

14     Q.   The front door.  And are you saying that was --

15   because Adams was slightly ahead of you; correct?

16     A.   I don't recall.

17     Q.   And the door, I think you already indicated was

18   open?

19     A.   The door was open, but we're not using that as

20   concealment.  We're on the dirt shoulder.  So I would say we

21   were at least ten feet away from the passenger side of the

22   that vehicle.

23     Q.   Did you have any cover on the dirt shoulder?

24     A.   No.

25     Q.   So you believe you were on the dirt shoulder in line

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 42

```
 1    more or less with the front door on the passenger side, but
 2    like ten feet from it; I guess it would be ten feet east of
 3    it?
 4         A.   Correct.
 5         Q.   And that's when you heard the shots?
 6         A.   Yes.
 7         Q.   And at some point you saw Mr. Puga turn and start
 8    running north or northwest?
 9         A.   Yes.
10         Q.   And you thought you had dropped your 40-millimeter
11    weapon and unholstered your firearm; that's what you thought
12    initially?
13         A.   Yes.
14         Q.   And but then when you saw the video, you realized
15    that something slightly different happened?
16         A.   Correct.
17         Q.   And when you watched the video, although you thought
18    you dropped your 40-millimeter and unholstered your firearm,
19    you saw that you actually did not unholster your firearm at
20    that initial time frame?
21         A.   Correct.
22         Q.   Did you drop your 40-millimeter initially?
23         A.   No.
24         Q.   How many shots did you hear approximately before
25    Mr. Puga started running away?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 43

1      A.   I don't recall.  It seemed as he was running as soon

2   as the gunfire started.

3      Q.   And did you hear any shots being fired as he was

4   continuing to running away?

5      A.   Yes.

6      Q.   Did anyone ever yell out, "Gun, he has a gun" or

7   words to that effect?

8      A.   I didn't hear that.

9      Q.   Did you hear anyone say, "Drop it" at any time?

10     A.   Not that I recall.

11     Q.   Do you recall him going to the ground at some

12   point?

13     A.   Yes.

14     Q.   And after he went to the ground, did you hear any

15   additional shots being fired?

16     A.   Yes.

17     Q.   How many additional shots did you hear after he went

18   to the ground?

19     A.   I don't recall.

20     Q.   Do you have any estimate?

21     A.   Several.

22     Q.   And when you say several, are we talking five to

23   ten?  What is your best estimate?

24     A.   More than three, less than ten.

25     Q.   Okay.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 46

 1    comments about his face.

 2        Q.    So going back to the time frame when he was in front

 3    of the car, do you have any estimate as to how long he was in

 4    the front of the car before you started moving towards the

 5    dirt shoulder with Deputy Adams?

 6        A.    Three or four minutes.

 7        Q.    And when you were approaching with Deputy Adams on

 8    the passenger side of the vehicle, could you physically see

 9    where the CHP officers were?

10        A.    Honestly, my intention was -- I know where I left

11    the one which was standing in the open passenger door of his

12    vehicle.  I knew that the other two had moved over on to the

13    street or the shoulder near the southbound lane of Peach.

14            But my attention wasn't directed towards what the

15    CHP were doing at that point.  It was solely directed at

16    Mr. Puga.

17        Q.    When Mr. Puga turned and started running, was he

18    running generally north or northwest?

19        A.    Yes.

20        Q.    And you heard gunshots continue to be fired as he

21    was running north, northwest?

22        A.    Yes.

23        Q.    You don't -- is it difficult for you to estimate how

24    many gunshots were fired before he started running away?

25        A.    Repeat the question one more time.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 50

```
 1  effect, having Mr. Puga step out of the vehicle, he said he

 2  had a shield and considered using the shield to go block him

 3  inside of the car and try to pull him out of that car.

 4          And I shook my head no, and told him -- I didn't

 5  tell him.  I just shook my head no.  That wasn't what we were

 6  going to do.

 7      Q.   So would it be fair to say there were some

 8  respectful disagreements to how best to proceed between

 9  yourself and the CHP sergeant?

10      A.   I believe just in that one aspect.

11      Q.   Okay.  Now, let's get back to you because it sounds

12  like you initially thought that you had dropped the

13  40-millimeter, pulled out your firearm, and came up on target

14  of Mr. Puga.

15          That was your initial what you believed happened; is

16  that fair?

17      A.   Correct.

18      Q.   And you in that scenario you coming up on target

19  with your firearm, decided not to shoot; is that also

20  correct?

21      A.   Yes.

22      Q.   And but then when you watched the video, it appeared

23  something different had actually happened?

24      A.   Yes.

25      Q.   And what did you see when watching the video that, I
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 51

1    guess, refreshed your recollection, if you will, that it

2    actually happened differently in terms of you and your

3    weapon?

4         A.   That I had remained on target with the 40-millimeter

5    as Mr. Puga ran away, and then I moved -- I turned away from

6    the -- from what was going on and dropped the 40-millimeter

7    on the ground.  I had unholstered my duty firearm, but as I

8    watched what was unfolding, Mr. Puga had already -- he was

9    either going down or already down, and I reholstered my

10   firearm.

11        Q.   And with respect to the 40-millimeter, was there

12   some issue as to whether the safety was on or not?

13        A.   Yes.

14        Q.   Can you explain that, please.

15        A.   Yes.  I had only received brief training at the

16   academy with respect to the 40-millimeter, and it has a

17   safety, and the safety has a red dot and a white dot.

18             I still to this day don't know if the white dot

19   means fire or the white dot means safe and red dot means

20   fire.  I can't recall at this point in time which way I had

21   the selector switch.

22             But if I remember the weapon system properly,

23   regardless of which way you put that safety switch, the

24   trigger pulls.  It's just whether or not it actually fires a

25   projectile or not.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Robert Vaccari on 11/14/2024

Page 52

1    Q.   Do you remember if you ever pressed the trigger or

2    attempted to press the trigger on the 40-millimeter?

3    A.   Yes, I did.

4    Q.   And do you know if anything came out of the

5    40-millimeter when you pressed it?

6    A.   I have no idea.

7    Q.   How did you become aware of the issue of the

8    safety?

9    A.   When I took the one -- I loaded the 40-millimeter

10   up, and I even had a conversation with Deputy Adams, is red

11   fire or white fire.

12           And so, yes.  Even to this day I don't know if the

13   40-millimeter fired.

14   Q.   Did Deputy Adams know or appeared to know whether it

15   was white or red?

16   A.   He did not.

17   Q.   It might have been easier to do red and green.

18   A.   I would have just assumed it had words.

19   Q.   Okay.  Now, your impression when you were watching

20   Mr. Puga running is that he had been struck by gunfire; is

21   that fair?

22   A.   Yes.  Just prior to him going to the ground.

23   Q.   And what did you see in observing him led you to

24   believe he had been struck prior to going to the ground?

25   A.   It looked more like he was staggering as opposed to

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 54

1     Q.   And you recall him being more or less chest-down?

2     A.   When we got to him, yes.

3     Q.   And you maintained a distance of about 15 feet at

4  that point?

5     A.   Yes.

6     Q.   And you noticed his breathing or the chest -- his

7  chest wall rising and falling?

8     A.   Yes.  That he appeared like he was still

9  breathing.

10    Q.   And you at some point decided to deploy the Taser?

11    A.   Yes.

12    Q.   And did you, in fact, deploy it?

13    A.   Yes.

14    Q.   And you were approximately 15 feet away when you did

15  so?

16    A.   Approximately.

17    Q.   And did you discuss the deployment of the Taser with

18  any of the other officers on-scene?

19    A.   I don't recall if there was a discussion.

20    Q.   Where were you essentially aiming when you pointed

21  the Taser?

22       Would it be towards the back?

23    A.   Yes.

24    Q.   And obviously, he was still shirtless?

25    A.   Yes.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 55

1    Q.   Could you tell whether the probes or darts made

2    contact?

3    A.   Yes.

4    Q.   Did they appear to?

5    A.   Yes.

6    Q.   What did you see based on your training, that led

7    you to believe that they made contact?

8    A.   There was a tensing and a muscle reaction by

9    Mr. Puga.

10   Q.   And based on your training, is that something that

11   you would expect to see if the darts made appropriate

12   contact?

13   A.   Yes.

14   Q.   And when you saw this muscle tensing of Mr. Puga,

15   was he essentially still chest-down?

16   A.   Yes.  Chest-down with his hands underneath his

17   body.

18   Q.   And you told me earlier that you had the impression

19   he had been struck by some of shots before he went to the

20   ground; is that fair?

21   A.   That was the appearance.  That's the impression that

22   I had based on how he was running.

23   Q.   And then you also heard shots continue immediately

24   before he went to the ground?

25   A.   You keep using the word immediately.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 56

```
 1      Q.   Within one or two seconds.

 2      A.   Before he went down, yes.

 3      Q.   And then you told me you heard some shots after he

 4  went to the ground?

 5      A.   Yes.

 6      Q.   But I take it all those shots had finished before

 7  you approached and utilized the Taser?

 8      A.   Yes.

 9      Q.   And so at the time you used the Taser, you were at

10  least had the impression that he had already been struck by

11  some of the shots?

12      A.   Struck by at least one.

13      Q.   Right.  And I take it overall, the number of shots

14  that you heard was quite numerous, maybe in excess of 20

15  shots or 30 shots; is that fair?

16           MS. GUSTAFSON:  Objection.  Misstates testimony.

17           You can answer.

18           THE WITNESS:  At least 20 shots.

19  BY MR. GALIPO:

20      Q.   Okay.  And then did you tase Mr. Puga a second

21  time?

22      A.   Yes.

23      Q.   And then he was eventually approached and searched

24  and handcuffed?

25      A.   Yes.
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 60

```
 1  is running away?

 2      A.   Yes.

 3           MR. GALIPO:  Exhibit 4, Hang, could we also play a

 4  portion of that, please.

 5           (Exhibit 4 was marked for identification.)

 6           MR. GALIPO:  And is this cued up shortly before the

 7  shooting?

 8           MS. LE:  Yes, it is.

 9           MR. GALIPO:  And it looks like it's at 34 seconds

10  in?

11           MS. LE:  Yes.

12           MR. GALIPO:  Okay.  Go ahead and play, please.

13           (Video playing.)

14           MR. GALIPO:  Okay.  We can stop that.

15           (Video paused.)

16  BY MR. GALIPO:

17      Q.   That's at 1:18, I think.

18           Is that one of the videos that you also watched?

19      A.   Yes.

20           MR. GALIPO:  And what was the last -- was it Exhibit

21  11 that we looked at yesterday that was the additional video,

22  Hang, if you remember?

23           MS. LE:  Yes.  It was Exhibit 11.

24           MR. GALIPO:  Okay.  Can we play a portion of that

25  because I think that shows the sergeant a little better in
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 63

1      Q.   And did you ever give a verbal warning to him that

2   you were going to tase him?

3      A.   I don't recall.

4      Q.   Do you recall ever hearing a verbal warning that

5   deadly force was going to be used?

6      A.   No.

7      Q.   Okay.  Thank you.

8           MR. GALIPO:  Diana, were you able to look at your

9   notes?

10          MS. ESQUIVEL:  Yes.  I have a few questions.

11                              EXAMINATION

12   BY MS. ESQUIVEL:

13      Q.   Good morning, Sergeant Vaccari.

14           My name is Diana Esquivel.  I represent the

15   California Highway Patrol and the officers involved in this

16   incident.

17           I just have a couple of follow-up questions.

18           I apologize if some of them might seem a little

19   repetitive.

20           You testified earlier that you didn't see muzzle

21   flash coming from Mr. Puga's direction; correct?

22      A.   Not the night of the incident.

23      Q.   From where you were standing, were you at any point

24   at any time before you heard the first shot regardless of who

25   shot it, were you able to see Mr. Puga's waist or his

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 64

1   waistband area?

2        A.    No.  It was below the body line of the hood of the

3   car that he was standing in front of.

4        Q.    Before you heard the shots, based on your position

5   were you able to see him lower his hand and grab at anything

6   in his waist and waistband area?

7        A.    Yes.

8        Q.    Did you see anything in his hand after he made that

9   motion?

10        A.    Yes.  He drew a firearm.

11        Q.    And you saw the firearm?

12        A.    Yes.

13        Q.    And did you see if he lifted it and pointed it in

14   any particular direction after you were able to see the

15   firearm in his hand?

16        A.    I didn't see him point it at any specific

17   direction.

18        Q.    To the best that you can estimate, how soon after

19   that you observed the firearm in Mr. Puga's hand did you hear

20   a shot, the first shot?

21            MR. GALIPO:  I'm going to object.  It assumes facts

22   potentially not in evidence that the shots didn't happen,

23   start beforehand.

24            THE WITNESS:  And I couldn't make that -- I can't

25   make that -- what would I say -- distinction.  I don't know

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 68

1                              CERTIFICATE

2                                  OF

3                CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5              I, JINNA GRACE KIM, CSR No. 14151, a Certified

6       Stenographic Shorthand Reporter of the State of California,

7       do hereby certify:

8              That the foregoing proceedings were taken before me

9       at the time and place herein set forth;

10             That any witnesses in the foregoing proceedings,

11      prior to testifying, were placed under oath;

12             That a verbatim record of the proceedings was made

13      by me, using machine shorthand, which was thereafter

14      transcribed under my direction;

15             Further, that the foregoing is an accurate

16      transcription thereof.

17             I further certify that I am neither financially

18      interested in the action, nor a relative or employee of any

19      attorney of any of the parties.

20

21             IN WITNESS WHEREOF, I have subscribed my name, this

22      date:  November 14, 2024.

23

24                             _____
                               Jinna Grace Kim, CSR No. 14151

25

00336