# **EXHIBIT V**

00337

```
 1                UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
              Plaintiffs,                   )
 7                                          )
              vs.                           ) Case No.
 8                                          ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
              Defendants.                   )
12   _____)

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                     ISAIAH KEE

18              TUESDAY, NOVEMBER 5, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  113704
```

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 2

```
 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                  Plaintiffs,               )
 7                                          )
                  vs.                       ) Case No.
 8                                          ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                  Defendants.               )
12   _____)

13

14

15

16          The remote videoconference deposition of ISAIAH KEE,

17   taken on behalf of the Plaintiffs, beginning at 9:38 a.m.,

18   and ending at 12:39 p.m., on Tuesday, November 5, 2024,

19   before Jinna Grace Kim, Certified Stenographic Shorthand

20   Reporter No. 14151.

21

22

23

24

25
```

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  HANG D. LE, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  hle@galipolaw.com
 8

 9    For the Defendants:

10            DEPUTY ATTORNEY GENERAL
              BY:  DIANA ESQUIVEL, ESQ.
11            1300 I Street, Suite 125
              P.O. Box 944255
12            Sacramento, California 94244
              E-mail:  diana.esquivel@doj.ca.gov
13

14            LYNBERG & WATKINS
              BY:  AMY R. MARGOLIES, ESQ.
15            1100 W. Town & Country Road, Suite 1450
              Orange, California 92868
16            E-mail:  mmargolies@lynberg.com

17

18    Also Present:  Plaintiffs (previously stated on the record)

19

20

21

22

23

24

25
```

00340

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

|    |  |  |
|----|--|--|
| | | **Page 4** |
| 1 | INDEX | |
| 2 | WITNESS: | PAGE |
| 3 | ISAIAH KEE | |
| 4 |    BY: MR. GALIPO | 5 |
| 5 |    BY: MS. MARGOLIES | 73 |
| 6 |    BY: MS. ESQUIVEL | 75 |
| 7 |    BY: MR. GALIPO | 92 |
| 8 | | |
| 9 | EXHIBITS | |
| 10 | MARKED FOR IDENTIFICATION | PAGE |
| 11 | Exhibit 5           Photograph | 17 |
| 12 | Exhibit 1           Photograph | 26 |
| 13 | Exhibit 2           Photograph | 26 |
| 14 | Exhibit 6           Photograph 650 | 63 |
| 15 | Exhibit 3           Video | 67 |
| 16 | Exhibit 4           Cell Phone Vidoe | 69 |
| 17 | Exhibit 7           Cell Phone Video 0241 | 70 |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 5

```
 1                          CALIFORNIA

 2                  TUESDAY, NOVEMBER 5, 2024

 3                          9:38 A.M.

 4                          ISAIAH KEE,

 5   called as a witness on behalf of the Plaintiffs, having been

 6   first duly sworn remotely via videoconference, was examined

 7   and testified as follows:

 8                          EXAMINATION

 9   BY MR. GALIPO:

10       Q.   Can you please state your name.

11       A.   My name is Isaiah Kee, K-e-e.

12       Q.   Are you able to hear me okay so far?

13       A.   Yes, sir.

14       Q.   If you any trouble hearing me at any time, will you

15   please let me know?

16       A.   Yes, sir.

17       Q.   And as I told you off the record, I usually go about

18   an hour and take a break, but if you need to take a break for

19   any reason at any time, you let me know and we'll talk a

20   break at that time.

21            Okay;

22       A.   Yes, sir.

23       Q.   Have you reviewed any documents to help prepare for

24   the deposition?

25       A.   Yes.
```

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 10

```
 1   first volley?

 2       A.   From what I can recall, like five, five to eight

 3   shots.

 4       Q.   It's my understanding from reading your statement

 5   that you initially fired when you saw Mr. Puga's hands moving

 6   towards the handgun in his waistband; is that correct?

 7       A.   Yes.

 8       Q.   And are you saying in that first volley as his hand

 9   was moving towards the waistband, you fired approximately

10   five to eight shots?

11       A.   Yes.

12       Q.   Would you have been aiming center mass?

13       A.   Yes.

14       Q.   Was that essentially from your perspective the

15   chest-abdomen area?

16       A.   Yes.

17       Q.   You more or less were aiming at his chest; is that

18   your recollection?

19       A.   Yes.

20       Q.   And from that distance your impression of these was

21   that you were striking him with some of your shots; is that

22   fair?

23       A.   Yes.

24       Q.   Do you recall if Mr. Puga had a shirt on or not at

25   the time?
```

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 11

1    A.    No, he did not have a shirt on.

2    Q.    No shirt?

3    A.    No, sir.

4    Q.    How about his pants, do you generally recall what

5    type of pants he had?

6    A.    Pair of jeans.

7    Q.    Do you recall whether they were baggy or tight?

8          How would you describe them?

9    A.    They were baggy.  He had a belt on, and I remember

10   the jeans were low enough to where you could see his

11   underwear, his under garment.

12   Q.    So they were -- the jeans were kind of hanging low

13   on his waistline or towards his buttocks?

14   A.    Yes, sir.

15   Q.    Did you notice him a few times during the entirety

16   incident -- I know it was a long incident -- reaching down

17   and kind of picking up his pants or moving his hand to pick

18   up his pants?

19   A.    Yes, sir.

20   Q.    How many times did you see him do that,

21   approximately?

22   A.    I recall twice when he was -- when he had exited out

23   of the vehicle, I recall him doing it twice.

24   Q.    Would that be when he was on the driver side of

25   advice?

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 14

```
 1   and I graduated May of 2001.

 2        Q.   And at some point you were promoted to sergeant?

 3        A.   Yes.

 4        Q.   And when were you promoted to sergeant?

 5        A.   That was in May of 2017.

 6        Q.   Do you recall the date of the incident we're here to

 7   talk about?

 8        A.   It was February 16 -- technically, the 17th, and

 9   that was in 2021.

10        Q.   Prior to that date had you yourself in your work as

11   a law enforcement officer ever seen a suspect with a gun in

12   their hand before?

13        A.   Yes.

14        Q.   On how many occasions, approximately?

15        A.   Maybe I would say three times.

16        Q.   Were you trained that you could shoot someone merely

17   for seeing a gun in their hand, that fact alone?

18        A.   Yes.

19        Q.   How about a gun in the waistband, had you ever seen

20   that before?

21        A.   Yes -- no.  As far as on a suspect?

22        Q.   Yes.

23        A.   Yes.

24        Q.   On how many occasions, approximately?

25        A.   Maybe twice.
```

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 16

1    Q.   Do you recall which officers fired in that

2    particular incident?

3    A.   Yes.

4    Q.   And who were they?

5    A.   Sergeant Fredericks, Officer Lugo, Officer

6    Blackwood, and I can't recall the last officer's name because

7    he was from a different area.

8    Q.   Were you involved in the vehicle pursuit in this

9    case we're here to talk about today?

10   A.   Yes.

11   Q.   And how long was the pursuit for, approximately?

12   A.   From what I recall, it was maybe 30 minutes.

13   Q.   And during the pursuit were any shots fired, to your

14   knowledge?

15   A.   No, sir.

16   Q.   Did you see any weapon in Mr. Puga's vehicle during

17   the pursuit?

18   A.   No, sir.

19   Q.   Were you aware at some point that there were at

20   least two people in the vehicle?

21   A.   No.

22   Q.   And what street did the pursuit end on?

23   A.   It was on Peach, northbound on Peach, south of

24   Catalpa.

25   Q.   And can you spell Catalpa?

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 17

```
 1     A.   It's C-a-l-t-a-p-a.

 2     Q.   Thank you.

 3          MR. GALIPO:  Can we, Hang, put up for the sergeant

 4   Exhibit 5 from yesterday's deposition.

 5          (Exhibit 5 was marked for identification.)

 6   BY MR. GALIPO:

 7     Q.   Are you able to see it on your screen?

 8     A.   Yes.

 9     Q.   And does that appear to be the general location of

10   where the shooting incident took place?

11     A.   Yes, sir.

12     Q.   Have you seen photos like this or similar photos?

13     A.   Yes.

14     Q.   The white car facing northbound on Peach furthest

15   north, would that be Mr. Puga's vehicle?

16     A.   Yes.

17     Q.   And the CHP vehicle closest to that vehicle also

18   facing northbound in the southbound lane, would that be the

19   vehicle that belonged to Rubalcava and Blackwood?

20     A.   Yes.

21     Q.   And then there is another CHP vehicle facing

22   northbound in the northbound lane.

23          Would that be your vehicle?

24     A.   Yes.

25     Q.   And the two white vehicles, to your knowledge, were
```

00347

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 19

```
 1      Q.   You were the only sergeant on-scene, to your
 2   knowledge?
 3      A.   No.  There was another sergeant from the Sheriff's
 4   Department on-scene as well.
 5      Q.   Do you know the name of that individual?
 6      A.   No, sir.
 7      Q.   At some point did a female come out of the white
 8   vehicle?
 9      A.   Yes.
10      Q.   And I take it for a period of time you were
11   attempting to get Mr. Puga out of the vehicle, but he was not
12   coming out of the vehicle; is that fair?
13      A.   Yes.
14      Q.   And at that point you were considering what
15   different options you had?
16      A.   Yes.
17      Q.   At some point did you consider calling in the SWAT
18   Team or the equivalent?
19      A.   Yes.
20      Q.   Did you make that request to somebody?
21      A.   Yes.
22      Q.   Who did you make the request to?
23      A.   I spoke to the Sheriff's sergeant.
24      Q.   And did you just generally inquire that you thought
25   that's something that should be considered, maybe calling
```

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 20

1    SWAT out to see if they're available?

2        A.    Yes.

3        Q.    And do you recall what the response was to your

4    request?

5        A.    They told me that they were not going to come for

6    something of this nature.

7        Q.    Do you know if the call was ever made?

8        A.    That, I don't know.  I just saw him go back to his

9    car, and he had a cell phone, and he got on the cell phone.

10            But I wasn't close enough to hear if he actually

11    called.

12        Q.    Has it been your experience being in law enforcement

13    for some time, that sometimes SWAT does come out for a

14    barricaded suspect?

15        A.    Yes.

16        Q.    And is that why you made the request?

17        A.    Yes.

18        Q.    At some point was it decided that pepper balls might

19    be helpful in making the inside of the car environment

20    uncomfortable and having Mr. Puga come out?

21        A.    Yes.

22        Q.    And obviously, to get pepper balls in the car, you

23    have to have a open or broken window to get them through; is

24    that fair?

25        A.    Yes.

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 22

1    Q.    And who was doing the pepper balls, if you know?

2    A.    That's the sergeant that I spoke about earlier who I

3    don't know his name.

4    Q.    So were the pepper balls being deployed by someone

5    from the Sheriff's Department?

6    A.    Yes.

7    Q.    And do you have any estimate as to how many pepper

8    balls were deployed?

9    A.    Well, I didn't -- if you don't mind, I could you

10   know maybe guess.  He told me that each container as I recall

11   had like a 100 balls in there, and that thing was almost

12   empty.  So you're looking at probably close to a 100 at least

13   in the 90's.

14   Q.    Okay --

15   A.    Maybe 90 to 95, I guess.

16   Q.    That's an estimate in part based on what he told you

17   about the total being a 100?

18   A.    Yes.

19   Q.    And over what period of time were the pepper balls

20   being deployed?

21         In other words, from the first one to the last one,

22   was it 10 minutes, 20 minutes?  Any estimate or range?

23   A.    It was probably close to 20, 20 to 25 minutes.

24   Q.    And do you have any training or experience with the

25   effects of the pepper balls or pepper spray in general?

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 23

```
 1     A.   Pepper spray yes.  Not pepper balls.
 2     Q.   At any point in time did you form the impression
 3   that one of the pepper balls may have struck Mr. Puga in the
 4   eye area or face area?
 5     A.   Yes.
 6     Q.   What did you see in that regard?
 7     A.   He grabbed his -- I remember when he was still in
 8   the vehicle, he grabbed his right eye, and he was making
 9   comments to the effect of, "Oh, you guys shot me in the eye,
10   my eye hurts."
11     Q.   Okay.  And at any point did you see any redness or
12   blood in that area?
13     A.   No, sir.
14     Q.   I know it took quite awhile, and a lot of effort on
15   your part, but did Mr. Puga eventually come out of the
16   vehicle?
17     A.   Yes.
18     Q.   And obviously, he came out on the driver's side?
19     A.   Yes.
20     Q.   And when he came out of the vehicle, is it fair to
21   say that he had no shirt on?
22     A.   That's correct.
23     Q.   And was he on the driver's side of the vehicle for
24   some period of time?
25     A.   Yes.
```

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 24

```
 1      Q.   During that period of time, were you able to see his

 2   hands at all?

 3      A.   Yes.

 4      Q.   And was there a period of time when he was on the

 5   driver's side of the vehicle that he raised his hands?

 6      A.   Yes.

 7      Q.   And when he raised his hands, could you see any

 8   object in his hands at that point?

 9      A.   No.

10      Q.   Did you see any weapon on him at any time before he

11   got out of the vehicle?

12           In other words, did you see any weapon inside the

13   car before he got out?

14      A.   No.

15      Q.   And when he was on the driver's side of the vehicle,

16   did you see any weapon at any time?

17      A.   No, sir.

18      Q.   Did you ever instruct him that if he does have a gun

19   in the car, not to take it out?

20      A.   I don't recall telling him that, no.

21      Q.   And given that the goal was to get him out of the

22   car, was there any discussion with your officers of a

23   tactical plan as to what you were going to do once he got

24   out?

25      A.   No.
```

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

1  on Mr. Puga?

2      A.    At that point he was nearing that northwest

3  corner.

4      Q.    Was he still in the intersection?

5      A.    For the most part he was out of the intersection.

6            So you're looking at northwest corner, see how there

7  is a change in color in the concrete?  Looks like there is

8  dirt there, but I don't know if it's dirt or concrete.

9      Q.    Yeah.  I can see that.

10     A.    He was in that area.

11     Q.    So if you fired five or eight shots in your first

12  volley, and a total of 18, just doing the math, that would be

13  I think 10 to 13 shots in your second volley.

14           Does that math seem to be correct?

15           MS. ESQUIVEL:  Objection.  Lacks foundation; calls

16  for speculation.

17           You can answer.

18           THE WITNESS:  Yes.

19  BY MR. GALIPO:

20     Q.    At the time you fired the initial shots at Mr. Puga,

21  what was the lighting like in the area that Mr. Puga was

22  standing?

23     A.    It was very low light conditions.

24     Q.    Was there any illuminations from the spotlights of

25  the vehicles or streetlights or anything like that?

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 59

```
 1      A.   Yes.

 2      Q.   So do you think maybe inadvertently either yourself

 3  or Rubalcava may have hit the button to turn off the

 4  recording?

 5           MS. ESQUIVEL:  Objection.  Lacks foundation; calls

 6  for speculation.

 7           THE WITNESS:  It's possible.

 8  BY MR. GALIPO:

 9      Q.   When you saw Mr. Puga's right hand lowering towards

10  his left waistband, was the left hand still up?

11      A.   Yes.

12      Q.   And you mentioned that you saw him pulling up his

13  pants, reaching down to pull up his pants a couple times on

14  the driver side of the car.

15           Did you recall that?

16      A.   Yes.

17      Q.   And I think you said he was standing in front of the

18  car for several minutes before the shooting?

19      A.   Yes.

20      Q.   Did you ever see him reach down to pick up his pants

21  when he was in front of the car?

22      A.   No.

23      Q.   Did you give any specific commands to Mr. Puga as

24  you were advancing towards the light pole?

25      A.   Yes.
```

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 60

1      Q.    What did you say?

2      A.    I told him to keep his hands up where I could see

3   them.

4      Q.    Anything else?

5      A.    Command-wise, no.  I did -- I know a couple times I

6   told him to step out under the streetlight which is the same

7   electrical pole that I pointed to before in the photo.

8            I told him to step out from in front of the vehicle

9   under the streetlight where I could see him.

10     Q.    When you -- at the time you fired your first shot,

11  could you see both of his hands?

12     A.    Yes.

13     Q.    One was up and one was moving towards the

14  waistband?

15     A.    Yes.

16     Q.    At the exact moment you fired the first shot, was

17  anything in either one of his hands?

18     A.    No.

19     Q.    Did you fire your first volley of shots in rapid

20  succession?

21     A.    Yes.

22     Q.    Do you have experience with that weapon that you

23  fired at the shooting range, the AR-15?

24     A.    Yes.

25     Q.    Is that weapon capable of firing four or five shots

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 65

1    A.   Yes.  From what I remember, that's about where I was

2    at because I remember to the right of me when I made

3    reference to me being hit, Rubalcava was right to my right in

4    the door jam.

5    Q.   Okay.  And then the other area moving up towards the

6    pole, is that where you generally think you were for the

7    first volley of shots?

8    A.   Yes.

9    Q.   Okay.

10        MR. GALIPO:  Thank you, Hang.

11        I'm going to take another break, kind of look at my

12   notes, and I think we can take another ten minutes if that

13   works for everyone.

14        I hope that I'll be done in 15 minutes or so, but

15   sometimes the other attorneys have some questions, so we'll

16   see how it goes.

17        (Recess taken.)

18   BY MR. GALIPO:

19   Q.   When you looked down at your left arm when you felt

20   a little something, did you look to see whether any of the

21   fabric was torn?

22   A.   Yes.

23   Q.   And I'm sure you were happy to see that it wasn't?

24   A.   Yes.

25   Q.   And when he was running away, are you saying that

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 66

1  you saw a gun in his hand?

2      A.   Yes.

3      Q.   And which hand was that?

4      A.   The left.

5      Q.   So in preparation for the depo, you mentioned you

6  saw some videos.

7           Did you see the MVARS again?

8      A.   Yes.

9      Q.   And did you see an extra cell phone video that you

10  had not seen before?

11      A.   Yes.

12      Q.   And did all the videos capture at least part of the

13  shooting?

14      A.   Yes.

15      Q.   We're going to show just a very limited portions.

16           Again, I want to caution the family as we did

17  yesterday including Antonia; that she may want to tune out

18  for this.  I think she elected to tune out yesterday.

19           MR. GALIPO:  Let's go off the record for a moment.

20           (Discussion held off the record.)

21           MR. GALIPO:  Okay.  Let's go to Exhibit 3.

22  BY MR. GALIPO:

23      Q.   I'm just going to show you a few portions of the

24  video and may have a few questions for you, Sergeant.

25      A.   Yes, sir.

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 75

```
 1                        EXAMINATION

 2   BY MS. ESQUIVEL:

 3        Q.   Going back to the information -- were you aware

 4   of -- well, how did you become aware of the pursuit of

 5   Mr. Puga, for the standoff that we've been talking about?

 6        A.   Well, I was notified by our dispatcher that the

 7   officers -- my officers had stopped, the dispatcher's words

 8   were -- and again, I'm paraphrasing, that the guy from

 9   earlier or the vehicle earlier, not the guy, but the vehicle

10   from earlier who was involved in this road rage, the freeway

11   shooting, that my officers had the vehicle stopped on Bear

12   Valley, west of Cottonwood.

13        Q.   And did you join the -- why did you go out there, or

14   what did you do when you heard that?

15        A.   Well, I began responding to the scene, and before I

16   can get out there doing the traffic stop, the officers put

17   out that they were now in pursuit of the vehicle.

18        Q.   And did you have any information about the earlier

19   freeway shooting that the white vehicle, SUV, was suspected

20   of being involved in?

21        A.   Yes.

22        Q.   And what information did you have about that earlier

23   shooting?

24        A.   Well, because of the time my shift started, I was

25   the on-duty supervisor when the freeway shooting took place.
```

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 76

1   So I actually responded to the scene along with two officers

2   from that particular shift.

3           I spoke to the victim, and he showed me pictures of

4   the vehicle of the suspect's vehicle which ended up being

5   Mr. Puga's vehicle.

6   Q.   And did you see -- did the victim ever show you any

7   evidence of him or his vehicle being shot during that freeway

8   road rage incident?

9   A.   Yes.  I noticed he pointed -- he directed my

10  attention to the right passenger side door, and when I

11  inspected it, it had a bullet hole in the door, and when you

12  looked on the inside of the door, the bullet penetrated

13  through the door and the passenger seat.

14  Q.   And what kind of BOLO, if any, was put out

15  following this freeway shooting?

16  A.   We pull out BOLO for a white SUV with 22 inch rims

17  that were all black, and the thing that was very distinctive

18  is the left-rear corner of the rear window, it had Funeral in

19  the left rear window.  It was a little sticker.

20  Q.   Was there any information put out about the

21  driver?

22  A.   Yes.  The victim did describe the driver as a male

23  with bald head, and so we put out the description that the

24  victim gave.

25  Q.   Was there any little of -- I don't know what you

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 77

1    would call it -- dangerousness that could approach the

2    vehicle if units came across it?

3        A.    Yes.  During the briefing, because of this incident,

4    this freeway shooting was classified as a felony.  The

5    officers inquired based on the information that I gave them,

6    and when I mean officers, I'm referring to Blackwood and

7    Lugo, because part of my shift based on the time frame it

8    overlapped into the graveyard shift.

9            So during my brief in the graveyard shift which was

10   Lugo -- I'm sorry, not Lugo, but Blackwood and Rubalcava, I

11   explained to him what happened, and one of their questions

12   was, "Sergeant, if we come across the vehicle, can we

13   immediately conduct a felony stop?"

14           And I said, "Absolutely."

15       Q.    And what does that mean in terms of felony assault?

16           What does that mean?

17       A.    A felony stop means that --

18       Q.    A felony stop.  Sorry.

19       A.    No problem.  A felony stop means that the officers

20   do not approach the vehicle, and basically, they have the

21   occupants of the vehicle exit out, and the weapon officers

22   stand behind cover which typically the door of the parole car

23   with their weapons drawn, and they order all occupants out of

24   the vehicle.

25       Q.    Earlier you were asked in terms of whether you heard

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

Page 82

1    between you and Mr. Puga that you could use as cover if

2    Mr. Puga decided to shoot his gun?

3        A.    No.

4        Q.    Anything that in your training that you have

5    received from CHP and POST that you're aware of that requires

6    you to wait until you're fired upon before -- after you see a

7    suspect reach for a gun, that you're required to wait until

8    you're fired upon before you can fire first?

9        A.    No.

10       Q.    Now, you testified earlier that when we were talking

11   about the muzzle flash, you said you saw it during the first

12   volley of shots; correct?

13       A.    Yes.

14       Q.    Do you remember what Mr. Puga's position was when

15   you saw those flashes?

16             And by that, I mean was he already running?

17             Was he still standing towards you?

18             Please explain to us where his -- where he was

19   positioned.

20       A.    He was standing turning towards us, and what I

21   remember is just him turning towards us; he got the gun out,

22   and it was like he was cringing.  As he was firing he was

23   cringing, and but he was still able to turn towards us and

24   fire twice in our direction.

25       Q.    Were you able to notice where Officer Rubalcava was

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 85

1    Q.   At anytime that you regained sight of Mr. Puga once

2    you went down in the prone position, did you ever see him

3    drop the gun?

4    A.   No.

5    Q.   Did you have any reason to believe that he wouldn't

6    use the gun again?

7    A.   No.

8    Q.   You were asked earlier before the incident occurred

9    whether -- whether you had considered contacting the

10   residence in the immediate area and inform them about what

11   was going on, and you responded that no.

12        Why didn't you consider contacting the residence in

13   the immediate area and warn them about Mr. Puga's presence?

14        MR. GALIPO:   I'm going to object.   It may misstate

15   his testimony.   I thought he said he did consider it; he just

16   didn't do it.

17        MS. ESQUIVEL:   Well, let's ask him.

18   BY MS. ESQUIVEL:

19   Q.   Did you consider contacting the residence in the

20   immediate area about what was going on with Mr. Puga?

21   A.   Yes.

22   Q.   And did you -- what were you considering and far as

23   contacting him?   What were you thinking of informing them

24   about?

25   A.   I was going to let them know that Mr. Puga, you

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 89

1          Q.   Okay.  So I'm at 42 minutes and five seconds in, and

2     this is just right before the shooting begins.  I'm going to

3     be pausing it as we go along -- well, let me just stop you

4     before I ask you to play this.

5               Other than the gun, did you see anything else in

6     Mr. Puga's hands?

7          A.   No.

8          Q.   Once Mr. Puga went down, other than the gun, did you

9     find any other object on or around his body?

10         A.   No.

11              (Video playing.)

12              (Video paused.)

13    BY MS. ESQUIVEL:

14         Q.   So I don't know if you were able to see that.

15              I tried to stop it fast enough.

16              I'm going to rewind it.

17              Take a look right here and let me know if you notice

18    a shiny object.

19              (Video playing.)

20              (Video paused.)

21    BY MS. ESQUIVEL:

22         Q.   Do you see something keeps flashing as he's running?

23              Do you know what that was?

24         A.   It has to be the weapon because it did have a --

25    when we found it underneath him, the weapon has a shiny slide

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

1   on top.

2       Q.   Okay.  Let me just take a quick look at my notes and

3   the last question I had.

4           MS. ESQUIVEL:  Thank you, all, for your patience.

5           I'm looking through my pages.

6   BY MS. ESQUIVEL:

7       Q.   Oh, I did have a couple of questions.

8           Did any of the officers once Mr. Puga was secured,

9   handcuffed, and secured, did any of the -- as far as you saw,

10  did any officers start immediate CPR on Mr. Puga?

11      A.   No.

12      Q.   Why not?

13      A.   Because the EMR bag that has all the medical kit was

14  located in the patrol vehicle.  So one of the officer which

15  is Officer Rubalcava ran back to get the kit.

16          However, before we can retrieve it, I had already

17  had the medical personnel staged up the street, so they was

18  arrived on the scene.

19      Q.   At what point did you have medical staged up the

20  street?

21      A.   At the beginning of the standoff.

22      Q.   Why?

23      A.   Because of my previous experience four months

24  earlier with the shooting we had four months earlier.

25      Q.   And what about that experience made you make sure

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

```
 1                        CERTIFICATE

 2                            OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8            That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15            Further, that the foregoing is an accurate

16    transcription thereof.

17            I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  November 5, 2024.

23            _____

24            Jinna Grace Kim, CSR No. 14151

25
```

00365