# EXHIBIT W

00366

```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                    Plaintiffs,             )
 7                                          )
                    vs.                     ) Case No.
 8                                          ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                    Defendants.             )
12   _____)

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                  BERNARDO RUBALCAVA

18               MONDAY, NOVEMBER 4, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112646
```

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    JONATHAN WAYNE BOTTEN, SR.; TANJA        )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and      )
5    J.B., a minor by and through his         )
     guardian JONATHAN WAYNE BOTTEN, SR.,     )
6                                             )
                     Plaintiffs,              )
7                                             )
                     vs.                      ) Case No.
8                                             ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN       )
9    BERNARDINO; ISAIAH KEE; MICHAEL          )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT    )
10   VACCARI; JAKE ADAMS; and DOES 1-10,      )
     inclusive,                               )
11                                            )
                     Defendants.              )
12   _____ )

13

14

15

16           The remote videoconference deposition of BERNARDO

17   RUBALCAVA, taken on behalf of the Plaintiffs, beginning at

18   10:06 a.m., and ending at 1:19 p.m., on Monday, November 4,

19   2024, before Jinna Grace Kim, Certified Stenographic

20   Shorthand Reporter No. 14151.

21

22

23

24

25

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 3

```
 1    APPEARANCES OF COUNSEL:

 2
      For the Plaintiffs:
 3
              LAW OFFICES OF DALE K. GALIPO
 4            BY:  DALE K. GALIPO, ESQ.
              BY:  HANG D. LE, ESQ.
 5            21800 Burbank Boulevard, Suite 310
              Woodland Hills, California 91367
 6            Tel:  818-347-3333
              Fax:  818-347-4118
 7            E-mail:  dalekgalipo@yahoo.com
              E-mail:  hle@galipolaw.com
 8

 9    For the Defendants:

10            DEPUTY ATTORNEY GENERAL
              BY:  DIANA ESQUIVEL, ESQ.
11            1300 I Street, Suite 125
              P.O. Box 944255
12            Sacramento, California 94244
              E-mail:  diana.esquivel@doj.ca.gov
13

14            LYNBERG & WATKINS
              BY:  SHANNON L. GUSTAFSON, ESQ.
15            1100 W. Town & Country Road, Suite 1450
              Orange, California 92868
16            E-mail:  sgustafson@lynberg.com

17

18

19

20

21

22

23

24

25
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

|    |                        |                           | **Page 4** |
|----|------------------------|---------------------------|------------|
| 1  | INDEX                  |                           |            |
| 2  | WITNESS:               |                           | PAGE       |
| 3  | BERNARDO RUBALCAVA     |                           |            |
| 4  | BY: MR. GALIPO         |                           | 5          |
| 5  | BY: MS. ESQUIVEL       |                           | 76         |
| 6  | BY: MR. GALIPO         |                           | 91         |
| 7  | BY: MS. ESQUIVEL       |                           | 98         |
| 8  | BY: MR. GALIPO         |                           | 102        |
| 9  |                        |                           |            |
| 10 | EXHIBITS               |                           |            |
| 11 | MARKED FOR IDENTIFICATION |                        | PAGE       |
| 12 | Exhibit 1              | Photograph 1561           | 25         |
| 13 | Exhibit 2              | Photograph 1570           | 26         |
| 14 | Exhibit 3              | MVARS:  COSB 001465       | 71         |
| 15 | Exhibit 4              | Civilian Cell Phone Footage | 74       |
| 16 |                        |                           |            |
| 17 |                        |                           |            |
| 18 |                        |                           |            |
| 19 |                        |                           |            |
| 20 |                        |                           |            |
| 21 |                        |                           |            |
| 22 |                        |                           |            |
| 23 |                        |                           |            |
| 24 |                        |                           |            |
| 25 |                        |                           |            |

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 5

```
1                        CALIFORNIA

2                 MONDAY, NOVEMBER 4, 2024

3                      10:06 A.M.

4                  BERNARDO RUBALCAVA,

5   called as a witness on behalf of the Plaintiffs, having been

6   first duly sworn remotely via videoconference, was examined

7   and testified as follows:

8                      EXAMINATION

9   BY MR. GALIPO:

10      Q.   Can you please state your name and spell it for the

11   record.

12      A.   Bernardo Rubalcava, R-u-b-a-l-c-a-v-a.

13      Q.   Have you ever had your deposition taken before?

14      A.   For -- as far as?

15      Q.   Like in another case, for example?

16      A.   Yes.

17      Q.   How many other times have you had your deposition

18   taken?

19      A.   Once.

20      Q.   Have you testified in court before?

21      A.   Yes.

22      Q.   How many times have you done that, approximately?

23      A.   Approximately five times.

24      Q.   Are you able to hear me okay so far?

25      A.   Yes.
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 23

```
 1       Q.   And then are you saying that you fired your second
 2   volley when Mr. Puga was running away from you?
 3       A.   Yes.
 4       Q.   And you were aiming at his back?
 5       A.   Yes.
 6       Q.   And how far do you think he was from you, meaning
 7   Mr. Puga, when you started your second volley of shots?
 8       A.   About 30 feet.
 9       Q.   And how far do you think he was from you at the time
10   of your last shot?
11       A.   About 75 to 100 feet.
12       Q.   So was he essentially running away from you during
13   your second volley of shots?
14       A.   Yes.
15       Q.   Prior to the day of this incident with Mr. Puga, had
16   you ever seen a suspect with a gun in their hand?
17       A.   No.
18       Q.   Had you ever been present before for an
19   officer-involved shooting?
20       A.   No.
21       Q.   Were you involved in the vehicle pursuit of Mr.
22   Puga?
23       A.   Yes.
24       Q.   And do you know which vehicle you were in line
25   generally during the pursuit?
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 24

| | | |
|---|---|---|
| 1 | A. | The lead vehicle. |
| 2 | Q. | At some point did the vehicle pursuit end? |
| 3 | A. | Yes. |
| 4 | Q. | How long approximately would you estimate the |
| 5 | | vehicle pursuit was? |
| 6 | A. | Approximately an hour. |

7     Q.    During the vehicle pursuit, could you tell how many

8    individuals were in the car you were pursuing?

9     A.    Two.

10     Q.    Did it appear to be a male and female, or could you

11    tell at the time?

12     A.    I couldn't tell at the time.

13     Q.    But it appeared like two occupants?

14     A.    Yes.

15     Q.    Were any shots fired, if you know, during the

16    vehicle pursuit?

17     A.    No.

18     Q.    Did you see a weapon or anything during the vehicle

19    pursuit?

20     A.    No.

21     Q.    Do you know what road the vehicle stopped on at the

22    end of the pursuit?

23     A.    Peach.

24     Q.    I want to see if I could just show you a few photos.

25          I'll see if I could identify the Bate numbers.

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 27

```
 1   BY MR. GALIPO:

 2       Q.   Are you able to see this image on your screen?

 3       A.   Yes.

 4       Q.   And does this look to be like another angle or

 5   picture of Mr. Puga's white vehicle?

 6       A.   Yes.

 7       Q.   Obviously, it's light outside when these photos were

 8   taken, but it was dark outside at the time of the shooting;

 9   is that correct?

10       A.   Yes.

11       Q.   And the vehicle we see towards the middle behind and

12   offset to Mr. Puga's vehicle, that would be your vehicle?

13       A.   Yes.

14       Q.   Now, did Mr. Puga remain in your vehicle for some

15   time after the pursuit ended?

16       A.   Yes.

17       Q.   And do you have an approximation as to how long he

18   was remained in the vehicle?

19       A.   Approximately an hour.

20       Q.   And during that time frame, were you communicating

21   with other CHP officers?

22       A.   Yes.

23       Q.   And also with some Deputy Sheriffs?

24       A.   Yes.

25       Q.   Do you know if any less-lethal was used on Mr. Puga
```

00374

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 28

 1    during the hour he was in the vehicle?

 2        A.    Yes.

 3        Q.    What was used, to your knowledge?

 4        A.    The less-lethal shotgun and pepper balls.

 5        Q.    And do you know who was deploying the pepper

 6    balls?

 7        A.    San Bernardino deputies.

 8        Q.    Do you have any estimate as to how many pepper balls

 9    were deployed?

10        A.    No.

11        Q.    Do you have an approximation as to over what period

12    of time they were deployed?

13              In other words, was it just for a minute or two?

14              Was it for more of an extended period?

15        A.    More of an extended period of time.

16        Q.    And what part of the car were they deployed through,

17    if you know?

18        A.    The rear windshield.

19        Q.    And at some point was the rear windshield shot out

20    with less-lethal?

21        A.    Yes.

22        Q.    And what was the less-lethal used to shoot out the

23    rear windshield?

24        A.    Less-lethal shotgun.

25        Q.    And who was firing the less-lethal shotgun, if you

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 29

```
 1    know?
 2         A.   I believe it was Sergeant Kee.
 3         Q.   And is Sergeant Kee with your department or with the
 4    Sheriff's Department?
 5         A.   With my department.
 6         Q.   Would the windshield have been shot out before the
 7    pepper balls were deployed?
 8         A.   Yes.
 9         Q.   At some point did the female get out of the car?
10         A.   Yes.
11         Q.   And I'm assuming one of the goals was to also get
12    Mr. Puga out the car?
13         A.   Yes.
14         Q.   And is that one of reasons that they were using the
15    pepper balls, to make it uncomfortable for him in the car so
16    he would come out?
17         A.   Yes.
18         Q.   Could you hear anything Mr. Puga was saying while he
19    was in the car for the hour?
20              MS. ESQUIVEL:  Objection.  Overbroad.
21              Go ahead.
22              THE WITNESS:  Yes.
23    BY MR. GALIPO:
24         Q.   And could you tell me some of the things you were
25    recalling him saying?
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 30

```
 1          MS. ESQUIVEL:  Objection.  Overbroad.

 2          THE WITNESS:  I don't recall.

 3   BY MR. GALIPO:

 4      Q.   Do you recall anything that he said while was in the

 5   car?

 6      A.   He requested to make a phone call; he wanted to have

 7   a cigarette; he was yelling.

 8      Q.   Okay.  Anything else you can recall?

 9      A.   He was agitated; cursing.

10      Q.   Any other words that you could recall that he said

11   other than what you've told me so far?

12      A.   No.

13      Q.   Was there a tactical plan discussed as to what

14   different roles the different officers would have once Mr.

15   Puga got out of the car?

16      A.   It was a brief discussion with my sergeant.

17      Q.   And what was the discussion?  Can you tell me.

18      A.   To approach Mr. Puga and cuff him.

19      Q.   Was that discussion before he got out of the car or

20   after?

21      A.   After.

22      Q.   Was there any tactical discussion before he got out

23   of the car?

24      A.   No.

25      Q.   For example, was anybody designated less-lethal once
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 36

```
 1   my child's school.  So I want to follow up and make sure it's
 2   nothing urgent.
 3           MR. GALIPO:  Yes, yes.  Let's go off the record.
 4           We'll take a five-minute break.  No problem.
 5           MS. GUSTAFSON:  Thank you.
 6           MR. GALIPO:  You're very welcome.
 7           (Recess taken.)
 8           MR. GALIPO:  Back on the record.
 9   BY MR. GALIPO:
10       Q.   During the time that Mr. Puga was in the vehicle, so
11   this would be about after the pursuit ended, but before he
12   got out, that approximate hour.
13           Are you with me time-wise?
14       A.   Yes.
15       Q.   Did you ever see a gun in the car during that time
16   frame?
17       A.   No.
18       Q.   And then at some point did you see Mr. Puga get out
19   of the vehicle?
20       A.   Yes.
21       Q.   Were any of the units doing anything, if you know,
22   to help illuminate the area like with spotlights or other
23   lighting?
24       A.   The helicopter.
25       Q.   There was a helicopter circling overhead?
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 37

```
 1              Is that a yes?

 2     A.    Yes.

 3     Q.    Sorry.  I didn't hear you.

 4              And was it making some noises as it was circling?

 5     A.    Yes.

 6     Q.    And it was using its spotlight?

 7     A.    Yes.

 8     Q.    Do you have spotlights on your CHP vehicle?

 9     A.    Yes.

10     Q.    Were you using those at all?

11     A.    Yes.

12     Q.    So there was some illumination from the spotlights

13   and the helicopter light.

14              Would that be fair?

15     A.    Yes.

16     Q.    And when Mr. Puga got out of the vehicle, what side

17   did he get out on?

18     A.    Driver's side.

19     Q.    Did you see him getting out of the vehicle?

20     A.    Yes.

21     Q.    Where were you positioned at that time?

22     A.    Behind my driver's side door.

23     Q.    Were you using that partially as cover?

24     A.    Yes.

25     Q.    And when Mr. Puga got out of the vehicle, did you
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 38

```
 1   see any weapon in his hands?

 2        A.   No.

 3        Q.   Any weapon on his person?

 4        A.   No.

 5        Q.   Could you see his hands when he got out of the

 6   car?

 7        A.   Yes.

 8        Q.   And where did he go after getting out of the car?

 9        A.   He stood to the left of the vehicle, to the left of

10   the driver's side.

11        Q.   And how long approximately was he in that

12   position?

13        A.   For a few minutes.

14        Q.   And during that time did you see any weapon in his

15   hands?

16        A.   No.

17        Q.   Did you see him reaching for a weapon during that

18   time?

19             Is that a no?

20        A.   No.

21        Q.   Could you hear him saying anything during that time

22   frame?

23        A.   He was having a conversation with Sergeant Kee.

24        Q.   Were you able to make out any of the words?

25        A.   Yes.
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 39

1      Q.   What could you make out?

2      A.   I don't recall what was said, but they were building

3   rapport.

4      Q.   And where were you positioned during this

5   conversation?

6      A.   Behind my driver's side door.

7      Q.   Did you hear during that time frame Mr. Puga say

8   words to the effect he was afraid of being shot?

9      A.   He did.

10     Q.   And did he say that when he was at the driver's side

11  of the vehicle or in that area?

12     A.   Yes.

13     Q.   And did you hear whether the sergeant responded to

14  that concern?

15     A.   He did.

16     Q.   What did the sergeant say, generally?

17     A.   He said, "No one's going to shoot you."

18     Q.   At some point did Mr. Puga go to the front of the

19  car?

20     A.   Yes.

21     Q.   And that would be after a few minutes that he was on

22  the driver's side?

23     A.   Yes.

24     Q.   Did Mr. Puga say why he wanted to go to the front of

25  the car?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 41

1    Q.   At some point do you know -- strike that.

2         At some point did you approach to take him into

3    custody?

4    A.   Yes.

5    Q.   And is that when you got up to the area you talked

6    about earlier, at the left-front corner of his vehicle?

7    A.   Yes.

8    Q.   And when you were approaching, did you know if any

9    of the deputies were approaching on the passenger side of his

10   vehicle?

11   A.   I don't recall.

12   Q.   You were kind of focused on what you were doing?

13   A.   Yes.

14   Q.   And as you were approaching, did you have any cover

15   at that point?

16   A.   No.

17   Q.   And as you were approaching the front of Mr. Puga's

18   vehicle, could you see his hands up as you were

19   approaching?

20   A.   Yes.

21   Q.   Were you saying anything to him as you were

22   approaching?

23   A.   No.

24   Q.   Was your sergeant saying anything to him as you were

25   approaching?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 42

```
 1      A.   Yes.

 2      Q.   What was your sergeant saying to him?

 3      A.   To put his hands up, let us see his hands.

 4      Q.   And while your sergeant was saying that, were his

 5   hands up?

 6      A.   Yes.

 7      Q.   Did you at least feel that was an act of compliance

 8   when he had put his hands up in response to the sergeant's

 9   request?

10           MS. ESQUIVEL:  Objection.  Vague.

11           THE WITNESS:  No.

12   BY MR. GALIPO:

13      Q.   Did you think he was putting his hands up without

14   more or less voluntarily, not in response to the request?

15      A.   Yes --

16           MS. ESQUIVEL:  Objection.  Calls for speculation.

17   BY MR. GALIPO:

18      Q.   So at the time you approached the front of Mr.

19   Puga's vehicle, how long approximately do you think that Mr.

20   Puga had been out of the car?

21      A.   A few minutes.

22      Q.   And when you say a few minutes, are we talking like

23   three to five minutes, two to four minutes?

24           What range do you have in mind?

25      A.   I don't.  Maybe --
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 43

1      Q.   Just a few minutes?

2      A.   I don't recall exactly how many minutes passed.

3      Q.   Okay.  Because you told me earlier that you thought

4  he was at the side for a few minutes, and then he went to the

5  front.

6           You're just saying if was a few minutes, but you're

7  not exactly sure about the time?

8      A.   When he was on the side, it was a few minutes.

9      Q.   How about when he was in the front, how long was he

10  in the front of vehicle before you approached?

11     A.    It was less than the time he was on the side, but

12  again, I don't recall how long.

13     Q.   And when he was in the front of the vehicle prior to

14  you approaching, could you see his hands up?

15     A.   Yes.

16     Q.   And were his arms extended above his head?

17     A.   Yes.

18     Q.   And as you were approaching him, were his hands

19  still up?

20     A.   Yes.

21     Q.   And which way was he facing as you approached him?

22     A.   South.

23     Q.   Towards the front of the vehicle?

24     A.   Yes.

25     Q.   Was there any illumination on Mr. Puga as you

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 44

1    approached him?

2        A.    Yes.

3        Q.    And what was the source of illumination?

4             The same as what we discussed before?

5        A.    Yes.

6        Q.    And at some point did you see Mr. Puga's hands

7    lower?

8        A.    Yes.

9        Q.    Where were you when you saw his hands lower?

10            Basically in the same position you told me earlier,

11   to the left front corner of his vehicle?

12       A.    Yes.

13       Q.    And how much time do you think passed between seeing

14   his hands lower and hearing the first shot?

15       A.    Seconds.

16       Q.    When you say seconds, could it have been like a

17   split second?

18       A.    Split second, one second.

19       Q.    One second.  And I think you told me earlier you

20   heard two shots before you fired?

21       A.    Yes.

22       Q.    And then you fired approximately five shots in your

23   first volley?

24       A.    Yes.

25       Q.    And why did you do a tactical reload after you fired

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 48

1    the front of his vehicle, was it both hands or one hand?

2        A.    Both hands.

3        Q.    Do you ever recall him lowering one and keeping the

4    other hand up?

5        A.    I don't recall.

6        Q.    When you fired your first volley of shots, were you

7    moving or stationary?

8        A.    I was moving.

9        Q.    Which direction were you moving?

10       A.    Towards my patrol car.

11       Q.    Moving back south towards your patrol car?

12       A.    Yes.

13       Q.    How about Mr. Puga, was he moving before you fired

14   your -- strike that.

15             Was he moving during your first volley of shots?

16       A.    Yes.

17       Q.    And in which way was he moving?

18       A.    He turned around and began running north.

19       Q.    You mentioned earlier that there was some light from

20   the spotlights and some lights from the helicopter

21   circling?

22       A.    Yes, sir.

23       Q.    And you were aware generally it was a residential

24   neighborhood?

25       A.    Yes.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 51

```
 1   going to get my glasses out.

 2       A.   Okay.

 3       Q.   So during your second volley of shots, would it be

 4   correct to say that you saw Mr. Puga running northbound on

 5   Peach towards the northwest corner?

 6       A.   Yes.

 7       Q.   And you continued firing until he was down?

 8       A.   Yes.

 9       Q.   At some point did Sergeant Kee request the deputies

10   to take over the pursuit?

11       A.   Yes.

12       Q.   And to your knowledge, was that request denied?

13       A.   Yes.

14       Q.   During the approximate hour that he was in the car,

15   was there any discussion about either notifying or evacuating

16   residence in the area?

17       A.   No.

18       Q.   Did you ever hear that issue brought up by anyone?

19       A.   No.

20       Q.   Did he have any shirt on, Mr. Puga?

21       A.   No.

22       Q.   Okay.

23            MR. GALIPO:  Can we -- is it possible, Hang, to pull

24   up Page 48 of the officer's statement to see if I can show

25   him something and see if it refreshes his recollection.
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 53

1      A.   The sergeant from the Sheriff's Department.

2      Q.   Okay.  And does that also refresh your recollection

3  that the plan was that they would approach on the passenger

4  side, and you would approach on the driver's side?

5      A.   Yes.

6      Q.   Do you know if that Taser was ever deployed?

7      A.   No.

8      Q.   And I think you've already today me this, but would

9  you agree that generally when Mr. Puga was at the front of

10  the vehicle, he had his hands up?

11      A.   Yes.

12      Q.   When he was in front of the vehicle as you were

13  approaching, did you see any weapon in his waistband at that

14  point?

15      A.   I was unable to see the waistband.

16      Q.   Was it blocked from your view in part by the car?

17      A.   Yes.

18           MR. GALIPO:  Can we show him Page 51, please,

19  Hang.

20  BY MR. GALIPO:

21      Q.   Towards the bottom starting on Line 14, you're

22  talking about he turned to right.

23           Do you see that?

24      A.   Yes.

25      Q.   And you indicate turning to the right would be

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 57

```
 1     A.   Yes.

 2     Q.   And where did he end up, if you remember?

 3          Was it on the street, or in a yard?

 4          How would you describe his resting position?

 5     A.   On the dirt shoulder.

 6     Q.   And what body position was he in?

 7          Was he chest-down, or in some other position?

 8     A.   It was chest-down.

 9     Q.   Could you tell if he was still alive when you

10  approached him?

11     A.   No.

12     Q.   For example, could you hear him or see him

13  breathing?

14     A.   Yes.

15     Q.   So if he was breathing, that would have been a sign

16  to you that he was still alive?

17     A.   Yes.

18     Q.   Did anyone tase him, if you know, when he was on the

19  ground after all the shots had been fired?

20     A.   Yes.

21     Q.   Who tased him?

22     A.   The Sheriffs.

23     Q.   Were you present when that happened?

24     A.   Yes.

25     Q.   Do you know what part of his body was tased?
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 58

```
 1      A.   No.

 2      Q.   Was it done in a probe or dart mode?

 3           In other words, from a distance, as opposed to a

 4   drive-stun?

 5      A.   It was from a distance.

 6      Q.   At some point he was handcuffed?

 7      A.   Yes.

 8      Q.   Did you roll him over after he was handcuffed?

 9      A.   Yes.

10      Q.   Was he still breathing at the time you rolled him

11   over?

12      A.   I don't recall.

13      Q.   Did he say anything to you after the shooting?

14      A.   No.

15      Q.   Did you say anything to him?

16      A.   No.

17           MS. ESQUIVEL:  Just to clarify, when you say him,

18   I'm assuming you're referring to Mr. Puga?

19           MR. GALIPO:  Yes.  Thank you, Diana.

20   BY MR. GALIPO:

21      Q.   Now, did you become aware at some point after the

22   shooting that some innocent bystanders had been struck?

23      A.   Yes.

24      Q.   How did you become aware of that?

25      A.   One of the deputies mentioned it.
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 77

1    that you shot the second volley?

2        A.    One to two seconds.

3        Q.    And on the video that we just saw, Mr. Puga is

4    exiting the vehicle.

5              At any time when he -- did you observe him exit the

6    vehicle?

7        A.    Yes.

8        Q.    When he exited the vehicle, at any time did you have

9    or were you able to see his front waistband?

10       A.    No.

11       Q.    Did you know that he had a gun?

12       A.    No.

13       Q.    When the -- let me back up a little bit.

14              During the pursuit, how did the pursuit start of Mr.

15   Puga's vehicle?

16       A.    We observed him exit the freeway, and we made a

17   U-turn, and he yielded on his own to the right curb.

18       Q.    How did you know that you were looking for his

19   vehicle?

20       A.    His vehicle matched the broadcast for a -- they put

21   a brief -- during our briefing to look for this vehicle which

22   was known to be a suspect of a freeway shooting.

23       Q.    And when you say briefing, are you talking about the

24   beginning of your shift?

25       A.    Yes.

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 78

```
 1      Q.   And what time does your shift start on February 17,
 2   2021?
 3      A.   10:00 p.m.
 4      Q.   And tell me all that you remember as to what you
 5   were told as to why you were looking for a white SUV.
 6      A.   A white SUV was the suspect's vehicle of a freeway
 7   shooting, and it was described as a white Ford SUV with black
 8   rims, no plates, with the Funeral statement in the back, and
 9   black tinted windows.
10      Q.   Were you given information as to the time of that
11   earlier freeway shooting?
12      A.   I did, but I don't recall what time it was.
13      Q.   Were you given any information about the suspect
14   that had -- was involved in the freeway shooting?
15      A.   Hispanic male, adult, heavy set, with a beard.
16      Q.   When -- you testified earlier that there was a
17   less-lethal used that included the shotgun.
18           What kind of rounds did the shotgun discharge?
19      A.   Bean bags.
20      Q.   And you said it was Sergeant Kee?
21      A.   Yes.
22      Q.   That discharged -- fired the shotgun?
23      A.   Yes.
24      Q.   Did you have any less-lethal weapons in your arsenal
25   or in your vehicle?
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 79

```
 1      A.   Just my Taser.

 2      Q.   Did you have that on your person?

 3      A.   On my person.

 4      Q.   Any other less-lethal in the vehicle?

 5      A.   No.

 6      Q.   You indicated earlier that you did not warn Mr. Puga

 7   or didn't give him a verbal warning that you were going to

 8   use lethal weapon or shoot your gun at him.

 9           Did you have an opportunity to do so?

10      A.   No.

11      Q.   Why didn't you have that opportunity to warn him?

12      A.   It's within split second he pulled out his firearm

13   and shot at us.

14      Q.   And when you were approaching Mr. Puga, did you have

15   your gun out?

16      A.   Yes.

17      Q.   Did you have it pointed at him?

18      A.   Yes.

19      Q.   At any point did you holster your gun as you were

20   approaching him?

21      A.   Yes.

22      Q.   At what point did you do that?

23      A.   When he was to the driver's side of his truck, I

24   holstered my weapon because the plan was to approach him and

25   handcuff him.
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 83

1    So at the time as you were approaching Mr. Puga, was

2    there anything that could have shielded you from Mr. Puga's

3    gunfire?

4    A.   No.

5    Q.   Was there -- based on your understanding of where

6    Sergeant Kee was standing relative to you, was there anything

7    that could have shielded Sergeant Kee from Mr. Puga's

8    gunfire?

9    A.   No.

10   Q.   The first -- during the first volley, the three to

11   five rounds that you discharged from your firearm, did you

12   feel that those three to five shots were necessary?

13   A.   Yes.

14   Q.   Why?

15   A.   Eliminate the threat.

16   Q.   If he only fired two, why was he still a threat

17   after the two?

18   A.   He still had possession of this firearm.

19        He was still able to shoot at us.

20   Q.   During those three to five rounds that you

21   discharged during the first volley, you testified earlier

22   that you were moving?

23   A.   Yes.

24   Q.   You were moving -- is this where you were trying to

25   get back to your vehicle?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 85

1        Do you remember if you had already reached your

2    vehicle door and using it as a shield, or if you were still

3    trying to get to the car?

4        A.    Trying to get to the car.

5        Q.    And were you facing Mr. Puga as you were getting to

6    your car, or was your side facing Mr. Puga?

7        A.    I was facing Puga.

8        Q.    Is it fair to say you had -- you kept a visual on

9    Mr. Puga the entire time?

10       A.    Yes.

11       Q.    During the first and second volley?

12       A.    Yes.

13       Q.    During the time that you shot those five to ten

14   rounds during the second volley, did you ever at any point

15   see Mr. Puga drop the gun?

16       A.    No.

17       Q.    Did you ever see him make any gestures that he was

18   surrendering?

19       A.    No.

20       Q.    When you saw in the video that Mr. Puga at some

21   point went down, do you have now having reviewed the videos,

22   have any recollection as to whether you continued to shoot

23   after Mr. Puga went down to the ground?

24       A.    I don't.

25       Q.    Did you see him fall to the ground?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 86

```
 1      A.   Yes.

 2      Q.   Could you see at any point as to whether he dropped

 3   the gun as he fell to the ground?

 4      A.   No.

 5      Q.   When you approached him after the incident was over

 6   and you testified earlier that he was handcuffed; correct?

 7      A.   Yes.

 8      Q.   Who handcuffed him?

 9      A.   Myself and a deputy.

10      Q.   Was the gun still in his hands when you reached the

11   location of where Mr. Puga went down?

12      A.   Yes.

13      Q.   Where exactly was it?

14      A.   It was underneath -- he was facing down, stomach

15   facing down -- he was -- he had it tucked underneath his

16   stomach.

17      Q.   Was it still in his hand, or was his body just on

18   it?

19      A.   Both hands were on his stomach as well.

20      Q.   So you couldn't tell whether or not it was actually

21   in his hand?

22      A.   No.

23      Q.   Did you still consider him an immediate threat

24   during that second volley when you fired the five to ten

25   rounds even though he was running away from you?
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 87

1      A.    Yes.

2      Q.    Why was he a threat?

3      A.    He still had the gun in his hand, and he was running

4  towards a residential area.

5      Q.    And what was the concern with him running towards

6  the residential area?

7      A.    He would barricade himself inside the home and use

8  the people who live there as hostages.

9      Q.    You testified earlier that there was a helicopter

10  and then the spotlights where the vehicle were used to

11  Illuminate the area around Mr. Puga to get a better view of

12  him; is that correct?

13     A.    Correct.

14     Q.    At any point did you recall the helicopter leaving

15  the area?

16     A.    Yes.

17     Q.    Do you remember at what point?

18     A.    No.

19     Q.    Do you know the helicopter was still there during

20  the shooting incident that we just viewed?

21     A.    No.

22     Q.    You don't remember, or it wasn't there?

23     A.    It wasn't there.

24     Q.    So if you testified earlier that it was pretty dark

25  down Peach Street once he started running north down Peach

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 106

1                          CERTIFICATE

2                              OF

3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

6    Stenographic Shorthand Reporter of the State of California,

7    do hereby certify:

8            That the foregoing proceedings were taken before me

9    at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  November 4, 2024.

23           _____

24           Jinna Grace Kim, CSR No. 14151

25