# EXHIBIT X

00399

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                   Plaintiffs,             )
 7                                          )
                   vs.                      ) Case No.
 8                                          ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                   Defendants.             )
12   _____)

13

14

15

16           REMOTE VIDEOCONFERENCE DEPOSITION OF

17                     MICHAEL BLACKWOOD

18                 MONDAY, NOVEMBER 4, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112646
```

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 2

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3

 4    JONATHAN WAYNE BOTTEN, SR.; TANJA        )
      DUDEK-BOTTEN; ANNABELLE BOTTEN; and      )
 5    J.B., a minor by and through his         )
      guardian JONATHAN WAYNE BOTTEN, SR.,     )
 6                                             )
                      Plaintiffs,              )
 7                                             )
                      vs.                      ) Case No.
 8                                             ) 5:23-CV-00257-JGB-SHK
      STATE OF CALIFORNIA; COUNTY OF SAN       )
 9    BERNARDINO; ISAIAH KEE; MICHAEL          )
      BLACKWOOD; BERNARDO RUBALCAVA; ROBERT    )
10    VACCARI; JAKE ADAMS; and DOES 1-10,      )
      inclusive,                               )
11                                             )
                      Defendants.              )
12    _____)

13

14

15

16          The remote videoconference deposition of MICHAEL

17    BLACKWOOD, taken on behalf of the Plaintiffs, beginning at

18    2:09 p.m., and ending at 4:00 p.m., on Monday, November 4,

19    2024, before Jinna Grace Kim, Certified Stenographic

20    Shorthand Reporter No. 14151.

21

22

23

24

25
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 3

```
 1   APPEARANCES OF COUNSEL:

 2
     For the Plaintiffs:
 3
             LAW OFFICES OF DALE K. GALIPO
 4           BY:  DALE K. GALIPO, ESQ.
             BY:  HANG D. LE, ESQ.
 5           21800 Burbank Boulevard, Suite 310
             Woodland Hills, California 91367
 6           Tel:  818-347-3333
             Fax:  818-347-4118
 7           E-mail:  dalekgalipo@yahoo.com
             E-mail:  hle@galipolaw.com
 8

 9   For the Defendants:

10           DEPUTY ATTORNEY GENERAL
             BY:  DIANA ESQUIVEL, ESQ.
11           1300 I Street, Suite 125
             P.O. Box 944255
12           Sacramento, California 94244
             E-mail:  diana.esquivel@doj.ca.gov
13

14           LYNBERG & WATKINS
             BY:  SHANNON L. GUSTAFSON, ESQ.
15           1100 W. Town & Country Road, Suite 1450
             Orange, California 92868
16           E-mail:  sgustafson@lynberg.com

17

18   Also Present:  Plaintiffs (previously stated on the record)

19

20

21

22

23

24

25
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

|     |                                                    | **Page 4** |
|-----|----------------------------------------------------|------------|
| 1   | INDEX                                              |            |
| 2   | WITNESS:                                           | PAGE       |
| 3   | MICHAEL BLACKWOOD                                  |            |
| 4   |    BY: MR. GALIPO                                  | 5          |
| 5   |    BY: MS. GUSTAFSON                               | 50         |
| 6   |    BY: MS. ESQUIVEL                                | 50         |
| 7   |    BY: MR. GALIPO                                  | 59         |
| 8   |                                                    |            |
| 9   | EXHIBITS                                           |            |
| 10  | MARKED FOR IDENTIFICATION                          | PAGE       |
| 11  | Exhibit 1          Photograph Previously Marked    | 12         |
| 12  | Exhibit 6          Photograph 544                  | 16         |
| 13  | Exhibit 5          Photograph                      | 27         |
| 14  |                                                    |            |
| 15  |                                                    |            |
| 16  |                                                    |            |
| 17  |                                                    |            |
| 18  |                                                    |            |
| 19  |                                                    |            |
| 20  |                                                    |            |
| 21  |                                                    |            |
| 22  |                                                    |            |
| 23  |                                                    |            |
| 24  |                                                    |            |
| 25  |                                                    |            |

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 5

```
1                          CALIFORNIA
2                    MONDAY, NOVEMBER 4, 2024
3                          2:09 P.M.
4                      MICHAEL BLACKWOOD,
5    called as a witness on behalf of the Plaintiffs, having been
6    first duly sworn remotely via videoconference, was examined
7    and testified as follows:
8                          EXAMINATION
9    BY MR. GALIPO:
10       Q.   Can you please state your full name and spell it for
11   the record.
12       A.   Michael Blackwood.
13       Q.   Are you able to hear me okay so far?
14       A.   I am, yes.
15       Q.   Who do you currently work for?
16       A.   I'm a registered nurse in the City of Apple
17   Valley.
18       Q.   Nice.  How long have you been doing that for?
19       A.   I graduated this year in February and got hired in
20   June.  So since June of this year.
21       Q.   And when did you first go to nursing school?
22       A.   I -- it was -- I graduated in February.
23            It was about a 22-months program.  So I don't
24   know what the month was, but about 22 months before that.
25       Q.   At some point did you go to the police academy?
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 13

1    Q.    And where on the passenger side were you,

2    approximately?

3    A.    Maybe approximately like one to two feet from the

4    patrol vehicle from the passenger side at the door.

5    Q.    Were you in the "V" of the open door?

6    A.    I believe so, yes.

7    Q.    And where was Mr. Puga when you fired your first

8    shot?

9    A.    He was in front of his vehicle a little bit to the

10    left.

11    Q.    Was he stationary or moving when you fired your

12    first shot?

13    A.    He was -- he wasn't -- he was stationary.

14    Q.    And for how many of your shots was he stationary?

15    A.    I would -- I don't know.  I wouldn't be able to

16    estimate.  I'm not sure.

17    Q.    Do you know if it was more than one or two shots

18    that he was stationary?

19    A.    Again, it would -- it would be a guess on my part.

20    I'm not sure.

21    Q.    Do you recall pepper balls being deployed in the

22    vehicle at some point?

23    A.    Yes.

24    Q.    And do you recall seeing some injury to Mr. Puga

25    while he was still in the vehicle?

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 15

1    the vehicle?

2        A.    I do, yes.

3        Q.    What do you recall him saying regarding his eye?

4        A.    I just remember him saying, "My eye, my eye," but

5    other than that, I don't remember the other comments that he

6    was making regarding his eye.

7        Q.    At some point after you goat out of the vehicle, did

8    you see him put his hands up?

9        A.    Yes.

10       Q.    Where was he when you saw him put his hands up?

11       A.    He was in the "V" of his vehicle on the driver's

12   side.

13       Q.    Did you ever see him go to the front of the vehicle

14   at some point?

15       A.    I did.

16       Q.    Did you ever see him with his hands up when he was

17   to the front of the vehicle?

18       A.    Yes.

19       Q.    And were both of his arms appeared to be extended

20   upward above his head?

21           MS. ESQUIVEL:  Objection.  Vague; overbroad.

22           THE WITNESS:  I don't recall if his hands were fully

23   extended or partially.

24   BY MR. GALIPO:

25       Q.    When his hands were extended upward, did you see

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 16

```
 1   anything in his hands?

 2       A.   No.

 3       Q.   Did he have a shirt on?

 4       A.   No.

 5       Q.   Did you ever hear him verbally threaten to harm any

 6   of the officers?

 7       A.   No.

 8       Q.   Did you have any specific information that he had

 9   specifically injured anyone before he got out of the car?

10       A.   No.

11       Q.   I want to show you an exhibit that I think was part

12   of your statement, and I'll mark it as Exhibit 6, and it's --

13   I think the Bates stamp ends in 544.

14            (Exhibit 6 was marked for identification.)

15   BY MR. GALIPO:

16       Q.   Do you recall this type of photograph or depiction

17   being discussed at the time of your statement?

18       A.   Yes.

19       Q.   And we could see Mr. Puga's vehicle in this?

20       A.   Yes.

21       Q.   And I think you already told me that his vehicle

22   would be facing northbound?

23       A.   Correct.

24       Q.   Do you see your patrol vehicle?

25       A.   Yes.
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 18

1    Q.   Were you generally in the same position for all of

2    your shots?

3    A.   Yes.

4    Q.   So you believe you fired all your shots from within

5    the open "V" on the passenger side of your patrol unit?

6    A.   So I did move out of the "V" sometime during that

7    interaction, but it was a foot to -- no more than two feet

8    away from the "V."

9         So I was generally in the same area, but not always

10   in the "V" of my vehicle.

11   Q.   So at some point when Mr. Puga was in the front of

12   the vehicle, did you notice other officers approaching his

13   position?

14   A.   There was -- yes.

15   Q.   And tell me about that.

16        What CHP officers did you notice approaching?

17   A.   So to the -- Sergeant Kee and Officer Rubalcava were

18   to the left of the patrol vehicle in the south, like west

19   dirt area, and there was two Sheriff's deputies, I believe, a

20   sergeant and the deputy who were approaching towards the

21   lights.

22   Q.   And before the approach did you hear any

23   conversation about the Sheriff's deputies having a Taser

24   available?

25   A.   I don't recall that conversation.

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 19

1       Q.   Were you -- did you have any awareness that there

2   was less-lethal designated before the shooting?

3       A.   Can you kind of rephrase that?

4       Q.   Sure.

5            MR. GALIPO:  We can take this photo down.

6   BY MR. GALIPO:

7       Q.   I take it one of the goals was to get him out of the

8   car?

9       A.   Yes, correct.

10      Q.   That's why the pepper balls whether it was a 100 or

11   150 or whatever it was were used to make it so uncomfortable

12   he would come out of the car; is that your understanding?

13      A.   Yes.

14      Q.   And he eventually came out?

15      A.   Yes.

16      Q.   Was there a tactical plan that you're aware of in

17   place as to once he got out of the car, who would he

18   designated lethal, and would who he designated less-lethal?

19      A.   I understand.  Not -- there wasn't a conversation

20   with me about it, no.

21      Q.   Did you overhear any conversations about it?

22      A.   Not that I recall, no.

23      Q.   Did you hear anyone say, for example, so and so will

24   be designated the bean bag, so and so would be designated

25   Taser, and so and so would be designated lethal?

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 21

1    Q.   Was your impression that you heard shots before you

2    fired; correct?

3    A.   I did, yes.

4    Q.   You were not the first one to fire, were you?

5    A.   No.

6    Q.   Okay.  And you recall hearing two or three shots

7    before you fired?

8    A.   Correct.

9    Q.   It sounded like they were coming from your left?

10   A.   I can't be certain if all three, two or three shots

11   came from my left, but I did hear at least a shot coming from

12   my left, yes.

13   Q.   And did you see immediately after the shots started,

14   Mr. Puga starting to run away?

15   A.   It wasn't immediately, but seconds after, yes.

16   Q.   And where did you see him running, in which

17   direction?

18   A.   It was in a like northwest direction.

19        So not straight up the road, but he was running

20   north and a little bit to the west.

21   Q.   And were you firing any shots at him while he was

22   running away?

23   A.   I did, yes.

24   Q.   How many shots do you believe you fired as he was

25   running away?

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 26

1      A.   Not from what I could tell.

2      Q.   Another officer indicated that he was tased after he

3   went to the ground.

4           Do you have a similar recollection?

5      A.   That's correct.

6      Q.   Was he, in fact, tased twice after he went to the

7   ground, if you know?

8      A.   I don't recall how many times.  I don't recall how

9   many times he was tased.

10     Q.   Did you have the impression he was still alive when

11   he was tased?

12          MS. GUSTAFSON:  Objection.  Speculation.

13          THE WITNESS:  No.

14   BY MR. GALIPO:

15     Q.   How about was he handcuffed at some point?

16     A.   He was.

17     Q.   Do you know who handcuffed him?

18     A.   It was Officer Rubalcava.

19     Q.   And did you assist Officer Rubalcava in handcuffing

20   him?

21     A.   No.

22     Q.   Did you have any contact with any of the innocent

23   bystanders who were shot?

24     A.   No.

25     Q.   Did you learn while you were at the scene that

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 33

1    before the paramedics arrived?

2        A.   Not that I'm aware of.

3        Q.   I'm just going to show you a few portions of your

4    statement, and then we'll take our first break.

5             We're going to try to share the screen and show you

6    the bottom of Page 53 and the top of Page 54 of your

7    statement.

8             Are you able to see that on your screen?

9        A.   Yes.

10       Q.   You see the bottom question by Detective Bustamante

11   or Investigator Bustamante asking you about how many pepper

12   ball rounds you recall?

13            Do you see that general questions on Lines 24

14   through 26?

15            Do you want us to enlarge it a little bit for you?

16       A.   I could see it.  I apologize.

17       Q.   It's okay.  Take your time.

18            You might have to look above to give it context.

19       A.   Yes, I remember that.

20       Q.   Going to the top of Page 54, do you see your

21   estimate between 100 and 150?

22       A.   Yes.

23       Q.   Does that seem about right?

24       A.   Yes.

25       Q.   At any time prior to Mr. Puga going to the front of

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 34

1   his vehicle, did you ever see any gun in his hand or on his

2   person?

3       A.   No.

4       Q.   Did you at any time ever see the gun in his

5   waistband, actually in his waistband?

6       A.   No.

7            MR. GALIPO:  Can we go to Page 64, please.

8   BY MR. GALIPO:

9       Q.   Looking towards the top and particularly Lines 3, 4,

10  and 5, do you see the reference to hearing them talking about

11  the Taser?

12      A.   Yes.

13      Q.   Does that refresh your memory, you did something

14  about a Taser at some point?

15      A.   Yes.

16           MR. GALIPO:  Can we go to Page 66, please.

17  BY MR. GALIPO:

18      Q.   Looking at the top, you're referencing him bending

19  over, and that's when you thought he probably got hit?

20      A.   Yes.

21      Q.   And you were thinking maybe by your shots or maybe

22  by someone else's shots; is that fair?

23      A.   Yes.

24      Q.   And then you say, "And he starts to run kind of

25  north, and then you stop firing because it looks like he's

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 38

1          MS. ESQUIVEL:  Objection.  Lacks foundation;

2   misstates prior testimony.

3          Go ahead.  You can answer.

4          THE WITNESS:  After reviewing the statement I gave,

5   yes.

6   BY MR. GALIPO:

7      Q.   Okay.  And when you saw him stumbling, was he kind

8   of like in the middle of the street at that point?

9      A.   I don't remember at what position he was in the road

10   at that point.

11      Q.   Let's look at Page 72 real quick, and then we'll

12   take a break.

13          On Lines 9 through 14, I think you're talking about

14   he was running, he was still kind of like in the middle of

15   the intersection, he doesn't really fall, but it looks like

16   he's going to fall, but and then he kind of like pops back

17   up, and then he keeps running, and then that's when he falls,

18   falls in the dirt shoulder face-down.

19          I'm paraphrasing a little bit, but do you see

20   that?

21      A.   I see that, yes.

22      Q.   Is that consistent with your recollection now that

23   we've refreshed it a little bit?

24      A.   Yes.

25      Q.   So when he initially stumbled, he was more in the

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 42

1              THE WITNESS:  No.

2    BY MR. GALIPO:

3         Q.   I'm looking through your statement, so there may be

4    a few pauses because many of this we already covered.

5              Just bear with me for a moment.  Okay?

6         A.   Okay.

7         Q.   The videos that you saw, how many times did you

8    watch those, approximately?

9         A.   The one to two.

10        Q.   At some point did you and Officer Rubalcava kind of

11   switch positions?

12             In other words, you went to the right and he went to

13   the left?

14        A.   Yes.

15        Q.   Do you know why that occurred?

16        A.   Mr. Puga demanded me to not be next to Sergeant Kee.

17             So Sergeant Kee had to switch positions.

18        Q.   Kind of a de-escalation technique?

19        A.   Yes.

20        Q.   The pepper balls, were they deployed through an open

21   window into the vehicle?

22        A.   They were deployed through the rear windshield of

23   the vehicle.  However, I don't recall if the pepper balls

24   broke the windshield for them to go through, or if another

25   device or something else was used to break the rear

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 43

1    windshield.

2        Q.   We heard it was possibly the bean bag round.

3             Does that sound like that could be a possibly, or

4    you just don't remember?

5        A.   I know the bean bag round was -- that was the first

6    less-lethal used, and that was completely ineffective to the

7    vehicle's windows.  So the rear windshield was broken by the

8    Sheriff's Department.

9             I don't recall if they had a different device or if

10   it was with the pepper balls.

11       Q.   Okay.  Thank you.

12            MR. GALIPO:  And then can we go to the bottom of

13   Page 17 of his statement, please, Hang.

14   BY MR. GALIPO:

15       Q.   I'm looking at the last few lines.

16            We kind of talked about this, and you're saying you

17   kind of can see blood like from his like eye area.

18            Do you see that reference?

19       A.   Yes.

20       Q.   And then going to the top of the next page, Page 18,

21   you're referencing like one of them actually hit his eye.

22            You're referring to the pepper balls?

23       A.   Yes.

24       Q.   And he is just covering his face like the whole

25   time, and at that point he has like three different towels in

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 47

```
 1      A.   I remember hearing shots from my left, and I know

 2   Sergeant Kee and Rubalcava were to my left.

 3          I don't know if anybody else was to my left,

 4   however, so.

 5      Q.   And you heard those shots before you fired your

 6   first shot?

 7      A.   I heard at least one shot come in from my left,

 8   yes.

 9      Q.   So when you got to him, was he more or less

10   chest-down or face-down with his arms and hands underneath

11   him?

12      A.   He was face-down, but with his arms underneath of

13   him, yes.

14      Q.   And going to Page 78 of your statement, if we can

15   look at that for just a moment and read to yourself if you

16   want to Lines 11 through 22, and let me know when you've had

17   a chance to do that.

18      A.   I'm done.

19      Q.   Have you had a chance -- does a refresh your

20   recollection about the two tasing and the body locking up?

21      A.   Yes.

22      Q.   And I take it you had the impression he was still

23   alive at that time?

24          MS. ESQUIVEL:  Objection.  Calls for speculation.

25   BY MR. GALIPO:
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 51

1     Q.   Officer, I'm going to call you officer because at

2   that time you were an officer.

3          How was it that you came to be involved in the

4   pursuit of Mr. Puga?

5     A.   I -- so we, me and Officer Rubalcava recognized that

6   vehicle from a description that was given to us at the

7   beginning of our shift where that vehicle was involved in a

8   car-to-car freeway shooting.

9          So that's -- we made a traffic stop on that

10   vehicle.

11     Q.   And what were you told about that earlier

12   incident?

13     A.   We were told that there was a car-to-car shooting

14   involving a white Ford Expedition with black rims that had a

15   yellow sticker in the back windshield that said Funeral, and

16   that that shooting resulted from a road rage incident; that

17   the victim of that shooting followed the Expedition for a

18   little bit, and then lost sight of it, and the officers

19   during the day attempted to locate that vehicle, and they

20   didn't locate the vehicle.

21     Q.   Were you told anything about the suspected driver?

22     A.   Not that I remember, no.

23     Q.   You testified earlier when Mr. Galipo showed you

24   exhibit, and I believe it's either 6 or 5, a photograph and

25   the Bates stamp 544, that was shown to you during your

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 53

```
 1    there.
 2       Q.   Based on where you were positioned and where you
 3    shot from, did you have any reason to shoot in the direction
 4    of the northeast corner?
 5       A.   No.
 6       Q.   And you testified earlier that -- well, we'll call
 7    it two volleys, that there were two volleys of the first --
 8    there were ten shots during the first volley second after you
 9    saw Mr. Puga stumble, but not -- I think you he was going to
10    fall, and then you resumed firing.
11            At any time during the first volley when you started
12    shooting, did you ever see a gun in Mr. Puga's hands?
13       A.   Can you -- sorry.  Can you repeat the question?
14       Q.   Sure.  Before you started firing the first volley,
15    did you ever see a gun in Mr. Puga's hand?
16       A.   I did.
17       Q.   Did you -- and I know you testified earlier that you
18    didn't see a flash, but did you hear a gunshot that you
19    believe came from the gun that you saw in Mr. Puga's hands?
20            MR. GALIPO:  Objection.  Leading.  Also -- well,
21    leading well.
22            THE WITNESS:  I remember hearing a shot coming from
23    the -- I remember one shot, at least one shot coming from the
24    left side of me.  Prior to that I do remember hearing a shot.
25            I couldn't tell you where it came from.
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 54

1   BY MS. ESQUIVEL:

2       Q.   And when you said you saw Mr. Puga starting running

3   away and you saw him stumble, that you paused and reassessed,

4   then he didn't fall, so you continued to fire; is that

5   correct?

6       A.   Yes.

7       Q.   Why did you continue to fire if he was running away

8   from you?

9       A.   Because I knew he initially had a firearm, and I

10  didn't see him drop the firearm.  At that time part of my

11  reassessment was tracking from where he was at to where --

12  where he initially started to where he was at that point, and

13  I didn't see a firearm on the ground up until that point.

14          So that's why I continued to fire.

15      Q.   And why did you consider the fact that he still had

16  the gun as an immediate threat to yourself or someone else?

17          MR. GALIPO:  Objection.  Leading.

18          THE WITNESS:  Because of -- he still had the gun in

19  his hand.  He was still able to fire at me or my partners,

20  and then the fact that he was heading towards where he was

21  running, headed towards residential area, him being able to

22  enter residence with the handgun could have made a worse

23  situation.

24  BY MS. ESQUIVEL:

25      Q.   And what was the concern on your part that he would

00420

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 55

1    enter a residence?

2        A.    So the whole interaction appeared to be -- I guess

3    desperate would be the right word.  He demanded to call his

4    sister, his mom.  He was drinking.  He was throwing stuff out

5    the window, seemed very erratic.  So him entering a residence

6    to barricade himself or even potentially take a hostage was

7    something that was in my mind definitely.

8        Q.    You testified earlier that you did not see any of

9    your officers on the scene render aid to Mr. Puga.

10            Why did you not provide immediate CPR to Mr. Puga

11   once he was secured on the ground?

12       A.    So we had medical on standby.  I believe they were

13   staged just north of where we were at by that next

14   intersection or so.  And I saw their headlights -- I'm

15   sorry -- their emergency lights on driving towards us.

16            So I knew medical aid was there.  I knew it was

17   coming, and then also, part of like our training is before we

18   do any aid to anybody, make sure we have all of our

19   equipment -- to get medical equipment and all of my medical

20   equipment was in our patrol car including like the sterile

21   gloves.

22            So since I saw the ambulance come in already, by the

23   time I went to the patrol car, they would have already been

24   there.  So it didn't make sense to do that.

25       Q.    Did you at any time while you were there, did you --

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 58

1          MR. GALIPO:  That is on the first page, I think.

2          MS. ESQUIVEL:  Isn't it on that top there March 18,

3   2021?

4          MR. GALIPO:  It says that, but I don't know if you

5   look at Line 3, it says February 22.

6          MS. ESQUIVEL:  Okay.

7          MR. GALIPO:  So I don't know if one was the date the

8   transcription was done and one was the interview.

9          I'm not sure.

10          MS. ESQUIVEL:  So let's get that clarified.

11  BY MS. ESQUIVEL:

12      Q.   Officer Blackwood, to the best of your recollection,

13  do you think it was over a month that you were interviewed,

14  or within a couple of days?

15      A.   It would have been within a couple of days.

16      Q.   So you think February 22 is the accurate date that

17  you were interviewed?

18      A.   Yes.  I believe that's the accurate date.

19      Q.   Okay.  Thank you.

20          And I think that's all the questions I have.

21          I'm sorry.  I did have one question.

22          You testified that your statement that were shown to

23  you, you said that there was about a 100 to 150 pepper balls

24  fired into the SUV, in to the white Expedition?

25      A.   Yes.

00422

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 59

1      Q.   How do you know that it was 100 to 150 pepper

2   balls?

3      A.   I just remember that conversation between -- I don't

4   know who it was between, but I just know Sheriff's deputies

5   said that his canister was full, and then it has anywhere

6   between a 100 to 150 pepper balls.

7           So that's where that number came from.

8      Q.   Okay.  I have no further questions.

9           MR. GALIPO:  Okay.  Shannon, any follow-up?

10          MS. GUSTAFSON:  No.  I have nothing else.

11          MR. GALIPO:  Okay.  I have nothing further.

12          I'm assuming you both want the same request from the

13   court reporter?

14          MS. ESQUIVEL:  Yes.  Madam Court Reporter, the

15   witness will review the transcript.  I'll order an electronic

16   only, and I will provide my copy to him for review.

17          MS. GUSTAFSON:  And I would like a copy if you need

18   it on the record.

19          MR. GALIPO:  I just thought of one other question.

20          I'm sorry.

21                         EXAMINATION

22   BY MR. GALIPO:

23      Q.   Was the helicopter orbiting above for some period of

24   time?

25      A.   It was.

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 63

```
 1                        CERTIFICATE

 2                            OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6    Stenographic Shorthand Reporter of the State of California,

 7    do hereby certify:

 8            That the foregoing proceedings were taken before me

 9    at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11    prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13    by me, using machine shorthand, which was thereafter

14    transcribed under my direction;

15            Further, that the foregoing is an accurate

16    transcription thereof.

17            I further certify that I am neither financially

18    interested in the action, nor a relative or employee of any

19    attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22    date:  November 4, 2024.

23            _____

24            Jinna Grace Kim, CSR No. 14151

25
```