# EXHIBIT AA

Alexander Jason
Certified Senior Crime Scene Analyst
Shooting Incident Analysis & Reconstruction
P.O. Box 375, Pinole, CA 94564 • 510 724 1003 • Fax: 724 0733
www.alexanderjason.com
The Anite Company, Inc

Ms. Amy R. Margolies
Lynberg & Watkins
1100 W. Town & Country Rd., Suite 1450
Orange, California 92868

L.C. et al., State of California, et al. Case No. 5:22-CV-00949-KK- SHK
Botten et al. v. State of California, et al. Case No. 5:23-cv-00257

February 13, 2025

**Rebuttal to Roger Clark Report and Materials Including Videos by M. Kimmins.**

---

I have reviewed the plaintiff's expert report of Roger Clark and I have found many errors and omissions:

## Rebuttal to Clark Opinion 2:

Mr. Clark states:

*"Sergeant Kee violated standard police practices and training when he shot at Mr. Puga when he saw Mr. Puga drop his right hand from a raised position. It is my opinion that Sergeant Kee overreacted when he saw Mr. Puga drop his right hand from a raised position."*

The time interval from reaching for a pistol in a waistband and firing it can be very short, less than one second. An officer facing someone with a pistol in his waistband cannot wait to react until after the person has grabbed the pistol: He must act immediately when the hand moves towards the pistol. This movement must be regarded as an immediate deadly threat. This is particularly true when facing a suspect who has recently used the firearm against another person in a criminal assault, as Mr. Puga was known to have done.

A peer reviewed study on the relative time intervals involved in a suspect drawing and shooting a pistol and an officer's ability to defend himself stated:

> *These findings suggest that if a law enforcement officer does not or cannot take pre-emptive (action) to avoid or control the situation, they simply lack sufficient time to react and respond to the stimulus, prior to taking fire, which is supported by prior literature.*

*Kantor, M. L., W.J. et al. (2022). Kinematic Analysis of Naive Shooters in Common Law Enforcement Encounters. journal of Forensic Biomechanics, 13(5).*

**Rebuttal to Clark Opinion 3:**

Plaintiff expert Clark's report, Opinion 3 makes several assertions which are not only inaccurate but which appear to be made with deliberate omissions of relevant witness testimony:

Clark's Opinion 3 states*:*

"*3. Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they shot at Mr. Puga while he was running away. It is my opinion that even if Mr. Puga had initially presented a threat when the officers first opened fire,* ***Mr. Puga did not present an immediate threat of death or serious bodily injury as he was running.*****"** (emphasis added).

Mr. Clark's opinion that Mr. Puga did not present an immediate threat while he was running while holding his loaded pistol is incorrect. First, it must be recognized that the officers saw Mr. Puga fire his pistol at them before he started to run. This fact was also supported by the testimony of a civilian witness (Annabelle Botton) who saw Mr. Puga fire at the officers:

Interview of Annabelle Botton, COSB007447, Page 21:

> *Annabelle saw Puga lower his right hand toward the front of his waist, and raised what she described as a black handgun.*

*Annabelle saw Puga shoot once at the CHP officers, who stood on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle flash from his handgun.*

A person holding a pistol while running away is able to:

1. Turn around and fire within less than one half second. (This dynamic has been proven in human movement testing and published in peer-reviewed publications.
2. Point the handgun over his shoulder and fire backwards.
3. Point the handgun around his torso and fire backwards.

I have performed considerable research on the ability of a person to shoot at someone behind them. I have prepared a video demonstration of the timing involved in shooting at 180 degrees (backward.) It is available for viewing here: https://www.dropbox.com/scl/fi/otinx9ttlz756ao7hwigo/Shooting-at-180-deg-V2.mp4?rlkey=6pehb5vbapkksjhzt3f9tfttw&st=kdtnki8o&dl=0

Mr. Clark omits relevant testimony from other officers clearly describing Mr. Puga pointing his gun at them while he was running:

1. Officer Rubalcalva described Mr. Puga's aiming his pistol backward as he ran:



RUBALCAVA: Uh, he continued running north uh west direction holding his gun pointing it towards us.

BUSTAMANTE: Okay, can you describe what that means because if he's running away from you did, he have it over his shoulder or how, how, can you describe that?

RUBALCAVA: Over his shoulder.

*Figure 1: Interview of Ofc Rubalcava, COSB006283, Page 99*

2. In both his interview and his deposition, Deputy Adams described Mr. Puga aiming backwards as he ran:

ADAMS: Um, yeah I, I remember seeing two different things uh I don't know if because he was twisting or if it's my own mind playing tricks on me um when he first shot he was turned square up to me um he shot with one hand on the gun um and then when he was running um I remember he was turned the other way pointed the gun backwards or he was running northbound with his shoulders squared to the east um pointing backwards towards um myself and the other officers um, but then I also know when he got across to the corner I remember seeing him again turn his shoulders and just were squared to the west and he was pointing backwards towards us.

*Figure 2 – Interview of Deputy Adams, COSB006455, Page 46.*



RIPLEY: Okay. And when or after that initial volley what was the suspect, what was the suspect's reaction?

ADAMS: He was still running, still pointing a gun uh in my direction.

*Figure 3 - Interview of Deputy Adams, COSB006455, Page 47.*



RIPLEY: …um what you were showing to us I just want to make sure it's on tape is that he was running forward and he's using his right arm placed backwards….

ADAMS: Correct.

*Figure 4 - Interview of Deputy Jake Adams, COSB006455, Page 47*

**Q. And was Mr. Puga still running away at that point?**

A. Yes, sir. Also, during that time as he was running, I remember seeing the gun again as he turned towards me and the other officers.

**Q. Which hand did you see the gun in?**

A. I believe it was his right hand, sir.

*Figure 5 – Deposition of Dep. Jake Adams, Page 38*

3. In his deposition, Sgt Isaiah Kee described Mr. Puga aiming backward as he ran:



A. I could only see his side because I recall seeing in

www.huseby.com Huseby Global Litigation 800-333-2082

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

**Page 84**

his left hand a gun, and he was running, but pointing back at us. And so I could only see like his side, like his rib cage area.

*Figure 6 – Deposition of Sgt Isaiha Kee, Pgs 83-84*

4. Sgt Robert Vaccari also described Mr. Puga aiming backwards as he ran:

VACCARI: But he was running and pointing it.

ABERNATHY: Okay. And what direction was he pointing it?

VACCARI: Towards the CHP officers.

*Figure 7 – Sgt Robert Vaccari interview, COSB006387, Page 67*

**DR 192101044**
**H# 2021-024**
**Typed By: Terry**
**Reviewed By / Date:**

VACCARI: I would say if he was running northwest towards where he ended up and he was pointing it southwest, is that correct? He's pointing it back towards where the CHP officers were, were located.

*Figure 8 - Sgt Robert Vaccari interview, COSB006387, Page 68*

Mr. Clark's Opinion 3 further asserts that: "***Under the facts of this case, there was no immediate defense of life situation while Mr. Puga was running away****.*"

This assertion is invalid as the above statements by officers describe the threat officers saw as they observed Mr. Puga aiming at them while he ran away.

**Mr. Clark's Opinion 3 also asserts that:**

*"Several different video sources captured Mr. Puga running from the Expedition until he ultimately fell to the ground. The videos show Mr. Puga running straight ahead, with both arms pumping back and forth in a running motion; never turning around towards the officers and never pointing either hand back toward the officers."*

While there were several videos recording aspects of the incident from different perspectives, it is obvious to any observer of the videos that the scene and the actions of Mr. Puga are extremely difficult to see

clearly because of the location darkness, gunsmoke, and movement of the recording devices.

The three recording video cameras were the CHP MVARS ("dashcam") systems from Sgt Kee's vehicle (top left), Ofc Rubacalva's vehicle (top right), and a civilian witness, Erin Mangerino (bottom center). Example video frames from each of these cameras is shown below: One before the shooting began with Mr. Puga standing at the front of his vehicle and the second after the shooting had started and Mr. Puga was running away.

The Mangerino video (COSB001468-COSB001469) was taken from a relatively long distance (approximately 120 feet) and is of low quality. It is not possible for anyone viewing this video to see sufficient detail of Mr. Puga (who is actually facing away from his vehicle before running) to determine what could or could not be in his waistband or hands. This recording is also made less intelligible because of the severe movement of the person holding the camera during the shooting sequence.

It is important to note that none of the recording cameras were recording what the officers saw with their eyes; they were much closer to Mr. Puga as ran from his starting location.

Alexander Jason, MFS, CSCSA / Rebuttal Report / L.C. et al v State of CA / Page 8 of 16



*Figure 9 – These images show the scene before Mr. Puga ran. CHP MVARS from Sgt Kee on top left, CHP MVARS from Ofc Rubacalva on top right. Mangerino cell phone video at bottom center.*



*Figure 10 -- These images show the scene as Mr. Puga ran. CHP MVARS from Sgt Kee on top left, CHP MVARS from Ofc Rubacalva on top right. Mangerino cell phone video at bottom center. It is obvious that none of the videos shows sufficient clear detail to determine if Mr. Puga was holding a pistol.*

**Additional Rebuttal to Clark Opinion 3:**

Mr. Clark opines that

> *"Mr. Puga was running in the middle of the street and not close to any residence nor about to enter any residence when the officers shot him."*

This is also an invalid statement. Mr. Puga started his run from the middle of the street but quickly moved onto the dirt shoulder to his left.




*Figure 11 – From Sgt Kee's MVAC camera Puga is seen running onto the dirt shoulder. He was clearly not running down the middle of the street.*



*Figure 12 – Black "box" is Puga's final location. Note nearby residences.*

There certainly was a concern by the officers that Mr. Puga would try to enter a residence. Where else would he go?

Deputy Blackwood interview, COSB000642, page 98:

*I felt that if I didn't stop him that um that . . . I didn't know if he what his plan was like running to to the house so I was concerned with like public safety like the residence of the house and the other houses around us as well.*

Sgt Kee Interview, COSB006068, page 65:

*I was in fear for my, my life, the officers and the deputies that was with me and then I was also concerned about him making it to the residence.*
*Q: At that point ws there a possibility that the suspect could have invaded a home at some point?*
*Yes, Sir.*

Deputy Rubalcava interview, COSB006313, page 129:

*BUSTAMANTE: When the suspect ran away was there any fear he could be running towards the residents?*
*RUBALCAVA: Yes.*
*BUSTAMANTE: Okay did that change your mindset as to not only had he just shot at you, but there was, he could, was he making a direct line for a specific residence, did it look like he was trying to escape capture?*
*RUBALCAVA: Um, my, well it seemed like he was running in a north for some reason in a northwesterly direction towards the residents in the corner*
*RUBALCAVA: So, my reaction was, stop the threat before he, he potentially run into their residence keep them as hostage or shoot back at us.*

## Rebuttal to Clark Opinion 4

Mr. Clark opines that Mr. Puga could not have been an immediate threat after he fell prone to the ground:

*"Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they shot at Mr. Puga after he had fallen to the ground. It is clear that Mr. Puga was no longer an immediate threat of death or serious bodily injury after he had fallen to the ground."*

This assertion is incorrect as it disregards the context and reality of what had just happened: Mr. Puga fired his pistol at officers, ran away

while pointing his pistol back towards the officers. Before he fell to at his final location, Mr. Puga fell to the ground and rose up somewhat. This indicated that he was continuing to resist and to ignore the commands to stop and show his hands. The officer continued to fire because it was not clear what Mr. Puga was doing or what his intentions were. **One thing is clear, at no point during his run or after he fell did Mr. Puga ever raise his hands up – which would have immediately been recognized as a surrender indication.**

Mr. Clark further asserts (without any cited basis) that:

> *". . . there were approximately fifteen shots fired after Mr. Puga had gone to the ground. Although no officer admitted to firing at Mr. Puga after he had gone to the ground, it is undisputed that Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams discharged their weapons and that shots were fired at Mr. Puga after he had gone to the ground."*

Again, this assertion is not supported by any facts or evidence. The officers statements were:

- Officer Blackwood said he continued firing until Puga stopped moving, but also stated he did not fire after Puga fell.
- Sergeant Kee said he fired until Puga fell face first and that he did not fire at Puga after he was on the ground.
- Deputy Adams stated he stopped firing when Puga no longer posed a threat, which was after he fell, and he did not believe he fired any shots after Puga went to the ground, though he wasn't 100% certain.
- Officer Rubalcava did not recall firing after Puga went down, but admitted he might have.

Civilian Witnesses reported:

- Tammy Goodson heard 25 to 30 gunshots over several seconds with no pause and reported that Puga fell to the ground.
- Erin Mangerino heard approximately 15 to 20 gunshots over several seconds with no pause and reported that Puga fell to the ground.
- Betzabeth Gonzalez stated Puga took one or two steps before she lost sight of him, and then she heard shots.
- Jonathan Botten Jr. heard shots but did not know where they were coming from.

It should also be recognized the scientific, peer-reviewed and published research has shown that there is a time interval before a police officer can stop firing. The stopping is not instantaneous. One research paper established that in a test, most police officers were not able to stop firing upon the activation of a signal and actually fired one or more shots. This was a non-stressed test. During stressful situations, the SSRT (stop signal reaction time) is increased significantly.

It does not appear that Mr. Clark has any foundation for stating that it is "*undisputed*" that the four officers fired at Mr. Puga while he was prone on the ground.

**Bullet Wounds**

The bullet wounds in Mr. Puga's body are consistent with the many movements and positions he assumed while running, falling, lifting his legs. The fatal bullet described as Gunshot #9 entered Puga's left back, traveling back to front, left to right, and upward could have been sustained while Mr. Puga ran in a bent-forward-at-the-waist position. (Note: the fatal wound was not immediately fatal nor incapacitating.)

**The Prone Position**

Mr. Puga eventually fell in a prone position with his hands under his chest area. His pistol was under his body. The officers could not possibly know the extent of his injuries or his intentions but did note that he was still breathing.

Mr. Puga, while in the prone position, ignored shouted commands to show his hands. In view of his past extremely oppositional and violent behavior, it was rational to suspect that Mr. Puga was planning another attack. A person in a prone position with a pistol in hand, can very quickly rotate and fire his pistol. This dynamic was explored and published in a research paper which found that:

> *The prone subject with his or her hands hidden is a unique threat. Responding officers are unaware if the prone individual is carrying or holding a weapon and how quickly the subject might be able to turn and injure an officer.*
>
> *As demonstrated by the results of this study, a prone subject is likely able to move and fire before the officer would even be able to initiate movement.*

*Lewinski, W. J. e. a. (2016). The Speed of a Prone Subject. Law Enforcement Executive Forum, 16(1).*

**Additional Rebuttal to Clark Opinion 4:**

Mr. Clark states:

> *"It is my opinion that the officers had time to provide Mr. Puga with a warning that deadly force was going to be used prior to the shooting. Officers are trained that a warning that deadly force is going to be used should be given when feasible. Additionally, the officers also had time to provide an additional warning that deadly force was going to be used in between their first and subsequent volleys of shots."*

This opinion is completely inaccurate. As the officers approached Mr. Puga while he was at the front of his vehicle, they repeatedly shouted,

"Don't, don't reach!" and "Get your hands up!". It was at this time the Mr. Puga fired at the officers. There was no time to provide a "warning that deadly force is going to ge used". Anyone being approached by officers with guns drawn shouting "Get your hands up!" would recognize the inherent threat of deadly force being used.

And while Mr. Puga ran, he was continually pointing his gun back at the officers. It is absurd to believe that they should have given a warning at that time – while they were shooting at Mr. Puga to prevent him from shooting at them.

Note that Mr. Clark even admits that a warning should be issued "***when feasible***." There was no feasible moment in this fast moving incident.

**Rebuttal Regarding: Muzzle Flash**

Mr. Clark makes numerous references to the fact that several witnesses – police and civilian – stated that they did not see a "muzzle flash" (although witness Annabelle Botten did). It should be noted that a pistol's muzzle flash (the briefly illuminated cloud of gas that appears near the muzzle of a firearm upon discharge) is of such short duration that a witnesses' eye-blink can prevent can miss it completely.

This fact was proven in a peer-reviewed and published research paper which was co-authored by this analyst. The paper's title is: *Muzzle Flash: One Witness Sees It, the Other Does Not.* A finding in this paper was that:

> *"The duration of the visible discharges from handguns firing modem ammunition can be very short (far less than 1/60 of a second). Such brief time intervals are substantially less*

*that the time duration of a spontaneous blinking of the eyes (0.10 to 0.40 seconds) consequently it is quite possible that a witness who spontaneously blinked at the instant a firearm was discharged would not see the muzzle flash."*

*Haag, L. C., Jason, A. (2007). Muzzle Flash: One Witness Sees It, the Other Does Not. AFTE, 39(2), 116-126*

Another reason why a muzzle flash would not be visible to a witness is because of the angle of viewing. Not everyone had the same perspective and field of view. It is not valid to assume that they all had the same field of view.

**Rebuttal Point to Videos by Plaintiff Expert M. Kimmins**

These videos contain commentary on the bottom of the video frame. These comments are often inaccurate and misleading. A viewer can decide for themselves what is being shown. Commentary is not helpful.

**Summary Opinion**

**Plaintiff expert Roger Clark's report contains many errors of fact and he ignores very significant testimony which he should have considered.**

Alexander Jason, MFS, F-AAFS, CSCSA,
Certified Senior Crime Scene Analyst
Certified Force Science Analyst