1   ROB BONTA
    Attorney General of California
2   NORMAN D. MORRISON
    Supervising Deputy Attorney General
3   DIANA ESQUIVEL
    Deputy Attorney General
4   State Bar No. 202954
      1300 I Street, Suite 125
5     P.O. Box 944255
      Sacramento, CA 94244-2550
6     Telephone:  (916) 210-7320
      Facsimile:  (916) 322-8288
7     E-mail:  Diana.Esquivel@doj.ca.gov
    *Attorneys for Defendants State of California, by and*
8   *through the California Highway Patrol, Blackwood,*
    *Kee, and Rubalcava*
9

10              IN THE UNITED STATES DISTRICT COURT

11           FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                      EASTERN DIVISION

13

| | |
|---|---|
| **L.C., et al.,** | No. 5:22-cv-00949 KK (SHKx) |
| Plaintiffs, | **DECLARATION OF DIANA ESQUIVEL IN SUPPORT OF STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| **v.** | |
| **STATE OF CALIFORNIA, et al.,** | Date:          March 20, 2025<br>Time:          9:30 a.m.<br>Courtroom:  3 (3rd Floor)<br>Judge:        Hon. Kenly Kiya Kato<br>Trial Date:   June 2, 2025<br>Action Filed: June 7, 2022 |
| Defendants. | |

         I, Diana Esquivel, declare:

         1.  I am admitted to practice law in California and before this Court, and am a

Deputy Attorney General with the Office of the Attorney General for the State of

California, attorneys of record for Defendants State of California, by and through

the California Highway Patrol (CHP), CHP Officers Michael Blackwood, Isaiah

Kee, and Bernardo Rubalcava (collectively, State Defendants).

2.  Exhibit A is a true and correct copy of an aerial photograph taken from CHP Unit H-82 (bates stamped AG0674). I added text boxes to identify the streets and the location of decedent Hector Puga's body and other material objects. Other than adding the text boxes and arrows, the photograph has not been altered in any other manner.

3.  Exhibit B is a true and correct copy of the Mobile Video Audio Recording System (MVARS), Part 1, from the patrol unit Defendant Kee drove on February 17, 2021.

4.  Exhibit C is a true and correct copy of the MVARS, Part 2, from the patrol unit Defendant Kee drove on February 17, 2021.

5.  Exhibit D is a true and correct copy of the MVARS, Part 1, from the patrol unit Defendant Blackwood drove on February 17, 2021.

6.  Exhibit E is a true and correct copy of the MVARS, Part 2, from the patrol unit Defendant Blackwood drove on February 17, 2021.

7.  Exhibit F is a true and correct copy of the MVARS, Part 3, from the patrol unit Defendant Blackwood drove on February 17, 2021.

8.  Exhibit G is a true and correct copy of the MVARS, Part 4, from the patrol unit Defendant Blackwood drove on February 17, 2021.

9.  Exhibit H is a true and correct copy of the relevant cellphone footage that Edward Mangerino recorded on February 17, 2021, from inside his home and that was produced in discovery as bates stamped COSB001459.

10.  Exhibit I is a true and correct copy of the relevant cellphone footage that Erin Mangerino recorded on February 17, 2021, from inside her home and that was produced in discovery as bates stamped COSB001416.

11.  Exhibit J is a true and correct copy of the relevant cellphone footage that Betzbeth Gonzalez recorded on February 17, 2021, from inside her home and that was produced in discovery as bates stamped PLAINTIFF 0241.

12.  Exhibit K is a true and correct copy of the relevant portion of the audio recorded interview of Plaintiff Annabelle Botten, conducted on February 17, 2021, at 10:11 a.m. by Detective Hernandez of the San Bernardino County Sheriff's Office. The recording was produced in discovery as bates stamped COSB001379.

13.  Exhibit L is a true and correct copy of the CHP Arrest-Investigation Report (CHP 216), No. F03885021, concerning the February 16, 2021 freeway shooting incident allegedly involving decedent Puga.

14.  Exhibit M is a true and correct copy of the Federal Rule Civil Procedure 26(b) report prepared by the State Defendants' police-practices expert, Greg Meyer.

15.  Exhibit N is a true and correct copy of the relevant portion of the Rule 26(b) report prepared by the County Defendants' criminalist/forensic firearm examiner, Lucien C. Haag.

16.  Exhibit O are excerpts of the relevant portions of the transcript of Defendant Kee's deposition testimony, taken on November 5, 2024, in this matter.

17.  Exhibit P are excerpts of the relevant portions of the transcript of Defendant Blackwood's deposition testimony, taken on November 4, 2024, in this matter.

18.  Exhibit Q are excerpts of the relevant portions of the transcript of Defendant Rubalcava's deposition testimony, taken on November 4, 2024, in this matter.

19.  Exhibit R are excerpts of the relevant portions of the transcript of Defendant Deputy Jake Adams' deposition testimony, taken on November 12, 2024, in this matter.

20.  Exhibit S are excerpts of the relevant portions of the transcript of third-party witness Edward Mangerino's deposition testimony, taken on November 25, 2024, in this matter.

1    21.  Exhibit T are excerpts of the relevant portions of the transcript of third-

2    party witness Tammy Goodson's deposition testimony, taken on November 26,

3    2024, in this matter.

4    22.  Exhibit U are excerpts of the relevant portions of the transcript of Dr.

5    Timonthy Jong's deposition testimony, taken on December 16, 2024, in this matter.

6    I declare under penalty of perjury under the laws of the United States and the

7    State of California that the foregoing statements are true and correct.

8

9    Dated:  February 20, 2025                    */s/ Diana Esquivel*

10                                                     Diana Esquivel

11   LA2022603031
     38804697.docx

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit A



CALIFORNIA HIGHWAY PATROL H-82

34.45965° N      117.26768° W
SPD    36 KTS    HDG    359°T
ALT    3580 FT

269°T

34.45962° N      117.27082° W
SPD      0 MPH    HDG   ---°T
ELV   2979 FT    SLT   0.18 NM

02/17/21
07:07:32

LRF TARGET
--.-----°
---.-----°   -
ELV    --- FT
SLT    -- NM

Puga's body

Blackwood
patrol vehicle

Peach St.

Kee patrol
vehicle

Puga
vehicle

Catalpa St.

LRF L  FIRE
LP   C ARMED
LI     ARMED

HDEO

FOC GEO
EXP AUT

W          N    39 FT

-35°      270°

GEOPOINT
INS NAV 0.40°

Botten
Residence

TRK CEN

SLAVE ACTIVE

AG0674

Place holder for

# Exhibits B to K

**(audio and video exhibits are being lodged with the court)**

# Exhibit L

**CONFIDENTIAL**

STATE OF CALIFORNIA
DEPARTMENT OF CALIFORNIA HIGHWAY PATROL

# ARREST - INVESTIGATION REPORT

CHP 216 (Rev. 11-15) OPI 061

| | |
|---|---|
| ☐ Misdemeanor | ☐ Domestic Violence (Refer HPM 100.69) |
| ☒ Felony | ☐ Missing Person (Refer HPM 100.69) |
| ☐ Other | |

PAGE 1 of 20

LAST NAME, FIRST NAME, AND MIDDLE INITIAL
**PUGA, HECTOR JAVIER**

| COURT | FILE NUMBER | EVIDENCE/PROPERTY |
|---|---|---|
| VICTORVILLE | F03885021 | ☒ YES  ☐ NO |

| AREA | BEAT | COLLISION REPORT NUMBER | E 20210033 |
|---|---|---|---|
| 850 | 083 | N/A | |

| DATE/TIME OF ARREST REPORT | DATE/TIME OF INCIDENT | LOCATION OF ARREST/INCIDENT | MVARS ☒ YES ☐ NO |
|---|---|---|---|
| | 02/16/2021   1745 | I-15 N/B (BARSTOW FREEWAY), JNO PALMDALE ROAD | Disc # B3- 02/16/2021 |

| CITATION NUMBER | OFFENSE(S) CHARGED OR INVESTIGATED | JUS 8715 REQUIRED |
|---|---|---|
| NONE | 664 PC/ 187 PC, 245(A)(2) PC, 246 PC | NUMBER   ☐ YES ☒ NO |

## SUBJECT NO    1    OF    1

| NAME (last, first, middle) | AKA |
|---|---|
| PUGA, HECTOR JAVIER | UNKNOWN |

| RESIDENCE ADDRESS 9940 RAMONA STREET  BELLFLOWER  CA 90706  US | MAILING ADDRESS  16612 INDIANA AVENUE  PARAMOUNT  CA 90723  US  ☐ SAME |
|---|---|

| RACE | SEX | BIRTHDATE | HAIR | EYES | HEIGHT | WEIGHT | PLACE OF BIRTH (city, state, country) | DISPATCH NOTIFIED |
|---|---|---|---|---|---|---|---|---|
| Hispanic | M | 01/17/1989 | BRN | BRN | 5-09 | 200 | UNKNOWN | ☒ YES ☐ NO |

| DRIVERS LICENSE NUMBER | STATE | DDL STATUS | MISC (SSN, INS #, ETC.) | TIME 1750 |
|---|---|---|---|---|
| D7320932 | CA | SUSPENDED | N/A | ID  A07785 |

| EMPLOYER | ADDRESS | LOG 186 |
|---|---|---|
| UNKNOWN | US | |

| BOOKING, CII, FBI, ETC., NUMBER(S) | WHERE BOOKED/CONFINED | DATE/TIME | FINGERPRINTED ☐ YES ☒ NO |
|---|---|---|---|

☐ JUVENILE   ☐ FOREIGN NATIONAL   ☐ IMMUNITY CLAIM      NOTIFYING OFFICIAL

## VEHICLE

| LICENSE | STATE | YEAR | VIN/EN NUMBER | VEHICLE WAS | STORAGE AUTHORITY |
|---|---|---|---|---|---|
| 4NOM967 | CA | 2021 | 1FMEU17L4YLC09487 | ☐ PARKED ☐ RELEASED ☐ STORED ☐ RECOVERED ☐ IMPOUNDED | |

| VEH YEAR | MAKE | BODY STYLE | COLOR | BODY TYPE | LOCATION OF VEHICLE/RELEASED TO/TELEPHONE NUMBER |
|---|---|---|---|---|---|
| 2000 | FORD | EXPEDITI | WHT | SUV | FLED SCENE |

| NAME OF REGISTERED OWNER  ☐ SAME AS SUBJECT | ADDRESS  8609 CEDAR STREET | ☐ SAME AS SUBJECT |
|---|---|---|
| SALAS ANTONIA, OR SALAS SAMUEL | BELLFLOWER  CA 90706  US | |

| NAME OF LEGAL OWNER  ☒ SAME AS R/O | ADDRESS | LOCATION OF KEYS  WITH VEHICLE |
|---|---|---|

## WITNESS

| BIRTHDATE | SEX | NAME | ☐ WITNESS ☐ PASSENGER | ADDRESS/AGENCY | PHONE RES:  BUS: |
|---|---|---|---|---|---|
| | | | ☐ WITNESS ☐ PASSENGER | | RES:  BUS: |
| | | | ☐ WITNESS ☐ PASSENGER | | RES:  BUS: |
| | | | ☐ WITNESS ☐ PASSENGER | | RES:  BUS: |

## VICTIM INFORMATION

| 1 | NAME  SALVADOR HERNANDEZ PACHECO | ADDRESS  PO BOX 665  BLOOMINGTON  CA 92316  US | | | |
|---|---|---|---|---|---|

| BIRTHDATE | SEX | DL# | STATE | DAY PHONE | EVENING PHONE |
|---|---|---|---|---|---|
| 07/28/1982 | M | D3810177 | CA | (909)600-4743 | None |

| VEH.LIC.# | STATE | YEAR | MAKE | BODY STYLE | COLOR | BODY TYPE |
|---|---|---|---|---|---|---|
| 7ZTU362 | CA | 2017 | HOND | CIVIC | BLK | PASSENGER |

| 2 | NAME | ADDRESS | | | |
|---|---|---|---|---|---|

| BIRTHDATE | SEX | DL# | STATE | DAY PHONE | EVENING PHONE |
|---|---|---|---|---|---|

| VEH.LIC.# | STATE | YEAR | MAKE | BODY STYLE | COLOR | BODY TYPE |
|---|---|---|---|---|---|---|

## MISDEMEANOR INCARCERATION
(To be completed upon physical arrest for any misdemeanor, pursuant to Penal Code Section 853.6.)

As determined by the arresting officer, the person arrested:

1. ☐ was so intoxicated as to be a danger to himself/herself or others.
2. ☐ required medical examination or medical care or was otherwise unable to care for his/her own safety.
3. ☐ was arrested under one or more of the circumstances listed in Sections 40302 and 40303 of the Vehicle Code (Note 5 and 8 if also applicable).
4. ☐ had one or more outstanding arrest warrants issued.
5. ☐ could not provide satisfactory evidence of personal identification.
6. ☐ if released immediately, would jeopardize the prosecution of the offense or offenses for which arrested or the prosecution of any other offenses.
7. ☐ would be reasonably likely to continue the offense or offenses, or the safety of persons or property would be imminently endangered if immediately released.
8. ☐ demanded to be taken before a magistrate or refused to sign the citation.
9. ☐ would not appear at the time and place specified in the notice.
10. ☐ Other:

| ARRESTING/INVESTIGATING OFFICER (Print name/rank) | I.D. NUMBER | REVIEWED BY (Print name/rank) | I.D. NUMBER | DATE |
|---|---|---|---|---|
| Alejandro Tovar / Officer | 021643 | | | |

Destroy Previous Editions          An Internationally Accredited Agency          Chp216_0311 .pdf

AG0241

LAST NAME, FIRST NAME, AND MIDDLE INITIAL

PUGA, HECTOR JAVIER

CITATION/CASE NO.

NONE/7038850207

## ARREST -- INVESTIGATION REPORT NARRATIVE(CONTINUED)

### ADMONITION OF RIGHTS

1. YOU HAVE THE RIGHT TO REMAIN SILENT.

2. ANYTHING YOU SAY CAN AND WILL BE USED AGAINST YOU IN A COURT OF LAW.

3. YOU HAVE THE RIGHT TO TALK WITH AN ATTORNEY AND TO HAVE AN ATTORNEY PRESENT BEFORE AND DURING QUESTIONING.

4. IF YOU CANNOT AFFORD AN ATTORNEY, ONE WILL BE APPOINTED FREE OF CHARGE TO REPRESENT YOU BEFORE AND DURING QUESTIONING, IF YOU DESIRE.

THE ABOVE STATEMENT WAS READ TO THE ARRESTEE BY:

[X] NOT ADVISED     [ ] ARRESTING OFFICER     [ ] OR:          I.D.          TIME:

| DO YOU UNDERSTAND EACH OF THESE RIGHTS I HAVE EXPLAINED TO YOU? | HAVING THESE RIGHTS IN MIND, DO YOU WISH TO TALK TO US NOW? | WAIVER STATEMENT |
|---|---|---|
| [ ] YES   [ ] NO | [ ] YES   [ ] NO | |

SEE PAGE THREE.

CONFIDENTIAL          AG0242

CONFIDENTIAL

STATE OF CALIFORNIA

**NARRATIVE/SUPPLEMENTAL**                                          PAGE  3  OF  20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **1. <u>CASE IDENTIFICATION:</u>**

2

3    **CHP Felony Number:**          **F03885021**

4    **CHP Log Number:**             **210216BS00186**

5    **Date / Time of incident:**    **February 16, 2021 / 1745 hours**

6

7    Name / DOB:                     Hector Javier Puga / January 17, 1989

8    Description:                    Hispanic, Male, BRN Hair, BRN Eyes, 5'-09", 200 lbs.

9    Scar / Oddity / Tattoo:         Unknown

10   Residence Address:              9940 Ramona Street, Bellflower, CA 90706

11   License or Identification (State):   Suspended, CA DL: D7320932

12   Social Security Number:         Unknown

13   Booking information:            N/A

14   Probation / Parole:             Parole

15   Birthplace:                     Unknown

16

17   **Charges:**                    664 PC/187 PC- Attempted Murder

18                                   245(A)(2) PC – Assault with a Deadly Weapon

19                                   246 PC – Discharge Firearm

20

21



22

23

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                    PAGE  4  OF  20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **2. CASE INDEX**          **PAGE**

2

3    Case Identification     3

4    Case Index     4

5    Violations Investigated     5

6    Summary     6-9

7    Agencies Involved     10

8    Narrative     11-17

9    Evidence     18

10    Analysis and Opinions     19

11    Recommendations     20

12    MVARS     20

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                      PAGE  5  OF  20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

3.  **VIOLATIONS INVESTIGATED:**

**664 PC/ 187(A) PC- Attempted Murder**

*"Every person who attempts to commit any crime, but fails, or is prevented or intercepted in its*

*perpetration, shall be punished where no provision is made by law for the punishment of those attempts*

*(a) Murder is the unlawful killing of a human being, or a fetus, with malice aforethought."*

**245(A)(2) PC – Assault with a Deadly Weapon**

*"Any person who commits an assault upon the person of another with a firearm shall be punished by*

*imprisonment in the state prison for two, three, or four years, or in a county jail for not less than six months*

*and not exceeding one year, or by both a fine not exceeding ten thousand dollars ($10,000) and*

*imprisonment."*

**246 PC – Discharge of Firearm**

*"Any person who shall maliciously and willfully discharge a firearm at an inhabited dwelling house,*

*occupied building, occupied motor vehicle, occupied aircraft, inhabited housecar, as defined in Section 362*

*of the Vehicle Code, or inhabited camper, as defined in Section 243 of the Vehicle Code, is guilty of a*

*felony, and upon conviction shall be punished by imprisonment in the state prison for three, five, or seven*

*years, or by the county jail for a term of not less than six months and not exceeding one*

*year."*

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                        PAGE 6 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **4.  <u>SUMMARY:</u>**

2

3    On Tuesday, February 16, 2021, at approximately 1808 hours, I was on-duty (Unit 12-83), in uniform, in a

4    marked CHP patrol vehicle, when I received a radio call from CHP Barstow Dispatch Center (BDC) of a

5    freeway shooting. BDC informed me the freeway shooting occurred on Interstate 15 (I-15) northbound

6    (Barstow Freeway), between Palmdale Road and Roy Rogers Drive. The victim, later identified as Salvador

7    Hernandez Pacheco, told BDC the suspect was driving a white Ford Expedition, with black rims. The

8    suspect was identified as a Hispanic male. BDC informed me Pacheco was waiting with a San Bernardino

9    County Sheriff-Coroner's Department (SBCSD) Deputy for a CHP unit near the intersection of La Paz

10    Drive and Seventh Street. I responded from the vicinity of I-15 northbound, north of Main Street.

11

12    At approximately 1815 hours, I located Pacheco and the SBCSD unit at the 99 Cent Store parking lot,

13    located at 14670 Seventh Street, Victorville, CA 92395. Upon my arrival, I was contacted by SBCSD

14    Deputy J. Johnson, IDH7557, who related Pacheco was shot at while driving on I-15 northbound, between

15    Palmdale Road and Roy Rogers Drive. I contacted Pacheco and identified by his California Driver License

16    (D3810177).

17

18

19

20

21

22

23

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                             PAGE 7 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **4. <u>SUMMARY (CONTINUED)</u>:**

2

3    *VICTIM STATEMENT:*

4

5    After identifying Pacheco, he related the following: He was driving his black Honda Civic, on I-15

6    northbound, in the #1 lane, at approximately 80 miles per hour. While continuing northbound, from his

7    right-side mirror, Pacheco saw a white Ford SUV, making unsafe lane changes across all lanes of I-15

8    northbound. Pacheco saw the Ford was to the rear of another unknown vehicle and was following too close.

9    The unknown vehicle was in the #2 lane, to the right rear of Pacheco's vehicle. The Ford changed lanes

10   from the #2 lane to the #3 lane and passed the unknown vehicle from the right. The Ford made an unsafe

11   lane change from the #3 lane to the #2 lane, to the front of the unknown vehicle. As the Ford entered the #2

12   lane, the Ford partially veered into the #1 lane, causing Pacheco to steer his vehicle to the left, and entered

13   the west asphalt shoulder. Pacheco was able to avoid a collision with the center median wall and re-entered

14   the #1 lane.

15

16   With the intent of making a statement to the subject driver of the Ford, Pacheco rolled down his right front

17   passenger side window. The driver side window of the Ford was down, and the subject yelled, "Fucking

18   punk!" Pacheco immediately observed the subject display a black, 9mm pistol, with his right hand. The

19   subject took his left hand off the steering wheel of the Ford and racked the gun. The subject placed his left

20   hand on the Ford's steering wheel and held the pistol in his right hand. The pistol was pointed at Pacheco,

21   and the subject fired the pistol one time.

22

23   The subject fled the scene taking I-15 northbound to Roy Rogers Drive off-ramp and Pacheco chased the

24   Ford. The Ford made a right turn going eastbound on La Paz Drive. Pacheco was able to take a picture of

25   the Ford with his cell phone. The Ford made a right turn going in a southerly direction within an unknown

26   business parking lot, located in the area of La Paz Drive, west of Seventh Street. The Ford made a U-turn

27   and re-entered eastbound La Paz Drive. Pacheco last saw the Ford going eastbound on La Paz Drive, west of

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                    PAGE 8 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    4. <u>**SUMMARY (CONTINUED)**</u>:

2

3    *VICTIM STATEMENT (CONTINUED):*

4

5    Seventh Street. Pacheco drove his vehicle to the 99 Cent Store parking lot and called 9-1-1. Pacheco

6    remained on scene and waited for law enforcement arrival.

7

8    Pacheco described the subject as a heavy set, bald, Hispanic male, with a trimmed mustache and a goatee.

9    The subject was wearing a white shirt and was the only occupant of the Ford. Pacheco related he would be

10   able to identify the subject in the future. In addition, the Ford was described as a white, older model, Ford

11   Expedition, with unknown license plates. The Ford had stickers to the rear window stating, "Funeral."

12

13   On Wednesday, February 24, 2021, at approximately 1742 hours, Pacheco arrived at the CHP Victorville

14   Area office for a photo lineup and contacted Officer C. Ramos, ID 21878. Prior to the photo line-up,

15   Pacheco told me he saw an article of the officer involved shooting on www.VVNG.com. When Pacheco

16   saw the pictures in the article, he immediately recognized the Ford in the article to be the subject vehicle. In

17   addition, the pistol in the article was similar to the pistol he saw at the time of the incident, but he was not

18   certain.

19

20

21

22

23

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                      PAGE 9 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **4. SUMMARY (CONTINUED):**

2

3    *SUSPECT STATEMENT:*

4

5    No statement was obtained from Hector Javier Puga because he was pronounced deceased following an

6    officer involved shooting. He was identified by the SBCSD Coroner's Office.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                                    PAGE  10 OF  20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **5.  <u>AGENCIES INVOLVED:</u>**

2

3    **California Highway Patrol – Victorville Area**

4    14210 Amargosa Road

5    Victorville, CA 92392

6    (760) 241-1186

7

8        • Officer A. Tovar, ID 21643 – Investigating Officer

9        • Sergeant I. Kee, ID 16418- Supervisor

10       • Officer X. Rodriguez, ID 21675- Assisting Officer

11       • Officer J. Leanos, ID 22386- Assisting Officer

12       • Officer J. Rodriguez, ID 21422- Assisting Officer

13       • Officer C. Ramos, ID 21878- Assisting Officer

14

15   **California Highway Patrol – Inland Division**

16   847 East Brier Drive

17   San Bernardino, CA 92408

18   (909) 806-2400

19

20       • Officer R. Maday, ID 19457– Assisting Investigator

21

22   **San Bernardino County Sherriff- Coroner's Department – Victorville**

23   14200 Amargosa Road

24   Victorville, CA 92392

25   (760) 241-2911

26

27       • Deputy J. Johnson, ID H7557 – Responding Deputy

28

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                                    PAGE 11 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    6. **NARRATIVE:**

2

3  On Tuesday, February 16, 2021, at approximately 1808 hours, I was on-duty (Unit 12-83), in uniform, in a

4  marked CHP patrol vehicle, when I received a radio call from CHP Barstow Dispatch Center (BDC) of a

5  freeway shooting. BDC informed me the freeway shooting occurred on I-15 northbound (Barstow Freeway),

6  between Palmdale Road and Roy Rogers Drive. The victim, later identified as Salvador Hernandez Pacheco,

7  told BDC the suspect was driving a white Ford Expedition, with black rims. The suspect was identified as a

8  Hispanic male. BDC informed me Pacheco was waiting with a San Bernardino County Sheriff-Coroner's

9  Department (SBCSD) Deputy for a CHP unit near the intersection of La Paz Drive and Seventh Street. I

10  responded from the vicinity of I-15 northbound, north of Main Street.

11

12  At approximately 1815 hours, I located Pacheco and the SBCSD unit at the 99 Cent Store parking lot,

13  located at 14670 Seventh Street, Victorville, CA 92395. Upon my arrival, I was contacted by SBCSD

14  Deputy J. Johnson, IDH7557, who related Pacheco was shot at while driving on I-15 northbound, between

15  Palmdale Road and Roy Rogers Drive. Shortly after, Sergeant I. Kee, ID 16418, and Officer X. Rodriguez,

16  ID 21675, arrived at my location.

17

18  I contacted Pacheco and identified him with his California Driver License (D3810177). Pacheco related he

19  was shot at but did not sustain any injuries. After obtaining Pacheco's statement, he showed me a picture of

20  the Ford from his cellphone, but it was blurry, and I was unable to obtain a plate number. Pacheco sent the

21  picture to my business email for evidence. I relayed my findings to Sergeant Kee and he contacted BDC.

22  Sergeant Kee advised BDC of Puga's physical description and the Ford's information for a Be on the Look

23  Out broadcast.

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                                    PAGE  12 OF  20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1   **6.   NARRATIVE (CONTINUED):**

2

3   Pacheco gave me permission to inspect his vehicle for evidence and damage. Pacheco's vehicle was

4   identified as a 2017 black Honda Civic (CA Plate number: 7ZTU362). Prior to entering the Honda, I saw a

5   bullet hole located on the upper portion of the right front passenger side door. The bullet went through the

6   exterior and the interior portion of the door. The bullet continued to travel and penetrated the right front

7   passenger seat. No other damage was observed. With the assistance of Officer X. Rodriguez, we were able

8   to locate one, unknown caliber bullet within the right front passenger seat. The bullet was located on the

9   bottom portion of the right front passenger seat. Pictures were taken prior to obtaining the bullet for

10  evidence. After locating the bullet, I took 360-degree pictures of the Honda and the damage caused by the

11  bullet. Pacheco was released without further incident.

12

13  Picture number 1:



14

15

16

17

18

19

20

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                    PAGE 13 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **6.  NARRATIVE (CONTINUED):**

2

3    Picture number 2:



4
5

6    Picture number 3:

7



8
9
10

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                    PAGE 14 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **6.   NARRATIVE (CONTINUED):**

2

3   After releasing Pacheco, Sergeant Kee, Officer X. Rodriguez, Officer J. Leanos, ID 22386, and I went to

4   I-15 northbound, at Palmdale Road, to conduct a search for the casing. Traffic for I-15 northbound was

5   stopped, and we did a search of the casing by foot from Palmdale Road to Roy Rogers Drive. No casing was

6   located in the area.

7

8   On Wednesday, February 17, 2021, at approximately 1400 hours, I was contacted by Sergeant W.

9   Osegueda, ID 16101. He related a vehicle matching the description of my freeway shooting was involved in

10  an attempted murder of a peace officer. The Ford was located by Officer M. Blackwood, ID 21516, and

11  Officer B. Rubalcava, ID 22510. Sergeant Osegueda advised me Officer R. Maday, ID 19457, from Inland

12  Division Investigative Services Unit (ISU), was at the SBCSD Hesperia office, located at 15840 Smoke

13  Tree Street, Hesperia, CA 92345. Officer Maday was with the passenger of the Ford.

14

15  At approximately 1548 hours, I contacted the passenger of the Ford, Christina Renee Barrett, at the SBCSD

16  Hesperia office. Barrrett was identified by her name and date of birth.

17

18  Name: Christina Renee Barrett

19  Date of Birth: April 11, 1987 Sex: Female

20  Address: 16773 A Street, Victorville, CA 92395

21  Phone: (760) 955-5606

22

23

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                    PAGE 15 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **6.   NARRATIVE (CONTINUED):**

2

3    After identifying Barrett, she related the following: On Wednesday, February 17, 2021, in the late evening,

4    the driver of the white SUV, identified as Hector Javier Puga, came to her residence located at 16773 A

5    Street, Victorville, CA 92395, to visit her. Puga was upset he drove from Long Beach to Hesperia to visit

6    his wife, named Claudia. Upon Puga's arrival, he did not find his wife at her house and immediately went to

7    Barrett's residence. Barrett did not know exactly where Claudia lived, but believed Claudia lived near Main

8    Street, within the city limits of Hesperia. Puga arrived at Barrett's residence and ate spaghetti with her. After

9    eating his food, Puga stated he was going to make a phone call, but left Barrett's residence in his white

10   SUV. Puga left Barrett's residence at approximately 1600 hours.

11

12   On Wednesday, February 17, 2021, after midnight, Barrett was contacted by Puga, via telephone, and was

13   told he was going to pick her up. Shortly after, she was picked up by Puga and they went to an unknown

14   store located on D Street, within the city limits of Apple Valley where Puga purchased alcohol. As Puga was

15   driving within the area of Bear Valley Road, east of I-15, a CHP unit conducted an enforcement stop and a

16   pursuit ensued. Puga came to a stop at an unknown location, and she was able to safely exit the white SUV

17   prior to the shooting. She was taken by SBCSD units to the SBCSD Hesperia office for an interview.

18

19   Barrett related she was not involved in the freeway shooting and was unaware Puga was possibly involved

20   in one until she was advised by law enforcement. Puga did not disclose to Barrett he had a pistol within the

21   vehicle, nor did she have knowledge he owned any guns. During the pursuit, Puga did not make mention to

22   Barrett he was involved in a freeway shooting.

23

24   Barrett related Puga possibly attempted to flee the enforcement stop because he possibly had no bail

25   warrants. From Barrett's knowledge, Puga is a responsible driver and does not get involved in road rage.

26   Barrett described Puga's vehicle as a white, unknown make and model, SUV. Barrett described Puga as a

27   heavyset, bald, Hispanic male, with facial hair, and was wearing an unknown color t-shirt. Puga is the owner

28   of the white SUV and does not loan his vehicle to other people.

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                              PAGE 16 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    6.  **NARRATIVE (CONTINUED):**

2

3   On Friday, February 19, 2021, at approximately 1642 hours, I was contacted by Officer J. Rodriguez, ID

4   21422, at the CHP Victorville Area office. Officer J. Rodriguez related he was able to obtain a copy of the

5   surveillance camera footage containing the Ford and Honda exiting the freeway using the I-15 northbound

6   to Roy Rogers Drive off-ramp. Both vehicles were seen exiting the freeway and going eastbound on Roy

7   Rogers Drive. The surveillance camera footage was from Valley High Kia and was put onto a compact disk

8   (Refer to Officer J. Rodriguez supplemental for more details). After I received the compact disk from

9   Officer J. Rodriguez, it was booked into evidence.

10

11  On Monday, February 22, 2021, at approximately 1415 hours, I was contacted by Officer J. Rodriguez at the

12  CHP Victorville Area office. Officer J. Rodriguez was able to obtain a copy of the 9-1-1 recording made by

13  Pacheco. The recording was provided by BDC and was copied onto a compact disk (Refer to Officer J.

14  Rodriguez supplemental for more details). After I received the compact disk from Officer J. Rodriguez, it

15  was booked into evidence.

16

17  On Tuesday, February 23, 2021, at approximately 1357 hours, I received an email from Officer B. Baker,

18  ID 21176, from the CHP Critical Incident Investigation Team (CIIT). Officer Baker informed me the

19  suspect was positively identified by the SBCSD as Hector Javier Puga (CA DL: D7320932). The on-scene

20  Ford of the officer involved shooting was identified as a white, 2000 Ford Expedition (VIN:

21  1FMEU17L4YLC09487). In addition, Officer Baker related a pistol was found at the officer involved

22  shooting scene. No make or model was identified for the pistol. The firearm was described as black and

23  silver pistol, with an unknown serial number.

24

25  On Wednesday, February 24, 2021, at approximately 1025 hours, I was contacted by Officer J. Rodriguez,

26  and he advised he created a photo lineup for Pacheco. Officer J. Rodriguez told me to contact Pacheco to set

27  a date and time for a photo lineup. At approximately 1035 hours, I contacted Pacheco via telephone, and

28  requested him to come to the CHP Victorville Area office for a photo lineup.

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                                    PAGE 17 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **6.    NARRATIVE (CONTINUED):**

2

3    On Wednesday, February 24, 2021, at approximately 1742 hours, Pacheco arrived at the CHP Victorville

4    Area office for a photo lineup and contacted Officer C. Ramos, ID 21878. Pacheco was escorted to the front

5    of Officer Ramos' patrol vehicle and Officer Ramos activated his Mobile Video/Audio Recording Systems

6    (MVARS) (Disc: 6). Officer Ramos read the CHP 216L, Lineup Admonishment, verbatim to Pacheco and

7    Pacheco related he understood. Pacheco chose picture number 6, as Puga and signed the photo at

8    approximately 1750 hours. However, the correct picture of Puga was picture number 2. When Pacheco

9    signed and chose his photo, he stated, "I think that's him". The photo lineup was booked into evidence.

10

11    Additional follow-up will be conducted and be submitted in the form of a supplemental report. The

12    following follow-up will be conducted:

13

14        • Interview the registered owner of the Ford

15        • Obtain a warrant for Puga's phone

16        • Obtain a geofencing warrant for Puga's phone

17

18

19

20

21

22

23

24

25

26

27

28

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                      PAGE  18 OF  20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **7.  <u>EVIDENCE:</u>**

2

3  Evidence stored at California Highway Patrol Victorville Area office

4

5  Evidence Number 20210033-          One unknown caliber bullet

6

7                                              Compact disk containing 28 pictures

8

9                                              Compact disk containing interview recording of Christina R. Barrett

10

11                                             Compact disk containing surveillance camera footage provided by

12                                             Valley High Kia

13

14                                             Compact disk containing recording of Salvador Hernandez Pacheco

15                                             calling   9-1-1

16

17                                             Original signed CHP 216L, Lineup Admonishment, from Salvador

18                                             Hernandez Pacheco and photos of lineup

19

20

21

22

23

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                    PAGE 19 OF 20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **8. ANALYSIS AND OPINIONS:**

2

3    • The crime of 644 PC/ 187 PC- Attempted Murder. This can be established because the suspect had

4    the intent to unlawfully murder, Salvador Hernandez Pacheco. Based on Pacheco's statement, the

5    description of the subject vehicle given by Pacheco, and the physical evidence found on Pacheco's

6    vehicle, the subject had the intention of killing Pacheco by intentionally pointing a firearm at

7    Pacheco's vehicle and firing a bullet from the firearm. The description of the subject given by

8    Pacheco matched the description of Puga.

9

10   • The crime of 245(A)(2) PC- Assault with a Deadly Weapon. This can be established because the

11   suspect committed an assault upon the victim, Pacheco, with a deadly weapon to cause serious

12   bodily injury or death. Based on Pacheco's statement, the description of the subject vehicle given by

13   Pacheco, and the physical evidence found on Pacheco's vehicle, the subject had the intention of

14   committing serious bodily injury by intentionally pointing a firearm on Pacheco's vehicle and firing

15   a bullet from the firearm. At the time, Pacheco's vehicle was occupied and in motion. The discharge

16   of the firearm caused damage to the right front passenger door and right front passenger seat of

17   Pacheco's vehicle. In addition, the description of the subject given by Pacheco matched the

18   description of Puga.

19

20   •  The crime of 246 PC- Discharge of Firearm. This can be established because the subject willfully

21   discharged a firearm in a grossly negligent manner towards the victim, Pacheco, while the involved

22   vehicles were in motion. Based on Pacheco's statement, the description of the subject vehicle given

23   by Pacheco, and the physical evidence found on Pacheco's vehicle, the discharge of the subject's

24   firearm could have resulted in injury or death. The discharge of the firearm caused damage to the

25   right front passenger door and right front passenger seat of Pacheco's vehicle. In addition, the

26   description of the subject given by Pacheco matched the description of Puga.

27

28

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

CONFIDENTIAL

STATE OF CALIFORNIA
**NARRATIVE/SUPPLEMENTAL**                                        PAGE  20 OF  20

| DATE OF INCIDENT | TIME | NCIC NUMBER | OFFICER I.D. | NUMBER |
|---|---|---|---|---|
| 02/16/2021 | 1745 | 9850 | 021643 | F03885021 |

1    **9.    RECOMMENDATIONS:**

2

3   Due to Hector Javier Puga being deceased, no charges are being recommended.

4

5    **10.    MOBILE VIDEO/AUDIO RECORDING SYSTEMS (MVARS) INFORMATION:**

6

7   This event involved a CHP patrol vehicle(s) equipped with an MVARS that may or may not have been

8   activated, and may or may not have captured all information relevant to the event. The original MVARS

9   recording(s) are maintained at the Victorville Area.

10

11   The following CHP personnel were present at the event:

12

13    1.   Officer A. Tovar, ID 21643, Investigating Officer, MVARS activated.

14    2.   Sergeant I. Kee, ID 16418, Supervisor, MVARS not activated.

15    3.   Officer X. Rodriguez, ID 21675- Assisting Officer, MVARS not activated

16    4.   Officer J. Leanos, ID 22386- Assisting Officer, MVARS not activated

17    5.   Officer C. Ramos, ID 21878- Assisting Officer, MVARS activated

18

19

20

21

22

23

24

25

26

27

28

29

| PREPARED BY | I.D. NUMBER | DATE | REVIEWER'S NAME | DATE |
|---|---|---|---|---|
| ALEJANDRO TOVAR / OFFICER | 021643 | 02/16/2021 | | |

# Exhibit M

**L.C., a minor,** *et al.*

**v.**

**STATE OF CALIFORNIA,** *et al.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Case No.  5:22-cv-00949-JGB-KK**

**EXPERT WITNESS REPORT**

**by**

**GREG MEYER**

**January 30, 2025**

L.C., a minor, *et al.* v. State of California, *et al.*                Greg Meyer's Rule 26 Report

## INTRODUCTION and QUALIFICATIONS

As requested by defense counsel for the State of California and California Highway Patrol (CHP) Sergeant Isaiah Kee, Officer Michael Blackwood, and Officer Bernardo Rubalcava, I have reviewed and analyzed case documentation for this incident by applying my combined 48 years of knowledge, skills, education, training, and experience as a law enforcement officer and my continuing involvement as a police procedures expert.

My opinions are based on my analysis of the documentation and evidence in this case, then applying my knowledge and understanding of generally accepted professional standards and practices in law enforcement. My opinions are offered with a reasonable degree of professional certainty and are based on:

1. My 49 years of law enforcement experience including 36 years as a sworn police officer, detective, sergeant, lieutenant, captain, reserve officer, and specialist volunteer at the Los Angeles Police Department (LAPD) combined with more than 35 years as a police tactics and procedures consultant; particularly including my experience as captain at the LAPD Academy in charge of training, including tactical training to include lethal and nonlethal Use of Force                                              .

2. I chaired LAPD's Use of Force Best Practices Work Group and LAPD's Tactics Training Review Committee, and I continued to serve on both committees for several years after I retired.

3. My personal experience with respect to the investigation, administrative review, and adjudication at the supervisory and command levels at the LAPD for police Use of Force incidents including officer-involved shootings.  For example, I conducted reviews of dozens of police shootings for the LAPD Deputy Chief in charge of the LAPD Use of Force Review Board; and as a captain, I reviewed and presented such cases for adjudication by the LAPD Use of Force Review Board.

4. For two years (2015-2017) I was the designated independent law enforcement expert for the United States Department of Homeland Security's Division of Civil Rights and Civil Liberties where I conducted special investigations involving Use of Force by such agencies as the Border Patrol, ICE, and the Federal Protective Service.

5. On 21 occasions (including 13 police shootings) I have conducted outside reviews of police Use of Force cases as requested by four District Attorney offices that were considering whether to file criminal charges against police officers; and on one occasion for a federal prosecutor after the officer was charged.  In addition, I have conducted outside reviews of seven incidents (including three police shootings) as requested by chiefs of police of local agencies.

6. I wrote the tactical "Lessons Learned" sections of a series of books authored by a former Los Angeles County District Attorney detailing the murders of two dozen peace officers in Los Angeles County.

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

7.  I hold the Force Science Analyst certification from the Force Science Institute (FSI) and have held the Certified Litigation Specialist credential from Americans for Effective Law Enforcement (AELE).

8.  I have taught law enforcement and other professionals (including lawyers and judges) about police Use of Force on more than 50 occasions throughout the United States.

9.  I am a member of and receive frequent professional education updates from the International Association of Chiefs of Police (IACP, life member), the Police Executive Research Forum (PERF, life member), the Peace Officers Association of Los Angeles County (POALAC, life member), the International Law Enforcement Educators and Training Association (ILEETA), the California Force Investigators Association (CALFIA), and the Association of Force Investigators (AFI).

10. On numerous occasions I produced and instructed at Use of Force and Police Video Evidence and other seminars for POALAC, where I have been a board member for 20 years and chaired the Training Committee for 10 years.

11. I was a member of the design committee and taught classes for the revised California Peace Officer Standards and Training (POST) course on the investigation of officer-involved shootings and arrest-related deaths.

12. I have prior and ongoing work as an expert witness on police procedures, training, equipment, tactics, supervision and review processes, in federal, state, and local courts, both civil and criminal, as well as at arbitrations.

13. I have been an expert witness or consultant for more than 450 cases in the past 35 years, mostly involving police officers making arrests and mostly involving lethal and nonlethal Use of Force.  More than 100 of my cases have involved officer-involved shootings.

14. I have testified in court on police procedures matters more than 70 times, and I have been deposed in such matters more than 90 times.

15. While the majority of my work involves the defense of police officers, I have worked on cases adverse to police officers (criminal, civil, arbitrations/hearings) on more than 40 occasions.


## LIMITATIONS

1.  If, after submission of this report, I am asked to consider other relevant materials and/or documents, I may either modify my stated conclusions or offer additional opinions via a supplemental report, as deemed appropriate.

2.  I reserve the right to review and to respond if I deem it appropriate to any Plaintiff's police procedures expert report that I might receive in the future.

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

3. I do not offer legal conclusions.  To the extent that my report may refer to statutes or case law, it is in the context of law enforcement training that refers to such matters.

4. When there are factual disputes among the parties and witnesses regarding their memories of specific events during the incident, I do not make determinations of the credibility of parties and witnesses, for that is the purview of the trier of fact.

5. When my report documents quotations and timings from audio/video evidence, I made my best effort to document those things accurately.

## LIST OF DOCUMENTS

1. See **EXHIBIT NO. 1** – List of Documents Provided to Greg Meyer
2. California Peace Officer Standards and Training (POST) Learning Domain No. 20 Use of Force/Deescalation, Version 5.3

## PLAINTIFF'S FIRST AMENDED COMPLAINT re CHP
- False detention/arrest
- Excessive force
- Denial of medical treatment
- Negligence
- Failure to intervene.

## INCIDENT OVERVIEW
On February 17, 2021 at approximately 0141 hours (1:41am), California Highway Patrol (CHP) Officers Blackwood and Ruvalcava observed a vehicle that matched the description of a vehicle that had early been involved in a freeway shooting in the Victorville area.  When the officers attempted to stop the vehicle, suspect Puga attempted to elude them, and a high-speed pursuit occurred involving CHP officers and deputies from the San Bernardino County Sheriff's Department (SBCSD).  At approximately 0239 hours (2:39 am), the hour-long pursuit ended northbound Peach Avenue at Catalpa Street in Hesperia.  A stand-off between suspect Puga and the CHP officers and SBCSD deputies lasted for more than an hour.  Led by CHP Sergeant Kee, CHP officers continuously engaged in verbal de-escalation and negotiation attempts with suspect Puga in an effort to get suspect Puga to surrender.  At approximately 0348 hours (3:48am), as suspect Puga was out of his vehicle but hiding from view his waistband, two CHP officers (Sergeant Kee and Officer Ruvalcava) and two SBCSD deputies approached him from two angles.  Suspect Puga pulled a 9mm semi-automatic pistol from his waistband and reportedly fired a shot at the CHP officers.  As suspect Puga turned and fled toward a residential area, multiple officers and deputies returned fire.  Suspect Puga fell to the ground and was pronounced dead at the scene.

Detailed summaries of the incident are found at Bates AGO4-44C and COSB000044-47.

4

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

## POTENTIAL LIMITATIONS OF VIDEO EVIDENCE

This case involves video evidence. My training and experience are that video evidence of a police use of force incident is generally very valuable to an investigation, but it has several significant, potential limitations that investigators and adjudicators must be aware of:

- Videos are made with two-dimensional technology, but we live in a three-dimensional world.
- Videos do not always capture the involved officer's point of view.
- Videos may capture objects and events that the officer did not see.
- Videos do not always capture objects and events that the officer did see.
- Videos may capture more information than an officer's brain can process because of the psychological stress experienced in the moment.
- Video cameras do not capture objects and movements that are blocked from the camera lens.
- Videos may document lighting conditions, depth perception, and peripheral fields of view that are different than the human eye.
- Some videos have a low frame rate, thus they do not capture real time.
- Bystander cell phone videos tend not to capture the entire incident.
- Video devices are not always pointed at the action.
- Video devices often capture voices and other sounds that are more valuable to the investigation than what is seen on the video.
- Video cameras are neutral, inanimate objects; thus, videos do not experience the bio-mechanical, physiological and psychological aspects that the involved human being experiences under stress in terms of perception, fear, adrenalin-influenced physiological changes (such as breathing, heart rate, and blood pressure), interpretation of contextual cues, narrowly focused attention ("tunnel vision"), time distortion, sound distortion, memory (formation, storage, and retrieval), and other human performance phenomena.
- Videos of use-of-force incidents tend to cause emotion-based (not fact-based) reactions by viewers, because use of force is generally not pleasant to view.
- In some cases it is advisable to engage the services of a certified forensic video analyst.
- Officers experience events in real time, and only once. Officers do not have the luxury of repeated viewings of videos or manipulating videos (such viewing videos in slow motion or making freeze frame photographs of isolated events, for example) as investigators and adjudicators commonly do.
- Videos are not "the ultimate truth." Investigators and adjudicators must determine what the officer perceived at the time and apply the totality of the circumstances along with policy, training and the law to determine whether or not the officer's perceptions and actions were objectively reasonable.

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

## OPINIONS

I was retained to issue Opinions about the police procedures used by CHP Sergeant Kee, Officer Blackwood, and Officer Rubalcava.

### Opinion No. 1
**Based on my training and experience along with my review of the evidence in this case, if under the totality of the circumstances CHP Sergeant Kee reasonably perceived that the actions of suspect Puga created an imminent/immediate danger of death or serious bodily injury to himself or others, then CHP Sergeant Kee's use of deadly force conformed with contemporary law enforcement training and procedures, and any reasonable officer could have done the same thing.**

Video evidence clearly shows Puga's noncompliance with the officers' control commands, and it shows extensive de-escalation efforts that went on for more than a half-hour before the shooting.[1]

CHP Sergeant Kee fired his rifle during the incident when Puga pulled a handgun from his waistband and reportedly fired at officers.

Based on my review of a video taken by Edward Mangerino (COSB0001459) at counter 00:32, I can see what appears to be a handgun in Mr. Puga's right waistband.

Based on my review of the Blackwood MVARS video (Bates 814C), I can see a shiny object in Puga's hand on three occasions: (1) once at counter 42:28 as he steps away from the front of his SUV and the officer-involved shooting commences; (2) and twice as he's running away, at counters 42:30 and 42:32.

Witness Annabelle Botten stated that she observed suspect Puga fire a shot from his handgun toward the CHP officers:[2]

> Annabelle saw Puga run to the front of his Expedition and faced the officers. The unidentified officer negotiated with Puga, and asked him to step away from the front of the SUV. Puga did not comply and remained in front of the Expedition. Puga promised the officers he did not have a gun. However, Puga would not show the officers his waistband as they requested. Annabelle saw two unidentified CHP officers walk north along the driver's side of the Expedition. Annabelle saw Puga lower his right hand toward the front of his waist, and raised what she described as a black handgun. Annabelle saw Puga shoot once at the CHP officers, who stood on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle flash from his handgun. After Puga shot, the CHP officers shot back at Puga, and that is when numerous bullets struck Annabelle's residence. Puga ran north on Peach Avenue as the officers continued to shoot him.

---

[1] Document [814c] Blackwood MVARS Fragment 04
[2] SBSCD report of interview of Annabelle Botten, COSB000750, para. 1

6

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

Witness Edward Mangerino testified at deposition that before the police started shooting, he observed smoke coming from the front of Hector's hand, although he did not see the gun; and he assessed that before the shooting the officers were attempting to de-escalate the situation.

Page 35
10 And I can't really recollect what the police
11 were saying. But if you want to go on, at some point
12 while he was standing there. But his arm was raised
13 up -- and I could not see a gun, so we'll be clear on
14 that, I couldn't see a gun.
15 But his arm was up, he had his hand around
16 something, and smoke came from the front of his hand,
17 which gave me the impression that he had a gun.
…
Page 39
-- a puff of smoke come from that hand. And
4 based on your impression of his movement and the smoke
5 and the way his arm is raised, you believed he had a
6 gun?
7 A Yes, I do.
8 Q And then what happened after that?
9 A The officers started returning fire, and he
10 just took off turning -- going north up Peach, and
11 that's when I lost sight of him.
…
Page 42
5 Q Mr. Mangerino, how would you describe law
6 enforcement's demeanor from what you saw during this
7 encounter?
8 A Just from listening to them -- because I didn't
9 see them -- they seemed calm. They were trying to be
10 helpful to get him out of the car. There was no
11 aggression, that I can recollect, in their voices.
12 They got panicky when he went in front of the
13 car; their voices then changed then. But it was
14 still -- I didn't see any real aggression, like, you
15 know. They were trying to be very calm. They were
16 trying to de-escalate the situation.
…
Page 50
24 Q Do you remember, to the best you can, whether
25 that puff from Hector's hand, if that came before or
Page 51
1 after you heard gunshots that you might have suspected
2 came from the officers?
3 A The puff of smoke was before I heard
4 gunshots.

7

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

All California peace officers must attend and pass training provided by the Commission on Peace Officer Standards and Training (POST).  Following are excerpts from what California POST teaches peace officers regarding deadly force:[3]

> In some instances, peace officers may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions must be made. …

> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect arrest, to prevent escape, or to overcome resistance. (Penal Code Section 835a(b))

> A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary. (Penal Code Section 835a(c))

> Imminent means: a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)) …

> Force options that officers may use in Life Threatening situations:

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Life-threatening | Any action likely to result in serious bodily injury or death to the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

If CHP Sergeant Kee reasonably believed that deadly force was necessary, CHP Sergeant Kee complied with CHP policy HPM 70.6, 2.e which states:

> e. Deadly Force. An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life. In determining whether deadly force reasonably appears to be necessary, officers shall evaluate each situation in light of the particular circumstances of each case. If reasonably safe and feasible to do so, officers shall use other available resources and techniques.

---

[3] POST Learning Domain No. 20 Use of Force/Deescalation, Version 5.3, p. 3-7, 4-3, 4-7, 4-13 and 3-7

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

Officers are trained that the purpose of shooting at a subject is to stop the threat.  In a dynamic situation, it often takes multiple rounds to stop the threat.  The United States Supreme Court has recognized that reality:

> "It makes sense that, if officers are justified in firing at a suspect in order to end a severe threat to public safety, **they need not stop shooting until the threat has ended.**"
> *Plumhoff v. Rickard* 134 US 2012 (2014) *[emphasis added]*

Based upon my training and experience, a person holding a handgun in any position and point and shoot at a target in ¼ second or less, which is faster than any police officer or any other person can react to the deadly threat.  This fact is easily demonstrated in the courtroom, and I have done so on several occasions.

Police officers in the United States are universally taught that the legal standard used to determine the lawfulness of a Use of Force is the Fourth Amendment to the United States Constitution.  See *Graham v. Connor* 490 U.S. 386 (1989).  *Graham* states in part*, "*The reasonableness of a particular Use of Force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation.  The test of reasonableness is not capable of precise definition or mechanical application."

Officers are taught that "reasonableness" is assessed using *Graham* and from the articulated facts from the perspective of a peace officer with similar training and experience placed in generally the same set of circumstances.  In determining the appropriate level of force, officers evaluate each situation in light of facts and circumstances of each particular case.  Those factors may include (but are not limited to) the following factors, with my [**bracketed comments**] as they pertain to my analysis of the issues in this case:

> The seriousness of the crime or suspected offense [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.**]*;*
>
> The level of threat or resistance presented by the subject [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.**]*;*
>
> Whether the subject was posing an imminent threat to officers or a danger to the community [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.**]*;*

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

The potential for injury to citizens, officers or subjects **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.]***;*

The risk or apparent attempt by the subject to escape **[If suspect Puga escaped capture, the armed suspect (whom the officers knew was wanted for the prior freeway shooting, and Puga had already reportedly fired a shot at the officers just before he turned and ran toward the residential area) would put the community at great risk.]**;

The conduct of the subject being confronted (as reasonably perceived by the officer at the time) **[According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.]***;*

The time available to an officer to plan **[The officers needed to act immediately when Puga presented a deadly threat.]**;

The availability of other resources **[Multiple officers from CHP and SBCSD were at the scene.]**;

The training and experience of the officer **[CHP Sergeant Kee had 20 years of experience as a peace officer. His training record documents that he regularly performed qualification shooting and attended training classes on tactics.]**

The proximity or access of weapons to the subject **[Suspect Puga was armed with and held a handgun, and he reportedly fired it at officers.]**;

The environmental factors and/or other exigent circumstances **[The incident occurred during pre-dawn hours in a residential neighborhood as CHP and SBCSD officers attempted to arrest suspect Puga at the end of a lengthy pursuit. The following quote from the District Attorney's report (at Bates AGO 1681) that analyzed this case is instructive: "In this case, Sergeant Kee, Officer Blackwood, Officer Rubalcava, Sergeant Vaccari, and Deputy Adams each had an honest and objectively reasonable believe that Puga posed an imminent risk of serious bodily injury or death. Each law enforcement officer was aware to some degree that the vehicle that they were pursuing matched the description of an armed suspect at large. Puga led law enforcement on a high-speed pursuit throughout city streets for approximately one hour followed by a one-hour standoff. At the end of the standoff Puga acted evasive, specifically hiding the front of his waistband. Puga pulled a firearm and pointed and fired it at law enforcement."]**

As of January 1, 2020 (in effect on the date of this incident), Subsections (b) and (c) of Section 835a of the California Penal Code sets forth criteria for the use of force by peace officers. POST requires that this law revision be taught to peace officers throughout California. Here are my **[bracketed comments]** as they pertain to the Section 835a (b and c) issues in this case:

L.C., a minor, *et al.* v. State of California, *et al.*          Greg Meyer's Rule 26 Report

- (b) Were the officers using force to effect an arrest, or prevent escape, or to overcome resistance?  **[Yes, all three criteria apply.]**  N

- (c) (1) (A) Was deadly force used to defend against an imminent threat of death or serious bodily injury to the officer or to another person? **[According to multiple officers and witnesses, Mr. Puga was armed with a handgun and he fired it at officers.]**

- (c) (1) (B) Was deadly force used to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury?  **[Officers fired at an armed wanted felony suspect who had reportedly fired at officers and who was running in the direction of nearby houses.]**

- (c) (2) Was deadly force used against a person based on the danger that person poses to themselves when the person did not pose an imminent threat of death or serious bodily injury to the peace officer or to another person. **[No.]**


**Opinion No. 2**
**Based on my training and experience along with my review of the evidence in this case, if under the totality of the circumstances CHP Officer Blackwood reasonably perceived that the actions of suspect Puga created an imminent/immediate danger of death or serious bodily injury to himself or others, then CHP Officer Blackwood's use of deadly force conformed with contemporary law enforcement training and procedures, and any reasonable officer could have done the same thing.**

Video evidence clearly shows Puga's noncompliance with the officers' control commands, and it shows extensive de-escalation efforts that went on for more than a half-hour before the shooting.[4]

CHP Officer Blackwood fired his rifle during the incident when Puga pulled a handgun from his waistband and reportedly fired at officers.

Based on my review of a video taken by Edward Mangerino (COSB0001459) at counter 00:32, I can see what appears to be a handgun in Mr. Puga's right waistband.

Based on my review of the Blackwood MVARS video (Bates 814C), I can see a shiny object in Puga's hand on three occasions: (1) once at counter 42:28 as he steps away from the front of his SUV and the officer-involved shooting commences; (2) and twice as he's running away, at counters 42:30 and 42:32.

Witness Annabelle Botten stated that she observed suspect Puga fire a shot from his handgun toward the CHP officers:[5]

> Annabelle saw Puga run to the front of his Expedition and faced the officers. The unidentified officer negotiated with Puga, and asked him to step away from the front of

---

[4] Document [814c] Blackwood MVARS Fragment 04
[5] SBSCD report of interview of Annabelle Botten, COSB000750, para. 1

L.C., a minor, *et al.* v. State of California, *et al.*            Greg Meyer's Rule 26 Report

the SUV. Puga did not comply and remained in front of the Expedition. Puga promised the officers he did not have a gun. However, Puga would not show the officers his waistband as they requested. Annabelle saw two unidentified CHP officers walk north along the driver's side of the Expedition. Annabelle saw Puga lower his right hand toward the front of his waist, and raised what she described as a black handgun. Annabelle saw Puga shoot once at the CHP officers, who stood on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle flash from his handgun. After Puga shot, the CHP officers shot back at Puga, and that is when numerous bullets struck Annabelle's residence. Puga ran north on Peach Avenue as the officers continued to shoot him.

Witness Edward Mangerino testified at deposition that before the police started shooting, he observed smoke coming from the front of Hector's hand, although he did not see the gun; and he assessed that before the shooting the officers were attempting to de-escalate the situation.

Page 35
10 And I can't really recollect what the police
11 were saying. But if you want to go on, at some point
12 while he was standing there. But his arm was raised
13 up -- and I could not see a gun, so we'll be clear on
14 that, I couldn't see a gun.
15 But his arm was up, he had his hand around
16 something, and smoke came from the front of his hand,
17 which gave me the impression that he had a gun.
…
Page 39
-- a puff of smoke come from that hand. And
4 based on your impression of his movement and the smoke
5 and the way his arm is raised, you believed he had a
6 gun?
7 A Yes, I do.
8 Q And then what happened after that?
9 A The officers started returning fire, and he
10 just took off turning -- going north up Peach, and
11 that's when I lost sight of him.
…
Page 42
5 Q Mr. Mangerino, how would you describe law
6 enforcement's demeanor from what you saw during this
7 encounter?
8 A Just from listening to them -- because I didn't
9 see them -- they seemed calm. They were trying to be
10 helpful to get him out of the car. There was no
11 aggression, that I can recollect, in their voices.
12 They got panicky when he went in front of the
13 car; their voices then changed then. But it was

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

14 still -- I didn't see any real aggression, like, you
15 know. They were trying to be very calm. They were
16 trying to de-escalate the situation.
…
Page 50
24 Q Do you remember, to the best you can, whether
25 that puff from Hector's hand, if that came before or
Page 51
1 after you heard gunshots that you might have suspected
2 came from the officers?
3 A The puff of smoke was before I heard
4 gunshots.

All California peace officers must attend and pass training provided by the Commission on Peace Officer Standards and Training (POST).  Following are excerpts from what California POST teaches peace officers regarding deadly force:[6]

In some instances, peace officers may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions must be made. …

Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect arrest, to prevent escape, or to overcome resistance. (Penal Code Section 835a(b))

A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary. (Penal Code Section 835a(c))

Imminent means: a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)) …

Force options that officers may use in Life Threatening situations:

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Life-threatening | Any action likely to result in serious bodily injury or death to the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

---

[6] POST Learning Domain No. 20 Use of Force/Deescalation, Version 5.3, p. 3-7, 4-3, 4-7, 4-13 and 3-7

L.C., a minor, *et al.* v. State of California, *et al.*                Greg Meyer's Rule 26 Report

If CHP Officer Blackwood reasonably believed that deadly force was necessary, CHP Sergeant Kee complied with CHP policy HPM 70.6, 2.e which states:

> e. Deadly Force. An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life. In determining whether deadly force reasonably appears to be necessary, officers shall evaluate each situation in light of the particular circumstances of each case. If reasonably safe and feasible to do so, officers shall use other available resources and techniques.

Officers are trained that the purpose of shooting at a subject is to stop the threat. In a dynamic situation, it often takes multiple rounds to stop the threat. The United States Supreme Court has recognized that reality:

> "It makes sense that, if officers are justified in firing at a suspect in order to end a severe threat to public safety, **they need not stop shooting until the threat has ended.**"
> *Plumhoff v. Rickard* 134 US 2012 (2014) *[emphasis added]*

Based upon my training and experience, a person holding a handgun in any position and point and shoot at a target in ¼ second or less, which is faster than any police officer or any other person can react to the deadly threat. This fact is easily demonstrated in the courtroom, and I have done so on several occasions.

Police officers in the United States are universally taught that the legal standard used to determine the lawfulness of a Use of Force is the Fourth Amendment to the United States Constitution. See *Graham v. Connor* 490 U.S. 386 (1989). *Graham* states in part, "The reasonableness of a particular Use of Force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation. The test of reasonableness is not capable of precise definition or mechanical application."

Officers are taught that "reasonableness" is assessed using *Graham* and from the articulated facts from the perspective of a peace officer with similar training and experience placed in generally the same set of circumstances. In determining the appropriate level of force, officers evaluate each situation in light of facts and circumstances of each particular case. Those factors may include (but are not limited to) the following factors, with my [**bracketed comments**] as they pertain to my analysis of the issues in this case:

L.C., a minor, *et al.* v. State of California, *et al.*                Greg Meyer's Rule 26 Report

The seriousness of the crime or suspected offense **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]**;

The level of threat or resistance presented by the subject **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]**;

Whether the subject was posing an imminent threat to officers or a danger to the community **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]**;

The potential for injury to citizens, officers or subjects **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]**;

The risk or apparent attempt by the subject to escape [**If suspect Puga escaped capture, the armed suspect (whom the officers knew was wanted for the prior freeway shooting, and Puga had already reportedly fired a shot at the officers just before he turned and ran toward the residential area) would put the community at great risk.**];

The conduct of the subject being confronted (as reasonably perceived by the officer at the time) **[According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]**;

The time available to an officer to plan **[The officers needed to react immediately when Puga presented a deadly threat.]**;

The availability of other resources **[Multiple officers from CHP and SBCSD were at the scene.]**

The training and experience of the officer **[CHP Officer Blackwood had more than four years of experience as a peace officer.  His training record documents that he regularly performed qualification shooting and attended training classes on tactics.]**

The proximity or access of weapons to the subject **[Suspect Puga was armed with and held a handgun, and he reportedly fired it at officers.]**;

The environmental factors and/or other exigent circumstances **[The incident occurred during pre-dawn hours in a residential neighborhood as CHP and SBCSD officers attempted to arrest suspect Puga at the end of a lengthy pursuit. The following quote from the District Attorney's report (at Bates AGO 1681) that analyzed this case is instructive: "In this case, Sergeant Kee, Officer Blackwood, Officer Rubalcava, Sergeant Vaccari, and Deputy Adams each had an honest and objectively reasonable believe that Puga posed an imminent risk of serious bodily injury or death. Each law**

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

**enforcement officer was aware to some degree that the vehicle that they were
pursuing matched the description of an armed suspect at large. Puga led law
enforcement on a high-speed pursuit throughout city streets for approximately one
hour followed by a one-hour standoff. At the end of the standoff Puga acted evasive,
specifically hiding the front of his waistband. Puga pulled a firearm and pointed and
fired it at law enforcement."]**

As of January 1, 2020 (in effect on the date of this incident), Subsections (b) and (c) of Section
835a of the California Penal Code sets forth criteria for the use of force by peace officers.   POST
requires that this law revision be taught to peace officers throughout California. Here are my
**[bracketed comments]** as they pertain to the Section 835a (b and c) issues in this case:

- (b) Were the officers using force to effect an arrest, or prevent escape, or to overcome
  resistance?  **[Yes, all three criteria apply.]**

- (c) (1) (A) Was deadly force used to defend against an imminent threat of death or serious
  bodily injury to the officer or to another person? **[According to multiple officers and
  witnesses, Mr. Puga was armed with a handgun, and he fired it at officers.]**

- (c) (1) (B) Was deadly force used to apprehend a fleeing person for any felony that
  threatened or resulted in death or serious bodily injury?  **[Officers fired at an armed
  wanted felony suspect who had reportedly fired at officers and who was running in
  the direction of nearby houses.]**

- (c) (2) Was deadly force used against a person based on the danger that person poses to
  themselves when the person did not pose an imminent threat of death or serious bodily
  injury to the peace officer or to another person. **[No.]**

**<u>Opinion No. 3</u>**
**Based on my training and experience along with my review of the evidence in this case, if
under the totality of the circumstances CHP Officer Rubalcava reasonably perceived that
the actions of suspect Puga created an imminent/immediate danger of death or serious
bodily injury to himself or others, then CHP Officer Rubalcava's use of deadly force
conformed with contemporary law enforcement training and procedures, and any
reasonable officer could have done the same thing.**

Video evidence clearly shows Puga's noncompliance with the officers' control commands, and it
shows extensive de-escalation efforts that went on for more than a half-hour before the shooting.[7]

CHP Officer Rubalcava fired his handgun during the incident when Puga pulled a handgun from
his waistband and reportedly fired at officers.

---

[7] Document [814c] Blackwood MVARS Fragment 04

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

Based on my review of a video taken by Edward Mangerino (COSB0001459) at counter 00:32, I can see what appears to be a handgun in Mr. Puga's right waistband.

Based on my review of the Blackwood MVARS video (Bates 814C), I can see a shiny object in Puga's hand on three occasions: (1) once at counter 42:28 as he steps away from the front of his SUV and the officer-involved shooting commences; (2) and twice as he's running away, at counters 42:30 and 42:32.

Witness Annabelle Botten stated that she observed suspect Puga fire a shot from his handgun toward the CHP officers:[8]

> Annabelle saw Puga run to the front of his Expedition and faced the officers. The unidentified officer negotiated with Puga, and asked him to step away from the front of the SUV. Puga did not comply and remained in front of the Expedition. Puga promised the officers he did not have a gun. However, Puga would not show the officers his waistband as they requested. Annabelle saw two unidentified CHP officers walk north along the driver's side of the Expedition. Annabelle saw Puga lower his right hand toward the front of his waist, and raised what she described as a black handgun. Annabelle saw Puga shoot once at the CHP officers, who stood on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle flash from his handgun. After Puga shot, the CHP officers shot back at Puga, and that is when numerous bullets struck Annabelle's residence. Puga ran north on Peach Avenue as the officers continued to shoot him.

Witness Edward Mangerino testified at deposition that before the police started shooting, he observed smoke coming from the front of Hector's hand, although he did not see the gun; and he assessed that before the shooting the officers were attempting to de-escalate the situation.

> Page 35
> 10 And I can't really recollect what the police
> 11 were saying. But if you want to go on, at some point
> 12 while he was standing there. But his arm was raised
> 13 up -- and I could not see a gun, so we'll be clear on
> 14 that, I couldn't see a gun.
> 15 But his arm was up, he had his hand around
> 16 something, and smoke came from the front of his hand,
> 17 which gave me the impression that he had a gun.
> …
>
> Page 39
> -- a puff of smoke come from that hand. And
> 4 based on your impression of his movement and the smoke
> 5 and the way his arm is raised, you believed he had a

---

[8] SBSCD report of interview of Annabelle Botten, COSB000750, para. 1

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

> 6 gun?
> 7 A Yes, I do.
> 8 Q And then what happened after that?
> 9 A The officers started returning fire, and he
> 10 just took off turning -- going north up Peach, and
> 11 that's when I lost sight of him.
> …
> Page 42
> 5 Q Mr. Mangerino, how would you describe law
> 6 enforcement's demeanor from what you saw during this
> 7 encounter?
> 8 A Just from listening to them -- because I didn't
> 9 see them -- they seemed calm. They were trying to be
> 10 helpful to get him out of the car. There was no
> 11 aggression, that I can recollect, in their voices.
> 12 They got panicky when he went in front of the
> 13 car; their voices then changed then. But it was
> 14 still -- I didn't see any real aggression, like, you
> 15 know. They were trying to be very calm. They were
> 16 trying to de-escalate the situation.
> …
> Page 50
> 24 Q Do you remember, to the best you can, whether
> 25 that puff from Hector's hand, if that came before or
> Page 51
> 1 after you heard gunshots that you might have suspected
> 2 came from the officers?
> 3 A The puff of smoke was before I heard
> 4 gunshots.

All California peace officers must attend and pass training provided by the Commission on Peace Officer Standards and Training (POST). Following are excerpts from what California POST teaches peace officers regarding deadly force:[9]

> In some instances, peace officers may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions must be made. …
>
> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect arrest, to prevent escape, or to overcome resistance. (Penal Code Section 835a(b))
>
> A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary. (Penal Code Section 835a(c))

---

[9] POST Learning Domain No. 20 Use of Force/Deescalation, Version 5.3, p. 3-7, 4-3, 4-7, 4-13 and 3-7

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

> Imminent means: a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)) …

Force options that officers may use in Life Threatening situations:

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Life-threatening | Any action likely to result in serious bodily injury or death to the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

If CHP Officer Rubalcava reasonably believed that deadly force was necessary, CHP Sergeant Kee complied with CHP policy HPM 70.6, 2.e which states:

> e. Deadly Force. An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life. In determining whether deadly force reasonably appears to be necessary, officers shall evaluate each situation in light of the particular circumstances of each case. If reasonably safe and feasible to do so, officers shall use other available resources and techniques.

Officers are trained that the purpose of shooting at a subject is to stop the threat. In a dynamic situation, it often takes multiple rounds to stop the threat. The United States Supreme Court has recognized that reality:

> "It makes sense that, if officers are justified in firing at a suspect in order to end a severe threat to public safety, **they need not stop shooting until the threat has ended.**"
> *Plumhoff v. Rickard* 134 US 2012 (2014) *[emphasis added]*

Based upon my training and experience, a person holding a handgun in any position and point and shoot at a target in ¼ second or less, which is faster than any police officer or any other person can react to the deadly threat. This fact is easily demonstrated in the courtroom, and I have done so on several occasions.

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

Police officers in the United States are universally taught that the legal standard used to determine the lawfulness of a Use of Force is the Fourth Amendment to the United States Constitution. See *Graham v. Connor* 490 U.S. 386 (1989). *Graham* states in part, "The reasonableness of a particular Use of Force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation. The test of reasonableness is not capable of precise definition or mechanical application."

Officers are taught that "reasonableness" is assessed using *Graham* and from the articulated facts from the perspective of a peace officer with similar training and experience placed in generally the same set of circumstances. In determining the appropriate level of force, officers evaluate each situation in light of facts and circumstances of each particular case. Those factors may include (but are not limited to) the following factors, with my [**bracketed comments**] as they pertain to my analysis of the issues in this case:

> The seriousness of the crime or suspected offense [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**]*;*

> The level of threat or resistance presented by the subject [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**]*;*

> Whether the subject was posing an imminent threat to officers or a danger to the community [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**]*;*

> The potential for injury to citizens, officers or subjects [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**]*;*

> The risk or apparent attempt by the subject to escape [**If suspect Puga escaped capture, the armed suspect (whom the officers knew was wanted for the prior freeway shooting, and Puga had already reportedly fired a shot at the officers just before he turned and ran toward the residential area) would put the community at great risk.**];

> The conduct of the subject being confronted (as reasonably perceived by the officer at the time) [**According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**]*;*

> The time available to an officer to plan [**The officers needed to act immediately when Puga presented a deadly threat.**];

L.C., a minor, *et al.* v. State of California, *et al.*          Greg Meyer's Rule 26 Report

The availability of other resources **[Multiple officers from CHP and SBCSD were at the scene.]**;

The training and experience of the officer **[CHP Officer Rubalcava had one year of experience as a peace officer. His training record documents that he regularly performed qualification shooting and attended training classes on tactics.]**

The proximity or access of weapons to the subject **[Suspect Puga was armed with and held a handgun, and he reportedly fired it at officers.]**;

The environmental factors and/or other exigent circumstances **[The incident occurred during pre-dawn hours in a residential neighborhood as CHP and SBCSD officers attempted to arrest suspect Puga at the end of a lengthy pursuit. The following quote from the District Attorney's report (at Bates AGO 1681) that analyzed this case is instructive: "In this case, Sergeant Kee, Officer Blackwood, Officer Rubalcava, Sergeant Vaccari, and Deputy Adams each had an honest and objectively reasonable believe that Puga posed an imminent risk of serious bodily injury or death. Each law enforcement officer was aware to some degree that the vehicle that they were pursuing matched the description of an armed suspect at large. Puga led law enforcement on a high-speed pursuit throughout city streets for approximately one hour followed by a one-hour standoff. At the end of the standoff Puga acted evasive, specifically hiding the front of his waistband. Puga pulled a firearm and pointed and fired it at law enforcement."]**

As of January 1, 2020 (in effect on the date of this incident), Subsections (b) and (c) of Section 835a of the California Penal Code sets forth criteria for the use of force by peace officers. POST requires that this law revision be taught to peace officers throughout California. Here are my **[bracketed comments]** as they pertain to the Section 835a (b and c) issues in this case:

- (b) Were the officers using force to effect an arrest, or prevent escape, or to overcome resistance? **[Yes, all three criteria apply.]**

- (c) (1) (A) Was deadly force used to defend against an imminent threat of death or serious bodily injury to the officer or to another person? **[According to multiple officers and witnesses, Mr. Puga was armed with a handgun and he fired it at officers.]**

- (c) (1) (B) Was deadly force used to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury? **[Officers fired at an armed wanted felony suspect who had reportedly fired at officers and who was running in the direction of nearby houses.]**

- (c) (2) Was deadly force used against a person based on the danger that person poses to themselves when the person did not pose an imminent threat of death or serious bodily injury to the peace officer or to another person. **[No.]**

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

## Opinion No. 4
**Based upon my training and experience, it was appropriate police procedure for the CHP officers to detain and arrest Mr. Puga under these circumstances.**

The officers had been briefed at the beginning of their shift that there was a vehicle wanted for a freeway shooting that had occurred earlier.

CHP Officer Blackwood testified at deposition:
> p. 51
> 13· · · ·A.· ·We were told that there was a car-to-car shooting
> 14· ·involving a white Ford Expedition with black rims that had a
> 15· ·yellow sticker in the back windshield that said Funeral, and
> 16· ·that that shooting resulted from a road rage incident; that
> 17· ·the victim of that shooting followed the Expedition for a
> 18· ·little bit, and then lost sight of it, and the officers
> 19· ·during the day attempted to locate that vehicle, and they
> 20· ·didn't locate the vehicle.

CHP Officer Rubalcava testified at deposition:
> p. 78
>  6· · · ·A.· ·A white SUV was the suspect's vehicle of a freeway
> ·7· ·shooting, and it was described as a white Ford SUV with black
> ·8· ·rims, no plates, with the Funeral statement in the back, and
> ·9· ·black tinted windows.

Mr. Puga's vehicle matched that description, he was wanted for a violent crime, he engaged in a high-speed pursuit in an effort to evade capture, and he resisted detention/arrest, he produced a handgun and reportedly fired at officers at the pursuit termination scene.


## Opinion No. 5
**The CHP officers ensured that Mr. Puga was provided medical treatment.**

Paramedics were staged nearby during the standoff.  After the shooting and Puga was secured, paramedics responded in a timely manner to where Puga had fallen.[10]


## Opinion No. 6
**Based upon my knowledge, education, training and experience, the CHP officers did not fail to intervene.**

CHP policy states in relevant part:[11]
> 8. INVOLVEMENT IN OR WITNESSING EXCESSIVE FORCE.

---

[10] Bates AGO817, at counter 2:00
[11] CHP policy, Bates AGO1568

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

    a. Officer Responsibility. When officers are involved in or witness an incident in which they believe excessive force is currently or may have been used by any peace officer, they shall take immediate action to stop the excessive force.

I am a strong believer in the duty for officers to intervene if they see that one or more other officers are clearly using excessive force, and they are in a position and have time to attempt to stop it.  In this case, it is my opinion that excessive force was not occurring (see Opinions No. 1, 2, and 3, above).


**Opinion No. 7**
**I have seen no evidence that CHP officers were negligent during this incident.**

Based upon my training and experience, the CHP officers performed their duties well during this challenging tactical incident.

The CHP officers were part of a multi-agency incident.  The combined agency efforts included extensive de-escalation efforts that lasted approximately 45 minutes before the shooting occurred.

De-escalation is the hoped-for outcome of the process of verbally engaging with a resisting suspect if time permits, to lower the intensity of a standoff situation, and to persuade the suspect to peacefully submit.  It involves deploying nonlethal tools and tactics if verbal communications are not effective.

De-escalation efforts in this case included extensive verbalization with the uncooperative Puga and the use of a variety of nonlethal weapons (beanbag shotgun, 40mm launcher, and Pepper Ball launcher) to attempt to control the situation and bring it to an end without the use of deadly force.

When Mr. Puga suddenly produced a handgun and reportedly fired at officers, there was no feasible opportunity to provide a lethal-force warning before the officers fired.

Mr. Puga chose to shoot at someone on a freeway, then to engage in a high-speed pursuit, then to resist arrest, then to arm himself with a handgun, then to shoot at officers, thus Mr. Puga set in motion a series of events that resulted in the police shooting.

Mr. Puga chose to shoot at someone on a freeway, then to engage in a high-speed pursuit, then to resist arrest, then to arm himself with a handgun, then to shoot at officers, thus Mr. Puga set in motion a series of events that resulted in the police shooting.

Had Mr. Puga merely obeyed the law and surrendered when the officers attempted to detain and arrest him at the pursuit-termination scene, the shooting incident would not have occurred.

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

## EXHIBITS

1. List of documents provided to me by defense counsel
2. Curriculum Vitae (Greg Meyer)

## EXPERT QUALIFICATIONS, PUBLICATIONS, AND OTHER CASES

My *curriculum vitae* (see **EXHIBIT NO. 2**) documents my qualifications, the relevant publications I have authored in the past 10 years (per Rule 26), and it lists all cases in which I have testified at trial or deposition in the past 4 years (per Rule 26). A brief summary of my qualifications appears on pages 2-3 of this report.

## COMPENSATION

My normal fee for work including document review, research, meetings, and reports is $450 per hour. Travel within California is charged at $150 per hour (one-way only), plus IRS mileage rate, plus direct expenses (hotel, food, etc., if any). In-court days are charged at $3,000 flat per day.

**Depositions are charged at $450 per hour payable at the time of deposition; if remote, I or the counsel I am working for must receive a check made out to Greg Meyer for the anticipated number of hours in advance of the deposition, per California Code of Civil Procedure § 2034.450.** (If the amount of time for the deposition is less than the prepaid amount, I will quickly refund the pro-rated difference; if the deposition takes longer than the number of prepaid hours, the deposing side must pay the difference within five days of receiving my invoice.)

Executed on January 30, 2025 at Glendale, California.

GREG MEYER

# Exhibit N

Illustrated Report of January 29, 2025

Prepared
for
Shannon Gustafson
Attorney at Law
LYNBERG&WATKINS
1100 Town & Country Road
Suite 1450
Orange, California 92868

by
Lucien C. Haag
Criminalist/Forensic Firearm Examiner
Forensic Science Services
P.O. Box 5347
Carefree, AZ 85377

Case Number
L.C. et al. v. State of California et al. 5:22-cv-00949-KK-
SHK

**Page 1  Haag Illustrated Report of January 29, 2025**

File Creation/Case Overview

This file was first opened on March 1, 2021 upon the receipt of numerous documents, reports and photographs from the law firm of Lynberg & Watkins. These were followed by additional documents in the months to follow.

From the subsequent review of these materials, it became apparent that this protracted incident began with a law enforcement encounter and pursuit arising out of a car-to-car shooting of a black Honda Civic on Interstate 15 by a driver in a white Ford Expedition. This occurred at approximately 6pm on February 16, 2021. The driver of the black Honda was Salvador Pacheco. A fired bullet was later recovered from the black Honda and impounded by the California Highway Patrol. A vehicle matching that of the suspect vehicle was subsequently engaged by California Highway Patrol (CHP) officers Michael Blackwood and Bernardo Rubalcava in their marked CHP patrol vehicle at about 1:41am on February 17, 2021, a lengthy 52-mile pursuit of the white Ford Expedition ensued which was joined by CHP Sgt. Kee in his marked CHP patrol vehicle and two (2) marked San Bernardino County Sheriff Department (SBCSD) vehicles driven by Deputy Jake Adams and Sgt. Robert Vaccari. This pursuit ended at about 2:39am at the residential intersection of Peach Avenue and Catalpa Street in Hesperia, California. The white Ford Expedition, driven by Hector Puga, was on the south side of the intersection facing north. The two CHP units were in staggered positions behind the Ford Expedition with the two SBCSD vehicles stopped further back (to the south) on Peach Avenue and slightly west. After a lengthy standoff, the driver of the Ford Expedition, Hector Puga ultimately exited the driver's seat and moved to the front of his vehicle where he purportedly produced and fired a handgun. CHP Sgt. Kee, CHP officers Rubalcava and Blackwood and SBCSD deputy Jake Adams discharged their firearms at the subject as he ran diagonally across the intersection and toward the northwest corner of that intersection during which time he sustained multiple gunshot wounds and died at the scene. Three members of the Botten family sustained non-fatal injuries as they stood and watched the shooting incident from the front doorway of their residence on the northeast corner of the intersection of Peach Avenue and Catalpa Street.  **Figure 1a** and **1b**, annotated by this writer illustrate the positions and identities of the five (5) vehicles as well as the location of the Botten residence and the decedent.

Materials Received and Reviewed

- The California Highway Patrol Incident Report F03885021.
- California Highway Patrol (CHP) dashcam videos of the pursuit and subsequent standoff culminating in a shooting incident at the intersection of Peach Avenue and Catalpa Street in Hesperia, California.
- Numerous shooting scene photographs depicting the locations of the white Expedition, CHP vehicles, the San Bernardino County Sheriff's Department (SBCSD) vehicles, yellow 'tents' (marking the locations of spent law enforcement cartridge cases), the decedent, the decedent's semi-automatic pistol near his body, a spent 9mm cartridge case also near the decedent's body, the Botten residence, apparent ballistic damage to the Botten residence and various images of injuries to John Botten, Sr., John Botten, Jr. and Tanja Botten supplemented by

**Page 2  Haag Illustrated Report of January 29, 2025**
numerous x-ray views of small, radio-opaque objects associated with these wounds.
- Audio interviews of CHP Sgt. Kee, CHP officer Bernardo Rubalcava, CHP officer Michael Blackwood, and SBCSD Deputy Jake Adams.
- Audio interviews of John Botten, Sr. John Botten, Jr., and Tanja Botten.
- Aerial views of the scene marked by CHP Sgt. Kee, CHP officer Rubalcava, CHP officer Blackwood, and SBCSD Sgt. Vaccari.
- The autopsy report for Hector Puga and the autopsy photographs.
- The property impound list of recovered and secured items of physical evidence from the scene and the Ford Expedition.
- The depositions of CHP Sgt. Kee, CHP Officers Rubalcava and Blackwood, SBCSD Deputy Jake Adams and Sgt. Vacarri.
- The Deposition of Tammy Goodson.
- The CHP Dashcam video showing Hector Puga in front of his vehicle then running toward the northwest intersection of Peach and Catalpa.
- A homeowner video by Erin Mangerino (CHP Exhibit 4) showing Hector Puga running toward this recording.

A study of these materials revealed the following insofar as firearms discharged by law enforcement officers:
AR15 (.223Remington caliber) by CHP Sgt. Kee
AR15 (.223Remington caliber) by CHP officer Blackwood
Smith&Wesson M&P pistol (.40S&W caliber) by CHP officer Rubalcava
Glock (9mm caliber) by SBCSD deputy Jake Adams
.45Auto pistol, SBCSD Sgt. Robert Vaccari (did not discharge his pistol)

<u>Hector Puga Autopsy Findings</u>
The decedent sustained nine (9) non-fatal gunshot wounds and one (1) fatal wound listed as gunshot wound #9 and described as follows by Dr. Jong:
"Gunshot #9 entry wound to Puga's left back.  The trajectory for gunshot #9 was back to front, left to right, and upward. Gunshot #9 traveled through the soft tissue of the back, left ribcage, left lung (upper/lower lobes), and lodged in the upper left chest cavity, within tissue."  Doctor Jong located and recovered a fired bullet in Puga's left chest cavity, within tissue. Doctor Jong deemed gunshot wound #9 as fatal.
Photographs of this bullet revealed it to be an evenly and fully expanded 5.56mm (.223-caliber) rifle bullet. [See **Figure 2**] The source of this bullet must be Sgt. Kee or Officer Blackwood- the only shooters of AR15s. SBCSD Deputy Jake Adams is therefore *excluded* as having fired the fatal shot.
Two (2) intact and unexpanded 9mm bullets were also recovered from the decedent at autopsy. These are shown in **Figure 3** and **Figure 4** and were associated with non-fatal gunshot wounds to the right flank and left thigh. Based on the caliber and design of these bullets, they were fired by SBCSD Deputy Adams- the only 9mm shooter associated with this incident. Subsequent, firsthand examination of these bullets revealed that they had experienced a ricochet event before striking Hector Puga.

**Page 3  Haag Illustrated Report of January 29, 2025**

<u>Hector Puga Autopsy Finings</u> (cont'd.

The wound paths for these two 9mm gunshot wounds combined with the general upward flight path of ricocheted bullets, reveal that these wounds were sustained prior to Hector Puga falling or collapsing to is final prone position. [See **Figure 5** and **Figure 6**]

The toxicology results on Hector Puga revealed the presence of amphetamine, methamphetamine and a blood alcohol level of 0.114%w/v.

SBCSD Deputy Adams was excluded as the source of the Botten family injuries as a result of his shooting position and his direction of fire toward Hector Puga and the nature of their injuries. Deputy Adams' position can be seen in **Figure 7a** derived from CHP Sgt. Kee's dashcam video. **Figure 7b** provides a daylight view taken from the east side of Peach Avenue looking north. The decedent's location, the right side of his vehicle and the Botten house have been identified in this figure as well as the general direction of fire by SBCSD Deputy Jake Adams (<span style="color:red">red arrows</span>).

**Figure 8a** derived from the Dashcam in CHP Officers Blackwood and Rubalcava's shows Hector Puga at the front of his vehicle with one arm raised immediately prior to the initial firing of shots. **Figure 8b** shows the subject running toward the northwest corner of the intersection of Peach and Catalpa where he will subsequently be found collapsed in a prone position. In **Figure 8c**, also from the same dashcam, a single frame captures something shiny (circled in yellow) can be seen in Hector Puga's right hand causing a momentary reflection. A profile view of the Puga pistol has been inserted in this figure and provides the likely explanation for the momentary reflection in this dashcam video.

A non-law enforcement video supplied to this writer as CHP Exhibit 4 was also studied and a frame copied which shows an object in Hector Puga's right hand. This video frame is reproduced here as **Figure 8d**.

On January 14 and 15, 2024, this writer inspected the scene of this incident in both daylight and nighttime. A number of photographs and videos were taken during these inspections.

The nighttime visit revealed this scene to be very dark and comparable to that depicted in **Figures 7a, 8a, 8b, 8c** and **8d.** The only fixed source of lighting at the time of the incident and this writer's January 14, 2024, inspection was a single light pole on the southwest corner of the intersection of Peach Avenue and Catalpa Street.

On January 16, 2024, numerous items of physical evidence recovered from the scene and the decedent's vehicle were examined at the Property Facility of the San Bernardino County Sheriff's Department. These items included the 9mm PMF pistol and 9mm ammunition, expended 9mm cartridge cases, expended Federal brand .40S&W cartridge cases and expended Speer brand .223Remington cartridge cases, bullets recovered from the Puga autopsy and the Botten residence. Selected autopsy bullets have been previously presented in **Figures 2, 3** and **4.**

A total of eleven (11) fired .40S&W cartridge cases were recovered from the scene. Their locations are shown with yellow highlighting in **Figure 9.**

Thirty-eight (38) fired .223-caliber cartridge cases were also recovered from the scene. Their locations are shown with blue highlighting in **Figure 10.**

**Page 4  Haag Illustrated Report of January 29, 2025**

No effort was made at this time to distinguish those cartridges fired by CHP Sgt. Kee from those fired by CHP Officer Blackwood.

A total of 10, fired 9mm cartridge cases were also recovered from the scene. These are attributable to SBCSD Deputy Jake Adams. Their locations are shown with blue highlighting in **Figure 11**.

Non-Law Enforcement Pistol and Ammunition Recovered

A number of scene photographs show a semi-automatic pistol with a partially-removed magazine next to the body of Hector Puga. One of these is attached here as **Figure 12**.

A fired 9mm cartridge case next to the pistol has been circled in red by this writer.

An examination of this pistol on January 16, 2024, revealed it to be a 'PMF' (Personally-Manufactured Firearm) gun often referred to as a "Ghost gun", chambered for the 9mm cartridge. The barrel was conventionally rifled with 6 lands and grooves with a right-hand twist. The magazine was of Korean manufacture with a total capacity of 17, 9mm cartridges. A profile view of this pistol appears in **Figure 13** to include a view of the mixed headstamps and primer types for the thirteen (13) 9mm cartridges that were impounded with this pistol. These cartridges were all loaded with round nose, full metal-jacketed bullets.

A fired 9mm cartridge bearing the "LAX" headstamp was photographed at the scene next to the decedent's body and marked with placard 50. This headstamp is also represented among the 13 live rounds recovered from the 9mm PMF pistol by law enforcement. **Figure 14** is comprised of a scene photograph of this cartridge case and placard 50 along with a close-up photograph of this cartridge's headstamp taken by the author on January 16, 2024. This fired cartridge was ultimately identified as having been fired in the 9mm PMF pistol shown next to the decedent's body and shown previously in **Figure 12** and **Figure 13**.

Law enforcement Item K-11 was found to contain thirteen (13) additional rounds of 9mm ammunition listed as having been removed from Hector Puga's right pocket. These also consisted of mixed headstamps to include the "LAX" headstamp. A profile view of these cartridges is given in **Figure 14**.

**Figure 15** shows 13 live 9mm cartridges with mixed headstamps purportedly removed form Hector Puga's right pants pocket. Law enforcement Item B-1 was found to contain three (3), fired 9mm cartridge cases listed as have come from the center console, left cup holder in the white Ford Expedition. These are shown in **Figure 16**. Two of these possess the "LAX" headstamp.

These 3 fired cartridges were ultimately identified as having been fired in the 9mm PMF pistol appearing next to the decedent's body shown previously in **Figure 12** and **Figure 13**.

Law enforcement Item B-2 was found to contain a live, 9mm cartridge listed as having been found under the left front seat of the Ford Expedition. This cartridge possessed the "LAX" headstamp. The envelope and a view of this cartridge's headstamp can be seen in **Figure 17**.

**Page 5  Haag Illustrated Report of January 29, 2025**

SUMMARY and OPINIONS

Based on an examination of the ballistic evidence in this case and the caliber of the various law enforcement firearms discharged and the autopsy findings, San Bernardino County Sheriff Deputy Jake Adams is *excluded* as having fired Hector Puga's fatal shot (Gunshot wound #9 in Dr. Jung's autopsy report).

The fatal wound was caused by a .223-caliber rifle bullet. This bullet is depicted in **Figure 2.**

A study of the audio track from the CHP Dashcam revealed that the shooting portion of this encounter lasted approximately 15.4 seconds from start to finish. A graphic depiction of this is shown in **Figure 18.**

Signed,

Lucien C. Haag

A current CV is attached describing my training, experience and publications.

A list of trial and deposition appearances for the last 6 years is also attached.

# Exhibit O

JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL
Isaiah Kee on 11/05/2024

1               UNITED STATES DISTRICT COURT

2             CENTRAL DISTRICT OF CALIFORNIA

3

4   JONATHAN WAYNE BOTTEN, SR.; TANJA    )
    DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
5   J.B., a minor by and through his     )
    guardian JONATHAN WAYNE BOTTEN, SR., )
6                                        )
              Plaintiffs,                )
7                                        )
              vs.               ) Case No.
8                               ) 5:23-CV-00257-JGB-SHK
    STATE OF CALIFORNIA; COUNTY OF SAN   )
9   BERNARDINO; ISAIAH KEE; MICHAEL      )
    BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10  VACCARI; JAKE ADAMS; and DOES 1-10,  )
    inclusive,                           )
11                                       )
              Defendants.        )
12  _____)

13

14

15

16        REMOTE VIDEOCONFERENCE DEPOSITION OF

17                 ISAIAH KEE

18          TUESDAY, NOVEMBER 5, 2024

19

20

21

22

23  Reported Stenographically By:

24  Jinna Grace Kim, CSR No. 14151

25  Job No.:  113704

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

---

Page 2

1          UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
3
4   JONATHAN WAYNE BOTTEN, SR.; TANJA    )
    DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
5   J.B., a minor by and through his     )
    guardian JONATHAN WAYNE BOTTEN, SR., )
6                                        )
              Plaintiffs,                )
7                                        )
         vs.              ) Case No.
8                         ) 5:23-CV-00257-JGB-SHK
    STATE OF CALIFORNIA; COUNTY OF SAN   )
9   BERNARDINO; ISAIAH KEE; MICHAEL      )
    BLACKWOOD; BERNARDO RUBALCAVA; ROBERT)
10  VACCARI; JAKE ADAMS; and DOES 1-10,  )
    inclusive,                           )
11                                       )
              Defendants.                )
12  _____     )
13
14
15
16       The remote videoconference deposition of ISAIAH KEE,
17  taken on behalf of the Plaintiffs, beginning at 9:38 a.m.,
18  and ending at 12:39 p.m., on Tuesday, November 5, 2024,
19  before Jinna Grace Kim, Certified Stenographic Shorthand
20  Reporter No. 14151.
21
22
23
24
25

---

Page 3

1   APPEARANCES OF COUNSEL:
2
    For the Plaintiffs:
3
         LAW OFFICES OF DALE K. GALIPO
4        BY:  DALE K. GALIPO, ESQ.
         BY:  HANG D. LE, ESQ.
5        21800 Burbank Boulevard, Suite 310
         Woodland Hills, California 91367
6        Tel:  818-347-3333
         Fax:  818-347-4118
7        E-mail:  dalekgalipo@yahoo.com
         E-mail:  hle@galipolaw.com
8
9   For the Defendants:
10       DEPUTY ATTORNEY GENERAL
         BY:  DIANA ESQUIVEL, ESQ.
11       1300 I Street, Suite 125
         P.O. Box 944255
12       Sacramento, California 94244
         E-mail:  diana.esquivel@doj.ca.gov
13
14       LYNBERG & WATKINS
         BY:  AMY R. MARGOLIES, ESQ.
15       1100 W. Town & Country Road, Suite 1450
         Orange, California 92868
16       E-mail:  mmargolies@lynberg.com
17
18  Also Present:  Plaintiffs (previously stated on the record)
19
20
21
22
23
24
25

---

Page 4

1                    INDEX
2   WITNESS:                      PAGE
3   ISAIAH KEE
4    BY: MR. GALIPO                5
5    BY: MS. MARGOLIES              73
6    BY: MS. ESQUIVEL               75
7    BY: MR. GALIPO                 92
8
9              EXHIBITS
10  MARKED FOR IDENTIFICATION            PAGE
11  Exhibit 5     Photograph            17
12  Exhibit 1     Photograph            26
13  Exhibit 2     Photograph            26
14  Exhibit 6     Photograph 650        63
15  Exhibit 3     Video                 67
16  Exhibit 4     Cell Phone Vidoe      69
17  Exhibit 7     Cell Phone Video 0241 70
18
19
20
21
22
23
24
25

---

Page 5

1              CALIFORNIA
2         TUESDAY, NOVEMBER 5, 2024
3            9:38 A.M.
4              ISAIAH KEE,
5   called as a witness on behalf of the Plaintiffs, having been
6   first duly sworn remotely via videoconference, was examined
7   and testified as follows:
8              EXAMINATION
9   BY MR. GALIPO:
10       Q.  Can you please state your name.
11       A.  My name is Isaiah Kee, K-e-e.
12       Q.  Are you able to hear me okay so far?
13       A.  Yes, sir.
14       Q.  If you any trouble hearing me at any time, will you
15  please let me know?
16       A.  Yes, sir.
17       Q.  And as I told you off the record, I usually go about
18  an hour and take a break, but if you need to take a break for
19  any reason at any time, you let me know and we'll talk a
20  break at that time.
21       Okay;
22       A.  Yes, sir.
23       Q.  Have you reviewed any documents to help prepare for
24  the deposition?
25       A.  Yes.

---

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 6

1  Q. Can you please tell me what you've reviewed?
2  A. I reviewed some videos in connection with the
3  incident, and I reviewed the interview that took place at the
4  San Bernardino Sheriff's Department for the criminal
5  portion.
6  Q. Did you read a transcript of that interview?
7  A. Yes.
8  Q. Do you recall when that interview took place in
9  relation to the date of the shooting?
10  A. I don't remember. I read it, and it's pretty long.
11  So I just don't remember. I want to say it's about
12  three or four days after the shooting.
13  Q. And did you have any representatives present at that
14  interview?
15  A. Yes.
16  Q. Do you recall who they were?
17  A. I know one was an attorney for the California
18  Association of Highway Patrolmen, and the second
19  representative was this guy who is now retired.
20  His name was Sergeant Chris Dinkers, and he -- is
21  what you call an area representative.
22  He wasn't an attorney.
23  Q. Okay. Before you gave that interview, did they
24  allow you to look at the MVARS video?
25  A. Yes, sir.

Page 7

1  Q. And would the MVARS video have been from one of the
2  CHP units?
3  A. Yes, sir.
4  Q. Was that the unit that belonged to Rubalcava and
5  Blackwood?
6  A. Both. Rubalcava and Blackwood, and they allowed me
7  to review the MVARS to my patrol cars.
8  Q. As of the time of your initial interview, were you
9  aware of any other videos?
10  A. Yes. They did show another video that was taken by
11  a cell phone of a residence.
12  Q. So before you gave your initial interview, you were
13  able to see the two MVARS videos and also the one cell phone
14  video?
15  A. Yes.
16  Q. Did any of those videos show on the video Mr. Puga
17  with a gun in his hand?
18  A. No.
19  Q. Did any of those videos actually show Mr. Puga
20  firing a gun?
21  A. No.
22  Q. Did any of those videos show Mr. Puga pointing a gun
23  at anyone?
24  A. No.
25  Q. Did you fire some rounds during this incident?

Page 8

1  A. Yes.
2  Q. What type of weapon did you fire the rounds from?
3  A. I fired a round from my AR-15.
4  Q. How many rounds did you fire altogether if you
5  know?
6  A. Based off the records that I read, it was 18.
7  Q. Do you know how many rounds that particular weapon
8  holds?
9  A. Each magazine at that time held 20.
10  Q. Did you change magazines, or did you fire all 18
11  rounds from one magazine?
12  A. I fired all 18 from one magazine.
13  Q. And is that weapon a semiautomatic weapon, or was it
14  at the time?
15  A. Yes, sir.
16  Q. So you have to press the trigger for each shot?
17  A. Yes, sir.
18  Q. Did you hear any shots being fired before you fired
19  your first shot?
20  A. I didn't hear. I just saw muzzle flash.
21  Q. You're saying --
22  A. Well, let me -- I apologize. I'm Sorry.
23  For that question, no.
24  Q. Yeah. I'm trying to be very specific.
25  A. Yes, yes.

Page 9

1  Q. Let me ask you again just to make sure we're on the
2  same page.
3  A. Okay.
4  Q. What I asked you is, did you hear any rounds or
5  shots being fired before your first shot?
6  A. No.
7  Q. Did you have the impression you were the first
8  police officer to fire?
9  A. Yes.
10  Q. How far were you from Mr. Puga when you fired your
11  first shot, approximately?
12  A. About 20 to 30 feet.
13  Q. Prior to firing your first shot did you see a
14  handgun in Mr. Puga's waistband?
15  A. Yes.
16  Q. And how much time would you estimate passed between
17  you seeing the handgun in his waistband and you firing your
18  first shot?
19  A. I'll say about three seconds.
20  Q. Did you fire your first shot as you saw Mr. Puga's
21  hands going towards the gun?
22  A. Yes.
23  Q. Had he touched the gun before your first shot?
24  A. No.
25  Q. How many shots approximately did you fire in the

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 10

1 first volley?

2    A. From what I can recall, like five, five to eight

3 shots.

4    Q. It's my understanding from reading your statement

5 that you initially fired when you saw Mr. Puga's hands moving

6 towards the handgun in his waistband; is that correct?

7    A. Yes.

8    Q. And are you saying in that first volley as his hand

9 was moving towards the waistband, you fired approximately

10 five to eight shots?

11    A. Yes.

12    Q. Would you have been aiming center mass?

13    A. Yes.

14    Q. Was that essentially from your perspective the

15 chest-abdomen area?

16    A. Yes.

17    Q. You more or less were aiming at his chest; is that

18 your recollection?

19    A. Yes.

20    Q. And from that distance your impression of these was

21 that you were striking him with some of your shots; is that

22 fair?

23    A. Yes.

24    Q. Do you recall if Mr. Puga had a shirt on or not at

25 the time?

Page 11

1    A. No, he did not have a shirt on.

2    Q. No shirt?

3    A. No, sir.

4    Q. How about his pants, do you generally recall what

5 type of pants he had?

6    A. Pair of jeans.

7    Q. Do you recall whether they were baggy or tight?

8        How would you describe them?

9    A. They were baggy.  He had a belt on, and I remember

10 the jeans were low enough to where you could see his

11 underwear, his under garment.

12    Q. So they were – the jeans were kind of hanging low

13 on his waistline or towards his buttocks?

14    A. Yes, sir.

15    Q. Did you notice him a few times during the entirety

16 incident – I know it was a long incident – reaching down

17 and kind of picking up his pants or moving his hand to pick

18 up his pants?

19    A. Yes, sir.

20    Q. How many times did you see him do that,

21 approximately?

22    A. I recall twice when he was – when he had exited out

23 of the vehicle, I recall him doing it twice.

24    Q. Would that be when he was on the driver side of

25 advice?

Page 12

1    A. Yes, sir.

2    Q. So would it at least be correct to say during your

3 first volley of shots, you did not see the gun in Mr. Puga's

4 hand?

5    A. That's correct.

6    Q. Did you give any verbal warning that you were going

7 to shoot Mr. Puga before you fired?

8    A. No, sir.

9    Q. So before we get into all the details of the rest of

10 the incident, I just want to learn a little bit about your

11 background.

12    A. Yes, sir.

13    Q. Starting with your education, I'm assuming you

14 graduated high school?

15    A. Yes.

16    Q. And what year did you do that in, approximately?

17    A. 1993.

18    Q. Did you play any sports in high school?

19    A. Yes.

20    Q. What sports did you play?

21    A. Baseball, football, and I was on the wrestling

22 team.

23    Q. Any military experience?

24    A. Yes.

25    Q. Can you tell me about that, please.

Page 13

1    A. Well, I did four years in Marine Corps from 1993 to

2 1997.  While in the Marine Corps, my job was a military

3 police.  Upon entering Marine Corps, of course, I had to

4 complete a three months of boot camp training, and then I

5 transitioned to what you call Marine combat training which is

6 another three months.

7        And then that's when I transitioned to the Military

8 Police School which was another three months.

9    Q. And up to what year were you in the Marine Corps?

10    A. From October 1993 to October 1997.

11    Q. And after the Marine Corps, where did you work or go

12 next?

13    A. After the Marine Corps I worked in a private prison.

14        While in the private prison I did go back in to the

15 military, but I joined the National Guard, and I was military

16 policeman in National Guard.  And then I left the private

17 prison.  I started to work in the State Correctional

18 Facility, and after the State Correctional Facility, I got a

19 job with the Highway Patrol.

20    Q. And did you go to a separate academy for the Highway

21 Patrol?

22    A. Yes, sir.

23    Q. And when did you do that, in what year,

24 approximately?

25    A. I went to the Highway Academy in November of 2000,

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 14

1  and I graduated May of 2001.
2  Q. And at some point you were promoted to sergeant?
3  A. Yes.
4  Q. And when were you promoted to sergeant?
5  A. That was in May of 2017.
6  Q. Do you recall the date of the incident we're here to
7  talk about?
8  A. It was February 16 -- technically, the 17th, and
9  that was in 2021.
10  Q. Prior to that date had you yourself in your work as
11  a law enforcement officer ever seen a suspect with a gun in
12  their hand before?
13  A. Yes.
14  Q. On how many occasions, approximately?
15  A. Maybe I would say three times.
16  Q. Were you trained that you could shoot someone merely
17  for seeing a gun in their hand, that fact alone?
18  A. Yes.
19  Q. How about a gun in the waistband, had you ever seen
20  that before?
21  A. Yes -- no. As far as on a suspect?
22  Q. Yes.
23  A. Yes.
24  Q. On how many occasions, approximately?
25  A. Maybe twice.

Page 15

1  Q. Were you trained that you could shoot someone merely
2  for seeing a gun in their waistband?
3  A. Yes.
4  Q. Had you been present before February 2021 for any
5  other officer-involved shootings?
6  A. Yes.
7  Q. On how many occasions?
8  A. Once. And that was for months prior to this
9  shooting.
10  Q. And where did that happen in general?
11  A. That particular incident happened on the northbound
12  I-15 Freeway, and it was just south of Hodge Road on Outlet
13  Center Drive. I just don't remember the exact cross.
14  MR. GALIPO: Jinna, were you able to get the street
15  names, or would you like the spellings?
16  COURT REPORTER: The spellings would be helpful.
17  BY MR. GALIPO:
18  Q. I think he said Hodge Road.
19  And what was the other one?
20  A. Outlet Center Drive.
21  Q. Thank you for that.
22  And did you shoot in that particular incident?
23  A. No.
24  Q. Were other CHP officers fired?
25  A. Yes.

Page 16

1  Q. Do you recall which officers fired in that
2  particular incident?
3  A. Yes.
4  Q. And who were they?
5  A. Sergeant Fredericks, Officer Lugo, Officer
6  Blackwood, and I can't recall the last officer's name because
7  he was from a different area.
8  Q. Were you involved in the vehicle pursuit in this
9  case we're here to talk about today?
10  A. Yes.
11  Q. And how long was the pursuit for, approximately?
12  A. From what I recall, it was maybe 30 minutes.
13  Q. And during the pursuit were any shots fired, to your
14  knowledge?
15  A. No, sir.
16  Q. Did you see any weapon in Mr. Puga's vehicle during
17  the pursuit?
18  A. No, sir.
19  Q. Were you aware at some point that there were at
20  least two people in the vehicle?
21  A. No.
22  Q. And what street did the pursuit end on?
23  A. It was on Peach, northbound on Peach, south of
24  Catalpa.
25  Q. And can you spell Catalpa?

Page 17

1  A. It's C-a-t-t-a-p-a.
2  Q. Thank you.
3  MR. GALIPO: Can we, Hang, put up for the sergeant
4  Exhibit 5 from yesterday's deposition.
5  (Exhibit 5 was marked for identification.)
6  BY MR. GALIPO:
7  Q. Are you able to see it on your screen?
8  A. Yes.
9  Q. And does that appear to be the general location of
10  where the shooting incident took place?
11  A. Yes, sir.
12  Q. Have you seen photos like this or similar photos?
13  A. Yes.
14  Q. The white car facing northbound on Peach furthest
15  north, would that be Mr. Puga's vehicle?
16  A. Yes.
17  Q. And the CHP vehicle closest to that vehicle also
18  facing northbound in the southbound lane, would that be the
19  vehicle that belonged to Rubalcava and Blackwood?
20  A. Yes.
21  Q. And then there is another CHP vehicle facing
22  northbound in the northbound lane.
23  Would that be your vehicle?
24  A. Yes.
25  Q. And the two white vehicles, to your knowledge, were

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 18

1 they County Sheriff's vehicles?
2    A.  Yes.
3    Q.  And it appears there were residences on all four
4 corners?
5    A.  Yes.
6        MS. ESQUIVEL:  Objection.  I'm just going to
7 belated -- overbroad, and vague as to time.
8        Excuse me.
9 BY MR. GALIPO:
10    Q.  Were you aware at the time that the Puga vehicle
11 stopped that you were in the residential neighborhood?
12    A.  Yes.
13    Q.  Okay.
14        MR. GALIPO:  Thank you for that, Hang.
15 BY MR. GALIPO:
16    Q.  And there was a period of time after the vehicle
17 stopped before Mr. Puga got out of the vehicle; is that
18 fair?
19    A.  Yes.
20    Q.  And you would have been the supervising officer at
21 least for the CHP officers?
22    A.  Yes.
23    Q.  To your knowledge, was there anybody higher in
24 command than you at the scene?
25    A.  No.

Page 19

1    Q.  You were the only sergeant on-scene, to your
2 knowledge?
3    A.  No.  There was another sergeant from the Sheriff's
4 Department on-scene as well.
5    Q.  Do you know the name of that individual?
6    A.  No, sir.
7    Q.  At some point did a female come out of the white
8 vehicle?
9    A.  Yes.
10    Q.  And I take it for a period of time you were
11 attempting to get Mr. Puga out of the vehicle, but he was not
12 coming out of the vehicle; is that fair?
13    A.  Yes.
14    Q.  And at that point you were considering what
15 different options you had?
16    A.  Yes.
17    Q.  At some point did you consider calling in the SWAT
18 Team or the equivalent?
19    A.  Yes.
20    Q.  Did you make that request to somebody?
21    A.  Yes.
22    Q.  Who did you make the request to?
23    A.  I spoke to the Sheriff's sergeant.
24    Q.  And did you just generally inquire that you thought
25 that's something that should be considered, maybe calling

Page 20

1 SWAT out to see if they're available?
2    A.  Yes.
3    Q.  And do you recall what the response was to your
4 request?
5    A.  They told me that they were not going to come for
6 something of this nature.
7    Q.  Do you know if the call was ever made?
8    A.  That, I don't know.  I just saw him go back to his
9 car, and he had a cell phone, and he got on the cell phone.
10        But I wasn't close enough to hear if he actually
11 called.
12    Q.  Has it been your experience being in law enforcement
13 for some time, that sometimes SWAT does come out for a
14 barricaded suspect?
15    A.  Yes.
16    Q.  And is that why you made the request?
17    A.  Yes.
18    Q.  At some point was it decided that pepper balls might
19 be helpful in making the inside of the car environment
20 uncomfortable and having Mr. Puga come out?
21    A.  Yes.
22    Q.  And obviously, to get pepper balls in the car, you
23 have to have a open or broken window to get them through; is
24 that fair?
25    A.  Yes.

Page 21

1    Q.  And do you recall what attempts were made to try to
2 break the window or windows?
3    A.  Yes.  I first attempted to break the window with our
4 what we refer to as the less-lethal shotgun, but in layman's
5 term most people refer to it as a bean bag shotgun.
6        And so I fired five shots into the left rear
7 passenger side window which is basically behind the driver,
8 and they all failed.
9    Q.  They struck the window, but they were not successful
10 in breaking it?
11    A.  That's correct.
12    Q.  And then did you go to a Plan B to try to break one
13 of the windows?
14    A.  Yes.  That's when I was informed by the Sheriff's
15 sergeant that they had a tool that they can use, and that's
16 when he brought out -- our department doesn't have it.
17        So I don't know the actual name of it.  I could only
18 describe it.  It just looks like a paint ball gun.
19    Q.  In any event, did that work?
20    A.  Yes.
21    Q.  And they broke out the back window of the vehicle?
22    A.  Yes.
23    Q.  And then did you direct someone to use the pepper
24 balls?
25    A.  Yes.

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 26

1    the electrical pole located to the west of Mr. Puga's
2    vehicle.  So I was in general terms -- I was making my way
3    towards that pole.
4        Q.   Okay.  Let's see if we can look at Exhibit 1 from
5    yesterday.  I think one of these exhibits might show the
6    pole.
7             (Exhibit 1 was marked for identification.)
8             MR. GALIPO:  I don't think that one shows it, but
9    put that back up for just a second, Hang.
10   BY MR. GALIPO:
11       Q.   Obviously, this is a view looking south; is that
12   correct?
13       A.   Yes.
14       Q.   And we could see Mr. Puga's vehicle, a portion of
15   your vehicle, and the other CHP vehicle?
16       A.   Yes.
17       Q.   And am I understanding  you correctly, that the pole
18   you're referring to would be on the right side of this
19   photo?
20       A.   Yes.
21       Q.   Okay.
22            MR. GALIPO:  Let's look at Exhibit 2 and see if that
23   might show the pole.
24            (Exhibit 2 was marked for identification.)
25   BY MR. GALIPO:

Page 27

1        Q.   I think you can just see a little bit in the
2    background?
3        A.   Yes.
4        Q.   That's on the very right of the photo?
5        A.   Yes.
6        Q.   And it looks like the pole if you drew a line going
7    across the street, the pole is somewhere in the area of the
8    front of Mr. Puga's vehicle; is that fair?
9        A.   Yes.
10            MS. MARGOLIES:  Mr. Galipo, what photo is this?
11            Is there a Bates stamp or an Exhibit number?
12            I apologize.
13            MR. GALIPO:  That's okay.  Yes.  There is both.
14            We actually used these exhibits yesterday.  So that
15   was Exhibit 1 and 2 from yesterday's deposition.
16            And, Hang, do you see the Bates stamp numbers so you
17   can let Amy know.
18            MS. LE:  Sure.  It's COSB001571.
19            MS. MARGOLIES:  Okay.  But current what's on the
20   screen is Exhibit 2.
21            MR. GALIPO:  That's Exhibit 2.
22            Do you want the Bates stamp for Exhibit 1, also?
23            MS. MARGOLIES:  No.  All set.  Thank you.
24            MR. GALIPO:  Okay.  But they will be attached from
25   yesterday, and I think they were e-mailed to Shannon also

Page 28

1    yesterday.
2             Is that good, Amy?
3             MS. MARGOLIES:  That's good.
4             MR. GALIPO:  Okay.  Thank you.
5             Okay.  Thank you for that, Hang.
6    BY MR. GALIPO:
7        Q.   At some point was there an airship overhead?
8        A.   Yes.
9        Q.   And was the an airship utilizing its spotlight?
10       A.   Yes.
11       Q.   And rotating overhead during some of the incident?
12       A.   Yes.
13       Q.   And was the spotlight providing some light for the
14   area?
15       A.   Yes.
16       Q.   Was there any tactical discussion with your
17   officers, the two CHP officers when you were getting ready to
18   approach?
19       A.   No.
20       Q.   Were you aware that when you were approaching, other
21   officers were also approaching?
22       A.   No.
23       Q.   Did you get close to that pole at some point?
24       A.   Yes.
25       Q.   And how long were you in the area of the pole

Page 29

1    approximately before you saw the handgun in Mr. Puga's
2    waistband area?
3        A.   I would say maybe three to five seconds.
4        Q.   So a short period of time?
5        A.   Yes.
6        Q.   So just so I'm understanding you, before you got to
7    the pole, so as you're moving forward towards the pole, did
8    you observe any other officers, either CHP or Sheriffs, also
9    advancing forward?
10       A.   No.  The only person that -- that remember advancing
11   was Officer Rubalcava who was actually with me as we was
12   moving towards the pole.
13       Q.   And where was he in relation to you?
14            Were you side-by-side, or in some other
15   configuration?
16       A.   Pretty much side-by-side.
17       Q.   And do you recall if he was to your right or to your
18   left?
19       A.   To the right.
20       Q.   As you were approaching the area of the pole, could
21   you see at least a portion of Mr. Puga's body in front of the
22   vehicle?
23       A.   Yes.
24       Q.   And were there times as you were approaching the
25   pole where you saw Mr. Puga's hands up?

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 30

1    A. Yes.
2    Q. And am I understanding you correctly that within
3  approximately three to five seconds of you getting to the
4  area of the pole, is when you saw the handgun in Mr. Puga's
5  right hand going down towards it?
6    A. Yes.
7    Q. And that would be when you fired your first volley
8  of shots?
9    A. Yes.
10    Q. And I think we covered this, but you did not hear
11  any shots being fired before your first shot; is that fair?
12    A. That's correct, sir.
13    Q. After you fired your first five to eight shots, did
14  you hear any other shots being fired?
15    A. Yes.
16    Q. Could you tell if any of those shots were coming
17  from law enforcement officers?
18    A. Not really. I just was assuming they were coming
19  from the other officers.
20    Q. For example, Rubalcava, I think was to your -- would
21  it be to your right?
22    A. Yes.
23    Q. Did you have the impression he was firing at some
24  point?
25    A. The issue is when I started firing, it just seemed

Page 31

1  like it just became tunnel vision where I was just -- it was
2  weird. Like I couldn't hear. I couldn't hear. It's like I
3  could see things happen, but I just couldn't hear anything.
4      So I mean, yeah, I can say I assumed that he was
5  firing because I saw the gun, and I started firing, but I
6  can't say concretely that I know for a fact that he was
7  shooting at the time.
8    Q. Okay. Have you heard the term before, "auditory
9  exclusion" or something to that effect?
10    A. Yes.
11    Q. Now, at some point did you go down prone?
12    A. Yes.
13    Q. I take it one of the issues you're trained on
14  probably both in the military and as a law enforcement
15  officer is crossfire?
16    A. Yes.
17    Q. And I take it you didn't want to get caught in the
18  crossfire; is that fair?
19    A. Exactly, yes.
20    Q. So at some point did you intentionally put yourself
21  down in a prone position?
22    A. Yes.
23    Q. And was one of the reasons you did that so that you
24  would not be in the crossfire?
25    A. Yes.

Page 32

1    Q. And how many shots do you think you had fired before
2  you went into the prone position?
3    A. I was thinking I fired maybe like five to eight
4  shots.
5    Q. The first volley?
6    A. Yes.
7    Q. You went to the prone position after your first
8  volley of shots?
9    A. Yes.
10    Q. And how much time do you think passed between your
11  last shot and going in to the prone position?
12      Was it pretty quick?
13    A. Yes. Probably three to five seconds.
14    Q. And when you were in the prone position, were you in
15  the dirt or the street, or do you recall?
16    A. The dirt.
17    Q. And do you recall if your head was generally north
18  and your feet south, or some other angle?
19    A. Yes, head north. Feet south, yes.
20    Q. Did you have any conversation with Officer Rubalcava
21  when you went in this prone position?
22    A. No.
23    Q. For example, you never told him you were struck by
24  gunfire or something, did you?
25    A. Yes. You're right. I do remember saying something

Page 33

1  to that effect that I was like, "I think I'm hit" because I
2  felt something hit my forearm, my left forearm.
3    Q. Did you look at your left forearm at some point?
4    A. Yes. Afterwards.
5    Q. And did it appear that you were struck by a gunshot
6  when you looked at it?
7    A. I couldn't tell if it was a gunshot or a foreign
8  object, but I did have a scrape along my forearm.
9    Q. At least do you know now that you were not struck by
10  any gunshots?
11    A. Yes.
12    Q. Have you had training on the concept of contagious
13  fire or sympathetic fire?
14      Have you heard those terms?
15      MS. ESQUIVEL: Objection. Vague.
16      THE WITNESS: No.
17  BY MR. GALIPO:
18    Q. Okay. The concept, maybe it's something you've
19  heard about, but another phrase was used.
20      The concept that as a law enforcement officer, you
21  don't want to start shooting just because you hear other
22  shots.
23      In other words, you don't want it to be a reaction
24  just to hearing shots, that you start shooting.
25      You want to make sure there is a basis for it.

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 50

1    A. Yes, sir.

2    Q. Can we go a little bit more towards the top.

3        Okay. So obviously, I know you've looked at this

4    before. You see that there are lines on the left-hand

5    side?

6    A. Yes.

7    Q. And then when you respond, they put your name to the

8    left.

9        Do you see that?

10   A. Yes.

11   Q. And it looks like starting on Line 7 the

12   investigator or detective was asking you how many rounds you

13   were firing in essence, and your estimate at least at that

14   time was about 12?

15   A. Yes.

16   Q. And then you're saying you later learned it was

17   18?

18   A. Yes.

19   Q. And then they asked you about injuries, and you said

20   you had a little scrape on your left forearm.

21       Do you see that?

22   A. Yes.

23   Q. And is that the – what you were telling me about

24   earlier?

25   A. Yes.

Page 51

1    Q. Do you know if you scraped your forearm when you

2    went down in to that prone position?

3    A. I'm still debating that because when I went in the

4    prone position, I felt this really – like it wasn't

5    basically – I actually felt something like it hit my arm,

6    and it had pretty good force behind it. So it wasn't like I

7    slid and hit, and scraped it.

8        So that's why I was on the impression that I had

9    been hit, but the scrape was so minor, it wasn't consistent

10   with like a gunshot wound. So I just shrugged it off.

11   Q. Okay. Do you know if it could have possibly been a

12   casing that impacted you?

13   A. It had little more force than that.

14       Like I said, from my military experience and law

15   enforcement experience from just shooting different weapons,

16   the amount of force that I felt from the impact, it was

17   greater than just a casing falling out and hitting.

18   Q. Okay. At some point you learned Hector's first

19   name?

20   A. Yes.

21   Q. And you tried to use that to establish a rapport

22   with him?

23   A. Yes.

24   Q. And obviously, part of the training in situations

25   like this is de-escalation?

Page 52

1    A. Yes.

2    Q. At some point did he express when he got out of the

3    vehicle on the driver's side a concern that he was going to

4    be shot or he thought the officers were going to shoot him?

5    A. Yes.

6    Q. And did you try to assure him or re-assure him that

7    wasn't going to happen?

8    A. Yes.

9    Q. Did he say something like about hearing a click, and

10   he got afraid that somebody was getting ready to shoot him?

11   A. Yes.

12   Q. And you indicated in your statement, I think,

13   similar to what you told me today, when you saw his hand

14   going towards his waistband, that's when you started

15   shooting?

16   A. Yes.

17   Q. And was that more or less like within a second that

18   you saw his hand coming down and the shots started?

19   A. Yes.

20   Q. Were you ever using the suspect's vehicle as

21   cover?

22   A. Yes. In a – well, we use the term called pying off

23   the vehicle, kind of a pying which is basically you're using

24   what would be a building or a vehicle, basically, whatever

25   object, and you're slowly – you're trying to use that

Page 53

1    vehicle – well, the object, in this case the vehicle, for

2    cover.

3        So tactically speaking, yes, we were using his

4    vehicle as we approached as some sort of cover.

5    Q. When you say we, you and Officer Rubalcava?

6    A. Yes.

7    Q. You didn't have any prior contact with Mr. Puga, did

8    you?

9    A. No.

10   Q. Have you ever been shown a picture of Mr. Puga

11   before the time you shot him?

12   A. No.

13   Q. Is part of the goal in taking someone into custody

14   to do it safely as possible?

15   A. Yes.

16   Q. With the least amount of force if feasible?

17   A. Yes.

18   Q. And safety is a concern in these situations I take

19   it for everyone, the law enforcement officers, the public,

20   and even the suspect?

21   A. Yes.

22   Q. And the AR-15, does that have 223 ammunition?

23   A. Yes.

24   Q. And you picked that particular weapon because you

25   thought it could give you a tactical advantage?

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 74

```
 1      A.   Well, he received training at the CHP Academy when I
 2 attended, and I also received training in during my field
 3 training time, and also we had to do quarterly training for
 4 use of force.
 5      Q.   Have you heard of term being POST-certified?
 6      A.   Yes.
 7      Q.   And are you POST-certified?
 8      A.   Yes.
 9      Q.   Probably a better question, were you POST-certified
10 at the time of the incident?
11      A.   Yes.
12      Q.   And do you know at the time of the incident what
13 level of POST-certification you had?
14      A.   I have the -- it's two certificates, and I have
15 both.  I just can't recall what terminology we use for it,
16 but I do have both POST certificates.
17      Q.   Have you heard of the term basic POST
18 certification?
19      A.   Yes.  Basic and advanced, yes.
20           Thank you.
21      Q.   I think that's all the question I have.
22           Thank you for your time today.
23      A.   Thank you.
24           MS. ESQUIVEL:  I have a lot of follow-up questions.
25      Hopefully, it won't take too long.
```

Page 75

```
 1                        EXAMINATION
 2 BY MS. ESQUIVEL:
 3      Q.   Going back to the information -- were you aware
 4 of -- well, how did you become aware of the pursuit of
 5 Mr. Puga, for the standoff that we've been talking about?
 6      A.   Well, I was notified by our dispatcher that the
 7 officers -- my officers had stopped, the dispatcher's words
 8 were -- and again, I'm paraphrasing, that the guy from
 9 earlier or the vehicle earlier, not the guy, but the vehicle
10 from earlier who was involved in this road rage, the freeway
11 shooting, that my officers had the vehicle stopped on Bear
12 Valley, west of Cottonwood.
13      Q.   And did you join the -- why did you go out there, or
14 what did you do when you heard that?
15      A.   Well, I began responding to the scene, and before I
16 can get out there doing the traffic stop, the officers put
17 out that they were now in pursuit of the vehicle.
18      Q.   And did you have any information about the earlier
19 freeway shooting that the white vehicle, SUV, was suspected
20 of being involved in?
21      A.   Yes.
22      Q.   And what information did you have about that earlier
23 shooting?
24      A.   Well, because of the time my shift started, I was
25 the on-duty supervisor when the freeway shooting took place.
```

Page 76

```
 1 So I actually responded to the scene along with two officers
 2 from that particular shift.
 3           I spoke to the victim, and he showed me pictures of
 4 the vehicle of the suspect's vehicle which ended up being
 5 Mr. Puga's vehicle.
 6      Q.   And did you see -- did the victim ever show you any
 7 evidence of him or his vehicle being shot during that freeway
 8 road rage incident?
 9      A.   Yes.  I noticed he pointed -- he directed my
10 attention to the right passenger side door, and when I
11 inspected it, it had a bullet hole in the door, and when you
12 looked on the inside of the door, the bullet penetrated
13 through the door and the passenger seat.
14      Q.   And what kind of BOLO, if any, was put out
15 following this freeway shooting?
16      A.   We pull out BOLO for a white SUV with 22 inch rims
17 that were all black, and the thing that was very distinctive
18 is the left-rear corner of the rear window, it had Funeral in
19 the left rear window.  It was a little sticker.
20      Q.   Was there any information put out about the
21 driver?
22      A.   Yes.  The victim did describe the driver as a male
23 with bald head, and so we put out the description that the
24 victim gave.
25      Q.   Was there any little of -- I don't know what you
```

Page 77

```
 1 would call it -- dangerousness that could approach the
 2 vehicle if units came across it?
 3      A.   Yes.  During the briefing, because of this incident,
 4 this freeway shooting was classified as a felony.  The
 5 officers inquired based on the information that I gave them,
 6 and when I mean officers, I'm referring to Blackwood and
 7 Lugo, because part of my shift based on the time frame it
 8 overlapped into the graveyard shift.
 9           So during my brief in the graveyard shift which was
10 Lugo -- I'm sorry, not Lugo, but Blackwood and Rubalcava, I
11 explained to him what happened, and one of their questions
12 was, "Sergeant, if we come across the vehicle, can we
13 immediately conduct a felony stop?"
14           And I said, "Absolutely."
15      Q.   And what does that mean in terms of felony assault?
16      What does that mean?
17      A.   A felony stop means that --
18      Q.   A felony stop.  Sorry.
19      A.   No problem.  A felony stop means that the officers
20 do not approach the vehicle, and basically, they have the
21 occupants of the vehicle exit out, and the weapon officers
22 stand behind cover which typically the door of the parole car
23 with their weapons drawn, and they order all occupants out of
24 the vehicle.
25      Q.   Earlier you were asked in terms of whether you heard
```

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 78

1 any shots, and you said that you did not, but that you saw
2 muzzle flash.
3      At what point did you see muzzle flash?
4   A. I think you're referring to Mr. Puga or the muzzle
5 flash?
6   Q. Well, you were asked by Mr. Galipo that during the
7 first volley, the first shot from your weapon, whether you
8 heard a shot.
9      And your response was that you did not hear a shot,
10 but that you saw muzzle flash.
11   A. Yes.
12      MR. GALIPO: I'm going to object as that's
13 mischaracterizing his testimony.
14 BY MS. ESQUIVEL:
15   Q. So I'm going to go back to that part.
16      So you've already testified at length about the
17 first shot, the first volley of rounds.
18      So I just want to understand at what point, if you
19 saw the muzzle flash, whether it was during that first
20 volley, or whether it was between the first volley and the
21 second volley, or whether it was during the second volley.
22      So my question to you is, at what point did you see
23 the muzzle flash?
24   A. Yes. So when I contacted Mr. Puga at the front of
25 his vehicle, and upon firing my weapon at Mr. Puga, he was

Page 79

1 able to remove the weapon from his waistband and point the
2 gun in myself and Officer Rubalcava's direction.
3      And I saw two muzzle flashes.
4   Q. Was this while you were still firing during the
5 first volley?
6   A. Yes.
7   Q. Now, you were asked questions as to whether your
8 training would allow you to shoot someone when they had a gun
9 in their hand, and Mr. Galipo also asked you whether you were
10 trained that you could shoot someone when you saw a gun in
11 their waistband, and you responded yes to both.
12      So I just want to clarify that.
13      Are you saying that in your training, just seeing an
14 individual with a gun in his waistband allows you to then
15 fire upon that person?
16   A. No, not necessarily. It's the actions of the
17 individual with the gun.
18   Q. So I'm just going to -- just listen to question.
19      Does your training allow you to someone just because
20 they have a gun in their hand?
21   A. Yes.
22   Q. Is there anything particular about having the gun in
23 the hand that would then justify you shooting?
24   A. Yes.
25   Q. And what is that?

Page 80

1   A. It's the perception of the officer or sergeant,
2 whoever is engaged with the person at the time. So if a
3 person has a gun, and I'm in fear for my life, then I can use
4 deadly force to protect myself or others.
5   Q. Now, taking this situation where you answered yes to
6 Mr. Galipo's questions, but putting it in context of what
7 was occurring with Mr. Puga, what did Mr. Puga do that you
8 then felt that you felt justified in shooting him?
9   A. Well, there was two major things. One, he had
10 already -- we can't say concretely, but the vehicle was
11 involved in a shooting earlier in the freeway where a person
12 was fired upon.
13      The second thing is that in this situation I saw the
14 gun in a waistband, and it was only when he -- what I felt
15 was he was reaching for the gun, that's when I was felt that
16 he was going to possibly do serious bodily injury or even
17 death upon myself and/or my officers.
18   Q. You testified earlier in response to Mr. Galipo's
19 questions that you observed Mr. Puga exit the vehicle.
20   A. Yes.
21   Q. Based on the view that you had of Mr. Puga exiting
22 the vehicle, were you able to see his waist or his
23 waistband?
24   A. No.
25   Q. When he was standing on the driver's side of the

Page 81

1 vehicle which you testified was for about five to seven
2 minutes before he moved to the front of the vehicle, during
3 that five to seven minutes, at any time did you -- were you
4 able to have a view or see his waist or waistband?
5   A. No.
6   Q. Once he moved to the front of the vehicle where you
7 said he was there for about eight to ten minutes before you
8 first shot, during that eight to ten minutes, did he ever
9 turn to you towards you such that you could see his waist or
10 his waistband?
11   A. No.
12   Q. At what point then did you first see the gun in his
13 waistband?
14   A. Once I had moved forward of his vehicle.
15      So once I was past his vehicle, because his vehicle
16 was blocked from the waist down, so when he was standing up
17 in front of his vehicle, I could only see his chest up.
18      So once I had passed his vehicle, that's when I was
19 able to see his waistband.
20   Q. And is this when you were still on the southwest
21 corner of the intersection?
22   A. Yes.
23   Q. And were you still on the dirt portion?
24   A. Yes.
25   Q. Once you could see his waistband, was there anything

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 82

1  between you and Mr. Puga that you could use as cover if
2  Mr. Puga decided to shoot his gun?
3      A.  No.
4      Q.  Anything that in your training that you have
5  received from CHP and POST that you're aware of that requires
6  you to wait until you're fired upon before – after you see a
7  suspect reach for a gun, that you're required to wait until
8  you're fired upon before you can fire first?
9      A.  No.
10      Q.  Now, you testified earlier that when we were talking
11  about the muzzle flash, you said you saw it during the first
12  volley of shots; correct?
13      A.  Yes.
14      Q.  Do you remember what Mr. Puga's position was when
15  you saw those flashes?
16          And by that, I mean was he already running?
17          Was he still standing towards you?
18          Please explain to us where his – where he was
19  positioned.
20      A.  He was standing turning towards us, and what I
21  remember is just him turning towards us; he got the gun out,
22  and it was like he was cringing.  As he was firing he was
23  cringing, and but he was still able to turn towards us and
24  fire twice in our direction.
25      Q.  Were you able to notice where Officer Rubalcava was

Page 83

1  in relation to you when you saw the muzzle flashes?
2      A.  I just remember him still being to my right.
3      Q.  And after the muzzle flashes, you testified that you
4  ran – you turned your back; correct; towards him?
5      A.  Yes.
6      Q.  And then you slid and went into a prone position –
7  I'm just going to speed this up a little bit.
8      A.  Yes.
9      Q.  And then that's when you took cover on the ground
10  and repositioned yourself to then go through the second
11  volley of rounds; correct?
12      A.  Yes.
13      Q.  Okay.  As you positioned yourself, I'm assuming you
14  obtained Mr. Puga in your sights of your weapon?
15      A.  Yes.
16      Q.  When you got him in your sight, do you recall where
17  he was at?
18      A.  He was located in that north, northwest corner
19  because he was running in north westerly direction.
20          So it was like northwest just barely – just outside
21  of the intersection.
22      Q.  And what part of his body could you see just as you
23  were ready to shoot, start the second round, the second
24  volley of rounds?
25      A.  I could only see his side because I recall seeing in

Page 84

1  his left hand a gun, and he was running, but pointing back at
2  us.  And so I could only see like his side, like his rib cage
3  area.
4      Q.  So you were not shooting at his back, were you?
5      A.  No.
6      Q.  And what was it about what Mr. Puga was doing at the
7  time right before you pulled the trigger to begin the second
8  volley that you felt that you or someone else was in imminent
9  danger of serious harm or death?
10          MR. GALIPO:  Objection.  Leading.
11  BY MS. ESQUIVEL:
12      Q.  Right before you pulled the trigger to begin the
13  second volley, did you feel that you or anybody else was in
14  imminent threat of death or serious harm?
15      A.  Yes.
16      Q.  Why?
17      A.  Well, I saw the muzzle flashes during my first
18  volley.  So and then in combination of what had happened
19  earlier on the freeway earlier, I was concerned not only for
20  my safety and the officer's safety, but the direction he was
21  running, he was running towards the house.
22          So my thought process was if he makes it to the
23  house, now we're going to have a bigger problem because
24  potentially for a hostage situation.  So I was concerned
25  about the residence in the house.

Page 85

1      Q.  At anytime that you regained sight of Mr. Puga once
2  you went down in the prone position, did you ever see him
3  drop the gun?
4      A.  No.
5      Q.  Did you have any reason to believe that he wouldn't
6  use the gun again?
7      A.  No.
8      Q.  You were asked earlier before the incident occurred
9  whether – whether you had considered contacting the
10  residence in the immediate area and inform them about what
11  was going on, and you responded that no.
12          Why didn't you consider contacting the residence in
13  the immediate area and warn them about Mr. Puga's presence?
14          MR. GALIPO:  I'm going to object.  It may misstate
15  his testimony.  I thought he said he did consider it; he just
16  didn't do it.
17          MS. ESQUIVEL:  Well, let's ask him.
18  BY MS. ESQUIVEL:
19      Q.  Did you consider contacting the residence in the
20  immediate area about what was going on with Mr. Puga?
21      A.  Yes.
22      Q.  And did you – what were you considering and far as
23  contacting him?  What were you thinking of informing them
24  about?
25      A.  I was going to let them know that Mr. Puga, you

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 86

1  know, was armed and dangerous, and basically to just stay
2  inside.
3     Q.  Do you know if that was done, if anybody?
4     A.  No.  Because I didn't want to put the deputies or
5  anyone else in danger because based on where he was
6  positioned, and in order for him to access those houses on
7  the corner, then he would have been in a crossfire.
8        And you were also asked questions about whether you
9  had considered your background that -- I mean, you could --
10  strike that.
11       You testified earlier that you are required to
12  consider your background for potential innocent bystanders
13  being shot by stray bullets.
14       In this case did you consider that before you fired
15  the first volley?
16    A.  Yes.
17    Q.  Did you have any information that led you to believe
18  that someone might be struck by your bullets when you fired
19  your first volley?
20    A.  No.
21    Q.  Why didn't you consider that you would hit someone
22  or innocent bystanders?
23    A.  Because when we were approached him, my line of
24  sight from what I could see was the roadway.  That's what I
25  saw in his background, the direction that my weapon was

Page 87

1  pointed, I saw Catalpa.  So I was under the impression that
2  if I, you know, just prior to firing if I had to fire, then
3  my rounds would more or less like travel down the street and
4  not towards the house.
5     Q.  So at the time when you started the first volley of
6  shots, where were you relative to Mr. Puga?
7     A.  At the time I was like a 90-degree angle to
8  Mr. Puga.
9     Q.  So the backdrop would have been what?
10    A.  Just a street.  It's like almost DS.
11    Q.  And when you started the second round of volleys,
12  second volley of rounds, what was your backdrop then?
13    A.  Then it was in essence Peach and open desert.
14    Q.  You were also asked whether you had turned off your
15  MVARS during your interview or your discussion with the adult
16  male bystander that was shot, the dad?
17    A.  Yes.
18    Q.  And that that conversation was not captured on any
19  of the MVARS recordings.
20       Do you -- and you said you don't know whether or not
21  you turned off your radio; correct?
22    A.  Yes.
23    Q.  Do you know what the distance is it from the MVARS
24  to your radio in order for the MVARS in the vehicle to be
25  able to record and capture what is being said?

Page 88

1     A.  No.  It happens rather frequently.  I don't know the
2  exact distance, but typically, if you get too far away from
3  the car, it won't capture it.
4     Q.  You reviewed the MVARS of -- from both yours and
5  from Blackwood's vehicle; correct?
6     A.  Yes.
7     Q.  And part of that captures when you're all at the
8  cite where Mr. Puga went down; correct?
9     A.  Yes.
10    Q.  Do you recall being able to hear the conversations
11  that you had while you're at the cite where Mr. Puga went
12  down?
13    A.  No.
14    Q.  Do you have any reason to believe that you would
15  have turned off your radio that connected to the vehicle
16  recording system at that point?
17    A.  No.
18    Q.  So I think that I do want to go over one thing with
19  you, and this is the -- what's marked as Exhibit 3, the
20  video, Blackwood's MVARS.  I believe it's the fourth segment.
21       And I am going to show you.  Let me share my screen
22  here.
23       Do you see that on your screen?  It should show the
24  white SUV?
25    A.  Yes.

Page 89

1     Q.  Okay.  So I'm at 42 minutes and five seconds in, and
2  this is just right before the shooting begins.  I'm going to
3  be pausing it as we go along -- well, let me just stop you
4  before I ask you to play this.
5        Other than the gun, did you see anything else in
6  Mr. Puga's hands?
7     A.  No.
8     Q.  Once Mr. Puga went down, other than the gun, did you
9  find any other object on or around his body?
10    A.  No.
11       (Video playing.)
12       (Video paused.)
13  BY MS. ESQUIVEL:
14    Q.  So I don't know if you were able to see that.
15       I tried to stop it fast enough.
16       I'm going to rewind it.
17       Take a look right here and let me know if you notice
18  a shiny object.
19       (Video playing.)
20       (Video paused.)
21  BY MS. ESQUIVEL:
22    Q.  Do you see something keeps flashing as he's running?
23       Do you know what that was?
24    A.  It has to be the weapon because it did have a --
25  when we found it underneath him, the weapon has a shiny slide

**JONATHAN WAYNE BOTTEN, ET AL vs STATE OF CALIFORNIA, ET AL**
**Isaiah Kee on 11/05/2024**

Page 94

1  individual in their homes?

2    A.  Yes.

3    Q.  And I think you've told me this before, but you were

4  aware there was a home on the northeast corner before the

5  shooting started; is that fair?

6    A.  Yes.

7    Q.  I think that's all I have.

8    MS. ESQUIVEL:  Any other questions?

9    Sorry, Dale.  I was observing your authority.

10    MR. GALIPO:  That's okay.

11    MR. GALIPO:  Amy, any further questions?

12    MS. MARGOLIES:  No further questions.

13    MR. GALIPO:  Diana, any further questions?

14    MS. ESQUIVEL:  No, no questions.

15    Jinna, the witness will review.  I'll order the

16  electronic copy.  You don't need to send the witness the

17  copy.  I will provide him the copy and do the review that

18  way.

19    MS. MARGOLIES:  And I'll request a copy on the

20  record.

21    (Deposition proceeding concluded at 12:39 p.m.)

22        * * *

23

24

25

Page 95

1        DECLARATION UNDER PENALTY OF PERJURY

2

3  Case Name:  Jonathan Wayne Botten, et al. vs. State of

4  California, et al.

5  Date of Deposition:  November 5, 2024

6  Job No.:  113704

7

8    I, _____, hereby certify

9  under penalty of perjury under the laws of the State of

10  California that the foregoing is true and correct.

11    Executed this _____ day of _____,

12  20____, at _____, California.

13

14

15

16

17

18    _____

19        ISAIAH KEE

20

21

22

23

24

25

Page 96

1        CERTIFICATE

2          OF

3    CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5    I, JINNA GRACE KIM, CSR No. 14151, a Certified

6  Stenographic Shorthand Reporter of the State of California,

7  do hereby certify:

8      That the foregoing proceedings were taken before me

9  at the time and place herein set forth;

10      That any witnesses in the foregoing proceedings,

11  prior to testifying, were placed under oath;

12      That a verbatim record of the proceedings was made

13  by me, using machine shorthand, which was thereafter

14  transcribed under my direction;

15      Further, that the foregoing is an accurate

16  transcription thereof.

17      I further certify that I am neither financially

18  interested in the action, nor a relative or employee of any

19  attorney of any of the parties.

20

21      IN WITNESS WHEREOF, I have subscribed my name, this

22  date:  November 5, 2024.

23

24      _____

25      Jinna Grace Kim, CSR No. 14151

Page 97

1        DEPOSITION ERRATA SHEET

2  Case Name:  Jonathan Wayne Botten, et al. vs. State of

3  California, et al.

4  Witness:  Isaiah Kee

5  Date of Deposition:  November 5, 2024

6  Job No.:  113704

7  Reason Codes:  1. To clarify the record.

8        2. To conform to the facts.

9        3. To correct transcription errors.

10

11  Page _____ Line _____ Reason _____

12  From _____    To _____

13  Page _____ Line _____ Reason _____

14  From _____    To _____

15  Page _____ Line _____ Reason _____

16  From _____    To _____

17  Page _____ Line _____ Reason _____

18  From _____    To _____

19  Page _____ Line _____ Reason _____

20  From _____    To _____

21  Page _____ Line _____ Reason _____

22  From _____    To _____

23  Page _____ Line _____ Reason _____

24  From _____    To _____

25  Page _____ Line _____ Reason _____

# Exhibit P

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   JONATHAN WAYNE BOTTEN, SR.; TANJA    )
    DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
5   J.B., a minor by and through his     )
    guardian JONATHAN WAYNE BOTTEN, SR., )
6                                        )
              Plaintiffs,                )
7                                        )
              vs.            ) Case No.
8                            ) 5:23-CV-00257-JGB-SHK
    STATE OF CALIFORNIA; COUNTY OF SAN   )
9   BERNARDINO; ISAIAH KEE; MICHAEL      )
    BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10  VACCARI; JAKE ADAMS; and DOES 1-10,  )
    inclusive,                           )
11                                       )
              Defendants.        )
12  _____)

13

14

15

16         REMOTE VIDEOCONFERENCE DEPOSITION OF

17              MICHAEL BLACKWOOD

18            MONDAY, NOVEMBER 4, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112646

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 2

```
1          UNITED STATES DISTRICT COURT
2          CENTRAL DISTRICT OF CALIFORNIA
3
4  JONATHAN WAYNE BOTTEN, SR.; TANJA    )
   DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
5  J.B., a minor by and through his     )
   guardian JONATHAN WAYNE BOTTEN, SR., )
6                                       )
             Plaintiffs,                )
7                                       )
        vs.              ) Case No.
8                        ) 5:23-CV-00257-JGB-SHK
   STATE OF CALIFORNIA; COUNTY OF SAN   )
9  BERNARDINO; ISAIAH KEE; MICHAEL      )
   BLACKWOOD; BERNARDO RUBALCAVA; ROBERT)
10 VACCARI; JAKE ADAMS; and DOES 1-10,  )
   inclusive,                          )
11                                     )
             Defendants.                )
12 _____   )
13
14
15
16      The remote videoconference deposition of MICHAEL
17 BLACKWOOD, taken on behalf of the Plaintiffs, beginning at
18 2:09 p.m., and ending at 4:00 p.m., on Monday, November 4,
19 2024, before Jinna Grace Kim, Certified Stenographic
20 Shorthand Reporter No. 14151.
21
22
23
24
25
```

Page 3

```
1  APPEARANCES OF COUNSEL:
2
   For the Plaintiffs:
3
      LAW OFFICES OF DALE K. GALIPO
4        BY:  DALE K. GALIPO, ESQ.
         BY:  HANG D. LE, ESQ.
5        21800 Burbank Boulevard, Suite 310
         Woodland Hills, California 91367
6        Tel:  818-347-3333
         Fax:  818-347-4118
7        E-mail:  dalekgalipo@yahoo.com
         E-mail:  hle@galipolaw.com
8
9  For the Defendants:
10     DEPUTY ATTORNEY GENERAL
         BY:  DIANA ESQUIVEL, ESQ.
11       1300 I Street, Suite 125
         P.O. Box 944255
12       Sacramento, California 94244
         E-mail:  diana.esquivel@doj.ca.gov
13
14     LYNBERG & WATKINS
         BY:  SHANNON L. GUSTAFSON, ESQ.
15       1100 W. Town & Country Road, Suite 1450
         Orange, California 92868
16       E-mail:  sgustafson@lynberg.com
17
18 Also Present:  Plaintiffs (previously stated on the record)
19
20
21
22
23
24
25
```

Page 4

```
1                    INDEX
2  WITNESS:                    PAGE
3  MICHAEL BLACKWOOD
4    BY: MR. GALIPO              5
5    BY: MS. GUSTAFSON          50
6    BY: MS. ESQUIVEL           50
7    BY: MR. GALIPO             59
8
9            EXHIBITS
10 MARKED FOR IDENTIFICATION             PAGE
11 Exhibit 1     Photograph Previously Marked 12
12 Exhibit 6     Photograph 544          16
13 Exhibit 5     Photograph              27
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1            CALIFORNIA
2            MONDAY, NOVEMBER 4, 2024
3            2:09 P.M.
4            MICHAEL BLACKWOOD,
5  called as a witness on behalf of the Plaintiffs, having been
6  first duly sworn remotely via videoconference, was examined
7  and testified as follows:
8            EXAMINATION
9  BY MR. GALIPO:
10    Q.  Can you please state your full name and spell it for
11 the record.
12    A.  Michael Blackwood.
13    Q.  Are you able to hear me okay so far?
14    A.  I am, yes.
15    Q.  Who do you currently work for?
16    A.  I'm a registered nurse in the City of Apple
17 Valley.
18    Q.  Nice.  How long have you been doing that for?
19    A.  I graduated this year in February and got hired in
20 June.  So since June of this year.
21    Q.  And when did you first go to nursing school?
22    A.  I -- it was -- I graduated in February.
23        It was about a 22-months program.  So I don't
24 know what the month was, but about 22 months before that.
25    Q.  At some point did you go to the police academy?
```

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 6

1   A. I did.
2   Q. And when did you do that?
3   A. That was in February of 2016.
4   Q. And how long were you a police officer altogether?
5   A. I was a police officer until March of 2023.
6   Q. And what happened at that point?
7   A. In March of 2023 I medically retired.
8   Q. And did you work during your time as a police
9   officer with the CHP?
10  A. Yes.
11  Q. And we're here to talk about a shooting incident
12  with Mr. Puga.
13     Have you had a chance to review some documents
14  related to that?
15  A. I have.
16  Q. And what have you reviewed?
17  A. I reviewed some MVARS recordings. I reviewed the
18  CHP CAD log. I reviewed two recordings from neighboring
19  residents that's from where the shooting occurred, and I
20  reviewed the final report from the -- written by the San
21  Bernardino County Sheriff's detectives.
22  Q. How about your statement, did you review your
23  interview?
24  A. I did. Part of -- my interview was also in that
25  final statement from the Sheriff's Department.

Page 7

1   Q. And when did you give your interview in relation to
2   the incident?
3   A. It was -- I don't know the exact day, but it was --
4   I believe a few days, anywhere from like two days to a week
5   after the incident.
6      I don't remember the exact date when I went in for
7   the interview.
8   Q. Do you recall the date of the shooting incident?
9   A. Not the exact date. I just know it was in
10  February.
11  Q. Of what year?
12  A. 2022, I believe.
13  Q. Did you have another shooting incident in 2020?
14  A. My first shooting incident was three months prior to
15  this one in October.
16  Q. How many shooting incidents have you had
17  altogether?
18  A. Two.
19  Q. The one before and this one?
20  A. Yes, sir.
21  Q. And so the one before was about three months
22  before?
23  A. Correct.
24  Q. And how many shots did you fire in that previous
25  shooting incident?

Page 8

1   A. I do not know.
2   Q. Do you have any estimate?
3   A. I wouldn't even be able to estimate.
4      I don't know.
5   Q. Do you recall what type of weapon you fired the
6   shots from?
7   A. It was my Smith&Wesson sidearm.
8   Q. Is that a 40 caliber?
9   A. It is, yes.
10  Q. For example, you don't know if you fired more or
11  less than ten shots in that incident?
12  A. I don't know.
13  Q. Why did you shoot in that incident, just very
14  basically?
15  A. The subject pulled out a gun on us.
16  Q. Did he point the gun at you, or just pull it out?
17  A. It was pointed.
18  Q. Do you know if any portion of that was caught on
19  video?
20  A. I don't know. I know that the vehicle MVARS was
21  running. So I'm assuming it was caught on video. I never --
22  I don't remember reviewing. I don't remember reviewing all
23  the videos from that incident or report.
24  Q. So you're not sure if the MVARS video in that case
25  captures the pointing of the gun or not because you don't

Page 9

1   remember seeing it?
2   A. Correct.
3   Q. Did you watch any of the MVARS video in this case
4   before you gave your statement?
5   A. Yes.
6   Q. Don't they normally allow you to do that?
7   A. Yes.
8   Q. And did you give a statement in the other case?
9   A. Yes.
10  Q. And do you recall if you had the opportunity to
11  watch the MVARS video in the other case?
12  A. Yes.
13  Q. And I noted that you had an attorney present for
14  your statement in this case?
15  A. Yes.
16  Q. Do you recall her name?
17  A. I don't. I believe it was a male attorney.
18  Q. Do you remember there were two attorneys, a Brian
19  Gabriel, I think who was a male, and a Melanie Weaver who was
20  a female?
21  A. Melanie Weaver was our Union rep.
22     She was present, yes.
23  Q. And then also a male attorney?
24  A. Correct.
25  Q. And did you have either one of those as your

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 10

1  representatives in your prior shooting that happened three
2  months earlier?
3     A.   Melanie Weaver was, yes.
4     Q.   Okay.  She was there as a representative in your
5  statement in the prior shooting as well?
6     A.   Yes.
7     Q.   Now, in this case that we're here to talk about with
8  Mr. Puga, how many shots did you fire?
9     A.   After like reviewing the final report, I fired 20
10 shots.
11    Q.   And what type of weapon did you fire the shots
12 from?
13    A.   It was a AR-15.
14    Q.   And was that in a automatic or semiautomatic mode at
15 the time?
16    A.   Semiautomatic.
17    Q.   So you have to press the trigger each time?
18    A.   Yes.
19    Q.   So to fire 20 shots, essentially you have to press
20 the trigger 20 times?
21    A.   Yes.
22    Q.   And what type of ammunition?
23         Is it 223?
24    A.   223, yes.
25    Q.   Did you hear any shots being fired before you fired

Page 11

1  your first shot?
2     A.   Yes.
3     Q.   How many shots did you hear before you fired your
4  first shot?
5     A.   I couldn't be specific on the exact number, but
6  approximately two to three.
7     Q.   Could you tell where those two or three shots were
8  coming from?
9     A.   No.
10    Q.   When you fired your first group, you had two volleys
11 of shots; is that correct?
12    A.   I don't -- I don't recall.
13         I don't recall pausing.
14    Q.   Do you recall in your statement describing your
15 first ten shots and then describing your second ten shots?
16    A.   I don't off the top of my head.
17         I would have to review it.
18    Q.   Okay.  I'll show you some portions of it in a little
19 bit just so we can look at it together.
20         Where you located when you fired -- when you
21 started firing?
22    A.   I was to the right of my patrol vehicle.
23    Q.   And where was your patrol vehicle in relationship to
24 Mr. Puga's vehicle?
25    A.   It was behind his vehicle to the left.

Page 12

1     Q.   Did you have a partner that night?
2     A.   I did.
3     Q.   And who was your partner?
4     A.   Officer Rubalcava.
5     Q.   Okay.
6          MR. GALIPO:  Hang, could we show Exhibit 1 from the
7  last deposition, please.
8          (Exhibit 1 was marked for identification.)
9  BY MR. GALIPO:
10    Q.   Are you able to see that on your screen?
11    A.   I am.
12    Q.   The white vehicle, was that Mr. Puga's vehicle?
13    A.   Yes.
14    Q.   And would the white vehicle be facing northbound?
15    A.   Yes.
16    Q.   And the patrol vehicle that's facing northbound in
17 the southbound lane, that would be your vehicle?
18    A.   Yes.
19    Q.   And I take it that you're partner was driving the
20 vehicle that shift?
21    A.   I was driving.
22    Q.   You were driving.  And so when you fired, started
23 firing, are you saying you were on the passenger side, or the
24 driver's side of that vehicle?
25    A.   The passenger side.

Page 13

1     Q.   And where on the passenger side were you,
2  approximately?
3     A.   Maybe approximately like one to two feet from the
4  patrol vehicle from the passenger side at the door.
5     Q.   Were you in the "V" of the open door?
6     A.   I believe so, yes.
7     Q.   And where was Mr. Puga when you fired your first
8  shot?
9     A.   He was in front of his vehicle a little bit to the
10 left.
11    Q.   Was he stationary or moving when you fired your
12 first shot?
13    A.   He was -- he wasn't -- he was stationary.
14    Q.   And for how many of your shots was he stationary?
15    A.   I would -- I don't know.  I wouldn't be able to
16 estimate.  I'm not sure.
17    Q.   Do you know if it was more than one or two shots
18 that he was stationary?
19    A.   Again, it would -- it would be a guess on my part.
20         I'm not sure.
21    Q.   Do you recall pepper balls being deployed in the
22 vehicle at some point?
23    A.   Yes.
24    Q.   And do you recall seeing some injury to Mr. Puga
25 while he was still in the vehicle?

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 30

1  he was running away and you were shooting north?
2     A.  His back area.
3     Q.  Okay.  And how far do you think he ran from where he
4  started at the car to where he fell down?
5     A.  Approximately like 100 feet.
6     Q.  Okay.  And are you saying, I think you said you kept
7  shooting until he fell down; is that right?
8     A.  I continued to fire until I didn't see him move
9  anymore.  So when he fell down, I didn't see anymore
10  movement, so yes.
11     Q.  So you stopped firing when you saw him stop
12  moving?
13     A.  Correct.
14     Q.  So are you saying that you were firing during the
15  course of him running this 100 feet, approximately?
16     A.  Yes.
17     Q.  And how long do you think it took him to run this
18  100 feet, approximately?
19     A.  Again, an estimate, maybe six to ten seconds.
20     Q.  And were you firing during this six to ten
21  seconds?
22     A.  Yes.
23     Q.  Were you trying to assist during the time you were
24  firing?
25     A.  Yes.

Page 31

1     Q.  And what were you doing to try to assess?
2     A.  I was looking for a gun, if he had dropped it from
3  the front of his car to where he fell.
4     Q.  But I think you've already told us that you could
5  not see his hands when he was running because they were like
6  in front of him?
7     A.  Correct.  When he was running, correct.
8     Q.  Did his hands seem like they were more towards his
9  chest when he was running away?
10        Was that your impression?
11     A.  Yes.
12     Q.  And when he was running away, were you the only
13  person firing, or were there other officers firing, if you
14  know?
15     A.  I don't know.
16     Q.  So from your first shot to your last shot, you think
17  it was approximately six to ten seconds?
18     A.  Yes.  That would be my estimate, yes.
19     Q.  Did you ever discuss any tactical plan with the
20  other CHP officers you were with as to what you three were
21  going to do once he got out of the car?
22     A.  It was -- there was no plan discussed that I recall,
23  no.
24     Q.  Was there any discussion about possibly just having
25  the four residences at the corner see if you can get the

Page 32

1  people out of those residences at least?
2        MS. ESQUIVEL:  Objection.  Lacks foundation; calls
3  for speculation.
4        Go ahead.  You can answer.
5        THE WITNESS:  I don't remember having that
6  conversation with anybody.
7  BY MR. GALIPO:
8     Q.  Were you aware looking back at this Exhibit 5 on the
9  screen, were you aware that the three people that were shot
10  in addition to Mr. Puga were living in the residence on the
11  northeast corner?
12        Did you learn that after the incident?
13     A.  Yes.
14     Q.  Were ambulances dispatched, if you know, for them as
15  well?
16     A.  Yes.
17     Q.  Did you provide any medical care or had any contact
18  with those individuals?
19     A.  No.
20     Q.  To your knowledge, did any of the CHP officers
21  provide any medical care to anyone before the paramedics
22  arrived?
23     A.  Not that I could recall, no.
24     Q.  How about the deputy Sheriffs, did you have any
25  knowledge of any of them giving any medical care to anyone

Page 33

1  before the paramedics arrived?
2     A.  Not that I'm aware of.
3     Q.  I'm just going to show you a few portions of your
4  statement, and then we'll take our first break.
5        We're going to try to share the screen and show you
6  the bottom of Page 53 and the top of Page 54 of your
7  statement.
8        Are you able to see that on your screen?
9     A.  Yes.
10     Q.  You see the bottom question by Detective Bustamante
11  or Investigator Bustamante asking you about how many pepper
12  ball rounds you recall?
13        Do you see that general questions on Lines 24
14  through 26?
15        Do you want us to enlarge it a little bit for you?
16     A.  I could see it.  I apologize.
17     Q.  It's okay.  Take your time.
18        You might have to look above to give it context.
19     A.  Yes, I remember that.
20     Q.  Going to the top of Page 54, do you see your
21  estimate between 100 and 150?
22     A.  Yes.
23     Q.  Does that seem about right?
24     A.  Yes.
25     Q.  At any time prior to Mr. Puga going to the front of

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 34

1  his vehicle, did you ever see any gun in his hand or on his
2  person?
3    A.  No.
4    Q.  Did you at any time ever see the gun in his
5  waistband, actually in his waistband?
6    A.  No.
7      MR. GALIPO:  Can we go to Page 64, please.
8  BY MR. GALIPO:
9    Q.  Looking towards the top and particularly Lines 3, 4,
10  and 5, do you see the reference to hearing them talking about
11  the Taser?
12    A.  Yes.
13    Q.  Does that refresh your memory, you did something
14  about a Taser at some point?
15    A.  Yes.
16      MR. GALIPO:  Can we go to Page 66, please.
17  BY MR. GALIPO:
18    Q.  Looking at the top, you're referencing him bending
19  over, and that's when you thought he probably got hit?
20    A.  Yes.
21    Q.  And you were thinking maybe by your shots or maybe
22  by someone else's shots; is that fair?
23    A.  Yes.
24    Q.  And then you say, "And he starts to run kind of
25  north, and then you stop firing because it looks like he's

Page 35

1  going to fall."
2      Do you see that?
3    A.  Yes.
4    Q.  And he stumbles a little bit, but then he keeps
5  going.
6      Do you see that?
7    A.  Yes.
8    Q.  And you say, "And then I continued to fire."
9      Do you see that?
10    A.  Yes.
11    Q.  Does that refresh your recollection that you
12  continued to fire after you saw him stumble?
13    A.  Yes.
14      MS. ESQUIVEL:  Objection.  Misstates the
15  transcript.
16  BY MR. GALIPO:
17    Q.  And you were asked further down that page whether
18  you saw any muzzle flash, but you already told me you did not
19  see that; correct?
20    A.  That's correct.
21    Q.  Okay.
22      MR. GALIPO:  Thank you.  That's okay, Hang.
23  BY MR. GALIPO:
24    Q.  Going to Page 68, please, I want to ask you about
25  your response towards the middle, Lines 13 to 17.

Page 36

1    A.  You say, "So I'm tracking him and firing as he's
2  running, and then stopped when it looks like he's going to
3  fall to the ground."
4      Do you see that part on Line 13 and 14?
5    A.  Yes.
6    Q.  "And then he doesn't fall to the ground, and he
7  keeps running, so I get him back into my sights, and then
8  continued firing until he falls to the ground."
9      Do you see that?
10    A.  Yes.
11    Q.  So I think we covered this, but you would agree that
12  you saw him appear to stumble at some point, and you
13  continued firing after you saw that?
14      MS. ESQUIVEL:  Objection.  Misstates the transcript.
15      Go ahead.
16      THE WITNESS:  Yes.
17  BY MR. GALIPO:
18    Q.  And during that time you could not see his hands or
19  the gun; is that fair?
20    A.  Correct.
21    Q.  And if you can turn, we can look at Page 71, please,
22  towards the top or at the top, Bustamante's asking, he says,
23  "And now you track him and you're firing approximately 20
24  times, what – was that – those – was that cadence pretty
25  close together, you would say?"

Page 37

1      And then you say, "I fired about 10 pretty close
2  together, and that's when I thought it looked like he was
3  going to fall to the ground, and then he like caught himself
4  and then kept running, kept running, and that's when I fired
5  ten more."
6      Do you see that?
7    A.  I do.
8    Q.  And I take it this incident was probably fresher in
9  your mind when you gave your statement a few days later than
10  it is now in some respects; is that fair?
11    A.  Sure, yes.
12    Q.  And so it sounds like looking at Page 71 of what we
13  went through on Page 68, you came off your sights for some
14  period of time during this time it looked like he was
15  stumbling?
16    A.  Yes.
17    Q.  And then when he didn't go to the ground at that
18  point, you got back up on your sights, and at least according
19  to this, fired ten more rounds?
20    A.  Yes.
21    Q.  So getting back to what I stated at the beginning
22  that there were two volleys of shots, would you at least
23  agree there was somewhat of a pause between your first group
24  of shots and your last group of shots at about the time it
25  looked like he was stumbling?

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 38

1    MS. ESQUIVEL: Objection. Lacks foundation;
2  misstates prior testimony.
3        Go ahead. You can answer.
4        THE WITNESS: After reviewing the statement I gave,
5  yes.
6  BY MR. GALIPO:
7    Q.  Okay. And when you saw him stumbling, was he kind
8  of like in the middle of the street at that point?
9    A.  I don't remember at what position he was in the road
10  at that point.
11    Q.  Let's look at Page 72 real quick, and then we'll
12  take a break.
13        On Lines 9 through 14, I think you're talking about
14  he was running, he was still kind of like in the middle of
15  the intersection, he doesn't really fall, but it looks like
16  he's going to fall, but and then he kind of like pops back
17  up, and then he keeps running, and then that's when he falls,
18  falls in the dirt shoulder face-down.
19        I'm paraphrasing a little bit, but do you see
20  that?
21    A.  I see that, yes.
22    Q.  Is that consistent with your recollection now that
23  we've refreshed it a little bit?
24    A.  Yes.
25    Q.  So when he initially stumbled, he was more in the

Page 39

1  street, and then when he finally fell, it was more on the
2  dirt shoulder?
3    A.  Yes.
4    Q.  Okay.
5        MR. GALIPO: Thank you, Hang.
6        All right. If it's okay with everyone, I think
7  we're making a lot of progress. I don't expect to be as
8  long as I was with the first depo, but we can take a
9  ten-minute break.
10        MS. ESQUIVEL: Okay. Thank you.
11        (Recess taken.)
12  BY MR. GALIPO:
13    Q.  When you fired your initial shots, what would you
14  estimate the distance to be between yourself and Mr. Puga?
15    A.  Approximately 20 to 30 feet.
16    Q.  And you were using your sights when you fired?
17    A.  Yes.
18    Q.  Aiming at his – essentially, would it be the chest,
19  maybe the left side, did you say?
20    A.  Yes.
21    Q.  And was it your impression that some of your initial
22  shots may have struck him?
23    A.  Yes.
24    Q.  And when he continued to run and you continued to
25  fire and he started stumbling, at that point did you think

Page 40

1  some additional shots you fired may have struck him when you
2  saw him look like he was stumbling?
3    A.  Yes.
4    Q.  And is that why you stopped for a moment thinking
5  maybe he's going to fall to the ground?
6    A.  Correct.
7    Q.  But then he kept going?
8    A.  Yes.
9    Q.  And that's when you got back on your sights and
10  fired your additional shots?
11    A.  Yes.
12    Q.  And then he eventually went to the ground again; is
13  that correct?
14    A.  Yes.
15    Q.  And I think you said you stopped firing when he
16  stopped moving?
17    A.  Correct.
18    Q.  Do you know if you fired any shots as he was going
19  to the ground?
20    A.  I can't be sure.
21    Q.  Did you know if you fired any shots after he went to
22  the ground?
23    A.  No.
24    Q.  Did you hear any shots being fired after he went to
25  the ground?

Page 41

1    A.  Yes.
2    Q.  You're just not sure when you fired any of those
3  shots or not?
4        MS. ESQUIVEL: Misstates prior testimony.
5        THE WITNESS: I did not fire after he fell to the
6  ground.
7  BY MR. GALIPO:
8    Q.  Okay. So you heard shots, but they didn't come from
9  you?
10    A.  Correct.
11    Q.  And based on your training, is the weapon you were
12  using and the ammunition more powerful than the 40-caliber
13  handgun?
14    A.  Yes.
15    Q.  The attorney and representative that you had for
16  your statement, did you at least have a chance to consult
17  with them before you gave your statement?
18        MS. ESQUIVEL: Objection. Invades the
19  attorney-client privilege.
20        Do not answer that.
21        MR. GALIPO: Okay. Just so that I'm clear, I'm not
22  asking about what was spoken about, just whether or not they
23  had a chance to consult.
24        MS. ESQUIVEL: Go ahead and answer just yes or no on
25  that.

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 50

1          EXAMINATION
2 BY MS. GUSTAFSON:
3      Q.  When Mr. Puga was in the vehicle, did you actually
4 see him get hit in the head with the pepper ball?
5      A.  No.
6      Q.  And pepper spray is meant to be an irritant to the
7 eyes; correct?
8      A.  Yes.
9      Q.  Do you know one way or the other whether Mr. Puga
10 was saying, "My eye, my eye," whether it was because he was
11 struck with something in the eye, or because his eyes were
12 irritated from the pepper spray in the vehicle?
13     A.  I remember seeing blood on his forehead.
14         So I'm assuming he got struck by something.
15     Q.  Did you know when he was saying, "My eye, my eye,"
16 whether it was because he was struck and he was hurting from
17 that, or because something was irritating his eyes?
18     A.  When he initially made that statement, I don't know
19 either way.
20     Q.  Thank you.
21         MR. GALIPO:  Diana, do you have any questions of
22 your client today?
23         MS. ESQUIVEL:  Yes, I have a few questions.
24         EXAMINATION
25 BY MS. ESQUIVEL:

Page 51

1      Q.  Officer, I'm going to call you officer because at
2 that time you were an officer.
3          How was it that you came to be involved in the
4 pursuit of Mr. Puga?
5      A.  I -- so we, me and Officer Rubalcava recognized that
6 vehicle from a description that was given to us at the
7 beginning of our shift where that vehicle was involved in a
8 car-to-car freeway shooting.
9          So that's -- we made a traffic stop on that
10 vehicle.
11     Q.  And what were you told about that earlier
12 incident?
13     A.  We were told that there was a car-to-car shooting
14 involving a white Ford Expedition with black rims that had a
15 yellow sticker in the back windshield that said Funeral, and
16 that that shooting resulted from a road rage incident; that
17 the victim of that shooting followed the Expedition for a
18 little bit, and then lost sight of it, and the officers
19 during the day attempted to locate that vehicle, and they
20 didn't locate the vehicle.
21     Q.  Were you told anything about the suspected driver?
22     A.  Not that I remember, no.
23     Q.  You testified earlier when Mr. Galipo showed you
24 exhibit, and I believe it's either 6 or 5, a photograph and
25 the Bates stamp 544, that was shown to you during your

Page 52

1 interview as well.
2          And you mentioned that there were homes on each of
3 the for corners of the intersection where the incident
4 occurred.
5          At the time of the incident were you aware that
6 there were homes on each of the four corners?
7      A.  So initially, I was only aware of the houses on the
8 west side of the road just because I mean the west side of
9 the road was lit up, and then where we had stopped and where
10 I was out of the vehicle, I couldn't really see -- I really
11 couldn't see to like the -- sorry, I'm trying to think of the
12 directions -- the east side of me because of the Expedition
13 was kind of blocking my view.
14         So initially, what I remember was a dirt lot on the
15 northwest corner where we were at, and there was a house on
16 the north -- sorry -- southwest corner of where we were at.
17         Those are the only two houses initially that I was
18 aware of.
19     Q.  At what point did you become aware that there were
20 homes on the east side of the street on both north and south
21 side?
22     A.  The first time that I remember being aware of houses
23 on that side of the street was when I heard somebody saying,
24 "You shot him, you shot him."
25         That's when I realized that there was houses over

Page 53

1 there.
2      Q.  Based on where you were positioned and where you
3 shot from, did you have any reason to shoot in the direction
4 of the northeast corner?
5      A.  No.
6      Q.  And you testified earlier that -- well, we'll call
7 it two volleys, that there were two volleys of the first --
8 there were ten shots during the first volley second after you
9 saw Mr. Puga stumble, but not -- I think you he was going to
10 fall, and then you resumed firing.
11         At any time during the first volley when you started
12 shooting, did you ever see a gun in Mr. Puga's hands?
13     A.  Can you -- sorry.  Can you repeat the question?
14     Q.  Sure.  Before you started firing the first volley,
15 did you ever see a gun in Mr. Puga's hand?
16     A.  I did.
17     Q.  Did you -- and I know you testified earlier that you
18 didn't see a flash, but did you hear a gunshot that you
19 believe came from the gun that you saw in Mr. Puga's hands?
20         MR. GALIPO:  Objection.  Leading.  Also -- well,
21 leading well.
22         THE WITNESS:  I remember hearing a shot coming from
23 the -- I remember one shot, at least one shot coming from the
24 left side of me.  Prior to that I do remember hearing a shot.
25         I couldn't tell you where it came from.

JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.
Michael Blackwood on 11/04/2024

Page 54

1 BY MS. ESQUIVEL:
2    Q. And when you said you saw Mr. Puga starting running
3 away and you saw him stumble, that you paused and reassessed,
4 then he didn't fall, so you continued to fire; is that
5 correct?
6    A. Yes.
7    Q. Why did you continue to fire if he was running away
8 from you?
9    A. Because I knew he initially had a firearm, and I
10 didn't see him drop the firearm. At that time part of my
11 reassessment was tracking from where he was at to where --
12 where he initially started to where he was at that point, and
13 I didn't see a firearm on the ground up until that point.
14       So that's why I continued to fire.
15    Q. And why did you consider the fact that he still had
16 the gun as an immediate threat to yourself or someone else?
17       MR. GALIPO: Objection. Leading.
18       THE WITNESS: Because of -- he still had the gun in
19 his hand. He was still able to fire at me or my partners,
20 and then the fact that he was heading towards where he was
21 running, headed towards residential area, him being able to
22 enter residence with the handgun could have made a worse
23 situation.
24 BY MS. ESQUIVEL:
25    Q. And what was the concern on your part that he would

Page 55

1 enter a residence?
2    A. So the whole interaction appeared to be -- I guess
3 desperate would be the right word. He demanded to call his
4 sister, his mom. He was drinking. He was throwing stuff out
5 the window, seemed very erratic. So him entering a residence
6 to barricade himself or even potentially take a hostage was
7 something that was in my mind definitely.
8    Q. You testified earlier that you did not see any of
9 your officers on the scene render aid to Mr. Puga.
10       Why did you not provide immediate CPR to Mr. Puga
11 once he was secured on the ground?
12    A. So we had medical on standby. I believe they were
13 staged just north of where we were at by that next
14 intersection or so. And I saw their headlights -- I'm
15 sorry -- their emergency lights on driving towards us.
16       So I knew medical aid was there. I knew it was
17 coming, and then also, part of like our training is before we
18 do any aid to anybody, make sure we have all of our
19 equipment -- to get medical equipment and all of my medical
20 equipment was in our patrol car including like the sterile
21 gloves.
22       So since I saw the ambulance come in already, by the
23 time I went to the patrol car, they would have already been
24 there. So it didn't make sense to do that.
25    Q. Did you at any time while you were there, did you --

Page 56

1 well, strike that.
2       You testified earlier you believe that it took Mr.
3 Puga about five to six seconds to run about a 100 feet from
4 where he looked like he doubled over where you hit him to the
5 point where he fell down to the ground; is that correct?
6       MR. GALIPO: I'm going to object as
7 mischaracterizing his testimony.
8       I thought he said six to ten seconds.
9       MS. ESQUIVEL: Okay. What did I say?
10       MR. GALIPO: Five to six, I think.
11       MS. ESQUIVEL: I'm sorry.
12 BY MS. ESQUIVEL:
13    Q. Why don't you clarify for us, Officer Blackwood.
14       How many seconds can you estimate, or did you
15 previously say it took Mr. Puga to get from the point where
16 he doubled over from what you thought was because you shot
17 him to the point where he then fell to the ground?
18    A. So thinking about the situation when -- from when I
19 started firing until he went to the ground, that whole
20 situation probably -- I mean it was really quick.
21       I don't -- I -- that was probably like four seconds,
22 maybe. I mean it was really fast. So my time that I gave
23 initially of the up to ten seconds was probably not the right
24 time estimate.
25       It could have been a lot less than that.

Page 57

1    Q. Would you rely on the videos that were taken to
2 determine, obviously, how long it took him to get from point
3 A to point B?
4    A. Yes.
5    Q. And your interview, I don't know if you paid
6 attention, at the top, it had a March 10th, I belive.
7       Let me just see if I can pull it up real fast,
8 unless, Hang, could just pop one page the screen for us.
9       MS. LE: Is this Exhibit 5?
10       MS. ESQUIVEL: No. It was on his -- Exhibit 5
11 Blackwood's transcript of his interview?
12       MR. GALIPO: No. Exhibit 5 was the photograph that
13 was shown to him during his interview.
14       MS. ESQUIVEL: Right. I just want to know that if
15 I'm correct that it said March 10th on the transcript that
16 you've been showing Officer Blackwood.
17       MR. GALIPO: Do you want us to put up a page?
18       MS. ESQUIVEL: Please, if you don't mind.
19       Any page is fine.
20       MR. GALIPO: I don't mind.
21       I didn't quite understand. You want to confirm
22 what, Diana?
23       MS. ESQUIVEL: The date.
24       MR. GALIPO: The date his interview was taken?
25       MS. ESQUIVEL: Yes.

**JONATHAN WAYNE BOTTEN SR, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Michael Blackwood on 11/04/2024**

Page 62

1    DECLARATION UNDER PENALTY OF PERJURY

2

3    Case Name:  Jonathan Wayne Botten, et al. vs. State of

4    California, et al.

5    Date of Deposition:  November 4, 2024

6    Job No.:  112646

7

8          I, _____, hereby certify

9    under penalty of perjury under the laws of the State of

10   California that the foregoing is true and correct.

11         Executed this _____ day of _____,

12   20____, at _____, California.

13

14

15

16

17

18          _____

            MICHAEL BLACKWOOD

19

20

21

22

23

24

25

Page 63

1               CERTIFICATE

2                   OF

3       CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5       I, JINNA GRACE KIM, CSR No. 14151, a Certified

6    Stenographic Shorthand Reporter of the State of California,

7    do hereby certify:

8          That the foregoing proceedings were taken before me

9    at the time and place herein set forth;

10         That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12         That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15         Further, that the foregoing is an accurate

16   transcription thereof.

17       I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21       IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  November 4, 2024.

23

24       _____

            Jinna Grace Kim, CSR No. 14151

25

Page 64

1    DEPOSITION ERRATA SHEET

2    Case Name:  Jonathan Wayne Botten, et al. vs. State of

3    California, et al.

4    Witness:  Michael Blackwood

5    Date of Deposition:  November 4, 2024

6    Job No.:  112646

7    Reason Codes:  1. To clarify the record.

8                   2. To conform to the facts.

9                   3. To correct transcription errors.

10

11   Page _____ Line _____ Reason _____

12   From _____ To _____

13   Page _____ Line _____ Reason _____

14   From _____ To _____

15   Page _____ Line _____ Reason _____

16   From _____ To _____

17   Page _____ Line _____ Reason _____

18   From _____ To _____

19   Page _____ Line _____ Reason _____

20   From _____ To _____

21   Page _____ Line _____ Reason _____

22   From _____ To _____

23   Page _____ Line _____ Reason _____

24   From _____ To _____

25   Page _____ Line _____ Reason _____

Page 65

1    DEPOSITION ERRATA SHEET

2    From _____ To _____

3    Page _____ Line _____ Reason _____

4    From _____ To _____

5    Page _____ Line _____ Reason _____

6    From _____ To _____

7    Page _____ Line _____ Reason _____

8    From _____ To _____

9    Page _____ Line _____ Reason _____

10   From _____ To _____

11   Page _____ Line _____ Reason _____

12   From _____ To _____

13   Page _____ Line _____ Reason _____

14   From _____ To _____

15   Page _____ Line _____ Reason _____

16   From _____ To _____

17

18   _____ Subject to the above changes, I certify that the

19   transcript is true and correct.

20   _____ No changes have been made.  I certify that the

21   transcript is true and correct.

22

23       _____

            MICHAEL BLACKWOOD

25

# Exhibit Q

1              UNITED STATES DISTRICT COURT

2              CENTRAL DISTRICT OF CALIFORNIA

3

4  JONATHAN WAYNE BOTTEN, SR.; TANJA    )
   DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
5  J.B., a minor by and through his     )
   guardian JONATHAN WAYNE BOTTEN, SR., )
6                                   )
            Plaintiffs,             )
7                                   )
            vs.              ) Case No.
8                        ) 5:23-CV-00257-JGB-SHK
   STATE OF CALIFORNIA; COUNTY OF SAN   )
9  BERNARDINO; ISAIAH KEE; MICHAEL      )
   BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10 VACCARI; JAKE ADAMS; and DOES 1-10,  )
   inclusive,                     )
11                             )
            Defendants.        )
12 _____)

13

14

15

16         REMOTE VIDEOCONFERENCE DEPOSITION OF

17              BERNARDO RUBALCAVA

18            MONDAY, NOVEMBER 4, 2024

19

20

21

22

23  Reported Stenographically By:

24  Jinna Grace Kim, CSR No. 14151

25  Job No.:  112646

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 2

1            UNITED STATES DISTRICT COURT
2            CENTRAL DISTRICT OF CALIFORNIA
3
4   JONATHAN WAYNE BOTTEN, SR.; TANJA    )
    DUDEK-BOTTEN; ANNABELLE BOTTEN; and  )
5   J.B., a minor by and through his     )
    guardian JONATHAN WAYNE BOTTEN, SR., )
6                                        )
            Plaintiffs,                  )
7                                        )
        vs.              ) Case No.
8                        ) 5:23-CV-00257-JGB-SHK
    STATE OF CALIFORNIA; COUNTY OF SAN   )
9   BERNARDINO; ISAIAH KEE; MICHAEL      )
    BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10  VACCARI; JAKE ADAMS; and DOES 1-10,  )
    inclusive,                           )
11                                       )
            Defendants.                  )
12  _____)
13
14
15
16        The remote videoconference deposition of BERNARDO
17  RUBALCAVA, taken on behalf of the Plaintiffs, beginning at
18  10:06 a.m., and ending at 1:19 p.m., on Monday, November 4,
19  2024, before Jinna Grace Kim, Certified Stenographic
20  Shorthand Reporter No. 14151.
21
22
23
24
25

Page 3

1   APPEARANCES OF COUNSEL:
2
    For the Plaintiffs:
3
        LAW OFFICES OF DALE K. GALIPO
4       BY:  DALE K. GALIPO, ESQ.
        BY:  HANG D. LE, ESQ.
5       21800 Burbank Boulevard, Suite 310
        Woodland Hills, California 91367
6       Tel:  818-347-3333
        Fax:  818-347-4118
7       E-mail:  dalekgalipo@yahoo.com
        E-mail:  hle@galipolaw.com
8
9   For the Defendants:
10      DEPUTY ATTORNEY GENERAL
        BY:  DIANA ESQUIVEL, ESQ.
11      1300 I Street, Suite 125
        P.O. Box 944255
12      Sacramento, California 94244
        E-mail:  diana.esquivel@doj.ca.gov
13
14      LYNBERG & WATKINS
        BY:  SHANNON L. GUSTAFSON, ESQ.
15      1100 W. Town & Country Road, Suite 1450
        Orange, California 92868
16      E-mail:  sgustafson@lynberg.com
17
18
19
20
21
22
23
24
25

Page 4

1                    INDEX
2   WITNESS:                     PAGE
3   BERNARDO RUBALCAVA
4     BY: MR. GALIPO               5
5     BY: MS. ESQUIVEL             76
6     BY: MR. GALIPO               91
7     BY: MS. ESQUIVEL             98
8     BY: MR. GALIPO              102
9
10                  EXHIBITS
11  MARKED FOR IDENTIFICATION              PAGE
12  Exhibit 1        Photograph 1561       25
13  Exhibit 2        Photograph 1570       26
14  Exhibit 3        MVARS:  COSB 001465   71
15  Exhibit 4        Civilian Cell Phone Footage 74
16
17
18
19
20
21
22
23
24
25

Page 5

1                    CALIFORNIA
2              MONDAY, NOVEMBER 4, 2024
3                    10:06 A.M.
4              BERNARDO RUBALCAVA,
5   called as a witness on behalf of the Plaintiffs, having been
6   first duly sworn remotely via videoconference, was examined
7   and testified as follows:
8                    EXAMINATION
9   BY MR. GALIPO:
10      Q.  Can you please state your name and spell it for the
11  record.
12      A.  Bernardo Rubalcava, R-u-b-a-l-c-a-v-a.
13      Q.  Have you ever had your deposition taken before?
14      A.  For -- as far as?
15      Q.  Like in another case, for example?
16      A.  Yes.
17      Q.  How many other times have you had your deposition
18  taken?
19      A.  Once.
20      Q.  Have you testified in court before?
21      A.  Yes.
22      Q.  How many times have you done that, approximately?
23      A.  Approximately five times.
24      Q.  Are you able to hear me okay so far?
25      A.  Yes.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 6

1    Q.  If you have any trouble hearing me at any time, will
2  you please met know?
3    A.  Yes.
4    Q.  As I state --
5        MS. ESQUIVEL: I'm sorry.  I don't mean to
6  interrupt.
7        Can we get appearances?  There is a lot of -- I'm
8  seeing a lot of dial-ins, and I am not sure who everybody is.
9        MR. GALIPO: Okay.  Sure.  Hang, do you know?
10       Some of their names are on the dial-ins it looks
11  like.  I think one it looks like Antonia Salas.
12       Do you see that name?
13       MS. ESQUIVEL: Yes.  Can we just please have
14  everybody show their faces, state their name the record so
15  that the record will reflect that they were present at this
16  deposition?
17       MR. GALIPO: Okay.  You don't have to show your
18  faces if don't want, but if you can that would be nice.
19       So let's just go around and for those who are
20  listening in, just state your name so we have those for the
21  record.
22       If you're able to unmute yourself and state your
23  name, that would be great starting with Antonia.
24       SPEAKER 1: Antonia Salas.
25       MR. GALIPO: Thank you.

Page 7

1        MR. GALIPO: Jasmine?  No Jasmine yet?
2        How about John or Monina?
3        SPEAKER 2: Jonathan Botten.
4        MR. GALIPO: Thank you.  And Monina?
5        Monina or Jasmine, can you state your name?
6        Maybe they stepped away.
7        We'll follow up with that in a little bit for you.
8        MS. ESQUIVEL: My only problem with that I don't
9  know who these individuals are, if their parties which are
10  the only individuals, in fact, who have a right to be present
11  at a deposition.  So if they're not going to identify
12  themselves, then I would ask them that they be forcibly
13  logged off.
14       MR. GALIPO: Well, I'm not going to do that yet.
15       Maybe Hang knows whether they're parties.  You know,
16  I always thought, Diana, it was parties only, but there was a
17  case that came out to my surprise that said it's not only
18  parties that could attend a deposition.
19       I was opposed to that case, but it was very shocking
20  to me because my whole career, it was only parties, but this
21  case said something different.
22       Hang, do you know who these people are?
23       COURT REPORTER: I'm not sure if this would help,
24  but it looks like that iPhone is used to log in for the other
25  party who stated their name.

Page 8

1        MR. GALIPO: Yeah.  That does help.
2        Hang, can you help us with this, please.
3        SPEAKER 3: Hi.  Sorry.  I was having trouble.
4        I'm Jasmine.  I'm Hector's son's mother.
5        MR. GALIPO: Okay.  Thank you.
6        MS. ESQUIVEL: Okay.  Thank you.
7        SPEAKER 3: Sorry.
8        MR. GALIPO: And I think the only one listening is
9  Monina?
10       MS. ESQUIVEL: Jasmine, can you state your last
11  name?
12       SPEAKER 3: I'm Jasmine Hernandez.
13       MR. GALIPO: Okay.  Hang, do you know who Monina is?
14       MS. LE: I'm trying to figure that out.
15       MR. GALIPO: Is it okay if we proceed, Diana, while
16  we try to figure that out?
17       MS. ESQUIVEL: I prefer that Monina identify
18  herself.
19       MR. GALIPO: Can you identify yourself, Monina,
20  please.  Otherwise, you're going to have to log off.
21       MS. GUSTAFSON: I guess while we're waiting I'll
22  identify myself on the record.  Shannon Gustafson, I'm the
23  attorney for the County of San Bernardino Defendants.
24       MR. GALIPO: Thank you.
25       MS. ESQUIVEL: And we have Defendants Kee and

Page 9

1  Blackwood appearing from Ontario.
2        My concern, Dale, is that we might get into matters
3  that might fall confidential under the protective order, so
4  I'm not comfortable with having anybody listen in when there
5  is that possibility.  So either Monina identifies herself or
6  whoever is using that phone, or she or that individual logs
7  off, is forcibly logged off of this session.
8        MR. GALIPO: Okay.  I think Hang is trying to figure
9  it out now.  So we'll just give her a minute or two.
10       I've just been told she just called my office.
11       It's Maria Cadena, but her microphone doesn't work.
12       Is she a named party, Hang?
13       MS. LE: Yeah.  She's one of the mothers.
14       MR. GALIPO: Okay.  Is that good for you, Diana?
15       MS. ESQUIVEL: Yes.  That's fine.
16       We can move on.
17       MR. GALIPO: Okay.  Thank you very much.
18       Everyone else should mute themselves, please,
19  including Jasmine.
20       SPEAKER 3: How do I do that.  Oh, sorry.
21       MR. GALIPO: There you go.  You just did it.
22       You're good.  Okay.
23       Let's continue.
24  BY MR. GALIPO:
25    Q.  Who do you currently work for?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 10

1    A.  California Highway Patrol.
2    Q.  How long have you worked for them?
3    A.  Five years and four months.
4    Q.  Do you recall the date of the incident we're here to
5  talk about?
6    A.  Yes.
7    Q.  What was the date?
8    A.  It was February.  I'm not sure of the exact date.
9       February of 2021.
10   Q.  How long had you been with the CHP at that time?
11   A.  A year and six – a year and seven or eight
12  months.
13   Q.  When did you go to the academy?
14   A.  July 8th – I believe July 6th or 8th of 2019.
15   Q.  When did you complete the academy?
16   A.  January 26 of 2020.
17   Q.  Did you have a period of field training?
18   A.  Yes.
19   Q.  How long was that?
20   A.  Four months.
21   Q.  When did you complete that?
22      Somewhere like late May or early June?
23   A.  Late May.
24   Q.  So how long were you off of field training
25  approximately when this incident occurred?

Page 11

1    A.  Nine or ten months.
2    Q.  In at academy did you have instruction on the use of
3  force?
4    A.  Yes.
5    Q.  And that included deadly force?
6    A.  Yes.
7    Q.  And during your field training did you also have
8  instruction on that?
9    A.  Yes.
10   Q.  Before we get into the incident, I just want to
11  learn a little bit about your background starting with
12  education.
13      I'm assuming you graduated from high school?
14   A.  Yes.
15   Q.  What year do you do that in?
16   A.  2003.
17   Q.  Any military experience?
18   A.  No.
19   Q.  What type of work did you generally do before you
20  went to the academy?
21   A.  I worked for Direct TV as an installer.
22   Q.  Up to what year did you do that?
23   A.  Just before the academy, 2019.
24   Q.  Did you go to any college after high school?
25   A.  No.

Page 12

1    Q.  How old are you currently?
2    A.  39.
3    Q.  How tall are you?
4    A.  Five-eight.
5    Q.  How much do you currently weigh, approximately?
6    A.  190.
7    Q.  Was that about your approximate weight at the time
8  of the this incident?
9    A.  No.
10   Q.  You weighed less or more?
11   A.  About 185, about the same.
12   Q.  Maybe a little more?
13   A.  Just slightly less.
14   Q.  Okay.  Slightly less.
15      Now, did you fire any shots in the incident?
16   A.  Yes.
17   Q.  How many shots did you fire?
18   A.  From my recollection 10 to – about 10 to 15.
19   Q.  What type of weapon did you fire the shots from?
20   A.  My Smith&Wesson M&P 40.
21   Q.  Is that a semiautomatic weapon?
22   A.  Yes.
23   Q.  You have to press the trigger for each shot?
24   A.  Yes.
25   Q.  So your recollection is you would have pressed the t

Page 13

1  trigger between 10 and 15 times?
2    A.  Yes.
3    Q.  How many rounds does the magazine hold on that
4  weapon?
5    A.  16.
6    Q.  Do you normally load it with one in the chamber?
7    A.  Yes.
8    Q.  So normally you would have 17 rounds altogether?
9    A.  15, plus one in the chamber.
10   Q.  So 16 altogether?
11   A.  Yes.
12   Q.  And do you know how many rounds were left in your
13  weapon after the shooting?
14   A.  No.
15   Q.  Was a round count done on your weapon, if you
16  know?
17   A.  Yes.
18   Q.  Do you know what the results of that round count
19  were?
20   A.  No.
21   Q.  Do you think that it's possible that you fired all
22  16 shots?
23      MS. ESQUIVEL:  Objection.  Calls for speculation.
24      You can answer.
25      THE WITNESS:  I reloaded after the first volley of

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 14

1 rounds.
2 BY MR. GALIPO:
3    Q.  How many rounds did you fire in the first volley,
4 approximately?
5    A.  Approximately five.
6    Q.  And how many rounds did you fire in the second
7 volley, approximately?
8    A.  Five to eight -- or five to ten.
9    Q.  So you believe you fired more rounds in the second
10 volley than the first volley?
11    A.  Yes.
12    Q.  How much time passed between your first volley and
13 your second volley, approximately?
14    A.  Few seconds.
15    Q.  When you say a few seconds, do you have any range in
16 mind?  Like, two to three seconds, three to five seconds,
17 anything you're comfortable with?
18    A.  Five to ten seconds.
19    Q.  During your first volley of shots, were you aiming
20 center mass at the person you were firing at?
21    A.  Yes.
22    Q.  How far would you estimate the individual was from
23 you in your first volley of shots?
24    A.  Ten or fifteen feet.
25    Q.  Do you know the name of the person you were firing

Page 15

1 at now?
2    A.  Now, yes.
3    Q.  What is his name?
4    A.  Right now, or at the time?
5    Q.  No.  Do you know now what his name is?
6    A.  Hector Puga.
7    Q.  And where was Mr. Puga positioned when you fired the
8 first volley of shots?
9       Was he near the front of a vehicle?
10    A.  He was in the front of his vehicle.
11    Q.  And where were you positioned in relation to that
12 vehicle when you fired your first volley of shots?
13    A.  To the left of that vehicle.
14    Q.  When you say the left, are you speaking of the
15 driver's side, or some other side?
16    A.  The driver's side.
17    Q.  And where approximately on the driver's side were
18 you when you fired your first volley of shots?
19    A.  I was aligned with the front of the bumper.
20    Q.  Near the front corner bumper area?
21    A.  Correct.
22    Q.  And what part of Mr. Puga's body were you aiming at
23 when you fired your first volley of shots?
24    A.  His upper torso area on the stomach up.
25    Q.  Like stomach-chest area?

Page 16

1    A.  Stomach and chest area.
2    Q.  And I think you already told me this, but you
3 approximate your distance between you and him to be what?
4    A.  About five -- about ten feet.
5    Q.  Before you fired your first shot, did you hear any
6 other shots being fired?
7    A.  Yes.
8    Q.  How many shots did you hear before you fired your
9 first shot?
10    A.  Two.
11    Q.  Did you give any verbal warning you were going to
12 shoot before you fired?
13    A.  No.
14    Q.  Did you hear anyone else give a verbal warning that
15 they were going to shoot before you heard the shots?
16    A.  No.
17    Q.  Was Mr. Puga essentially in the same position for
18 your first volley of shots?
19    A.  What do you mean?
20    Q.  In other words, you told me he was about ten feet
21 away from you towards the front of the vehicle when you fired
22 your first volley of shots; is that correct?
23    A.  Correct.
24    Q.  I'm wondering whether he changed positions, like
25 turned away from you, started running, anything like that

Page 17

1 during the first volley?
2       Or was he generally in the same position?
3    A.  He turned away and started running.
4    Q.  And how soon after you started firing did he turn
5 away and started running?
6    A.  Immediately.
7    Q.  So do you believe some of your shots were being
8 fired as he turned away from you and started running?
9    A.  I don't -- I don't know.
10    Q.  Okay.  Because you said he immediately turned away
11 from you and started running; correct?
12    A.  Correct.
13    Q.  So you're saying you're not sure if some of your
14 first volley of shots were fired after he turned?
15    A.  No.  It's -- as soon as he turned around and fired
16 at us, that's when I returned -- I returned fire.
17    Q.  Let me just make sure I'm understanding.
18       Did he turn away from you before you before you
19 fired your first shot?
20    A.  He turned towards us before I shot my first round of
21 shots.
22    Q.  And then you're saying you were shooting at his
23 chest-abdomen area; is that correct?
24    A.  Yes.
25    Q.  Did you have your weapon in one hand or two?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 18

1    A.  Two.

2    Q.  Were you using your sights?

3    A.  Yes.

4    Q.  And then you said he immediately turned away from

5  you after you started firing?

6    A.  Yes.

7    Q.  And started running away?

8    A.  Yes.

9    Q.  What I'm wondering is, during your first approximate

10  five shots, was he turning back away from you?

11    A.  No.

12    Q.  So you think he was facing you generally during your

13  first five shots?

14    A.  Yes.

15    Q.  Okay.  Then he turned away from you and started

16  running away?

17    A.  Yes.

18    Q.  And when you fired your other approximate five or

19  eight shots, was he running away from you?

20    A.  Yes.

21    Q.  And then what part of was his center mass to you at

22  that point?

23    A.  His back.

24    Q.  So were you aiming essentially at his back for your

25  second volley of shots?

Page 19

1    A.  Yes.

2    Q.  Which should be approximately five or eight shots?

3    A.  Yes.

4    Q.  And was he running away from you during your

5  approximate five to eight shots?

6    A.  Yes.

7    Q.  Did you ever see him going to the ground?

8    A.  Yes.

9    Q.  Were any shots fired by any officer that you heard

10  after he went to the ground?

11      MS. ESQUIVEL:  Objection.  Calls for speculation.

12      THE WITNESS:  I don't recall.

13  BY MR. GALIPO:

14    Q.  Did you think based on your training it was

15  appropriate to shoot him after he went to the ground?

16      MS. ESQUIVEL:  Objection.  Lacks foundation;

17  improper hypothetical.

18      THE WITNESS:  Yes.

19  BY MR. GALIPO:

20    Q.  Did you fire any shots after he went to the

21  ground?

22    A.  I don't recall.

23    Q.  Are you saying you might have; you're not sure?

24    A.  Yes.

25    Q.  Did you hear any shots being fired after your last

Page 20

1  shot?

2    A.  I don't recall.

3    Q.  In between your first shot and your last shot, did

4  you give any commands to Mr. Puga?

5    A.  No.

6    Q.  What was in your background when you were firing

7  your first group of shots at him?

8    A.  It was dark.

9    Q.  You were aware there was a residential

10  neighborhood?

11    A.  I was not aware there were houses in the

12  background.

13    Q.  Were you aware that there was a residential

14  neighborhood, though, that there were some homes somewhere in

15  the area?

16    A.  Yes.

17    Q.  You're just saying you were not aware specifically

18  there were houses in the background?

19    A.  Correct.

20    Q.  Were you trained that you have to – you should

21  consider your background or backdrop when you fire?

22    A.  Yes.

23    Q.  And were you trained that the reason that's

24  important is because if your bullets miss, innocent people

25  could get shot?

Page 21

1    A.  Yes.

2    Q.  And do you know what your background was when you

3  fired your second group of shots?

4    A.  Yes.

5    Q.  What was it?

6    A.  Just a roadway.

7    Q.  Do you know now that your background when you fired

8  your first group of shots were some homes?

9    A.  Yes.

10    Q.  The vehicle that Mr. Puga was in, was it a white

11  vehicle?

12    A.  Yes.

13    Q.  Do you recall which way it was facing directionally

14  when it was in a stopped position?

15    A.  Facing north.

16    Q.  And then when you were firing, were you kind of

17  firing in a northeast direction for your first volley of

18  shots?

19    A.  Yes.

20    Q.  Do you know if any other officers were near you on

21  the driver's side of the vehicle when you fired your first

22  volley of shots?

23    A.  Yes.

24    Q.  What other officers were on the driver's side?

25    A.  Sergeant Kee.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 22

1    Q.  Do you know how to spell the last name for the court
2    reporter?
3    A.  It's K-e-e.
4    Q.  Thank you.  And where was Sergeant Kee positioned
5    approximately, if you know?
6    A.  To the left of my – to the left of me approximately
7    two – two feet to the left.
8    Q.  So also towards the front of the vehicle, but two
9    feet to your left?
10   A.  Yes.
11   Q.  And would to your left be to the west?
12   A.  Yes.
13   Q.  Do you know if Sergeant Kee fired any shots?
14   A.  Yes.
15   Q.  What is your understanding?  That he did?
16   A.  He did.
17   Q.  Were you aware he was firing during the time frame
18   you were firing your first volley?
19   A.  Yes.
20   Q.  In your second volley of shots, that would have been
21   after you took out one magazine and reloaded with another?
22   A.  Yes.
23   Q.  And I assume that took you a little bit of time to
24   do?
25   A.  Yes.

Page 23

1    Q.  And then are you saying that you fired your second
2    volley when Mr. Puga was running away from you?
3    A.  Yes.
4    Q.  And you were aiming at his back?
5    A.  Yes.
6    Q.  And how far do you think he was from you, meaning
7    Mr. Puga, when you started your second volley of shots?
8    A.  About 30 feet.
9    Q.  And how far do you think he was from you at the time
10   of your last shot?
11   A.  About 75 to 100 feet.
12   Q.  So was he essentially running away from you during
13   your second volley of shots?
14   A.  Yes.
15   Q.  Prior to the day of this incident with Mr. Puga, had
16   you ever seen a suspect with a gun in their hand?
17   A.  No.
18   Q.  Had you ever been present before for an
19   officer-involved shooting?
20   A.  No.
21   Q.  Were you involved in the vehicle pursuit of Mr.
22   Puga?
23   A.  Yes.
24   Q.  And do you know which vehicle you were in line
25   generally during the pursuit?

Page 24

1    A.  The lead vehicle.
2    Q.  At some point did the vehicle pursuit end?
3    A.  Yes.
4    Q.  How long approximately would you estimate the
5    vehicle pursuit was?
6    A.  Approximately an hour.
7    Q.  During the vehicle pursuit, could you tell how many
8    individuals were in the car you were pursuing?
9    A.  Two.
10   Q.  Did it appear to be a male and female, or could you
11   tell at the time?
12   A.  I couldn't tell at the time.
13   Q.  But it appeared like two occupants?
14   A.  Yes.
15   Q.  Were any shots fired, if you know, during the
16   vehicle pursuit?
17   A.  No.
18   Q.  Did you see a weapon or anything during the vehicle
19   pursuit?
20   A.  No.
21   Q.  Do you know what road the vehicle stopped on at the
22   end of the pursuit?
23   A.  Peach.
24   Q.  I want to see if I could just show you a few photos.
25       I'll see if I could identify the Bate numbers.

Page 25

1        One ends in 1561.
2        MR. GALIPO:  If we can show that photo, Hang, and
3    I'll mark it as Exhibit 1.
4        (Exhibit 1 was marked for identification.)
5        MR. GALIPO:  And we'll send these to counsel later
6    so you have all the exhibits marked.
7        MS. ESQUIVEL:  Dale, are these COB or Plaintiffs
8    that ends with –
9        MR. GALIPO:  It looks like COSB.
10       MS. ESQUIVEL:  Okay.  Thank you.
11       MR. GALIPO:  You're welcome.
12   BY MR. GALIPO:
13   Q.  Officer, are you able to see this image on your
14   screen?
15   A.  Yes.
16   Q.  The white car to the bottom-left, was that Mr.
17   Puga's vehicle, if you know?
18   A.  Yes.
19   Q.  And do you see some of the CHP units also?
20   A.  Yes.
21   Q.  Can you see the vehicle you were driving that day in
22   this photo?
23   A.  The vehicle I was in was the one to the right of the
24   white vehicle.
25   Q.  So if I have my directions right, would the vehicle

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 26

1  you would be in, when you say to the right, you mean on the
2  photo?
3      A. On the photo, yes.
4      Q. Okay. So your vehicle would have also been facing
5  northbound, but you would have actually been in the
6  southbound lane?
7      A. Yes.
8      Q. Okay. And then when you fired your first volley of
9  shots, you would have been near the left-front bumper area as
10  you described of the white vehicle, Mr. Puga's vehicle?
11      A. Yes. By the -- near the dirt.
12      Q. And the sergeant would have been about two feet to
13  your left?
14      A. To my left.
15      Q. And where was Mr. Puga at the time you were firing
16  your first group of shots in relation to the vehicle?
17      A. In the center of the front hood of his vehicle.
18      Q. And how far do you think he was from the center of
19  the vehicle when you started firing?
20         In other words, how far from the front of the car?
21      A. He was leaning against it when he turned around.
22      Q. Okay.
23         MR. GALIPO: Let's see if we can put up COSB 1570 as
24  Exhibit 2.
25         (Exhibit 2 was marked for identification.)

Page 27

1  BY MR. GALIPO:
2      Q. Are you able to see this image on your screen?
3      A. Yes.
4      Q. And does this look to be like another angle or
5  picture of Mr. Puga's white vehicle?
6      A. Yes.
7      Q. Obviously, it's light outside when these photos were
8  taken, but it was dark outside at the time of the shooting;
9  is that correct?
10      A. Yes.
11      Q. And the vehicle we see towards the middle behind and
12  offset to Mr. Puga's vehicle, that would be your vehicle?
13      A. Yes.
14      Q. Now, did Mr. Puga remain in your vehicle for some
15  time after the pursuit ended?
16      A. Yes.
17      Q. And do you have an approximation as to how long he
18  was remained in the vehicle?
19      A. Approximately an hour.
20      Q. And during that time frame, were you communicating
21  with other CHP officers?
22      A. Yes.
23      Q. And also with some Deputy Sheriffs?
24      A. Yes.
25      Q. Do you know if any less-lethal was used on Mr. Puga

Page 28

1  during the hour he was in the vehicle?
2      A. Yes.
3      Q. What was used, to your knowledge?
4      A. The less-lethal shotgun and pepper balls.
5      Q. And do you know who was deploying the pepper
6  balls?
7      A. San Bernardino deputies.
8      Q. Do you have any estimate as to how many pepper balls
9  were deployed?
10      A. No.
11      Q. Do you have an approximation as to over what period
12  of time they were deployed?
13         In other words, was it just for a minute or two?
14         Was it for more of an extended period?
15      A. More of an extended period of time.
16      Q. And what part of the car were they deployed through,
17  if you know?
18      A. The rear windshield.
19      Q. And at some point was the rear windshield shot out
20  with less-lethal?
21      A. Yes.
22      Q. And what was the less-lethal used to shoot out the
23  rear windshield?
24      A. Less-lethal shotgun.
25      Q. And who was firing the less-lethal shotgun, if you

Page 29

1  know?
2      A. I believe it was Sergeant Kee.
3      Q. And is Sergeant Kee with your department or with the
4  Sheriff's Department?
5      A. With my department.
6      Q. Would the windshield have been shot out before the
7  pepper balls were deployed?
8      A. Yes.
9      Q. At some point did the female get out of the car?
10      A. Yes.
11      Q. And I'm assuming one of the goals was to also get
12  Mr. Puga out of the car?
13      A. Yes.
14      Q. And is that one of reasons that they were using the
15  pepper balls, to make it uncomfortable for him in the car so
16  he would come out?
17      A. Yes.
18      Q. Could you hear anything Mr. Puga was saying while he
19  was in the car for the hour?
20         MS. ESQUIVEL: Objection. Overbroad.
21         Go ahead.
22         THE WITNESS: Yes.
23  BY MR. GALIPO:
24      Q. And could you tell me some of the things you were
25  recalling him saying?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 42

1    A. Yes.
2    Q. What was your sergeant saying to him?
3    A. To put his hands up, let us see his hands.
4    Q. And while your sergeant was saying that, were his
5  hands up?
6    A. Yes.
7    Q. Did you at least feel that that was an act of compliance
8  when he had put his hands up in response to the sergeant's
9  request?
10      MS. ESQUIVEL: Objection. Vague.
11      THE WITNESS: No.
12  BY MR. GALIPO:
13    Q. Did you think he was putting his hands up without
14  more or less voluntarily, not in response to the request?
15    A. Yes –
16      MS. ESQUIVEL: Objection. Calls for speculation.
17  BY MR. GALIPO:
18    Q. So at the time you approached the front of Mr.
19  Puga's vehicle, how long approximately do you think that Mr.
20  Puga had been out of the car?
21    A. A few minutes.
22    Q. And when you say a few minutes, are we talking like
23  three to five minutes, two to four minutes?
24      What range do you have in mind?
25    A. I don't.  Maybe –

Page 43

1    Q. Just a few minutes?
2    A. I don't recall exactly how many minutes passed.
3    Q. Okay.  Because you told me earlier that you thought
4  he was at the side for a few minutes, and then he went to the
5  front.
6      You're just saying if was a few minutes, but you're
7  not exactly sure about the time?
8    A. When he was on the side, it was a few minutes.
9    Q. How about when he was in the front, how long was he
10  in the front of vehicle before you approached?
11    A. It was less than the time he was on the side, but
12  again, I don't recall how long.
13    Q. And when he was in the front of the vehicle prior to
14  you approaching, could you see his hands up?
15    A. Yes.
16    Q. And were his arms extended above his head?
17    A. Yes.
18    Q. And as you were approaching him, were his hands
19  still up?
20    A. Yes.
21    Q. And which way was he facing as you approached him?
22    A. South.
23    Q. Towards the front of the vehicle?
24    A. Yes.
25    Q. Was there any illumination on Mr. Puga as you

Page 44

1  approached him?
2    A. Yes.
3    Q. And what was the source of illumination?
4      The same as what we discussed before?
5    A. Yes.
6    Q. And at some point did you see Mr. Puga's hands
7  lower?
8    A. Yes.
9    Q. Where were you when you saw his hands lower?
10      Basically in the same position you told me earlier,
11  to the left front corner of his vehicle?
12    A. Yes.
13    Q. And how much time do you think passed between seeing
14  his hands lower and hearing the first shot?
15    A. Seconds.
16    Q. When you say seconds, could it have been like a
17  split second?
18    A. Split second, one second.
19    Q. One second.  And I think you told me earlier you
20  heard two shots before you fired?
21    A. Yes.
22    Q. And then you fired approximately five shots in your
23  first volley?
24    A. Yes.
25    Q. And why did you do a tactical reload after you fired

Page 45

1  your first group of shots?
2    A. I was trained – what we're trained.
3    Q. Were you concerned that you might have used all of
4  your rounds?
5    A. No.
6    Q. Or you just wanted to make sure you had enough
7  round?
8    A. I wanted to make sure I had enough rounds.
9    Q. Do you know whether you fired more than five shots
10  in the first volley?
11    A. No.
12    Q. So five is just like your estimate?
13    A. Yes.
14    Q. And when you say you fired five to ten shots in the
15  second volley, do you know whether you fired more than
16  that?
17    A. No.
18    Q. Again, that would be your estimate?
19    A. Correct.
20    Q. And I think you said when you started your second
21  volley of shots, Mr. Puga was approximately 30 feet from
22  you?
23    A. Yes.
24    Q. And where were you positioned?
25      Still towards the front of his vehicle?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 46

1    A.  During the second volley, I was behind my driver's
2  side door.
3    Q.  You retreated to behind your door?
4    A.  Yes.
5    Q.  And I think you said by the end of your second
6  volley, he might have been 75 to 100 feet from you?
7    A.  Yes.
8    Q.  Was there any illumination over Mr. Puga during your
9  second volley of shots?
10   A.  No.
11       MR. GALIPO:  Okay.  I think this is a good time we
12  can take a break for about ten minutes if that's good for
13  everybody.
14       MS. ESQUIVEL:  Sounds good.
15       MS. GUSTAFSON:  That's fine.
16       MR. GALIPO:  All right.  Thank you, all.
17       (Recess taken.)
18  BY MR. GALIPO:
19   Q.  Was there any discussion as you were approaching the
20  vehicle that someone was going to tase Mr. Puga?
21   A.  No.
22   Q.  Did you know if anyone was designated as the tasing
23  officer?
24   A.  No.
25   Q.  At some point before you fired your first group of

Page 47

1  shots, were you aware that the deputies had approached Mr.
2  Puga on the passenger side of his vehicle?
3    A.  No.
4    Q.  During your first shots were you aware there were
5  deputies on the passenger side?
6    A.  No.
7    Q.  Did you at any time become aware that deputies had
8  approached Mr. Puga on the passenger side of the vehicle?
9    A.  Yes.
10   Q.  When did you become aware of that?
11   A.  After I fired the first volley of shots.
12   Q.  And what did you see in that regard?
13   A.  Just other deputies on the other side of the
14  vehicle.
15   Q.  Did you ever hear shots coming from that side of the
16  vehicle?
17   A.  Yes.
18   Q.  How many shots did you hear approximately coming
19  from the passenger side of Mr. Puga's vehicle?
20   A.  I don't recall.
21   Q.  Would it be more than one?
22   A.  Yes.
23   Q.  At least two?
24   A.  Yes.
25   Q.  When you saw Mr. Puga's hand lowered when he was at

Page 48

1  the front of his vehicle, was it both hands or one hand?
2    A.  Both hands.
3    Q.  Do you ever recall him lowering one and keeping the
4  other hand up?
5    A.  I don't recall.
6    Q.  When you fired your first volley of shots, were you
7  moving or stationary?
8    A.  I was moving.
9    Q.  Which direction were you moving?
10   A.  Towards my patrol car.
11   Q.  Moving back south towards your patrol car?
12   A.  Yes.
13   Q.  How about Mr. Puga, was he moving before you fired
14  your – strike that.
15       Was he moving during your first volley of shots?
16   A.  Yes.
17   Q.  And in which way was he moving?
18   A.  He turned around and began running north.
19   Q.  You mentioned earlier that there was some light from
20  the spotlights and some lights from the helicopter
21  circling?
22   A.  Yes, sir.
23   Q.  And you were aware generally it was a residential
24  neighborhood?
25   A.  Yes.

Page 49

1    Q.  Did you notice some homes in the area?
2    A.  Yes.
3    Q.  Did you notice some porch lights on in the area?
4    A.  No.
5    Q.  Did you notice some cars parked in driveways?
6    A.  No.
7    Q.  At some point after or during your first group of
8  shots, did you notice that the sergeant went to the ground?
9    A.  Yes.
10   Q.  And was that after your first volley of shots or
11  during?
12   A.  During.
13   Q.  Did the sergeant say anything when he was on the
14  ground?
15   A.  He was saying he was hit or he was shot.
16   Q.  Did you see any blood or sign that he had been
17  shot?
18   A.  No.
19   Q.  Anything else you recall the sergeant saying?
20   A.  He said he's been hit or he's been shot.
21   Q.  Right.  Anything other than that when he went down
22  to the ground?
23   A.  I don't recall.
24   Q.  Have you ever had some training on a topic called
25  "tactical repositioning?"

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 50

1    A.  Yes.
2    Q.  And is that in part what you were doing by moving
3  south towards your vehicle?
4    A.  Yes.
5    Q.  And is part of your training when you hear gunfire,
6  is one possible tactical reposition for an officer, to move
7  into a prone position?
8    A.  Yes.
9    Q.  To get down to avoid gunfire?
10    A.  Yes.
11    Q.  And what position did you see the sergeant on the
12  ground when he went to the ground?
13      Was he prone?  Chest-down?  Or in some other
14  position?
15    A.  Some other position.
16    Q.  Not prone?
17    A.  I don't believe so.
18    Q.  I'm looking through portions of your statement, so
19  there might be some pauses now because a lot of this we
20  already covered.  So if there is a pause, it's because I'm
21  just looking.  And if it's something we covered, I'm going to
22  go to the next point.
23      Okay?
24    A.  Okay.
25    Q.  Because my eyes are not what they used to be, I'm

Page 51

1  going to get my glasses out.
2    A.  Okay.
3    Q.  So during your second volley of shots, would it be
4  correct to say that you saw Mr. Puga running northbound on
5  Peach towards the northwest corner?
6    A.  Yes.
7    Q.  And you continued firing until he was down?
8    A.  Yes.
9    Q.  At some point did Sergeant Kee request the deputies
10  to take over the pursuit?
11    A.  Yes.
12    Q.  And to your knowledge, was that request denied?
13    A.  Yes.
14    Q.  During the approximate hour that he was in the car,
15  was there any discussion about either notifying or evacuating
16  residence in the area?
17    A.  No.
18    Q.  Did you ever hear that issue brought up by anyone?
19    A.  No.
20    Q.  Did he have any shirt on, Mr. Puga?
21    A.  No.
22    Q.  Okay.
23      MR. GALIPO:  Can we – is it possible, Hang, to pull
24  up Page 48 of the officer's statement to see if I can show
25  him something and see if it refreshes his recollection.

Page 52

1  BY MR. GALIPO:
2    Q.  I'm going to try to show you a page of the
3  transcription of your statement and ask you about one of your
4  answers and see if that refreshes your recollection.
5      MR. GALIPO:  Is it possible to make it slightly
6  bigger?
7  BY MR. GALIPO:
8    Q.  Can you see that, first of all, on your screen?
9    A.  Yes.
10    Q.  And do you see how there's some line numbers on the
11  left-hand side?
12    A.  Yes.
13    Q.  So from Line 7 through 10, you say, "To see if we
14  can see the waistband or to see the weapon.  We were right
15  here at this time.  The SOS they were right here, the
16  sergeant from the SO he had his Taser out.  The plan was for
17  them to tase him, and we go in to arrest him."
18      Do you see that?
19    A.  Yes.
20    Q.  Does that refresh your recollection that there were
21  some discussion about a Taser?
22    A.  It does.
23    Q.  And if you remember, was that your sergeant that was
24  going to have the Taser, or the sergeant from the Sheriff's
25  Department?

Page 53

1    A.  The sergeant from the Sheriff's Department.
2    Q.  Okay.  And does that also refresh your recollection
3  that the plan was that they would approach on the passenger
4  side, and you would approach on the driver's side?
5    A.  Yes.
6    Q.  Do you know if that Taser was ever deployed?
7    A.  No.
8    Q.  And I think you've already today me this, but would
9  you agree that generally when Mr. Puga was at the front of
10  the vehicle, he had his hands up?
11    A.  Yes.
12    Q.  When he was in front of the vehicle as you were
13  approaching, did you see any weapon in his waistband at that
14  point?
15    A.  I was unable to see the waistband.
16    Q.  Was it blocked from your view in part by the car?
17    A.  Yes.
18      MR. GALIPO:  Can we show him Page 51, please,
19  Hang.
20  BY MR. GALIPO:
21    Q.  Towards the bottom starting on Line 14, you're
22  talking about he turned to right.
23      Do you see that?
24    A.  Yes.
25    Q.  And you indicate turning to the right would be

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 66

1    A. Yes.
2    Q. Do you know if he's still with the CHP?
3    A. No.
4    Q. What is your -- what was your assignment at the
5    time?
6        Was it essentially a patrol, or what would you
7    characterize it as?
8    A. It's patrol.
9    Q. And what is your assignment now; is it the same?
10   A. Yes.
11   Q. And what area are you assigned to now; the same
12   area, or a different area?
13   A. Different area.
14   Q. Which area are you assigned now?
15   A. Rancho Cucamonga.
16   Q. What area were you assigned at that time?
17       MS. ESQUIVEL: I'm sorry, Dale. I was just
18   reminding Mr. Rubalcava to please allow you to finish your
19   question before he starts answering.
20       MR. GALIPO: Okay. I'm sure the court reporter will
21   love you for that, Diana.
22   BY MR. GALIPO:
23   Q. Where were you assigned at the time?
24   A. Victorville.
25   Q. Okay.

Page 67

1        MR. GALIPO: Let's go off the record for ten
2    minutes, and then I'll look at my notes and I'm hopeful I'll
3    conclude this by 12:30 or so.
4        Does that work for everybody?
5        MS. GUSTAFSON: That's fine.
6        MS. ESQUIVEL: Okay.
7        (Recess taken.)
8    BY MR. GALIPO:
9    Q. So just so that I'm clear, just before you fired
10   your first shot, were you aware that officers had moved up on
11   the passenger side of Mr. Puga's vehicle just before you
12   fired your first shot?
13   A. Yes.
14   Q. And how were you aware of that?
15   A. From -- I believe it was discussed to me by Sergeant
16   Kee.
17   Q. Did you also see that approach peripherally?
18   A. From the peripheral, yes.
19   Q. And who did you understand was approaching on the
20   passenger side?
21       Was it just Sheriffs or also Blackwood?
22   A. Only the deputies.
23   Q. Did you know if Blackwood was approaching at all?
24   A. No.
25   Q. Was Blackwood your partner?

Page 68

1    A. Yes.
2    Q. Do you have an understanding now whether or not any
3    shots were fired by the deputies or anyone from the passenger
4    side of the vehicle?
5        Now, do you have an understanding of that?
6    A. Yes.
7    Q. What is your understanding now?
8    A. Shots were fired from the passenger side of the
9    vehicle.
10   Q. Did you know at the time you fired your first group
11   of shots that deputies on the passenger side were also
12   firing?
13   A. Yes.
14   Q. You knew that at the time?
15   A. At the time, no.
16   Q. That's what I'm getting at.
17       So at the time, you didn't know they were firing,
18   but now you understand they were?
19   A. Yes.
20   Q. And you mentioned at the beginning I think at a
21   deposition that you watched a couple of the videos.
22       I think one was MVARS.
23   A. Yes.
24   Q. We're going to try to just show you a portion of it,
25   and we're going to try to share the screen.

Page 69

1        The first two exhibits I don't think I technically
2    attached, but I would like to do that just so they are
3    attached to the transcript.
4        And Hang will send those to you and Jinna and also
5    to Shannon right after the depo.
6        And then Exhibit 3 is going to be the MVARS, and I'm
7    just going to show a portion, and I'll indicate on the record
8    what the time frame is.
9        MS. ESQUIVEL: Dale, before we show that, I would
10   just like to say to the Plaintiffs and the family members
11   that some of these get pretty graphic. So they have the
12   option to not watch if they choose to do so.
13       MR. GALIPO: Yes. Thank you for that, Diana.
14       I'll second that, and let them know that this is
15   going to show the shooting, and it's graphic, could be very
16   upsetting. So if you don't want to see it, you should
17   probably look away or tune out.
18       And if it is upsetting to you, I need you at this
19   point to keep that upset to yourself and keep muted.
20       So if everyone is willing to do that and able to do
21   that, I'm going to wait about ten seconds to give you a
22   chance to either opt out or opt in and then we'll play it.
23       Don't start yet, Hang, because again, I want to give
24   them just a little more time.
25       MS. LE: Okay. I just want to for the record say

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 74

1  think would be better.
2      (Video playing.)
3      MR. GALIPO: Good enough.
4      We're playing it from 40:28.
5      (Video playing.)
6      MR. GALIPO: I think we can stop it now.
7      (Video paused.)
8  BY MR. GALIPO:
9    Q.  Does that show at least some portions of the MVARS
10  that you had seen before?
11   A.  Yes.
12   Q.  And then Exhibit 4, the last exhibit will be the –
13  I believe it's the civilian cell phone footage.
14      MR. GALIPO: Can we see if that we can play that,
15  Hang?
16      (Exhibit 4 was marked for identification.)
17  BY MR. GALIPO:
18   Q.  By the way, do you have an understanding as to how
19  many shots were fired total in this incident?
20   A.  Total, no.
21   Q.  Okay.  This will be Exhibit 4.
22      MR. GALIPO: We can go ahead and play it.
23      (Video playing.)
24      MR. GALIPO: That's good, I think.
25      (Video paused.)

Page 75

1  BY MR. GALIPO:
2    Q.  We stopped it at 1:26.
3      So could you see in a portion of that where he went
4  down to the ground?
5    A.  Yes.
6    Q.  And you saw him go down to the ground at some point,
7  I think you, told me earlier?
8    A.  Yes.
9    Q.  And when you watched Exhibit 4, did you hear some
10  additional shots being fired after he went to the ground?
11   A.  Yes.
12   Q.  Do you know if any of those shots were your shots?
13   A.  No, I don't know.
14   Q.  Okay.
15      MR. GALIPO: Thank you for that, Hang.
16      I think that's all the question I have.  I don't
17  know whether Shannon or Diana have any questions today of the
18  officer.
19      MS. GUSTAFSON: I don't have any questions.
20      MS. ESQUIVEL: I do.
21      Go ahead, or does anybody need a break?
22      MR. GALIPO: No.  I think you can go ahead.
23      Just keep your voice up so the court reporter can
24  hear you.  We're good.
25      Unless you want to unmute yourself, but I don't know

Page 76

1  if that's going to cause feedback.
2      MS. ESQUIVEL: It'll probably cause feedback.
3      So just let me know if I'm not speaking loud enough.
4      MR. GALIPO: I think we can hear you now fine.
5      MS. ESQUIVEL: Okay.
6          EXAMINATION
7  BY MS. ESQUIVEL:
8    Q.  Officer Rubalcava, you testified earlier that you
9  believe that during the first volley, you fired five rounds,
10  and during the second volley, somewhere between five to ten
11  rounds.
12      Is that the best estimate that you can provide based
13  on your recollection?
14   A.  Best estimate the first volley is three to five.
15      Second volley is five to ten.
16   Q.  And you indicated earlier that you – that you
17  believe there was five-to ten-second lapse between the first
18  volley and the second volley.
19      Having seen the videos that have been marked as
20  Exhibits 3 and 4, do you still believe there was a five-to
21  ten-second lapse between the first volley and the second
22  volley?
23   A.  No.
24   Q.  Will you, if you can, estimate what – how much time
25  lapsed from the time you shot the first volley to the time

Page 77

1  that you shot the second volley?
2    A.  One to two seconds.
3    Q.  And on the video that we just saw, Mr. Puga is
4  exiting the vehicle.
5      At any time when he – did you observe him exit the
6  vehicle?
7    A.  Yes.
8    Q.  When he exited the vehicle, at any time did you have
9  or were you able to see his front waistband?
10   A.  No.
11   Q.  Did you know that he had a gun?
12   A.  No.
13   Q.  When the – let me back up a little bit.
14      During the pursuit, how did the pursuit start of Mr.
15  Puga's vehicle?
16   A.  We observed him exit the freeway, and we made a
17  U-turn, and he yielded on his own to the right curb.
18   Q.  How did you know that you were looking for his
19  vehicle?
20   A.  His vehicle matched the broadcast for a – they put
21  a brief – during our briefing to look for this vehicle which
22  was known to be a suspect of a freeway shooting.
23   Q.  And when you say briefing, are you talking about the
24  beginning of your shift?
25   A.  Yes.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 78

1    Q.  And what time does your shift start on February 17,
2  2021?
3    A.  10:00 p.m.
4    Q.  And tell me all that you remember as to what you
5  were told as to why you were looking for a white SUV.
6    A.  A white SUV was the suspect's vehicle of a freeway
7  shooting, and it was described as a white Ford SUV with black
8  rims, no plates, with the Funeral statement in the back, and
9  black tinted windows.
10    Q.  Were you given information as to the time of that
11  earlier freeway shooting?
12    A.  I did, but I don't recall what time it was.
13    Q.  Were you given any information about the suspect
14  that had -- was involved in the freeway shooting?
15    A.  Hispanic male, adult, heavy set, with a beard.
16    Q.  When -- you testified earlier that there was a
17  less-lethal used that included the shotgun.
18      What kind of rounds did the shotgun discharge?
19    A.  Bean bags.
20    Q.  And you said it was Sergeant Kee?
21    A.  Yes.
22    Q.  That discharged -- fired the shotgun?
23    A.  Yes.
24    Q.  Did you have any less-lethal weapons in your arsenal
25  or in your vehicle?

Page 79

1    A.  Just my Taser.
2    Q.  Did you have that on your person?
3    A.  On my person.
4    Q.  Any other less-lethal in the vehicle?
5    A.  No.
6    Q.  You indicated earlier that you did not warn Mr. Puga
7  or didn't give him a verbal warning that you were going to
8  use lethal weapon or shoot your gun at him.
9      Did you have an opportunity to do so?
10    A.  No.
11    Q.  Why didn't you have that opportunity to warn him?
12    A.  It's within split second he pulled out his firearm
13  and shot at us.
14    Q.  And when you were approaching Mr. Puga, did you have
15  your gun out?
16    A.  Yes.
17    Q.  Did you have it pointed at him?
18    A.  Yes.
19    Q.  At any point did you holster your gun as you were
20  approaching him?
21    A.  Yes.
22    Q.  At what point did you do that?
23    A.  When he was to the driver's side of his truck, I
24  holstered my weapon because the plan was to approach him and
25  handcuff him.

Page 80

1    Q.  When you holstered your weapon, did you pull out
2  your handcuffs?
3    A.  Yes.
4    Q.  So at what point did you then unholster your gun as
5  you approached Mr. Puga?
6    A.  When he ran to the front of his vehicle.
7    Q.  So at that point why did you pull out your gun?
8    A.  To -- because of the plans changed.  We were no
9  longer going to approach to handcuff him because he was being
10  uncooperative.
11    Q.  What was it about his running to -- Mr. Puga running
12  to the front of his vehicle that then changed your plan from
13  handcuffing him to now drawing your gun again?
14    A.  He still wouldn't expose his waistband.
15    Q.  And from the view that you had of Mr. Puga as you
16  were approaching him, could you see his waistband at all?
17    A.  No.
18    Q.  What was blocking your view?
19    A.  The hood of a truck.
20    Q.  Do you -- to the best of your recollection, who
21  fired the first round during this shooting incident?
22    A.  The suspect, Puga.
23    Q.  And did you see any flashes, or was it just the
24  sound that alerted you to the fact that he had pulled the
25  trigger?

Page 81

1    A.  I saw the flash.
2    Q.  How many flashes did you see?
3    A.  One.
4    Q.  You testified earlier that you heard two shots.
5      So you saw one flash, but heard two shots; is that
6  correct?
7    A.  Yes, correct.
8    Q.  Do you know if you were the first officer to shoot,
9  or whether someone shot before you did in response to Mr.
10  Puga?
11    A.  I don't know.
12    Q.  When you said in your peripheral sight you could see
13  a Sheriff's deputy or two approaching from the right side of
14  Mr. Puga's vehicle; correct?
15    A.  Correct.
16    Q.  And you testified earlier that the plan included
17  that the Sheriffs would tase him; correct?
18    A.  Correct.
19    Q.  Was there any discussion as to what point Mr. Puga
20  would be tased?
21      Would it be when he just stepped out of his car?
22      Would it be when he took a prone position?
23      Was there any discussion as to what point he would
24  be tased?
25    A.  That was discussed between the sergeants and the

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 82

1  deputies.
2   Q.  So you don't have any knowledge in terms of when
3  that tasing would have occurred?
4   A.  No.
5   Q.  Were you required to wait until a deputy attempted
6  to tase Mr. Puga before you returned fire after Mr. Puga had
7  shot the first round?
8   A.  Can you repeat the question?
9   Q.  Sure.  Based on your training, were you required to
10  wait for the Sheriff deputy to attempt to tase Mr. Puga after
11  Mr. Puga had already discharged the first volley?
12   A.  No.
13   Q.  Why not?
14   A.  Because at that point lethal force is authorized.
15      He's an immediate threat to death or great bodily
16  injury.
17   Q.  And when he fired that first weapon, the first
18  round, was there anything between you and Mr. Puga that could
19  have shielded you from his gunfire?
20   A.  Just the hood of his patrol car – the hood of his
21  vehicle.
22   Q.  And that could have shielded you?
23   A.  Oh, between me and him, no.
24   Q.  That's what I meant.  Let me repeat my question just
25  so it's clear.

Page 83

1      So at the time as you were approaching Mr. Puga, was
2  there anything that could have shielded you from Mr. Puga's
3  gunfire?
4   A.  No.
5   Q.  Was there – based on your understanding of where
6  Sergeant Kee was standing relative to you, was there anything
7  that could have shielded Sergeant Kee from Mr. Puga's
8  gunfire?
9   A.  No.
10   Q.  The first – during the first volley, the three to
11  five rounds that you discharged from your firearm, did you
12  feel that those three to five shots were necessary?
13   A.  Yes.
14   Q.  Why?
15   A.  Eliminate the threat.
16   Q.  If he only fired two, why was he still a threat
17  after the two?
18   A.  He still had possession of this firearm.
19      He was still able to shoot at us.
20   Q.  During those three to five rounds that you
21  discharged during the first volley, you testified earlier
22  that you were moving?
23   A.  Yes.
24   Q.  You were moving – is this where you were trying to
25  get back to your vehicle?

Page 84

1   A.  Retreating back towards the driver side of the
2  patrol car.
3   Q.  Did you keep a visual on Mr. Puga as you were
4  returning to your vehicle and during that first volley of
5  rounds?
6   A.  Yes.
7   Q.  And you saw where he was able – where he started
8  running to?
9   A.  Yes.
10   Q.  So in terms of now reloading, you said you changed
11  out the clip to have a fresh clip –
12   A.  After reviewing the MVARS, I reload – I have a
13  better recollection, and I reloaded after.
14   Q.  After you shot the second volley?
15   A.  Yes.
16   Q.  So just so we're clear, you did not reload
17  between the first –
18   A.  Between –
19   Q.  Let me finish my question.  I know you're
20  anticipating where I'm going, but so we have a clean record,
21  so during the – after the first volley and the second
22  volley, you did not stop to reload; is that correct?
23   A.  Correct.
24   Q.  So at what point did you start – did you fire the
25  first round of the second volley towards Mr. Puga?

Page 85

1      Do you remember if you had already reached your
2  vehicle door and using it as a shield, or if you were still
3  trying to get to the car?
4   A.  Trying to get to the car.
5   Q.  And were you facing Mr. Puga as you were getting to
6  your car, or was your side facing Mr. Puga?
7   A.  I was facing Mr. Puga.
8   Q.  Is it fair to say you had – you kept a visual on
9  Mr. Puga the entire time?
10   A.  Yes.
11   Q.  During the first and second volley?
12   A.  Yes.
13   Q.  During the time that you shot those five to ten
14  rounds during the second volley, did you ever at any point
15  see Mr. Puga drop the gun?
16   A.  No.
17   Q.  Did you ever see him make any gestures that he was
18  surrendering?
19   A.  No.
20   Q.  When you saw in the video that Mr. Puga at some
21  point went down, do you have now having reviewed the videos,
22  have any recollection as to whether you continued to shoot
23  after Mr. Puga went down to the ground?
24   A.  I don't.
25   Q.  Did you see him fall to the ground?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 86

1    A.  Yes.
2    Q.  Could you see at any point as to whether he dropped
3  the gun as he fell to the ground?
4    A.  No.
5    Q.  When you approached him after the incident was over
6  and you testified earlier that he was handcuffed; correct?
7    A.  Yes.
8    Q.  Who handcuffed him?
9    A.  Myself and a deputy.
10    Q.  Was the gun still in his hands when you reached the
11  location of where Mr. Puga went down?
12    A.  Yes.
13    Q.  Where exactly was it?
14    A.  It was underneath -- he was facing down, stomach
15  facing down -- he was -- he had it tucked underneath his
16  stomach.
17    Q.  Was it still in his hand, or was his body just on
18  it?
19    A.  Both hands were on his stomach as well.
20    Q.  So you couldn't tell whether or not it was actually
21  in his hand?
22    A.  No.
23    Q.  Did you still consider him an immediate threat
24  during that second volley when you fired the five to ten
25  rounds even though he was running away from you?

Page 87

1    A.  Yes.
2    Q.  Why was he a threat?
3    A.  He still had the gun in his hand, and he was running
4  towards a residential area.
5    Q.  And what was the concern with him running towards
6  the residential area?
7    A.  He would barricade himself inside the home and use
8  the people who live there as hostages.
9    Q.  You testified earlier that there was a helicopter
10  and then the spotlights where the vehicle were used to
11  illuminate the area around Mr. Puga to get a better view of
12  him; is that correct?
13    A.  Correct.
14    Q.  At any point did you recall the helicopter leaving
15  the area?
16    A.  Yes.
17    Q.  Do you remember at what point?
18    A.  No.
19    Q.  Do you know the helicopter was still there during
20  the shooting incident that we just viewed?
21    A.  No.
22    Q.  You don't remember, or it wasn't there?
23    A.  It wasn't there.
24    Q.  So if you testified earlier that it was pretty dark
25  down Peach Street once he started running north down Peach

Page 88

1  Street, how is it that you could still see him if the
2  helicopter was no longer there?
3    A.  It was dark, but it was -- there was still some
4  visibility where I was able to see him.
5    Q.  Do you know if there were any streetlights on Peach
6  Street?
7    A.  There is.
8    Q.  And you testified earlier that you had your Taser on
9  you.  Was using your Taser an option once Mr. Puga discharged
10  his firearm?
11    A.  No.
12    Q.  Why wasn't the Taser an option?
13    A.  Taser -- because Taser's not going to eliminate the
14  threat.  He's still a danger to myself and danger to
15  others.
16    Q.  Could you discharge a Taser as fast as you can a
17  firearm?
18    A.  No.
19    Q.  How close do you have to be to someone for the
20  prongs -- I don't know if they're called prongs, that strike
21  the body before electricity can go --
22    A.  15 feet.
23    Q.  In a situation when someone's shooting at you, do
24  you think could you have had the wherewithal to hit him with
25  your Taser --

Page 89

1    A.  No --
2    Q.  -- under those circumstances --
3    A.  No.
4    Q.  Did you have any other weapon available to you other
5  than your handgun to respond to Mr. Puga's firing his gun at
6  you?
7    A.  No.
8    Q.  Mr. Galipo asked you earlier about your interview
9  where you stated that you were -- that there were houses on
10  the northeast, northwest, and the south.
11       I'll just read it.  Let me see if I can do that.
12       Can you see that on your screen?
13    A.  Yes.
14    Q.  So we're on Page 29 of COSB000478, Page number to
15  this transcript is from 39 to 729 Bates stamp.
16       So on the page before that the interviewer had asked
17  you about Ms. Hernandez right here on Line 6 says, "Where
18  were the houses if you can remember?"
19       And then he said on Line 10, says you can refer to
20  the sketch here if you'd like.
21       And then your response on Line 12 says, "There's
22  houses on north, northwest, northeast corner and to the right
23  here and right here."
24       When you were responding to the interviewer's
25  questions, were with you telling him where the houses were

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 94

1  Q.  So you're saying you would have fired at him even if
2  he didn't fire shots at you; is that true?
3  A.  I would have.
4  Q.  In fact, how much time passed from you seeing this
5  handgun in his waistband to you firing your first shot?
6  A.  Split second.
7  Q.  Split second; is that what you said?
8  A.  A second.
9  Q.  Okay.  Did you think based on your training just
10  seeing a handgun in someone's waistband was enough to
11  shoot?
12  A.  No.
13  Q.  And I think you've already said this, but you never
14  gave any commands or warning; is that correct?
15  A.  Correct.
16  Q.  Now, you told me you were at the front of his
17  vehicle when you started firing your shots; correct?
18  A.  Correct.
19  Q.  And how much time do you think it took you to fire
20  your first three to five shots in the first volley?
21  A.  A second.
22  Q.  And then after those shots, is that when you
23  retreated?
24  A.  Yes.
25  Q.  And you retreated to all the way to the door area of

Page 95

1  your car?
2  A.  Yes.
3  Q.  And you're saying that you were at the door area of
4  your car when you fired the second volley?
5  A.  Yes.
6  MR. GALIPO:  So if we can put back Exhibit 1,
7  please.
8  BY MR. GALIPO:
9  Q.  This exhibit shows Mr. Puga's car and your car;
10  correct?
11  A.  Yes.
12  Q.  But your car, you're saying the door would have been
13  opened at the time of the incident?
14  A.  Yes.
15  Q.  So you went – you fired your first volley of shots
16  you're saying within a second when you were at the front
17  driver's corner of Mr. Puga's vehicle; is that correct?
18  MS. ESQUIVEL:  Objection.  Misstates prior
19  testimony.
20  Go ahead.  You can answer.
21  THE WITNESS:  I was near the – I was on the dirt
22  area near the front of Mr. Puga's vehicle.
23  BY MR. GALIPO:
24  Q.  Okay.  And near the front bumper area?
25  A.  Yes.

Page 96

1  Q.  So if you draw a line across from the front bumper
2  area into the dirt, that's where you were approximately?
3  A.  Approximately, yes.
4  Q.  And then from that area you're saying after you
5  fired your first volley of shots, you repositioned yourself
6  to get behind the door, driver's door of your patrol
7  vehicle?
8  A.  Yes.
9  Q.  And then you fired the second volley of shots from
10  behind the door of your patrol vehicle?
11  A.  Yes.
12  Q.  And when did this conversation between you and the
13  sergeant happen when you saw him go to the ground?
14  A.  What conversation?
15  Q.  I thought you said that the sergeant said he was hit
16  or something.
17  Did that happen between the two volleys of shots?
18  A.  Yes.
19  Q.  So you would agree it would take you some time to
20  get from the dirt area in line with the front of the vehicle,
21  have this conversation with the sergeant, and get behind the
22  driver's door of your vehicle?
23  A.  I didn't have conversation with the sergeant.
24  He yelled it out.
25  Q.  Would you agree it would take you some time to get

Page 97

1  from the dirt area adjacent to the front of the car to behind
2  the door of your vehicle?
3  A.  Yes.
4  Q.  And you're saying you were behind the door of your
5  vehicle when you fired the second volley of shots?
6  A.  Yes.
7  Q.  And the tactical reload that you told us about
8  before when you said you did the reload between the two
9  volleys, you think you were mistaken in that regard?
10  A.  Yes.
11  Q.  And what did you see that made you believe you were
12  mistaken?
13  A.  I saw myself reloading after the incident ended.
14  Q.  How many magazines do you carry on your belt?
15  A.  One in the handgun, two in my belt.
16  Q.  So you could possibly tactically reload twice,
17  couldn't you?
18  A.  Yes.
19  Q.  Do you think under the facts of this case based on
20  your training, it would have been appropriate for you to
21  shoot if you merely saw the gun in Mr. Puga's waistband?
22  A.  No.
23  MR. GALIPO:  I think that's all I have, Diana.
24  MS. ESQUIVEL:  I just have a couple of clarifying
25  questions to your questions.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 106

1           CERTIFICATE

2              OF

3      CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5      I, JINNA GRACE KIM, CSR No. 14151, a Certified

6 Stenographic Shorthand Reporter of the State of California,

7 do hereby certify:

8      That the foregoing proceedings were taken before me

9 at the time and place herein set forth;

10      That any witnesses in the foregoing proceedings,

11 prior to testifying, were placed under oath;

12      That a verbatim record of the proceedings was made

13 by me, using machine shorthand, which was thereafter

14 transcribed under my direction;

15      Further, that the foregoing is an accurate

16 transcription thereof.

17      I further certify that I am neither financially

18 interested in the action, nor a relative or employee of any

19 attorney of any of the parties.

20

21      IN WITNESS WHEREOF, I have subscribed my name, this

22 date:  November 4, 2024.

23

24      _____

           Jinna Grace Kim, CSR No. 14151

25

Page 107

1 DEPOSITION ERRATA SHEET

2 Case Name:  Jonathan Wayne Botten, et al. vs. State of

3 California, et al.

4 Witness:  Bernardo Rubalcava

5 Date of Deposition:  November 4, 2024

6 Job No.:  112646

7 Reason Codes:  1. To clarify the record.

8          2. To conform to the facts.

9          3. To correct transcription errors.

10

11 Page _____ Line _____ Reason _____

12 From _____ To _____

13 Page _____ Line _____ Reason _____

14 From _____ To _____

15 Page _____ Line _____ Reason _____

16 From _____ To _____

17 Page _____ Line _____ Reason _____

18 From _____ To _____

19 Page _____ Line _____ Reason _____

20 From _____ To _____

21 Page _____ Line _____ Reason _____

22 From _____ To _____

23 Page _____ Line _____ Reason _____

24 From _____ To _____

25 Page _____ Line _____ Reason _____

Page 108

1 DEPOSITION ERRATA SHEET

2 From _____ To _____

3 Page _____ Line _____ Reason _____

4 From _____ To _____

5 Page _____ Line _____ Reason _____

6 From _____ To _____

7 Page _____ Line _____ Reason _____

8 From _____ To _____

9 Page _____ Line _____ Reason _____

10 From _____ To _____

11 Page _____ Line _____ Reason _____

12 From _____ To _____

13 Page _____ Line _____ Reason _____

14 From _____ To _____

15 Page _____ Line _____ Reason _____

16 From _____ To _____

17

18 _____ Subject to the above changes, I certify that the

19 transcript is true and correct.

20 _____ No changes have been made.  I certify that the

21 transcript is true and correct.

22

23      _____

24           BERNARDO RUBALCAVA

25

# Exhibit R

```
 1                 UNITED STATES DISTRICT COURT

 2                CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
 5   J.B., a minor by and through his       )
     guardian JONATHAN WAYNE BOTTEN, SR.,   )
 6                                          )
                     Plaintiffs,            )
 7                                          )
                 vs.                        ) Case No.
 8                                          ) 5:22-CV-00949-JGB-KK
     STATE OF CALIFORNIA; COUNTY OF SAN     )
 9   BERNARDINO; ISAIAH KEE; MICHAEL        )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10   VACCARI; JAKE ADAMS; and DOES 1-10,    )
     inclusive,                             )
11                                          )
                     Defendants.            )
12   _____)

13

14

15

16        REMOTE VIDEOCONFERENCE DEPOSITION OF

17                     JAKE ADAMS

18            TUESDAY, NOVEMBER 12, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  116769
```

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 10

1    Q.   And once you got in that position behind Sergeant
2    Vaccari, how much longer did the pursuit go on?
3    A.   I don't have the call log in front of me.
4        I would have to estimate which I could be off on a
5    number.  I know there is specifics of when I joined in, we
6    would be able to see on a call log.
7        So I don't want to misspeak.
8    Q.   Okay.  I am entitled to an estimate.
9        It's not a big deal.  You can even give a range if
10   you're comfortable.  You know, 15 to 30 minutes, whatever
11   you're comfortable with.  It's only an estimate.
12   A.   Sure.  If I had to guess, sir, or estimate, it was
13   somewhere between 20 minutes and an hour, approximately.
14   Q.   And where did the pursuit come to an end?
15   A.   At the intersection of Peach Avenue and Catalpa
16   Street in the City of Hesperia.
17   Q.   Do you know when way Peach runs?
18   A.   Yes, sir, I do.
19   Q.   Which way?
20   A.   It is a north and south street through the City of
21   Hesperia.
22   Q.   And was the vehicle, the suspect vehicle, a white
23   vehicle?
24   A.   Yes, sir.
25   Q.   And do you recall what type of vehicle it was

Page 11

1    generally?
2    A.   I believe it was a Ford Expedition, sir.
3    Q.   And did that vehicle when it finally came to a stop,
4    was it on Peach facing generally northbound?
5    A.   Yes, sir.
6    Q.   And then there was some CHP units somewhere
7    positioned behind it?
8    A.   Yes, sir.
9    Q.   And was the vehicle you were in that day a white
10   vehicle?
11   A.   Yes, sir.
12   Q.   And do you recall what type of vehicle you were
13   in?
14   A.   Marked Sheriff's Ford Explorer.
15   Q.   And was your vehicle and Sergeant Vaccari's vehicle
16   more or less side-by-side, if you recall?
17   A.   At the end of the pursuit, sir?
18   Q.   Yes.
19   A.   Yes, sir.  They were side-by-side.
20   Q.   And it was dark outside at the time?
21   A.   Yes, sir.
22   Q.   And it's my understanding having reviewed some of
23   the materials, the statements, taken some of the other
24   depositions, that Mr. Puga was in the white vehicle for some
25   period of time after it came to a stop there.

Page 12

1    Is that your recollection as well?
2    A.   Yes, sir.
3    Q.   Was there a helicopter overhead at some point?
4    A.   Yes, sir.  The helicopter was overhead for a period
5    of time throughout the end of the pursuit or through the
6    pursuit as well as through the end.
7        But they were not there through the duration or
8    through the ending of the incident that occurred that day.
9    Q.   So if I'm understanding what you're saying, the
10   helicopter was present during the pursuit, and after the
11   pursuit came to an end, but it left at some point before the
12   shooting; is that correct?
13   A.   Yes, sir, that's correct.
14   Q.   Did you see any guns in the vehicle, the white
15   suspect vehicle during the pursuit?
16   A.   I was not able to see inside of the vehicle during
17   the pursuit, sir.
18   Q.   Were any shots fired during the pursuit that you're
19   aware of?
20   A.   Not that I'm aware of.
21   Q.   Did you have an understanding as to how many people
22   were in the vehicle?
23        MS. GUSTAFSON:  Objection.  Vague as to time.
24        You can answer.
25   BY MR. GALIPO:

Page 13

1    Q.   During the pursuit.
2    A.   During the pursuit I was not aware of how many
3    people may have been inside of the vehicle.
4    Q.   At some point did it come to your attention that
5    there was more than one person in the vehicle?
6    A.   Yes, sir.
7    Q.   And at some point was a female either taken out, or
8    did she exit the vehicle?
9    A.   Yes, sir.
10   Q.   Did you have any conversation with the female after
11   she exited the vehicle?
12   A.   Yes, sir.
13   Q.   Can you tell me about that, please.
14   A.   Yes.  She exited the vehicle and was given commands
15   to walk back towards deputies, and I made contact with her,
16   placed her in handcuffs, patted her down for weapons, and I
17   asked her if anybody else was inside the vehicle, and she
18   told me Mr. Puga was inside.
19        She referred to him as Hector.  She wasn't sure on
20   his last name.  I also asked her if there were other weapons
21   inside the vehicle and if there was anything for me to know
22   about, and she said she didn't know.
23        And she informed me that she -- he wanted to call
24   his wife, and he was a new father.  That was about the extent
25   of the conversation I had with her.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 14

1    Q.   Did you communicate any of that conversation to any
2    of the other officers on-scene?
3    A.   I told my supervisor the suspect's name, and we were
4    unsure of the last name and unsure of any weapons inside the
5    vehicle.
6    Q.   I take it since you didn't have the last name, you
7    were unable to run a criminal history; is that a correct
8    statement?
9    A.   I think due to the dynamic nature of the situation
10   and being involved in a high-risk traffic stop, it
11   was probably the primary reason I was unable to or chose not
12   to step aside and run a criminal history on Mr. Puga at that
13   time.
14   Q.   So at some point was it decided that pepper balls
15   would be used to try to see if that would assist getting him
16   out of the car?
17   A.   Yes, sir.  It's true.
18   Q.   And who did you have that discussion with?
19   A.   I was not privy to that discussion or part of that
20   decision making process.  I would say it was made by my
21   supervisor.
22   Q.   And do you know who ended up deploying the pepper
23   balls?
24   A.   I do know.
25   Q.   And who was that?

Page 15

1    A.   My supervisor, Sergeant Vaccari.
2    Q.   And I'm assuming that for the pepper balls to be
3    effective, they have to get into the car.
4         So was there some attempt at some point to break a
5    window?
6    A.   There was, sir.
7    Q.   And who did that, if you know?
8    A.   One of the CHP officers utilized a less-lethal bean
9    bag round in attempt to break the windows on the side of the
10   vehicle.
11   Q.   And eventually, was a window broken?
12   A.   Yes, sir.
13   Q.   Which window was it, you if know?
14   A.   Back windshield was broken.
15   Q.   And at that point was the female already out of the
16   car?
17   A.   Yes, sir.
18   Q.   And were pepper balls then deployed in the
19   vehicle?
20   A.   Yes, sir.
21   Q.   Do you have any estimate as to how many pepper balls
22   were deployed in the vehicle?
23   A.   My estimate -- I know I -- during my original
24   statement I think I estimated approximately 75 to a 100.
25        I haven't gone back to get an exact amount, nor do I

Page 16

1    know.  So I probably would say it's still an estimate that I
2    have till this day.
3    Q.   And do you have an estimates to over what period of
4    time the pepper balls were deployed from the first one to the
5    last one?
6    A.   I would estimate over a period of 30 to 45 minutes,
7    probably.
8    Q.   Where were you positioned, and there may be multiple
9    positions, during the deployment of the pepper balls?
10   A.   During the deployment of pepper balls, I was next to
11   the -- behind the suspect vehicle, but next to the CHP
12   vehicles that were still facing northbound behind the suspect
13   vehicle.
14   Q.   When you say next to, were you like on the passenger
15   side, for example?
16   A.   Yes.  The passenger side behind the open door.
17   Q.   And were you able to make any observations of
18   Mr. Puga inside the vehicle before he got out?
19   A.   Yes, sir.  During while watching the vehicle and
20   maintaining observation of it, I could see that Mr. Puga was
21   twisting and turning his body, reaching around, leaning over,
22   reaching back at different periods of time.
23        And at one point I could remember seeing him reach
24   from the driver side where he was seated, reach across, and
25   pull the passenger -- the front passenger door which had been

Page 17

1    left open when the female exited, he pulled that door closed.
2    He had at different times opened and closed the driver's door
3    during the deployment of pepper balls.
4         So I could see his general movements of going
5    side-to-side and twisting and turning.  And going back, when
6    I was able to see that, one, from my position like I just
7    mentioned next to the CHP vehicles, there was two, and if
8    memory serves me correctly, I remember going from, you know,
9    one to the other just getting from one passenger side of one
10   to the either driver side or passenger side of the other.
11        I don't know how many times because he had moved
12   around, but I was able to still try to again best point of
13   observation I could.
14   Q.   Did you ever hear Mr. Puga say anything in the car
15   before he exited?
16   A.   Yes.  A lot of it was inaudible to me.
17        I couldn't make out exactly what he was saying.
18        I was not positioned closest to the vehicle, nor was
19   I directly engaged in communication with him.  But I could
20   hear him talking back and forth or trying to shout back and
21   forth while commands were being given during that period of
22   where he was still inside the vehicle.
23   Q.   Could you make any words out that he said?
24   A.   Yes.  In different times he -- I think he had asked
25   for to call his wife either with phone numbers or numbers

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 18

1  trying to be given, and at one point in time he was shouting
2  that he had been hit with the pepper ball in the head or the
3  face.
4          Different things of that nature.  I don't remember
5  exactly what his statements were verbatim, though.
6      Q.   Okay.  Did you ever see anything in his face or head
7  that was consistent with him being struck by pepper balls in
8  the face?
9      A.   Not that I recall.
10     Q.   Did you ever hear any coughing or anything like that
11  coming from the car after the deployment of the pepper
12  balls?
13     A.   Yes.  I remember hearing coughing.
14     Q.   Based on your training is that consistent at least
15  with one of the potential effects from the pepper balls?
16     A.   That's one of the effects.  It doesn't necessarily
17  make it effective, but that can be one of the effects of
18  pepper balls.
19     Q.   Do you have training with respect to the pepper
20  balls?
21     A.   Yes, sir.
22     Q.   And based on the training what are some of the
23  intended effects or effects of pepper balls?
24     A.   The intended effect is to create a distraction for
25  and gain compliance through the pain given to the --

Page 19

1  someone's ability to see and breathe comfortably so that
2  they -- so they can comply, get them out of the environment,
3  detain them as they needed, and then remove them from that
4  environment so they can see and breathe more clearly.
5      Q.   And so I have some familiarity with pepper spray.
6      Is it some of the similar effects, the burning of
7  the skin, the tearing up of the eye, the effect on the mucous
8  membranes, et cetera?
9      A.   Yes, sir.
10     Q.   Was there some tactical plan that you were aware of
11  of what steps were going to be taken once, if and when
12  Mr. Puga exited the vehicle?
13     A.   No.  I don't think there was a tactical plan fully
14  formed and put together.  I think when the pursuit came to an
15  end, the officers, myself, and my supervisor gained positions
16  of best the cover we could while trying to control the
17  situation.  These situations tend to be very dynamic, and we
18  needed to be able to, one, maintain observations of the
19  suspect as well as there was communication going on with the
20  suspect as well as being able to attempt to try to
21  communicate amongst ourselves as well.
22     Q.   Were you taking a position of cover during some of
23  this time frame?
24     A.   Yes, sir.
25     Q.   And where were you taking a position of cover?

Page 20

1      A.   Behind the open doors of the patrol vehicles behind
2  the suspect vehicle, sir.
3      Q.   Once Mr. Puga exited the vehicle on the driver side,
4  were you able to see him from your position?
5      A.   Yes, sir.
6      Q.   And were you behind the open passenger door of the
7  CHP vehicle at that point?
8      A.   When he exited I don't recall if I was behind the
9  passenger side of the CHP vehicle or the secondary vehicle
10  which would have put me behind the driver's side door, but it
11  was next to the CHP vehicle.
12     Q.   But you recall being close to a CHP vehicle and
13  somewhere with cover?
14     A.   Yes, sir.
15     Q.   And do you have an estimate as to how long
16  approximately Mr. Puga was on the driver's side of the
17  vehicle before he went to the front?
18     A.   I think my best estimate would be approximately
19  somewhere between five or ten minutes.
20     Q.   And were you watching him continuously during that
21  time frame?
22     A.   Yes, sir.
23     Q.   During that time frame did he make any comments, if
24  you recall, about his eye?
25     A.   I don't recall exactly what was said while he was

Page 21

1  outside the vehicle.
2      Q.   Do you recall anything that he said when he was on
3  the driver's side of the vehicle even if it's not exact to
4  the effect?
5      A.   I remember him saying something to the effect of he
6  was -- he was getting out or he's listening, or my hands are
7  up.  But that was during the time where he would raise his
8  hands up and then he would lower them back down.
9          But, no, I don't recall exactly what he said.
10     Q.   Was he being given some commands to put his hands up
11  when he was on the driver's side?
12     A.   Yes, sir.
13     Q.   And at times were his hands up?
14     A.   At various times he would put his hands up, but then
15  he would put them down.  They were never up for an extended
16  period of time.  He was not compliant at any point in time.
17     Q.   What is the longest period of time you recall him
18  having his hands up?
19     A.   I don't know because the situation was so dynamic.
20          I don't know that I could even give a reasonable
21  guess of how long the hands were up.  I don't, sir.
22     Q.   During the time he was on the driver's side of the
23  vehicle, did you ever see a weapon in his hands?
24     A.   Not during that time, sir, no.
25     Q.   Did you ever see a weapon on his person during the

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 30

1      MR. GALIPO:  Thank you, Diana.
2      So I want to mark Exhibit 8, and I think it's Bates
3  stamp ending in 1500.
4      (Exhibit 8 was marked for identification.)
5      MR. GALIPO:  And I would like to mark as Exhibit 9,
6  a photo with Bates stamp ending in 1557.
7      (Exhibit 9 was marked for identification.)
8      MR. GALIPO:  And we'll see if we can put Exhibit 8
9  first, it ends in 1500.
10 BY MR. GALIPO:
11     Q.  Can you see that on your screen?
12     A.  Yes, sir.
13     Q.  And does that appear to be the passenger side of the
14 suspect vehicle?
15     A.  Yes.
16     Q.  And the door is open in this photo, but at the time
17 of your approach, was the door opened or closed?
18     A.  I don't specifically recall.  I believe the door --
19 I don't want to misspeak.  I don't specifically recall,
20 sir.
21     Q.  All right.
22     MR. GALIPO:  Can we put up Exhibit 9, please.
23 BY MR. GALIPO:
24     Q.  This also shows a portion of the white vehicle; is
25 that correct?

Page 31

1      A.  Yes, sir.
2      Q.  And if my angles are right, is this looking like
3  northwest?
4      A.  Yes, sir.
5      MR. GALIPO:  And lastly, if we can find Exhibit 1499
6  or I should say Bates stamp 1499 we'll mark as Exhibit 10.
7      (Exhibit 10 was marked for identification.)
8  BY MR. GALIPO:
9      Q.  Are you able to see this on your screen as well?
10     A.  Yes, sir.
11     Q.  And this shows a portion of the CHP vehicle that you
12 were at initially?
13     A.  That's correct.
14     Q.  Okay.
15     MR. GALIPO:  Thank you, Hang.
16     We'll get back to those in a little bit.
17 BY MR. GALIPO:
18     Q.  So as you're approaching on the passenger side if
19 I'm understanding correctly, your sergeant is slightly behind
20 you?
21     A.  Yes, sir.
22     Q.  And do you have anything in your hands?
23     A.  Yes, sir.
24     Q.  What do you have in your hand?
25     A.  I had my firearm which is a Glock 17, sir.

Page 32

1      Q.  What caliber is it?
2      A.  9-millimeter.
3      Q.  Are you right-handed or left?
4      A.  Right-handed, sir.
5      Q.  As you were approaching, did you hear any commands
6  being given to Mr. Puga?
7      A.  I knew there were consistent commands for Mr. Puga
8  to keep his hands up and to walk back towards the CHP
9  officers.  The hands up commands were repeated extensively
10 and that that's ongoing.
11     Q.  And did you hear those type of commands being given
12 by the CHP officers as you were approaching?
13     A.  I don't recall exactly what was being said during my
14 approach.
15     Q.  Did you give any command at any time during your
16 approach to Mr. Puga?
17     A.  No, sir.  Not that I recall.
18     Q.  Did you ever hear anyone tell him to get down on the
19 ground?
20     A.  Yes.  That was said to Mr. Puga.
21     I know it started when he exited the vehicle and was
22 getting to the driver side of the vehicle.  He was told to
23 keep his hands up.  I believe he was told to get on the
24 ground, walk backwards towards the CHP officers.
25     I do believe that was said.

Page 33

1      Q.  Did you hear anyone tell him to get on the ground as
2  you were approaching on the passenger side?
3      A.  I don't recall, sir.
4      Q.  And did you ever tell him to get on the ground as
5  you were approaching on the passenger side?
6      A.  I don't believe I did, sir.
7      Q.  My understanding is that officers are trained to try
8  to avoid conflicting commands if they can.
9      Is that generally correct?
10     A.  Yes, sir.  That's fairly correct.
11     Q.  Do you think telling someone to put their hands up
12 and get on the ground could be potentially conflicting?
13     MS. GUSTAFSON:  Objection.  Overbroad; vague;
14 speculation.
15     You can answer.
16     THE WITNESS:  I think when faced with a situation
17 where somebody's non-compliant for an extended period of
18 time, you don't continue to do one thing over and over; you
19 try other options and see what will work in hopefully
20 avoiding escalation of the incident.
21 BY MR. GALIPO:
22     Q.  And one of the goals is to de-escalate?
23     A.  Yes, sir.
24     Q.  And try to take the person into custody with the
25 minimal amount of force?  That's at least the objective?

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

Page 34

1    A.   Yes, sir.
2    Q.   And one of the issues is not only the safety of the
3  officers and the community, but the safety of the suspect?
4    A.   Absolutely, sir.
5    Q.   I guess what I'm wondering, based on your training,
6  if someone's telling someone to put their hands up and to get
7  down on the ground at the same time, do you think that could
8  be potentially conflicting or confusing?
9        MS. GUSTAFSON:  Objection.  Overbroad; vague;
10 speculation.
11       You can answer.
12       MS. ESQUIVEL:  And misstates prior testimony, prior
13 statement.
14       MS. GUSTAFSON:  You can answer.
15       THE WITNESS:  As I previously said, sir, I think if
16 one thing is not working in attempts to have the best level
17 of communication possible with the suspect, other commands
18 may be given in hopes of trying to better connect with that
19 suspect to gain compliance.
20 BY MR. GALIPO:
21    Q.   Would you generally agree that if someone had their
22 hands up, and they were standing up and told to get on the
23 ground, their hands would have to lower to some extent to get
24 on the ground?
25    A.   No, I don't think so, sir.  I think you can step

Page 35

1  back with one foot and drop down to a knee and then a second
2  knee and keeping your hands up.  That is general practice.
3        A lot of times during high-risk traffic stops where
4  we've asked somebody to walk backwards towards us, we attempt
5  to have them keep their hands where we can see them until the
6  last possible minute where they might need to place them on
7  the ground.
8    Q.   Right.  But in a high-risk traffic stop you're
9  normally are very specific with the commands; right?
10       Go to a knee, but keep your hands up, for example?
11   A.   That's correct, sir.
12   Q.   Now, as you were approaching at some point, do you
13 hear shots?
14   A.   Yes, sir.
15   Q.   And do you hear shots before you fired your first
16 shots?
17   A.   Yes, sir.
18   Q.   And how many shots did you hear before you fired
19 your first shot?
20   A.   I do not know, sir.
21   Q.   Do you have any estimate?
22   A.   I do not, sir.
23   Q.   Do you know if it was more or less than ten, for
24 example?
25   A.   I would estimate it was less than ten shots were

Page 36

1  fired before I fired.
2    Q.   Were you looking at Mr. Puga when you heard the
3  shots starting?
4    A.   Yes, sir.
5    Q.   And did you ever see any muzzle flash coming from
6  Mr. Puga?
7    A.   When I approached on the east side of the vehicle,
8  Mr. Puga faced at me, and I saw his hands dive down into his
9  waistband area.  I don't know if it was waistband or pockets.
10 And I saw a gun, and then I heard shots, and then I returned
11 fire.
12   Q.   I think my question was, did you ever see any muzzle
13 flash coming from Mr. Puga?
14   A.   At what point in time, sir?
15   Q.   When he was in front of the vehicle before you
16 fired?
17   A.   When I saw the gun and heard the shots, I did not
18 specifically see a muzzle flash at that point in time.
19   Q.   Is one of the documents that you reviewed in
20 preparation for the deposition your statement or interview
21 you gave?
22   A.   Yes, sir.
23   Q.   And when was the last time you reviewed that?
24   A.   This past weekend, sir.
25   Q.   Do you recall in your statement indicating you heard

Page 37

1  the shots before you saw anything in Mr. Puga's hand?
2    A.   I do not recall that, sir.
3    Q.   Do you recall in your statement saying that you
4  yelled at Mr. Puga to get on the ground and simultaneously
5  you heard gunshots?
6    A.   I believe that's accurate, sir.
7    Q.   And do you recall saying after you heard the
8  gunshots is when you saw his arm or hand come up?
9    A.   I don't specifically recall that, sir.
10   Q.   Had you fired your first shot when Mr. Puga already
11 starting to run?
12   A.   I believe so.
13   Q.   And how many shots did you fire altogether?
14   A.   I believe it was ten rounds that I fired, sir.
15   Q.   Was there any pause in your sequence?
16   A.   Yes, sir.  There were two extended or distinct
17 pauses over the course of what I would describe as three
18 volleys of fire.
19   Q.   What would you estimate the number of shots in your
20 first volley?
21   A.   I believe it was three.  I believe that's what it
22 was in my first volley, sir.
23   Q.   And Mr. Puga was already starting to run away at the
24 time of your first volley of shots?
25   A.   Yes, sir.  It was very fluid and dynamic.

**JONATHAN W. BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Jake Adams on 11/12/2024**

| | Page 78 |
|---|---|
| 1 | DECLARATION UNDER PENALTY OF PERJURY |
| 2 | |
| 3 | Case Name:  Jonathan Wayne Botten, et al. vs. State of |
| 4 | California, et al. |
| 5 | Date of Deposition:  November 12, 2024 |
| 6 | Job No.:  116769 |
| 7 | |
| 8 | I, _____, hereby certify |
| 9 | under penalty of perjury under the laws of the State of |
| 10 | California that the foregoing is true and correct. |
| 11 | Executed this _____ day of _____, |
| 12 | 20____, at _____, California. |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | _____ |
| | JAKE ADAMS |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

| | Page 80 |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | Case Name:  Jonathan Wayne Botten, et al. vs. State of |
| 3 | California, et al. |
| 4 | Witness:  Jake Adams |
| 5 | Date of Deposition:  November 12, 2024 |
| 6 | Job No.:  116769 |
| 7 | Reason Codes:   1. To clarify the record. |
| 8 | 2. To conform to the facts. |
| 9 | 3. To correct transcription errors. |
| 10 | |
| 11 | Page _____ Line _____ Reason _____ |
| 12 | From _____ To _____ |
| 13 | Page _____ Line _____ Reason _____ |
| 14 | From _____ To _____ |
| 15 | Page _____ Line _____ Reason _____ |
| 16 | From _____ To _____ |
| 17 | Page _____ Line _____ Reason _____ |
| 18 | From _____ To _____ |
| 19 | Page _____ Line _____ Reason _____ |
| 20 | From _____ To _____ |
| 21 | Page _____ Line _____ Reason _____ |
| 22 | From _____ To _____ |
| 23 | Page _____ Line _____ Reason _____ |
| 24 | From _____ To _____ |
| 25 | Page _____ Line _____ Reason _____ |

| | Page 79 |
|---|---|
| 1 | CERTIFICATE |
| 2 | OF |
| 3 | CERTIFIED STENOGRAPHIC SHORTHAND REPORTER |
| 4 | |
| 5 | I, JINNA GRACE KIM, CSR No. 14151, a Certified |
| 6 | Stenographic Shorthand Reporter of the State of California, |
| 7 | do hereby certify: |
| 8 | That the foregoing proceedings were taken before me |
| 9 | at the time and place herein set forth; |
| 10 | That any witnesses in the foregoing proceedings, |
| 11 | prior to testifying, were placed under oath; |
| 12 | That a verbatim record of the proceedings was made |
| 13 | by me, using machine shorthand, which was thereafter |
| 14 | transcribed under my direction; |
| 15 | Further, that the foregoing is an accurate |
| 16 | transcription thereof. |
| 17 | I further certify that I am neither financially |
| 18 | interested in the action, nor a relative or employee of any |
| 19 | attorney of any of the parties. |
| 20 | |
| 21 | IN WITNESS WHEREOF, I have subscribed my name, this |
| 22 | date:  November 12, 2024. |
| 23 | |
| 24 | _____ |
| | Jinna Grace Kim, CSR No. 14151 |
| 25 | |

| | Page 81 |
|---|---|
| 1 | DEPOSITION ERRATA SHEET |
| 2 | From _____ To _____ |
| 3 | Page _____ Line _____ Reason _____ |
| 4 | From _____ To _____ |
| 5 | Page _____ Line _____ Reason _____ |
| 6 | From _____ To _____ |
| 7 | Page _____ Line _____ Reason _____ |
| 8 | From _____ To _____ |
| 9 | Page _____ Line _____ Reason _____ |
| 10 | From _____ To _____ |
| 11 | Page _____ Line _____ Reason _____ |
| 12 | From _____ To _____ |
| 13 | Page _____ Line _____ Reason _____ |
| 14 | From _____ To _____ |
| 15 | Page _____ Line _____ Reason _____ |
| 16 | From _____ To _____ |
| 17 | |
| 18 | _____ Subject to the above changes, I certify that the |
| 19 | transcript is true and correct. |
| 20 | _____ No changes have been made.  I certify that the |
| 21 | transcript is true and correct. |
| 22 | |
| 23 | _____ |
| 24 | JAKE ADAMS |
| 25 | |

# Exhibit S

**Page 1**

```
              UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF CALIFORNIA
L.C., a minor by and through     )
her guardian ad litem Maria      )
Cadena, individually and as      )
successor-in-interest to         )
Hector Puga; I.H., a minor by)   )
and through his guardian ad )    )
litem Jasmine Hernandez,         )
individually and as              )
successor-in-interest to         ) CASE NO. 5:22-cv-00949-KK
Hector Puga; A.L., a minor by)   )        (SHKx)
and through her guardian ad )    )
litem Lydia Lopez,               )
individually and as              )
successor-in-interest to         )
Hector Puga; and ANTONIA         )
SALAS UBALDO, individually,      )
                                 )
        Plaintiffs,              )
                                 ) ORAL AND VIDEOTAPED
        vs.                      )     DEPOSITION OF
                                 )   EDWARD MANGERINO
STATE OF CALIFORNIA; COUNTY      ) VIA WEB VIDEOCONFERENCE
OF SAN BERNARDINO: S.S.C., a )   ) MONDAY, NOVEMBER 25, 2024
nominal defendant; ISAIAH        )
KEE; MICHAEL BLACKWOOD;          )
BERNARDO RUBALCAVA; ROBERT       )
VACCARI; JAKE ADAMS; and         )
DOES 6-10, inclusive,            )
                                 )
        Defendants.              )
_____ )
```

Oral and videotaped deposition taken remotely on behalf of Defendants, commencing at 2:01 p.m. on Monday, November 25, 2024 before Erika "Rik" Rutledge, Certified Shorthand Reporter No. 13774 for the State of California.

**Page 2**

1  APPEARANCES OF COUNSEL:
2
   FOR PLAINTIFFS:
4      LAW OFFICES OF DALE K. GALIPO
       BY:  HANG D. LE
           ATTORNEY AT LAW
       21800 Burbank Boulevard
6      Suite 310
       Woodland Hills, California 91367
8      818.347.3333
       hlee@galipolaw.com
9
   FOR DEFENDANTS State of California by and through the
   CHP, and Officers Michael Blackwood, Isaiah Kee, and
10 Bernardo Rubalcava:
       STATE OF CALIFORNIA
11     TORT & CONDEMNATION SECTION
       OFFICE OF ATTORNEY GENERAL
       BY:  DIANA ESQUIVEL
13         DEPUTY ATTORNEY GENERAL
       1300 "I" Street
14     Sacramento, California 95814
       916.210.7320
15     diana.esquivel@doj.ca.gov
16
   FOR DEFENDANTS County of San Bernardino, Robert Vaccari,
   and Jake Adams:
18
       LYNBERG & WATKINS
19     BY:  AMY R. MARGOLIES
           ATTORNEY AT LAW
20     1100 West Town & Country Road
       Suite 1450
21     Orange, California 92868
       714.937-1010
22     amargolies@lynberg.com
23
24 LEGAL VIDEOGRAPHER:
25     Armando Perez

**Page 3**

              INDEX
DEPONENT      EXAMINATION      PAGE
Edward Mangerino   Ms. Margolies      5, 67
              Ms. Esquivel    49, 62
              Ms. Le          56

              EXHIBITS

Exhibit      Description      Page

EXHIBIT 19   Notice of Deposition and Subpoena   6

EXHIBIT 20   Interview Audio (Bates: COSB 1383) 18

EXHIBIT 21   Photograph - Incident Scene      23
             (Bates: COSB 3377)
EXHIBIT 22   Video - Incident Scene      41
             (Bates: COSB 1417)

EXHIBIT 23   Video - Incident Scene      59
             (Bates: COSB 1459)

PREVIOUSLY MARKED AND ATTACHED HEREIN
EXHIBIT 13   Interview Audio (Bates: COSB 1415)
EXHIBIT 17   Photograph - Incident Scene
             (Bates: COSB 3233)


              QUESTIONS NOT ANSWERED

              (None)


              INFORMATION REQUESTED

              (None)

**Page 4**

REMOTE VIA WEB VIDEOCONFERENCE
MONDAY, NOVEMBER 25, 2024 2:01 P.M.
oo00oo

14:01:52    THE VIDEOGRAPHER:  We're now on the record. Today's date is November 25th, 2024, and the time is 2:01 p.m. Pacific.  This is the video deposition of Edward Mangerino in the matter of L.C., et al. versus State of California, et al.  Filed in the United States
14:02:21    District Court, Central District of California.  Case No. 522CV00949-KK(SHKx).

This deposition is taking place via web videoconference, with all participants attending remotely.  My name is Armando Perez; I'm the
14:02:57    videographer representing Jilio-Ryan Court Reporters.

Would counsel on the conference please identify yourselves and state whom you represent, beginning with the questioning attorney.

MS. MARGOLIES:  Good afternoon.  Amy Margolies
14:03:09    from Lynberg & Watkins on behalf of the County of San Bernardino and Deputies Adam and Vaccari.

MS. ESQUIVEL:  Good afternoon.  Diana Esquivel representing the State of California by and through the California Highway Patrol, and Officers Blackwood, Kee,
14:03:29    and Rubalcava.

Mangerino, Edward
L.C. v. State of California

---

**33**

1     passenger side of the car.

2        **Q During that whole hour that Hector was in his**

3     **vehicle, do you remember anything that Hector was doing**

4     **inside his vehicle?**

14:46:10  5     A Yeah, he took his shirt off, threw it outside

6     the car. He threw some beer cans out; I think he was

7     kind of drinking at the same time. I couldn't really

8     see that, but he threw the beer cans out.

9        He did put his hands out of the vehicle.

14:46:25  10  Because the window was open, either it was shot or he

11   opened it. He put his hands out a couple times, but

12   basically I guess he was getting the verbal that we just

13   listened to, that I described in the police report I

14   gave.

14:46:42  15     **Q At any point do you recall if Puga opened the**

16   **passenger door?**

17     A I cannot remember that.

18     **Q I'm going to play Exhibit 20 again COSB 1383 at**

19   **four minutes.**

14:47:17  20     (2:47 p.m. audio played for all parties.)

21   BY MS. MARGOLIES:

22     **Q I'm pausing it now at 4:06. Did listening to**

23   **that refresh your recollection about whether or not**

24   **Mr. Puga opened the passenger door before he got out of**

14:47:37  25  **the vehicle?**

---

**34**

1     A No, it doesn't. But if I said that, then I

2     have to assume, yes. That's my testimony, yeah, I'll

3     accept that as correct, yes. But it doesn't help me.

4     Sorry.

14:47:47  5     **Q That's okay. That's a lawyerly type of**

6   **question that I ask, and I completely understand that it**

7   **does not refresh your recollection.**

8     **Okay. You actually stopped and gave us a**

9   **really great transition point when you described that he**

14:48:14  10  **got out of his vehicle, they, being the law enforcement,**

11   **wanted him to close the door, he didn't comply, he**

12   **eventually did close the door, he was told to raise his**

13   **hands, he did not raise his hands, and then he ran to**

14   **the front of his vehicle placing his vehicle in between**

14:48:32  15  **himself and law enforcement.**

16     **Do I have that correct so far?**

17     A Yes.

18     **Q And about how long was the duration from when**

19   **he exited his vehicle to when he ran to the front of his**

14:48:46  20  **vehicle, if you recall?**

21     A Has to be about five minutes; no more than ten.

22   It was pretty quick.

23     **Q And during the five minutes that he was out of**

24   **his vehicle, is it fair to say that he never walked**

14:49:03  25  **backwards, then, to law enforcement?**

---

**35**

1     A No, he did not. He made no attempt to do so.

2     **Q Go ahead and pick up what you recall from**

3   **there. Then he runs to the front of his vehicle, and**

4   **what happens next?**

14:49:31  5     A They're now telling him to come back, I'm

6   assuming. I can't remember exactly what they said. But

7   I just know from my feelings is that I just realized

8   this thing could take a whole different course. It now

9   got very serious.

14:49:52  10     And I can't really recollect what the police

11   were saying. But if you want to go on, at some point

12   while he was standing there. But his arm was raised

13   up -- and I could not see a gun, so we'll be clear on

14   that, I couldn't see a gun.

14:50:08  15     But his arm was up, he had his hand around

16   something, and smoke came from the front of his hand,

17   which gave me the impression that he had a gun.

18     Then that's when my camera died, my phone died,

19   and everything else I think Erin has on her phone after

14:50:25  20  that. This is something I forgot to tell you, and it's

21   going to be important.

22     Erin was in the bedroom filming. I was filming

23   from the south door along the garage facing south on

24   Catalpa in that picture. I was at the south door, and I

14:50:43  25  had a clearer view than what Erin had at that time

---

**36**

1     period. But she gets everything else after that period.

2     When I finally get back to the bedroom, the

3   gentleman has just fallen to the ground.

4     **Q I'm going to show you again Exhibit 21, COSB**

14:51:28  5   **3377. I'm not sure if we can see it. I think we can.**

6   **But if you could let me know from looking at this**

7   **photograph if you could show us where you were standing**

8   **when you saw the suspect with his arm out, his hand**

9   **wrapped around something, and then a puff of the smoke**

14:51:51  10  **expel from that hand. You said you did not see a gun?**

11     A No, I didn't. But the impression of his

12   movements and things like that, yes, that gave me the

13   impression he had a gun.

14     **Q The item then that his hand was wrapped around,**

14:52:22  15  **your impression was based on his movement and that smoke**

16   **came from it?**

17     A Yes. Yes, it was.

18     **Q I'm going to show you Exhibit 21 again**

19   **(indicating). Can you see that?**

14:52:39  20     A If you see the three cars in my front yard,

21   you'll see the door just between two of the cars; that's

22   where I was standing there. So from that angle, the car

23   was almost kitty-corner from that angle. But I can't

24   show you where he was standing.

14:53:01  25     If you had the other picture, would that be

---

9 (Pages 33 to 36)

1  better, when we were looking at the police law
2  enforcement, the back of the vehicle?
3      Q  Absolutely.  I will bring up now exhibit -- I
4  think it's 17, I was corrected.  It's COSB 3233.
14:53:26  5      A  You see where the highway patrol car is right
6  behind him, behind the vehicle?
7      Q  Yes.
8      A  He came out on the left side and spun himself
9  in front of the white vehicle.  So yeah, almost where
14:53:42  10  your hand is.  He was almost centered in the car.
11      Q  In front of it?
12      A  Yeah, in front of that car.
13      Q  Now I'm zooming in a bit to your house to see
14  if you can identify for us in this exhibit photo where
14:54:00  15  you were standing and filming from.
16      A  If you look at the white Subaru, that door
17  behind it, that's where I was at.  And I had the little
18  door open and I was standing just a bit out of it.
19      Q  (Indicating)?
14:54:20  20      A  Just right there.
21      Q  When I look at the white Subaru, in front of
22  it -- well, really to the left of it -- I see a small
23  rectangle almost like a window followed by --
24      A  It's actually a little side door.  So the main
14:54:35  25  door is there, but the two sides opened up at their end.

37

1  So I actually had that window -- or that little doorway
2  open when I was filming.
3      Q  So the record is clear, I just want to finish
4  what I'm describing that I see.  To the left of your
14:54:51  5  white Subaru, I see a rectangle and then two squares and
6  then another rectangle moving left to right.
7      A  Yeah, it would be -- that was the door I was
8  standing out of.
9      Q  Is the door the two squares in between the --
14:55:14  10      A  Yeah, the doors are two squares.
11      Q  Thank you, sorry if that was a bit painful.
12      A  That's okay.
13      Q  So you're describing that you had a different
14  vantage point than your daughter does --
14:55:28  15      A  Yeah.
16      Q  -- who's all the way on the other side of the
17  house in your bedroom?
18      A  Yes.  So she probably saw more of the back of
19  him; where I saw more of the side of him.  But when they
14:55:43  20  went down the street, then she would have a better
21  vantage point than I did because then I lose sight of
22  him behind the house as he goes down the street.
23      Q  So after you saw the suspect run to the front
24  of his vehicle, he has his arm up, his hand in the arm
14:56:05  25  that's raised wrapped around something that you could

38

1  not tell what it was --
2      A  Uh-huh.
3      Q  -- a puff of smoke come from that hand.  And
4  based on your impression of his movement and the smoke
14:56:17  5  and the way his arm is raised, you believed he had a
6  gun?
7      A  Yes, I do.
8      Q  And then what happened after that?
9      A  The officers started returning fire, and he
14:56:30  10  just took off turning -- going north up Peach, and
11  that's when I lost sight of him.
12      Q  Is this when you then left from that garage
13  area back to your bedroom with the rest of your
14  family?
14:56:47  15      A  Yes, that's when I came back.
16      Q  So then safe to say that you were not able to
17  see what was occurring out on the street when you moved
18  yourself from the garage to your bedroom window?
19      A  Yes, that's correct.
14:56:57  20      Q  I believe the next thing that you saw was that
21  the suspect was on the floor in your, I guess, front
22  lawn?
23      A  Almost, yeah.  He was on the side of the street
24  but on my property.
14:57:16  25      Q  What did you see next?

39

1      A  He did lift up a little, but then he just fell
2  back down.  They went and checked, but he wasn't moving.
3  Fire eventually came and they did an assessment and he
4  was deceased at that time period.
14:57:37  5      Q  Do you have any recollection in terms of time,
6  how long it took for Fire to get to the scene?
7      A  It was not very long, to be exact.  We were
8  surprised because when the ambulance came, they didn't
9  go straight to the deceased, they went straight to the
14:57:58  10  house with the Bottlies [sic], went straight to their
11  home.
12      And that's where a lot of the police officers
13  went also after that.  That's when -- they must have
14  become aware that they had been shot.  A fire truck did
14:58:11  15  pull up next to the deceased and one of the paramedics
16  did check with the defibrillator, but he was gone.
17      Q  You described that it wasn't a very long time
18  and you were surprised.  Could you give us an estimate
19  in terms of minutes, perhaps, it took for Fire and
14:58:35  20  paramedics to come?
21      A  Anywhere from five to ten minutes.  The station
22  is only about ten minutes from my -- not even that --
23  five minutes from my house.  So they would have been
24  here pretty quick.  So no more than five to ten minutes.
14:58:54  25  I would say ten would probably be the -- by the time

40

10  (Pages 37 to 40)

Mangerino, Edward
L.C. v. State of California

---

1    they got dispatched and everything out.
2        Q   Mr. Mangerino, I have about 45 short videos
3    that appear to have come from your phone.  And in
4    listening to your interview, it sounds like in order to
5    send them, you had to clip them; does that sound right?
6        A   I don't know.  My daughter sent them for me.
7    Sorry about that.  Yeah, I'm not tech savvy, so I'm
8    assuming my daughter or my son sent them to the police
9    force.
10       They were -- actually, it's not one continuous
11   video, if I remember correctly; it's small segments.
12   Each one is a small segment.
13       THE REPORTER:  Ms. Margolies, did you say "45"
14   or "four to five" -- you did say -- okay.
15       MS. MARGOLIES:  Forty-five.
16       I'm not going to show them all to you.  But for
17   the record, I believe we are now on Exhibit 22.  For the
18   record the videos range from COSB 1417 continuously,
19   ending at COSB 1461.  And I'm just going to play the
20   very first one.  And if you could watch it for a few
21   seconds.  It's actually only 14 seconds long.
22       (EXHIBIT 22 MARKED FOR IDENTIFICATION.)
23   BY MS. MARGOLIES:
24       Q   If you could let us know if this was a video
25   that you took.  I'm showing you COSB 1417.

                                                    41

---

1    Puga's demeanor, how would you describe that?
2        A   He was cagey.  You're talking about the
3    suspect?
4        Q   I'm sorry, Hector Puga, yes, thank you.
5        A   He was cagey.  I would say agitated, is the
6    word maybe.  And I do believe that if he had complied,
7    there would not have been the result that they ended up
8    with.
9        MS. MARGOLIES:  We've been going for an hour,
10   but I actually think I'm just about done.  If we can
11   just go for about another five minutes and then take a
12   break, would that be all right with everybody?
13       THE WITNESS:  That's fine with me.
14   BY MS. MARGOLIES:
15       Q   Following the incident did you post anything on
16   social media about the incident?
17       A   No.
18       Q   I'm going back.  I don't know if we have spoken
19   about this because I've listened to your interviews
20   quite a lot and I'm getting it confused with what we've
21   spoke about.  Can you describe for us the lighting at
22   the intersection on the day of the incident.
23       A   Yeah.  It was actually pretty well lit.
24   There's actually a streetlight on the southwest corner
25   of the street.  So almost opposite where the suspect

                                                    43

---

1    (3:00 p.m. video played for all parties.)
2        THE WITNESS:  Yes, that's from my vantage
3    point.
4    BY MS. MARGOLIES:
5        Q   Mr. Mangerino, how would you describe law
6    enforcement's demeanor from what you saw during this
7    encounter?
8        A   Just from listening to them -- because I didn't
9    see them -- they seemed calm.  They were trying to be
10   helpful to get him out of the car.  There was no
11   aggression, that I can remember, in their voices.
12       They got panicky when he went in front of the
13   car; their voices then changed then.  But it was
14   still -- I didn't see any real aggression, like, you
15   know.  They were trying to be very calm.  They were
16   trying to de-escalate the situation.
17       Q   I'm going to play for you your interview again,
18   COSB 1383, Exhibit 20, starting at six minutes, 38
19   seconds.
20       (3:03 p.m. audio played for all parties.)
21   BY MS. MARGOLIES:
22       Q   I'm stopping at 7:05.  From that audio clip
23   there, does that refresh your recollection as to the
24   officers' demeanor, pretty consistent with what you just
25   told us, that the officers seemed calm.  And in terms of

                                                    42

---

1    vehicle was at.
2        Q   Then we know there were the police lights that
3    you described.
4        A   Yes.  I can't believe I forgot those.
5        Q   What about any porch lights?  Did you have your
6    porch light or any neighbors?
7        A   My porch light would have been on, but none of
8    the other porch -- not even mine would have made much
9    difference to the lighting around the vehicle.
10       The exact -- the helicopter had already left.
11   So when we first -- you looked first on the video, you
12   see the light from the helicopter on the vehicle.  But
13   they had to leave.  I don't know why, but they left;
14   they weren't there for the final part.
15       Q   Do you know how long into the incident the
16   helicopter left?
17       A   You know, I don't know.  It could have been
18   maybe 15 to 20 minutes.  They didn't seem to be there
19   very long, but it's just my recollection four years
20   ago.
21       Q   Of course.  But your recollection was that the
22   helicopter was there the first time the vehicles went up
23   your street?
24       A   I don't know if the first time.  I do know it
25   was there when he came down.

                                                    44

---

11 (Pages 41 to 44)

```
 1   STATE OF CALIFORNIA      )
                              )     ss.
 2   COUNTY OF ORANGE         )

 3

 4

 5              I, Erika "Rik" Rutledge, Certified

 6   Shorthand Reporter, Certificate No. 13774, for the State

 7   of California, hereby certify:

 8              I am the deposition officer that

 9   stenographically recorded the testimony in the foregoing

10   deposition;

11              Prior to being examined, the deponent was

12   by me first duly sworn;

13              The foregoing transcript is a true and

14   accurate record of the testimony given.

15

16   Dated:  December 16, 2024

17

18

19   _____

20              Erika "Rik" Rutledge

21

22

23

24

25
```

# Exhibit T

## Page 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

L.C., a minor by and through )
her guardian ad litem Maria )
Cadena, individually and as )
successor-in-interest to )
Hector Puga, et al., )
) Case No.
Plaintiffs, ) 5:22-cv-00949-KK-(SHKx)
)
vs. )
)
STATE OF CALIFORNIA, et al., )
)
Defendants. )
_____)
)
ABBREVIATED CAPTION. )
_____)

VIDEOTAPED DEPOSITION OF TAMMY GOODSON
TUESDAY, NOVEMBER 26, 2024
TAKEN REMOTELY VIA ZOOM

Reported by:

SUSAN H. CAIOPOULOS
CSR No. 8122

## Page 2

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

L.C., a minor by and through her )
guardian ad litem Maria Cadena, )
individually and as successor-in- )
interest to Hector Puga; I.H., a )
minor by and through his guardian )
ad litem Jasmine Hernandez, )
individually and as successor-in- ) Case No.
interest to Hector Puga; A.L., a ) 5:22-cv-00949-KK-(SHKx)
minor by and through her guardian )
ad litem Lydia Lopez, individually )
and as successor-in-interest to )
Hector Puga; and ANTONIA SALSA )
UBALDO, individually, )
)
Plaintiffs, )
)
vs. )
)
STATE OF CALIFORNIA; COUNTY OF )
SAN BERNARDINO; S.S.C., a nominal )
defendant; ISAIAH KEE; MICHAEL )
BLACKWOOD; BERNARDO RUBALCAVA; )
ROBERT VACCARI; JAKE ADAMS; and )
DOES 6-10, inclusive, )
)
Defendants. )
_____)

VIDEOTAPED DEPOSITION OF TAMMY GOODSON, taken
remotely via Zoom, on behalf of Defendants County of
San Bernardino, Robert Vaccari, and Jake Adams,
beginning at 2:17 p.m. and ending at 4:00 p.m. on
Tuesday, November 26, 2024, before SUSAN H. CAIOPOULOS,
Certified Shorthand Reporter No. 8122.

## Page 3

APPEARANCES:

For Plaintiffs L.C., I.H., A.L.,
and Antonia Salas Ubaldo:

LAW OFFICES OF DALE K. GALIPO
BY: HANG D. LE, ESQ.
21800 Burbank Boulevard, Suite 310
Woodland Hills, California 91367
(818) 347-3333
hlee@galipolaw.com

For Defendants County of San Bernardino,
Robert Vaccari, and Jake Adams:

LYNBERG & WATKINS
BY: AMY R. MARGOLIES, ESQ.
1100 West Town & Country Road, Suite 1450
Orange, California 92868
(714) 937-1010
amargolies@lynberg.com

For Defendants State of California by and through
California Highway Patrol, and Michael Blackwood,
Isaiah Kee, and Bernardo Rubalcava:

DEPUTY ATTORNEY GENERAL
TORTE & CONDEMNATION SECTION
BY: DIANA ESQUIVEL, ESQ.
1300 I Street, Suite 125
Sacramento, California 95814
(916) 210-7320
diana.esquivel@doj.ca.gov

Also Present:

ELIZABETH PRADO, Videographer

JESSICA GOODSON

RAYMOND GOODSON

## Page 4

I N D E X

WITNESS                    EXAMINATION
TAMMY GOODSON
        BY MS. MARGOLIES        6, 66
        BY MS. ESQUIVEL         40
        BY MS. LE               50

EXHIBITS MARKED FOR IDENTIFICATION
NUMBER          DESCRIPTION          PAGE
Exhibit 24  Amended Notice of Taking Deposition     7
        of Tammy Goodson, with attachments;
        8 pages
Exhibit 25  Audio recording; (COSB001413)      23
Exhibit 26  Audio recording; (COSB001414)      37
Exhibit 27  Photo; (COSB003771)      67

EXHIBITS ATTACHED FOR REFERENCE
NUMBER          DESCRIPTION          PAGE
Exhibit 15  Scene overview photos; (COSB000105)      28
Exhibit 17  Scene photos (COSB003233);      56

1 (Pages 1 to 4)

1    Q   And you were watching from your bedroom window;
is that right?

3    A   That is correct.  It woke me up, and I was
thinking what in the world is going on, because -- I
02:53   5   didn't know what was going on.

6    Q   And when you woke up and first looked out your
window, was the chase happening up and down your street
8    or was the --

9    A   No, it was stopped at that point.  They were
02:53  10   just trying to get him out of the car.

11    Q   So if I'm understanding you right, when you
12   looked out the window for the first time, all the
13   vehicles, the suspect's vehicle and law enforcement's
14   vehicles, were stopped?

02:53  15   A   Yes, right behind him.

16    MS. MARGOLIES:  Okay.  I'm going to continue
17   playing at 2 minutes and 35 seconds.

18    THE WITNESS:  Okay.

19    (Audio played.)

02:54  20    MS. MARGOLIES:  I'm pausing it at 3 minutes and
21   5 seconds.

22   BY MS. MARGOLIES:

23    Q   Did you hear yourself, Ms. Goodson, telling the
24   investigator -- the detective rather, that it took him,
02:54  25   being the suspect, forever to get out of the car?

25

1    A   Yes.

2    Q   And is it your recollection --

3    A   Yes, I did.  Mm-hmm, yes.

4    Q   And then when he finally did, he was opening
02:55   5   the door and closing the door.  You could see he threw
6    his shit out, and you kept wondering is he going to get
7    out, is he going to get out, and then he finally got
8    out.  Is that right?

9    A   That is correct.

02:55  10    Q   Do you know about how long that interaction was
11   happening, how long law enforcement was trying to get
12   him out of the car for?

13    A   I think like 30 minutes.  And then when he
14   finally did get out, he took something out of his
02:55  15   waistband, it looked like a gun, and I think that's when
16   he shot at the cops.  And then that's when that whole
17   fire thing went on.

18    Q   Okay.  So just to back up, so for approximately
19   30 minutes is what you recall law enforcement was trying
02:56  20   to get the suspect, Mr. Puga, out of the vehicle?

21    A   Yes, I would say, at least.

22    Q   And after about 30 minutes, the suspect finally
23   gets out of the vehicle?

24    A   Yes.  And then he takes something out of his
02:56  25   waistband, a gun apparently, shot at the cops, and then

26

1    that's when everything happened.  That's when everything
2    went down.  Bullets were flying everywhere.  I mean, I
3    still have bullet holes in my house, in my car.

4    Q   Would you describe for us how Mr. Puga got out
02:57   5   of his car?

6    A   Yeah, he just, like, kind of jumped out, and
7    then went running, shooting.  And then he went running,
8    running towards our house, and then that's when the
9    fire -- like, they started firing at him.

02:57  10    And he ended up outside my back gate, and he
11   just like was laying there.  And they said, "Show me
12   your hands.  Show me your hands."  And I was thinking
13   he's not going to show you his hands.  You just shot the
14   hell out of him.

02:57  15    And then they left him there, laying there on
16   the ground.  And finally after a few hours they put
17   something around him to cover him up, but it was a long
18   time before they did that.

19    At the time we had a boat in our backyard, but
02:58  20   we don't have it anymore.  We had a pool for our dog; we
21   don't have that anymore.  They shot that too.

22    Q   Okay.  I'm going to show you a couple
23   photographs.

24    A   Okay.

02:58  25    Q   Because I want to try to understand and get a

27

1    visual of where you were when this happened.  Okay?

2    A   All right.

3    Q   I'm going to show you to Exhibit 27, Bates-stamped
COSB003767.

02:58   5   A   Okay.  Kinda scared.

6    Q   I apologize.  It's actually going to be a scene
7    overview of the incident, that four-way intersection at
8    Peach and Catalpa, and it's actually going to be
9    Exhibit 15, COSB000105.

02:59  10    A   Okay.

11    Q   I'm going to try to make it as big as possible,
12   because I know that you're using a cell phone.

13    A   Mm-hmm.

14    (Exhibit 15 was marked at a prior deposition
02:59  15    and is attached hereto for reference.)

16   BY MS. MARGOLIES:

17    Q   Ms. Goodson, do you see a photograph on your
18   screen now?

19    A   I do, mm-hmm.

02:59  20    Q   Could you describe for us what you see in this
21   photograph?

22    A   I can barely see it, but --

23    Q   I've tried to zoom in on Exhibit 15, and it's a
24   photo of the intersection of Catalpa and Peach.  And I
03:00  25   wanted to know if, in this photograph, you recognize

28

Goodson, Tammy
L.C. v. State of California

---

**Page 29**

your house.

A   Oh, dang it.  Dang it.

Raymond, come here for a minute.

Well, I live on the corner of Peach and Birch.

Do you see our house in that photograph?

Q   I'm sorry, you live on the corner of Peach and Birch?

(Indiscernible male voice in background.)

THE WITNESS:  Yeah.  Do you see it?

Yeah, I live on the corner of Peach and Birch.

BY MS. MARGOLIES:

Q   So Ms. Goodson, you do not live on the corner of --

A   I can barely see that.

Q   I'll stop sharing it.

Ms. Goodson, I just want to make sure I'm understanding.  You do not live on the corner of Catalpa and Peach?

A   No.  I live on the corner of Peach and Birch, which is -- my backyard is like towards Catalpa.

(Indiscernible male voice in background.)

THE WITNESS:  Like right there.  So where he landed was at my backyard, like right in the middle of my neighbor next to me and right in our yard, like towards our gate.

---

**Page 30**

BY MS. MARGOLIES:

Q   Okay.  Is it correct then that your neighbors live on the corner of Catalpa and Peach?

A   That is correct.

Q   Okay.  So you're one house up --

A   Mm-hmm, yeah.

Q   You're one house up Peach then, from the corner of the intersection where this event occurred?

A   Exactly, mm-hmm, yes.

Q   So --

A   And our yard is kind of large.  So the backyard landed at right where almost he was, where our gate was and our boat and everything else, that's where he landed.

Q   I understand now.  I had you at a different house.

So then when you looked out your window, were you looking down Peach at the incident?

A   Yes.

Q   Yes?

A   Yes.  Yeah.  Because my house is facing towards Catalpa.  Like my bedroom window faces towards that road.  So that's exactly where I was looking.

Q   If you could clarify for me.  Your bedroom window faces Catalpa or Peach?

---

**Page 31**

A   Catalpa.

Q   From your bedroom window can you see the intersection of Catalpa and Peach?

A   Oh, yeah, mm-hmm.

Q   Yes?

A   Oh, yes.

Q   When you looked out your window, did you -- what is the first car that you can see?

A   I saw the man's -- I think it was a truck, the suspect's truck.  And then there was a bunch of police cars behind him.  Helicopter swirling around, like yelling.

Q   Okay.  That is very helpful.

So walking it back, for at least 30 minutes law enforcement's -- the vehicles I guess on the scene, as well as the helicopter, are trying to get the suspect out of the vehicle.  And he eventually comes out, right?

A   Exactly.

Q   Okay.  And he grabs something from his waistband, and you said "a gun apparently."  What makes you believe it was a gun?

A   Well, because, um, it looked like he was shooting and running away.  And that's what made them shoot at him, to make him stop.

Q   Could you describe for us what exactly you saw

---

**Page 32**

that led you to believe he had a gun and that he was shooting?  Is it something you saw, or heard, or both?

A   Both.  It's like he got out of his vehicle all of a sudden, grabbed something from his waistband that looked to appear as a gun from where I could see.  He started shooting, at least what I know.  And then that's when all the gunfire started happening.

Q   And so your recollection is that the suspect fired his gun at law enforcement before law enforcement fired their weapons?

A   Exactly.  Yes.

Q   And about how long did the shooting last for, if you can recall?

A   Oh, man.  I can't recall exactly, but I think it was like two minutes maybe.  There was just bullets flying everywhere.

Q   When you were watching from your bedroom window, did you have your bedroom window open or closed?

A   It was closed.  But the curtains were open, obviously, and I could see out.  But it was so loud, it didn't matter.

Q   And how would you describe the lighting at that intersection where the shooting occurred?

A   Well, it was very lit up because of the officers' flashlights and stuff.  They were shining

---

8  (Pages 29 to 32)

**Goodson, Tammy**
**L.C. v. State of California**

---

1    A   Yes, when it first happened.
2        Q   -- white car came to a stop, or was it further
into the incident?
4    A   It was when it first happened.  When I seen
03:26 5  them out there stopped, that's when the announcement was
made.
7        Q   Okay.
8    A   Like, "Don't" -- "don't get out of your house,"
9    or "Stay inside," you know, "Don't leave."
03:26 10     Q   And --
11   A   And right when they first -- I saw them first
12   stopped there, and the police vehicles behind him,
13   that's when I heard the announcement.
14       Q   Okay.  Do you know how long the helicopter
03:27 15 stayed in the area?
16   A   The whole time.
17       Q   That's your recollection, was that it was there
18   even through the shooting?
19   A   Yep, the whole time.
03:27 20     Q   Okay.  From the location where you were
21   standing, looking -- and this was your bedroom window,
22   correct?
23   A   Yes.
24       Q   Okay.  From the location where you were
03:27 25 standing, looking at the events that were occurring at

45

---

1    the intersection of Peach and Catalpa --
2    A   Yeah.
3        Q   -- could you see the front door of the Bottens'
4    house?
03:27 5   A   No.  No.
6        Q   Okay.
7    A   Nope.
8        Q   Could you see whether there were any lights on
9    anywhere in the house?  I don't even know if you were
03:28 10 paying attention to that, but to the best of your
11   recollection.
12   A   I didn't even notice that.  I didn't even
13   notice that.
14       Q   Okay.  And I heard you testify earlier that
03:28 15 when you were listing the prior jobs that you had, I
16   thought I heard you say that you once worked as a CNA.
17   Is that correct?
18   A   Yes.
19       Q   And is that a certified nursing assistant?
03:28 20  A   That's correct.
21       Q   Okay.  How long did you do that for?
22   A   Four years.
23       Q   Okay.  And you testified earlier that you --
24   while you were watching the officers once Hector went
03:28 25 down to the ground, that they were giving him commands

46

---

1    to give them -- you know, to put up his hand or to show
2    them their hands.
3    A   Mm-hmm.
4        Q   And that you believe that he had died.  How did
03:29 5  you come to that conclusion, that you believed that he
6    had died?
7    A   Well, being the multiple shots fired in there,
8    there's no way he could live.  I mean, there was gunfire
9    all over the house, over my house.
03:29 10     Q   Okay.  As he was running --
11   A   So I'm sure --
12       Q   Oh, I'm sorry.  Go ahead.  Go ahead.
13   A   I'm sure he was riddled with bullets at that
14   point.
03:29 15     Q   Okay.  Well, my question is a little -- I'm
16   going to ask you a very specific question, and try to
17   make the difference between an assumption and what you
18   actually saw, is:  As he was running towards you --
19   A   Mm-hmm.
03:29 20     Q   -- were you able to see that he had been hit by
21   bullets?
22   A   Oh, yes.
23       Q   Okay.  And what did you see that gave you the
24   impression that he had been hit by a bullet?
03:29 25  A   Well, it was like fire, fire, fire, fire.  He's

47

---

1    running and he's falling.  Fire.  And he falls to the
2    ground.  And then I knew, I already knew at that point
3    he was no longer alive probably at that point, as many
4    times as he was shot.
03:30 5      Q   Okay.
6    A   Like I said, bullets ricocheting all over my
7    house.
8        Q   Okay.  Well, again, you know, I just want to be
9    specific in terms of as he was running towards you, did
03:30 10 you see blood coming out of anywhere in his body, or
11   maybe soaking his clothes?
12   A   He didn't -- I don't even think he had a shirt
13   on.  And I didn't see any of that.
14       Q   Okay.  So just based on the number of fire --
03:31 15 of gunfire that you heard, you're making the assumption
16   that he was hit?
17   A   Oh, I'm not assuming.  I'm not assuming that he
18   was hit.  You could see it happening visually, like -- I
19   don't know how to explain it.  When you get shot by a
03:31 20 gun, how it happens, he was just like -- I don't know
21   how to explain it.  Literally shot, shot, shot, and
22   shot.
23       Q   So is it just --
24   A   And hit the ground.
03:31 25     Q   Is it the movement of his body that gave you

48

---

12  (Pages 45 to 48)

the impression that he had been shot, since you said --

A Yes.

Q -- that you didn't see any blood?

A I couldn't see the blood, no. But I know --

03:31  Q Okay. So it's the movement, is that a fair statement, that it's the way he was moving, to you, that gave you the impression he had been struck?

A Yes, definitely.

Q Okay.

03:32  A Honestly, yes.

Q Okay. And then you testified earlier also that you saw him pull a gun out of his waistband and shoot at the officers.

A Yes.

03:32  Q Did you actually see the gun in his hand?

A Well, I seen something come out of his waistband, pulled it towards the officers, I hear the gunfire, and then all of a sudden they shot at him.

Q Okay. So were you able to see -- so you definitely heard a shot, correct?

03:32  A Oh, yeah.

Q Do you remember how many you heard?

A I heard two or three before they shot at him.

Q Okay. Other than the shots, do you recall if

03:33  you saw any flash or smoke come out of the area of

49

Hector's hand that was holding the gun?

A Oh, no. There is no way, hmm-mm.

Q Okay.

A It was like 2-something in the morning.

03:33  Q Okay. And from the -- where you were standing watching the events unfold, were you able to see if there were any officers on the -- on your side of Peach Street below Catalpa?

A What about that?

03:33  Q No, were you able to see if there were any officers on the Peach -- on your side of Peach Street, but below Catalpa, not -- on the south side, not the north side?

A No. No, not until after the incident occurred.

03:34  MS. ESQUIVEL: Okay. I think that's all the questions I have. Thank you very much for your time.

THE WITNESS: Thank you.

EXAMINATION

03:34  BY MS. LE:

Q Good afternoon, Ms. Goodson. My name is Hang. I represent the plaintiffs in this case.

I have quite a few questions for you. So if you want to take a break, I'm happy to give you a

03:34  ten-minute break now. If you're okay to move forward,

50

we could do that as well, but --

A Let's just -- let's just go.

Q Okay.

Okay. So you previously testified that from

03:34  the time that you started watching till the time that Mr. Puga exited the vehicle, you estimated up to 35 minutes; is that correct?

A Yes.

Q Okay.

03:35  A At least.

Q At least 35 minutes. Yes.

A Mm-hmm.

Q You also testified that close in time to before he got out of the car, a passenger -- or someone on the

03:35  passenger side of the car got out of the car before that; is that correct?

A Yes, mm-hmm.

Q How long before he got out of the car did the passenger get out of the car?

03:35  A Um, she got out first, right away, and then he -- and then he got out.

Q Can you give me an estimate as to how many minutes she got out before he got out?

A I didn't -- I think it was instantly.

03:35  Q So she got out, and then he instantly got out

51

of the car?

A She instantly got out. I think it was like he told her, "Get out of the car."

Q So --

03:35  A And --

Q Oh, I'm sorry. Go ahead.

A He got out.

Q So you saw her get out of the car, and then immediately he exited the car as well?

03:35  A Finally, yes.

Q Okay. And then you said that when he got out of the car -- you said he got out of the car, all of a sudden grabbed something from his waistband that looked like a gun, and starting shooting; is that correct?

03:36  A That's correct.

Q Okay. So was that kind of like one full movement, he got out of the car, immediately grabbed something --

A Yes.

03:36  Q Okay. So there was no -- there's nothing -- no intervening event in between; he just got out of the car, grabbed something from his waistband, and started shooting immediately?

A Yes.

03:36  Q Okay. Where was he in relation to his car when

52

13 (Pages 49 to 52)

**Page 53**

1    he grabbed something from his waistband?
2        A   Right after he got out of the door.
3        Q   So he was still near the driver's side door
4    when he grabbed something from his waistband?
03:36 5        A   Yes.
6        Q   Okay.  And where in his waistband did he grab
7    the gun from?
8        A   It was like the front, the front, the front of
9    his waistband, like literally the front.
03:37 10        Q   Okay.  And what direction was he facing when he
11    grabbed that gun from his waistband?  Was he facing
12    towards your house, or was he facing away from your
13    house?
14        A   Away.
03:37 15        Q   Away.
16        A   He was facing towards the police.
17        Q   Okay.  But he was still next to the door, the
18    driver's side door?
19        A   Yes.
03:37 20        Q   Okay.  And did you see which hand he grabbed
21    the gun with?
22        A   Let me think.  Um, I'm trying to think when he
23    got out.  I think it was right hand.
24        Q   Okay.  And then you said that he -- and then he
03:37 25    fired the gun.  Did you see how he fired the gun?  Was

**Page 54**

1    his hand fully extended towards a direction, or was it
2    near his body?  How did he fire the gun?
3        A   It was kind of near his body.
4        Q   Okay.  And in what direction did he fire the
03:37 5    gun?
6        A   Towards the police.
7        Q   Which -- so where was --
8        A   Which is directly away from our house, but
9    directly towards them.
03:38 10        Q   When you say towards the police, where were the
11    police at the moment in time?
12        A   They were all -- they were all behind him and
13    his truck.
14        Q   So they were all behind --
03:38 15        A   They were all behind him, and they were trying
16    to get him out.  And then he just finally gets out and
17    starts firing that direction.
18        Q   So you're saying that as soon as he gets out of
19    the car, he grabs something from his -- grabs a gun from
03:38 20    his waistband, and he fires toward -- in the direction
21    of the police cars; is that correct?
22        A   That is correct.
23        Q   Okay.  Did you ever see any law enforcement or
24    police officers near the passenger side of the car at
03:39 25    the time that he shot?

**Page 55**

1        A   I think when the lady, the girl came out, I
2    think -- yeah, they were there.
3        Q   Did he ever turn towards them at any time --
4    when you said that he shot his gun?
03:39 5        A   No.
6        Q   Okay.  Did you ever see any law enforcement --
7    I'm sorry.  Strike that.
8        Is there a stop sign on the corner of Peach and
9    Catalpa?
03:39 10        A   You know, I'm not sure.  I don't think so.
11        Q   Okay.  That's okay.
12        Do you know if there's a light pole on the
13    corner of Peach and Catalpa?
14        A   Nope.  We don't have any lights over here.
03:39 15        Q   Maybe I am mischaracterizing something then.  I
16    am going to show you an exhibit.
17        A   Okay.
18        Q   Let me see if I can pull it up.
19        A   You know, I'm not sure, because -- I mean,
03:40 20    there should be.
21        Q   Okay.  I think --
22        A   We don't have, really, any lights on our
23    street.
24        Q   It might -- you know, it might be a telephone
03:40 25    pole, and I'm just mischaracterizing it.

**Page 56**

1        A   Oh, yeah, we do have like telephone poles with
2    like Internet stuff on there.
3        Q   So just bear with me for a moment while I pull
4    this up.
03:40 5        (Exhibit 17 was marked at a prior deposition
6        and is attached hereto for reference.)
7    BY MS. LE:
8        Q   So this would be -- this was already entered as
9    an exhibit, Exhibit 17, and it's -- let me read out the
03:41 10    Bates number, COSB003233.
11        A   Mm-hmm.
12        Q   And I'm going to show this to you on the
13    screen.  Let me know when you can see it.
14        Can you see that picture on your screen?
03:41 15        A   Not yet.  It's still loading.  Oh, yeah, I see
16    it now.
17        Q   Okay.  Great.
18        So do you see in the background there's this --
19    there's a white vehicle in the background, right there?
03:41 20        A   Mm-hmm.
21        Q   Is that the vehicle that you saw, the suspect's
22    vehicle?
23        A   No, that's a police vehicle.
24        Q   This is -- okay.  Strike that.
03:41 25        Do you see your house in this picture?

1    THE VIDEOGRAPHER:  Does anyone else have any
2  questions?
3    MS. MARGOLIES:  I think you're all done
4  answering questions.  Let's just let the videographer
03:59  5  give her final statements that she needs to make on the
6  record.
7    THE WITNESS:  Thank you.  I'm over this, man.
8    THE VIDEOGRAPHER:  This concludes the
9  deposition of Tammy Goodson.  Going off the record at
03:59  10  4:00 p.m.  Please stand by.
11    THE REPORTER:  And counsel, on the record, does
12  anyone need a copy?
13    MS. ESQUIVEL:  Yes, electronic only for me.
14  Thank you.
04:00  15    MS. LE:  Not at this time, but if you can send
16  me your information.
17
18    (The deposition concluded at 4:00 p.m.)
19      -o0o-
20
21
22
23
24
25

69

---

8    I, TAMMY GOODSON, do hereby declare under
9  penalty of perjury that I have read the foregoing
10  transcript; that I have made any corrections as appear
11  noted, in ink, initialed by me, or attached hereto; that
12  my testimony as contained herein, as corrected, is true
13  and correct.
14    EXECUTED this _____ day of _____,
15  2024, at _____, _____.
    (City)    (State)
16
17
18
19    _____
    TAMMY GOODSON
20
21
22
23
24
25

70

---

1    I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby certify:
3    That the foregoing proceedings were taken
4  before me at the time and place herein set forth; that
5  any witnesses in the foregoing proceedings, prior to
6  testifying, were placed under oath; that a verbatim
7  record of the proceedings was made by me using machine
8  shorthand which was thereafter transcribed under my
9  direction; further, that the foregoing transcript is an
10  accurate transcription thereof.
11    I further certify that I am neither financially
12  interested in the action nor a relative or employee of
13  any attorney of any of the parties.
14    IN WITNESS WHEREOF, I have this date subscribed
15  my name.
16
17  Dated: 12/04/2024
18
19
20    _____
    SUSAN H. CAIOPOULOS
21    CSR No. 8122
22
23
24
25

71

---

1  CASE NAME: _____
2  WITNESS NAME: _____
3  DATE TAKEN: _____
4    TRANSCRIPT ERRATA SHEET
5  The reasons for making changes are as follows:
    1.  To clarify the record;
6    2.  To conform to the facts;
    3.  To correct major transcription errors.
7  _____
  PAGE    LINE    CORRECTION & REASON
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____     _____
25  Signature of Deponent          Date

72

18 (Pages 69 to 72)

# Exhibit U

1                UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4    JONATHAN WAYNE BOTTEN, SR.; TANJA        )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and      )
5    J.B., a minor by and through his         )
     guardian JONATHAN WAYNE BOTTEN, SR.,     )
6                                             )
                    Plaintiffs,               )
7                                             )
                  vs.                         ) Case No.
8                                             ) 5:22-CV-00949-KK-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN       )
9    BERNARDINO; ISAIAH KEE; MICHAEL          )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,      )
     inclusive,                               )
11                                            )
                    Defendants.               )
12   _____)

13

14

15

16            REMOTE VIDEOCONFERENCE DEPOSITION OF

17                     TIMOTHY JONG, M.D.

18                  THURSDAY, JANUARY 2, 2025

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  127502

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 18

1    A.    Yes.
2    Q.    And did you determine both of those wounds were
3  entry wounds?
4    A.    Yes.
5    Q.    And obviously, you have training in determining or
6  distinguishing between an entry wound and an exit wound, for
7  example?
8    A.    Yes.
9    Q.    Without getting into too many specifics, I'm trying
10 to remember my forensic pathology basics.
11        But are entry wounds generally more circular than
12 exit wounds, and sometimes have an abrasion collar?
13    A.    Generally speaking, yes, that's correct.
14    Q.    I'm sure that's very basic.
15        That's some of what I remember.
16        What was the direction of the wound to the anterior
17 right lower leg, number one?
18    A.    The direction was slightly front-to-back,
19 right-to-left, and upward.
20    Q.    Where on the leg did that actually enter?
21    A.    It was on the front of the right lower leg towards
22 the bottom.
23    Q.    Towards the ankle?
24    A.    Yes.
25    Q.    And it entered there and went upward in the leg?

Page 19

1    A.    Yes.
2    Q.    So what I'm trying to imagine, if the shooter is on
3  ground level shooting at chest level, what type of body
4  position would the person have to be in to get shot in the
5  lower right leg and have it go upward?
6        It seems like it would have to be something other
7  than standing straight up; is that fair?
8    A.    The possibility exists.  There are obviously very
9  many scenarios in terms of hypotheticals which could occur.
10    Q.    Let me ask you this:  Is it consistent with the
11 person being on the ground in some fashion, getting shot in
12 the lower leg and having it traveling upward?
13    A.    May I ask a clarification question?
14    Q.    Of course.
15    A.    Are they completely lying flat on the ground with
16 their leg against the ground?
17    Q.    No.  Just on the ground in some manner with their
18 leg somewhat elevated?
19    A.    Leg somewhat elevated --
20        MS. ESQUIVEL:  Objection.  Lacks foundation; calls
21 for speculation.
22 BY MR. GALIPO:
23    Q.    You may answer.
24    A.    The possibility exists that that could occur.
25    Q.    Okay.  And that anterior right lower leg number one

Page 20

1  wound had an exit; is that correct?
2    A.    Yes.
3    Q.    And the anterior right lower leg number two, was
4  that close in area in terms of the entrance wound to right
5  lower leg number one?
6    A.    Yes.
7    Q.    And had similar direction including an upward
8  direction?
9    A.    Yes.
10    Q.    What were the associated injuries with that wound?
11    A.    So the associated injuries with the wound on the
12 anterior right lower leg number two were fractures of the
13 bones of the lower leg with hemorrhage throughout the wound
14 track.
15    Q.    And which bones were fractured?
16    A.    The right tibia and right fibula.
17    Q.    And remind me again, where is the tibia?
18    A.    So the tibia is -- well, it starts near your knee
19 and ends all the way at the level of pretty much above your
20 foot.
21    Q.    And how about the fibula?
22    A.    Same thing for the fibula.  It's a little bit to the
23 side of the tibia, but it starts at the level of the knee and
24 goes all the way down to the level of the ankle.
25    Q.    And then there was a gunshot wound to the right

Page 21

1  foot?
2    A.    Yes.
3    Q.    And did that strike in the area of the fifth toe?
4    A.    Yes.
5    Q.    And where did that travel after striking the toe or
6  the area of the fifth toe?
7    A.    The area that the projectile traveled through was
8  the skin and the soft tissue of the right foot.
9    Q.    Did that also have an upward trajectory?
10    A.    Yes.
11    Q.    And what were the associated injuries?
12    A.    The associated injuries of that wound included the
13 laceration which is a tear with surrounding hemorrhaging into
14 the soft tissue which is the ecchymosis on the sole of the
15 fourth toe of the right foot as well as another tear on the
16 anterior aspect of the right foot which is the front aspect
17 between the third and fourth toes, and there was also
18 hemorrhage throughout the wound track.
19    Q.    So were there ten entry wounds altogether?
20    A.    Yes.
21    Q.    And multiple shots to the backside of the body?
22    A.    That's correct.
23    Q.    And your opinion, the fatal shot was the wound to
24 the mid left back that we started off by describing?
25    A.    Yes.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 22

1    Q.   And one of the reasons that was fatal was because it
2  went through major organs and the internal bleeding?
3    A.   Yes.
4    Q.   I take it with the wound like that, death is not
5  instantaneous; it happens over minutes in part because of the
6  loss of blood?
7    A.   Yes.  There is also the possibility that air could
8  have gotten into the left chest cavity which I previously
9  mentioned which could also compress the lung.
10   Q.   Which could also add to the cause of death?
11   A.   Yes.
12   Q.   And then you have something called Other Injuries on
13 Page 7 of your report towards the bottom.
14        Do you see that section?
15   A.   Yes.
16   Q.   Item one, were you describing something in your
17 opinion that was consistent with the decedent being struck by
18 a Taser dart?
19   A.   Yes.
20   Q.   And where on the body generally was that?
21   A.   That was on the right upper back.
22   Q.   And item two, what were you describing there?
23   A.   I was describing a puncture on the mid right back.
24   Q.   Do you know if that was consistent with a Taser or
25 some other less-lethal ammunition?

Page 23

1    A.   It could be consistent with a Taser or a conductive
2  energy device as we call it.
3    Q.   How about item three, what were you describing
4  there?
5    A.   I was describing another puncture wound.
6    Q.   Item four as well?
7    A.   That's correct.
8    Q.   And three and four were also to the back?
9    A.   That's correct.
10   Q.   Also consistent with Taser wounds?
11   A.   Yes.  It could be consistent with it.
12   Q.   And then you documented numerous abrasions to the
13 body?
14   A.   Yes.
15   Q.   And then going to Page 10, is this where you're kind
16 of doing a synopsis or summary diagnosis of all the injuries?
17   A.   Yes.
18   Q.   And again, without going through all this, this is
19 much of the information we've already been discussing; is
20 that fair?
21   A.   Yes.
22   Q.   Do you recall if you were ever provided with any of
23 the video of the shooting itself?
24   A.   I don't know if I saw video, but my recollection is
25 I did not.

Page 24

1    Q.   Okay.  And then in terms of the clothing, I noticed
2  you have some documentation or diagrams with respect to
3  clothing.
4        Did you have an opportunity to look at some of the
5  decedent's clothing?
6    A.   Yes.
7    Q.   And did you examine the clothing yourself, or did
8  someone else do that, if you recall?
9    A.   I examined the clothing myself.
10   Q.   And were there bullet defects in the clothing that
11 were consistent with at least some of the wounds you saw to
12 the body?
13   A.   Yes.
14   Q.   Okay.  Thank you, Doctor.
15        That's all the question I have.
16        But I think other counsel may have some questions.
17        So let's find out.
18   A.   Sounds good.
19        MS. ESQUIVEL:  Yes.  I do have a couple of
20 questions, Doctor.
21                    EXAMINATION
22 BY MS. ESQUIVEL:
23   Q.   I apologize because I am not as learned as Mr.
24 Galipo is.  So I'm going to be asking some more basic
25 questions looking from more layman terms on some of these.

Page 25

1        As far as -- just going through the -- some wounds
2  that you have identified here starting on Page 3 of your
3  report, the one of the entry wound K to the mid left, other
4  than the lung -- well, first of all, did the bullet -- did
5  the -- did the gunshot -- did the bullet puncture more than
6  one lung?
7    A.   No.
8    Q.   Other than the lung, were there any other major
9  organs that were injured based on the trajectory or the
10 travel track of the bullet?
11   A.   No.
12   Q.   And here you describe the entry point as 17 and
13 one-eighth inches from the top of the head and nine inches
14 left of the posterior midline.
15        Can you tell me generally -- I know size makes a
16 difference, but just on your body can you tell me where that
17 would be, generally, what would be that general area?
18   A.   Clarification:  Are you referring to the measurement
19 17 and one-eighth inches from the top of the head?
20   Q.   Right.  Where that would be, or if looking on your
21 diagram, if you can tell me which one it is.
22        Because I'm looking at it, and I don't see a K.
23        I see a number.  So I don't know if that's
24 different.  So whichever one would be easier for you to tell
25 me, just point to me where on the back that entry point is

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

**Page 54**

```
 1                    CERTIFICATE
 2                        OF
 3         CERTIFIED STENOGRAPHIC SHORTHAND REPORTER
 4
 5         I, JINNA GRACE KIM, CSR No. 14151, a Certified
 6   Stenographic Shorthand Reporter of the State of California,
 7   do hereby certify:
 8         That the foregoing proceedings were taken before me
 9   at the time and place herein set forth;
10         That any witnesses in the foregoing proceedings,
11   prior to testifying, were placed under oath;
12         That a verbatim record of the proceedings was made
13   by me, using machine shorthand, which was thereafter
14   transcribed under my direction;
15         Further, that the foregoing is an accurate
16   transcription thereof.
17         I further certify that I am neither financially
18   interested in the action, nor a relative or employee of any
19   attorney of any of the parties.
20
21         IN WITNESS WHEREOF, I have subscribed my name, this
22   date:  January 2, 2025.
23
24         _____
           Jinna Grace Kim, CSR No. 14151
25
```

**Page 56**

```
 1   DEPOSITION ERRATA SHEET
 2   From _____    To _____
 3   Page _____ Line _____ Reason _____
 4   From _____    To _____
 5   Page _____ Line _____ Reason _____
 6   From _____    To _____
 7   Page _____ Line _____ Reason _____
 8   From _____    To _____
 9   Page _____ Line _____ Reason _____
10   From _____    To _____
11   Page _____ Line _____ Reason _____
12   From _____    To _____
13   Page _____ Line _____ Reason _____
14   From _____    To _____
15   Page _____ Line _____ Reason _____
16   From _____    To _____
17
18   _____ Subject to the above changes, I certify that the
19   transcript is true and correct.
20   _____ No changes have been made.  I certify that the
21   transcript is true and correct.
22
23         _____
24                TIMOTHY JONG
25
```

**Page 55**

```
 1   DEPOSITION ERRATA SHEET
 2   Case Name:  Jonathan Wayne Botten, et al. vs. State of
 3   California, et al.
 4   Witness:  Timothy Jong, M.D.
 5   Date of Deposition:  January 2, 2025
 6   Job No.:  127502
 7   Reason Codes:   1. To clarify the record.
 8                   2. To conform to the facts.
 9                   3. To correct transcription errors.
10
11   Page _____ Line _____ Reason _____
12   From _____    To _____
13   Page _____ Line _____ Reason _____
14   From _____    To _____
15   Page _____ Line _____ Reason _____
16   From _____    To _____
17   Page _____ Line _____ Reason _____
18   From _____    To _____
19   Page _____ Line _____ Reason _____
20   From _____    To _____
21   Page _____ Line _____ Reason _____
22   From _____    To _____
23   Page _____ Line _____ Reason _____
24   From _____    To _____
25   Page _____ Line _____ Reason _____
```