1

**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)

2
dalekgalipo@yahoo.com
Hang D. Le, Esq. (Bar No. 293450)

3
hlee@galipolaw.com
21800 Burbank Boulevard, Suite 310

4
Woodland Hills, California, 91367
Telephone: (818) 347-3333

5
Facsimile: (818) 347-4118

6
Attorneys for Plaintiffs
L.C., I.H., A.L., and Antonia Salas Ubaldo

7

**UNITED STATES DISTRICT COURT FOR THE**

8
**CENTRAL DISTRICT OF CALIFORNIA**

9

10
L.C., a minor by and through her

11
guardian *ad litem* Maria Cadena,
individually and as successor-in-interest

12
to Hector Puga; I.H., a minor by and
through his guardian *ad litem* Jasmine

13
Hernandez, individually and as
successor-in-interest to Hector Puga;

14
A.L., a minor by and through her
guardian *ad litem* Lydia Lopez,

15
individually and as successor-in-interest

16
to Hector Puga; and ANTONIA SALAS
UBALDO, individually;

17

18
                    Plaintiffs,

19
            vs.

20
STATE OF CALIFORNIA; COUNTY

21
OF SAN BERNARDINO; S.S.C., a
nominal defendant; ISAIAH KEE;

22
MICHAEL BLACKWOOD;
BERNARDO RUBALCAVA; ROBERT

23
VACCARI; JAKE ADAMS; and DOES

24
6-10, inclusive,

25
            Defendants.

26

27

28

Case No. 5:22-cv-00949-KK-SHK

*Honorable Kenly Kiya Kato*

**PLAINTIFFS' CONSOLIDATED OPPOSITION TO COUNTY DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Date:    March 20, 2025
Time:    9:30 a.m.
Crtrm:  3 (3rd Floor)

1

## **TABLE OF CONTENTS**

2

3    I.    INTRODUCTION ..................................................................................1

4    II.   STATEMENT OF FACTS ...................................................................1

5    III.  LEGAL STANDARD ........................................................................13

6    IV.   ARGUMENT ......................................................................................14

7          A.    Kee, Rubalcava, Blackwood and Adams Used Excessive Deadly
8                Force.......................................................................................14

9          B.    Vaccari Used Excessive Force Against Puga .......................20

10         C.    Plaintiff L.C. Has Standing Under the Fourteenth Amendment..........20

11         E.    The Officers Not Entitled to Qualified Immunity for Their Uses
                 of Force .................................................................................22

12         F.    The Officers are Not Entitled to Summary Judgment on
13               Plaintiffs' Battery or Negligence Claim ...............................25

14         G.    Plaintiffs' Bane Act Claim Survives......................................27

15         H.    State Law Immunities Do Not Apply ....................................28

16         I.    Plaintiffs May Maintain State Law Claims Against Defendants
                 Despite Seeking Wrongful Death Damages .........................29

17         J.    Plaintiffs Substantially Complied with the Government Tort
18               Claim Act and Alleged Use of Less-Lethal Force and Negligent
                 Tactics in the Operative Complaint ......................................30

19   V.    CONCLUSION ..................................................................................31

20

21

22

23

24

25

26

27

28

PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TABLE OF AUTHORITIES

Cases

*A.D. v. California Highway Patrol*,
   712 F.3d 446 (9th Cir. 2013).................................................................22, 25

*Adickes v. S.H. Kress & Co.*,
   398 U.S. 144 (1970) .........................................................................13

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) .........................................................................13

*Bailey v. County of San Joaquin*,
   671 F.Supp.2d 1167 (E.D. Cal. 2009).....................................................20

*Boyd v. Benton Cnty.*,
   374 F.3d 773 (9th Cir. 2004)...............................................................20

*Bryan v. MacPherson*,
   630 F.3d 805 (9th Cir. 2010)...............................................................15

*Caldwell v. Montoya*,
   10 Cal. 4th 972 (1995) ......................................................................28

*Coleman v. Quaker Oats Co.*,
   232 F.3d 1271 (9th Cir. 2000)..............................................................31

*Corona v. Time Warner Cable, Inc.*,
   No. CV135521PSGVBKX, 2014 WL 11456535 (C.D. Cal. Oct. 16, 2014)..31

*Curnow By & Through Curnow v. Ridgecrest Police*,
   952 F.2d 321 (9th Cir. 1991)...........................................................17, 23

*Daniels v. Cnty of Ventura*,
   228 Fed. App'x 669 (9th Cir. 2007)......................................................23

*Diaz v. Cnty. of Ventura*,
   512 F. Supp. 3d 1030 (C.D. Cal. 2021)...................................................15

*Est. of Risher v. City of Los Angeles*,
   No. EDCV17995MWFKKX, 2020 WL 5377306 (C.D. Cal. July 29, 2020).18

*Foster v. City of Indio*,
   908 F.3d 1204 (9th Cir. 2018)..........................................................23, 24

*George v. Morris*,
   736 F.3d 829 (9th Cir. 2013)...........................................................16, 23

*Gillan v. City of San Marino*,
   147 Cal. App. 4th 1033 (2007) (cleaned up)..............................................28

*Gonzalez v. City of Anaheim*,
   747 F.3d 789 (9th Cir. 2014) ............................................................... 13

*Graham v. Connor*,
   490 U.S. 386 (1989) ............................................................................ 14

*Gravelet-Blondin v. Shelton*,
   728 F.3d 1086 (9th Cir. 2013) ............................................................. 24

*Grudt v. City of Los Angeles*,
   2 Cal.3d 575 (1970) ............................................................................ 25

*Harris v. Roderick*,
   126 F.3d 1189 (9th Cir. 1997) ............................................................. 23

*Hayes v. Cnty. of San Diego*,
   57 Cal.4th 622 (2013) ......................................................................... 25

*Hughes v. Rodriguez*,
   31 F.th 1211 (9th Cir. 2022) ............................................................... 27

*Hughey v. Candoli*,
   158 Cal. App. 2d 231 (1958) ............................................................... 29

*Hulstedt v. City of Scottsdale*,
   884 F. Supp. 972 (D. Ariz. 2012) .................................................. 19, 20

*Hyde v. City of Wilcox*,
   23 F.4th 863 (9th Cir. 2022) ............................................................... 18

*Koussaya v. City of Stockton*,
   54 Cal. App. 5th 909 (2020) ............................................................... 26

*Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*,
   841 F.2d 872 (9th Cir. 1987) ............................................................... 13

*Lam v. City of Los Banos*,
   976 F.3d 986 (9th Cir. 2020) ............................................................... 24

*Landis v. Baker*,
   297 Fed. App'x 453 (6th Cir. 2008) .................................................... 24

*Latits v. Phillips*,
   878 F.3d 541 (6th Cir. 2017) ............................................................... 18

*Lennox v. City of Sacramento*,
   No. 2:21-CV-02075-DAD-CSK, 2024 WL 3845378 (E.D. Cal. Aug. 16, 2024) ............................................................................................ 21, 28

*Liston v. Cnty. of Riverside*,
   120 F.3d 965 (9th Cir. 1997) ............................................................... 13

*Lopez v. City of Riverside*,
   No. 22-55723, 2023 WL 8433959 (9th Cir. Dec. 5, 2023) .................. 17

*Mattos v. Agarano*,
    666 F.3d 433 (9th Cir. 2011)..................................................................16

*McCorkle v. City of Los Angeles*,
    70 Cal. 2d 252 (1969)..........................................................................28

*McLeod v. City of Redding*,
    No. 2:22-CV-00585 WBS JDP, 2024 WL 3011227 (E.D. Cal. June 12, 2024)
    ..................................................................................................26

*Mendez v. Cnty. of Los Angeles*,
    897 F.3d 1067 (9th Cir. 2018)..............................................................25

*Monroy v. Perez*,
    No. 23-55793, 2025 WL 560233 (9th Cir. Feb. 20, 2025) ............................23

*Mulligan v. Nichols*,
    835 F.3d 983 (9th Cir. 2016).................................................................25

*Munoz v. Olin*,
    24 Cal. 3d 629 (1979)..........................................................................25

*Murillo v. City of Los Angeles*,
    707 F. Supp. 3d 947 (C.D. Cal. 2023)....................................................19

*Nelson v. City of Davis*,
    685 F.3d 867 (9th Cir. 2012).................................................................24

*Ochoa v. City of Mesa*,
    26 F.4th 1050 (9th Cir. 2022)...............................................................21

*Prison Legal News v. Lehman*,
    397 F.3d 692 (9th Cir. 2005).................................................................22

*Reese v. Cnty. of Sacramento*,
    888 F.3d 1030 (9th Cir. 2018)..............................................................27

*Robertson v. Cnty. of Los Angeles*,
    No. CV1602761BROSKX, 2017 WL 5643179 (C.D. Cal. Oct. 17, 2017) ....24

*S.R. Nehad v. Browder*,
    929 F.3d 1125 (9th Cir. 2019).....................................................14, 15, 16, 19

*S.T. v. City of Ceres*,
    327 F. Supp. 3d 1261 (E.D. Cal. 2018)...................................................23

*Santos v. Gates*,
    287 F.3d 846 (9th Cir. 2002).................................................................13

*Scott v. Henrich*,
    39 F.3d 912 (9th Cir. 1994)..............................................................13, 16

*Sharp v. Cnty. of Orange*,
    871 F.3d 901 (9th Cir. 2017).................................................................28

*Singh v. City of Phoenix,*
    124 F.4th 746 (9th Cir. 2024)................................................................14, 15

*Smith v. City of Hemet,*
    394 F.3d 689 (9th Cir. 2005)................................................................13, 15

*Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth.,*
    34 Cal. 4th 441 (2004)..............................................................................30

*Tabares v. City of Huntington Beach,*
    988 F.3d 1119 (9th Cir. 2021)..................................................................25

*Tennessee v. Garner,*
    471 U.S. 1 (1985)..............................................................................14, 16

*Torres v. City of Madera,*
    648 F.3d 1119 (9th Cir. 2011)..................................................................14

*Tuggle v. City of Tulare,*
    No. 1:19-CV-01525-JLT-SAB, 2023 WL 4273900 (E.D. Cal. June 29, 2023)
    ...............................................................................................................19

*Villalobos v. City of San Maria,*
    85 Cal. App. 5th 383 (2022)......................................................................26

*White v. Superior Court,*
    225 Cal. App. 3d 1505 (1990)...................................................................30

*Xiong v. Chavez,*
    No. 1:13-CV-00083-SKO, 2016 WL 345609 (E.D. Cal. Jan. 28, 2016)........20

*Yanez v. Plummer,*
    221 Cal. App. 4th 180 (2013)....................................................................29

*Zion v. Cnty. of Orange,*
    874 F.3d 1072 (9th Cir. 2017)..............................................................18, 24

Statutes

Cal. Civ. P. Code § 37734(b).......................................................................29

Other Authorities

CACI 1305A..............................................................................................26

CACI 1305B.........................................................................................26, 27

CACI 440..................................................................................................26

CACI 441..................................................................................................26

PLAINTIFFS' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

In the early morning hours of February 17, 2021, near the area of Peach Avenue and Catalpa Street in Hesperia, California, CHP Officers and San Bernardino Sheriff's Department Deputies shot and killed Hector Puga. Summary judgment should be denied because under Plaintiffs' facts, the officers used excessive and unreasonable force when they shot at Puga as he turned to run, despite Puga never aggressively reaching for anything, not having anything in his hands, never pointing anything at the officers, and never shooting a weapon at the officers. Summary judgment should also be denied because the officers were negligent in their conduct and pre-shooting tactics, including failing to formulate a tactical plan despite interacting with Puga for over an hour and failing to follow training in dealing with barricaded subjects.

## II.    STATEMENT OF FACTS

On February 17, 2021, CHP officers Bernardo Rubalcava, Michael Blackwood, CHP Sergeant Isaiah Kee, SBSD Sergeant Robert Vaccari and Deputy Jake Adams were involved in a pursuit of a white Expedition that matched the description of a vehicle involved in an earlier alleged crime. PAMF 224-228. There was little to no traffic on the road and no passing pedestrians during the pursuit. PAMF 229. The Expedition never targeted any of the officers nor forced other vehicles off the road during the pursuit. PAMF 230. The Expedition's speed during the pursuit was fast but not outrageous. PAMF 231. At some point during the pursuit, SBSD's police helicopter joined the pursuit. PAMF 232. As the pursuit continued down the dirt road, the Expedition's driving was not erratic. PAMF 233. The officers did not see any weapon in the Expedition during the pursuit. PAMF 234. Spikes strips were successfully deployed and the Expedition slowed down significantly, traveling approximately 5 to 10 miles per hour before coming to a stop at the intersection of Peach and Catalpa. PAMF 235-236.

1    The helicopter illuminated the middle of the intersection where the two streets

2  cross and the four homes on the corners. PAMF 237-238. There was also a

3  streetlight on the corner of Peach and Catalpa as well as the patrol vehicles'

4  spotlights and red and blue lights illuminating the area. PAMF 239. The officers

5  were aware they had stopped in a residential neighborhood. PAMF 240. Blackwood,

6  Adams, and Vaccari were aware that there were houses on each of the four corners

7  of the intersection. PAMF 241. Despite this, Kee never considered evacuating the

8  people in the nearby homes nor did he ever discuss it with the SBSD deputies.

9  PAMF 242. Vaccari never considering alerting the nearby residences of potential

10  harm or evacuating the people in the homes on the four corners of the intersection.

11  PAMF 243.

12    The officers had never seen Puga before and did not have any specific

13  knowledge regarding Puga's criminal history. PAMF 245. The officers did not have

14  any specific information that Puga had injured anyone. PAMF 246. The officers did

15  not have any specific information as to whether Puga was under the influence of

16  drugs or alcohol. PAMF 247.

17    The officers attempted to get Puga out of the vehicle but he was not coming

18  out. PAMF 248. Kee considered calling in SWAT because SWAT sometimes comes

19  out for barricaded suspects, and spoke to Vaccari about it but does not know

20  whether Vaccari actually called to inquire about SWAT. PAMF 249-250, 252. Kee

21  was told that SWAT would not come out for something of this nature. PAMF 251.

22  Vaccari did not have his cell phone to call SWAT because he had forgotten it at the

23  station and claims he told Kee this. PAMF 253-254. Vaccari has dealt with

24  barricaded suspects in homes before and has called SWAT to come assist with those

25  suspects, and in response SWAT would either give suggestions or advice or they

26  would come out. PAMF 255-256. There were also times when SWAT would give

27  suggestions or advice and when Vaccari recontacted them, SWAT would come out.

28  PAMF 257. Vaccari does not know what SWAT's criteria was in order for them to

come out for a barricaded suspect. PAMF 258. If SWAT had responded, Kee would
have let them handle the situation. PAMF 259.

The officers never developed a tactical plan. PAMF 260. Approximately 120
to 150 pepper balls were deployed into the Expedition over a period of 30 to 45
minutes to try to get Puga to come out. PAMF 264-265. Puga reacted to the pepper
balls by coughing and complaining that his eyes were burning and that he could not
see. PAMF 267. Adams observed Puga twisting and turning his body, reaching
around, leaning over, and reaching back at different periods of time while Puga was
inside the vehicle. PAMF 266. During the pepperball deployments, Vaccari
observed that Puga would get his head down low in the window. PAMF 270. After
deploying the pepper balls for approximately 30 minutes, Vaccari thought about
contacting SWAT by having Dispatch send their phone number to his screen and
using someone else's phone. PAMF 268. Instead, Vaccari decided to intentionally
hit Puga with pepper balls to try to motivate Puga with pain to come out. PAMF
269. Vaccari deployed pepper balls and struck Puga in the right eye. PAMF 271-
272.

Puga eventually exited the vehicle from the driver's side. PAMF 273. The
officers never formulated a tactical plan for what to do once Puga exited the vehicle.
PAMF 281. The officers were treating Puga as if he had a firearm when Puga was
outside of the vehicle. PAMF 274, 300. Puga was shirtless and had on a pair of
baggy pants when he. PAMF 275, 284. Puga did not appear to have a gun or weapon
in his hand, waistband, or pocket when he exited the vehicle and while he was
standing at the driver's side. PAMF 276, 280. Puga stood near the driver's side of
the car for a period of time and during that time, the officers were able to see Puga's
hands and his hands were raised for the majority of that time. PAMF 277-278. Puga
did not have anything in his hands and he never reached for any weapon. PAMF
279. While Puga was standing at the driver's side of the vehicle, there was no
discussion about a tactical plan. PAMF 282.

1    While Puga was next to the driver's side, he would at times raise his hands

2    and then lower them back down. PAMF 285. Puga was continually reaching down

3    to pull up his pants. PAMF 286. Puga expressed concerns to the officers that he

4    thought the officers were going to shoot him. PAMF 287. He sounded scared of

5    being shot by police. PAMF 288. Puga then said something about hearing a click

6    and being afraid that somebody was getting ready to shoot him and walked to the

7    front of the Expedition. PAMF 289-290.

8        After Puga went to the front of the vehicle, the officers still did not discuss

9    any tactical plan. PAMF 291. Puga had his hands up while he was positioned near

10   the front of the Expedition and did not have anything in his hands. PAMF 292-293.

11   He would occasionally drop his hands to pull up his pants. PAMF 294. A bystander

12   cellphone video shows Puga with his hands up and briefly dropping his right hand to

13   his waistband to adjust his pants before raising his hand up again, twice. PAMF 295.

14       Kee and Rubalcava decided to approach Puga to take him into custody.

15   PAMF 296. They did not coordinate with the SBSD Sheriffs' deputies regarding any

16   plan to approach and take Puga into custody. PAMF 297. As Kee and Rubalcava

17   were approaching Puga, they did not have any cover. PAMF 298. They were also

18   not aware that Vaccari and Adams were also approaching Puga. PAMF 299.

19       When Vaccari saw Kee and Rubalcava move towards the shoulder of Peach

20   Street, he thought they were moving to just get a better view of Puga, not to

21   approach Puga. PAMF 301. The only cover Vaccari and Adams had when moving

22   up was the passenger's side of Puga's vehicle. PAMF 303. As Vaccari approached

23   from the dirt shoulder, he did not have any cover. PAMF 305.

24       Kee claims he could not see Puga's waistband while Puga was standing in

25   front of the vehicle and could only see Puga's waistband once he moved past the

26   front of Puga's vehicle. PAMF 309. However, there was an electrical pole on the

27   southwest corner of the intersection that was parallel to the back passenger doors of

28   the Expedition and in Erin Mangerino's video of the incident, moments before the

shooting, two figures can be seen standing without cover in the street, partially obscured by the electrical pole before backing away in a southern direction, away from the pole, and out of frame. PAMF 306-307. Mangerino was unable to see any officers standing on her side of Peach Street. PAMF 308.

As soon as Puga turned to run, officers shot at Puga. PAMF 311. Puga never grabbed or aggressively reached for anything. PAMF 312. Puga never had a gun in his hand and never pointed his hand or a weapon in any specific direction or at any officer. PAMF 313-314. Puga never fired a weapon at any officer. PAMF 315. None of the videos capturing the incident show Puga with a gun in his hand, pointing a gun at anyone, or firing a gun. PAMF 317-319. Neither smoke nor any muzzle flash ever came from Puga. PAMF 316, 320.

As Puga was running, he never turned around to look at the officers. PAMF 321. Witness Betzabeth Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. PAMF 322. While Puga was running, his hands were moving in a running motion. PAMF 323. None of the videos that captured the shooting ever show Puga turn back towards the officers or point his hand back towards the officers. PAMF 324.

When Puga reached the northwest corner, he changed directions and started running north instead of towards the house on the corner. PAMF 325. Just prior to Puga going to the ground, he was staggering as if he had been struck by gunfire. PAMF 326. There were gunshots immediately before Puga went to the ground. PAMD 327. Puga then fell forward onto his chest and stomach and onto the ground with his hands beside him on the northwest shoulder near the southbound lane, some distance from the northwest corner. PAMF 328. Immediately after Puga fell onto the ground, Puga slightly raised his right leg. PAMF 334. Gunshots were going off as Puga raised his right leg immediately after he fell to the ground. PAMF 335. Puga's hands were next to him when he was on the ground. PAMD 330. There was no gun in either of Puga's hands immediately after Puga went to the ground. PAMF 331.

Puga did not pose a threat to anyone after falling to the ground and appeared incapacitated. PAMF 332. Several shots were fired at Puga after he fell to the ground, including final two volleys from two different firearms that were fired after a brief pause. PAMF 333, 336. As the last volleys are going off, Puga can be seen jerking on the ground as if struck by the gunshots.  PAMF 337. At no time did anyone provide a verbal warning that deadly force was going to be used. PAMF 425.

Puga sustained ten gunshot wounds, with wounds to the back of his body with back-to-front trajectories, and some with upward trajectories. PAMF 340-341, 343. Puga sustained a gunshot wound that entered the mid left back with a trajectory of back-to-front, left-to-right, and upward that was fatal. PAMF 345-346. The upward trajectory of the gunshot wound to the mid left back is consistent with the body leaning forward or falling forward when sustaining that wound. PAMF 348. Puga also sustained a gunshot wound to the lower left back with a trajectory of back-to-front, left-to-right, and upward. PAMF 349. The gunshot wound to the lower left back is consistent with Puga's back directly facing the shooter. PAMF 350. The gunshot wound to the lower left back could have also been fatal after a longer period of time. PAMF 351. Puga also sustained gunshot wounds to the middle right buttock, the side of the left thigh, the front of the left thigh, the back of the left thigh, the lateral left knee, two gunshot wounds to the anterior right lower leg, and a gunshot wound to the right foot. PAMF 352-353, 355-357, 360. The trajectories of the gunshot wounds to the anterior right lower leg are consistent with the body being on the ground with the leg somewhat elevated. PAMF 358. There are no bullet wounds that appear to have been caused by a bullet striking an intermediary object before striking Puga's body. PAMF 361.

Kee was the first officer to shoot and did not hear any shots fired before he fired his first shot. PAMF 362. Kee claims he fired two volleys of shots; one volley of 5 to 8 shots while Puga at the front of the vehicle and another volley of 10 to 13

shots at Puga's backside while Puga was running in a northwest direction. PAMF
363. When Kee fired his first shot, he could see both of Puga's hands and Puga did
not have a gun in his hand. PAMF 364-365. Kee was trained to consider his
background or backdrop when firing because if there are residences or businesses in
the background, innocent people could get shot. PAMF 366. Kee was aware that
there were residences in Puga's background when Kee was firing both volleys.
PAMF 367. After the first volley, Kee retreated to the dirt shoulder parallel to the
side of the CHP vehicle and went down prone. PAMF 368. Kee did not keep a
visual on Puga while he was repositioning and had his back turned to Puga. PAMF
370-371. Approximately 5 to 8 seconds elapsed between Kee's first volley and
when he started firing his second volley. PAMF 372.

Rubalcava heard two shots being fired before he fired his first shot. PAMF
376. Rubalcava was firing in a northeast direction during his first volley. PAMF
385. Rubalcava was side by side and to the right of Kee while they were
approaching and when Kee started firing. PAMF 377. Puga was near the front of the
vehicle when Rubalcava fired his first volley. PAMF 378. Rubalcava claims he fired
approximately 5 shots during his first volley and 5 to 10 shots during his second
volley. PAMF 381. There was an approximately 5 to 10 second pause between
Rubalcava's first volley and second volley. PAMF 386. Rubalcava was trained to
consider his background when he shoots because if his bullets miss, they may hit
innocent people. PAMF 382. Rubalcava claims would not have shot as many shots
if he had known there was a home in the northeast corner at the time of the shooting.
PAMF 384. Puga was running away and Rubalcava was aiming at Puga's back
during Rubalcava's second volley. PAMF 388-389. When asked during his
interview with detectives after the incident as to what caused Rubalcava to fire his
second volley, Rubalcava answered that Puga was still fleeing but that Puga was not
doing anything with any alleged weapon. PAMF 390. There was enough light for
Rubalcava to see Puga while Puga was running away. PAMF 391. Rubalcava does

1   not know whether he fired shots at Puga after Puga went to the ground. PAMF 392.

2   Rubalcava concedes it would not have been appropriate to shoot at Puga if he

3   merely saw a gun in Puga's waistband. PAMF 393. Based on Rubalcava's training,

4   if Puga had not pointed a gun at Rubalcava, Rubalcava would not have shot. PAMF

5   394.

6       Blackwood heard approximately 2 to 3 shots coming from his left before he

7   fired and Kee and Rubalcava were to Blackwood's left. PAMF 395. Puga had just

8   cleared the front of the vehicle when Blackwood started firing. PAMF 397.

9   Blackwood was firing at Puga's left side while Puga was hunched over as if he had

10  been struck by gunshots. PAMF 398. Blackwood was aiming at Puga's back while

11  Puga was running away. PAMF 400. Blackwood was trying to assess while he was

12  firing by looking for a gun but could not see Puga's hands and therefore never saw

13  Puga with a gun while Puga was running away. PAMF 401. Blackwood fired ten

14  shots during his first volley, paused when he saw Puga stumble, and then fired ten

15  more shots when Puga caught himself and continued to run. PAMF 403-404. When

16  Blackwood saw Puga stumble, he believed that some shots he fired may have struck

17  Puga. PAMF 405. During the time Blackwood was shooting at Puga, Blackwood

18  could not see Puga's hands. PAMF 406. Blackwood is not sure whether he fired any

19  shots at Puga while Puga was going to the ground. PAMF 407. Blackwood claims

20  he stopped firing when he saw Puga stop moving. PAMF 408.

21      When Adams approached the vehicle, Puga was standing in the front close to

22  the driver's side headlight and Adams could only see Puga from chest up. PAMF

23  409. The passenger door of the Expedition was still open when Adams and Vaccari

24  approached from the passenger side. PAMF 410. As Adams was approaching, he

25  heard shots. PAMF 411. Adams yelled at Puga to get on the ground and

26  simultaneously heard shots. PAMF 415. Adams and Vaccari had only reached the

27  part where the painted curb meets the unpainted curb when the shots started, which

28  is near the rear door of the Expedition. PAMF 412. Adams heard shots, ducked and

stepped over a high curb, and then fired. PAMF 413-414. Adams fired his first shot
when Puga had already started running. PAMF 416. Adams fired three volleys of
shots with two distinct pauses between the volleys. PAMF 418. Adams fired three
shots during his first volley, four shots during his second volley, and three shots
during his third volley. PAMF 419. Adams claims he was aiming at Puga's back and
side during all three volleys. PAMF 420. Puga was still running away when Adams
fired his second volley. PAMF 422. One of Adams' concern with being in a
residential neighborhood was innocent people being struck due to the number of
shots fired. PAMF 293. Adams is not sure whether he fired any shots after Puga
went to the ground. PAMF 424.

   Vaccari remained on target with the 40-millimeter as Puga ran away and later
dropped the 40-millimeter and unholstered his firearm but did not use it because
Puga was going down or already down. PAMF 426. Vaccari's impression what that
as Puga was running, he had been struck by gunfire because it appeared that Puga
was staggering. PAMF 427. When Adams and Vaccari approached Puga after the
shooting, Puga was still breathing. PAMF 428. Vaccari then decided to deploy the
Taser at Puga. PAMF 429. Vaccari did not give Puga a verbal warning that he was
going to deploy the Taser before deploying it. PAMF 430. The probes made contact
and there was tensing and muscle reaction and Puga appeared to lock up. PAMF
431. No one went in to handcuff Puga during the first Taser cycle. PAMF 432.
Vaccari later concedes during his interview with detectives that it would have been a
much better option to go in and handcuff Puga while he was under the power of the
initial Taser deployment instead of activating the Taser a second time. PAMF 433.
Vaccari tased Puga a second time which also caused Puga's body to lock up. PAMF
434-435.

   After the shooting, the officers heard someone exclaim about being shot
coming from the northeast corner house and later learned that three people frot he
northeast corner house had been shot. PAMF 436-437. The Botten family were

insdie their house when the shooting happened. PAMF 438. J.B. sustained three gunshot wounds to his chest that resulted in a collapsed lung on his left side, a ruptured spleen, and damage to his internal organs. PAMF 439. Dudek-Botten sustained gunshot wounds to her face, chest, and right shoulder. PAMF 440. Botten, Sr. sustained gunshot wounds to his right arm, left arm, left hand, and right leg. PAMF 441. There were bullet strikes to the front of the Botten residence, the screen door of the residence, one of the bedroom windows, and the side of the residence. PAMF 442.

Plaintiffs' police practices expert, Roger Clark, opined that Vaccari violated standard police practices and training when he deployed pepper balls to strike Puga and struck Puga in the face. PAMF 443. SBSD guidelines directs deputies to anticipate that a suspect will lower his head and to not shoot at the head, neck, or spine unless a deadly force situation exists. PAMF 444-445. Puga did not pose an immediate threat of death or serious bodily injury at the time Vaccari deployed the pepper ball launcher and struck Puga in the eye. PAMF 446.

Further, the officers' failure to follow standard police practices and training in dealing with barricaded subjects, poor tactics, and rushing to take Puga into custody once he was outside of the vehicle all contributed to the officers' unnecessary use of lethal force. PAMF 449. The officers failed to formulate a safe tactical plan, made poor tactical decisions, and limited their tactical options, ultimately leading to their unnecessary use of lethal force. PAMF 450.

POST advises officers that if available, officers should request specialized units and resources as soon as it has been determined that the suspect has taken a barricaded position. PAMF 451. SWAT specifically trains to respond to incidents where subject(s) may be armed, barricaded, and refusing to submit to arrest. PAMF 452. Clark opined that given that the officers believed that Puga was involved in a prior freeway shooting, was still armed, was refusing to exit his vehicle, and was situated in a residential neighborhood, Vaccari's failure to request for SWAT to

respond when initially requested by Kee and after initial less-lethal force was unsuccessful were poor tactical decisions that contributed to the officers' use of unnecessary lethal force. PAMF 453-454.

POST advises that some of the "fatal errors" officers commit are poor positioning due to rushing or poor tactics. PAMF 455. The officers' decision to leave cover and enter an open-air environment to take Puga into custody, when the officers stated that they still believed Puga to be armed and dangerous, and Kee stated that he was in fear for his life at the time he made the decision to approach and take Puga into custody, was a tactically poor decision. PAMF 456. The situation did not call for an urgent response at the time the officers approached Puga. PAMF 457.

Officers are trained that deadly force is only justified when there is an objectively reasonable belief that the suspect poses an immediate threat of death or serious bodily injury that an overreaction is excessive force. PAMF 458-459. Under the facts as alleged by Kee at the time he initially shot Puga, Kee violated standard police practices and training when he shot at Puga when he saw Puga drop his right hand from a raised position. PAMF 461. Kee overreacted when he saw Puga drop his right hand from a raised position. PAMF 462.

Rubalcava, Blackwood, Kee, and Adams violated standard police practices and training when they shot at Puga while he was running away. PAMF 464. Puga did not present an immediate threat of death or serious bodily injury as he was running and the officers failed to reassess and overreacted when they fired subsequent volleys when Puga was running. PAMF 465. There was no immediate defense of life situation while Puga was running away. PAMF 466-467. Officers are trained that they may use deadly force against a fleeing suspected felon to prevent escape only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others. PAMF 469. There were no bullet impacts or casings found near the area of the initial

shooting that would support the allegation that Puga fired a weapon at anyone. PAMF 468. There is evidence that this was likely a situation of contagious fire. PAMF 470.

Rubalcava, Blackwood, Kee, and Adams violated standard police practices and training when they shot at Puga after he had fallen to the ground. PAMF 471. Puga was not an immediate threat of death or serious bodily injury after he had fallen to the ground. PAMF 472. The officers had time to provide Puga with a warning that deadly force was going to be used prior to the shooting and time to provide an additional warning that deadly force was going to be used in between their first and subsequent volleys of shots. PAMF 473.

Rubalcava, Blackwood, Kee, and Adams violated standard police practices and training when they failed to consider their background prior to utilizing deadly force, resulting in the serious injuries of innocent bystanders. PAMF 474. The officers violated standard police practices and training in failing to request backup to set up a perimeter and evacuate uninvolved individuals from the area in order the ensure the safety of these uninvolved individuals. PAMF 475.

Sergeant Vaccari's two-time deployment of the Taser at Mr. Puga after he had been shot twice and was clearly incapacitated without prior verbal warning violated standard police practices and training. PAMF 476. Officers are also trained on the concept of "cuffing under power" in which an officer can safely go in and handcuff a suspect while the suspect is under effects of the neuromuscular incapacitation of the Taser. PAMF 478. The second Taser deployment violated standard police practices and training because it was clear from the first Taser deployment that Mr. Puga was incapacitated when his muscles responded to the Taser deployment but he did not respond, no verbal warning was given prior to the second Taser deployment, and Sergeant Vaccari admits that the second deployment would have been unnecessary had he considered at the time to go in and handcuff Mr. Puga while he was under the power of the Taser during the first Taser deployment. PAMF 479.

## III.    **LEGAL STANDARD**

In ruling on a motion for summary judgment, the court must view the evidence and draw all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970); *Lake Nacimiento Ranch Co. v. San Luis Obispo Cnty.*, 841 F.2d 872, 875 (9th Cir. 1987). Even where the basic facts are undisputed, summary judgment should be denied if reasonable minds could differ on the inferences to be drawn from those facts. *Adickes*, 398 U.S. at 158-59; *Lake Nacimiento Ranch Co.*, 841 F.2d at 875. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge..." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"Because [the excessive force inquiry] nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom, [the Ninth Circuit] held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002); *accord Liston v. Cnty. of Riverside*, 120 F.3d 965, 976 n.10 (9th Cir. 1997) (as amended) ("We have held repeatedly that the reasonableness of force used is ordinarily a question of fact for the jury."). "This is because such cases almost always turn on a jury's credibility determinations." *Smith v. City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005). Thus, "[t]he [court] must carefully examine all the evidence in the record . . . and the available physical evidence, as well as any expert testimony proffered by the plaintiff, to determine whether the officer's story is internally consistent and consistent with the known facts." *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994); *accord Gonzalez v. City of Anaheim*, 747 F.3d 789, 794-95 (9th Cir. 2014) (en banc). This includes "circumstantial evidence that, if believed, would tend to discredit the police officer's story." *Scott*, 39 F.3d at 915. Courts do "recognize that police officers are often forced to make split-second judgments" but "[n]ot all errors in perception or

1  judgment . . . are reasonable." *Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th
2  Cir. 2011) (internal quotation marks and citation omitted). While courts "do not
3  judge the reasonableness of an officer's actions 'with the 20/20 vision of hindsight,'
4  nor does the Constitution forgive an officer's every mistake." *Id.*

5  **IV.  ARGUMENT**

6      A. Kee, Rubalcava, Blackwood and Adams Used Excessive Deadly Force

7      A constitutional claim for excessive force is evaluated through the Fourth
8  Amendment's reasonableness standard, considering "whether the officers' actions
9  [we]re 'objectionably reasonable' in light of the facts and circumstances confronting
10  them." *Graham v. Connor*, 490 U.S. 386, 397 (1989).The inquiry into the
11  reasonableness of an officer's use of force "requires the careful balancing of 'the
12  nature and quality of the intrusion on the individual's Fourth Amendment interests'
13  against the countervailing governmental interests at stake." *Graham*, 490 at 396.
14  "The intrusiveness of a seizure by means of deadly force is unmatched." *Tennessee*
15  *v. Garner*, 471 U.S. 1, 9 (1985). Government interest factors to balance against the
16  type of force used include "(1) the severity of the crime at issue, (2) whether the
17  suspect poses an immediate threat to the safety of the officers or others, and (3)
18  whether he is actively resisting arrest or attempting to evade arrest by flight."
19  *Graham*, 490 at 396. In the context of deadly force, the force is reasonable only "if
20  the officer has probable cause to believe the suspect poses a significant threat of
21  death or serious physical injury to the officers or others." *Scott*, 39 F.3d at 914
22  (quoting *Garner*, 471 U.S. at 3).

23      Even when a suspect has previously committed a serious crime, "a jury could
24  discount the severity of the suspect's purported crimes when the suspect is
25  indisputably not engaged in felonious conduct when the officer arrives." *Singh v.*
26  *City of Phoenix*, 124 F.4th 746, 752 (9th Cir. 2024) (cleaned up) (citing *S.R. Nehad*
27  *v. Browder*, 929 F.3d 1125, 1136 (9th Cir. 2019)). Here, Puga was indisputably not
28  engaged in any shooting or felony when Blackwood and Rubalcava first attempted

to pull Puga over and under Plaintiffs' facts, Puga was not engaged in any felonious

conduct when Kee and Rubalcava shot Puga with their first volley of shots since

Puga had not aggressively reached for anything, did not have a gun in either hand,

did not point anything at anyone, did not shoot at anyone, and had turned to run

away when the shooting began. Accordingly, the alleged crimes do not support the

use of deadly force. *See S.R. Nehad*, 929 F.3d at 1136 (a jury could conclude that

the suspect's already completed felony of "threatening with a weapon" did not

render the officer's use of deadly force reasonable because the suspect was not

engaged in any such conduct when the officer arrived or when he fired his weapon);

*Diaz v. Cnty. of Ventura*, 512 F. Supp. 3d 1030, 1044 (C.D. Cal. 2021) (although the

suspect had led the officers on a high-speed chase, the crime was long over at the

time he was shot and therefore did not support the use of deadly force).

　　　Because "[r]esistance . . . should not be understood as a binary state, with

resistance being either completely passive or active[, r]ather, it runs the gamut from

the purely passive protestor who simply refuses to stand, to the individual who is

physically assaulting the officer," the nature of any resistance should be viewed in

light of the particular facts of the case. *Bryan v. MacPherson*, 630 F.3d 805, 830

(9th Cir. 2010). In *Smith v. City of Hemet*, the Ninth Circuit held that the plaintiff's

refusal to comply with commands to remove his hands from his pockets and place

them on his head and his reentry into his home despite officers' ordering otherwise

were "not…particularly bellicose." 394 F.3d at 703. In *Singh v. City of Phoenix*, the

Ninth Circuit held that the plaintiff's refusal to follow commands, which constituted

less than active resistance, did not warrant the use of deadly force. 124 F.4th at 753-

54. In *Diaz v. County of Ventura*, the district court found this factor did not weigh in

favor of the officers' use of deadly force because at the time of the shooting, the

suspect's only resistance was refusing to obey commands to surrender. 512 F. Supp.

3d at 1044. Similarly, Puga's only resistance was his refusal to surrender and

subsequent refusal to follow commands to walk backwards towards the officers.

1    Under Plaintiffs' facts, he was not actively resisting nor physically assaulting any of

2    the officers at the time of the use of force.

3        The most important *Graham* factor is whether the suspect posed an immediate

4    threat to anyone's safety." *S.R. Nehad*, 929 F.3d at 1132 (citing *Mattos v. Agarano*,

5    666 F.3d 433, 441 (9th Cir. 2011)). Deadly force is reasonable only "if the officer

6    has probable cause to believe the suspect poses a significant threat of death or

7    serious physical injury to the officers or others." *Scott*, 39 F.3d at 914 (quoting

8    *Garner*, 471 U.S. at 11.). "In cases where the best (and usually only) witness who

9    could offer direct testimony for the plaintiff about what happened before the

10   shooting has died, [the Ninth Circuit's] precedent permits the decedent's version of

11   events to be constructed circumstantially from competent expert and physical

12   evidence, as well as from inconsistencies in the testimony of law enforcement."

13   *George v. Morris*, 736 F.3d 829, 834 (9th Cir. 2013).

14       While outside of the car, Puga reached down to his waistband several times to

15   adjust his pants. He did so while standing next to the driver's side of the vehicle and

16   while standing in front of the vehicle. Moreover, Betzabeth Gonzalez, who observed

17   Puga reach down several times to adjust his pants, testified that she never saw Puga

18   aggressively reach for anything prior to the shooting, did not see any gun visible in

19   Puga's waistband, and heard Puga express several times that he was scared of being

20   shot. Several witnesses testified that they never saw Puga with a gun in his hand

21   when the shooting started nor did they ever see Puga point a weapon at anyone or

22   shoot at anyone; videos of the incident do not show Puga ever with a gun in his

23   hands or pointing an object at anyone; and forensic evidence supports a finding that

24   Puga never shot a gun while at the front of the Expedition. Further, Erin

25   Mangerino's cellphone video of the shooting shows that the shooting did not start

26   until Puga had turned away from the officers to start running. Under these facts, a

27   reasonable jury could find that Puga did not pose an immediate threat of death or

28   serious bodily injury at the time the shooting started because he had just reached

down to adjust his pants like he had done several times before, and he was no longer reaching for anything nor was he facing any of the officers, he was not visibly armed, pointing anything at anyone, or shooting a weapon at the time the shooting started and that he likely turned to run because he panicked at seeing several officers quickly approaching him and was scared he was going to be shot. *See Curnow By & Through Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991) (although it had been recognized that "an officer could use deadly force to arrest a fleeing felon if, under the circumstances, he reasonably believed such force was necessary to protect himself or others from death or serious physical harm," the officer could not reasonably believe that it was reasonable to use deadly force against a suspect who did not point the gun at the officers and was not facing the officers when they shot him the first time); *Lopez v. City of Riverside*, No. 22-55723, 2023 WL 8433959, at *1 (9th Cir. Dec. 5, 2023) ("a jury could reasonably find that, *at the moment* he was shot, (1) Mr. Lopez presented no immediate threat to Officer Wright and (2) Officer Wright's use of deadly force was in violation of Mr. Lopez's Fourth Amendment rights" despite the officer having prior knowledge that Lopez was armed with a gun and Lopez had reached into his coat and extracted his empty hands immediately prior to the shooting).

Even assuming *arguendo* that Kee started shooting as soon as he saw Puga's right hand drop from the raised position as he claims, a jury could still find Kee's initial volley to be unreasonable. A jury could find disbelieve Kee's claim that he saw a gun in Puga's waistband immediately prior to the shooting since a video capturing Puga exiting the vehicle does not show a gun visibly sticking out of Puga's waistband, witness Gonzalez testified that she did not see a gun in Puga's waistband, and it is disputed that Kee had reached a position to be able to see Puga's waistband. A jury could further find it to be unlikely that Kee would take his eyes off Puga and turn his back towards Puga to reposition if Kee had actually seen Puga with a gun and saw Puga fire a gun and thus conclude that Kee did not see a gun.

And since Puga had on many prior occasions dropped his hands from a raised
position to adjust his pants and the officers had observed him do so, a jury could
find that it was unreasonable for Kee to believe that Puga posed immediate threat of
death or serious bodily injury when he dropped his hand down towards his
waistband right before the shooting because he had done so on many prior occasions
without posing a threat and percipient witnesses testified that Puga did not
aggressively reach for anything, did not have a gun visible in his waistband, did not
have a gun in his hands, did not point anything, and did not shoot anything prior to
the initial shots.

Moreover, the Ninth Circuit has held that the analysis on the reasonableness
of force used "is not static, and the reasonableness of force may change as the
circumstances evolve." *Hyde v. City of Wilcox*, 23 F.4th 863, 870 (9th Cir. 2022).
Thus, even if the Court were to find that the initial use of deadly force was justified
when Puga turned and his hands dropped from a raised position, a reasonable jury
could find that the officers used excessive force when they continued to shoot Puga
as he was running away, as he was falling to the ground, and after he had fallen to
the ground. *See Est. of Risher v. City of Los Angeles*, No. EDCV17995MWFKKX,
2020 WL 5377306, at *10, 12 (C.D. Cal. July 29, 2020) ("lethal force can be
excessive even if the suspect at one time posed a threat or is still holding a gun
while fleeing" and finding that even though it was undisputed that the suspect shot
the officer earlier, a jury could determine the officer's use of force to be excessive if
it found the suspect was not pointing the gun at officers while fleeing at the time he
was shot); *Latits v. Phillips*, 878 F.3d 541, 549–50 (6th Cir. 2017) (fleeing suspect
did not place public or officers at imminent risk because under plaintiff's facts, prior
pursuit posed a relatively low risk to public due to empty highways and conduct
prior to being shot only showed intent to flee not intent to harm); *Zion v. Cnty. of
Orange*, 874 F.3d 1072, 1076-77 (9th Cir. 2017) (second volley of shots at suspect
who had fallen to ground after being struck by first volley could be found

unreasonable); *Murillo v. City of Los Angeles*, 707 F. Supp. 3d 947, 964 (C.D. Cal.
2023) (final shot at decedent who had fallen to the ground after a brief pause could
be found unreasonable). Under Plaintiffs' facts, Puga did not pose an imminent
threat to the public or the officers when he was shot in the back while he was fleeing
because the prior pursuit on empty roadways posed a relatively low risk to the
public and Puga did not show an intent to harm as he did not grab or aggressively
reach for anything, did not had a weapon in his hands, did not point anything at
anyone, did not shoot a weapon at anyone, and was simply running away. A jury
could also find the continuing shots at Puga as he was falling to the ground was
unreasonable. Additionally, any alleged threat had ended after Puga had fallen to the
ground and thus the pause before the final shots to Puga on the ground were also
unreasonable.

Additional factors also weigh against the reasonableness of the officers' use
of deadly force, including their failure to provide a warning that deadly force was
going to be used despite having the time to give commands prior to the initial shots
and Puga not making any threatening gesture of movements during the volleys while
he was running and after he had fallen to the ground, their failure to call for backup
instead of entering an open-air environment to take Puga into custody when there
was no urgency to do so, and the presence of innocent bystanders in the nearby
houses and the heightened risks to those bystanders due to the officers' tactics,
decisions, and excessive number of shots. *See S.R. Nehad*, 929 F.3d at 1137-38
(failure to warn that use of lethal force is contemplated and that noncompliance will
result in the use of deadly force cuts against reasonableness of deadly force);
*Hulstedt v. City of Scottsdale*, 884 F. Supp. 972, 992-93 (D. Ariz. 2012) (collecting
cases regarding failure to provide deadly force warning); *Tuggle v. City of Tulare*,
No. 1:19-CV-01525-JLT-SAB, 2023 WL 4273900, at *18 (E.D. Cal. June 29, 2023)
("the presence of innocent bystanders and the risk of harm to those bystanders by
the officers' chosen means of force may be relevant to the totality of the

circumstances") (citing *Boyd v. Benton Cnty.*, 374 F.3d 773, 779 (9th Cir. 2004); *Xiong v. Chavez*, No. 1:13-CV-00083-SKO, 2016 WL 345609, at *5 (E.D. Cal. Jan. 28, 2016); *Bailey v. County of San Joaquin*, 671 F.Supp.2d 1167, 1174 (E.D. Cal. 2009); *Hulstedt*, 884 F. Supp. 2d at 990).

B. Vaccari Used Excessive Force Against Puga

A jury could also find that Vaccari used excessive force against Puga when he struck Puga with a pepper ball in the eye and when he tased Puga twice after Puga had fallen after being struck by gunshots and did so without warning. SBSD guidelines regarding the use of the pepper ball launcher directs its deputies to not shoot at the head, neck or spine unless a deadly force situation exists and to anticipate that a suspect may lower his head. It is undisputed that Puga did not pose an immediate threat of death or serious bodily injury at the time Vaccari deployed the pepper ball launcher and struck Puga in the eye as he was inside his vehicle and had not done anything that would lead the officers to believe he was an imminent threat. Additionally, under Plaintiffs' facts, Puga's hands were beside his body, he had nothing in either hand, and he appeared incapacitated when the officers approached to take him into custody after the shooting. Thus, Puga did not pose a threat that necessitated the use of the Taser. Additionally, officers are trained that they can go in and handcuff a suspect while the suspect is under the effects of the Taser. It was clear that the Taser's first deployment was successful in locking Puga's body up but Vaccari failed to go in to handcuff Puga and failed to direct Adams to do so; instead, he activated another unnecessary cycle of the Taser on Puga who had not done anything in between the first and second deployments to indicate that he posed a threat to anyone. Vaccari admitted at his later interview with detectives that going in and handcuffing Puga during the first Taser cycle would have been the better option than unnecessarily activating the Taser a second time. //

C. Plaintiff L.C. Has Standing Under the Fourteenth Amendment

Puga maintained a consistent relationship with Plaintiff L.C. whenever he was able. L.C. was born in 2013. PAMF 480. After L.C. was born, Puga desperately wanted to see L.C. PAMF 481. Puga told L.C.'s mother that he would voluntarily provide support for L.C. because she was his child and would buy whatever L.C. she needed. PAMF 484-483. After L.C. was born, Puga was incarcerated for three to four years and then again from approximately 2019 until shortly before his death. PAMF 484. Despite this, Puga saw L.C. whenever L.C. visited Puga's mother, tried to ask L.C.'s mother to allow him to see more of L.C. and spoke with L.C. over the phone. PAMF 485-487, 491. Additionally, In the two years before Puga' passing, Puga would see L.C. at times when L.C. visited her aunt Susie, Puga's sister. PAMF 492. Thus, under these circumstances, Puga maintained a regular, enduring relationship with L.C.

D. <u>The Officers' Uses of Force Violated Plaintiffs' Fourteenth Amendment Rights</u>

Two tests govern whether conduct "shocks the conscience" and the application depends on whether the officers had time to deliberate: if the situation evolved over a time frame that permitted the officer to deliberate before acting, the deliberate-indifference test applies; if the situation escalated so quickly that the officer had to make a snap judgment, the purpose-to-harm test applies. *Ochoa v. City of Mesa*, 26 F.4th 1050, 1056 (9th Cir. 2022).

Plaintiffs contend that the deliberate indifference standard applies because the officers had over an hour to come up with a tactical plan while Puga was inside the vehicle and did not pose a threat to anyone and while Puga was in front of the vehicle as Kee continued to maintain a dialogue in an attempt to deescalate. *See Lennox v. City of Sacramento*, No. 2:21-CV-02075-DAD-CSK, 2024 WL 3845378, at *25 (E.D. Cal. Aug. 16, 2024) (jury could find officers had ample time to deliberate because the incident spanned roughly twenty minutes, there were several instances of continued dialogue and de-escalation attempts, and at the time the

officers advanced, the decedent did not appear to pose an immediate threat of death or serious bodily injury to anyone). Moreover, when Adams and Vaccari approached Puga after the shooting, Puga had been shot and was incapacitated with his hands visible and nothing in his hands. Thus, Vaccari had time to deliberate before using the Taser. Under this standard, a jury could find that Kee, Rubalcava, Blackwood, and Adams acted with a reckless indifference to Puga and the Bottens' rights when they approached Puga despite their being no urgency and shot numerous shots at Puga and towards the Botten house. A jury could also find that Vaccari acted with a reckless indifference when he deployed pepper balls at Puga's face and struck Puga in the eye, despite Puga not posing an immediate threat of death or serious bodily injury to anyone, and again when Vaccari tased Puga twice despite it being clear that Puga had been incapacitated by the shooting, and Puga's hands were visible with nothing in either hand.

Even under "purpose to harm" standard, a reasonable jury could find that officers' use of deadly force shocks the conscience because Puga did not pose an immediate threat to anyone at the time of the shooting as he had not aggressively reached for anything, did not have a gun in his hand, had not pointed anything at anyone, and had not shot at anyone. *See A.D. v. California Highway Patrol*, 712 F.3d 446, 458 (9th Cir. 2013). The jury could likewise find Vaccari acted with a purpose to harm when he deployed pepper balls that struck Puga in the eye and subsequently tased Puga despite it being clear that Puga had been incapacitated by the shooting, and Puga's hands were visible with nothing in either hand.

E. The Officers Not Entitled to Qualified Immunity for Their Uses of Force

In considering existing precedent, the court "may look at unpublished decisions and the law of other circuits, in addition to Ninth Circuit precedent." *Prison Legal News v. Lehman*, 397 F.3d 692, 702 (9th Cir. 2005). "It is clearly established that shooting a fleeing suspect in the back violates the suspect's Fourth Amendment rights" where the suspect poses no immediate threat to the officer or

others. *Foster v. City of Indio*, 908 F.3d 1204, 1211 (9th Cir. 2018); *see also Monroy v. Perez*, No. 23-55793, 2025 WL 560233, at *1 n.1 (9th Cir. Feb. 20, 2025) (*Tennessee v. Garner* established the "specific rule that officers may not reasonably use deadly force against a fleeing suspect who poses no imminent threat"). Preexisting case law placed the officers on notice that shooting at Puga in the back as he turned to run and while he was running, despite Puga never grabbing or aggressively reaching for anything, not having a gun in his hand, never pointing an object at anyone, and never shooting a weapon, was unreasonable. *See Curnow*, 952 F.2d at 323, 325 (officers not entitled to qualified immunity where they shot at suspect in the back while suspect was fleeing from the house with a gun where suspect did not point the gun and was not facing the officers, despite officers being allowed to use deadly force to arrest a fleeing suspect if the officers reasonably believed such force was necessary to protect himself or others from death or serious bodily harm); *George*, 736 F.3d at 838, 839 (deputies' use of deadly force against a man, without objective provocation, while he had his gun trained on the ground, violated the Fourth Amendment); *Harris v. Roderick*, 126 F.3d 1189, 1203-04 (9th Cir. 1997) (officers' use of deadly force, without warning, against an suspect armed with a gun who had shot at officers in the immediate past was not reasonable because the suspect had made no aggressive move of any kind); *Daniels v. Cnty of Ventura*, 228 Fed. App'x 669, 670, 671 (9th Cir. 2007) (officer who shot armed plaintiff 7 times in the back where there was no bystanders nearby and suspect was not entering a building with bystanders, despite plaintiff disobeying commands and physically resisting officer, was not entitled to qualified immunity); *S.T. v. City of Ceres*, 327 F. Supp. 3d 1261, 1277 (E.D. Cal. 2018) ("A reasonable jury could infer from the fact that he was shot in the back that the Decedent was facing away from the officers at the time that they fired and therefore did not pose an imminent threat to officer safety.")

It was further clearly established that shooting an incapacitated suspect after the suspect has been shot and had fallen to the ground is unconstitutional. *See Zion*, 874 F.3d at 1075-76 (second volley of shots at suspect who had previously stabbed an officer but was lying on the ground after being struck by first volley was not justified); *Lam v. City of Los Banos*, 976 F.3d 986, 1001-03 (9th Cir. 2020) (clearly established that "an officer violates the Fourth Amendment by shooting a person who had previously injured someone but no longer poses an immediate threat"); *Robertson v. Cnty. of Los Angeles*, No. CV1602761BROSKX, 2017 WL 5643179, at *10 (C.D. Cal. Oct. 17, 2017) (officers not entitled to qualified immunity because even if initial shots at decedent holding gun were reasonable, a jury could determine that not all the shots were justified since shots were fired at decedent after he fell to the ground and stopped moving).

It was also clearly established at the time of the incident that Vaccari's use of less-lethal force under the circumstances violated the Fourth Amendment. *See Nelson v. City of Davis*, 685 F.3d 867, 883 (9th Cir. 2012) (officer's deployment of a pepperball projectile at a nonthreatening subject, striking the subject in the eye, was unreasonable); *Gravelet-Blondin v. Shelton*, 728 F.3d 1086, 1094-95 (9th Cir. 2013) (clearly established that the use of the Taser, which is significant force, at a suspect who was passively resisting officers' commands was in violation of the Fourth Amendment); *Landis v. Baker*, 297 Fed. App'x 453, 455-64 (6th Cir. 2008) (denying qualified immunity to officer who deployed "a taser more times than necessary" against a non-violent, non-fleeing, non-verbally responsive suspect).

Additionally, an officer violates the Fourteenth Amendment's "purpose to harm" standard when an officer uses force against a clearly harmless or subdued suspect. *Foster*, 908 F.3d at 1211. It was clearly established at the time of the incident that the officers use of deadly force against Puga when he posed no immediate threat or serious bodily injury, especially after he had fallen to the ground, and Vaccari's deployment of the pepperball projectile at Puga's face and

-24-

subsequent deployment of the Taser at Puga while he was lying prone on the ground
after having been clearly struck and incapacitated by gunshots and with his hands
visible and nothing in them violated the Fourteenth Amendment. *See A.D.*, 712 F.3d
at 458 (evidence sufficient to support jury's finding of Fourteenth Amendment
violation where officer emptied his gun at decedent who did not pose an immediate
threat of death or serious bodily injury).

     F.  <u>The Officers are Not Entitled to Summary Judgment on Plaintiffs' Battery
or Negligence Claim</u>

     The California Supreme Court "has long recognized that peace officers have a
duty to act reasonably when using deadly force." *Hayes v. Cnty. of San Diego*, 57
Cal.4th 622, 629 (2013). "[A]n officer's lack of due care can give rise to negligence
liability for the intentional shooting death of a suspect." *Munoz v. Olin*, 24 Cal. 3d
629, 634 (1979). California "state negligence law, which considers the totality of the
circumstances surrounding any use of []force, is broader than federal Fourth
Amendment law, which tends to focus more narrowly on the moment when []force
is used." *Hayes*, 57 Cal.4th at 639 (internal citations omitted). The totality of the
circumstances necessarily includes the officer's "tactical conduct and decisions
leading up to the use of []force." *See id.* at 637-38; *see also Grudt v. City of Los
Angeles*, 2 Cal.3d 575, 588 (1970) (failure to follow policies is evidence of
negligence); *Mulligan v. Nichols*, 835 F.3d 983, 991 (9th Cir. 2016). "Under
California law, the officer's pre-shooting decisions can render his behavior
unreasonable under the totality of the circumstances, even if his use of deadly force
at the moment of the shooting might be reasonable in isolation." *Tabares v. City of
Huntington Beach*, 988 F.3d 1119, 1125 (9th Cir. 2021) (citing *Mendez v. Cnty. of
Los Angeles*, 897 F.3d 1067, 1082–83 (9th Cir. 2018); *Grudt*, 2 Cal.3d at 587)); *see
also Mulligan*, 835 F.3d at 991.

     A state law claim for battery by a peace officer considers the "totality of the
circumstances," which includes pre-force conduct as well as the use of force.

*McLeod v. City of Redding*, No. 2:22-CV-00585 WBS JDP, 2024 WL 3011227, at

\*8 (E.D. Cal. June 12, 2024) (finding that the analysis on the state law battery claim

"requires the same 'totality of the circumstances' inquiry that applied to negligence

claims" including pre-shooting conduct); *Villalobos v. City of San Maria*, 85 Cal.

App. 5th 383, 389 (2022) (evaluating both battery and negligence claims against

police officers under the reasonableness standard articulated in *Hayes*); *Koussaya v.*

*City of Stockton*, 54 Cal. App. 5th 909, 937 (2020) (same)). Indeed, California Civil

Jury Instructions for battery by a peace officer (deadly force) (CACI 1305B) and

negligent use of deadly force by a peace officer (CACI 441) instructs that the jury

may consider the officer's "tactical conduct and decisions before using deadly

force" and California Civil Jury Instructions for battery by a peace officer

(nondeadly force) (CACI 1305A) and negligent use of nondeadly force by law

enforcement (CACI 440) instructs that the jury may consider "the conduct of [the

officer and plaintiff/decedent] leading up to the use of force" (CACI 1305A) and

[defendant's] tactical conduct and decisions before using force" (CACI 440) as part

of the "totality of the circumstances". CACI 441 and 1035B further states:

> A threat of death or serious bodily injury is "imminent" when…a
> person has the *present ability, opportunity, and apparent intent to*
> *immediately* cause death or serious bodily injury to the peace officer or
> another person. An imminent harm is not merely a fear of future harm,
> *no matter how great the fear and no matter how great the likelihood of*
> *the harm,* but is one that, from appearances, must be instantly
> confronted and addressed.

CACI 441, 1305B (emphasis added).

    The officers made poor tactical decisions and tactical errors, which ultimately

led to the unnecessary use of deadly force. The officers believed they were dealing

with an armed, barricaded suspect in a residential neighborhood. Yet, they never

discussed or came up with a tactical plan for dealing with Puga, despite Puga

staying inside the stopped vehicle for over an hour, and never discussed a tactical

plan as to what to do when Puga exited the vehicle. Vaccari was also negligent in his failure to call SWAT, despite SWAT being specifically trained to deal with barricaded suspects and Puga's continual refusal to exit the car after thirty minutes of pepper ball deployments. Moreover, the officers violated POST training regarding responding to high-risks situations involving barricaded suspects when they failed to request backup, set up a perimeter, and evacuate all uninvolved individuals from the area. The officers also failed to effectively communicate with one another prior to approaching Puga. The officers acted negligently by leaving cover and entering an open-air environment despite allegedly believing that Puga was armed and intentionally concealing his waistband, despite there being no urgency for taking him into custody when they did so. Lastly, the officers failed to give a warning prior to their uses of force, including deadly force, despite it being feasible to do so.

Additionally, the officers are liable under battery for their excessive and unreasonable uses of force against Puga as discussed above, *supra* Section IV.A-B. Under Plaintiffs' facts, Puga was not an imminent threat of death or serious bodily injury nor was it reasonable for the officers to believe that Puga would cause death or serious bodily injury to another unless immediately apprehended when they shot at him with their firearms. *See* CACI 1305B. Moreover, Puga was not an immediate threat to the safety of others when Vaccari struck Puga in the eye with pepperball projectiles or when he tased Puga twice.

G. Plaintiffs' Bane Act Claim Survives

"The elements of a Bane Act claim are essentially identical to the elements of a § 1983 claim, with the added requirement that the government official had a 'specific intent to violate' a constitutional right." *Hughes v. Rodriguez*, 31 F.th 1211, 1224 (9th Cir. 2022). "[A] reckless disregard for a person's constitutional rights is evidence of specific intent to deprive that person of those rights." *Reese v. Cnty. of Sacramento*, 888 F.3d 1030, 1045 (9th Cir. 2018). As discussed above,

under Plaintiffs' facts, the officers used excessive and unreasonable force against Puga. The officers acted with reckless disregard for Puga's constitutional rights when they failed to follow their training in dealing with high-risk, barricaded suspects and used force, including deadly force, at a non-threatening Puga.

### H. State Law Immunities Do Not Apply

The discretionary immunity provided by Government Code section 820.2 only applies to "basic policy decisions which have been expressly committed to coordinate branches of government." *Gillan v. City of San Marino*, 147 Cal. App. 4th 1033, 1051 (2007) (cleaned up). Operational decisions purporting to apply the law, such as the decision to arrest a suspect, are not basic policy decisions. *Id.*; *Caldwell v. Montoya*, 10 Cal. 4th 972, 981-82 (1995). Accordingly, discretionary immunity does not apply to the officers. *See Sharp v. Cnty. of Orange*, 871 F.3d 901, 920 (9th Cir. 2017) (§ 820.2 immunity "does not apply to an officer's decision to detain or arrest a suspect" and "covers only 'policy decisions made by a 'coordinate branch[] or government,' not 'operational decision[s] by the police purporting to apply the law'") (citations omitted).  Even assuming *arguendo* that the officers' decision on detaining and arresting Puga were discretionary, immunity under section 820.2 does not apply such decisions result in the injury to another, "not from the employee's exercise of 'discretion vested in him' to undertake the act, but from his negligence in performing it after having made the discretionary decision to do so." *McCorkle v. City of Los Angeles*, 70 Cal. 2d 252, 261 (1969) (officer not immune under § 820.2 due to his negligence after exercising his discretion to undertake an investigation of an accident). Accordingly, the officers are not entitled to discretionary immunity under Government Code section 820.2.

The shooting officers are also not immune under California Penal Code §§ 196 and 835a because, as discussed above, there are disputed issues of fact that could lead a reasonable jury to conclude that the officers used excessive and unreasonable deadly force. *See Lennox*, 2024 WL 3845378, at *29.

I.  <u>Plaintiffs May Maintain State Law Claims Against Defendants Despite
Seeking Wrongful Death Damages</u>

From County Defendants' Motion, it is unclear whether County Defendants are seeking to dismiss Plaintiffs' state law claims that include, as part of the relief sought, wrongful death damages in its entirety; or that County Defendants simply seek to strike wrongful death damages as a form of relief sought against County Defendants. If the former, this argument fails because the minor Plaintiffs maintain both wrongful death and survival claims on behalf of Puga under Plaintiffs' negligence and battery claims. California Code of Civil Procedure § 377.34 provides in relevant part that an action by decedent's successors in interest on decedent's cause of action may recover damages for pain, suffering, or disfigurement if the action was filed after January 1, 2022 and before January 1, 2026. Cal. Civ. P. Code § 37734(b). This action was filed on June 7, 2022. (*See* Doc. No. 1). Additionally, the operative complaint specifies that the battery and negligence claims are both survival and wrongful death claims and that the minor plaintiffs are seeking damages individually and as Puga's successors in interest. (TAC, Doc. No. 68 ¶¶ 97, 101-103, 108, 111-113.

If the latter, this argument fails against Adams and the County (through vicarious liability) and Blackwood Rubalcava and the State (through vicarious liability) because there is evidence to support a finding that Adams or Rubalcava was the cause of Puga's gunshot wound to the lower left back, which would have been fatal if Puga had not sustained the gunshot wound to the mid left back. *See Yanez v. Plummer*, 221 Cal. App. 4th 180, 187 (2013) ("A defendant's negligent conduct may combine with another factor to cause harm"); *Hughey v. Candoli*, 158 Cal. App. 2d 231, 240 (1958) ("Where several persons act in concert and damages result from their joint tort, each person is held for the entire damages unless segregation as to causation can be established. Even though persons are not acting in

concert, if the results produced by their acts are indivisible, each person is held liable for the whole.").

    J.   <u>Plaintiffs Substantially Complied with the Government Tort Claim Act</u> <u>and Alleged Use of Less-Lethal Force and Negligent Tactics in the</u> <u>Operative Complaint</u>

In assessing compliance with California Government Code sections 945.4 and 910, the California Supreme Court has held:

> The claim…need not specify each particular act or omissions later proven to have caused injury. A complaint's fuller exposition of the factual basis beyond that given in the claim is not fatal, so long as the complaint is not based on an entirely different set of facts. Only where there has been a complete shift in allegations, usually involving an effort to premise civil liability on acts or omissions committed at different times or by different persons than those described in the claim, have courts generally found the complaint barred. Where the complaint merely elaborates or adds further detail to the claim, but is predicated on the same fundamental actions or failures to act by the defendants, courts have generally found the claim fairly reflects the facts pled in the complaint.

*Stockett v. Ass'n of Cal. Water Agencies Joint Powers Ins. Auth.*, 34 Cal. 4th 441, 447 (2004). Here, all four Plaintiffs alleged in their tort claims, "As a result of the shooting and *other uses of force*, Mr. Puga endured severe pain and suffering and lost his life and earning capacity. County UMF 207-210 (emphasis added). *See Stockett*, 34 Cal.4th at 444, 447 (complaint alleging wrongful termination in violation of public policy on three specific grounds was not barred where claim alleged wrongful termination); *White v. Superior Court*, 225 Cal. App. 3d 1505, 1507, 1508, 1511 (1990) (causes of action for negligent hiring, training, and retention and intentional failure to train, supervise and discipline were fairly reflected in claim that stated a police officer had falsely arrested and beaten plaintiff because they were predicated on the same fundamental facts). Additionally, under "Contention of Claimants," all four Plaintiffs listed "Negligence" as one of the

contentions. Accordingly, the use of less-lethal force and negligence, including
negligent tactics, were sufficiently alleged in Plaintiffs' Government Tort Claims.

Additionally, "[t]o rely on a theory at summary judgment, plaintiffs are
required to either (1) plead the additional theory in their complaints, or (2) to make
known during discovery their intention to pursue recovery on the theory omitted
from their complaints." *Corona v. Time Warner Cable, Inc.*, No.
CV135521PSGVBKX, 2014 WL 11456535, at *4 (C.D. Cal. Oct. 16, 2014)
(cleaned up) (citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir.
2000)). Plaintiffs made it known during discovery of their intention to pursue claims
of excessive force against Vaccari for his deployment of the pepperball projectile
that struck Puga's eye and his subsequent Taser deployments by questioning
Vaccari at his deposition regarding the pepperball deployment at Puga's eye and
Taser deployments, and by having Plaintiffs' police practices expert opine on the
reasonableness of Vaccari's pepperball projectile deployment and Taser
deployments in his Rule 26 Report that was exchanged with Defendants during the
course of discovery. PAMF 493. Accordingly, County Defendants had sufficient
notice of Plaintiffs' claims with regards to Vaccari's use of less-lethal force.

# V.    **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court deny
County Defendants' Motion for Summary Judgment and State Defendants' Motion
for Summary Judgment.


DATED: February 27, 2025        LAW OFFICES OF DALE K. GALIPO


                                By _____/s/ Hang D. Le_____
                                    Dale K. Galipo
                                    Hang D. Le
                                    Attorneys for Plaintiffs

## **Certificate of Compliance**

The undersigned, counsel of record for Plaintiffs L.C., I.H., A.L., and Antonia
Salas Ubaldo, certifies that this brief contains 11,134 words, which complies with
the word limit set by the court order dated February 26, 2025 (Doc. No. 110).

DATED: February 27, 2025          LAW OFFICES OF DALE K. GALIPO


                                  By _____*/s/ Hang D. Le*_____
                                        Dale K. Galipo
                                        Hang D. Le
                                        Attorneys for Plaintiffs