Exhibit 2

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

```
 1                UNITED STATES DISTRICT COURT

 2               CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA     )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and   )
 5   J.B., a minor by and through his      )
     guardian JONATHAN WAYNE BOTTEN, SR.,  )
 6                                         )
                   Plaintiffs,             )
 7                                         )
                   vs.                     ) Case No.
 8                                         ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN    )
 9   BERNARDINO; ISAIAH KEE; MICHAEL       )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,   )
     inclusive,                            )
11                                         )
                   Defendants.             )
12   _____)

13

14

15

16           REMOTE VIDEOCONFERENCE DEPOSITION OF

17                   BERNARDO RUBALCAVA

18                 MONDAY, NOVEMBER 4, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112646
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 14

1    rounds.

2    BY MR. GALIPO:

3        Q.    How many rounds did you fire in the first volley,

4    approximately?

5        A.    Approximately five.

6        Q.    And how many rounds did you fire in the second

7    volley, approximately?

8        A.    Five to eight -- or five to ten.

9        Q.    So you believe you fired more rounds in the second

10   volley than the first volley?

11       A.    Yes.

12       Q.    How much time passed between your first volley and

13   your second volley, approximately?

14       A.    Few seconds.

15       Q.    When you say a few seconds, do you have any range in

16   mind?  Like, two to three seconds, three to five seconds,

17   anything you're comfortable with?

18       A.    Five to ten seconds.

19       Q.    During your first volley of shots, were you aiming

20   center mass at the person you were firing at?

21       A.    Yes.

22       Q.    How far would you estimate the individual was from

23   you in your first volley of shots?

24       A.    Ten or fifteen feet.

25       Q.    Do you know the name of the person you were firing

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 15

```
 1   at now?

 2        A.   Now, yes.

 3        Q.   What is his name?

 4        A.   Right now, or at the time?

 5        Q.   No.  Do you know now what his name is?

 6        A.   Hector Puga.

 7        Q.   And where was Mr. Puga positioned when you fired the

 8   first volley of shots?

 9             Was he near the front of a vehicle?

10        A.   He was in the front of his vehicle.

11        Q.   And where were you positioned in relation to that

12   vehicle when you fired your first volley of shots?

13        A.   To the left of that vehicle.

14        Q.   When you say the left, are you speaking of the

15   driver's side, or some other side?

16        A.   The driver's side.

17        Q.   And where approximately on the driver's side were

18   you when you fired your first volley of shots?

19        A.   I was aligned with the front of the bumper.

20        Q.   Near the front corner bumper area?

21        A.   Correct.

22        Q.   And what part of Mr. Puga's body were you aiming at

23   when you fired your first volley of shots?

24        A.   His upper torso area on the stomach up.

25        Q.   Like stomach-chest area?
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 16

```
1      A.    Stomach and chest area.

2      Q.    And I think you already told me this, but you

3    approximate your distance between you and him to be what?

4      A.    About five -- about ten feet.

5      Q.    Before you fired your first shot, did you hear any

6    other shots being fired?

7      A.    Yes.

8      Q.    How many shots did you hear before you fired your

9    first shot?

10     A.    Two.

11     Q.    Did you give any verbal warning you were going to

12   shoot before you fired?

13     A.    No.

14     Q.    Did you hear anyone else give a verbal warning that

15   they were going to shoot before you heard the shots?

16     A.    No.

17     Q.    Was Mr. Puga essentially in the same position for

18   your first volley of shots?

19     A.    What do you mean?

20     Q.    In other words, you told me he was about ten feet

21   away from you towards the front of the vehicle when you fired

22   your first volley of shots; is that correct?

23     A.    Correct.

24     Q.    I'm wondering whether he changed positions, like

25   turned away from you, started running, anything like that
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 18

```
1      A.   Two.

2      Q.   Were you using your sights?

3      A.   Yes.

4      Q.   And then you said he immediately turned away from

5  you after you started firing?

6      A.   Yes.

7      Q.   And started running away?

8      A.   Yes.

9      Q.   What I'm wondering is, during your first approximate

10  five shots, was he turning back away from you?

11     A.   No.

12     Q.   So you think he was facing you generally during your

13  first five shots?

14     A.   Yes.

15     Q.   Okay.  Then he turned away from you and started

16  running away?

17     A.   Yes.

18     Q.   And when you fired your other approximate five or

19  eight shots, was he running away from you?

20     A.   Yes.

21     Q.   And then what part of was his center mass to you at

22  that point?

23     A.   His back.

24     Q.   So were you aiming essentially at his back for your

25  second volley of shots?
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 19

1      A.    Yes.

2      Q.    Which should be approximately five or eight shots?

3      A.    Yes.

4      Q.    And was he running away from you during your

5   approximate five to eight shots?

6      A.    Yes.

7      Q.    Did you ever see him going to the ground?

8      A.    Yes.

9      Q.    Were any shots fired by any officer that you heard

10   after he went to the ground?

11          MS. ESQUIVEL:  Objection.  Calls for speculation.

12          THE WITNESS:  I don't recall.

13   BY MR. GALIPO:

14      Q.    Did you think based on your training it was

15   appropriate to shoot him after he went to the ground?

16          MS. ESQUIVEL:  Objection.  Lacks foundation;

17   improper hypothetical.

18          THE WITNESS:  Yes.

19   BY MR. GALIPO:

20      Q.    Did you fire any shots after he went to the

21   ground?

22      A.    I don't recall.

23      Q.    Are you saying you might have; you're not sure?

24      A.    Yes.

25      Q.    Did you hear any shots being fired after your last

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 20

1    shot?

2        A.   I don't recall.

3        Q.   In between your first shot and your last shot, did

4    you give any commands to Mr. Puga?

5        A.   No.

6        Q.   What was in your background when you were firing

7    your first group of shots at him?

8        A.   It was dark.

9        Q.   You were aware there was a residential

10   neighborhood?

11       A.   I was not aware there were houses in the

12   background.

13       Q.   Were you aware that there was a residential

14   neighborhood, though, that there were some homes somewhere in

15   the area?

16       A.   Yes.

17       Q.   You're just saying you were not aware specifically

18   there were houses in the background?

19       A.   Correct.

20       Q.   Were you trained that you have to -- you should

21   consider your background or backdrop when you fire?

22       A.   Yes.

23       Q.   And were you trained that the reason that's

24   important is because if your bullets miss, innocent people

25   could get shot?

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 21

1    A.    Yes.

2        Q.    And do you know what your background was when you

3    fired your second group of shots?

4    A.    Yes.

5        Q.    What was it?

6    A.    Just a roadway.

7        Q.    Do you know now that your background when you fired

8    your first group of shots were some homes?

9    A.    Yes.

10        Q.    The vehicle that Mr. Puga was in, was it a white

11    vehicle?

12    A.    Yes.

13        Q.    Do you recall which way it was facing directionally

14    when it was in a stopped position?

15    A.    Facing north.

16        Q.    And then when you were firing, were you kind of

17    firing in a northeast direction for your first volley of

18    shots?

19    A.    Yes.

20        Q.    Do you know if any other officers were near you on

21    the driver's side of the vehicle when you fired your first

22    volley of shots?

23    A.    Yes.

24        Q.    What other officers were on the driver's side?

25    A.    Sergeant Kee.

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 22

1    Q.    Do you know how to spell the last name for the court

2    reporter?

3    A.    It's K-e-e.

4    Q.    Thank you.  And where was Sergeant Kee positioned

5    approximately, if you know?

6    A.    To the left of my -- to the left of me approximately

7    two -- two feet to the left.

8    Q.    So also towards the front of the vehicle, but two

9    feet to your left?

10   A.    Yes.

11   Q.    And would to your left be to the west?

12   A.    Yes.

13   Q.    Do you know if Sergeant Kee fired any shots?

14   A.    Yes.

15   Q.    What is your understanding?  That he did?

16   A.    He did.

17   Q.    Were you aware he was firing during the time frame

18   you were firing your first volley?

19   A.    Yes.

20   Q.    In your second volley of shots, that would have been

21   after you took out one magazine and reloaded with another?

22   A.    Yes.

23   Q.    And I assume that took you a little bit of time to

24   do?

25   A.    Yes.

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 31

1    he got out of the car?

2        A.    No.

3        Q.    Do you know if anyone at the scene had Tasers?

4        A.    Yes.

5        Q.    What is your understanding in that regard?

6              Who had Tasers?  Both CHP officers and the

7    Sheriffs?

8        A.    Yes.

9        Q.    And you already told me there was a less-lethal.

10             Was that a bean bag shotgun?

11       A.    Bean bag shotgun.

12       Q.    So you were aware at least there was some

13   less-lethal at the scene; is that fair?

14       A.    Yes.

15       Q.    To your knowledge, was anyone designated less-lethal

16   once he got out of the vehicle?

17       A.    No.

18       Q.    Before he got out of the car, meaning Mr. Puga, did

19   you have any specific information that he had specifically

20   injured anyone?

21             MS. ESQUIVEL:  Objection.  Overbroad; vague.

22   BY MR. GALIPO:

23       Q.    You may answer.

24       A.    Yes.  That he injured somebody?

25       Q.    That there was a specific injury?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 32

1       A.    No.

2       Q.    Had you ever seen him before, to your knowledge?

3       A.    No.

4       Q.    Did you have any information if he had a criminal

5    history, for example?

6       A.    No.

7       Q.    Did you have any specific information as to whether

8    he was under the influence of drugs or alcohol?

9       A.    No.

10      Q.    When the female was removed from the vehicle, did

11   you have any conversation with her?

12      A.    No.

13      Q.    Did you overhear any conversation with her?

14      A.    No.

15      Q.    How much time do you think passed from the beginning

16   of using the pepper balls to Mr. Puga finally coming out of

17   the vehicle?

18      A.    45 minutes.

19      Q.    Do you recall him saying anything like he was afraid

20   to come out because he was afraid he was going to be shot?

21      A.    No.

22      Q.    Was there any specific instructions that you recall

23   given to him before he got out related to the gun or a gun?

24      A.    No.

25      Q.    Now, I'm assuming you reviewed some documents in

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 37

1          Is that a yes?

2     A.   Yes.

3     Q.   Sorry.  I didn't hear you.

4          And was it making some noises as it was circling?

5     A.   Yes.

6     Q.   And it was using its spotlight?

7     A.   Yes.

8     Q.   Do you have spotlights on your CHP vehicle?

9     A.   Yes.

10    Q.   Were you using those at all?

11    A.   Yes.

12    Q.   So there was some illumination from the spotlights

13    and the helicopter light.

14         Would that be fair?

15    A.   Yes.

16    Q.   And when Mr. Puga got out of the vehicle, what side

17    did he get out on?

18    A.   Driver's side.

19    Q.   Did you see him getting out of the vehicle?

20    A.   Yes.

21    Q.   Where were you positioned at that time?

22    A.   Behind my driver's side door.

23    Q.   Were you using that partially as cover?

24    A.   Yes.

25    Q.   And when Mr. Puga got out of the vehicle, did you

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 38

```
 1    see any weapon in his hands?

 2         A.   No.

 3         Q.   Any weapon on his person?

 4         A.   No.

 5         Q.   Could you see his hands when he got out of the

 6    car?

 7         A.   Yes.

 8         Q.   And where did he go after getting out of the car?

 9         A.   He stood to the left of the vehicle, to the left of

10    the driver's side.

11         Q.   And how long approximately was he in that

12    position?

13         A.   For a few minutes.

14         Q.   And during that time did you see any weapon in his

15    hands?

16         A.   No.

17         Q.   Did you see him reaching for a weapon during that

18    time?

19              Is that a no?

20         A.   No.

21         Q.   Could you hear him saying anything during that time

22    frame?

23         A.   He was having a conversation with Sergeant Kee.

24         Q.   Were you able to make out any of the words?

25         A.   Yes.
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 39

```
1       Q.   What could you make out?

2       A.   I don't recall what was said, but they were building

3    rapport.

4       Q.   And where were you positioned during this

5    conversation?

6       A.   Behind my driver's side door.

7       Q.   Did you hear during that time frame Mr. Puga say

8    words to the effect he was afraid of being shot?

9       A.   He did.

10      Q.   And did he say that when he was at the driver's side

11   of the vehicle or in that area?

12      A.   Yes.

13      Q.   And did you hear whether the sergeant responded to

14   that concern?

15      A.   He did.

16      Q.   What did the sergeant say, generally?

17      A.   He said, "No one's going to shoot you."

18      Q.   At some point did Mr. Puga go to the front of the

19   car?

20      A.   Yes.

21      Q.   And that would be after a few minutes that he was on

22   the driver's side?

23      A.   Yes.

24      Q.   Did Mr. Puga say why he wanted to go to the front of

25   the car?
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 40

1    A.    He just ran to the front of the car after he said we

2    were going to shoot him.

3    Q.    And when he went to the front of the car, was there

4    a period of time where you saw him with his hands up?

5    A.    Yes.

6    Q.    And when he had his hands up, could you see anything

7    in his hands?

8    A.    No.

9    Q.    And for how long of a period of time did you see him

10   with his hands up?

11   A.    For a few minutes.

12   Q.    And when he had his hands up when he was in the

13   front of the vehicle, was there any discussions with the

14   other officers as to what the tactical approach was going to

15   be?

16   A.    There was a discussion with me and my sergeant, with

17   Sergeant Kee.

18   Q.    Is that kind of when you talked about earlier?

19   A.    Yes.

20   Q.    Just basically to walk up there and take him into

21   custody?

22   A.    Yes.

23   Q.    Was there any coordination or discussion at that

24   time that you were aware with the Sheriffs?

25   A.    No.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 41

```
 1      Q.   At some point do you know -- strike that.

 2           At some point did you approach to take him into

 3   custody?

 4      A.   Yes.

 5      Q.   And is that when you got up to the area you talked

 6   about earlier, at the left-front corner of his vehicle?

 7      A.   Yes.

 8      Q.   And when you were approaching, did you know if any

 9   of the deputies were approaching on the passenger side of his

10   vehicle?

11      A.   I don't recall.

12      Q.   You were kind of focused on what you were doing?

13      A.   Yes.

14      Q.   And as you were approaching, did you have any cover

15   at that point?

16      A.   No.

17      Q.   And as you were approaching the front of Mr. Puga's

18   vehicle, could you see his hands up as you were

19   approaching?

20      A.   Yes.

21      Q.   Were you saying anything to him as you were

22   approaching?

23      A.   No.

24      Q.   Was your sergeant saying anything to him as you were

25   approaching?
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 47

1    shots, were you aware that the deputies had approached Mr.

2    Puga on the passenger side of his vehicle?

3        A.    No.

4        Q.    During your first shots were you aware there were

5    deputies on the passenger side?

6        A.    No.

7        Q.    Did you at any time become aware that deputies had

8    approached Mr. Puga on the passenger side of the vehicle?

9        A.    Yes.

10       Q.    When did you become aware of that?

11       A.    After I fired the first volley of shots.

12       Q.    And what did you see in that regard?

13       A.    Just other deputies on the other side of the

14   vehicle.

15       Q.    Did you ever hear shots coming from that side of the

16   vehicle?

17       A.    Yes.

18       Q.    How many shots did you hear approximately coming

19   from the passenger side of Mr. Puga's vehicle?

20       A.    I don't recall.

21       Q.    Would it be more than one?

22       A.    Yes.

23       Q.    At least two?

24       A.    Yes.

25       Q.    When you saw Mr. Puga's hand lowered when he was at

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 55

```
1    the number of shots in the first volley would be like three

2    to five?

3         A.   I don't recall.

4              MR. GALIPO:  Can we turn to Page 54, please.

5    BY MR. GALIPO:

6         Q.   Can you see this on your screen?

7         A.   Yes, sir.

8         Q.   So on Line 5, you say, "At that point I saw the

9    suspect running northbound, and I got a good sight of the

10   suspect and shot a couple more rounds."

11             Do you see that?

12        A.   Yes.

13        Q.   And then you were asked what caused you to fire a

14   second volley of rounds, and you said, "The suspect was still

15   fleeing with his weapon."

16             Do you see that response?

17        A.   Yes.

18        Q.   And then the next question by the detective to you

19   was, "And what was he doing at this point with his weapon."

20             And your answer was, "Nothing."

21             Do you see that?

22        A.   Yes.

23        Q.   And did you continue firing pretty much till he went

24   to the ground?

25        A.   Yes.
```

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 59

1      Q.   And did you have an understanding as to how many

2   people had been struck that was innocent bystanders?

3      A.   Yes.

4      Q.   What was your understanding?

5      A.   Three bystanders got hit.

6      Q.   And did you have an understanding as to whether they

7   were adults or juveniles?

8      A.   Yes.

9      Q.   What was your understanding?

10      A.   One adult male, one adult female, and male

11   juvenile.

12      Q.   And did you know whether they were struck?

13      A.   Yes.

14      Q.   What was your understanding of where they were

15   struck?

16      A.   The juvenile was hit in the chest; female adult

17   right shoulder, and the adult male on his hand.

18      Q.   And did you have an understanding as to what

19   residents they were related to?

20      A.   Yes.

21      Q.   What residents?

22      A.   The northeast corner residents.

23      Q.   And I think you told me earlier that your initial

24   shots were fired in a northeast direction?

25          Is that a yes?

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 60

```
1     A.   Yes.

2          MR. GALIPO:  And then can we look at Page 79,

3    please.  The Bates stamp endS in 478.

4    BY MR. GALIPO:

5     Q.   You see on Line 7 you were asked if you remember

6    where the residence or houses were, and you indicate that

7    on Line 10 on the southeast, northeast, and southwest

8    corners?

9     A.   Yes.

10    Q.   And on Line 14 you were asked if it's residential or

11   commercial area, and you indicated residential area?

12    A.   Yes.

13    Q.   And do you remember indicating in your statement

14   that you believe that Mr. Puga had fired two rounds?

15    A.   Yes.

16    Q.   And then you were asked how he fired them, you know,

17   what was the position of his arm or hand.

18         And you recall saying, "I don't remember?"

19    A.   Yes.

20    Q.   And going to Page 102 which is Bates stamp 501, so

21   on Lines 10 through 13, Bustamante is asking you, "And when

22   you fired, did you in your perception at that point, was the

23   suspect already moving, or was he stationary?"

24         And you indicated he was already moving.

25         Do you see that?
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 61

1    A.    Yes.

2    Q.    And then the follow-up is and you described, earlier

3    he ran in that north kind of west corner, and you said he ran

4    in a northwest direction; is that correct?

5    A.    Correct.

6    Q.    Did any of the CHP officers, to your knowledge,

7    render medical aid to Mr. Puga?

8    A.    No.

9    Q.    Did any of the deputy Sheriffs, to your knowledge,

10   render medical aid to Mr. Puga?

11   A.    No.

12   Q.    Do you have an estimate as to how long it took for

13   the paramedics to get there?

14   A.    No.

15   Q.    With the MVARS, is there like a microphone on you

16   that at least picks up the sound even if it's off camera?

17   A.    Yes.

18   Q.    Have you listened to the entirety of the audio

19   recording of this incident?

20   A.    No, not the entirety.

21   Q.    Did you turn off your mic or the MVARS at any point

22   in time prior to the paramedics getting there?

23   A.    No.

24   Q.    I would like to ask you a few questions about the

25   training you received at the academy and with the CHP on

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 68

```
 1      A.   Yes.

 2      Q.   Do you have an understanding now whether or not any

 3   shots were fired by the deputies or anyone from the passenger

 4   side of the vehicle?

 5           Now, do you have an understanding of that?

 6      A.   Yes.

 7      Q.   What is your understanding now?

 8      A.   Shots were fired from the passenger side of the

 9   vehicle.

10      Q.   Did you know at the time you fired your first group

11   of shots that deputies on the passenger side were also

12   firing?

13      A.   Yes.

14      Q.   You knew that at the time?

15      A.   At the time, no.

16      Q.   That's what I'm getting at.

17           So at the time, you didn't know they were firing,

18   but now you understand they were?

19      A.   Yes.

20      Q.   And you mentioned at the beginning I think at a

21   deposition that you watched a couple of the videos.

22           I think one was MVARS?

23      A.   Yes.

24      Q.   We're going to try to just show you a portion of it,

25   and we're going to try to share the screen.
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 75

```
 1   BY MR. GALIPO:

 2       Q.   We stopped it at 1:26.

 3            So could you see in a portion of that where he went

 4   down to the ground?

 5       A.   Yes.

 6       Q.   And you saw him go down to the ground at some point,

 7   I think, you told me earlier?

 8       A.   Yes.

 9       Q.   And when you watched Exhibit 4, did you hear some

10   additional shots being fired after he went to the ground?

11       A.   Yes.

12       Q.   Do you know if any of those shots were your shots?

13       A.   No, I don't know.

14       Q.   Okay.

15            MR. GALIPO:  Thank you for that, Hang.

16            I think that's all the question I have.  I don't

17   know whether Shannon or Diana have any questions today of the

18   officer.

19            MS. GUSTAFSON:  I don't have any questions.

20            MS. ESQUIVEL:  I do.

21            Go ahead, or does anybody need a break?

22            MR. GALIPO:  No.  I think you can go ahead.

23            Just keep your voice up so the court reporter can

24   hear you.  We're good.

25            Unless you want to unmute yourself, but I don't know
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 78

1       Q.    And what time does your shift start on February 17,

2    2021?

3       A.    10:00 p.m.

4       Q.    And tell me all that you remember as to what you

5    were told as to why you were looking for a white SUV.

6       A.    A white SUV was the suspect's vehicle of a freeway

7    shooting, and it was described as a white Ford SUV with black

8    rims, no plates, with the Funeral statement in the back, and

9    black tinted windows.

10      Q.    Were you given information as to the time of that

11   earlier freeway shooting?

12      A.    I did, but I don't recall what time it was.

13      Q.    Were you given any information about the suspect

14   that had -- was involved in the freeway shooting?

15      A.    Hispanic male, adult, heavy set, with a beard.

16      Q.    When -- you testified earlier that there was a

17   less-lethal used that included the shotgun.

18            What kind of rounds did the shotgun discharge?

19      A.    Bean bags.

20      Q.    And you said it was Sergeant Kee?

21      A.    Yes.

22      Q.    That discharged -- fired the shotgun?

23      A.    Yes.

24      Q.    Did you have any less-lethal weapons in your arsenal

25   or in your vehicle?

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 80

1    Q.    When you holstered your weapon, did you pull out

2    your handcuffs?

3    A.    Yes.

4    Q.    So at what point did you then unholster your gun as

5    you approached Mr. Puga?

6    A.    When he ran to the front of his vehicle.

7    Q.    So at that point why did you pull out your gun?

8    A.    To -- because of the plans changed.  We were no

9    longer going to approach to handcuff him because he was being

10   uncooperative.

11   Q.    What was it about his running to -- Mr. Puga running

12   to the front of his vehicle that then changed your plan from

13   handcuffing him to now drawing your gun again?

14   A.    He still wouldn't expose his waistband.

15   Q.    And from the view that you had of Mr. Puga as you

16   were approaching him, could you see his waistband at all?

17   A.    No.

18   Q.    What was blocking your view?

19   A.    The hood of a truck.

20   Q.    Do you -- to the best of your recollection, who

21   fired the first round during this shooting incident?

22   A.    The suspect, Puga.

23   Q.    And did you see any flashes, or was it just the

24   sound that alerted you to the fact that he had pulled the

25   trigger?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 83

1          So at the time as you were approaching Mr. Puga, was

2    there anything that could have shielded you from Mr. Puga's

3    gunfire?

4        A.    No.

5        Q.    Was there -- based on your understanding of where

6    Sergeant Kee was standing relative to you, was there anything

7    that could have shielded Sergeant Kee from Mr. Puga's

8    gunfire?

9        A.    No.

10       Q.    The first -- during the first volley, the three to

11   five rounds that you discharged from your firearm, did you

12   feel that those three to five shots were necessary?

13       A.    Yes.

14       Q.    Why?

15       A.    Eliminate the threat.

16       Q.    If he only fired two, why was he still a threat

17   after the two?

18       A.    He still had possession of this firearm.

19             He was still able to shoot at us.

20       Q.    During those three to five rounds that you

21   discharged during the first volley, you testified earlier

22   that you were moving?

23       A.    Yes.

24       Q.    You were moving -- is this where you were trying to

25   get back to your vehicle?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 86

```
 1      A.   Yes.

 2      Q.   Could you see at any point as to whether he dropped

 3   the gun as he fell to the ground?

 4      A.   No.

 5      Q.   When you approached him after the incident was over

 6   and you testified earlier that he was handcuffed; correct?

 7      A.   Yes.

 8      Q.   Who handcuffed him?

 9      A.   Myself and a deputy.

10      Q.   Was the gun still in his hands when you reached the

11   location of where Mr. Puga went down?

12      A.   Yes.

13      Q.   Where exactly was it?

14      A.   It was underneath -- he was facing down, stomach

15   facing down -- he was -- he had it tucked underneath his

16   stomach.

17      Q.   Was it still in his hand, or was his body just on

18   it?

19      A.   Both hands were on his stomach as well.

20      Q.   So you couldn't tell whether or not it was actually

21   in his hand?

22      A.   No.

23      Q.   Did you still consider him an immediate threat

24   during that second volley when you fired the five to ten

25   rounds even though he was running away from you?
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 92

1     Q.   And is it your testimony that you didn't know during

2     that time that there were homes around the area?

3     A.   Yes.

4     Q.   You didn't see the helicopter's light illuminating

5     any homes?

6     A.   No.

7     Q.   You're saying you didn't know there were any homes

8     on the corners near where you were?

9     A.   I didn't know.

10    Q.   You indicated there were street lights and lighting

11    such that you could see Mr. Puga running away in the dark?

12    A.   Yes.

13    Q.   But you're saying you were not aware of any homes

14    there?

15    A.   I wasn't aware of any homes in the northeast

16    corner.

17    Q.   How about the other corners?

18    A.   I was aware of the northwest corner.

19    Q.   You could see the home there?

20    A.   Yes.

21    Q.   Are you saying if you knew there was a home in the

22    northeast corner, you wouldn't have shot so many shots?

23    A.   No.

24    Q.   So you would have shot the same number of shots

25    anyway?

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 93

1    A.    Probably not.

2    Q.    With respect to justifying all your shots, based on

3    your training, there has to be an immediate threat of death

4    or serious bodily injury for each shot; correct?

5    A.    Correct.

6    Q.    And you simply can't shoot someone for running away,

7    true?

8    A.    True.

9    Q.    With respect to your recollection that Mr. Puga

10   fired two shots at you, do you know where these bullets went?

11   A.    No.

12   Q.    Do you know if they struck anything?

13   A.    I believe -- no.

14   Q.    Do you know if they were located anywhere down

15   range?

16   A.    No.

17   Q.    Do you know if you can see these muzzle flash you're

18   referring to in any of the videos from Mr. Puga?

19   A.    No.

20   Q.    Do you know if other deputies saw him actually

21   firing a shot, or it was only you?

22   A.    I don't know.  I didn't speak to the deputies.

23   Q.    Are you saying that if he wouldn't have fired shots

24   at you, you wouldn't have fired at him?

25   A.    No.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 94

1      Q.   So you're saying you would have fired at him even if

2  he didn't fire shots at you; is that true?

3      A.   I would have.

4      Q.   In fact, how much time passed from you seeing this

5  handgun in his waistband to you firing your first shot?

6      A.   Split second.

7      Q.   Split second; is that what you said?

8      A.   A second.

9      Q.   Okay.  Did you think based on your training just

10  seeing a handgun in someone's waistband was enough to

11  shoot?

12      A.   No.

13      Q.   And I think you've already said this, but you never

14  gave any commands or warning; is that correct?

15      A.   Correct.

16      Q.   Now, you told me you were at the front of his

17  vehicle when you started firing your shots; correct?

18      A.   Correct.

19      Q.   And how much time do you think it took you to fire

20  your first three to five shots in the first volley?

21      A.   A second.

22      Q.   And then after those shots, is that when you

23  retreated?

24      A.   Yes.

25      Q.   And you retreated to all the way to the door area of

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 97

1  from the dirt area adjacent to the front of the car to behind

2  the door of your vehicle?

3      A.   Yes.

4      Q.   And you're saying you were behind the door of your

5  vehicle when you fired the second volley of shots?

6      A.   Yes.

7      Q.   And the tactical reload that you told us about

8  before when you said you did the reload between the two

9  volleys, you think you were mistaken in that regard?

10     A.   Yes.

11     Q.   And what did you see that made you believe you were

12  mistaken?

13     A.   I saw myself reloading after the incident ended.

14     Q.   How many magazines do you carry on your belt?

15     A.   One in the handgun, two in my belt.

16     Q.   So you could possibly tactically reload twice,

17  couldn't you?

18     A.   Yes.

19     Q.   Do you think under the facts of this case based on

20  your training, it would have been appropriate for you to

21  shoot if you merely saw the gun in Mr. Puga's waistband?

22     A.   No.

23          MR. GALIPO:  I think that's all I have, Diana.

24          MS. ESQUIVEL:  I just have a couple of clarifying

25  questions to your questions.

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 103

```
1    on one corner, but not the other?

2            Or you didn't know either way?

3        A.   Didn't know either way.

4        Q.   And just so I'm clear, if he had not pointed a gun

5    at you, are you saying you still would have shot him?

6        A.   Can you repeat the question?

7        Q.   Sure.  If he had not pointed a gun at you -- forget

8    about the shots, shooting the gun -- if he had not pointed a

9    gun at you, are you saying you wouldn't have shot him?

10       A.   No.

11           MS. ESQUIVEL:  Calls for speculation.

12   BY MR. GALIPO:

13       Q.   So you would have shot him even if he didn't point a

14   gun at you; is that what you're saying?

15       A.   If he wouldn't have pointed a gun, I would not have

16   shot him.

17       Q.   And that's based on your training?

18       A.   Yes.

19       Q.   That's all I have.

20           MS. ESQUIVEL:  Any other questions from anyone?

21           MR. GALIPO:  I don't have any other, and I think

22   Shannon has no questions, I think.

23           MS. GUSTAFSON:  Yeah, I don't have any questions.

24           Sorry.  I was having trouble turning my mic on.

25           MS. ESQUIVEL:  Madam Court Reporter, the witness
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 106

```
 1                          CERTIFICATE

 2                              OF

 3              CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5              I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6     Stenographic Shorthand Reporter of the State of California,

 7     do hereby certify:

 8              That the foregoing proceedings were taken before me

 9     at the time and place herein set forth;

10              That any witnesses in the foregoing proceedings,

11     prior to testifying, were placed under oath;

12              That a verbatim record of the proceedings was made

13     by me, using machine shorthand, which was thereafter

14     transcribed under my direction;

15              Further, that the foregoing is an accurate

16     transcription thereof.

17              I further certify that I am neither financially

18     interested in the action, nor a relative or employee of any

19     attorney of any of the parties.

20

21              IN WITNESS WHEREOF, I have subscribed my name, this

22     date:  November 4, 2024.

23              _____

24              Jinna Grace Kim, CSR No. 14151

25
```