Exhibit 5

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

```
 1                    UNITED STATES DISTRICT COURT

 2                    CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA     )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and   )
 5   J.B., a minor by and through his      )
     guardian JONATHAN WAYNE BOTTEN, SR.,  )
 6                                         )
                   Plaintiffs,            )
 7                                         )
                   vs.                     ) Case No.
 8                                         ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN    )
 9   BERNARDINO; ISAIAH KEE; MICHAEL       )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,   )
     inclusive,                            )
11                                         )
                   Defendants.            )
12   _____)

13

14

15

16            REMOTE VIDEOCONFERENCE DEPOSITION OF

17                        ROBERT VACCARI

18                  THURSDAY, NOVEMBER 14, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112656
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 9

```
 1      A.   Yes.

 2      Q.   Is it your understanding he is an attorney?

 3      A.   Yes.

 4      Q.   Before you gave the interview, were you able to

 5   watch any of the dash cams or other videos?

 6      A.   Yes.

 7      Q.   And do you recall what you watched, whether they

 8   were all the ones you recently saw or just some of them?

 9      A.   I believe I saw the same videos, but yesterday with

10   Shannon there was one or two additional videos that I didn't

11   see prior.

12      Q.   And the additional videos, did those appear to be

13   cell phone videos?

14      A.   Yes.

15      Q.   In the videos that you did see before your

16   interview, were you able to see a gun in Mr. Puga's hand in

17   any of those videos?

18      A.   No.

19      Q.   Did you see Mr. Puga pointing a gun in anyone in any

20   of those videos?

21      A.   No.

22      Q.   So before we talk about the incident, I just would

23   like to learn a little bit about your background starting

24   with education.

25           I'm assuming you graduated from high school?
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 12

```
 1      A.   Yes.
 2      Q.   And did you maintain that assignment up until the
 3   time of the shooting?
 4      A.   Yes.
 5      Q.   Prior to the date of the shooting that we're here to
 6   talk about, had you ever had a situation where someone was
 7   barricaded in a car before?
 8      A.   Yes.
 9      Q.   And do you know if that happened on one prior
10   occasion or more than one?
11      A.   I would say I've had several incidents.
12           None that went on as long as this one, but I've had
13   several.
14      Q.   And had you had any incidents where someone was
15   barricaded in a home before?
16      A.   Yes.
17      Q.   And do you have an estimate as to approximately how
18   many?
19           You can give a range if that's comfortable for you.
20      A.   I wouldn't have a number.
21      Q.   Do you know if it's more or less than five?
22      A.   Probably more than five.
23      Q.   In any of those occasions where someone was
24   barricaded, did you call or attempt to call SWAT to assist?
25      A.   Yes.
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 13

1    Q.   And was it your understanding that depending on the

2    circumstances, SWAT would sometimes come to assist if there

3    was a barricaded suspect?

4    A.   Yes.

5    Q.   And normally, when you requested the assistance of

6    SWAT, would they normally come?

7    A.   Depending on the circumstances.

8         They would ask questions as to what we had done in

9    the field, what were the circumstances, and they would

10   evaluate it and give suggestions or advice over the phone.

11   Q.   So sometimes they would give suggestion s or advice,

12   and other times they would come out?

13   A.   Yes.

14   Q.   Were there also times where they gave suggestions or

15   advice, and then you re-contacted them, and they might come

16   out at some point later?

17   A.   Yes.

18   Q.   Did you have a general understanding as to what

19   their criteria was for coming out for someone who is a

20   barricaded suspect?

21        MS. GUSTAFSON:  Objection.  Speculation.

22        You can answer if you know.

23        THE WITNESS:  I don't know.

24   BY MR. GALIPO:

25   Q.   Had you ever seen a suspect with a gun in their hand

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 18

1      Q.   What is that, generally?

2      A.   Would you also consider that sympathetic fire?

3      Q.   Yes.  I think that's more or less synonymous.

4      A.   Okay.  One officer sees a threat and potentially

5   starts firing his gun, and other officers that may not see

6   the same threat fire because of the firing by the first

7   officer.

8      Q.   And are officers generally trained to be aware of

9   that concept and try to avoid contagious or sympathetic

10  fire?

11          MS. GUSTAFSON:  Objection.  Speculation.

12          You can answer.

13          THE WITNESS:  Yes.  To be aware that the -- exist.

14  BY MR. GALIPO:

15     Q.   Okay.  So let's talk a little bit about this

16  incident.

17          I understand there was a vehicle pursuit at some

18  point; is that correct?

19     A.   Yes.

20     Q.   And were you involved in part of the vehicle

21  pursuit?

22     A.   Yes.

23     Q.   And what was your involvement in the vehicle

24  pursuit?

25     A.   California Highway Patrol asked for our assistance

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 19

1  when the vehicle left.  They were pursuing a vehicle, and it

2  had left the freeway and traveled into the City of

3  Hesperia.

4       Q.   And at some point did you observe this vehicle?

5       A.   Yes.

6       Q.   And generally, where was the vehicle when you first

7  observed it?

8       A.   I believe on Peach Avenue in Hesperia.

9       Q.   And was the vehicle stopped or moving when you first

10  saw it?

11       A.   It was moving.

12       Q.   And how much time passed from you first seeing the

13  vehicle to the vehicle coming to a stop?

14       A.   It would be an estimate on my part.

15            Half an hour to 45 minutes.

16       Q.   And during that time frame, to your knowledge, were

17  any shots fired either from the vehicle or at the vehicle?

18       A.   I don't know of any shots that were fired.

19       Q.   In other words, did you hear any shots, or was there

20  any report over the radio of shots?

21       A.   No.

22       Q.   Was there any report of seeing a gun inside the car

23  during the pursuit?

24       A.   No.

25       Q.   Did you have any information as to how many

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 26

1    Q.   Did you attempt over your police radio to request

2    SWAT?

3    A.   No.

4    Q.   Is that something you were able to do if you thought

5    it appropriate to at least request them over the police radio

6    as opposed to a cell tone call?

7    A.   Yes.   It could have been done.

8    Q.   Was there any discussion at the scene as to whether

9    SWAT should be called?

10   A.   Yes.   The CHP sergeant had asked if SWAT was

11   available, and I told him that I didn't have my cell phone to

12   call them, but we hadn't done anything other than try to

13   establish communication with the driver of the car to get him

14   to come out of the car.

15   Q.   So you thought at that point it might be

16   premature?

17   A.   Yes.

18   Q.   And was that in the early part of the encounter?

19   A.   Yes.

20   Q.   Do you know if that conversation about SWAT took

21   place before or after the female exited the car?

22   A.   I believe after.

23   Q.   Were there any further discussions about calling

24   SWAT to the scene as the situation continued?

25   A.   No.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 29

```
 1   pepper balls?

 2       A.   Mine.

 3       Q.   And did you discuss the decision at all with the CHP

 4   officers?

 5       A.   I believe I talked with their sergeant and told him

 6   that I had the pepper ball launcher.

 7       Q.   And did he seem supportive of it or neutral?

 8            What was your impression?

 9       A.   He seemed supportive of the use of it.

10       Q.   And was there an attempt initially to break the

11   window with like a bean bag shotgun?

12       A.   I guess the CHP sergeant, I believe it was him,

13   tried to use his bean bag shotgun to break out the window on

14   the driver's side of that vehicle.

15       Q.   And my understanding, that was not successful?

16       A.   Not at all.

17       Q.   And then was there some tool that was then used to

18   break out the window?

19       A.   Yes.

20       Q.   And whose tool was that, if you know?

21       A.   The Sheriff's Department.

22       Q.   And who used that tool to break out the window?

23       A.   I did.

24       Q.   And can you describe the tool, please.

25       A.   Yes.  In the pepper ball launcher case there was the
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 30

1    pepper ball launcher, there was air cylinders for it, and

2    then there was plastic that looks like test tubes of glass

3    breaker pepper balls -- not pepper balls -- glass breaker

4    balls for the pepper ball launcher.

5         They were labeled with glass breaker on them.

6    Q.   And is that what was used?

7    A.   Yes.

8    Q.   And was that successful in breaking the glass?

9    A.   Yes.

10   Q.   And then who was actually deploying the pepper balls

11   into the vehicle?

12   A.   I was.

13   Q.   And where were you positioned when you were

14   deploying them?

15   A.   To the rear of the white Expedition alongside the

16   passenger side of one of the CHP units.

17   Q.   Were you in a position of cover or semi-cover when

18   you were deploying the pepper balls?

19   A.   Yes.

20   Q.   And would that be behind an open door?

21   A.   Yes.

22   Q.   And over what period of time would you estimate you

23   were deploying pepper balls into the vehicle?

24   A.   At least 30 minutes.

25   Q.   And do you have any estimate as to how many pepper

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 31

```
 1   balls you deployed?
 2           Maybe you can give me a total, or tell me, you know,
 3   you would do it every, you know, three to five minutes, in
 4   volleys, or whatever it was?
 5       A.   Yes.  It was -- there would be communication.
 6           We would ask Hector to get out of the vehicle.
 7           Either myself or the CHP, I believe it was the
 8   sergeant that was doing the talking to them, and when we
 9   wouldn't get a response, I would introduce the pepper balls
10   into the car.
11           I can't say they were at a timed interval like every
12   three minutes, but there would be several minutes that would
13   pass, and I would shoot between five and twelve pepper balls.
14           With the pepper ball launcher, not every pop you
15   hear from a trigger pull yields a pepper balls coming out.
16   Its feeding system is just okay.  So sometimes I may have
17   pulled the trigger a dozen times, and I might have only got
18   six or seven balls that actually fired out of the gun.
19       Q.   How many pepper balls do you think were deployed
20   altogether by you?
21       A.   An estimate, between 120 and 150, maybe.
22       Q.   And at some point I take it after 15 or 20 minutes
23   of the pepper ball deployments, there was still no luck
24   initially with Mr. Puga coming out of the vehicle?
25       A.   He didn't physically come out of the vehicle, but he
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 32

1    would tell us that he was coming out of the vehicle.

2            I can't recall at exactly at what points in time,

3    but he would open the door, close the door.  He would tell us

4    he was coming out of the vehicle.  We would give him an

5    opportunity to come out of the vehicle.  He wouldn't come

6    out, and then we would introduce more or I would introduced

7    more pepper balls into the vehicle.

8        Q.   At some point did you hear him coughing or any other

9    sounds that told you it may be having some effect?

10       A.   I believe I did hear coughing, but I don't know

11   specifically where that was coming from.  It could have been

12   one of the CHP members that were near the car as pepper balls

13   dust was leaving the vehicle, but I did hear coughing.

14       Q.   Did you ever have the impression that one of the

15   pepper balls may have struck him in the face or head?

16       A.   Only based on what Mr. Puga said.

17       Q.   And what did he say in that regard?

18       A.   "You shot me in the eye."

19       Q.   And after he said that did you deploy any additional

20   pepper balls?

21       A.   No.

22       Q.   After he said that, you stopped with the pepper ball

23   deployments?

24       A.   Yes.

25       Q.   And did you believe that Mr. Puga was armed with a

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 34

```
 1            So southbound lane.
 2       Q.   Okay.  And when Mr. Puga got out of the vehicle, did
 3   you still think that he possibly had a firearm on his
 4   person?
 5       A.   We were going to treat him as though he had a
 6   firearm until we knew he didn't.
 7       Q.   Did you ever see him put his hands up when he was on
 8   the driver's side of the vehicle?
 9       A.   I believe he did.
10       Q.   Was he given commands at any time to put his hands
11   up?
12       A.   I can't recall if he did it voluntarily or if he was
13   given some type of commands by the CHP to put his hands up.
14       Q.   At some point did you hear an exchange between
15   Mr. Puga and the CHP sergeant where Mr. Puga was concerned
16   that he was going to be shot?
17       A.   Yes.
18       Q.   And did you hear the CHP sergeant assure him words
19   to the effect that he wasn't going to be shot?
20       A.   Something to that effect, but it was also based on
21   Mr. Puga's compliance.
22       Q.   And at some point after Mr. Puga expressed a concern
23   for being shot, do you recall him going to the front of the
24   vehicle?
25       A.   In regards to him saying he had concerns for being
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 35

1    shot, I believe he said it when he was standing outside of

2    the driver's side door.  I don't know if there was additional

3    statements made by him when he got to the front of the

4    vehicle.

5        Q.    Okay.  Do you remember something about him saying

6    that he thought he heard a click or something like that?

7        A.    I do remember him saying that.

8        Q.    Okay.  In any event at some point, you recall him

9    going to the front of the vehicle?

10       A.    Yes.

11       Q.    And when he went to the front of the vehicle, do you

12   recall if the driver's door of the vehicle was open or

13   closed?

14       A.    Closed.

15       Q.    Do you recall if the passenger door on the vehicle

16   was open or closed?

17       A.    I only have recollection of that based on my review

18   of the video.

19       Q.    And what did the video indicate in that regard?

20       A.    That at some point while we were dealing with

21   Mr. Puga alone in the car, he opened the passenger door of

22   the vehicle.

23       Q.    Do you know if that door could have remained open

24   when the female got out?

25       A.    It was closed.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 36

1    Q.   You recall it was closed at that point?

2    A.   From the video.

3    Q.   I see.

4    A.   I was only on the driver side of the vehicle.

5         I didn't have any knowledge at the actual incident,

6    I didn't have knowledge of whether the female had closed the

7    door when she exited fairly early on in the incident, but

8    after watching the video, the door opens.

9    Q.   Okay.  So based on that, it's your current belief

10   that Mr. Puga somehow opened that door at some point?

11   A.   Yes.

12   Q.   And when Mr. Puga was in the front of the vehicle,

13   you're still treating him as if he has a firearm until it's

14   shown that he didn't?

15   A.   Correct.

16   Q.   At some point was there some discussion between you

17   and the CHP sergeant as to whether or not you should approach

18   Mr. Puga when he was in front of the vehicle?

19   A.   No.  Not between myself and the CHP sergeant.

20   Q.   Was there any joint tactical plan that was

21   communicated between yourself and the CHP sergeant as to how

22   to handle the situation now that he was in front of the

23   vehicle?

24   A.   No.  There was not any discussion of a tactical plan

25   between us, between us and the CHP sergeant.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 37

```
 1      Q.   Did you overhear any discussion between the CHP

 2   sergeant and the CHP officers as to what they were going to

 3   do?

 4      A.   No.

 5      Q.   Did you have any understanding as to whether they

 6   were going to try to approach or not?

 7      A.   When Mr. Puga moved to the front of his vehicle, it

 8   became more of a dynamic situation.  The CHP sergeant and one

 9   of the CHP officers moved towards the shoulder of Peach on

10   the west side, and I believe that was to get a better view of

11   him while he was at the front of the vehicle.

12      Q.   During some of the time that Mr. Puga was in the

13   vehicle, was there an airship overhead?

14      A.   During some of the time, yes.

15      Q.   And was the helicopter using its spotlight?

16      A.   I don't remember.

17      Q.   Were you aware this was a residential

18   neighborhood?

19      A.   Yes.

20      Q.   And you were aware there were residences on the four

21   corners?

22      A.   Yes.

23      Q.   And did you ever consider tactically by way of PA

24   system or otherwise to alert the people of the potential harm

25   or to have them evacuated?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 38

1      A.   No, I did not.  I did not use the PA to try to alert

2   them of the situation as it was unfolding.

3      Q.   Did you ever consider that possibility, not

4   necessarily by the PA system, but whether we should try to

5   evacuate these people in the homes on the four corners?

6      A.   No.

7      Q.   So when the CHP officers approached Mr. Puga, I

8   guess they would be going generally north, but more towards

9   the dirt shoulder?

10      A.   I don't believe they were approaching him.

11           They were moving to a position of where they could

12   better see him.

13      Q.   Okay.  And in that position did they have any

14   cover?

15           MS. GUSTAFSON:  Objection.  Speculation.

16           You can answer if you know.

17           THE WITNESS:  I don't know.

18   BY MR. GALIPO:

19      Q.   Did you see anything in that area that they were

20   approaching that could serve as cover for them?

21      A.   A telephone pole.

22      Q.   Anything else?

23      A.   From my thinking about it now, from my position, I

24   don't know exactly how far they moved north or west, if they

25   would have had any cover provided by their other CHP unit.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 39

```
 1              I don't know.  The only thing I can generally recall

 2      that would have been in their area was the telephone pole,

 3      but I never went over and stood in that position to look and

 4      see if they had any cover or concealment from where I

 5      remember them.

 6         Q.   How about yourself, did you have any discussion with

 7      Deputy Adams as to what you wanted to do in terms of Mr. Puga

 8      being in front of the vehicle at that point?

 9         A.   Yes, I did.

10         Q.   Can you please tell me about that.

11         A.   I felt like we needed to come off an avenue of

12      escape.  He was standing upright.  He was at the front of his

13      vehicle.  He was mobile.  He had the entire engine

14      compartment which is very good cover from his vehicle.

15              And he also had in addition to the front of his

16      vehicle, he had the passenger side engine compartment he

17      could use for cover and concealment along with the entire

18      passenger side of the vehicle.

19              So I wanted to move over on to the passenger side of

20      the vehicle to cut off any avenues of escape.

21         Q.   And did you want to be able to have some cover as

22      you were doing that?

23         A.   We were going to use the best cover we could.

24         Q.   And what was that?

25         A.   The passenger side of his vehicle.
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 40

1      Q.   And you had the 40-millimeter at that point?

2      A.   Yes.  That was the weapon system I chose.

3      Q.   Was there an earlier discussion about possibly using

4   the Taser?

5      A.   I was hypothetically just thinking outloud when I

6   was talking with Adams.  Mr. Puga wasn't wearing a shirt at

7   the time which makes a very good target for the use of a

8   Taser.

9           However, you have to be pretty close to him, and I

10  didn't want to get that close to him to use the Taser.  So I

11  thought that the -- I chose the 40-millimeter because of its

12  overall effective range.  It could be used much closer safely

13  than the bean bag shotgun, and it had the ability to shoot

14  over a greater -- over a same distance as the bean bag

15  shotgun.  So I felt like the 40-millimeter gave me the most

16  options.

17     Q.   But some of the less-lethal options that you at

18  least thought about would include the Taser, the bean bag

19  shotgun, and the 40-millimeter; is that fair?

20     A.   At that point, yes.

21     Q.   At some point as you were approaching, did you hear

22  shots?

23     A.   Not as I'm approaching.

24     Q.   Did you hear shots at some point?

25     A.   Yes.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Robert Vaccari on 11/14/2024

Page 41

1    Q.   And where were you in relation to the white vehicle

2    when you first heard the shots?

3    A.   I would say we were on the passenger side of the

4    white Expedition on the dirt shoulder probably where the

5    passenger side door was.

6    Q.   When you say we, are you referring to yourself and

7    Deputy Adams?

8    A.   Yes.

9    Q.   So when you say you're at the passenger side door, I

10   know there is two doors on the passenger side.

11        Are you talking about the rear door on the passenger

12   side?

13   A.   I would say the front door.

14   Q.   The front door.  And are you saying that was --

15   because Adams was slightly ahead of you; correct?

16   A.   I don't recall.

17   Q.   And the door, I think you already indicated was

18   open?

19   A.   The door was open, but we're not using that as

20   concealment.  We're on the dirt shoulder.  So I would say we

21   were at least ten feet away from the passenger side of the

22   that vehicle.

23   Q.   Did you have any cover on the dirt shoulder?

24   A.   No.

25   Q.   So you believe you were on the dirt shoulder in line

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 42

1    more or less with the front door on the passenger side, but

2    like ten feet from it; I guess it would be ten feet east of

3    it?

4        A.   Correct.

5        Q.   And that's when you heard the shots?

6        A.   Yes.

7        Q.   And at some point you saw Mr. Puga turn and start

8    running north or northwest?

9        A.   Yes.

10       Q.   And you thought you had dropped your 40-millimeter

11   weapon and unholstered your firearm; that's what you thought

12   initially?

13       A.   Yes.

14       Q.   And but then when you saw the video, you realized

15   that something slightly different happened?

16       A.   Correct.

17       Q.   And when you watched the video, although you thought

18   you dropped your 40-millimeter and unholstered your firearm,

19   you saw that you actually did not unholster your firearm at

20   that initial time frame?

21       A.   Correct.

22       Q.   Did you drop your 40-millimeter initially?

23       A.   No.

24       Q.   How many shots did you hear approximately before

25   Mr. Puga started running away?

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 43

1      A.    I don't recall.  It seemed as he was running as soon

2    as the gunfire started.

3          Q.    And did you hear any shots being fired as he was

4    continuing to running away?

5          A.    Yes.

6          Q.    Did anyone ever yell out, "Gun, he has a gun" or

7    words to that effect?

8          A.    I didn't hear that.

9          Q.    Did you hear anyone say, "Drop it" at any time?

10         A.    Not that I recall.

11         Q.    Do you recall him going to the ground at some

12    point?

13         A.    Yes.

14         Q.    And after he went to the ground, did you hear any

15    additional shots being fired?

16         A.    Yes.

17         Q.    How many additional shots did you hear after he went

18    to the ground?

19         A.    I don't recall.

20         Q.    Do you have any estimate?

21         A.    Several.

22         Q.    And when you say several, are we talking five to

23    ten?  What is your best estimate?

24         A.    More than three, less than ten.

25         Q.    Okay.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 47

```
1      Q.    Sure.  You earlier testified that he started running

2   almost immediately after the gunshots started.

3            Do you recall that testimony?

4      A.    Yes.

5      Q.    I'm just wondering, maybe it was difficult to tell

6   because it all was happening at the same time, but do you

7   have any estimate as to how many shots you heard, if any,

8   before Mr. Puga started running away?

9      A.    I don't recall.  It seemed like they were immediate.

10           As soon as he -- I don't know if the shots came

11  first, and then he took a step, or if he took step and then

12  the shots came.  I don't know.

13     Q.    And when you say took a step, to start running?

14     A.    Yes.

15     Q.    And from his position he would have been turning to

16  his right or clockwise?

17     A.    Yes.

18     Q.    And that would have been away from your position?

19     A.    Yes.

20     Q.    And as Mr. Puga was running and you heard additional

21  shots, did you become aware at some point that Deputy Adams

22  was firing?

23     A.    Yes.  It sounded like the gunfire was closer to me.

24           So I knew at least he was firing.

25     Q.    Meaning, Deputy Adams?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 48

```
 1      A.   Yes.

 2      Q.   And where was Deputy Adam in relation to you when

 3   you heard shots that you believe were coming from Deputy

 4   Adams?

 5      A.   Alongside of me or just alongside and in front of

 6   me.

 7      Q.   And did you have an impression as Mr. Puga was

 8   running away as to whether Deputy Adams was the only officer

 9   shooting, or whether you had the impression that some or all

10   of the CHP officers were also shooting?

11      A.   I heard multiple gunfire, and I don't know if it

12   wasn't -- I knew at least Adams was firing.  Could have been

13   all of the CHP officers, could have been Mr. Puga.

14      Q.   Did you at any time see muzzle flash coming from

15   Mr. Puga?

16           MS. GUSTAFSON:  Objection.  Vague as to time.

17           You can answer.

18   BY MR. GALIPO:

19      Q.   Anytime.

20      A.   Muzzle flash, no.

21      Q.   Was there some discussion before your approach about

22   the use of a ballistic shield?

23      A.   Only during my interview.

24      Q.   That was -- that was discussed during the interview,

25   but not at the scene?
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 51

```
 1   guess, refreshed your recollection, if you will, that it

 2   actually happened differently in terms of you and your

 3   weapon?

 4        A.   That I had remained on target with the 40-millimeter

 5   as Mr. Puga ran away, and then I moved -- I turned away from

 6   the -- from what was going on and dropped the 40-millimeter

 7   on the ground.  I had unholstered my duty firearm, but as I

 8   watched what was unfolding, Mr. Puga had already -- he was

 9   either going down or already down, and I reholstered my

10   firearm.

11        Q.   And with respect to the 40-millimeter, was there

12   some issue as to whether the safety was on or not?

13        A.   Yes.

14        Q.   Can you explain that, please.

15        A.   Yes.  I had only received brief training at the

16   academy with respect to the 40-millimeter, and it has a

17   safety, and the safety has a red dot and a white dot.

18             I still to this day don't know if the white dot

19   means fire or the white dot means safe and red dot means

20   fire.  I can't recall at this point in time which way I had

21   the selector switch.

22             But if I remember the weapon system properly,

23   regardless of which way you put that safety switch, the

24   trigger pulls.  It's just whether or not it actually fires a

25   projectile or not.
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 52

1    Q.   Do you remember if you ever pressed the trigger or

2    attempted to press the trigger on the 40-millimeter?

3    A.   Yes, I did.

4    Q.   And do you know if anything came out of the

5    40-millimeter when you pressed it?

6    A.   I have no idea.

7    Q.   How did you become aware of the issue of the

8    safety?

9    A.   When I took the one -- I loaded the 40-millimeter

10   up, and I even had a conversation with Deputy Adams, is red

11   fire or white fire.

12        And so, yes.  Even to this day I don't know if the

13   40-millimeter fired.

14   Q.   Did Deputy Adams know or appeared to know whether it

15   was white or red?

16   A.   He did not.

17   Q.   It might have been easier to do red and green.

18   A.   I would have just assumed it had words.

19   Q.   Okay.  Now, your impression when you were watching

20   Mr. Puga running is that he had been struck by gunfire; is

21   that fair?

22   A.   Yes.  Just prior to him going to the ground.

23   Q.   And what did you see in observing him led you to

24   believe he had been struck prior to going to the ground?

25   A.   It looked more like he was staggering as opposed to

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 53

1    diving for cover.

2        Q.    So as he was running it appeared to some extent he

3    was staggering?

4        A.    Just prior to him going to the ground.

5        Q.    Do you recall hearing shots immediately before

6    Mr. Puga went to the ground?

7        A.    Yes.

8        Q.    Could you tell where those shots were coming from?

9        A.    I don't know if they were coming from the CHP or

10   from Deputy Adams.

11       Q.    When Mr. Puga went to the ground, did he end more or

12   less chest-down?

13       A.    Yes.

14       Q.    And was he near that northwest?

15              Trying to get my -- would it be the northwest

16   corner?

17       A.    He was on the northwest shoulder.  I don't think he

18   was close to the corner.  It was up from the corner, but on

19   the -- he was on the shoulder of the southbound lane.

20       Q.    Some distance from the corner?

21       A.    Yes.

22       Q.    And do you recall generally which way his head was

23   oriented and which way his feet were?

24       A.    I believe his head was to the north and his feet

25   were to the south.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 54

1    Q.   And you recall him being more or less chest-down?

2    A.   When we got to him, yes.

3    Q.   And you maintained a distance of about 15 feet at

4  that point?

5    A.   Yes.

6    Q.   And you noticed his breathing or the chest -- his

7  chest wall rising and falling?

8    A.   Yes.  That he appeared like he was still

9  breathing.

10    Q.   And you at some point decided to deploy the Taser?

11    A.   Yes.

12    Q.   And did you, in fact, deploy it?

13    A.   Yes.

14    Q.   And you were approximately 15 feet away when you did

15  so?

16    A.   Approximately.

17    Q.   And did you discuss the deployment of the Taser with

18  any of the other officers on-scene?

19    A.   I don't recall if there was a discussion.

20    Q.   Where were you essentially aiming when you pointed

21  the Taser?

22       Would it be towards the back?

23    A.   Yes.

24    Q.   And obviously, he was still shirtless?

25    A.   Yes.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 55

1    Q.   Could you tell whether the probes or darts made

2    contact?

3    A.   Yes.

4    Q.   Did they appear to?

5    A.   Yes.

6    Q.   What did you see based on your training, that led

7    you to believe that they made contact?

8    A.   There was a tensing and a muscle reaction by

9    Mr. Puga.

10    Q.   And based on your training, is that something that

11    you would expect to see if the darts made appropriate

12    contact?

13    A.   Yes.

14    Q.   And when you saw this muscle tensing of Mr. Puga,

15    was he essentially still chest-down?

16    A.   Yes.  Chest-down with his hands underneath his

17    body.

18    Q.   And you told me earlier that you had the impression

19    he had been struck by some of shots before he went to the

20    ground; is that fair?

21    A.   That was the appearance.  That's the impression that

22    I had based on how he was running.

23    Q.   And then you also heard shots continue immediately

24    before he went to the ground?

25    A.   You keep using the word immediately.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Robert Vaccari on 11/14/2024

Page 56

 1    Q.   Within one or two seconds.

 2    A.   Before he went down, yes.

 3    Q.   And then you told me you heard some shots after he

 4  went to the ground?

 5    A.   Yes.

 6    Q.   But I take it all those shots had finished before

 7  you approached and utilized the Taser?

 8    A.   Yes.

 9    Q.   And so at the time you used the Taser, you were at

10  least had the impression that he had already been struck by

11  some of the shots?

12    A.   Struck by at least one.

13    Q.   Right.  And I take it overall, the number of shots

14  that you heard was quite numerous, maybe in excess of 20

15  shots or 30 shots; is that fair?

16         MS. GUSTAFSON:  Objection.  Misstates testimony.

17         You can answer.

18         THE WITNESS:  At least 20 shots.

19  BY MR. GALIPO:

20    Q.   Okay.  And then did you tase Mr. Puga a second

21  time?

22    A.   Yes.

23    Q.   And then he was eventually approached and searched

24  and handcuffed?

25    A.   Yes.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 57

1    Q.   Do you recall who handcuffed him?

2    A.   I don't.

3    Q.   Now, at some point after the shooting during this

4    time frame that you're approaching Mr. Puga and even before

5    you tased him, did you hear some screaming or yelling coming

6    from the residence at the northeast corner?

7    A.   Yes.

8    Q.   And what do you recall about that?

9    A.   As we were making the approach to Mr. Puga, I could

10   hear the yelling, screaming coming from the northeast corner.

11   As I approached, it sounded to me as they were saying, "You

12   shot him, you shot him," and we didn't know if there were

13   friendlies in the neighborhood that were to Mr. Puga.

14          And I know his vehicle was incapacitated at that

15   point, but there was always a possibility that he was trying

16   to find some friendly residence in that area.  So as we were

17   making the approach, it sounded to me like, "You shot him,

18   you shot him," and that's what they were screaming.

19          It continued after we handcuffed him.  So I went

20   over to investigate what the -- who they were, what was

21   happening, and as I was getting closer to them, it wasn't

22   "You shot him."

23          It's "You shot us," and they told us that there were

24   people at that house that were struck by gunfire.

25   Q.   And did they tell you anything specific such as

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 62

1          MR. GALIPO:  I'm not -- given that the sergeant is

2     no longer working for the department, my preference would be

3     for us to have an agreement that I could serve a request for

4     him to appear like if this case ends up going to trial

5     without getting his, you know, personal residence address or

6     work currently.

7          Is that something you're willing to do or discuss

8     with him?

9          MS. GUSTAFSON:  Yeah.  I could accept service of the

10    subpoena on his behalf so that you don't have to serve him at

11    his home.

12         THE WITNESS:  Yes.

13         MR. GALIPO:  Okay.  I'd rather not do that.

14         MS. GUSTAFSON:  He'd rather that too.

15    Thank you.

16         MR. GALIPO:  Yes.  I want to respect his privacy.

17         I just had one other question while Diana is looking

18    at her notes.

19    BY MR. GALIPO:

20    Q.   One, second please.

21         I have just two additional questions about the

22    Taser.  I actually just forgot one of them.

23         But did anyone go in and handcuff him during the

24    taser cycle, if you know?

25    A.   No.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
Robert Vaccari on 11/14/2024

Page 63

1    Q.   And did you ever give a verbal warning to him that

2    you were going to tase him?

3    A.   I don't recall.

4    Q.   Do you recall ever hearing a verbal warning that

5    deadly force was going to be used?

6    A.   No.

7    Q.   Okay.  Thank you.

8         MR. GALIPO:  Diana, were you able to look at your

9    notes?

10        MS. ESQUIVEL:  Yes.  I have a few questions.

11                        EXAMINATION

12   BY MS. ESQUIVEL:

13   Q.   Good morning, Sergeant Vaccari.

14        My name is Diana Esquivel.  I represent the

15   California Highway Patrol and the officers involved in this

16   incident.

17        I just have a couple of follow-up questions.

18        I apologize if some of them might seem a little

19   repetitive.

20        You testified earlier that you didn't see muzzle

21   flash coming from Mr. Puga's direction; correct?

22   A.   Not the night of the incident.

23   Q.   From where you were standing, were you at any point

24   at any time before you heard the first shot regardless of who

25   shot it, were you able to see Mr. Puga's waist or his

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Robert Vaccari on 11/14/2024**

Page 64

1    waistband area?

2        A.    No.  It was below the body line of the hood of the

3    car that he was standing in front of.

4        Q.    Before you heard the shots, based on your position

5    were you able to see him lower his hand and grab at anything

6    in his waist and waistband area?

7        A.    Yes.

8        Q.    Did you see anything in his hand after he made that

9    motion?

10       A.    Yes.  He drew a firearm.

11       Q.    And you saw the firearm?

12       A.    Yes.

13       Q.    And did you see if he lifted it and pointed it in

14   any particular direction after you were able to see the

15   firearm in his hand?

16       A.    I didn't see him point it at any specific

17   direction.

18       Q.    To the best that you can estimate, how soon after

19   that you observed the firearm in Mr. Puga's hand did you hear

20   a shot, the first shot?

21           MR. GALIPO:  I'm going to object.  It assumes facts

22   potentially not in evidence that the shots didn't happen,

23   start beforehand.

24           THE WITNESS:  And I couldn't make that -- I can't

25   make that -- what would I say -- distinction.  I don't know

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Robert Vaccari on 11/14/2024

Page 68

1                        CERTIFICATE

2                            OF

3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

4

5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

6    Stenographic Shorthand Reporter of the State of California,

7    do hereby certify:

8            That the foregoing proceedings were taken before me

9    at the time and place herein set forth;

10           That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12           That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15           Further, that the foregoing is an accurate

16   transcription thereof.

17           I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21           IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  November 14, 2024.

23
                          _____
24
                          Jinna Grace Kim, CSR No. 14151
25