Exhibit 8

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

L.C., a minor by and through  )
her guardian ad litem Maria   )
Cadena; et al.,               )
                              )
         Plaintiff,           )
                              )
         vs.                  ) Case No.
                              ) 5:22-cv-00949-KK-(SHKx)
STATE OF CALIFORNIA; COUNTY   )
OF SAN BERNARDINO; et al.,    )
                              )
         Defendants.          )
_____)

VIDEOCONFERENCE DEPOSITION OF BETZABETH GONZALEZ

Taken on Monday, December 30, 2024, at 10:20 a.m.

REPORTED BY:

NICOLE JOHNSON

CSR No. 13030

Gonzalez, Betzabeth
L.C., a minor v. State of California

```
 1        Q.    Am I missing any communications?
 2        A.    No.
 3        Q.    Okay.  Did you ever speak to the police about
 4   the incident?
 5        A.    No.
 6        Q.    Did you ever reach out to the police to tell
 7   them that you had this video?
 8        A.    No.
 9        Q.    Is there any reason why?
10        A.    No.  I mean, when everything happened --
11   everything happened, like, literally, like, in front of
12   our house.  So, like, they blocked, like, the whole
13   street.  And to be honest with you, they did not seem
14   approachable at all, so I just didn't feel comfortable.
15        Q.    Okay.  And so this incident was in February of
16   2021.  From February 2021 up until your conservation with
17   Gabby where you sought her out to call her, there was no
18   time in there that you thought about reaching out to the
19   police with this video?
20        A.    No.
21        Q.    Have you had any negative interactions with the
22   police?
23        A.    No, I wouldn't say so.
24        Q.    Can you think of any reason, then, that you
25   didn't come forward to the police with the video?
```

16

```
 1   try to just kind of take it as you give it to me in
 2   whatever blocks you give it to me.  Okay?
 3        A.   Okay.
 4        Q.   So if I'm understanding you, you looked out your
 5   bathroom window.  And what you see, really what you hear,
 6   is a back and forth conversation between police who are
 7   trying to get the civilian out of the vehicle?
 8        A.   Correct.
 9        Q.   And how did you come to learn that his name was
10   Hector?
11        A.   Because they kept calling him Hector.
12        Q.   And what is it that they were wanting Hector to
13   do?
14        A.   To step out of the vehicle.
15        Q.   How many times do you think they asked him to do
16   that?
17        A.   I don't remember.
18        Q.   More than once?
19        A.   Yes, more than once.
20        Q.   More than five times?
21        A.   Yes.
22        Q.   More than ten times?
23        A.   I don't know.  It was a back and forth.  Because
24   I recall him telling them, "You're going to shoot me.  If
25   I come out, you're going to shoot me."  And then there
```

1  was -- I remember one -- one of the officers, like, from
2  Clarita's side -- so -- that was standing by Catalpa
3  seemed to be really, like -- he was the one that was,
4  like, really communicating with him and got him to come
5  down from the car.
6          But the ones that were behind him seemed like
7  they were just getting in the way, like, the way they were
8  talking to him.  So, yeah.  Like, I -- I remember that.
9  And him just like -- I think that's what got my attention
10 more than anything, because I remember hearing him saying,
11 "You're going to shoot me, you're going to shoot me."
12     Q.   How long did -- you estimated for us that it was
13 about an hour from the time that you first heard the
14 sirens go northbound on your street to when they came back
15 around and the vehicle stopped; right?
16     A.   Correct.
17     Q.   Okay.  How long do you think police were
18 speaking with Puga after the vehicle had stopped before he
19 got out of his car?
20     A.   I don't know.  It had to have been more than --
21 more than -- more than half an hour, for sure.  But I
22 don't know.  I would have to, like -- I don't know,
23 honestly.  I don't even know how I could look at a
24 timeline and figure that out.
25     Q.   And for the entire, at least 30 minutes -- I

41

```
 1   think you said more than 30 minutes, you're standing at
 2   your bathroom window observing through your phone?
 3        A.   Yes.
 4        Q.   Okay.  Do you ever go to try to wake up your
 5   husband, or do your kids ever come to you?
 6        A.   No.  The kids never woke up.  I did -- like,
 7   would talk to Jacob.  Because, like, the way my -- my
 8   bathroom is, like, I could see the bed.  It's a really
 9   small house.  So I -- I kept on, like, trying to, like,
10   you know, talk with him and stuff and tell him, like, oh
11   my gosh.  You know, like, this -- this was happening.
12   Like, why won't he just get out, or like, you know, just
13   try -- like just talk, like, I guess expressing how I was
14   feeling.
15        Q.   Did Jacob ever get out of bed and go to a
16   window?
17        A.   No.
18        Q.   Okay.  So for more than 30 minutes, police are
19   speaking with Hector Puga.  What happens next?  What's the
20   next thing that you recall?
21        A.   So once he stepped down from out of the car, I
22   remember his -- him pull -- trying to, like, you know,
23   pull up his pants.  And I remember him walking to the
24   front of the car and putting his hands on the -- on the --
25   on the front of the car.  And then it appeared that he
```

42

```
 1   looking through your -- your cell phone screen and zooming
 2   in, as opposed to your naked eye?
 3        A.   I mean, I -- I -- I -- I don't -- I want to say
 4   yes because it was nighttime.  But I have a pretty clear
 5   view from there.  You know, as long as there's enough
 6   light and everything.  Like, yeah, I can see, like,
 7   details.  I can see really good from my -- my bathroom
 8   window.  But I want to say that it was because it was
 9   nighttime that I felt like I could get a better view
10   through my phone.
11        Q.   Did you watch the incident -- you know,
12   everybody is different.  There's people that can hold
13   their phone and record and not look at their phone and
14   watch with their eye events.  And there's other people
15   that prefer to look through the phone.
16             To the best that you remember, were you looking
17   through your phone more than you were looking with your
18   naked eye at the events that were occurring at the
19   intersection?
20        A.   I don't remember.
21        Q.   Do you recall ever seeing a gun, whether it was
22   through your naked eye or through your phone, in Hector's
23   hand?
24        A.   I don't remember seeing a gun, no.
25        Q.   Do you recall ever hearing or -- hearing any
```

```
 1  remember, it was just him complaining about, like, his
 2  eyes burning.  Yeah, I don't -- I don't remember
 3  specific -- yeah.
 4       Q.   When you were in the house recording, the window
 5  was open; right?
 6       A.   Yes.
 7       Q.   Were you able to smell the pepper spray or
 8  anything like that from your house?
 9       A.   No.
10       Q.   So you heard Mr. Puga complaining that his eyes
11  were burning?
12       A.   Yes.
13       Q.   Did he say anything else like he couldn't see,
14  or anything like that?
15       A.   Yeah.  Yeah.
16       Q.   And then at some point he took off his -- his
17  tank top and -- and started wiping his face?
18       A.   Yes.
19       Q.   When they -- when the officers were deploying
20  the pepper spray rounds, did you hear Mr. Puga making any
21  sounds like he was in pain, or anything like that?
22       A.   Yes.
23       Q.   What kind of sounds was he making?
24       A.   Like, he was, like, moaning.  And, like, saying,
25  like, "It burns, it burns."  And then, like, I want to say
```

93

Gonzalez, Betzabeth
L.C., a minor v. State of California

```
 1      Q.   And were his hands empty when he put his hands
 2   out of the window?
 3      A.   Yes.
 4      Q.   Did you hear him say anything to the police when
 5   he had his hands out of the window?
 6      A.   Not at that particular time.  Not that I
 7   remember.
 8      Q.   Did you ever hear the police tell him to put his
 9   hands out of the window?
10      A.   I mean, I remember them saying, like -- like,
11   that they needed to see his hands.
12      Q.   Did you see him putting his hands out of the
13   window after the police told him, let me see your hands?
14      A.   I believe so.
15      Q.   When Mr. Puga stepped out of the vehicle, were
16   you able to see his whole body?
17      A.   Yes.
18      Q.   Does that include his hands also?
19      A.   Yes.
20      Q.   Did you ever see a gun in his hands at that
21   time?
22      A.   No.
23      Q.   Did you see a gun tucked in his waistband or in
24   a pocket or anything like that?
25      A.   No.
```

95

```
 1        A.   I mean, maybe a minute, yeah.
 2        Q.   Did you hear any shots being fired at Mr. Puga
 3   while he was in front of his vehicle?
 4        A.   No.
 5        Q.   I believe you said earlier that your
 6   recollection was that he started running first, and then
 7   shots were fired?
 8        A.   Yes.
 9        Q.   Were the shots fired almost immediately after he
10   started -- he turned around and started running?
11        A.   It seemed so.
12        Q.   Approximately how many steps did Mr. Puga
13   take -- take, to your recollection, before officers
14   started shooting?
15        A.   I mean, maybe like one step.
16        Q.   At the time that the officers started shooting
17   at Mr. Puga, were you still able to see him?
18        A.   Only when he -- yes, I could see him when he,
19   like -- when he turns.  And then he, like, gives, like,
20   one, two steps, and then I don't see him anymore.  And I'm
21   assuming that's when either he fell or got into, like,
22   where it was darker.
23        Q.   When you were able to see him, did you see a gun
24   in his hand at that time?
25        A.   No.
```

```
 1            THE WITNESS:  Yeah, I don't know.
 2   BY ATTORNEY SINCICH:
 3       Q.   Okay.  Do you know how close the officers were
 4   to the truck when they started firing?
 5       A.   I mean, no more than, like, Mr. Puga's and their
 6   car's length.  Because, like, the whole time, it seemed
 7   like they were -- they were by their car.
 8       Q.   Okay.  Earlier I believe you said that you saw
 9   some -- something like gun smoke at some point?
10       A.   Yeah.
11       Q.   And that gun smoke you saw was from the
12   officer's guns?
13       A.   Yes.
14       Q.   Did you ever see any kind of gun smoke coming
15   from Mr. Puga?
16       A.   No.
17       Q.   Do you know what a muzzle flash is?
18       A.   No.
19       Q.   Have you ever seen, like, on the TV that when
20   someone fires a gun, it's kind of like a little flash of
21   light comes out of the muzzle of the gun?
22       A.   Yes.
23       Q.   Did you ever see any kind of muzzle flash,
24   anything like that, coming from Mr. Puga?
25       A.   No.
```

99

```
 1           ATTORNEY ESQUIVEL:  Objection.  Lacks
 2   foundation.  Calls for speculation.
 3   BY ATTORNEY SINCICH:
 4       Q.   Did you ever see Mr. Puga lunge or run at any
 5   officers or any other people?
 6       A.   No.
 7       Q.   In the direction that Mr. Puga was running, did
 8   you see any officers or any people in that direction?
 9       A.   Not -- not from my view, no.
10       Q.   Did you ever see Mr. Puga try to punch, kick, or
11   grab anybody throughout the incident?
12       A.   No.
13       Q.   During the time frame that you were able to see
14   Mr. Puga during the shots, did you ever see Mr. Puga
15   trying to turn around to look at the officers, or anything
16   like that?
17       A.   No.
18       Q.   Were you surprised to hear the officers starting
19   to shoot at Mr. Puga?
20       A.   Yes.
21       Q.   You weren't expecting the gunshots at that time?
22       A.   No.
23       Q.   Is that why you said you were in disbelief
24   earlier?
25       A.   Yes.
```

100

```
 1        A.   Correct, no.  Just from what he was saying and
 2   the tone of his voice.
 3        Q.   Right.  So from what you were able to see and
 4   hear from the tone of his voice and how he was acting, did
 5   it appear to you that Mr. Puga was scared of the police?
 6             ATTORNEY ESQUIVEL:  Objection.  Lacks
 7   foundation.  Calls for speculation.
 8             THE WITNESS:  Well, he didn't have -- he didn't
 9   believe that they were going to, like -- going to take him
10   gently and just put him in the back of the car.
11             ATTORNEY MARGOLIES:  Same objections.
12   BY ATTORNEY SINCICH:
13        Q.   When you heard Mr. Puga say, "You're going to
14   shoot me, you're going to shoot me," was he still in the
15   car when he said that?
16        A.   I believe so, yes.
17        Q.   When he said that, in your opinion, was his tone
18   of voice scared of the police?
19        A.   Yeah, scared --
20             ATTORNEY ESQUIVEL:  Same objections.
21   BY ATTORNEY SINCICH:
22        Q.   I'm sorry, did you say yes?
23        A.   I said yes, yeah.
24        Q.   And the officer that was communicating with him
25   kind of from the front left of the vehicle, you said that
```

103

1   A. Yes.
2   Q. Is that when he was right there by the front
3   door, or his driver's door of the car when you saw that?
4   A. Yes, when it was still open.
5   Q. Did you ever see him try to pick up his pants or
6   anything like that after that one time that you saw it?
7   A. I mean, he just did it throughout the time. But
8   I don't remember, like, if -- I don't know, like -- I
9   guess I'm not understanding what time you're asking me,
10  when did he --
11  **Q. I'm just wondering if you ever saw it again**
12  **after the one time that you saw it when he was -- when he**
13  **first got out of the car and the door was still open?**
14  A. No, because I think when he got out of the car
15  and the -- the door closed -- like, when the door was
16  open, yes, he kept -- like, he would -- like, kept on
17  trying to pull them up because they seemed like they were
18  just falling off. Like, I just kept thinking, like, dude,
19  just let them fall. Because, like, I was afraid that they
20  were just going to, you know, shoot him for him trying to
21  do that.
22       But, yeah, that -- then when he closed the door,
23  I don't believe -- I don't remember, actually, if he tried
24  to pull them back up or not. Because it just seemed like
25  throughout the time, he kept on trying to pull them up.

105

```
 1   and ask you these questions again.  Is it your testimony
 2   that when Hector Puga got out of his vehicle and went to
 3   the front of his vehicle, you could actually see Hector
 4   Puga's body in front of his vehicle?
 5            ATTORNEY SINCICH:  Vague -- vague as to time.
 6            THE WITNESS:  I could see half his body.  Like
 7   the top of his -- like his torso and his hands and his
 8   face.
 9   BY ATTORNEY MARGOLIES:
10       Q.   Okay.  If you could see his face, does that mean
11   then that he was facing southbound?
12       A.   Correct.
13       Q.   And how clearly could you see Hector Puga's
14   torso when he was in front of his vehicle?
15            ATTORNEY SINCICH:  Vague and ambiguous.
16            THE WITNESS:  I believe pretty clear.
17   BY ATTORNEY MARGOLIES:
18       Q.   Could you see Hector Puga's waistband at any
19   time when he was in front of his vehicle?
20       A.   Yeah.  When he -- like, when he turned to take
21   off to run.
22       Q.   Prior to when Hector Puga turned to run, could
23   you ever see Hector Puga's waistband as he was standing in
24   front of his vehicle?
25       A.   No.
```

115

```
 1      Q.   When Hector Puga got out of his car and was
 2 standing in front of his car, would it be -- do you recall
 3 if Hector Puga's hands were up the entire time he was in
 4 front of his vehicle prior to him running?  Or if they
 5 were up and down?  Or something else?
 6      A.   They were up.
 7      Q.   Your testimony is that they were up the entire
 8 time he was in front of his vehicle?
 9           ATTORNEY SINCICH:  Misstates testimony.
10           THE WITNESS:  They were up.  And then when he
11 turned, like -- like he turned to run, and then, I mean,
12 they went down for him to run.  Like he didn't run with
13 his hands up, I don't think.  I don't recall him running
14 like that.
15 BY ATTORNEY MARGOLIES:
16      Q.   Where do you recall his hands when he was
17 running?
18      A.   Like, in a running motion.  Like, close to his
19 face.  Like -- like, it was really quick.  Like, he had
20 his hands up.  He turned to run, and then motioned to keep
21 running.
22      Q.   And when did you lose sight of Mr. Puga as he
23 was running?
24      A.   Probably like -- like I said, like, maybe three
25 steps -- like, when he went off the asphalt and into the
```

116

Gonzalez, Betzabeth
L.C., a minor v. State of California

```
 1    Hopefully not more.  I'm sorry.
 2         A.   It's okay.
 3         Q.   When you had your phone on the windowsill,
 4    approximately where on your body was -- was that base of
 5    the --
 6              ATTORNEY ESQUIVEL:  Sorry about that.
 7              ATTORNEY SINCICH:  No problem.
 8    BY ATTORNEY SINCICH:
 9         Q.   For instance, like, where was the phone in terms
10    of its height related to your body as you were watching?
11         A.   So the phone would be, like, at my -- between,
12    like, my -- my chin and my -- my chest area.  Because I --
13    like I said, I have, like, a little stool thing that I can
14    stand on.  So I remember going from, like, standing on the
15    stool to, like, leaning on the -- on the toilet to be able
16    to see.
17              So the whole time my head is above, like, where
18    the phone would be.
19         Q.   Okay.
20         A.   You would hear my voice more than you would hear
21    Jacob.
22         Q.   And my last question is, did you ever see
23    Mr. Puga shoot at any police officer?
24         A.   No.
25         Q.   Okay.  Thank you.
```

132

REPORTER'S CERTIFICATION

I, Nicole Johnson, do hereby certify:

That I am a licensed Certified Shorthand Reporter, duly qualified and certified as such by the State of California.

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify under oath.

That the preceding deposition was recorded stenographically by me at the time and place herein mentioned; and that the preceding pages constitute a complete and accurate record of the testimony given by the aforementioned witness.

That I am a neutral party, in no way interested in the outcome of said action, and that I am not related to or otherwise connected with any of the parties involved with this matter, or their respective counsel.

Dated: January 10, 2025

_____
Nicole Johnson, CSR No. 13030

139