Exhibit 18

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

```
1               UNITED STATES DISTRICT COURT

2               CENTRAL DISTRICT OF CALIFORNIA

3

4   JONATHAN WAYNE BOTTEN, SR.; TANJA      )
    DUDEK-BOTTEN; ANNABELLE BOTTEN; and    )
5   J.B., a minor by and through his       )
    guardian JONATHAN WAYNE BOTTEN, SR.,   )
6                                          )
                    Plaintiffs,            )
7                                          )
                    vs.                    ) Case No.
8                                          ) 5:22-CV-00949-KK-SHK
    STATE OF CALIFORNIA; COUNTY OF SAN     )
9   BERNARDINO; ISAIAH KEE; MICHAEL        )
    BLACKWOOD; BERNARDO RUBALCAVA; ROBERT  )
10  VACCARI; JAKE ADAMS; and DOES 1-10,    )
    inclusive,                             )
11                                         )
                    Defendants.            )
12  _____    )

13

14

15

16          REMOTE VIDEOCONFERENCE DEPOSITION OF

17                  TIMOTHY JONG, M.D.

18              THURSDAY, JANUARY 2, 2025

19

20

21

22

23  Reported Stenographically By:

24  Jinna Grace Kim, CSR No. 14151

25  Job No.:  127502
```

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 9

```
 1      A.   Yes.

 2      Q.   So starting with the gunshot wound of the mid left

 3   back, where was the entry, generally speaking?

 4      A.   Entry was on the mid left back area.

 5      Q.   And you took measurements with respect to each

 6   gunshot wound?

 7      A.   Yes.

 8      Q.   And you included those measurements in your

 9   report?

10      A.   Yes.

11      Q.   And I note you have entry, and then a parenthetical

12   "K."

13           Do you see that?

14      A.   Yes.

15      Q.   And was that the descriptor you were using for

16   purposes of this particular gunshot wound?

17      A.   Yes.

18      Q.   Would I be correct to say you did not list the

19   gunshots in the order you think they were necessarily

20   sustained; you listed them for discussion purposes?

21      A.   Yes.

22      Q.   And the gunshot wound to the left back, can you

23   generally tell us what that traveled through?

24      A.   Sure.  So the gunshot wound on the mid left back

25   traveled through the skin and soft tissue, and then it
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 10

1   traveled through the rib cage, and then the left lung, and

2   then the front part of the rib cage, and it terminated --

3   there is a projectile in the soft tissues of the left upper

4   chest.

5        Q.   So that projectile was recovered?

6        A.   Yes.

7        Q.   And that's why in essence there is no exit because

8   the projectile was recovered from within the body; is that

9   correct?

10       A.   That's correct.

11       Q.   And you described at the bottom of Page 3, the

12  recovered projectile?

13       A.   Yes.

14       Q.   What did you end up doing with the projectiles that

15  were recovered?

16            Did you turn them over to the investigating

17  agency?

18       A.   Yes.

19       Q.   What was the direction?

20            And I'm at the top of Page 4 now of your report --

21  the direction of the bullet wound to the mid left back?

22            And I'm assuming the direction is with the body in

23  and anatomical position; is that correct?

24       A.   Yes.

25       Q.   Tell us what the direction of that bullet was.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 11

1      A.    Sure.   The direction of that projectile was

2    back-to-front, left-to-right, and upward.

3      Q.    And were there associated injuries with that

4    projectile?

5      A.    Yes.

6      Q.    And what were those?

7      A.    So those associated injuries included 850

8    milliliters of blood in the left side of the chest, and over

9    the area of recovery where the projectile was recovered was

10    an ecchymosis which is similar to a bruise.

11         There were also big fractures, and there's

12    hemorrhaging throughout the wound track.

13     Q.    In your opinion was that projectile fatal?

14     A.    Yes.

15     Q.    And why was it fatal from a medical perspective?

16     A.    From a medical perspective, it went through the lung

17    and also created a defect at which air could move into the

18    chest cavity as well as when it hit the lung, blood was going

19    into the chest cavity, and that compresses the lung.

20         And that creates difficulty for the body to

21    oxygenate the blood.

22     Q.    And given that the entry wound was to the mid left

23    back, would that part of the body have to be exposed to the

24    muzzle of the gun for that shot to occur?

25     A.    Will you be able to reword that question, please.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 12

1      Q.   Sure.  In other words, I'm assuming that your

2   understanding is generally bullets travel in straight

3   paths?

4      A.   Most scenarios, yes.  But after awhile they tend to

5   lose velocity, and they actually curve downward after they

6   lose velocity.

7           But that's at a very far distance.

8      Q.   Right.  So what I'm getting at is very basic.

9           If, for example, if I have a gunshot wound to the

10   middle of my chest, this is my hypothetical.

11      A.   Sure.

12      Q.   One scenario that would be consistent with that is

13   that my chest was exposed to the trajectory of the bullet at

14   the time I was shot; is that generally a fair statement?

15      A.   Yeah.

16      Q.   And if the shot was to my back, likewise, my back

17   would have to be exposed to the trajectory of the bullet.

18           Does that make sense?

19      A.   Yes, it does.

20      Q.   So in this case at least we can say that the mid

21   left back would have been exposed to the trajectory of this

22   bullet?

23      A.   Sure.  Yeah.

24      Q.   And with respect to the back-to-front, you're

25   speaking back-to-front with the body in an anatomical

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 13

1    position?

2        A.    That's correct.

3        Q.    And the upward, again, that would be with the body

4    in an anatomical position; correct?

5        A.    Yes.

6        Q.    If you know, can you get an upward trajectory if the

7    body is leaning forward or fallen forward if the shot is to

8    the back?

9        A.    Just to clarify, you're saying in terms of upward?

10       Q.    Yes.

11       A.    Okay.  And leaning forward, or -- what was the other

12   position, please.

13       Q.    Or falling forward.  In other words, if the body is

14   canted forward away from the bullet, is that one explanation

15   for upward trajectory?

16       A.    That's a possibility, yes.

17       Q.    Okay.  And then going to the next one you described

18   at the top of Page 4, that would be a gunshot wound of the

19   left lower back?

20       A.    Yes.

21       Q.    And again, that area would have to be exposed to the

22   trajectory of that shot?

23       A.    Yes.

24       Q.    What did that bullet pass through?

25       A.    So that bullet passed through skin and soft tissue;

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 14

```
 1   it also passed through one of the hip bones, the large bowel,

 2   and it lodged -- the projectile lodged in the fat of the

 3   front of the abdomen.

 4        Q.   And that bullet was also recovered?

 5        A.   Yes.

 6        Q.   And were you able to determine with the two

 7   recovered bullets so far, whether they were from a handgun or

 8   a rifle, or is that beyond your area of expertise?

 9        A.   I would defer to the handgun analysis expert on

10   that.

11        Q.   Okay.  And so also, that wound did not have an exit;

12   is that correct?

13        A.   That's correct.

14        Q.   And that direction would have also been

15   back-to-front, left-to-right, and upward?

16        A.   Yes.

17        Q.   And the gunshot wound to the right buttock, where

18   was that generally in terms of the right buttock?

19             Was it more in the middle, or somewhere else?

20        A.   It was middle, slightly to the upper right.

21        Q.   And what did that pass through after entering the

22   body?

23        A.   It only passed through the soft tissues.

24        Q.   And that bullet was also recovered?

25        A.   Yes.
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 15

1    Q.   And that had a left-to-right and upward

2    trajectory?

3    A.   Yes.

4    Q.   And you listed the associated injuries?

5    A.   Yes.

6    Q.   So there would be at least the first three shots

7    would have all entered the back of the body; is that

8    correct?

9    A.   Yes.

10   Q.   And then you have a wound to the thigh.

11   Where did that enter?

12   A.   A clarification question:  Are you referring to the

13   left where the Page 4, the -- gunshot wound?

14   Q.   Yes.  I'm sorry.  I didn't realize until I turned

15   the page that there were more than one thigh shots.

16   Yeah.  So let's go chronological.  Thank you.

17   A.   Sure.  So to answer your question, the wound itself

18   was on the front, to the side, more to the side with midline

19   being closer to the midline.  It was closer to the front

20   outer part of the thigh.

21   Q.   And what did that bullet pass through?

22   A.   That bullet only passed through skin and soft

23   tissue.

24   Q.   How about the wound to the anterior left thigh, the

25   next one listed at the top of Page 5.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 16

1      A.    So the gunshot wound of the anterior left thigh

2    passed through the skin and soft tissue.

3      Q.    And that had a upward trajectory?

4      A.    Yes.

5      Q.    One moment.  I'm assuming the shot to the thighs in

6    your opinion were not fatal; is that correct?

7      A.    That's correct.

8      Q.    And then we have the next one, the posterior left

9    thigh.

10          Where did that enter?

11     A.    So that entered on the back of the left thigh.

12     Q.    Okay.  That would have been another wound to the

13   back of the body?

14     A.    Yes.

15     Q.    And what did that pass through?

16     A.    So that gunshot wound passed through the skin and

17   soft tissue.

18     Q.    That had a back-to-front trajectory?

19     A.    Yes.

20     Q.    Also left-to-right and upward?

21     A.    Yes.

22     Q.    If one is getting upward trajectories in the legs,

23   if you know, is that consistent with the body going towards

24   the ground or away from the shooter, to be shot in the leg

25   and have the bullet go upward?

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 17

1      A.    The possibility of that scenario, the possibility

2   exists, yes.

3      Q.    Okay.  And then you have the gunshot wound to the

4   lateral left knee?

5      A.    Yes.

6      Q.    You described that at the bottom of Page 5?

7      A.    Yes.

8      Q.    And tell us about the path of that bullet and

9   whether it had an exit.

10     A.    So the path of that bullet it went through the skin

11   and soft tissue, and it exited on the anterior or the front

12   portion of the left thigh.

13     Q.    Did that also have a back-to-front direction?

14     A.    Yes.

15     Q.    And also upward?

16     A.    Yes.

17     Q.    And the associated injuries would essentially be the

18   hemorrhaging in the wound track?

19     A.    Yes.

20     Q.    And then we have a gunshot wound to the anterior

21   right lower leg, and you listed it as number one; is that

22   right?

23     A.    Yes.

24     Q.    Did you do that because there were two separate

25   wounds to the anterior right lower leg?

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 18

1       A.   Yes.

2       Q.   And did you determine both of those wounds were

3    entry wounds?

4       A.   Yes.

5       Q.   And obviously, you have training in determining or

6    distinguishing between an entry wound and an exit wound, for

7    example?

8       A.   Yes.

9       Q.   Without getting into too many specifics, I'm trying

10   to remember my forensic pathology basics.

11            But are entry wounds generally more circular than

12   exit wounds, and sometimes have an abrasion collar?

13       A.   Generally speaking, yes, that's correct.

14       Q.   I'm sure that's very basic.

15            That's some of what I remember.

16            What was the direction of the wound to the anterior

17   right lower leg, number one?

18       A.   The direction was slightly front-to-back,

19   right-to-left, and upward.

20       Q.   Where on the leg did that actually enter?

21       A.   It was on the front of the right lower leg towards

22   the bottom.

23       Q.   Towards the ankle?

24       A.   Yes.

25       Q.   And it entered there and went upward in the leg?

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 19

```
 1     A.   Yes.

 2     Q.   So what I'm trying to imagine, if the shooter is on

 3   ground level shooting at chest level, what type of body

 4   position would the person have to be in to get shot in the

 5   lower right leg and have it go upward?

 6          It seems like it would have to be something other

 7   than standing straight up; is that fair?

 8     A.   The possibility exists.  There are obviously very

 9   many scenarios in terms of hypotheticals which could occur.

10     Q.   Let me ask you this:  Is it consistent with the

11   person being on the ground in some fashion, getting shot in

12   the lower leg and having it traveling upward?

13     A.   May I ask a clarification question?

14     Q.   Of course.

15     A.   Are they completely lying flat on the ground with

16   their leg against the ground?

17     Q.   No.  Just on the ground in some manner with their

18   leg somewhat elevated?

19     A.   Leg somewhat elevated --

20          MS. ESQUIVEL:  Objection.  Lacks foundation; calls

21   for speculation.

22   BY MR. GALIPO:

23     Q.   You may answer.

24     A.   The possibility exists that that could occur.

25     Q.   Okay.  And that anterior right lower leg number one
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 20

```
 1    wound had an exit; is that correct?

 2        A.    Yes.

 3        Q.    And the anterior right lower leg number two, was

 4    that close in area in terms of the entrance wound to right

 5    lower leg number one?

 6        A.    Yes.

 7        Q.    And had similar direction including an upward

 8    direction?

 9        A.    Yes.

10        Q.    What were the associated injuries with that wound?

11        A.    So the associated injuries with the wound on the

12    anterior right lower leg number two were fractures of the

13    bones of the lower leg with hemorrhage throughout the wound

14    track.

15        Q.    And which bones were fractured?

16        A.    The right tibia and right fibula.

17        Q.    And remind me again, where is the tibia?

18        A.    So the tibia is -- well, it starts near your knee

19    and ends all the way at the level of pretty much above your

20    foot.

21        Q.    And how about the fibula?

22        A.    Same thing for the fibula.  It's a little bit to the

23    side of the tibia, but it starts at the level of the knee and

24    goes all the way down to the level of the ankle.

25        Q.    And then there was a gunshot wound to the right
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 21

1    foot?

2        A.    Yes.

3        Q.    And did that strike in the area of the fifth toe?

4        A.    Yes.

5        Q.    And where did that travel after striking the toe or

6    the area of the fifth toe?

7        A.    The area that the projectile traveled through was

8    the skin and the soft tissue of the right foot.

9        Q.    Did that also have an upward trajectory?

10        A.    Yes.

11        Q.    And what were the associated injuries?

12        A.    The associated injuries of that wound included the

13    laceration which is a tear with surrounding hemorrhaging into

14    the soft tissue which is the ecchymosis on the sole of the

15    fourth toe of the right foot as well as another tear on the

16    anterior aspect of the right foot which is the front aspect

17    between the third and fourth toes, and there was also

18    hemorrhage throughout the wound track.

19        Q.    So were there ten entry wounds altogether?

20        A.    Yes.

21        Q.    And multiple shots to the backside of the body?

22        A.    That's correct.

23        Q.    And your opinion, the fatal shot was the wound to

24    the mid left back that we started off by describing?

25        A.    Yes.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 22

1      Q.    And one of the reasons that was fatal was because it

2   went through major organs and the internal bleeding?

3      A.    Yes.

4      Q.    I take it with the wound like that, death is not

5   instantaneous; it happens over minutes in part because of the

6   loss of blood?

7      A.    Yes.  There is also the possibility that air could

8   have gotten into the left chest cavity which I previously

9   mentioned which could also compress the lung.

10      Q.    Which could also add to the cause of death?

11      A.    Yes.

12      Q.    And then you have something called Other Injuries on

13   Page 7 of your report towards the bottom.

14          Do you see that section?

15      A.    Yes.

16      Q.    Item one, were you describing something in your

17   opinion that was consistent with the decedent being struck by

18   a Taser dart?

19      A.    Yes.

20      Q.    And where on the body generally was that?

21      A.    That was on the right upper back.

22      Q.    And item two, what were you describing there?

23      A.    I was describing a puncture on the mid right back.

24      Q.    Do you know if that was consistent with a Taser or

25   some other less-lethal ammunition?

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 30

```
 1   saying.

 2        Q.   Would having sustained this kind of wound as you

 3   described as K, would Mr. Puga been able to run, continue to

 4   run for a certain amount of distance?

 5        A.   That possibility exist, but as I mentioned before,

 6   it depend based on each person and their health condition.

 7        Q.   Okay.  Thank you.  The gunshot wound you identified

 8   as M on Page 4, would that gunshot -- would that have been

 9   fatal in and of itself?

10        A.   It possibly could be longer period of time.

11        Q.   And what do you mean by longer period of time?

12        A.   So it hit the large valve, the large intestine, and

13   with it hitting the large intestine, if that was not

14   addressed, there could be fecal matter which leaks out into

15   the basically abdominal cavity, and that could lead to a

16   very, very bad infection.

17        Q.   And is it fair to say infection takes time to

18   develop?

19        A.   Yes.

20        Q.   And requires also time to become fatal infection?

21        A.   Yes.

22        Q.   Based on the amount of leakage that you or the size

23   of the perforation of the large bowel, could you estimate how

24   long it would have taken for a fatal infection to develop in

25   Mr. Puga in order for him to succumb to the gunshot wound
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 31

1    identified as M?

2        A.    Sure.  So anywhere from hours to days.

3        Q.    And then the gunshot that you identified as N, the

4    gunshot wound to the right buttocks, would you identify or

5    consider that wound fatal in and of itself?

6        A.    No.

7        Q.    With respect to, again, gunshot wound M, looking at

8    your diagram on Page, Bates stamp 848 -- I forgot to ask you:

9            Can you make -- can you say -- sorry, strike that.

10           Can you make a determination whether given the

11   trajectory of the bullet and the track that you observed,

12   whether Mr. Puga's back was directly facing the shooter?

13       A.    That possibility exists.

14       Q.    Does the possibility also exist that his left side

15   could have been facing the shooter to sustain the type of

16   gunshot that you observed as N?

17       A.    That possibility is also possible.

18       Q.    Turning to Page 6 on your report concerning the

19   gunshot wound C to the right lower leg number one, so if I

20   understand this correctly, the bullet entered the front of

21   the thigh and traveled back; is that correct?

22       A.    No.

23       Q.    Okay.

24       A.    It entered on the front of the right lower leg.

25       Q.    I'm sorry.  I'm just looking on your diagram on Page

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 45

```
1      A.   Specific understanding, no, but general

2  understanding just based on physics.

3      Q.   General understanding is okay.

4      A.   Sure.  Yes.

5      Q.   What would be the distance before the appreciable

6  downward deviation?

7           MS. ESQUIVEL:  Objection.  Vague as to

8  appreciable.

9           THE WITNESS:  I apologize.  I believe I

10  misunderstood your question then.

11  BY MR. GALIPO:

12      Q.   That's okay.  I think you said earlier, I asked you

13  do bullets generally travel in a straight line, and I think

14  you said, yes, but at some point they could start to go lower

15  or go down.

16           Do you remember something to that effect?

17      A.   Yes.

18      Q.   And I just didn't know if you have had a distance in

19  mind like it was 300 yards or a 100 yards or a quarter of a

20  mile, or what distance did you have in mind before they

21  started to drop?

22      A.   I wouldn't know off the top of my head.

23           Probably a firearm expert would know.

24      Q.   Okay.  That's fair enough.

25           And then with respect so these trajectories as been
```

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 46

1    indicated in the questioning, many of the shots to the back,

2    the buttocks, et cetera, have a back-to-front trajectory;

3    correct?

4        A.    Yes.

5        Q.    And there were a few with an upward trajectory with

6    the body in an anatomical position that counsel pointed out.

7              Do you recall that?

8        A.    Yes.

9        Q.    And I think a couple that you pointed out was wound

10   H was with the anterior left thigh, and then C which was the

11   right lower leg number one, D was the right lower leg number

12   two, and F was the right foot.

13             Do you generally recall that?

14   A.    Yes.

15   Q.    Would those upward trajectories to the thigh, lower

16   right leg, and toe at least be consistent in your mind with

17   Mr. Puga going down to the ground having the front of his

18   legs exposed to the shooters and hitting his lower legs and

19   traveling upward?

20             MS. ESQUIVEL:  Objection.  Incomplete and improper

21   hypothetical.

22             Go ahead.

23             THE WITNESS:  So to clarify, you're saying that Mr.

24   Puga is face-down on the ground with one of his legs up?

25   BY MR. GALIPO:

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 47

1      Q.   No.  Not faced-down, just down on the ground, even

2  on his back or side with his legs out in front of him.

3      A.   That possibility does exist, yes.

4      Q.   And I think you answered the question before, but

5  you wouldn't expect the bullet to hit someone in the ankle

6  and travel straight up the leg if someone was standing

7  upright, would you?

8          MS. ESQUIVEL:  Same objection.

9  BY MR. GALIPO:

10      Q.   So if the shooter and the decedent were on the same

11  ground plane both standing up, and the shooters were shooting

12  from chest level, you wouldn't expect the bullet to hit him

13  in the ankle and travel up his leg, would you?

14      A.   Highly unlikely.  That's very highly unlikely.

15      Q.   And in terms of a ricochet, sometimes you describe

16  in your reports bullets hitting intermediary objects

17  potentially?

18      A.   That's correct.

19      Q.   And when a bullet hits a intermediary object, you

20  sometimes see an irregular entry wound; is that fair?

21      A.   Yes, you can.

22      Q.   And then you note that in your report when you see

23  that?

24      A.   Yes.

25      Q.   Did you indicate anywhere in your report that you

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 48

1   thought these bullets hit intermediary objects or ricochet?

2        A.   I did not.

3        Q.   Okay.  Thank you.

4             That's all that I have.

5             MS. ESQUIVEL:  I'm sorry, Doctor.

6             I just have a few follow-ups.

7                            EXAMINATION

8   BY MS. ESQUIVEL:

9        Q.   Did you order the toxicology report on Mr. Puga?

10       A.   Yes.

11       Q.   Is that something that you normally do in the course

12  of your work as a forensic pathologist?

13       A.   Yes.

14       Q.   Do you rely on the results of the toxicology report

15  to make your final determination as to cause of death?

16            MR. GALIPO:  Vague and ambiguous; incomplete

17  hypothetical.

18            You mean in this case?

19            MS. ESQUIVEL:  I'm just asking him in general.

20  BY MS. ESQUIVEL:

21       Q.   Do you rely on toxicology reports to make a

22  determination as to cause of death?

23            MR. GALIPO:  Vague and ambiguous; incomplete

24  hypothetical.

25            THE WITNESS:  Yes.

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 54

```
 1                          CERTIFICATE

 2                              OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5          I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8          That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10          That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12          That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15          Further, that the foregoing is an accurate

16   transcription thereof.

17          I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21          IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  January 2, 2025.

23
                          _____
24
                          Jinna Grace Kim, CSR No. 14151
25
```