Exhibit 24

# Roger Clark

## Police Procedures Consultant, Inc.

10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

January 30, 2025

Mr. Dale K. Galipo, Esq,
Ms. Hang D. Le, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367

***Regarding:  L.C., et al. v. State of California, et al., case no. 5:22-cv-00949-KK-SHK***
***Botten, et al. v. State of California, et al., case no.5:23-cv-00257-KK-SHK***

Dear Mr. Galipo and Ms. Le:

Thank you for retaining me to analyze and render opinions regarding the February 17, 2021 officer-involved use of force and shooting of Hector Puga ("Mr. Puga") by California Highway Patrol ("CHP") Sergeant Isaia Kee ("Sergeant Kee"), Officer Michael Blackwood ("Officer Blackwood"), Officer Bernardo Rubalcava ("Officer Rubalcava"), and San Bernardino County Sheriff's Department ("SBSD") Deputy Jake Adams ("Deputy Adams") and Sergeant Robert Vaccari ("Sergeant Vaccari"). Pursuant to the requirements of Rule 26, I have studied the police reports, SBSD policies, CHP policies, transcripts, and other materials (as listed below) provided to me thus far regarding this case.  Please be advised that if/when any additional information is submitted, a supplemental report may be necessary.

## **Materials Provided and Reviewed Thus Far**:

1.      Plaintiffs L.C., I.H., A.L., and Antonia Salas Ubaldo's Third Amended Complaint for Damages

2.      Plaintiffs Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, Annabelle Botten, and J.B.'s First Amended Complaint

3.      San Bernardino County Sheriff's Department Lethal Force Encounter Report

(COSB000039-000729)

4.    Photographs
    a.    Daytime Scene Photos (COSB001471-COSB001576)
    b.    Night Markers and Decedent Photos (COSB001577-COSB001826)
    c.    Additional Evidence and Scene Photos (COSB001827-COSB002644)
    d.    Additional Evidence and Scene Photos (COSB003176-COSB004061)
    e.    Aerial Photographs

5.    Videos
    a.    COSB001465 (Dashcam video)
    b.    COSB009200 (Dashcam video)
    c.    COSB001453 (Cellphone video)
    d.    COSB001454 (Cellphone video)
    e.    COSB001455 (Cellphone video)
    f.    COSB001456 (Cellphone video)
    g.    COSB001457 (Cellphone video)
    h.    COSB001458 (Cellphone video)
    i.    COSB001459 (Cellphone video)
    j.    COSB001460 (Cellphone video)
    k.    COSB001461 (Cellphone video)
    l.    COSB001470 (Cellphone video)
    m.    Plaintiff 0241 (Cellphone video)
    n.    PLTFS 00345 (Bystander video)

6.    Transcripts of Recorded Interviews of:
    a.    Sergeant Isaiah Kee
    b.    Officer Michael Blackwood
    c.    Officer Bernardo Rubalcava
    d.    Deputy Jake Adams
    e.    Sergeant Robert Vaccari

7.    Deposition Transcripts
    a.    Sergeant Isaiah Kee
    b.    Officer Michael Blackwood
    c.    Officer Bernardo Rubalcava
    d.    Deputy Jake Adams
    e.    Sergeant Robert Vaccari
    f.    Jonathan Wayne Botten, Sr.
    g.    Erin Mangerino
    h.    Betzabeth Gonzalez
    i.    Sergeant Robert Ripley

8.      Autopsy Report of Hector Puga

9.      Policies and Training
        a.      SBSD Use of Force Policies
        b.      TASER X2 User Course
        c.      CHP Use of Force Policies

10.     POST Basic Learning Domains:
        a.      #1:  "Leadership, Professionalism & Ethics"
        b.      #2:  "Criminal Justice System"
        c.      #3:  "Policing the Community"
        d.      #5:  "Introduction to Criminal Law"
        e.      #15: "Laws of Arrest"
        f.      #20: "Use of Force"
        g.      #21: "Patrol Techniques"
        h.      #23: "Crimes in Progress"
        i.      #33: "Arrest Methods/Defensive Tactics"
        j.      #35: "Firearms/Chemical Agents"

11.     Overview of the incident scene via the internet.

12.     Composite video of the incident by Trial Template

13.     Post-Fall Bullet Count video by Trial Template


**<u>Brief Overview of Events</u>**:

On February 16, 2021, CHP Sergeant Isaiah Kee received information from dispatch regarding a freeway shooting on the 15 Northbound Freeway between Palmdale and Roy Rogers. He received information that someone driving a white Expedition with 22" black rims, with the word "funeral" on a sticker in the left rear corner of the back window had fired one shot at a black Honda Civic as a result of a roadway dispute. The driver of the black Honda Civic had taken a picture of the white Expedition but was unable to obtain the white Expedition's license plate. After an investigation at the scene, Sergeant Kee returned to the office where he briefed two graveyard-shift officers, Officer Michael Blackwood and Officer Bernardo Rubalcava, about the earlier freeway shooting. He authorized the officers to perform a felony stop on the white Expedition of they came across the vehicle during their patrol.

At approximately 1:45 a.m. on February 17, 2021, Officer Blackwood and Officer Rubalcava were traveling west on Bear Valley and entering the freeway when they observed a white Expedition that matched the description of the vehicle involved in the

earlier freeway shooting. The officers turn their vehicle around to follow the white Expedition and observe the Expedition self-yield before the officers have a chance to turn on their lights or sirens. Officer Blackwood started giving the occupant(s) of the white Expedition to roll down their windows and turn off the car and observed the driver of the vehicle put his hands out the window, wave, and take off. The officers pursued the vehicle. Sergeant Kee was contacted by dispatch during that time, informing him that a unit had the vehicle stopped near Bear Valley. As Sergeant Kee headed out, he was informed that a pursuit had started. Sergeant Kee requested an air unit and requested that the San Bernardino Sheriff's Department (SBSD) take over the pursuit. He then responded towards the pursuit.

During the pursuit, dispatch informed Sergeant Kee that the San Bernardino Sheriff's Department could not take over, but that they could assist. Sergeant Kee asked dispatch to inform the Sheriff's Department that the suspect was armed and dangerous. Sergeant Robert Vaccari was the first from SBSD to join the pursuit. As Sergeant Vaccari broadcasted the directions, more of SBSD deputies joined the pursuit. During the pursuit, Sergeant Vaccari made a request for an air unit as well. At one point during the pursuit, seeing an SBSD secondary patrol unit following him, Sergeant Vaccari made the decision to call the rest of the patrol units off the pursuit. Sergeant Vaccari characterized the Expedition's speeds as "fast," "but not outrageous." At some point during the pursuit, SBSD deployed spike strips, deflating the right front tire of the Expedition. As the tire disintegrated, the vehicle slowly came to a stop on Peach Avenue, south of Catalpa Street. Officer Blackwood positioned his patrol vehicle off to the left of the driver's side of the expedition while Sergeant Kee positioned his patrol vehicle off to the right. Sergeant Vaccari and Deputy Adams positioned their vehicles behind the CHP vehicles.

The officers exited their vehicles. Sergeant Kee exited his vehicle with his AR-15 and positioned himself on the driver's side of Officer Blackwood's patrol vehicle and started giving the occupants of the Expedition commands. At that point, the officers realized that there were two people inside the Expedition. Next to Sergeant Kee is Officer Blackwood, also positioned in the driver's side door. Officer Rubalcava was positioned behind the passenger's side door of the patrol unit. Sergeant Vaccari was positioned behind the driver's side door of Sergeant Kee's patrol unit while Deputy Adams was positioned behind the passenger door of the same unit. It appeared to the officers that the driver was refusing to exit the Expedition, and at that point, the officers believed that the driver was still armed and dangerous.

Sergeant Kee decided to deploy the beanbag shotgun to break open the Expedition's window, but was unsuccessful. After the deployment, the passenger of the Expedition, a female, exited the vehicle and complied with the officers' commands to put her hands up and walk backward towards the officers, allowing the officers to handcuff her and take her into custody. The female informed the officers that the driver's name was Hector, later identified as the decedent, Hector Puga.

Officer Kee continued to communicate with Mr. Puga, requesting that he exit the vehicle. Mr. Puga told the officers that he was not ready to exit the vehicle yet and wanted to smoke his cigarettes before coming out. During this time, Mr. Puga also threw cans out of the driver's side window. During this period of fifteen to twenty minutes of negotiation, the SBSD air unit that was circling above with its spotlight informed the officers that it had to leave to refuel.

Also during this time, Sergeant Kee asked Sergeant Vaccari to request for SBSD SWAT to respond to the scene. According to Sergeant Kee, Sergeant Vaccari responded that he wasn't sure SWAT would respond but that he would check, and Sergeant Kee observed Sergeant Vaccari go back to his vehicle and get on a cell phone. However, according to Sergeant Vaccari, he had forgotten his cell phone at the station, and because he was new to the station, did not know the number for SWAT. Instead, he decided on his own, without communicating with the other officers, that they should try to further negotiate with Mr. Puga before attempting to call SWAT.

The officers claim that during Sergeant Kee's dialogue with Mr. Puga, Mr. Puga informed Sergeant Kee that he had "two strikes" and that he would be "going back for life." Sergeant Kee then requested that Sergeant Vaccari break open the Expedition's back window, which he did so with less-lethal glass breaker rounds. Sergeant Vaccari then gave Mr. Puga commands to get out of the vehicle, which Mr. Puga refused. Mr. Puga then requested that the officers call his "wife." It should be noted that at the time of his death, Mr. Puga was not married. Mr. Puga gave the officers a phone number to call. The officers tried the number, but no one picked up on the other end. Mr. Puga then requested that the officers call his family but was unable to provide phone numbers for his family. At that point, Sergeant Vaccari then deployed pepper ball rounds into the Expedition.

The officers testified that Sergeant Vaccari fired a volley of pepper balls into the Expedition approximately every five minutes, for about 45 minutes, for a total of 75 to 100 pepper balls. During this time, Sergeant Vaccari considered contacting dispatch to contact SWAT but ultimately decided to continue deploying pepper balls despite Mr. Puga still refusing to get out of the vehicle.

At one point, Sergeant Vaccari decided that he would try to intentionally strike Mr. Puga with a pepper ball in order to motivate him to exit the vehicle. Several witnesses testified that they heard Mr. Puga exclaim, "My eye," after Sergeant Vaccari's last volley of pepper ball deployment. Officer Blackwood stated that after hearing Mr. Puga say, "My eye," he observed blood around Mr. Puga's eye area and believed that a pepper ball had hit his eye. He later testified that he observed a cut above Mr. Puga's eye that he associated with him being hit by pepper balls. Mr. Puga then requested medical attention and agreed to exit the vehicle. Before the exited the vehicle, several witnesses testified

that they heard Mr. Puga express concern that he was going to be shot if he exited the vehicle.

As Mr. Puga slowly exited the Expedition, several witnesses, including officers and percipient witnesses, observed Mr. Puga rubbing his eyes and tending to his eyes. This action was also captured on video by a bystander's cell phone. Mr. Puga was shirtless and wearing light pants as he exited the vehicles. The officers testified that Mr. Puga exited the vehicle without showing his front side to the officers, leading the officers to believe that Mr. Puga was attempting to conceal a weapon in the front of his waistband. However, a bystander captured Mr. Puga's exit out of the Expedition on video and the video does not show any object in the front of Mr. Puga's waistband as he exited the vehicle.

Mr. Puga's exit from the vehicle and the subsequent shooting was captured on video, from multiple angles, by the CHP unit's dashcam and bystander cell phone videos. As Mr. Puga exited the vehicle he raised his hands in the air, over his head, showing his empty hands. Sergeant Kee can be heard giving Mr. Puga commands as he exited the vehicle. He occasionally dropped his hands to pull up his pants or to wipe his face but would then put his hands up again. After Mr. Puga closed the door to the Expedition, he walked to the front of the Expedition. Mr. Puga told Sergeant Kee that he heard a click and believed that the officers were going to shoot him.

Mr. Puga stood in front of the Expedition with his hands up. He complied with Sergeant Kee's commands to keep his hands up and subsequent commands to put his hands on his head, but did not comply with Sergeant Kee's commands to come towards Sergeant Kee. Mr. Puga stood in front of the Expedition for a few minutes, alternating between putting his hands up above his head and placing his hands on his head. Deputy Adams later testified that he also observed Mr. Puga reaching down several times and thought it looked like Mr. Puga was adjusting his pants, pulling up his pants, or reaching into his pockets.

During this time, Sergeant Kee and Officer Rubalcava decided to approach from the driver's side of the Expedition to take Mr. Puga into custody. At around the same time, Sergeant Vaccari and Deputy Adams decided to approach from the passenger's side of the Expedition to take Mr. Puga into custody. The CHP officers and the SBSD deputies did not communicate with each other regarding a plan or their intention to approach before they did so. The CHP officers were not aware that the SBSD deputies were approaching Mr. Puga on the other side of the Expedition.

As the officers approached Mr. Puga, who had his hands up, the stories and video evidence diverged. Sergeant Kee testified that as soon as he saw Mr. Puga drop his right hand towards a gun that was sticking out of his waistband. Sergeant Kee fired five to eight shots at Mr. Puga. Sergeant Kee believed that some of his shots struck Mr. Puga.

Sergeant Kee testified that while he was firing his first volley of shots, Mr. Puga was able to extract the firearm from his waistband, point the gun in Sergeant Kee and Officer Rubalcava's direction, and Sergeant Kee saw two muzzle flashes come from Mr. Puga. Sergeant Kee then retreated back into the dirt area by Officer Blackwood's patrol vehicle. He testified that he turned his back towards Mr. Puga was he was retreating and was not keeping a visual on Mr. Puga was he was retreating.

Officer Rubalcava testified that he heard two shots being fired before he fired his first volley. Officer Rubalcava further testified that he observed Mr. Puga turn towards him and fire two shots at him before Officer Rubalcava returned fire with approximately five shots. Officer Rubalcava testified that when he started shooting, Mr. Puga immediately turned away and started running away.

Officer Blackwood, who was positioned to the right of his patrol vehicle, testified that he heard two to three shots, at least one coming from the left of him, before he fired his first volley. Officer Blackwood testified that he shot because Mr. Puga pulled out a gun and pointed it "at us." During his initial interview, he told investigators that he saw the gun come up above the vehicle and that it was pointing towards Sergeant Kee and Rubalcava before he shot. Officer Blackwood did not see a muzzle flash coming from where Mr. Puga was before Officer Blackwood opened fire. He further testified that it was his impression that Mr. Puga was struck by the initial first volley of shots because of the way Mr. Puga bent over and reacted. Mr. Puga then started to run away. Officer Blackwood does not recall how many shots he fired during his initial volley, but believes he fired a total of 20 shots.

Deputy Adams, who was approaching on the passenger side of the Expedition, testified that as he approached, he observed Mr. Puga turn and look at him while simultaneously bringing his hand down towards his waistband and then pulling it up again with a gun in the hand. Deputy Adams further testified that he then heard gunshots while Mr. Puga was still facing him. However, Deputy Adams did not see a muzzle flash come from Mr. Puga. Almost immediately after hearing gunshots, he yelled, "Get on the ground," ducked, and stepped over an elevated curb into the dirt shoulder. Deputy Adams then fired a volley of shots at Mr. Puga while positioned in the dirt shoulder. It should be noted that the MVARS video from Sergeant Kee's patrol unit captures Deputy Adams and Sergeant Vaccari's approach on the passenger side of the Expedition and their subsequent actions. In the video, Deputy Adams appears to reach the portion of the curb where the painted curb meets the unpainted curb at the time the shots started and the front passenger door was open during their approach and during the shooting. Subsequent pictures taken of the scene show that the part where the painted curb meets the unpainted curb lines up with the rear of the right back tire of the Expedition.

Sergeant Vaccari, who was approaching on the passenger side of the Expedition in the dirt shoulder, was armed with a 40-millimeter less-lethal launcher. The MVARS video

shows Sergeant Vaccari also reach the area where the painted curb meets the unpainted
curb at the time the shots started. Sergeant Vaccari testified that he initially believed that
when he heard the shots, he dropped his 40-millimeter weapon and unholstered his
firearm. However, after the incident and after having the opportunity to review the
MVARS video, he realized that he did not drop the 40-millimeter weapon or unholster
his firearm during that timeframe. The MVARS video shows Sergeant Vaccari pointing
his 40-millimeter weapon in Mr. Puga's direction while multiple shots are going off,
before backing up, crossing over the curb, unholstering his weapon, and approaching
Deputy Adams at the open passenger side door. However, Sergeant Vaccari never
pointed his firearm at anyone and never discharged his firearm. Sergeant Vaccari never
saw a muzzle flash come from Mr. Puga at any time. Sergeant Vaccari further testified
that it appeared that Mr. Puga started running as soon as the shots started.

Two percipient witnesses who witnessed the shooting also testified that they did not see
Mr. Puga with a gun when the shots began. Jonathan Wayne Botten, Sr., who resided at
17994 Catalpa Street, Hesperia, California (the house on the northeast corner of the
incident location), observed the initial moments of the shooting through the security
screen door of his front door. He testified that he never saw Mr. Puga with a gun and did
not see Mr. Puga with a gun at the time the shots started. Betzabeth Gonzalez, who
resided at 11428 Peach Avenue, Hesperia, California, also observed the shooting. Ms.
Gonzalez also testified that she never saw Mr. Puga with a gun in his hands or on his
person, never saw a muzzle flash or smoke coming from Mr. Puga, and never saw Mr.
Puga point at or shoot at anyone.

As Mr. Puga was running in a northern direction, Deputy Adams testified that he
observed Mr. Puga turn towards him and other officers with the gun in his right hand.
Deputy Adams fired four shots during his second volley. As Mr. Puga continued running,
Deputy Adams fired three more rounds for a third volley of shots. Deputy Adams fired a
total of 10 shots. After Sergeant Kee's first volley, he backed up and repositioned
himself, prone on the dirt shoulder parallel to the CHP unit. He testified that after
repositioning, he looked north and saw Mr. Puga again and observed Mr. Puga holding
the gun in his left hand and pointing it towards the officers. Sergeant Kee fired a second
volley, for a total of eighteen shots. However, during Officer Rubalcava's initial
interview with investigators, when initially asked what caused him to fire his second
volley of shots, he answered that Mr. Puga was still fleeing with the weapon. When asked
a follow up question of what Mr. Puga was doing with his weapon while fleeing that
caused Officer Rubalcava to shoot, Officer Rubalcava answered, "Nothing." Officer
Rubalcava fired a second volley of five to ten shots. Officer Blackwood testified that
throughout the time Mr. Puga was running, he could not see a gun in Mr. Puga's hands
because he could not see Mr. Puga's hands due to them being in front of him. Officer
Rubalcava fired a second volley, for a total of twenty shots. All officers claim that they
stopped firing once Mr. Puga fell to the ground.

Two videos captured Mr. Puga's run from the Expedition and his fall to the ground. Neither video shows Mr. Puga ever turning back towards the direction of the officers or pointing either hand back towards the officers. However, both videos show that several shots were fired at Mr. Puga after Mr. Puga had fallen to the ground. All officers testified that after Mr. Puga fell to the ground, he was no longer an immediate threat of death or serious bodily injury.

After the shooting, the officers approached Mr. Puga to take him into custody. Deputy Adams testified that he observed Mr. Puga still breathing and that he had fallen on his hands in a prone position. Deputy Adams and Sergeant Vaccari gave Mr. Puga commands but there was no compliance. Sergeant Vaccari then deployed his Taser at Mr. Puga's back. It appeared to Sergeant Vaccari that the Taser made contact as he could see Mr. Puga tensing up. Sergeant Vaccari then deployed the Taser a second time. In his initial interview, Sergeant Vaccari conceded that he did not consider handcuffing Mr. Puga while he was under the power of the Taser, and that that would have been a much better option than deploying the Taser a second time. After the second Taser deployment, Mr. Puga was handcuffed and taken into custody.

The residents of 17994 Catalpa Street, Hesperia, California were struck by gunfire as a result of the officers' use of lethal force. Plaintiff J.B., a minor male at the time, sustained serious gunshot wounds to the chest that required surgery and hospitalization. Plaintiff Jonathan Wayne Botten, Sr. sustained gunshot wounds to the right arm, left hand, and right arm. Plaintiff Tanja Dudek-Botten sustained gunshot wounds to her chest, chin, face, and right arm. Ms. Botten also metal shrapnel in her eye that required removal.

**Opinions Thus Far**:

    1.      In consideration of all the evidence reviewed, Sergeant Vaccari's deployment of the pepper balls to strike Mr. Puga violated standard police practices and training. The San Bernardino Sheriff's Department guidelines for using the pepper ball launcher directs deputies to anticipate that the suspect will lower his head, target from the upper torso down or alternatively target surrounding objects, justify each use of force, and importantly, to not shoot at the head, neck or spine unless a deadly force situation exists and the use of force is within the Department policy. During the period of time Sergeant Vaccari deployed the pepper balls into the Expedition, he stated that he would observe Mr. Puga on occasions, lower his head down low and at times stick his back between the two seats. Sergeant Vaccari stated that at one point, he specifically intended deploy a pepper ball to strike Mr. Puga. While Sergeant Vaccari claims that he intended to strike Mr. Puga in the back, several witnesses, including Sergeant Vaccari, stated that they heard Mr. Puga exclaim that he had been hit in the eye.

Officer Blackwood testified that he later observed a cut or blood around Mr. Puga's eye area, consistent with him being struck in the eye by a pepper ball round. It is my opinion that Sergeant Vaccari lacked basic situational awareness and violated standard police practices and training when he deployed the pepper ball launcher and struck Mr. Puga in the eye. SBSD guidelines cautioned deputies to anticipate that a suspect will lower his head. Sergeant Vaccari stated that he did not know where Mr. Puga's head was at when he deployed the pepper ball. SBSD guidelines further directs its deputies to not shoot at the head unless a deadly force situation exists. Here, it is undisputed that Mr. Puga did not pose an immediate threat of death or serious bodily injury at the time Sergeant Vaccari deployed the pepper ball launcher and struck Mr. Puga in the eye. It is my opinion that had Sergeant Vaccari exercised better tactics, Mr. Puga would not have suffered injuries to his eye from the pepper ball launcher.

2.      Sergeant Kee violated standard police practices and training when he shot at Mr. Puga when he saw Mr. Puga drop his right hand from a raised position. It is my opinion that Sergeant Kee overreacted when he saw Mr. Puga drop his right hand from a raised position. Officers are trained that deadly force is only justified when there is an objectively reasonable immediate threat of death or serious bodily injury and that subjective fear is insufficient to use deadly force. Officers are also trained that an overreaction is excessive force. The percipient witness' cell phone video, labeled COSB0001459, shows Mr. Puga's frontside as he exits the car and there appears to be no weapon on or near Mr. Puga's waistband. Witness Betzabeth Gonzalez testified that when Mr. Puga stepped out of the vehicle, she was able to see his whole body and saw that he did not have a gun in his hands or in his waistband. Several witnesses testified that throughout the time Mr. Puga was outside of the Expedition, they observed Mr. Puga drop his hands from raised position several times. Some witnesses saw Mr. Puga drop his hands to wipe his face. Deputy Adams observed Mr. Puga drop his hands several times towards his waist and thought Mr. Puga was pulling his pants or adjusting his waistband or reaching into his pockets. In a percipient witness's cell phone video of the incident, Mr. Puga can be seen dropping his right hand to his waist at least twice before the officers approached. Under these circumstances, initial shooting by Sergeant Kee was inappropriate because Mr. Puga did not have the gun in his hand, and a gun was neither coming in the direction of Sergeant Kee or anyone nor was a gun pointed at Sergeant Kee or anyone.

3.      Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they shot at Mr. Puga while he was running away. It is my opinion that even if Mr. Puga had initially presented a threat when the officers first opened fire, Mr. Puga did not present an immediate threat of death or serious bodily injury as he was running and the officers failed to reassess and overreacted when they fired subsequent volleys

when Mr. Puga was running. Officers are trained that deadly force can only be used in an immediate defense of life situation and only as a last resort. Officers are trained that they are responsible for every shot and to reassess the threat or danger before firing the next shot. An officer's overreaction in using deadly force is excessive force. Under the facts of this case, there was no immediate defense of life situation while Mr. Puga was running away. There were no bullet impacts or casings found near the area of the initial shooting that would support the allegation that Mr. Puga fired a weapon at anyone. Several different video sources captured Mr. Puga running from the Expedition until he ultimately fell to the ground. The videos show Mr. Puga running straight ahead, with both arms pumping back and forth in a running motion; never turning around towards the officers and never pointing either hand back toward the officers. Additionally, when Officer Rubalcava was initially asked what Mr. Puga doing with the gun as he was running that caused Officer Rubalcava to shoot, Officer Rubalcava answered, "Nothing." Mr. Puga was running in the middle of the street and not close to any residence nor about to enter any residence when the officers shot him. There is evidence that this was likely a situation of contagious fire.

4.      Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they shot at Mr. Puga after he had fallen to the ground. It is clear that Mr. Puga was no longer an immediate threat of death or serious bodily injury after he had fallen to the ground. All officers testified and agreed that Mr. Puga was no longer an immediate threat after he had fallen to the ground. Yet, there were approximately fifteen shots fired after Mr. Puga had gone to the ground. Although no officer admitted to firing at Mr. Puga after he had gone to the ground, it is undisputed that Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams discharged their weapons and that shots were fired at Mr. Puga after he had gone to the ground.

5.      It is my opinion that the officers had time to provide Mr. Puga with a warning that deadly force was going to be used prior to the shooting. Officers are trained that a warning that deadly force is going to be used should be given when feasible. Additionally, the officers also had time to provide an additional warning that deadly force was going to be used in between their first and subsequent volleys of shots.

6.      It is my opinion that the officers' failure to follow standard police practices and training in dealing with barricaded subjects, poor tactics, and rushing to take Mr. Puga into custody once he was outside of the vehicle all contributed to the officers' unnecessary use of lethal force. Officers are trained that they are responsible for their tactical decisions when they resort to the use of lethal force. Accordingly, the reasonableness of an officer's use of deadly force includes consideration of the officer's tactical conduct and decisions leading up to the use

of force. Here, the officers failed to formulate a safe tactical plan, made poor tactical decisions, and limited their tactical options, ultimately leading to their unnecessary use of lethal force. Police officers are trained to approach every contact with officer safety in mind. Complacency, overconfidence, poor planning, or inappropriate positioning can leave officers vulnerable to attack. The officers failed to communicate with each other to formulate a plan on extracting Mr. Puga from the Expedition and what to do when Mr. Puga exited the Expedition. Further, given that the officers believed that Mr. Puga was involved in a prior freeway shooting, was still armed, was refusing to exit his vehicle, and was situated in a residential neighborhood, Sergeant Vaccari's failure to request for SWAT to respond when initially requested by Sergeant Kee and after initial less-lethal force was unsuccessful were poor tactical decisions that contributed to the officers' use of unnecessary lethal force. POST Learning Domain 23, "Crimes in Progress," advises officers that if available, officers should request specialized units and resources as soon as it has been determined that the suspect has taken a barricaded position. SWAT specifically trains to respond to incidents where subject(s) may be armed, barricaded, and refusing to submit to arrest. The utilization of San Bernardino Sheriff's Department SWAT would have been a safer alternative. SWAT is equipped with special training, equipment, and tools, which can help resolve the situation of a barricaded subject without escalating the situation. Further, the officers should have requested additional back up units and set up a perimeter as soon as possible. POST Learning Domain 23, Chapter 4: Responding to Other High Risk Situations; Barricaded Suspects/Hostage Situations advises officers that once the location is verified and notifications made, all efforts should be taken to safely contain the scene to prevent the escape of the suspect and to keep unwanted foot and vehicular traffic away from the area. Additionally, the officers' decision to leave cover and enter an open-air environment to take Mr. Puga into custody, when the officers stated that they still believed Mr. Puga to be armed and dangerous, and Sergeant Kee stated that he was in fear for his life at the time he made the decision to approach and take Mr. Puga into custody, was a tactically poor decision. Among the "Fatal Errors" listed by POST Learning Domain 23, "Crimes in Progress," is poor positioning due to rushing or poor tactics. The situation did not call for an urgent response at the time the officers approached Mr. Puga.

7.      It is my opinion that Sergeant Vaccari's two-time deployment of the Taser at Mr. Puga after he had been shot twice and was clearly incapacitated without prior verbal warning violated standard police practices and training. Officers are trained to give a verbal warning that they are prepared to deploy the Taser prior to the deployment of the Taser if feasible. The San Bernardino Sheriff's Department Manual also advises its deputies that a Taser may only be used when objective facts indicate that the suspect poses an immediate threat to the safety of the officer or a member of the public. Sergeant Vaccari testified that he does not recall ever

giving a verbal warning prior to deploying the Taser. At the time of the initial Taser deployment, it was clear that Mr. Puga had been struck and fallen by gunfire, was clearly incapacitated, and was no longer an immediate threat to anyone. Additionally, according to percipient witness Erin Mangerino, Mr. Puga's hands were not concealed but visibly next to his body. Officers are also trained on the concept of "cuffing under power" in which an officer can safely go in and handcuff a suspect while the suspect is under effects of the neuromuscular incapacitation of the Taser. Thus, it is my opinion that the second Taser deployment violated standard police practices and training because it was clear from the first Taser deployment that Mr. Puga was incapacitated when his muscles responded to the Taser deployment but he did not respond, no verbal warning was given prior to the second Taser deployment, and Sergeant Vaccari admits that the second deployment would have been unnecessary had he considered at the time to go in and handcuff Mr. Puga while he was under the power of the Taser during the first Taser deployment.

8.      It is my opinion that a reasonably trained officer facing the same facts and circumstances as the involved shooting officers would understand that the officers' intentional shooting in the direction of the Bottens' residence would cause a reasonable person in the Botten's position to believe that they were not free to leave their property while the officers were apprehending Mr. Puga in front of the Botten home and that the officers intended to restrain their freedom of movement while attempting to apprehend Mr. Puga. Officers are trained that a detention is an assertion of authority by a peace officer that would cause a reasonable person to believe they are not free to leave. Such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer. A reasonable officer facing the facts and circumstances confronting the involved officers knew or should have known that there were innocent bystanders inside the residential homes surrounding the incident location in the middle of the night. Additionally, reasonably trained officer facing the same facts and circumstances as the involved officers would understand that the officers' ongoing flashing lights, commands, and deployments of force, would cause a reasonable person residing in the nearby residences to believe that they were not free to leave their residence.

9.      Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they failed to consider their background prior to utilizing deadly force, resulting in the serious injuries of innocent bystanders Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B. Police officers are trained to consider their background prior to utilizing deadly force. The Los Angeles Police Department utilizes an acronym for required considerations before using a firearm: B.A.L.K.S.: Background (who and what is behind your target), Age of suspect (adult vs. juvenile, elderly, etc.), Last resort

(all other options have been depleted or would not be practical, Knowledge of the crime (how certain you are about the crime and the suspect's connection to the crime), and Seriousness of the crime (felony vs. misdemeanor). Here, the officers knew or should have known that they were stopped in a residential neighborhood with houses on four corners of the intersection. They failed to consider their background when they fired several volleys of shots at Mr. Puga. This tactical failure resulted in the serious injuries of Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B., who were inside their home at the time of the shooting.

10.    The officers violated standard police practices and training in failing to request backup to set up a perimeter and evacuate uninvolved individuals from the area in order the ensure the safety of these uninvolved individuals. It is my opinion that the officers' failure to follow standard practices and training in responding to high-risk situations involving barricaded suspects by requesting backup, setting up a perimeter, and evacuating all uninvolved individuals from the area contributed to the injuries suffered by the Botten family. In addition to requesting specialized units and establishing a perimeter to address barricaded subject(s), POST Learning Domain 23 advises officers that the safety of uninvolved individuals must be the principal concern to officers who respond to high-risk situations involving barricaded suspects. Thus, POST Learning Domain 23 advises officers to systematically evacuate all uninvolved individuals from the area, relocate them to a safe location, determine the identification of each, and debrief those individuals who could provide additional information relevant to the situation. Here, although the officers were dealing with Mr. Puga for over an hour in the residential neighborhood, they failed to take steps to ensure the safety of the residents of that neighborhood. The officers failed to request additional backup to set up a perimeter and systematically evacuate the residents in the surrounding houses despite dealing with a potentially armed, barricaded subject who they believed to have been involved in an earlier freeway shooting. A reasonably trained officer facing the same circumstances would have requested backup and additional resources in order to deal with a potentially armed, barricaded subject in order to ensure the safety of all uninvolved individuals in the area.

## The Basic Rules Regarding the Use of Deadly Force:

Peace officers and Deputies are trained that by accepting their badges and guns they must act at all times in consideration of the extreme value our society places on all human life. Firing a firearm at a human being is different from all other police uses of force. While there are other police tactics and tools that can qualify as deadly force, none carry the same high probability of death as the use of the officer's firearm. Accordingly, Officers are trained that they can only use firearms under the most extreme circumstances. These situations are very rare. In fact, studies indicate that only a very few police officers in the United States ever fire their weapons in the field during their

entire careers.

Officers are trained at the POST Basic academy that the use of force must meet an *"Objectively Reasonable"* standard.  The following quotes from POST typifies the training (emphasis added):

"A *reasonable officer* is defined as an officer with similar training, experience, and background in a similar set of circumstances, who will react in a similar manner." (Learning Domain #20: "Introduction to the Use of Force," page 1-4.)
Further, POST teaches early on in the basic curriculum the legislative and community expectations regarding their powers of arrest and use of force by POST certified police officers:

"The criminal justice system gives law enforcement two extraordinary powers:

1.      The power of arrest and
2.      The power to use deadly force.

"The authority to do so does not come from the rule of an authoritarian dictator.  Rather it comes from the will and consent of the people who *put their trust in law enforcement to use that power with the utmost of care and restraint*.  This is why it is important to emphasize that *peace officers do not confer "police powers" on themselves*.  These powers come to the criminal justice system from the people they serve."   (Learning Domain #2: "Criminal Justice System," page 1-4.  Emphasis added.)


Additionally, POST specifies that there are a number of key factors that can affect which force option is approved and appropriate under the concept of the "totality of circumstances."  (Learning Domain # 20 "Use of Force," Chapter 2.).

POST training specifies that the use of force under the "totality of circumstances" is only justified on the basis of an "objectively reasonable" standard.  In other words, per the POST requirements, officers are not justified in any use of force based upon "subjective" fear.  The requirements are taught in detail throughout the POST Basic Curriculum (as required by law).

The POST standard of "Reasonable Fear" is defined as: *"A controlled and legitimate fear or mechanism that is necessary for officer safety based on actually perceived circumstances."*  POST defines "Unreasonable Fear" as: *"Generated in the officers's mind with no direct correlation to facts and situations."*  (Learning Domain # 20, Chapter 5.  Emphasis added.).

Officers are also taught that POST requires that any use of deadly force must be based on an "objective" rather than "subjective") "reasonable necessity" of action to "imminent danger." (Learning Domain # 20, Chapter 3).

A great deal of emphasis is placed on tried and proven tactics at the POST Basic Academy with the strong message in almost every germane training domain that incompetent tactics will invariably lead to unnecessary injury and/or death. As stated above, the training domains in this regard have even given this type of reckless and dangerous behavior a specific name: *Tombstone Courage.*" POST has also given a specific name to tactical mistakes that are likely to lead to injury or death: *"Fatal Error."*

As stated above, few (if any) incidents within the police profession are more serious than a person being shot at the hands of a police officer.

"The use of deadly force is the most serious decision a peace officer may ever have to make. *Such a decision should be guided by the reverence for human life and, used only when other means of control are unreasonable or have been exhausted.*

"Deadly force applied by a peace officer is force likely to cause death or serious bodily injury.

*"Reverence for life is the foundation on which the use of deadly force rests. Deadly force is always the last resort used in the direst of circumstances. The authority to use deadly force is an awesome responsibility given to peace officers by the people who expect them to exercise that authority judiciously.* (POST Learning Domain # 20.)

## My Qualifications for Reviewing this Case:

My opinions are based in part on my training, professional experience and education. I am a twenty seven year veteran of the Los Angeles County Sheriff's Department (LASD). I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I retired holding a California Peace Officer Standards and Training (POST) Advanced Certificate, and I am a graduate of the POST Command College (class #5, 1988). The POST Command College was a Masters level two-year course of study requiring a thesis, in Police Administration, with the diploma awarded by the California Department of Justice (and not the California University system).

During the course of my service with the department, I had a wide range of duties. Those duties included an 18 month assignment as a staff jail deputy and two years as an

Administrator/Lieutenant in the same jail facility (Men's Central Jail).  I also served on the department as a patrol officer, field supervisor, jail watch commander and administrator, station watch commander, and commanding officer of investigative units. I was a field training officer while assigned as a patrol deputy, and I trained new officers in POST and department approved patrol procedures, field investigations, apprehension techniques, and emergency procedures.

I was a Station Detective and, as such, reviewed and assessed cases passed on to me by the patrol officers.  Those cases included possible complaints relating to both misdemeanor and felony crimes.  They frequently required follow up investigations and interviews before the exact nature of the case could be determined.  As a field officer and detective, I was trained in interview and interrogation methods and subsequently trained other officers.

Among other assignments as a Sergeant, I supervised field officers and station detectives as they took complaints and conducted preliminary investigations regarding criminal and administrative matters.

As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the POST accepted patrol tactics, and investigation and apprehension methods.

As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings. I was also assigned by my Department to sit as a member of Departmental review committees regarding the reasonable or unreasonable use of force and tactics.

As stated above, during my career I was assigned to the Los Angeles County Men's Central Jail (MCJ) for a period of 18 months as a line officer.  Upon my subsequent promotion to Lieutenant, I returned to the same facility approximately 10 years later. During that time, I was assigned as a Jail Watch Commander, and as the Facility Training and Logistics Administrator.  At the time of my assignment, the MCJ held a daily population in excess of 7,000 inmates, including a hospital, which was serviced by a staff of more than 900 sworn and civilian personnel.

During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I worked closely with the State of California Peace Officer Standards and Training in revamping our Reserve Academy to bring it into state compliance.  This process gave me an expertise in the POST Basic curriculum.  I also supervised the training of cadets at our Reserve Training Academy.  They were taught proper investigation, interview, and apprehension procedures.  Among other topics, I lectured the Reserve Academy on the POST syllabus: "The Legal and Moral Use of Force and Firearms."

During the 1984 Olympics held in Los Angeles, I was assigned and served as the Department's Intelligence Officer at the Los Angeles Olympics Emergency Operations Center.

During the last five and one half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major (career) criminals. I held this position until my retirement from the Department on March 31, 1993.

Criminals investigated and arrested by N.O.R.S.A.T. included suspects involved with homicide, robbery, kidnaping, extortion, burglary, major narcotics violations and police corruption. The majority of our cases were homicide cases, including the murder of police officers. Arrests frequently occurred in dynamic circumstances including crimes in progress.

My unit also conducted major narcotics investigations including undercover narcotics buys, buy busts, and reverse stings. We frequently deployed at the request of investigative units, such as Narcotics, which provided the initial investigative leads for our operations. These narcotics cases usually involved multiple kilogram quantities of drugs and amounts of money ranging from one hundred thousand to more than one million dollars.

Approximately 80% of cases assigned to N.O.R.S.A.T. were active Homicide investigations. In that regard, the unit processed, under my command and supervision, various aspects (depending on the complexity of the cases involved) of approximately 1,000 Homicides ranging from deaths of police officers to serial homicide suspects.

Additionally, the majority of the over 1550 cases for which I have been retained as a consultant (since 1993) have involved injuries or deaths connected with some aspect of force during either apprehension or while in police custody.

During the first three months of my command of N.O.R.S.A.T., the unit had three justifiable shooting incidents. From that time, and over the next five years of my command, N.O.R.S.A.T. established a remarkable record of more than two thousand arrests of career criminals without a single shot fired – either by my officers or by the suspects whom we arrested.

Many of these suspects were armed and considered to be very dangerous. Some were apprehended during the course of their crimes and were very prone to use firearms to escape apprehension. This record of excellence was accomplished through the use of proper tactics, management and supervision of personnel, training in correct apprehension methods, and adherence to the moral and ethical standards endorsed by

California POST and my Department.  These methods and principles are also embraced by every state training commission of which I am aware, as well as the national standards established by the U.S. Department of Justice.

As a result of my position and record as the commanding officer of N.O.R.S.A.T., I was assigned to author Field Operations Directive 89-3, "Tactical Operations Involving Detective Personnel."  This order remained in force 20 years (until September 30, 2009), and included the basic standards and considerations with which investigative officers must comply in the event of a tactical deployment such as the dynamic entry into a building for the purpose of an arrest and/or seizure of evidence.

Since my retirement, I have testified as an expert on use of force, jail procedures and jail administration, investigations, police procedures, police tactics, investigative procedures, shooting scene reconstruction, and police administration in Arizona State Courts, California State Courts, Washington State Courts and Federal Courts in Arizona, California, Colorado, Florida, Illinois, Indiana, Louisiana, Missouri, Nevada, Ohio, Oregon, Pennsylvania, Texas, Utah, Washington, New Mexico, New York and Wisconsin.  I have testified before the Los Angeles Police Department Board of Rights and the Los Angeles County Civil Service Commission.  I have testified before the Harris County (Texas) Grand Jury and the Cleveland Grand Jury.  I have also submitted written opinions in matters before Alaska, Delaware, Idaho, Montana, North Carolina, New York, Oregon, Kentucky, and Wyoming Federal and State Courts.  I was selected (January 20, 2007) to present on the topic of: "Police Experts" at the National Police Accountability Project held at Loyola Law School, Los Angeles, California.  I was selected (September 23, 2010) to present on the topic of: "Using POST Modules to Establish Police Officer' Standard of Care" at the National Police Accountability Project, National Lawyers Guild Convention, in New Orleans, Louisiana.  I was selected (March 30, 2012) to present to the Kern County Public Defenders in Bakersfield, California, on the topics of "Ethics, Police Investigations, the California POST Curriculum, and the M26 and X26 Taser weapons."  On August 7, 2013 I was invited and presented to the Texas Civil Rights Project (TCRP) 2013 Annual Legal Summit in Austin, Texas on the topic: "Ethically Working with Experts from the Prospective of a Police Expert."  On October 15, 2015 I was the invited presenter at a Community Forum in Victorville, California on the topics of Police Procedures, Community Policing, Use of Force, and features of the M26, X26 and X2 Taser weapons.

I have worked on several projects with the Paso Del Norte (El Paso, Texas) Civil Rights Project and the Texas Civil Rights Project (Austin, Texas).  As a result of my expert testimony in *Border Network, et al. v. Otero County, et al.*, Case No. 07-cv-01045 (D.N.M. 2008), a federal court issued a temporary injunction to stop the illegal and widespread immigration raids in Chaparral, New Mexico, implemented pursuant to Operation Stonegarden.  The case resulted in the adoption of a model policy for inquiring into a person's immigration status, which has been adopted nationwide and has also been

presented to the United States Senate, the Secretary of Homeland Security, and other government officials seeking to reform immigration enforcement.

I have been recognized, and my expert report was quoted by the USDC in *Burns v. City of Redwood City*, 737 F.Supp2nd.1047. I have been recognized, and my expert report was quoted by, the United States Court of Appeals for the Ninth Circuit as an expert in Police Administration and Use of Force in *Blankenhorn v. City of Orange, et al.*, 485 F.3d 463, 485 (9th Cir. 2007). The Ninth Circuit also drew from my expert report in another published case involving Police Detective Investigations. *Torres, et al. v. City of Los Angeles, et al.*, 540 F.3d 1031, 1042-43 (9th Cir. 2008). The *Torres* case was appealed to the U.S. Supreme Court and returned for trial. I provided the expert opinion in *Chavies Hoskin v. City of Milwaukee, et al.* (USDC Case No. 13-cv-0920), regarding field strip and cavity searches, hiring, training, discipline and supervision, and which resulted in significant policy changes within the MPD. My opinions supported argument in the Ninth Circuit case: *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1102 (9th Cir. 2014). The Ninth Circuit also drew from my expert reports regarding credible threats justifying the use of force, *Hayes v. County of San Diego*, 658 F.3d 867 (9th Cir. 2011), and *Young v. County of Los Angeles*, 655 F.3d 1156 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding Jail Administration and Administrative Responsibilities, *Starr v. Baca*, 652 F.3d 1202 (9th Cir. 2011). The Ninth Circuit also drew from my expert reports regarding an officer's violation of the 14th Amendment if an officer kills a suspect when acting with the purpose to harm, unrelated to a legitimate law enforcement objective, in *AD v. California Highway Patrol*, 712 F. 3d 446 (9th Cir. 2013). The Fifth Circuit drew from my expert report regarding search and seizure, investigations and no-knock requirements in *Bishop et al. v. Arcuri et al.*, 674 F.3d 456 (5th Cir. 2012). The Ninth Circuit also drew from my expert report regarding the use of impact weapons (PepperBall) on civilians in *Nelson v. City of Davis*, 685 F.3d 867 (9th Cir. 2012). I was the expert in the Ninth Circuit opinion regarding the allegations proffered by police officers and their use/display of firearms against civilians in *Green v. City and County of San Francisco*, 751 F. 3d 1039 (9th Cir. 2014). I was the expert in an important Ninth Circuit opinion regarding the allegations proffered by police officers and their use of lethal force against unarmed persons in *Jennifer Cruz, et al., v. City of Anaheim, et al.*, 765 F.3d 1076 (9th Cir. 2014). I was the expert at trial in the Ninth Circuit opinion regarding the order of evidence at trial in *Estate of Manuel Diaz, v. City of Anaheim*, et al., No. 14-55644. My opinion is quoted in the Ninth Circuit opinion regarding the use of lethal force in *A.K.H. a minor, et al, v. City of Tustin, et al.*, No. 14-55184. My opinions supported argument in the Ninth Circuit case: *Estate of Angel Lopez, et al., v. Kristopher Michael Walb*, No. 14-57007 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Estate of Shakina Ortega, et al., v. City of San Diego, et al.* No. 14-56824 (not for publication) wherein the Ninth Circuit Affirmed the Denial of Summary Judgement by the District Court. My opinions supported argument in the Ninth Circuit case: *Jerry Newmaker, et al., v. City of Fortuna,*

*et al.* No. 14-15098 (for publication). My opinions supported argument in the Ninth Circuit Case: *Tonya E. Shirar, v. Miguel Guerrero, et al.* regarding use of lethal force and "suicide by cop," No. 15-55029 (not for publication). My opinions supported argument in the Ninth Circuit Case *Angel Mendez; Jennifer Lynn Garcia, v County of Los Angeles, et al.,* Nos. 13-56686, and 13-57072 (for publication) and which was settled before the Supreme Court, No. 16-369, regarding the use of lethal force and searches. My opinions supported argument in the Ninth Circuit case: *Chien Van Bui, et al, v City and County of San Francisco, et al*, No. 14-16585 (not for publication), regarding the use of lethal force. My opinions supported argument in the Sixth Circuit opinion, Case No. 16-5322*, Carey Woodcock v. City of Bowling Green, et al,* Originating Case No. 1:13-cv-00124 regarding the use of lethal force. My opinions supported argument in the Ninth Circuit opinion, Case No. No. 14-17388 (for publication), *Johnathan Jones, et al v. Las Vegas Metropolitan Police Department, et al,* Originating Case No. 2:12-cv-01636-regarding the use of lethal force and Taser weapons. My opinions supported argument in the Ninth Circuit opinion, Case No. 16-15606 (for publication), *Christian Longoria, et al v. Pinal County, et al,* Originating Case No. 2:15-cv-00043, PHX SRB, regarding the use of lethal force after a vehicle pursuit. My opinions supported argument in the Ninth Circuit case: *S. B. v. County of San Diego,* 864 F.3rd 1010 (9th Cir. 2017), (for publication) regarding issues of qualified immunity. I was recently once again recognized by the Ninth Circuit for my expertise in police practices and training and expert report was quoted in the area of officer training regarding mentally ill subjects, tactical conduct, and use of lethal force. *Tabares v. City of Huntington Beach, et al.*, Case No. 19-56035 (for publication). My opinions supported argument in the Tenth Circuit case: *Russell Tenorio v. Brian Pitzer,* Case No. 2012-CV-01295 (U.S. Supreme Court No. 15-795) regarding issues of qualified immunity and use of deadly force.

The California Court of Appeal (Second Appellate District) drew in part from my expert report regarding search warrant service, *Macias v. County of Los Angeles*, 144 Cal. App.4th 313, 50 Cal. Rptr.3d 364 (2006). The California Supreme Court drew in part from my expert opinion regarding police tactics and the use of deadly force, *Hayes et al. v. County of San Diego et al.*, 57 Cal.4th 622 (2013).

On February 10, 1989, I was personally commended at the Los Angeles County Hall of Administration by United States Attorney General, the Honorable Edwin Meese III, for my work to establish California Penal Code Section 311.11 (forbidding the Possession of Child Pornography). On February 22, 1993 (at the time of my retirement), Mr. Meese presented a second personal commendation for the success of this critical five-year effort to bring this law into effect. California Penal Code Section 311.11 is required training for all Law Enforcement Officers in California and taught extensively in the POST Basic Learning Domain #9: "Crimes Against Children,"pages 1-18 to pages 1-21.

On December 7, 2015 I was requested by the Cleveland District Attorney to present my opinions to the Cleveland Grand Jury regarding the November 22, 2014 shooting death

of Tamir Rice by City of Cleveland police officers.  In March, 2016 I was requested by the Delaware Attorney General to review and provide my opinions regarding the shooting death of Jeremy McDole.  The AG report was published May 12, 2016.

I have been found competent by both Federal and State Courts to render opinions as to responsibilities as occurred in this case.  A number of my cases have involved law enforcement officers as civil plaintiffs and as criminal defendants.

Since my retirement, I have become an expert in the features and the use of TASER International's products, including the Model M26, Model X26 and Model X2 ECDs.  I own each, along with the download software.  I have reviewed all the TASER training materials and am familiar with the risks and tactics associated with these potentially lethal devices.  I have qualified as an expert on TASER products and testified both in deposition and before juries on their usage.  Two published examples are *Lee v. Nashville*, 596 F. Supp. 2d 1101, 1121-22 (M.D. Tenn. 2009), and *Heston v. City of Salinas*, 2007 U.S. Dist. LEXIS 98433, *25-*26 (E.D. Cal. 2007).  My most recent Federal acceptance/certifications as an expert in the general use and deployment of the TASER weapon (including Taser International product warnings/bulletins sent to every agency using the Taser weapon) occurred in Los Angles, California on November 7, 2017 in *William Mears, et al., v. City of Los Angeles, et al*, USDC Case No.: CV 15-08441 JAK (AJWx) and on February 22, 2018 in *Maria Hernandez; A.J., Jr., et al, v. City of Los Angeles, et al,* USDC Case No. 2:16-c-02689 AB (JEMx), and on May 3, 2018 in Heleine Tchayou, et al. v. City of Los Angeles, et al., Case No. 16-cv-06073-TJH-MRW.  There are many others.

Attached is a statement listing my law enforcement qualifications and experience; my fee schedule; and a listing of matters in which I have testified in the last four years as an expert.

I reserve the right to modify my opinions to the extent additional information is provided.

Roger A. Clark

I declare under penalty of perjury that the foregoing is true and correct.  Executed January 30, 2025, at Santee, CA.