**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
Hang D. Le, Esq. (Bar No. 293450)
hlee@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

Attorneys for Plaintiffs
L.C., I.H., A.L., and Antonia Salas Ubaldo

# UNITED STATES DISTRICT COURT FOR THE
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.C., a minor by and through her guardian *ad litem* Maria Cadena, individually and as successor-in-interest to Hector Puga; I.H., a minor by and through his guardian *ad litem* Jasmine Hernandez, individually and as successor-in-interest to Hector Puga; A.L., a minor by and through her guardian *ad litem* Lydia Lopez, individually and as successor-in-interest to Hector Puga; and ANTONIA SALAS UBALDO, individually;<br><br>Plaintiffs,<br>vs.<br><br>STATE OF CALIFORNIA; COUNTY OF SAN BERNARDINO; S.S.C., a nominal defendant; ISAIAH KEE; MICHAEL BLACKWOOD; BERNARDO RUBALCAVA; ROBERT VACCARI; JAKE ADAMS; and DOES 6-10, inclusive,<br><br>Defendants. | Case No. 5:22-cv-00949-KK-SHK<br><br>*Honorable Kenly Kiya Kato*<br><br>**DECLARATION OF ROGER A. CLARK** |

I, Roger A. Clark, hereby declare as follows:

1. I am an expert specializing in the procedures of police practices and proper police tactics, including proper procedures for the detention and arrest of individuals and the type and degree of force, if any, appropriate under different circumstances.

2. I am a competent adult and personally familiar with the facts contained herein and would and could competently testify thereto if called upon to do so.

3. My opinions are based in part on my training, professional experience, and education. I am a twenty-seven year veteran of the Los Angeles County Sheriff's Department. I was hired on December 1, 1965, and I retired from active service on March 31, 1993. My career included six years at the rank of Deputy Sheriff, six years as a Sergeant, and fifteen years as a Lieutenant. I hold a California Peace Officer Standards and Training ("P.O.S.T.") Advanced Certificate, and I am a graduate of the P.O.S.T. Command College (class #5).

4. As a Sergeant and as a Lieutenant, I served on the training staff of the Los Angeles County Sheriff's Department's Patrol School which taught the P.O.S.T. accepted investigation and apprehension methods.

5. During my assignment as the Administrative Lieutenant of the Department's Reserve Forces Bureau, I supervised the training of cadets at our Reserve Training Academy. They were taught proper investigation, interview, and apprehension procedures. I also lectured the Reserve Academy on the P.O.S.T. syllabus: "The Legal and Moral Use of Force and Firearms."

6. During the last five and one-half years of my career, I commanded a specialized unit known as the North Regional Surveillance and Apprehension Team (N.O.R.S.A.T.), which was created to investigate, locate, observe and arrest major career) criminals. I held this position until my retirement from the Department on March 31, 1993. The majority of our cases were homicide cases. Arrests frequently occurred in dynamic circumstances including crimes in progress.

7. As a Watch Commander and as a Lieutenant, I responded to, investigated, and reported on the use of force and officer-involved shootings.

8. Since my retirement, I have testified as an expert on jail procedures and jail administration, police procedures, police tactics, investigative procedures, shooting scene reconstruction, trajectory, use of force issues, and bullet casings in Arizona State Courts, California Courts, Washington State Courts and Federal Courts in California, Texas, Colorado, Illinois, Indiana, Pennsylvania, and Washington.

9. Prior to forming my opinions regarding the February 17, 2021 officer-involved shooting of Hector Puga, Jonathan Wayne Botten, Sr., Tanja-Dudek Botten, and J.B., I reviewed the police reports, photographs of the scene, CHP dashcam videos, bystander cellphone videos, deposition transcripts, and other related materials.

10. At the time of this incident on February 17, 2021, P.O.S.T., basic police officer training on deadly force, and California law surrounding deadly force included the following:

    a. A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary to defend against an imminent threat of death or serious bodily injury to the officer or to another person. (Penal Code Section 835a(c)(1)(A); LD 20: Chapter 4—Deadly Force, page 4).

    b. A threat of death or serious injury is imminent when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how

great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)).

c. <u>Totality of the Circumstances</u> means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force. (Penal Code Section 835a(e)(3)).

d. According to Penal Code Section 835a, fear alone does not justify the use of deadly force. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that from appearances, must be instantly confronted and addressed.

e. As taught in P.O.S.T., courts have held the following: A simple statement of fear for the officer's safety is not enough; there must be objective factors to justify the officer's concern. The use of deadly force must be objectively reasonable. The use of deadly force must be based on the facts and circumstances known to the officer at the time. (LD 20: Chapter 4—Use of Deadly Force, pages 7-8).

f. "Unreasonable fear" includes overreactions, and an overreaction in using deadly force can be a use of excessive force. LD 20: Chapter 4—Use of Deadly Force, page 7).

g. The officer must give some warning prior to the use of deadly force, where feasible. (LD 20: Chapter 4—Use of Deadly Force, page 5).

h. Another factor that may determine reasonableness in a use of force incident includes the availability of other objectively reasonable force options. (LD 20: Chapter 4—Use of Deadly Force, page 5).

i. An officer must justify every shot he or she fires.

11. After reviewing the relevant materials in this case, and based on my training background and experience, it is my opinion that the tactics used by CHP

Sergeant Isaiah Kee, CHP Officer Bernardo Rubalcava, CHP Officer Michael Blackwood, SBSD Deputy Jake Adams, and SBSD Sergeant Robert Vaccari violated standard police practices and training, which contributed to or was a cause of the shooting of Hector Puga, Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B.

12. Sergeant Vaccari violated standard police practices and training when he deployed pepper balls to strike Mr. Puga and struck Mr. Puga in the face. It is my opinion that Sergeant Vaccari lacked basic situational awareness and violated standard police practices and training when he deployed the pepper ball launcher and struck Mr. Puga in the eye. The San Bernardino Sheriff's Department guidelines for using the pepper ball launcher directs deputies to anticipate that the suspect will lower his head, target from the upper torso down or alternatively target surrounding objects, justify each use of force, and importantly, to not shoot at the head, neck or spine unless a deadly force situation exists and the use of force is within the Department policy. During the period of time Sergeant Vaccari deployed the pepper balls into the Expedition, he stated that he would observe Mr. Puga on occasions, lower his head down low and at times stick his back between the two seats. Sergeant Vaccari stated that at one point, he specifically intended deploy a pepper ball to strike Mr. Puga. several witnesses, including Sergeant Vaccari, stated that they heard Mr. Puga exclaim that he had been hit in the eye. Officer Blackwood testified that he later observed a cut or blood around Mr. Puga's eye area, consistent with him being struck in the eye by a pepper ball round. SBSD guidelines directs its deputies to not shoot at the head unless a deadly force situation exists. Here, it is undisputed that Mr. Puga did not pose an immediate threat of death or serious bodily injury at the time Sergeant Vaccari deployed the pepper ball launcher and struck Mr. Puga in the eye. It is my opinion that had Sergeant Vaccari exercised better tactics, Mr. Puga would not have suffered injuries to his eye from the pepper ball launcher.

13. It is my opinion that the officers' failure to follow standard police practices and training in dealing with barricaded subjects, poor tactics, and rushing to take Mr. Puga into custody once he was outside of the vehicle all contributed to the officers' unnecessary use of lethal force.

    a. Officers are trained that they are responsible for their tactical decisions when they resort to the use of lethal force.

    b. The officers failed to formulate a safe tactical plan, made poor tactical decisions, and limited their tactical options, ultimately leading to their unnecessary use of lethal force. The officers failed to communicate with each other to formulate a plan on extracting Mr. Puga from the Expedition and what to do when Mr. Puga exited the Expedition. The officers failed to communicate with each other and advise each other of their plan to apprehend Mr. Puga prior to approaching Mr. Puga at the front of the vehicle.

    c. POST Learning Domain 23, "Crimes in Progress," advises officers that if available, officers should request specialized units and resources as soon as it has been determined that the suspect has taken a barricaded position. SWAT specifically trains to respond to incidents where subject(s) may be armed, barricaded, and refusing to submit to arrest. The utilization of San Bernardino Sheriff's Department SWAT would have been a safer alternative. SWAT is equipped with special training, equipment, and tools, which can help resolve the situation of a barricaded subject without escalating the situation.

    d. Given that the officers believed that Mr. Puga was involved in a prior freeway shooting, was still armed, was refusing to exit his vehicle, and was situated in a residential neighborhood, Sergeant Vaccari's failure to request for SWAT to respond when initially requested by Sergeant Kee and after initial less-lethal force was unsuccessful were poor

|   |   |
|---|---|
| 1 | tactical decisions that contributed to the officers' use of unnecessary |
| 2 | lethal force. |
| 3 | e. Among the "Fatal Errors" listed by POST Learning Domain 23, |
| 4 | "Crimes in Progress," is poor positioning due to rushing or poor tactics. |
| 5 | The officers' decision to leave cover and enter an open-air environment |
| 6 | to take Mr. Puga into custody, when the officers stated that they still |
| 7 | believed Mr. Puga to be armed and dangerous, and Sergeant Kee stated |
| 8 | that he was in fear for his life at the time he made the decision to |
| 9 | approach and take Mr. Puga into custody, was a tactically poor |
| 10 | decision. The situation did not call for an urgent response at the time |
| 11 | the officers approached Mr. Puga. |

14. Officers are trained that deadly force is only justified when there is an objectively reasonable belief that the suspect poses an immediate threat of death or serious bodily injury, and that subjective fear is insufficient to use deadly force.

15. Officers are also trained that an overreaction is excessive force.

16. It is my opinion that under the facts and circumstances as alleged by Sergeant Kee at the time he initially shot Mr. Puga that Sergeant Kee violated standard police practices and training when he shot at Mr. Puga when he saw Mr. Puga drop his right hand from a raised position. It is my opinion that Sergeant Kee overreacted when he saw Mr. Puga drop his right hand from a raised position. The percipient witness' cell phone video, labeled COSB0001459, shows Mr. Puga's frontside as he exits the car and there appears to be no weapon on or near Mr. Puga's waistband. Witness Betzabeth Gonzalez testified that when Mr. Puga stepped out of the vehicle, she was able to see his whole body and saw that he did not have a gun in his hands or in his waistband. Several witnesses testified that throughout the time Mr. Puga was outside of the Expedition, they observed Mr. Puga drop his hands from raised position several times. Deputy Adams observed Mr. Puga drop his hands several times towards his waist and thought Mr. Puga was pulling his

pants or adjusting his waistband or reaching into his pockets. In a percipient witness's cell phone video of the incident, Mr. Puga can be seen dropping his right hand to his waist at least twice before the officers approached. Additionally, it is undisputed that Mr. Puga never verbally threatened any of the officers or anyone else. Under these circumstances, the initial shooting by Sergeant Kee when Mr. Puga dropped his right hand from a raised position was inappropriate because Mr. Puga did not have the gun in his hand, and a gun was neither coming in the direction of Sergeant Kee or anyone nor was a gun pointed at Sergeant Kee or anyone.

17. Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they shot at Mr. Puga while he was running away. Mr. Puga did not present an immediate threat of death or serious bodily injury as he was running and the officers failed to reassess and overreacted when they fired subsequent volleys when Mr. Puga was running.

    a. Officers are trained that deadly force may only be used in an immediate defense of life situation. Under the facts of this case, there was no immediate defense of life situation while Mr. Puga was running away. There were no bullet impacts or casings found near the area of the initial shooting that would support the allegation that Mr. Puga fired a weapon at anyone. Several different video sources captured Mr. Puga running from the Expedition until he ultimately fell to the ground. The videos show Mr. Puga running straight ahead, with both arms pumping back and forth in a running motion; never turning around towards the officers and never pointing either hand back toward the officers.

    b. When Officer Rubalcava was initially asked what Mr. Puga doing with the gun as he was running that caused Officer Rubalcava to shoot, Officer Rubalcava answered, "Nothing."

    c. Officers are trained that they may use deadly force against a fleeing suspected felon to prevent escape only if the officer has probable cause

to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others. Percipient witnesses testified that they never saw Mr. Puga aggressively reach for anything, point a gun, or was holding a gun in either hand while he was running. It is undisputed that Mr. Puga never verbally threatened anyone. Additionally, Mr. Puga was running in the middle of the street and not close to any residence nor about to enter any residence when the officers shot him.

    d. There is evidence that this was likely a situation of contagious fire.

18. Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they shot at Mr. Puga after he had fallen to the ground.

    a. Mr. Puga was not an immediate threat of death or serious bodily injury after he had fallen to the ground. The officers testified and agreed that Mr. Puga was no longer an immediate threat after he had fallen to the ground.

    b. Several shots were fired after Mr. Puga had gone to the ground. It is estimate that approximately 5 to 15 shots were fired after Mr. Puga had fallen to the ground.

    c. Although no officer admitted to firing at Mr. Puga after he had gone to the ground, it is undisputed that Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams discharged their weapons and that shots were fired at Mr. Puga after he had gone to the ground.

19. Officers are trained that a warning that deadly force is going to be used should be given when feasible. It is my opinion that the officers had time to provide Mr. Puga with a warning that deadly force was going to be used prior to the shooting as the officers were able to issue commands to "get your hands up" prior to the shooting. Additionally, the officers also had time to provide an additional

1 | warning that deadly force was going to be used in between their first and subsequent
2 | volleys of shots as Puga was simply running and then fell to the ground after being
3 | struck by shots.
4 |     20.    Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy
5 | Adams violated standard police practices and training when they failed to consider
6 | their background prior to utilizing deadly force, resulting in the serious injuries of
7 | innocent bystanders Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B.
8 | Police officers are trained to consider their background prior to utilizing deadly
9 | force. The Los Angeles Police Department utilizes an acronym for required
10 | considerations before using a firearm: B.A.L.K.S.: Background (who and what is
11 | behind your target), Age of suspect (adult vs. juvenile, elderly, etc.), Last resort (all
12 | other options have been depleted or would not be practical, Knowledge of the crime
13 | (how certain you are about the crime and the suspect's connection to the crime), and
14 | Seriousness of the crime (felony vs. misdemeanor). Here, the officers knew or
15 | should have known that they were stopped in a residential neighborhood with
16 | houses on four corners of the intersection. They failed to consider their background
17 | when they fired several volleys of shots at Mr. Puga. This tactical failure resulted in
18 | the serious injuries of Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B.,
19 | who were inside their home at the time of the shooting.
20 |     21.    The officers violated standard police practices and training in failing to
21 | request backup to set up a perimeter and evacuate uninvolved individuals from the
22 | area in order the ensure the safety of these uninvolved individuals. It is my opinion
23 | that the officers' failure to follow standard practices and training in responding to
24 | high-risk situations involving barricaded suspects by requesting backup, setting up a
25 | perimeter, and evacuating all uninvolved individuals from the area contributed to the
26 | injuries suffered by the Botten family.
27 |     a. POST Learning Domain 23 advises officers that the safety of
28 |        uninvolved individuals must be the principal concern to officers who

respond to high-risk situations involving barricaded suspects. Thus, POST Learning Domain 23 advises officers to systematically evacuate all uninvolved individuals from the area, relocate them to a safe location, determine the identification of each, and debrief those individuals who could provide additional information relevant to the situation.

    b. Despite the officers were dealing with Mr. Puga for over an hour in the residential neighborhood, they failed to take steps to ensure the safety of the residents of that neighborhood. The officers failed to request additional backup to set up a perimeter and systematically evacuate the residents in the surrounding houses despite dealing with a potentially armed, barricaded subject who they believed to have been involved in an earlier freeway shooting.

    c. A reasonably trained officer facing the same circumstances would have requested backup and additional resources in order to deal with a potentially armed, barricaded subject in order to ensure the safety of all uninvolved individuals in the area.

22. Sergeant Vaccari's two-time deployment of the Taser at Mr. Puga after he had been shot twice and was clearly incapacitated without prior verbal warning violated standard police practices and training.

    a. The San Bernardino Sheriff's Department Manual advises its deputies that a Taser may only be used when objective facts indicate that the suspect poses an immediate threat to the safety of the officer or a member of the public. Sergeant Vaccari testified that he does not recall ever giving a verbal warning prior to deploying the Taser. At the time of the initial Taser deployment, it was clear that Mr. Puga had been struck and fallen by gunfire, was clearly incapacitated, and was no longer an immediate threat to anyone. Additionally, according to

percipient witness Erin Mangerino, Mr. Puga's hands were not concealed but visibly next to his body.

b. Officers are also trained on the concept of "cuffing under power" in which an officer can safely go in and handcuff a suspect while the suspect is under effects of the neuromuscular incapacitation of the Taser. Thus, it is my opinion that the second Taser deployment violated standard police practices and training because it was clear from the first Taser deployment that Mr. Puga was incapacitated when his muscles responded to the Taser deployment but he did not respond, no verbal warning was given prior to the second Taser deployment, and Sergeant Vaccari admits that the second deployment would have been unnecessary had he considered at the time to go in and handcuff Mr. Puga while he was under the power of the Taser during the first Taser deployment.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed this 26th day of February 26, 2025, in Santee, California.

*Roger A. Clark*
Roger A. Clark