1  Rob Bonta
   Attorney General of California
2  Norman D. Morrison
   Supervising Deputy Attorney General
3  Diana Esquivel
   Deputy Attorney General
4  State Bar No. 202954
     1300 I Street, Suite 125
5    P.O. Box 944255
     Sacramento, CA 94244-2550
6    Telephone:  (916) 210-7320
     Facsimile:  (916) 322-8288
7    E-mail:  Diana.Esquivel@doj.ca.gov
   *Attorneys for Defendants State of California, by and*
8  *through the California Highway Patrol, Blackwood,*
   *Kee, and Rubalcava*
9

10          IN THE UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                  EASTERN DIVISION

13

14  | **L.C., et al.,** | No. 5:22-cv-00949 KK (SHKx) |
15  |                    |                             |
    | Plaintiffs,        | **STATE DEFENDANTS'**       |
16  |                    | **RESPONSE TO PLAINTIFFS'** |
    | **v.**             | **STATEMENT OF GENUINE**    |
17  |                    | **DISPUTES**                |
    | **STATE OF CALIFORNIA, et al.,** | Date:      March 20, 2025 |
18  |                    | Time:      9:30 a.m.        |
    | Defendants.        | Courtroom: 3 (3rd Floor)    |
19  |                    | Judge:     Hon. Kenly Kiya Kato |
    |                    | Trial Date: June 2, 2025    |
20  |                    | Action Filed: June 7, 2022  |
21

22          Defendants State of California, by and through the California Highway Patrol

23  (CHP), Michael Blackwood, Isaiah Kee, and Bernardo Rubalcava (State

24  Defendants) respond to Plaintiffs' statement of genuine disputes as follows:

25

26

27

28

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 224.    On February 17, 2021, CHP officers Bernardo Rubalcava and Michael Blackwood initiated a pursuit of a white Expedition due to it matching the description of a vehicle that had been involved in a prior freeway shooting. *Ex. 1 to Le Decl., Kee Dep. 14:6-9, 75:3-17; Ex. 3 to Le Decl., Blackwood Dep. 51:3-10.* | Undisputed. |
| 225.    CHP Sergeant Isaiah Kee also joined the pursuit. *Ex. 1 to Le Decl., Kee Dep. 75:13-17.* | Undisputed. |
| 226.    San Bernardino County Sheriff's Department received a call from dispatch requesting assistance with the pursuit. Ex. 5 to Le Decl., Vaccari Dep. 18:23-19:3. | Undisputed. |
| 227.    SBSD Sergeant Robert Vaccari and Deputy Jake Adams joined the pursuit to assist. *Ex. 4 to Le Decl., Adams Dep. 9:12-13; Ex. 5 to Le Decl., Vaccari Dep. 18:17-19:3.* | Undisputed. |
| 228.    CHP requested that SBSD take over the pursuit but Vaccari declined because he did not know the details of the alleged crime and did not know what CHP's policies and procedures were for trading or taking over a pursuit and did not want CHP to drop out of the pursuit in the event he agreed to take over. *Ex. 6 to Le Decl., Vaccari Int. 12:22-13:3* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 229.    There was little to no traffic on the road and no passing pedestrians during the pursuit. *See Ex. D to Esquivel Decl., Blackwood MVARS, Part 1; Ex. E to Esquivel Decl., Blackwood MVARS, Part 2.* | Disputed that there was little to no traffic.<br><br>"Any high-speed pursuit is inherently dangerous to the lives of the pursuing police officers." *People v. Howard*, 34 Cal. 4th 1129, 1140 (2005). Further, Plaintiffs ignore that Puga, on a number of occasions during the pursuit, was driving on the wrong side of the street and failing to stop a numerous stop signs in residential areas, including with oncoming traffic. *See, e.g., Blackwood MVARS, Part 2 at 00:22-0:33, 02:06-02:09, 04:34-04:38, 18:24-18:31, 19:44-19:52, 23:16-23:32, Ex. E to Esquivel Decl.* Puga's highspeed, reckless driving created an obvious dangerous condition for the public and the officers involved in the pursuit. |
| 230.    The white Expedition never targeted any of the officers nor forced other vehicles off the road during the pursuit. *See Ex. D to Esquivel Decl., Blackwood MVARS, Part 1; Ex. E to Esquivel Decl., Blackwood MVARS, Part 2.* | Undisputed that Puga did not attempt to hit any of the CHP patrol vehicles with his vehicle, but disputed that his not doing so made him any less dangerous. "Any high-speed pursuit is inherently dangerous to the lives of the pursuing police officers." *People v. Howard*, 34 Cal. 4th 1129, 1140 (2005). |
| 231.    The white Expedition's speed during the pursuit was fast but not outrageous as even on the freeway, the Expedition was only going 80 miles per hour. *Ex. 6 to Le Decl., Vaccari Int. 13:22-24; Ex. 4 to Le Decl., Adams Dep. 12:3-13.* | Disputed. Going 80 mph in commercial and residential areas is obviously "outrageous." Further, as Officer Blackwood's MVARS show, Puga's car was constantly swaying and veering into the opposite lane because of the speed Puga was going. "Any high-speed pursuit is inherently dangerous to |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | the lives of the pursuing police officers." *People v. Howard*, 34 Cal. 4th 1129, 1140 (2005);*see, generally*, *Blackwood MVARS, Parts 1-3, Ex. D-F to Esquivel Decl.* |
| 232.    At some point during the pursuit, Vaccari requested SBSD's police helicopter to join the pursuit and the helicopter did join the pursuit. *Ex. 6 to Le Decl., Vaccari Int. 15:6-11.* | Undisputed. |
| 233.    As the pursuit continued down the dirt road, the Expedition's driving was not erratic. *Ex. 6 to Le Decl., Vaccari Int. 16:6-8.* | Disputed and vague as to time. As Officer Blackwood's MVARS show, Puga's car was constantly swaying and veering into the opposite lane because of the speed Puga was going. "Any high-speed pursuit is inherently dangerous to the lives of the pursuing police officers." *People v. Howard*, 34 Cal. 4th 1129, 1140 (2005);*see, generally*, *Blackwood MVARS, Parts 1-3, Ex. D-F to Esquivel Decl.* |
| 234.    The officers did not see any weapon in the white Expedition during the pursuit. *Ex. 1 to Le Decl., Kee Dep. 16:16-18; Ex. 4 to Le Decl., Adams Dep. 12:14-17* | Undisputed as to Officer Kee. |
| 235.    Spike strips were successfully deployed on the Expedition around Main Street. Ex. F to Esquivel Decl. at 8:25; Ex. 6 to Le Decl., Vaccari Int. 17:2-3. | Undisputed. |
| 236.    The Expedition then turned north onto Peach and slowed down significantly, traveling | Undisputed that the Puga turned north onto Peach. Dispute any implication that Puga voluntarily reduced his speed |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| approximately 5 to 10 miles per hour before coming to a stop at the intersection of Peach and Catalpa. *Ex. F to Esquivel Decl. at 8:25-9:12; Ex. 6 to Le Decl., Vaccari Int. 17:4-6, 17:15-19; Ex. 1 to Le Decl., Kee Dep. 16:22-24.* | and stopped. The spike strip disabled Puga's vehicle. *Blackwood MVARS, Part 3 at 07:50-09:13, Ex. F to Esquivel Decl.* |
| 237.    The helicopter continued to orbit overhead for approximately 30 minutes, illuminating the middle of the intersection where the two streets cross and the four homes on the corners. *Ex. 1 to Le Decl., 28:7-15; Ex. 3 to Le Decl., Blackwood Dep. 59:23-61:1.* | Undisputed that helicopter continued to orbit for about 30 minutes and illuminated the intersection. Disputed that it illuminated the homes on the corners of the intersection. Blackwood Dep. 6015-21, Ex. 3 to Le Decl.; *Blackwood MVARS Part 3 at 09:00-37:30, Ex. F to Esquivel Decl.; Blackwood MVARS Part 4 at 00:00-13:04, Ex. G to Esquivel Decl.* |
| 238.    The house on the northeast corner, ("Botten Residence") had its porch light on and the helicopter's spotlight would occasionally illuminate the entire house while it orbited overhead. *Ex. C to Esquivel Decl., 12:56-13:13, 13:41-13:46, 14:15-14:25; Ex. 7 to Le Decl., Mangerino Dep. 56:1-10.* | Undisputed that the Botten residence had the porch light on and that the helicopter's spotlight illuminated certain portions of the house. Disputed that the spotlight illuminated the entire house on occasion. *Kee MVARS Part 1 at 38:50-1:04:20, Ex. B to Esquivel Decl.; Kee MVARS Part 2 at 00:00-16:45, Ex. C to Esquivel Decl.* |
| 239.    There was also a streetlight on the corner of Peach and Catalpa as well as the patrol vehicles' spotlights and red and blue lights illuminating the area. *Ex. 2 to Le Decl., Rubalcava Dep. 37:8-15; Ex. 7 to Le Decl., Mangerino Dep. 40:17-41:6.* | Disputed only to the extent that the phrase "illuminating the area" is vague. The northeast corner of the intersection was still dark despite the lighting. *Rubalcava Dep. 101:13-103:3, Ex. Q to Esquivel Suppl. Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 240.    At the time of the incident, the officers were aware they had stopped in a residential neighborhood. *Ex. 1 to Le Decl., Kee Dep. 18:10-12; Ex. 2 to Le Decl., Rubalcava Dep. 20:13-16; Ex. 4 to Le Decl., Adams Dep. 44:12-18; Ex. 5 to Le Decl., Vaccari Dep. 37:17-22.* | Undisputed as to the State Defendants. |
| 241.    At the time of the incident, Blackwood, Adams, and Vaccari were aware that there were houses on each of the four corners of the intersection. *Ex. 3 to Le Decl., Blackwood Dep. 59:23-61:1; Ex. 4 to Le Decl., Adams Dep. 44:12-18; Ex. 5 to Le Decl., Vaccari Dep. 37:17-22.* | Disputed. The cited deposition testimony of Blackwood does not support this fact. He explained that the spotlight was in the middle of intersection and did not remember how far it went out from the intersection. Blackwood was not asked if he was aware at the time of the incident that there was a house on each corner. *Blackwood Dep. 59:23-61:1, Ex. 3 to Le Decl.* |
| 242.    Kee never considered evacuating the people in the nearby homes nor did he ever discuss it with the SBSD deputies. *Ex. 1 to Le Decl., Kee Dep. 61:14-24.* | Disputed. Kee was asked whether evacuating the nearby homes was "something that [he] at least thought about?" He answered "yes." *Kee Dep. 61:14-21, Ex. 1 to Le Decl.*<br><br>Evacuating during a standoff situation as the one Kee encountered with Puga is a judgment call, based on various factors, including the available resources. *Meyer Dep. 72:24-74:5, Ex. Z.* |
| 243.    Vaccari never considering alerting the nearby residences of potential harm or evacuating the people in the homes on the four | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| corners of the intersection. *Ex. 5 to Le Decl., Vaccari Dep. 37:17-38:6.* | |
| 244.    At some point, a female exited the vehicle and was taken into custody, after which she informed Adams that the driver, later identified as Hector Puga, of his first name and that he was a new father and wanted to call his wife. *Ex. 4 to Le Decl., Adams Dep. 13:4-25.* | Not applicable to State Defendants. |
| 245.    The officers had never seen Puga before and did not have any specific knowledge regarding Puga's criminal history. *Ex. 1 to Le Decl., Kee Dep. 53:7-9; Ex. 2 to Le Decl., Rubalcava Dep. 32:2-6; Ex. 4 to Le Decl., Adams Dep. 14:6-13.* | Undisputed that State Defendants had not seen Puga before and Rubalcava had no specific knowledge of Puga's criminal history.<br><br>Disputed to the extent that the State Defendants were aware or informed that Puga was a suspect in the earlier freeway shooting incident. *Blackwood Dep. 51:3-20, Ex. P to Esquivel Decl.; Rubalcava Dep. 77:14-78:15, Ex. R to Esquivel Decl.; Arrest-Investigation Report 1-12, Ex. L to Esquivel Decl.* |
| 246.    The officers also did not have any specific information that Puga had injured anyone. *Ex. 2 to Le Decl., Rubalcava Dep. 31:18-32:1; Ex. 3 to Le Decl., Blackwood Dep. 16:8-10.* | Undisputed that Rubalcava and Blackwood had no specific information that Puga had injured anyone, but disputed to the extent the officers were aware that Puga was suspected of shooting at someone on the freeway. *Blackwood Dep. 51:3-20, Ex. P to Esquivel Decl.; Rubalcava Dep. 77:14-78:15, Ex. R to Esquivel Decl.* |
| 247.    The officers did not have any specific information as to whether | Undisputed as to Rubalcava. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| Puga was under the influence of drugs or alcohol. *Ex. 2 to Le Decl., Rubalcava Dep. 32:7-9.* | |
| 248.    For a period of time, the officers attempted to get Puga out of the vehicle but he was not coming out. *Ex. 1 to Le Decl., Kee Dep. 19:10-13.* | Undisputed. |
| 249.    At some point, Kee considered calling in the SWAT Team and spoke to Vaccari about it. *Ex. 1 to Le Decl., Kee Dep. 19:17-20:2.* | Undisputed. |
| 250.    Kee made the request because from his experience, SWAT sometimes comes out for barricaded suspects. *Ex. 1 to Le Decl., Keep Dep. 20:12-17.* | Undisputed. |
| 251.    Kee was told that SWAT would not come out for something of this nature. *Ex. 1 to Le Decl., Kee Dep. 20:3-6.* | Undisputed. |
| 252.    Kee saw Vaccari go back to his car and get on a cell phone but does not know whether Vaccari actually called to inquire about SWAT. *Ex. 1 to Le Decl., Kee Dep. 20:7-11.* | Undisputed. |
| 253.    Vaccari did not have his cell phone to call SWAT and claims he told Kee this. *Ex. 5 to Le Decl., Vaccari Dep. 26:8-14.* | Undisputed that this is Vaccari's testimony. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 254.   Vaccari had forgotten his cell phone at the station. *Ex. 6 to Le Decl., Vaccari Int. 20:1-6.* | Not applicable to State Defendants. |
| 255.   Vaccari has dealt with barricaded suspects in homes before and has called SWAT to come assist with those suspects. *Ex. 5 to Le Decl., Vaccari Dep. 12:14-15.* | Not applicable to State Defendants. |
| 256.   When SWAT is called, they would sometimes give suggestions or advice and other times they would come out. *Ex. 5 to Le Decl., Vaccari Dep. 13:5-13.* | Not applicable to State Defendants |
| 257.   There were also times when SWAT would give suggestions or advice and when Vaccari recontacted them, SWAT would come out. Ex. 5 to Le Decl., *Vaccari Dep. 13:14-17.* | Not applicable to State Defendants |
| 258.   Vaccari does not know what SWAT's criteria was in order for them to come out for a barricaded suspect. *Ex. 5 to Le Decl., Vaccari Dep. 13:18-23.* | Not applicable to State Defendants |
| 259.   If SWAT had responded, Kee would have let them handle the situation. *Ex. 1 to Le Decl., Kee Dep. 48:12-21.* | Undisputed. |
| 260.   The officers never developed a tactical plan. *Ex. 4 to Le Decl., Adams Dep. 19:10-21; Ex. 5 to Le Decl., 36:20-25.* | Disputed as to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 261.    At some point, a decision was made that pepper balls would be helpful in trying to get Puga to come out. *Ex. 1 to Le Decl., Kee Dep. 20:18-21.* | Undisputed. |
| 262.    Kee attempted to break the car's window with a beanbag shotgun to facilitate getting the pepper balls into the car but was unsuccessful. *Ex. 1 to Le Decl., Kee Dep. 20:22-21:11.* | Undisputed. |
| 263.    Vaccari then successfully used glass break balls to break open the back window. *Ex. 1 to Le Decl., Kee Dep. 21:12-22; Ex. 5 to Le Decl., Vaccari Dep. 29:17-30:9.* | Undisputed. |
| 264.    Kee then directed Vaccari to deploy pepper balls. *Ex. 1 to Le Decl., Kee Dep. 21:23-22:6.* | Undisputed. |
| 265.    Approximately 120 to 150 pepper balls were deployed into the Expedition over a period of 30 to 45 minutes. *Ex. 4 to Le Decl., Adams Dep. 16:3-7; Ex. 5 to Le Decl., Vaccari Dep. 30:22-24, 31:19-21.* | Not applicable to State Defendants.<br><br>Kee testified that he estimated Viccari deploying about 90 to 95 pepper balls over a 20 to 25 minute period. *Kee Dep. 22:1-23, Ex. 1 to Le Decl.* |
| 266.    Adams observed Puga twisting and turning his body, reaching around, leaning over, and reaching back at different periods of time while Puga was inside the vehicle. *Ex. 4 to Le Decl., Adams Dep. 16:17-22.* | Undisputed that this is what Deputy Adams testified to. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 267.    Puga reacted to the pepper balls by coughing and complaining that his eyes were burning and that he could not see. *Ex. 4 to Le Decl., Adams Dep. 18:10-13; Ex. 8 to Le Decl., Gonzalez Dep. 93:10-15.* | Undisputed that this is what the witnesses testified to. |
| 268.    After deploying the pepper balls for approximately 30 minutes, Vaccari thought about contacting SWAT by having Dispatch send their phone number to his screen and using someone else's phone. *Ex. 6 to Le Decl., Vaccari Int. 27:26-28:3.* | Disputed to the extent that the cited deposition testimony does not support this fact. |
| 269.    Vaccari then made the decision to intentionally hit Puga with pepper balls to try to motivate Puga with pain to come out. *Ex. 6 to Le Decl., Vaccari Int. 28:11-20.* | Disputed to the extent that the cited deposition testimony does not support this fact. |
| 270.    When Vaccari was deploying the pepper balls, he observed that Puga would get his head down low in the window. *Ex. 6 to Le Decl., Vaccari Int. 28:20-23.* | Disputed to the extent that the cited deposition testimony does not support this fact. |
| 271.    Vaccari deployed pepper balls and struck Puga in the right eye, which is extremely painful. *Ex. 1 to Le Decl., Kee Dep. 23:2-10; Ex. 3 to Le Decl., Blackwood Dep. 14:24-15:6; Ex. 5 to Le Decl., Vaccari Dep. 32:14-18; Ex. 6 to Le Decl., Vaccari Int. 28:25-29:4; Ex. 7 to Le Decl., Mangerino Dep. 25:23-26:1.* | Undisputed that cited deposition testimony states that Puga said he was shot or struck in the eye with a pepper ball. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 272.    Puga sustained a cut to the area of his forehead right above his right eye, which Blackwood associated with being hit in the right eye by pepper balls. *Ex. 3 to Le Decl., Blackwood Dep. 13:24-14:10.* | Undisputed that Blackwood testified to this. Disputed to the extent that Blackwood has no personal knowledge how Puga sustained the cut on his forehead, such that Blackwood's testimony is speculation. Fed. R. Eiv. 602. |
| 273.    Puga eventually exited the vehicle from the driver's side. *Ex. 1 to Le Decl., Kee Dep. 23:14-19.* | Undisputed. |
| 274.    The officers were treating Puga as if he had a firearm when Puga exited the vehicle. *Ex. 5 to Le Decl., Vaccari Dep. 34:2-6.* | Undisputed that Viccari testified to this. |
| 275.    Puga did not have a shirt on when he exited the vehicle. *Ex. 1 to Le Decl., Kee Dep. 23:18-22.* | Undisputed. |
| 276.    Puga did not appear to have a gun or weapon in his hand, waistband, or pocket when he exited the vehicle. *Ex. 1 to Le Decl., Kee Dep. 24:15-17; Ex. 2 to Le Decl., Rubalcava Dep. 37:25-38:4; Ex. 3 to Le Decl., Blackwood Dep. 34:4-6; Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25; Ex. 9 to Le Decl., Edward Mangerino Video; Clark Decl. ¶ 15.* | Undisputed to the extent the State Defendants did not see a gun on those parts of Puga's body that was visible to them. When Puga stepped out of the vehicle, he did not show the State Defendants the front of his torso or waistline. The video from Officer Blackwood's MVARS (dashcam) undisputably shows that, from the time Puga exits the vehicle to the point where Kee tells him not to reach after Puga tells Kee that he does not have a gun, Puga never displayed the front of his waistband to the officers despite being shirtless. The Gonzalez cellphone video similarly never shows the front of Puga's waistband. *Blackwood MVARS, Part 4 at 33:00-* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | *42:28, Ex. G to Esquivel Decl.; Gonzalez Video at 00:00-06:28, Ex. J to Esquivel Decl.*) |
| 277.    Puga stood near the driver's side of the car for a period of time and during that time, the officers were able to see Puga's hands. *Ex. 1 to Le Decl., Kee Dep. 23:23-24:3.* | Undisputed, but Puga stood with his back to the officers such that they could only see his hands when they were up or to his sides. *Blackwood MVARS, Part 4 at 33:00-42:28, Ex. G to Esquivel Decl* |
| 278.    Puga's hands were raised for the majority of the time he was positioned near the driver's side of the vehicle. *Ex. 1 to Le Decl., Kee Dep. 24:3-6; Ex. 3 to Le Decl., Blackwood Dep. 15:7-12; Ex. 5 to Le Decl., Vaccari Dep. 34:7-9.* | Disputed to the extent that none of the cited deposition testimony states that Puga had his hands up for a "majority" of the time. |
| 279.    Puga did not have anything in his hands and he never reached for any weapon while he was standing near the driver's side of the vehicle. *Ex. 1 to Le Decl., Kee Dep. 24:7-9; Ex. 2 to Le Decl., Rubalcava Dep. 38:8-20; Ex. 3 to Le Decl., Blackwood Dep. 15:25-16:2.* | Undisputed. |
| 280.    Puga did not appear to have a weapon in his hands or on his person while he stood next to the driver's side of the vehicle. *Ex. 3 to Le Decl., Blackwood Dep. 33:25-34:3; Ex. 4 to Le Decl., Adams Dep. 21:22-22:2.* | Undisputed to the extent the State Defendants did not see a weapon in Puga's hands or on those parts of Puga's body that was visible to them. When Puga stepped out of the vehicle, he did not show the State Defendants the front of his torso or waistline. The video from Officer Blackwood's MVARS (dashcam) undisputably shows that, from the time Puga exits the vehicle to the point where Kee tells |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | him not to reach after Puga tells Kee that he does not have a gun, Puga never displayed the front of his waistband to the officers despite being shirtless. The Gonzalez cellphone video similarly never shows the front of Puga's waistband. *Blackwood MVARS, Part 4 at 33:00-42:28, Ex. G to Esquivel Decl.; Gonzalez Video at 00:00-06:28, Ex. J to Esquivel Decl.* |
| 281.    The officers never formulated a tactical plan for what to do once Puga exited the vehicle. *Ex. 1 to Le Decl., Kee Dep. 24:21-25; Ex. 3 to Le Decl., Blackwood Dep. 19:16-22, 31:19-23.* | Disputed. Rubalcava testified that he had a brief discussion with Kee, and the plan was to approach Puga nd handcuff him. Blackwood testified that no one spoke with him about a plan once Puga got out of the care regarding designation of lethal and less-lethal. *Rubalcava Dep. 30:18, Ex. Q to Esquivel Decl.; Blackwood Dep. 19:16-22, 31:19-23, Ex. 3 to Le Decl.* |
| 282.    While Puga was standing at the driver's side of the vehicle, there was no discussion about a tactical plan. *Ex. 4 to Le Decl., Adams Dep. 22:9-12.* | Undisputed that this is what Deputy Adams testified to |
| 283.    Kee did not assign any CHP officer to be less-lethal nor did he know whether any sheriff's deputy had been assigned less-lethal. *Ex. 1 to Le Decl., Kee Dep. 25:1-6.* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 284.   Puga had on a baggy pair of jeans when he exited the vehicle. *Ex. 1 to Le Decl., Kee Dep. 11:4-14.* | Undisputed. |
| 285.   While Puga was positioned next to the driver's side of the vehicle, Puga would at times raise his hands and then lower them back down. *Ex. 4 to Le Decl., Adams Dep. 21:2-8.* | Undisputed. |
| 286.   Puga was continually reaching down to pull up his pants because they were loose and kept falling. *Ex. 1 to Le Decl., Kee Dep. 11:15-23; Ex. 4 to Le Decl., Adams Dep. 42:12-17, 43:5-13, 43:23-44:5; Ex. 8 to Le Decl., Gonzalez Dep. 105:11-25.* | Disputed that Puga "continually" pulled up his pants. Blackwood's MVARS and the Gonzalez cellphone video similarly show Puga pull up his underwear from behind (above his buttocks) then his pants by also grabbing them from the back. Puga never displayed his front torso or waistband to the officers. *Blackwood MVARS, Part 4 at 33:00-42:28, Ex. G to Esquivel Decl.; Gonzalez Video at 00:00-06:28, Ex. J to Esquivel Decl.* |
| 287.   Puga expressed concerns to the officers that he thought the officers were going to shoot him. *Ex. 1 to Le Decl., Kee Dep. 52:2-5; Ex. 5 to Le Decl., Vaccari Dep. 34:22-35:4; Ex. 2 to Le Decl., Rubalcava Dep. 39:7-9; Ex. 8 to Le Decl., Gonzalez Dep. 40:23-41:11.* | Undisputed. |
| 288.   Puga sounded scared of being shot by police. *Ex. 8 to Le Decl., Gonzalez Dep. 103:13-23.* | Undisputed that Ms. Gonzalez testified to this, but disputed that she has personal knowledge to testify about how Puga was feeling. Fed. R. Evid. 602. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 289.    Puga said something about hearing a click and being afraid that somebody was getting ready to shoot him. *Ex. 1 to Le Decl., Kee Dep. 52:9-11.* | Undisputed that Puga made this comment. |
| 290.    Puga then walked to the front of the white Expedition. *Ex. 8 to Le Decl., Gonzalez Dep. 42:21-25; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 37:48-37:50* | Undisputed that Puga went to the front of the vehicle despite Kee's repeated orders that Puga walk backwards to him. *Blackwood MVARS, Part 4 at 36:20-37:51, Ex. G to Esquivel Decl.* |
| 291.    After Puga went to the front of the vehicle, the officers still did not have any discussion regarding a tactical plan. *Ex. 4 to Le Decl., Adams Dep. 25:2-11.* | Disputed as vague as to time. Adams testified that he and Vaccari formulated a plan to move to the east side of the vehicle because they could no longer see Puga's hands when he was out of the vehicle. *Adams Dep. 25:12-22, Ex. 4 to Le Decl.* |
| 292.    Puga had his hands up while he was positioned near the front of the Expedition. *Ex. 2 to Le Decl., Rubalcava Dep. 40:3-5.* | Disputed. Puga lowered one or both of his hands several times while standing in front of the Expedition. *Erin Mangerino Video at 00:00-00:50, Ex. I to Esquivel Decl; Blackwood MVARS, Part 4 at 37:48 to 42.27, Ex. G to Esquivel Decl.; Gonzalez Video at 01:50-6:25, Ex. J to Esquivel Decl.* |
| 293.    When Puga was at front of the Expedition, Puga did not have anything in his hands. *Ex. 2 to Le Decl., Rubalcava Dep. 40:6-8.* | Undisputed. |
| 294.    Puga occasionally would drop his hands to pull up his pants while he was standing near the front of the vehicle. *Ex. 4 to Le Decl., Adams* | Disputed to the extent neither witness has personal knowledge of what Puga was doing with his hands when he lowered them while standing in front of the vehicle because his hand were |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Dep. 61:3-62:3; Ex. 8 to Le Decl., Gonzalez Dep. 42:18-25.* | hidden behind the vehicle and out of the witnesses' view. Fed. R. Evid. 602; *Erin Mangerino Video at 00:00-00:50, Ex. I to Esquivel Decl.; Blackwood MVARS, Part 4 at 37:48 to 42.27, Ex. G to Esquivel Decl.; Gonzalez Video at 01:50-6:25, Ex. J to Esquivel Decl.* |
| 295.    The bystander cell phone video taken by Erin Mangerino shows Puga with his hands up and briefly dropping his right hand to his waistband to adjust his pants before raising his hand up again, twice. *Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:03-00:07; 0:00:20-00:27.* | Disputed. The video taken by Erin Mangerino does not support a finding that Puga was adjusting his pants when he lowered his hands while standing in front of the Expedition. The amount of his dark underwear visible from behind Puga did not change, nor do his lighter pants appear to move, when he lowered his hands. If he was adjusting his pants, it is logical that the amount of underwear visible would either increase or decrease as the lighter pants move up or down. This does not happen on the video. *Erin Mangerino Video at 00:00-00:50, Ex. I to Esquivel Decl.* |
| 296.    At some point, Kee and Rubalcava decided to approach Puga to take him into custody. *Ex. 1 to Le Decl., Kee Dep. 25:17-18; Ex. 2 to Le Decl., Rubalcava Dep. 40:12-22.* | Undisputed that Kee and Rubalcava decided to approach Puga when Puga stated that he did not have any weapons on him. *Blackwood MVARS, Part 4 at 40:20 to 42.27, Ex. G to Esquivel Decl.;* |
| 297.    Kee and Rubalcava did not coordinate with the SBSD Sheriffs' deputies regarding any plan to approach and take Puga into custody. *Ex. 1 to Le Decl., Kee Dep. 28:16-19; Ex. 2 to Le Decl.,* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Rubalcava Dep. 40:23-25; Ex. 5 to Le Decl., Vaccari Dep. 36:16-19.* | |
| 298.    As Kee and Rubalcava were approaching Puga, they did not have any cover. *Ex. 2 to Le Decl., Rubalcava Dep. 41:14-16, 83:1-9.* | Undisputed. |
| 299.    Kee and Rubalcava were not aware that Vaccari and Adams were also approaching Puga. *Ex. 1 to Le Decl., Kee Dep. 28:20-22; Ex. 2 to Le Decl., Rubalcava Dep. 41:8-11.* | Undisputed. |
| 300.    Vaccari was still treating Puga as if he was armed with a weapon while Puga was standing near the front of the vehicle. *Ex. 5 to Le Decl., Vaccari Dep. 36:12-15.* | Not applicable as to State Defendants. |
| 301.    When Vaccari and Adams saw Kee and Rubalcava move towards the shoulder of Peach Street, they thought they were moving to just get a better view of Puga, not to approach Puga. *Ex. 4 to Le Decl., Adams Dep. 26:21-27:3; Ex. 5 to Le Decl., Vaccari Dep. 37:1-11, 38:7-12.* | Not applicable as to State Defendants. |
| 302.    Vaccari wanted to move up the passenger side of the vehicle to cut off an avenue of escape for Puga. *Ex. 5 to Le Decl., Vaccari Dep. 39:6-20.* | Not applicable as to State Defendants. |
| 303.    The only cover Vaccari and Adams had when moving up was the passenger's side of Puga's | Not applicable as to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| vehicle. *Ex. 5 to Le Decl., Vaccari Dep. 39:21-25.* | |
| 304.    Prior to approaching, Vaccari and Adams had discussed the possibility of using the Taser on Puga because Puga was a good candidate for the Taser due to him being shirtless, but Vaccari ultimately decided to utilize the 40-mm less-lethal instead. *Ex. 5 to Le Decl., Vaccari Dep. 40:3-16* | Not applicable as to State Defendants. |
| 305.    As Vaccari approached from the dirt shoulder, he did not have any cover. *Ex. 5 to Le Decl., Vaccari Dep. 41:14-24.* | Not applicable as to State Defendants. |
| 306.    There was an electrical pole on the southwest corner of the intersection that was parallel to the back passenger doors of the Expedition. *See Ex. 15 to Le Decl., Photograph of Scene; Ex. 16 to Le Decl., Photograph of Expedition at Curb.* | Undisputed. |
| 307.    In the Erin Mangerino cellphone video of the incident, moments before the shooting, two figures can be seen standing without cover in the street, partially obscured by the electrial pole before backing away in a southern direction, away from the pole, and out of frame. *Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:00:29-00:53.* | Disputed. The two individuals seen in the Erin Mangerino video are standing near the electrical pole, then start stepping back in a western direction, not a southern direction, until they are both out of the frame. *Erin Mangerino Video at 00:39-00:46, Ex. I to Esquivel Decl.*  Kee testified at his deposition that he was in the area of the electrical pole approximately 3-5 seconds before he |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | saw the gun in Puga's waistband. *Kee Dep. 28:23-29:5, Ex. O to Esquivel Decl.* |
| 308.    Erin Mangerino was unable to see any officers standing on her side of Peach Street. Ex. 7 to Le Decl., Mangerino Dep. 53:11-22. | Undisputed that the witness testified to this based on where she was located within her house. |
| 309.    Kee claims that as he approached the electrical pole, he could only see a portion of Puga's body in front of the vehicle. *Ex. 1 to Le Decl., Kee Dep. 29:20-23.* | Undisputed. |
| 310.    Kee claims he could not see Puga's waistband while Puga was standing in front of the vehicle and could only see Puga's waistband once he moved past the front of Puga's vehicle. *Ex. 1 to Le Decl., Kee Dep. 81:6-19.* | Undisputed. |
| 311.    As soon as Puga turned to run, officers shot at Puga. *Ex. 2 to Le Decl., Rubalcava Dep. 60:20-61:1; Ex. 5 to Le Decl., Vaccari Dep. 42:24-43:2, 47:5-14; Ex. 7 to Le Decl., Mangerino Dep. 34:3-9, 36:15-17, 37:11-13; Gonzalez Dep. 42:25-43:1, 55:1-4, 97:5-11, 97:12-15; Ex. 10 to Le Decl., Mangerino Cellphone Video at 0:00:51-00:54; Ex. 13 to Le Decl., Gonzalez Cellphone Video at 0:06:24-06:31.* | Disputed. Kee shot his first round when he saw Puga's hand going towards the gun in his waistband and before Puga started to run. Kee was approximately 20-30 feet from Puga and had seen the gun in Puga's waistband about three second before Kee fired the first shot. *Kee Dep. 9:10-10:3, Ex. O to Esquivel Decl.* |
| 312.    Puga never grabbed or aggressively reached for anything prior to the shots. *Ex. 8 to Le Decl.,* | Disputed, and vague as to the meaning of "aggressively reached." Kee saw Puga's hand reach for the gun in his |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Gonzalez Dep. 16:1-3; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.* | *waistband. Kee Dep. 9:10-24, Ex. O to Esquivel Decl.* |
| 313.    Puga never had a gun in his hand. *Ex. 8 to Le Decl., Gonzalez Dep. 97:16-25, 83:21-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.* | Disputed. Several officers and witnesses saw a gun or evidence of a gun in Puga's hand. *Annabelle Botten Interview at 02:00-02:50, Ex. K to Esquivel Decl.* (stating Puga "grabbed the gun" and "tried to shoot at the cops and that's when the cops started shooting back"); *Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl.* (stating Puga's arm was raised up and although he could not see a gun, Puga "had his hand around something, and smoke came from the front of his hand, which gave me the impression that he had a gun"); *Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl.* (testifying that Puga took something out of his waistband and shot at the cops, and that Puga was "shooting and running away"); *Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl.* (explaining that he saw Puga's hands "dive down into his waistband area," saw a gun, then heard shots, and then returned fire); *Blackwood Dep. 53:14-16, Ex. P to Esquivel Decl.* (confirming that he saw a gun in Puga's hand). |
| 314.    Puga never pointed his hand or a weapon in any specific direction or at any officer. *Ex. 5 to Le Decl.,* | Disputed. *Annabelle Botten Interview at 02:00-02:50, Ex. K to Esquivel Decl.* (stating Puga "grabbed the gun" and "tried to shoot at the cops and that's |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Vaccari Dep. 64:8-17; Ex. 8 to Le Decl., Gonzalez Dep. 97:1-6.* | *when the cops started shooting back").* |
| 315.   Puga never fired a weapon at any officer. *Ex. 7 to Le Decl., Mangerino Dep. 37:14-16; Ex. 8 to Le Decl., Gonzalez Dep. 132:22-24; Ex. 14 to Le Decl., Botten Dep. 129:13-25, 130:6-12.* | Disputed. Several witnesses heard or saw evidence that Puga had fired a gun. *Annabelle Botten Interview at 02:00-02:50, Ex. K to Esquivel Decl. (stating Puga "grabbed the gun" and "tried to shoot at the cops and that's when the cops started shooting back"); Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl. (stating Puga's arm was raised up and although he could not see a gun, Puga "had his hand around something, and smoke came from the front of his hand, which gave me the impression that he had a gun"); Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl. (testifying that Puga took something out of his waistband and shot at the cops, and that Puga was "shooting and running away"); Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl. (explaining that he saw Puga's hands "dive down into his waistband area," saw a gun, then heard shots, and then returned fire).* |
| 316.   Neither smoke nor any muzzle flash ever came from Puga. *Ex. 3 to Le Decl., Blackwood Dep. 20:10-12; Ex. 4 to Le Decl., Adams Dep. 36:12-18; Ex. 5 to Le Decl., Vaccari Dep. 48:14-20; Ex. 8 to Le Decl., Gonzalez Dep. 99:8-25.* | Disputed. Neighbor Edward Mangerino, who lives in the house on the northwest corner of the intersection of Peach and Catalpa Streets, testified that he saw Puga raise his arm up, and although he could not see a gun, Puga had his hand around something, and smoke came from the front of his hand, which gave Mangerino the impression |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
|  | that Puga had a gun. Kee also testified to seeing muzzle flash from Puga's location. *Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl.; Kee Dep. 82:10-85:7, Ex. O to Esquivel Decl.* |
| 317.    None of the videos capturing the incident show Puga with a gun in his hand. Ex. 1 to Le Decl., Kee Dep. 7:16-18; Ex. 5 to Le Decl., Vaccari Dep. 9:15-18. | Disputed. Blackwood's MVARS video, part 4, show a shiny object flashing in Puga's right hand as he is running in a northern-westerly direction to the curb. There is no evidence that Puga had a cell phone or other object on his person that could reflect light and create the shine or reflection seen in the video other than the gun found under his body at the end of the incident. *Blackwood MVARS, Part 4 at 42:29-42:31, Ex. G at Esquivel Decl.* |
| 318.    None of the videos capturing the incident show Puga ever pointing a gun at anyone. *Ex. 1 to Le Decl., Kee Dep. 7:22-24; Ex. 5 to Le Decl., Vaccari Dep. 9:19-21.* | Disputed to the extent that the quality and angles of the videos do not lend themselves to ascertain whether Puga is pointing a gun, especially when there is eye-witness testimony that Puga pointed or shot a gun at the officers. *Annabelle Botten Interview at 02:00-02:50, Ex. K to Esquivel Decl.; Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl.; Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl.; Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl.; Blackwood Dep. 53:14-16, Ex. P to Esquivel Decl.; Kee Dep. 82:10-85:7, Ex. O to Esquivel Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 319.    None of the videos capturing the incident show Puga ever firing a gun. *Ex. 1 to Le Decl., Kee Dep. 7:19-21.* | Disputed to the extent that the quality and angles of the videos do not lend themselves to ascertain whether Puga fired the gun, especially when there is eye-witness testimony that Puga pointed or shot a gun at the officers. *Annabelle Botten Interview at 02:00-02:50, Ex. K to Esquivel Decl.; Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl.; Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl.; Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl.; Blackwood Dep. 53:14-16, Ex. P to Esquivel Decl.; Kee Dep. 82:10-85:7, Ex. O to Esquivel Decl.* |
| 320.    None of the videos capturing the incident show any muzzle flash coming from the area Puga was at. *Ex. 1 to Le Decl., Kee Dep. 92:14-16; Ex. 2 to Le Decl., Rubalcava Dep. 93:17-19.* | Disputed to the extent that the quality and angles of the videos do not lend themselves to ascertain whether Puga fired the gun, especially when there is eye-witness testimony that Puga pointed or shot a gun at the officers. *Annabelle Botten Interview at 02:00-02:50, Ex. K to Esquivel Decl.; Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S to Esquivel Decl.; Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T to Esquivel Decl.; Adams Dep. 35:12-36:18, Ex. R to Esquivel Decl.; Blackwood Dep. 53:14-16, Ex. P to Esquivel Decl.; Kee Dep. 82:10-85:7, Ex. O to Esquivel Decl.* |
| 321.    As Puga was running, he never turned around to look at the officers. | Disputed to the extent that the quality and angles of the videos do not lend |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Ex. 8 to Le Decl., Gonzalez Dep. 100:13-17.* | themselves to ascertain whether Puga turned his head towards the officers as he ran. See, e.g., Blackwood MVARS, Part 4 at 42:29-42:31, Ex. G to Esquivel Decl. (showing Puga running towards northwest corner of intersection and color of head changes, suggesting his head turned towards the officers). |
| 322.    Gonzalez saw Puga's waistband when he turned to take off running and never saw a gun in his waistband. *Ex. 8 to Le Decl., Gonzalez Dep. 95:15-25, 115:18-21.* | Undisputed that Gonzalez testified at deposition that, from her position behind the officers, she did not see a gun in Puga's waistband. However, all the videos show that Puga never turned his torso in such a way that his front waistband was visible to the officers or anyone south of the intersection. Because Gonzalez's testimony so blatantly contradicts the video evidence, including her own video, no reasonable juror could find that Gonzalez could see the front of Puga's waistband, and this Court need not adopt that version of the facts for purposes of summary judgment. S*cott v. Harris*, 550 U.S. 372, 380 (2007). |
| 323.    While Puga was running, his hands were moving in a running motion. *Ex. 8 to Le Decl., Gonzalez Dep. 116:16-21.* | Undisputed. |
| 324.    None of the videos that captured the shooting ever show Puga turn back towards the officers or point his hand back towards the officers. *Ex. 10 to Le Decl., Erin Mangerino* | Disputed to the extent that the quality and angles of the videos do not lend themselves to ascertain whether Puga is pointing a gun, especially when there is eye-witness testimony that Puga |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *Cellphone Video at 0:00:50-01:44; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 0:42:23-42:47; Kee Dashcam Video at 46:47-47:07.* | pointed his hand back towards the officers as he ran. *Kee Dep. 83:13-84:3, Ex. O to Esquivel Decl.; Erin Mangerino Video at 00:50-01:02, Ex. I to Esquivel Decl.* |
| 325.    When Puga reached the northwest corner, he changed directions and started running north instead of towards the house on the corner. *Ex. 4 to Le Decl., Adams Dep. 50:15-21; Ex. 7 to Le Decl., Mangerino Dep. 34:3-12.* | Disputed to the extent that there is no evidence that Puga could not have accessed or entered the houses on the northwest side of Peach Street as he ran north on Peach. |
| 326.    Just prior to Puga going to the ground, he was staggering as if he had been struck by gunfire. *Ex. 5 to Le Decl., Vaccari Dep. 52:19-53:4.* | Undisputed that Sgt. Vaccari testified to this and that these were his observations. |
| 327.    There were gunshots immediately before Puga went to the ground. *Ex. 5 to Le Decl., Vaccari Dep. 53:5-7.* | Undisputed. |
| 328.    Puga then fell forward onto his chest and stomach and onto the ground with his hands beside him on the northwest shoulder near the southbound lane, some distance from the northwest corner. *Ex. 1 to Le Decl., Kee Dep. 37:10-13; Ex. 5 to Le Decl., Vaccari Dep. 53:11-21; Ex. 7 to Le Decl., Mangerino Dep. 60:9-61:13.* | Disputed to the extent that, as worded, this purported fact suggests that Puga did not move after falling down. The Erin Mangerino video shows Puga crawled up the street on his elbows after he falls and his limbs continued to move after the fall. *Erin Mangerino Video at 01:03-01:10, Ex. I to Esquivel Decl.* |
| 329.    Puga's head was oriented north and his feet were to the south after | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| he fell. *Ex. 5 to Le Decl., Vaccari Dep. 53:22-25.* | |
| 330.    Puga's hands were next to him when he was on the ground. *Ex. 7 to Le Decl., Mangerino Dep. 61:7-13.* | Undisputed that the witness testified to this, but the Erin Mangerino video shows Puga crawled up the street on his elbows after he falls and his limbs continued to move after the fall. *Erin Mangerino Video at 01:03-01:10, Ex. I to Esquivel Decl.* |
| 331.    There was no gun in either of Puga's hands immediately after Puga went to the ground. *Ex. 4 to Le Decl., Adams Dep. 52:18-22.* | Undisputed that Deputy Adams testified to this. |
| 332.    Puga did not pose a threat to anyone after falling to the ground and appeared incapacitated. *Ex. 1 to Le Decl., Kee Dep. 37:17-38:3; Ex. 4 to Le Decl., Adams Dep. 52:1-6.* | Undisputed. |
| 333.    Several shots were fired at Puga after he fell to the ground. *Ex. 1 to Le Decl., Kee Dep. 68:17-24; Ex. 3 to Le Decl. Blackwood Dep., 25:8-12; Ex. 5 to Le Decl., Vaccari Dep. 43:11-24; Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 0:01:04-01:12; Ex. 11 to Le Decl., Rubalcava Dashcam Video at 0:42:37-42:45.* | Undisputed that several shots were fired in Puga's direction after he fell to the ground. However, there is no evidence that he was struck by any of those shots. |
| 334.    Immediately after Puga fell onto the ground, Puga slightly raised his right leg. *Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 1:00-1:05.* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 335.    Gunshots were going off as Puga raised his right leg immediately after he fell to the ground. *Ex. 10 to Le Decl., Erin Mangerino Cellphone Video at 1:00-1:05.* | Undisputed. |
| 336.    After Puga fell to the ground, several shots are fired and there was a pause before the final two, almost simultaneous volleys of shots from two different firearms are heard. *Ex. 10 to Le Decl., Erin Magerino Cellphone Video at 01:02-01:10.* | Disputed to the extent this fact is vague as to time. As the Erin Mangerino Video shows, Puga continued to move his limbs after he fell to the ground and shots can be heard during this points in time. However, the firing stops when Puga no longer moves. *Erin Mangerino Video at 01:00-01:12, Ex. I to Esquivel Decl.* |
| 337.    As the last volleys are going off, Puga can be seen jerking on the ground as if struck by the gunshots. *Ex. 10 to Le Decl., Erin Magerino Cellphone Video at 01:06-01:10.* | Disputed that Puga is "jerking" and that his movement was caused by being struck with gunshot. Plaintiffs cite not evidence to support this purported fact. |
| 338.    After Puga went down, Kee did not find any other object on or around Puga's body other than the gun allegedly found near Puga. *Ex. 1 to Le Decl., Kee Dep. 89:8-10.* | Undisputed. |
| 339.    Throughout the incident, Puga wore a polished, silver watch on his left wrist. *See Ex. 19 to Le Decl., Photograph of Puga's Hands after Shooting.* | Undisputed but immaterial. As Puga starts to run towards the northwest corner of the intersection, light is reflecting off of an objection in his **right** hand. *Blackwood MVARS Part 4 at 42:29-42:32, Ex. G to Esquivel Decl.* |
| 340.    Puga sustained ten gunshot wounds to his body, altogether. *Ex. 18 to Le Decl., Jong Dep. 21:19-20.* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 341.    There were multiple shots to Puga's backside. *Ex. 18 to Le Decl., Jong Dep. 21:21-22.* | Undisputed. |
| 342.    Death was not instantaneous as a result of Puga's gunshot wounds. *Ex. 18 to Le Decl., Jong Dep. 21:23-22:11.* | Undisputed but only one gunshot was fatal, such that Puga would have survived the other nine gunshots. *Jong Dep. 21:23-25, Ex. 18 to Le Decl.* |
| 343.    Many of the gunshots wounds have a back-to-front trajectory. *Ex. 18 to Le Decl., Jong Dep. 45:25-46:4.* | Undisputed. |
| 344.    Some of the gunshot wounds had an upward trajectory. *Ex. 18 to Le Decl., Jong Dep. 46:5-8.* | Undisputed. |
| 345.    Puga sustained a gunshot wound that entered the mid left back with a trajectory of back-to-front, left-to-right, and upward. *Ex. 18 to Le Decl., Jong Dep. 9:2-4, 9:22-10:4, 10:25-11:2.* | Undisputed. Dr. Jong described this wound as "K." *Jong Dep. 9:11-17, Ex. 18 Le Decl.* |
| 346.    The gunshot wound to the mid left back was fatal. *Ex. 18 to Le Decl., Jong Dep. 11:13-14.* | Undisputed. |
| 347.    In order to get the gunshot wound to the mid left back, the back would have had to been exposed to the muzzle of the gun. *Ex. 18 to Le Decl., Jong Dep. 11:22-13:23.* | Undisputed, but Dr. Jong clarified that wound to the mid left back, or "K," was on the left back near the arm pit area, and this wound could have made while Puga had his entire back facing the shooter or with his left side facing the shooter. *Jong Dep. 25:20-26:3, 27:3-9, 27:16-28:18, Ex. U to Esquivel Suppl. Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 348.    The upward trajectory of the gunshot wound to the mid left back is consistent with the body leaning forward or falling forward when sustaining that wound. *Ex. 18 to Le Decl., Jong Dep. 13:6-16.* | Undisputed. |
| 349.    Puga sustained a gunshot wound to the lower left back with a trajectory of back-to-front, left-to-right, and upward. *Ex. 18 to Le Decl., Jong Dep. 13:17-20, 14:14-16.* | Undisputed, but the upward trajectory of the gunshot wounds could also have been caused by Puga's body movement. *Jong Dep. 35:10-14, Ex. U to Esquivel Suppl. Decl.* |
| 350.    The gunshot wound to the lower left back is consistent with Puga's back directly facing the shooter. *Ex. 18 to Le Decl., Jong Dep. 31:7-13.* | Undisputed. |
| 351.    The gunshot wound to the lower left back could have also been fatal after a longer period of time. *Ex. 18 to Le Decl., Jong Dep. 30:7-31:2.* | Undisputed but death would come from the ensuing infection, not the gunshot wound. *Jong Dep. 30:17-21, Ex. 18 to Le Decl..* |
| 352.    Puga sustained a gunshot wound to the middle right buttock. *Ex. 18 to Le Decl., Jong Dep. 14:17-20.* | Undisputed. |
| 353.    Puga sustained two gunshot wounds to the left thigh that entered the side of the thigh and the front of the thigh. *Ex. 18 to Le Decl., Jong Dep. 15:10-16:2.* | Undisputed. |
| 354.    The gunshot wound to the front of the left thigh had an upward trajectory. *Ex. 18 to Le Decl., Jong Dep. 16:3-4.* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 355.    Puga sustained a gunshot wound to the back of the left thigh with back-to-front, left-to-right and upward trajectory. *Ex. 18 to Le Decl., Jong Dep. 16:8-21.* | Undisputed. |
| 356.    Puga sustained a gunshot wound to the lateral left knee with a back-to-front and upward trajectory. *Ex. 18 to Le Decl., Jong Dep. 17:3-16.* | Undisputed. |
| 357.    Puga sustained two gunshot wounds to the anterior right lower leg with front-to-back, right-to-left, and upward trajectories. *Ex. 18 to Le Decl., Jong Dep. 17:20-18:19, 20:3-9.* | Undisputed. |
| 358.    The trajectories of the gunshot wounds to the anterior right lower leg are consistent with the body being on the ground with the leg somewhat elevated. *Ex. 18 to Le Decl., Jong Dep. 19:2-24.* | Disputed to the extend Dr. Jong testified that is one possibility and that there "are obviously very many scenarios in terms of hypotheticals which could occur." *Jong Dep. 19:6-9, Ex. 18 to Le Decl.* |
| 359.    The gunshot wounds to the anterior right lower leg fractured the right tibia and right fibula with hemorrhage throughout. *Ex. 18 to Le Decl., Jong Dep. 20:10-24.* | Undisputed. |
| 360.    Puga sustained a gunshot wound to the right foot with an upward trajectory. *Ex. 18 to Le Decl., Jong Dep. 20:25-21:10.* | Undisputed. |
| 361.    There are no bullet wounds that appear to have been caused by a bullet striking an intermediary | Disputed. Dr. Jong testified that he would need to look at each gunshot wound picture to determine whether |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| object before striking Puga's body. *Ex. 18 to Le Decl., Jong Dep. 47:15-48:2.* | the bullet ricocheted before it struck Puga; he could not say whether something ricocheted or not. *Jong Dep. 49:15-50:2, Ex. U to Esquivel Suppl. Decl.* |
| 362.   Kee was the first officer to shoot and did not hear any shots fired before he fired his first shot. *Ex. 1 to Le Decl., Kee Dep. 9:4-9.* | Undisputed. |
| 363.   Kee claims he fired two volleys of shots; one volley of 5 to 8 shots while Puga at the front of the vehicle and another volley of 10 to 13 shots at Puga's backside while Puga was running in a northwest direction. *Ex. 1 to Le Decl., Kee Dep. 8:4-9, 9:24-10:3, 30:7-9, 34:12-23, 35:2-20, 35:24-36:5, 46:11-18.* | Disputed to the extent that Kee testified that, during the second volley, he was aiming at Puga's left side, rib cage area, while Puga ran in a northwest direction. *Kee Dep. 35:24-36:21, Ex. 1 to Le Decl.* |
| 364.   When Kee fired his first shot, he could see both of Puga's hands. *Ex. 1 to Le Decl., Kee Dep. 60:10-12.* | Undisputed. |
| 365.   Puga did not have a gun in his hand when Kee fired his first volley. *Ex. 1 to Le Decl., Kee Dep. 12:2-25* | Disputed. Kee testified that as he was shooting his first volley at Puga, Puga was able to remove the gun from his waistband, point the gun in Kee and Rubalcava's direction, and fire because Kee saw two muzzle flashes. *Kee Dep. 78:15-79:6, Ex. O to Esquivel Decl.* |
| 366.   Kee was trained to consider his background or backdrop when firing because if there are residences or businesses in the background, | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| innocent people could get shot. *Ex. 1 to Le Decl., Kee Dep. 54:16-24* | |
| 367.    Kee was aware that there were residences in Puga's background when Kee was firing both volleys. *Ex. 1 to Le Decl., Kee Dep. 55:1-19.* | Disputed. Misstates Kee's deposition testimony and the contents of Kee's interview. At his interview, Kee stated that the backdrop during the first volley was Catalpa Street and the street running north was the backdrop during the second volley. *Kee Interview 50:20-51:7, Ex. AA to Esquivel Suppl. Decl.* |
| 368.    After the first volley, Kee retreated to the dirt shoulder parallel to the side of the CHP vehicle and went down prone. *Ex. 1 to Le Decl., Kee Dep. 31:11-32:9, 42:23-43:5.* | Undisputed. |
| 369.    Approximately 3 to 5 seconds elapsed between the last shot in Kee's first volley and when Kee went down into prone position in the dirt. *Ex. 1 to Le Decl., Kee Dep. 32:10-16* | Undisputed. |
| 370.    Kee did not keep a visual on Puga while he was repositioning. *Ex. 1 to Le Decl., Kee Dep. 43:14-18.* | Undisputed. |
| 371.    Kee's back was to Puga while he repositioned to the dirt area. *Ex. 1 to Le Decl., Kee Dep. 45:22-46:1.* | Undisputed. |
| 372.    Approximately 5 to 8 seconds elapsed between Kee's first volley and when he started firing his | Undisputed but Kee testified that the time lapse was a "guess." *Kee Dep. 54:5-9, Ex. 1 to Le Decl.* |

State Defs.' Response to Statement of
Genuine Disputes

33

5:22-cv-0949 KK (SHKx)

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| second volley. *Ex. 1 to Le Decl., Kee Dep. 54:5-9.* | |
| 373.    Kee was not struck by any gunshots. *Ex. 1 to Le Decl., Kee Dep. 33:3-11.* | Undisputed. |
| 374.    Kee never mentioned in his interview with detectives that he thought he had been struck. *Ex. 1 to Le Decl., Kee Dep. 44:3-7.* | Disputed but immaterial, and it misstate Kee's testimony. Kee testified that he did not recall whether he informed the Sheriff's Department that he may have been struck by gun fire. *Kee Dep. 44:3-7, Ex. 1 to Le Decl.* |
| 375.    When Kee looked down at his left arm, which he claims is where he thought he had been struck, the fabric was not torn. *Ex. 1 to Le Decl., Kee Dep. 65:19-24.* | Undisputed but immaterial. |
| 376.    Rubalcava heard two shots being fired before he fired his first shot. *Ex. 2 to Le Decl., Rubalcava Dep. 16:5-10* | Undisputed. |
| 377.    Rubalcava was side by side and to the right of Kee while they were approaching and when Kee started firing. *Ex. 2 to Le Decl., Rubalcava Dep. 29:10-19, 30:16-22.* | Disputed to the extent the cited testimony does not support this fact. |
| 378.    Puga was near the front of the vehicle when Rubalcava fired his first volley. *Ex. 2 to Le Decl., Rubalcava Dep. 15:7-10.* | Undisputed. |
| 379.    Rubalcava also heard shots coming from the passenger's side of | Undisputed but vague as to time. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| the vehicle. *Ex. 2 to Le Decl., Rubalcava Dep. 47:12-17.* | |
| 380.    Rubalcava was not aware that at the time he was firing his first volley, Adams was also firing from the other side. *Ex. 2 to Le Decl., Rubalcava 68:10-15.* | Undisputed. |
| 381.    Rubalcava claims he fired approximately 5 shots during his first volley and 5 to 10 shots during his second volley. *Ex. 2 to Le Decl., Rubalcava Dep. 14:2-8.* | Undisputed. |
| 382.    Rubalcava was trained to consider his background when he shoots because if his bullets miss, they may hit innocent people. *Ex. 2 to Le Decl., Rubalcava Dep. 20:20-21:1.* | Undisputed. |
| 383.    Rubalcava now knows that there were homes in the background when he fired his first volley. *Ex. 2 to Le Decl., Rubalcava Dep. 21:7-9.* | Undisputed but immaterial and irrelevant what his knows "now." |
| 384.    Rubalcava claims would not have shot as many shots if he had known there was a home in the northeast corner at the time of the shooting. *Ex. 2 to Le Decl., Rubalcava Dep. 92:21-93:1.* | Disputed. Misstates Rubalcava's testimony. Rubalcava testify that he "probably" would not have shot the same number of rounds. *Rubalcava Dep. 92:21-93:1, Ex. 2 to Le Decl.* |
| 385.    Rubalcava was firing in a northeast direction during his first volley. *Ex. 2 to Le Decl., Rubalcava Dep. 21:16-19.* | Undisputed but Rubalcava confirmed that he was "kind of firing" in  he was northeast direction. *., Rubalcava Dep. 21:16-19, Ex. 2 to Le Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 386.    Rubalcava claims that there was an approximately 5 to 10 second pause between Rubalcava's first volley and second volley. *Ex. 2 to Le Decl., Rubalcava Dep. 14:12-18.* | Disputed. Misstates Rubalcava's testimony. Rubalcava initially testified that he believed 5-10 seconds lapse between each volley. But after refreshing his recollection by reviewing the MVARS video, he testified that one to two second lapsed between the first and second volleys. *Rubalcava Dep. 14:12-18, 76:16-77:2, Ex. Q to Esquivel Decl.,* |
| 387.    Rubalcava took out his magazine and reloaded before firing a second volley of shots. *Ex. 2 to Le Decl., Rubalcava Dep. 22:20-22, 97:13-18.* | Disputed. Misstates Rubalcava's testimony. After reviewing the MVARS video, Rubalcava recalled that he reloaded after the second volley. *Rubalcava 84:10-23, Ex. Q to Esquivel Decl.* |
| 388.    Puga was running away when Rubalcava fired his second volley. *Ex. 2 to Le Decl., Rubalcava Dep. 18:18-20.* | Undisputed. |
| 389.    Rubalcava was aiming at Puga's back during the second volley. *Ex. 2 to Le Decl., Rubalcava Dep. 18:21-19:1.* | Undisputed. |
| 390.    When asked during his interview with detectives after the incident as to what caused Rubalcava to fire his second volley, Rubalcava answered that Puga was still fleeing but that Puga was not doing anything with any alleged weapon. *Ex. 2 to Le Decl., Rubalcava Dep. 55:8-22.* | Undisputed, but Rubalcava was provided an incomplete portion of his response during the interview. At the Sheriff's interview, Rubalcava explained that he continued to hear gunshots after his first volley, and believed that some of those shots were coming from Puga, so Rubalcava feared for his life and shot the second volley. *Rubalcava Interview 54:5-* |

State Defs.' Response to Statement of Genuine Disputes

36

5:22-cv-0949 KK (SHKx)

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | *55:21, Ex. BB to Esquivel Suppl. Decl.* |
| 391.    There was enough light for Rubalcava to see Puga while Puga was running away. *Ex. 2 to Le Decl., Rubalcava Dep. 92:10-12.* | Disputed to the extent it takes Rubalcava's testimony out of context. Rubalcava testified there was sufficient light in the northwest corner to see Puga and the houses on that side of the street, but he was unaware of the homes in the northeast corner of the intersection. He further explained that the northeast corner was dark, and he could not see that there was a home there. *Rubalcava Dep. 92:1-20, 102:4-12, Ex. Q to Esquivel Suppl. Decl.* |
| 392.    Rubalcava does not know whether he fired shots at Puga after Puga went to the ground. *Ex. 2 to Le Decl., Rubalcava Dep. 75:9-13.* | Undisputed. |
| 393.    Rubalcava concedes it would not have been appropriate to shoot at Puga if he merely saw a gun in Puga's waistband. *Ex. 2 to Le Decl., Rubalcava Dep. 97:19-22.* | Undisputed. |
| 394.    Based on Rubalcava's training, if Puga had not pointed a gun at Rubalcava, Rubalcava would not have shot. *Ex. 2 to Le Decl., Rubalcava Dep. 103:7-18.* | Undisputed. |
| 395.    Blackwood heard approximately 2 to 3 shots coming from his left before he fired and Kee and Rubalcava were to Blackwood's left. *Ex. 3 to Le Decl., Blackwood Dep. 11:3-6, 20:13-15, 46:23-47:8.* | Undisputed, but incomplete testimony. Blackwood testified that he saw a gun in Puga's hand and saw it pointed. Blackwood Dep. 8:13-17, Ex. P to Esquivel Decl. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 396.    Blackwood fired his first volley of shots due north while Puga was in the front of the car, near the driver's side. *Ex. 3 to Le Decl., Blackwood Dep. 28:9-19.* | Undisputed. |
| 397.    Puga had just cleared the front of the vehicle when Blackwood started firing. *Ex. 3 to Le Decl., Blackwood Dep. 28:20-23.* | Undisputed. |
| 398.    Blackwood was firing at Puga's left side while Puga was hunched over as if he had been struck by gunshots. *Ex. 3 to Le Decl., Blackwood Dep. 29:9-20.* | Undisputed. |
| 399.    When Blackwood saw Puga bending over, he believed Puga had been shot. *Ex. 3 to Le Decl., Blackwood Dep. 34:18-23.* | Undisputed. |
| 400.    Blackwood was aiming at Puga's back while Puga was running away. *Ex. 3 to Le Decl., Blackwood Dep. 29:25-30:2.* | Undisputed. |
| 401.    Blackwood was trying to assess while he was firing by looking for a gun but could not see Puga's hands and therefore never saw Puga with a gun while Puga was running away. *Ex. 3 to Le Decl., Blackwood Dep. 24:10-13, 30:23-31:11, 45:23-46:2.* | Undisputed. |
| 402.    Blackwood claims he fired at Puga while Puga was running because he did not see any gun on the ground and believed Puga was | Undisputed but incomplete testimony. Blackwood explained that he believed Puga still had the gun and considered him as an immediate threat to |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| still in possession of a gun. *Ex. 3 to Le Decl., Blackwood Dep. 54:7-14.* | Blackwood and others, and Puga was now running towards a house, creating a potential for a hostage situation. *Blackwood 54:7-55:7, Ex. P to Esquivel Decl.* |
| 403.    Blackwood fired ten shots during his first volley, paused when he saw Puga stumble, and then fired ten more shots when Puga caught himself and continued to run. *Ex. 3 to Le Decl., Blackwood Dep. 36:21-37:7.* | Undisputed. |
| 404.    Blackwood came off his sights and paused when he saw Puga stumbling, and when Puga did not go to the ground, Blackwood got back up on his sights and fired ten more shots. *Ex. 3 to Le Decl., Blackwood Dep. 37:12-38:5.* | Undisputed but incomplete testimony. Blackwood explained that Puga continued to pose an immediate threat of death or serious harm to the officers and others because he was still in possession of the gun, had been drinking, asked to speak with his mother, and was now heading towards a house that could have resulted in a hostage situation. *Blackwood 54:7-55:7, Ex. P to Esquivel Decl.* |
| 405.    When Blackwood saw Puga stumble, he believed that some shots he fired may have struck Puga. *Ex. 3 to Le Decl., Blackwood Dep. 39:24-40:3.* | Undisputed. |
| 406.    During the time Blackwood was shooting at Puga, Blackwood could not see Puga's hands. *Ex. 3 to Le Decl., Blackwood Dep. 36:18-20.* | Undisputed. |
| 407.    Blackwood is not sure whether he fired any shots at Puga while | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| Puga was going to the ground. *Ex. 3 to Le Decl., Blackwood Dep. 40:18-20.* | |
| 408. Blackwood claims he stopped firing when he saw Puga stop moving. *Ex. 3 to Le Decl., Blackwood Dep. 30:11-13.* | Undisputed. |
| 409. When Adams approached the vehicle, Puga was standing in the front close to the driver's side headlight and Adams could only see Puga from chest up. *Ex. 4 to Le Decl., Adams Dep. 40:16-22, 41:2-12, 45:11-16.* | Not applicable to State Defendants. |
| 410. The passenger door of the Expedition was still open when Adams and Vaccari approached from the passenger side. *Ex. 4 to Le Decl., Adams Dep. 73:2-6; Ex. 12 to Le Decl., Kee MVARS Part 2 at 46:42-46:49.* | Undisputed. |
| 411. As Adams was approaching from the passenger's side of the expedition, he heard shots. *Ex. 4 to Le Decl., Adams Dep. 35:12-14.* | Not applicable to State Defendants. |
| 412. Adams and Vaccari had only reached the part where the painted curb meets the unpainted curb when the shots started, which is near the rear door of the Expedition. *Ex. 4 to Le Decl., Adams Dep. 76:1-19; Ex. 12 to Le Decl., Kee Dashcam Video* | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *at 46:46-46:49; Ex. 16 to Le Decl., Photograph of Expedition at Curb.* | |
| 413.    Adams heard shots before he fired. *Ex. 4 to Le Decl., Adams Dep. 35:15-17.* | Not applicable to State Defendants. |
| 414.    After hearing the gunshots, Adams ducked and then stepped over a high curb before firing. *Ex. 4 to Le Decl., Adams Dep. 38:1-4.* | Not applicable to State Defendants. |
| 415.    Adams yelled at Puga to get on the ground and simultaneously heard shots. | Not applicable to State Defendants. |
| 416.    Adams fired his first shot when Puga had already started running. | Not applicable to State Defendants. |
| 417.    Adams fired ten shots altogether. | Not applicable to State Defendants. |
| 418.    Adams fired three volleys of shots with two distinct pauses between the volleys. | Not applicable to State Defendants. |
| 419.    Adams fired three shots during his first volley, four shots during his second volley, and three shots during his third volley. | Not applicable to State Defendants. |
| 420.    Adams claims he was aiming at Puga's back and side during all three volleys. | Not applicable to State Defendants. |
| 421.    Adams had moved closer to the passenger side of the vehicle and was behind the open passenger door for cover when he fired his second volley. | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 422.    Puga was still running away when Adams fired his second volley. | Not applicable to State Defendants. |
| 423.    One of Adams' concern with being in a residential neighborhood was innocent people being struck due to the number of shots fired. | Not applicable to State Defendants. |
| 424.    Adams is not sure whether he fired any shots after Puga went to the ground. | Not applicable to State Defendants. |
| 425.    At no time did anyone provide a verbal warning that deadly force was going to be used. *Ex. 2 to Le Decl., Rubalcava Dep. 94:13-15; Ex. 3 to Le Decl., Blackwood Dep. 24:17-25; Ex. 5 to Le Decl., Vaccari Dep. 63:4-6* | Not applicable to State Defendants. |
| 426.    Vaccari remained on target with the 40-millimeter as Puga ran away and later dropped the 40-millimeter and unholstered his firearm but did not use it because Puga was going down or already down. | Not applicable to State Defendants. |
| 427.    Vaccari's impression what that as Puga was running, he had been struck by gunfire because it appeared that Puga was staggering. | Not applicable to State Defendants. |
| 428.    When Adams and Vaccari approached Puga after the shooting, Puga was still breathing. | Not applicable to State Defendants. |
| 429.    Vaccari then decided to deploy the Taser at Puga. | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 430.    Vaccari did not give Puga a verbal warning that he was going to deploy the Taser before deploying it. | Not applicable to State Defendants. |
| 431.    The probes made contact and there was tensing and muscle reaction and Puga appeared to lock up. | Not applicable to State Defendants. |
| 432.    No one went in to handcuff Puga during the first Taser cycle. | Undisputed. |
| 433.    Vaccari later concedes during his interview with detectives that it would have been a much better option to go in and handcuff Puga while he was under the power of the initial Taser deployment instead of activating the Taser a second time. | Not applicable to State Defendants. |
| 434.    Vaccari tased Puga a second time. | Not applicable to State Defendants. |
| 435.    Puga's body also locked up during the second Taser activation. | Not applicable to State Defendants. |
| 436.    After the shooting, the officers heard someone exclaim about being shot coming from the northeast corner house. *Ex. 5 to Le Decl., Vaccari Dep. 57:16-24.* | Undisputed but immaterial. |
| 437.    The officers learned that three people from the house on the northeast corner had been shot: an adult male, and adult female, and a juvenile. *Ex. 1 to Le Decl., Kee Dep.* | Undisputed but immaterial. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| *56:22-57:6; Ex. 2 to Le Decl., Rubalcava Dep. 59:1-17, 59:18-22.* | |
| 438.    The Botten family, consisting of father Jonathan Wayne Botten, Sr., mother Tanja Dudek-Botten, daughter Annabelle Botten, and son J.B., were inside their house when the shooting happened. Ex. 14 to Le Decl., Botten Dep. 63:4-64:2, 64:16-19 | Undisputed but immaterial. |
| 439.    J.B. sustained three gunshot wounds to his chest that resulted in a collapsed lung on his left side, a ruptured spleen, and a lot damage to his internal organs due to the spreading of the bullets. *Ex. 15 to Le Decl., Botten Dep. 96:19-97:13.* | Undisputed but immaterial. |
| 440.    Dudek-Botten sustained gunshot wounds to her face, chest, and right shoulder. *Ex. 14 to Le Decl., Botten Dep. 85:20-86:3, 86:7-14, 109:18-110:4.* | Undisputed but immaterial. |
| 441.    Botten, Sr. sustained gunshot wounds to his right arm, left arm, left hand, and right leg. Ex. 14 to Le Decl., Botten Dep. 70:5-9, 71:20-72:5, 74:7-15, 75:14-20, 76:1-7. | Undisputed but immaterial. |
| 442.    There were bullet strikes to the front of the Botten residence, the screen door of the residence, one of the bedroom windows, and the side of the residence. *Ex. 18 to Le Decl., Ripley Dep. 31:16-33:19.* | Undisputed. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 443.    Vaccari violated standard police practices and training when he deployed pepper balls to strike Puga and struck Puga in the face. | Not applicable to State Defendants. |
| 444.    SBSD guidelines directs deputies to anticipate that a suspect will lower his head and to target from the upper torso down or alternatively, target surrounding objects. | Not applicable to State Defendants. |
| 445.    SBSD guidelines directs its deputies to not shoot at the head, neck, or spine unless a deadly force situation exists. | Not applicable to State Defendants. |
| 446.    It is undisputed that Puga did not pose an immediate threat of death or serious bodily injury at the time Vaccari deployed the pepper ball launcher and struck Puga in the eye | Not applicable to State Defendants. |
| 447.    Had Sergeant Vaccari exercised better tactics, Mr. Puga would not have suffered injuries to his eye from the pepper ball launcher | Not applicable to State Defendants. |
| 448.    Officers are trained that they are responsible for their tactical decisions when they resort to the use of lethal force. Clark Decl. ¶ 13a | Undisputed. |
| 449.    The officers' failure to follow standard police practices and training in dealing with barricaded subjects, poor tactics, and rushing to take Puga into custody once he was outside of the vehicle all contributed | Disputed. State Defendants' tactics met the standard of care and did not contribute to Plaintiffs' injuries. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| to the officers' unnecessary use of lethal force. Clark Decl. ¶ 13. | |
| 450.    The officers failed to formulate a safe tactical plan, made poor tactical decisions, and limited their tactical options, ultimately leading to their unnecessary use of lethal force. Clark Decl. ¶ 13b. | Disputed. State Defendants' tactics met the standard of care and did not contribute to Plaintiffs' injuries. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 451.    POST Learning Domain 23, "Crimes in Progress," advises officers that if available, officers should request specialized units and resources as soon as it has been determined that the suspect has taken a barricaded position. Clark Decl. ¶ 13c. | Undisputed but vague as to the term barricaded. Use of SWAT team is a judgment call on the part of the officer in charge. *Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.* |
| 452.    SWAT specifically trains to respond to incidents where subject(s) may be armed, barricaded, and refusing to submit to arrest. Clark Decl. ¶ 13c. | Undisputed but vague as to the term barricaded. Use of SWAT team is a judgment call on the part of the officer in charge. *Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.* |
| 453.    The utilization of San Bernardino Sheriff's Department SWAT would have been a safer alternative as SWAT is equipped with special training, equipment, and tools, which can help resolve the situation of a barricaded subject without escalating the situation. Clark Decl. ¶ 13c. | Disputed. Use of SWAT team is a judgment call on the part of the officer in charge. *Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.* |
| 454.    Given that the officers believed that Puga was involved in a prior freeway shooting, was still armed, was refusing to exit his vehicle, and | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| was situated in a residential neighborhood, Vaccari's failure to request for SWAT to respond when initially requested by Kee and after initial less-lethal force was unsuccessful were poor tactical decisions that contributed to the officers' use of unnecessary lethal force. Clark Decl. ¶ 12c. | |
| 455.    Among the "Fatal Errors" listed by POST Learning Domain 23, "Crimes in Progress," is poor positioning due to rushing or poor tactics. Clark Decl. ¶ 13e. | Disputed to the extent it implies that State Defendants were poorly positioned, and there is no evidence that Kee rushed in his tactics. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 456.    The officers' decision to leave cover and enter an open-air environment to take Puga into custody, when the officers stated that they still believed Puga to be armed and dangerous, and Kee stated that he was in fear for his life at the time he made the decision to approach and take Puga into custody, was a tactically poor decision. Clark Decl. ¶ 13e. | Disputed. State Defendants' tactics met the standard of care and did not contribute to Plaintiffs' injuries. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 457.    The situation did not call for an urgent response at the time the officers approached Puga. Clark Decl. ¶ 13e. | Disputed. No evidence shows that Kee "urgently" responded to Puga's pursuit and standoff. Both incidents lasted over an hour. Kee engaged in lengthy de-escalation efforts to get Puga to exit the vehicle and submit to an arrest. *See generally Blackwood MVARS Parts 3-4, Ex. F-G to Esquivel Decl.*<br><br>Further, the State Defendants' tactics met the standard of care for proper |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| | police practices. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 458.    Officers are trained that deadly force is only justified when there is an objectively reasonable belief that the suspect poses an immediate threat of death or serious bodily injury. Clark Decl. ¶ 14. | Disputed to the extent that it misstates the requirements of POST pertaining to the use of deadly force. *Meyer Report 13-14, Ex. M to Esquivel Decl.* |
| 459.    Officers are trained that subjective fear is insufficient to justify the use of deadly force. Clark Decl. ¶ 14. | Undisputed. |
| 460.    Officers are also trained that an overreaction is excessive force. Clark Decl. ¶ 15. | Undisputed but vague. |
| 461.    Under the facts and circumstances as alleged by Kee at the time he initially shot Puga, Kee violated standard police practices and training when he shot at Puga when he saw Puga drop his right hand from a raised position. Clark Decl. ¶ 16. | Disputed. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 462.    Kee overreacted when he saw Puga drop his right hand from a raised position. Clark Decl. ¶ 16. | Disputed. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 463.    The percipient witness' cell phone video, labeled COSB0001459, shows Puga's front side as he exits the car and there appears to be no weapon on or near Puga's waistband. Clark Decl. ¶ 16. | Disputed. State Defendants' police practices expert sees a gun in Puga's waistband as depicted in the Edward Mangerino Video, bates stamped COSB0001459. Meyer Dep. 75:11-14, Ex. Z to Esquivel Suppl. Decl. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 464.    Rubalcava, Blackwood, Kee, and Adams violated standard police practices and training when they shot at Puga while he was running away. Clark Decl. ¶ 17 | Disputed. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 465.    Puga did not present an immediate threat of death or serious bodily injury as he was running and the officers failed to reassess and overreacted when they fired subsequent volleys when Puga was running. Clark Decl. ¶ 17. | Disputed. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 466.    Officers are trained that deadly force may only be used in an immediate defense of life situation. Clark Decl. ¶ 16a. | Disputed to the extent that it misstates the requirements of POST pertaining to the use of deadly force. *Meyer Report 13-14, Ex. M to Esquivel Decl.* |
| 467.    There was no immediate defense of life situation while Puga was running away. Clark Decl. ¶ 17a. | Disputed. *Meyer Report 22-28, Ex. M to Esquivel Decl.*<br><br>Also disputed because this is not a fact but a legal conclusion. |
| 468.    There were no bullet impacts or casings found near the area of the initial shooting that would support the allegation that Puga fired a weapon at anyone. Clark Decl. ¶ 17a. | Undisputed that bullet impacts or casing from Puga's gun were not located. Disputed that Puga did not fire his gun at anyone. *Annabelle Botten Interview at 02:00-02:50, Ex. K; Mangerino Dep. 35:2-36:17, 50:14-52:5, Ex. S; Goodson Dep. 26:10-27:3, 31:19-32:11, 49:11-22, 53:6-54:6, Ex. T; Adams Dep. 35:12-36:18, Ex. R; Blackwood Dep. 53:14-16, Ex. P.* |
| 469.    Officers are trained that they may use deadly force against a fleeing suspected felon to prevent | Undisputed. |

State Defs.' Response to Statement of Genuine Disputes

49

5:22-cv-0949 KK (SHKx)

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| escape only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officers or others. Clark Decl. ¶ 17c. | |
| 470.    There is evidence that this was likely a situation of contagious fire. Clark Decl. ¶ 17d. | Disputed. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 471.    Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they shot at Mr. Puga after he had fallen to the ground. Clark Decl. ¶ 18. | Disputed as to the State Defendants. *Meyer Report 22-28, Ex. M to Esquivel Decl.* |
| 472.    Mr. Puga was not an immediate threat of death or serious bodily injury after he had fallen to the ground. Clark Decl. ¶ 18a. | Disputed to the extent that it is vague as to time. As the Erin Mangerino Video shows, Puga continued to move and attempt to flee after he fell to the ground. He could have raised his hand with the gun and fired at the officer from the ground. |
| 473.    The officers had time to provide Mr. Puga with a warning that deadly force was going to be used prior to the shooting and time to provide an additional warning that deadly force was going to be used in between their first and subsequent volleys of shots. Clark Decl. ¶ 19. | Disputed. *Meyer Report 22-28, Ex. M to Esquivel Decl.* Rubalcava Dep. 79:6-80:19, Ex. Q to Esquivel Decl.<br><br>Also disputed because this is not a fact but a legal conclusion. |
| 474.    Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard | Disputed. *Meyer Report 22-28, Ex. M to Esquivel Decl.;* Kee Dep. 86:17-87:13, Ex. O; Rubalcava Dep. 45:20- |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| police practices and training when they failed to consider their background prior to utilizing deadly force, resulting in the serious injuries of innocent bystanders. Clark Decl. ¶ 20. | 46:7, 51:3-8, Ex. Q.<br><br>Also, disputed as irrelevant as to innocent bystanders. |
| 475.    The officers violated standard police practices and training in failing to request backup to set up a perimeter and evacuate uninvolved individuals from the area in order the ensure the safety of these uninvolved individuals. Clark Decl. ¶ 21. | Disputed. *Meyer Report 22-28, Ex. M to Esquivel Decl.; Meyer Dep. 72:24-74:5, Ex. Z to Esquivel Suppl. Decl.*<br><br>Also, disputed as irrelevant as to uninvolved individuals. |
| 476.    Sergeant Vaccari's two-time deployment of the Taser at Mr. Puga after he had been shot twice and was clearly incapacitated without prior verbal warning violated standard police practices and training. Clark Decl. ¶ 22. | Not applicable to State Defendants. |
| 477.    The San Bernardino Sheriff's Department Manual advises its deputies that a Taser may only be used when objective facts indicate that the suspect poses an immediate threat to the safety of the officer or a member of the public. Clark Decl. ¶ 22a. | Not applicable to State Defendants. |
| 478.    Officers are also trained on the concept of "cuffing under power" in which an officer can safely go in and handcuff a suspect while the suspect is under effects of the | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| neuromuscular incapacitation of the Taser. Clark Decl. ¶ 22b. | |
| 479.    The second Taser deployment violated standard police practices and training because it was clear from the first Taser deployment that Mr. Puga was incapacitated when his muscles responded to the Taser deployment but he did not respond, no verbal warning was given prior to the second Taser deployment, and Sergeant Vaccari admits that the second deployment would have been unnecessary had he considered at the time to go in and handcuff Mr. Puga while he was under the power of the Taser during the first Taser deployment. Clark Decl. ¶ 22b. | Not applicable to State Defendants. |
| 480.    L.C. was born in 2013. Ex. 21 to Le Decl., Cadena Dep. 12:19-20. | Undisputed. |
| 481.    After L.C. was born, Puga desperately wanted to see L.C. Ex. 21 to Le Decl., Cadena Dep. 37:16-22. | Undisputed that L.C.'s mother testified as stated here. But Puga's desire to see his daughter does not create a factual dispute that he saw L.C. or had a recognizable relationship with her. |
| 482.    At some point, Puga approached L.C.'s mother and told her that he would voluntarily support L.C. because she was his child. Ex. 21 to Le Decl., Cadena Dep. 38:3-7. | Undisputed that L.C.'s mother testified as stated here. But Puga's willingness to pay child support for L.C., which he was legally obligated to do, does not create a factual dispute that he had a recognizable relationship with his daughter. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 483.    Puga told L.C.'s mother that he would buy L.C. whatever she needed or whatever L.C.'s mother needed. Ex. 21 to Le Decl., Cadena Dep. 38:8-12. | Undisputed that L.C.'s mother testified as stated here. But Puga's willingness to purchase necessities for L.C., which he was legally obligated to do, does not create a factual dispute that he had a recognizable relationship with his daughter. |
| 484.    After L.C. was born, Puga was incarcerated for three to four years and then again from approximately 2019 to shortly before his death. Ex. 22 to Le Decl., Salas Dep. 23:12-14; Ex. 23 to Le Decl., Hernandez Dep. 31:14-21, 35:13-15. | Undisputed. |
| 485.    Puga would see L.C. at times when L.C. visited her grandmother, Puga's mother. Ex. 21 to Le Decl., Cadena Dep. 26:6-13, 28:4-7. | Disputed. Misstates the cited testimony. Cadena testified that she never let Puga see L.C., and she was "pretty sure" Puga's mother let him see L.C. when L.C. visited her grandmother. But Cadena was not present during those visits and has no personal knowledge whether Puga visited L.C. on those seven occasions that L.C. visited her grandmother. Cadena Dep. 26:6-13. |
| 486.    L.C. visited Puga's mother approximately seven times. Ex. 21 to Le Decl., Cadena Dep. 26:14-17, 27:10-13. | Undisputed but there is no evidence that Puga saw L.C. while she visited her grandmother. |
| 487.    L.C. spoke to Puga over the phone approximately three times. Ex. 21 to Le Decl., Cadena Dep. 28:21-24. | Undisputed but three phone calls over the course of L.C. young life does not amount to the type of relationship recognized under the Fourteenth Amendment. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| 488.    Puga would have preferred to see L.C. more often. Ex. 22 to Le Decl., Salas Dep. 30:10-20. | Undisputed that Puga's sister as stated here. But Puga's preference does not create a factual dispute that he had a recognizable relationship with his daughter. |
| 489.    L.C.'s mother saw Puga the Friday before he died and Puga asked about how L.C. was doing. Ex. 21 to Le Decl., Cadena Dep. 15:16-16:6. | Undisputed that L.C.'s mother testified as stated here. But Puga's inquiry does not create a factual dispute that he had a recognizable relationship with his daughter. |
| 490.    Puga would regularly follow the bus L.C.'s mother drove for work whenever Puga was in Long Beach and ask about L.C. Ex. 21 to Le Decl., Cadena Dep. 16:7-14. | Undisputed that L.C.'s mother testified as stated here. But Puga's actions of following L.C.'s mother on the bus does not create a factual dispute that he had a recognizable relationship with his daughter. |
| 491.    Puga had previously contacted L.C.'s mother about seeing L.C. Ex. 21 to Le Decl., Cadena Dep. 28:11-13. | Undisputed that L.C.'s mother testified as stated here. But Puga's contact with L.C.'s mother, absent evidence that he also had meaningful contact with L.C., does not create a factual dispute that he had a recognizable relationship with his daughter. |
| 492.    In the two years before Puga' passing, Puga would see L.C. at times when L.C. visited her aunt Susie, Puga's sister. Ex. 22 to Le Decl., Salas Dep. 30:10-20; 31:2-16, 81:6-10. | Undisputed that Puga's sister testified as stated here. But Plaintiffs provided no evidence as to the nature, quality, and quantity of the contact Puga had with L.C. while visiting her aunts. Absent such evidence, Plaintiffs failed to create a factual dispute that Puga had a recognizable relationship with his daughter |
| 493.    In Plaintiffs' police practices expert Roger Clark's Rule 26 Expert | Not applicable to State Defendants. |

| Plaintiffs' (Nonmoving Party) Additional Material Facts | State Defendants' Response to Plaintiffs' Additional Fact |
|---|---|
| Report, he opined on the reasonableness of Vaccari's deployment of the pepperball projectile that struck Puga's eye and Vaccari's subsequent deployments of the Taser. | |

Dated:  March 6, 2025

Respectfully submitted,

ROB BONTA
Attorney General of California
NORMAN D. MORRISON
Supervising Deputy Attorney General

*/s/ Diana Esquivel*

DIANA ESQUIVEL
Deputy Attorney General
*Attorneys for Defendants State of Cal., Blackwood, Kee, and Rubalcava*

LA2022603031
38843985.docx