ROB BONTA
Attorney General of California
NORMAN D. MORRISON
Supervising Deputy Attorney General
DIANA ESQUIVEL
Deputy Attorney General
State Bar No. 202954
 1300 I Street, Suite 125
 P.O. Box 944255
 Sacramento, CA 94244-2550
 Telephone: (916) 210-7320
 Facsimile: (916) 322-8288
 E-mail: Diana.Esquivel@doj.ca.gov
*Attorneys for Defendants State of California, by and
through the California Highway Patrol, Blackwood,
Kee, and Rubalcava*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| **L.C.,**<br><br>Plaintiffs,<br><br>v.<br><br>**STATE OF CALIFORNIA, et al.,**<br><br>Defendants. | No. 5:22-cv-00949 KK (SHKx)<br><br>**STATE DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**<br><br>Date: March 20, 2025<br>Time: 9:30 a.m.<br>Courtroom: 3 (3rd Floor)<br>Judge: Hon. Kenly Kiya Kato<br>Trial Date: June 2, 2025<br>Action Filed: June 7, 2022022 |

State Defs.' Reply to Pls.' Opp'n to Motion
for Summary Judgment

5:22-cv-00949 KK (SHKx)

**INTRODUCTION**

Relying on unsupported assumptions and inferences, irrelevant facts, and incomplete or out-of-context deposition testimony, Plaintiffs seek to create factual disputes where none exist. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). Here, Plaintiffs' opposition to the State Defendant's motion for summary judgment is replete with argument that is contradicted by eye witness testimony and other evidence that Plaintiffs ignore.

While State Defendants cannot reasonably list every incomplete or inaccurate representation of the evidence in Plaintiffs' opposition, State Defendants address the pertinent arguments that relate to the reasonableness of the State Defendants' use of lethal force when Puga reached for a gun in his waistband, thus posing an immediate threat of death or seriously body harm to the officers, the lack of evidence that State Defendants acted with intent to harm, and Plaintiffs' failure to show that Rubalcava can be liable for wrongful death damages when the undisputed evidence shows he did not cause the fatal gun wound. State Defendants direct the Court's attention to their responses to Plaintiffs' Statement of Genuine Disputes that contains a whopping 269 additional facts, the majority of which are immaterial.

**PLAINTIFF CANNOT IGNORE PERTINENT EYE WITNESS TESTIMONY THAT PUGA HAD A GUN TO DEFEAT SUMMARY JUDGMENT ON THE USE-OF-FORCE CLAIMS**

Plaintiffs first argue in their opposition to the State Defendants' motion on their Fourth Amendment, battery, and Bane Act claims is that neighbor Betzbeth Gonzalez testified at deposition that she did not see a gun in Puga's waistband when he stepped out of the vehicle. Plaintiffs' reliance on Gonzalez's deposition is misplaced for one significant reason: her testimony is contradicted by her own video recording showing that Puga never displayed the front of his waistband to the

officers. Gonzalez was at home when the incident occurred, watching through her bathroom window. . Her house is the second house on Peach Street from the southwest corner of the intersection of Peach and Catalpa streets. Thus, her view of the incident was from behind the officers as her video recording shows. (Gonzalez Dep. 31:23-32:4, 51:11-52:4, 69:7-10, 70:1-71:4 & Ex. 54 thereto, Ex. DD to Esquivel Suppl. Decl.; s*ee*, Gonzalez Video, Ex. J to Esquivel Decl.) Gonzalez's video, like the dashcam from Blackwood's patrol vehicle undisputable show that Puga never turned his body towards the officers such that the front of his waistband was visible to the officers. Puga only faced south on Peach Street when he went to the front of his vehicle and used the hood a shield to conceal the front of his waistband from the officers. Thus, Gonzalez's testimony that she could see the front of Puga's waistband is so blatantly contradicted by the record, no reasonable juror could believe Gonzalez's testimony that she did not see a gun in Puga's waistband. *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Plaintiffs' relied on Gonzalez's testimony to the exclusion of the testimony of Annabelle Botten, Edward Mangerino, and Tammy Goodson who testified that they either saw a gun in Puga's hand or evidence that he had and fired a gun, such as Mr. Mangerino who saw Puga holding something in his hand then saw smoke coming from the top of Puga's hand that he recognized as gun smoke. Nowhere in Plaintiffs' opposition did they address the testimony of these witnesses. Nor can Gonzalez's testimony create a factual dispute as to the testimony of these witnesses because, as stated above, her testimony is contrary to the video evidence that no reasonable juror can believe her account.

Similarly, Plaintiffs' contention that Puga was pulling up his pants rather than reaching for a gun in his waistband is not supported by the numerous videos. While the videos show that Puga pulled up his underwear and pants on a few occasions, that is not true for the critical moment when he reached for the gun while standing in front of his vehicle. No video shows Puga's pants moving to indicate his was

1    pulling them up or adjusting them rather than reaching for a gun immediately

2    before Officer Kee shot his first round.

3        Plaintiffs' contention that a jury could disbelief Kee's testimony that he was a

4    gun because Puga was shirtless and the back or sides of his waistband may have

5    been visible to Kee when Puga stepped out of the vehicle is completely speculative.

6    The undisputed evidence shows that Puga never permitted the officers to see the

7    front of his waistband. Kee did not see the gun until he walked up the street to

8    where he was almost even with the front of Puga's vehicle, and for the first time

9    was able to see the front of Puga's waistband and the gun. Plaints have not pointed

10   to any evidence that Kee saw the front of Puga's waistband before then.

11       As argued in the State Defendants moving papers, Kee was justified in using

12   lethal force when Puga reached for the gun in his waistband even if Puga started to

13   turn and run northwest on Peach Street. By reaching for and obtaining the gun in

14   his waistband, Puga posed an immediate threat of death or serious bodily harm to

15   Kee and the other officer such that the State Defendants' use of lethal force was

16   reasonable and justified.

17       Plaintiffs next contend that Puga did not pose an immediate threat when he

18   started to run with his back towards the officers. Not so. Here, the officers had

19   information that Puga was involved in an earlier freeway shooting. Puga had just

20   brandished a gun and fired it in Kee's direction. Although Puga took off running,

21   no officer show him drop the gun. Thus, he still posed an immediate threat because

22   the gun was in his possession, and he could have easily fired upon the officers

23   again. Moreover, Puga was running in the direction of a couple of houses on Peach

24   Street. Puga had already evaded police following the freeway shooting, and again

25   when Rubalcava and Blackwood attempted to arrest him before the hour-long,

26   highspeed pursuit ensued. State Defendants thus had a reasonable and well founded

27   belief that Puga could potentially barricade himself in a residence and take hostages

28

1    to avoid arrest. Because the State Defendants' use of lethal force was reasonable

2    during both volleys, Plaintiffs' Fourth Amendment Claim against them fails.

3    **PLAINTIFFS' CITED NO CASE LAW TO SHOW THE LAW WAS CLEAR
      TO PUT STATE DEFENDANTS WERE ON NOTICE THAT THEIR USE
4    OF LETHAL FORCE WAS UNLAWFUL**

5        Although Plaintiffs broadly claim that an officer cannot shoot a suspect in the

6    back, the cases cited are factually inapposite from the circumstances presented here.

7    There is simply no precedent that an officer cannot fire upon a person who draws

8    his firearm and has not verbalized or expressed an intent to surrender. *Reynolds v.*

9    *County of San Diego*, 858 F. Supp. 1064, 1072 (S.D. Cal. 1994) ("[A]n officer may

10   reasonably use deadly force when he or she confronts an armed suspect in close

11   proximity whose actions indicate an intent to attack. In these circumstances, the

12   Courts cannot ask an officer to hold fire in order to ascertain whether the suspect

13   will, in fact, injure or murder the officer."). There is likewise no case law that

14   requires warnings be given when a suspect reaches in his waistband and pulls out a

15   firearm nor were there any facts presented here that a warning was feasible.

16       Plaintiffs' opposition does not address, let alone attempt to distinguish, the

17   authorities the State Defendants cite to in their moving papers that case precedent

18   permits an officer to use lethal force if a suspect reaches for a gun in his waistband,

19   or even if he reaches there for some other reason. *Cruz v. Cty. of Anaheim*, 765 F.3d

20   1076, 1078 (9th Cir. 2014); *Est. of Strickland v. Nevada Cnty.*, 69 F.4th 614, 620

21   (9th Cir. 2023), cert. denied, 144 S. Ct. 559, 217 L. Ed. 2d 297 (2024).

22       Further, Plaintiffs' cases establishing that shooting at an incapacitated suspect

23   after he has been shot and fallen are inapposite. None of the case Plaintiffs rely on

24   resemble the situation the State Defendants encountered here. While Puga may

25   have stumbled when he took off running, he did not fall. He continued to run for

26   another approximate 100 feet. The video evidence shows that once he fell, Puga

27   continued to move—he crawled and was moving his hands and feet such that he

28   could have easily turned and fired upon the officers again. The undisputed evidence

1   also shows that once Puga fell to the ground, Kee ceased firing; once Puga stopped

2   moving, Blackwood and Rubalcava stopped firing. Although Rubalcava does not

3   recall if he fired upon Puga when he fell, he had stopped firing by the time Puga

4   stopped moving. Thus, contrary to the cases upon which Plaintiffs' rely, the

5   evidence here show that despite Puga's fall, he continued to pose an immediate

6   threat to the officers because he was still moving his arms, and the officers had no

7   information or basis to believe that Puga was no longer in possession of the gun.

8   His movement demonstrated his continued ability to use and fire a gun. State

9   Defendants are therefore entitled to qualified immunity.

10  **PLAINTIFFS FAILED TO COME FORWARD WITH ANY EVIDENCE TO
11  CREATE A FACTUAL DISPUTE THAT RUBALCAVA CAUSED PUGA'S
    DEATH**

12  A wrongful death claim necessarily requires that the defendant cause the death

13  of another person. *Holland v. Silverscreen Healthcare, Inc.*, 101 Cal. App. 5th

14  1125, 1132 (2024). Despite the undisputed evidence that Puga died from a fatal

15  gunshot wound from a .223 caliber bullet, Plaintiffs' illogically argue that their

16  wrongful death claim against Puga survives because these is evidence that

17  Rubalcava caused another wound that **could have** been fatal. The wound to Puga's

18  lower left back was not fatal; it may have become fatal because the bullet

19  perforated the intestine. However, as the pathologist who performed Puga's autopsy

20  testified, death would have been the result of an infection left untreated, not the

21  gunshot wound. It is undisputed that Puga died of a fatal gunshot wound to the mid

22  lower back. Plaintiffs have no evidence to support their contention that Puga could

23  have died of the gunshot wound to his lower left back that pierced his intestine.

24  Rubalcava is therefore entitled to summary judgment on Plaintiffs' wrongful death

25  claim.

26  / / /

27  / / /

28

1

## CONCLUSION

2       State Defendants will not belabor the remaining arguments in Plaintiffs'

3  opposition. They are addressed in connection with the State Defendants' responses

4  to Plaintiffs' Statement of Genuine Disputes and in their moving papers for

5  summary judgment. For the reasons discussed above and in their moving papers,

6  the Court should grant the State Defendants' motion and entered judgment in their

7  favor.

8

9  Dated:  March 6, 2025             Respectfully submitted,

10                                  ROB BONTA
                                      Attorney General of California

11                                  NORMAN D. MORRISON
                                    Supervising Deputy Attorney General

12

13                                  ***/s/ Diana Esquivel***

14                                  DIANA ESQUIVEL
                                    Deputy Attorney General

15                                  *Attorneys for Defendants State of Cal.,*
*by and through the Cal. Highway*

16                                  *Patrol, Blackwood, Kee, and*
*Rubalcava*

17  LA2022603031

18  38843987.docx

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF COMPLIANCE**

2      The undersigned, counsel of record for State of California, Blackwood, Kee,

3  and Rubalcava, certifies that this brief contains 2,721 words, which complies with

4  the word limit of L.R. 11-6.1.

5

6  Dated:  March 6, 2025                    Respectfully submitted,

7                                           ROB BONTA
                                            Attorney General of California
8

9                                          */s/ Diana Esquivel*

10                                          DIANA ESQUIVEL
                                            Deputy Attorney General
11                                          *Attorneys for Defendants State of Cal.,*
                                            *Blackwood, Kee, and Rubalcava*
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28