ROB BONTA
Attorney General of California
NORMAN D. MORRISON
Supervising Deputy Attorney General
DIANA ESQUIVEL
Deputy Attorney General
State Bar No. 202954
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7320
  Facsimile: (916) 322-8288
  E-mail: Diana.Esquivel@doj.ca.gov
*Attorneys for Defendants State of California, by and through the California Highway Patrol, Blackwood, Kee, and Rubalcava*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| **L.C., et al.,**<br><br>                              Plaintiffs,<br><br>**v.**<br><br>**STATE OF CALIFORNIA, et al.,**<br><br>                              Defendants. | No. 5:22-cv-00949 KK (SHKx)<br><br>**SUPPLEMENTAL DECLARATION OF DIANA ESQUIVEL IN SUPPORT OF REPLY TO STATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date:          March 20, 2025<br>Time:          9:30 a.m.<br>Courtroom:  3 (3rd Floor)<br>Judge:        Hon. Kenly Kiya Kato<br>Trial Date:   June 2, 2025<br>Action Filed: June 7, 2022 |

I, Diana Esquivel, declare:

1. I am admitted to practice law in California and before this Court, and am a Deputy Attorney General with the Office of the Attorney General for the State of California, attorneys of record for Defendants State of California, by and through the California Highway Patrol (CHP), CHP Officers Michael Blackwood, Isaiah Kee, and Bernardo Rubalcava (collectively, State Defendants).

2. Exhibit Q are additional excerpts of the relevant portions of the transcript of Defendant Rubalcava's deposition testimony, taken on November 4, 2024, in this matter.

3. Exhibit U are additional excerpts of the relevant portions of the transcript of Dr. Timothy Jong's deposition testimony, taken on February 12, 2024, in this matter.

4. Exhibit Z are excerpts of the relevant portions of the transcript of State Defendants' police practices expert, Greg Meyer, whose deposition testimony was taken on February 12, 2025, in this matter.

5. Exhibit AA are the relevant portions of Defendant Isaiah Kee's interview with the San Bernardo County Sheriff's Department, conducted on March 4, 2021.

6. Exhibit BB are the relevant portions of Defendant Bernardo Rubalcava's interview with the San Bernardino County Sherriff's Department, conducted on March 5, 2021.

7. Exhibit HH are excerpts of the relevant portions of the transcript of Betzabeth Gonzalez's deposition testimony, taken on December 30, 2024, in this matter.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing statements are true and correct.


Dated:  March 6, 2025                    ___*/s/ Diana Esquivel*___
                                         Diana Esquivel

LA2022603031
38847506.docx

# Exhibit Q

```
 1                    UNITED STATES DISTRICT COURT

 2                   CENTRAL DISTRICT OF CALIFORNIA

 3

 4   JONATHAN WAYNE BOTTEN, SR.; TANJA     )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and   )
 5   J.B., a minor by and through his      )
     guardian JONATHAN WAYNE BOTTEN, SR.,  )
 6                                         )
                     Plaintiffs,           )
 7                                         )
                     vs.                   ) Case No.
 8                                         ) 5:23-CV-00257-JGB-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN    )
 9   BERNARDINO; ISAIAH KEE; MICHAEL       )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,   )
     inclusive,                            )
11                                         )
                     Defendants.           )
12   _____)

13

14

15

16            REMOTE VIDEOCONFERENCE DEPOSITION OF

17                     BERNARDO RUBALCAVA

18                  MONDAY, NOVEMBER 4, 2024

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  112646
```

**JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Bernardo Rubalcava on 11/04/2024**

Page 90

1  located as you knew it at the time you were being
2  interviewed, or at the time of the shooting.
3      A.  At the time I was being interviewed.
4      Q.  At the time of the shooting, were you aware where
5  all the houses were located on the intersection of Peach
6  and -- I don't remember the name of the cross street?
7      A.  No.
8      Q.  At the time that you were approaching Mr. Puga, did
9  you have any intention to shoot him?
10     A.  No.
11     Q.  Did you think that that might be a possibility given
12 the fact that during the briefing you were informed that the
13 suspect was armed?
14     A.  Yes.
15     Q.  Did you see any lights coming from behind Mr. Puga's
16 person as you were approaching him?
17     A.  No.
18     Q.  Anything indicate to you that there were residents
19 or people somewhere in his background?
20     A.  No.
21     Q.  I think that might be all the questions I have.
22         Just give me a minute.
23         You testified earlier that you spoke to one of the
24 bystanders that was shot; is that correct?
25     A.  Yes.

Page 91

1      Q.  Where did that conversation take place?
2      A.  At the intersection -- well, he sat at the rear of
3  the ambulance.
4      Q.  Other than obtaining his names and the injuries
5  sustained by the other individuals, any other conversations
6  that you had with that gentleman?
7      A.  No.
8      Q.  Did he say anything to you other than providing you
9  with the information that you were asking?
10     A.  No.
11     Q.  I think that's all the question I have.
12         Thank you, Officer.
13         MR. GALIPO:  I just have a few follow-up based on
14 those questions.
15                 EXAMINATION
16 BY MR. GALIPO:
17     Q.  So am I understanding that the helicopter with the
18 light was there earlier, but not there at the time of the
19 shooting?
20     A.  Yes.
21     Q.  And how long do you think the helicopter was
22 illuminating the area with its spotlight?
23         Half hour?  45 minutes?
24         What would be your estimate?
25     A.  Half hour.

Page 92

1      Q.  And is it your testimony that you didn't know during
2  that time that there were homes around the area?
3      A.  Yes.
4      Q.  You didn't see the helicopter's light illuminating
5  any homes?
6      A.  No.
7      Q.  You're saying you didn't know there were any homes
8  on the corners near where you were?
9      A.  I didn't know.
10     Q.  You indicated there were street lights and lighting
11 such that you could see Mr. Puga running away in the dark?
12     A.  Yes.
13     Q.  But you're saying you were not aware of any homes
14 there?
15     A.  I wasn't aware of any homes in the northeast
16 corner.
17     Q.  How about the other corners?
18     A.  I was aware of the northwest corner.
19     Q.  You could see the home there?
20     A.  Yes.
21     Q.  Are you saying if you knew there was a home in the
22 northeast corner, you wouldn't have shot so many shots?
23     A.  No.
24     Q.  So you would have shot the same number of shots
25 anyway?

Page 93

1      A.  Probably not.
2      Q.  With respect to justifying all your shots, based on
3  your training, there has to be an immediate threat of death
4  or serious bodily injury for each shot; correct?
5      A.  Correct.
6      Q.  And you simply can't shoot someone for running away,
7  true?
8      A.  True.
9      Q.  With respect to your recollection that Mr. Puga
10 fired two shots at you, do you know where these bullets went?
11     A.  I believe -- no.
12     Q.  Do you know if they struck anything?
13     A.  I believe -- no.
14     Q.  Do you know if they were located anywhere down
15 range?
16     A.  No.
17     Q.  Do you know if you can see these muzzle flash you're
18 referring to in any of the videos from Mr. Puga?
19     A.  No.
20     Q.  Do you know if other deputies saw him actually
21 firing a shot, or it was only you?
22     A.  I don't know.  I didn't speak to the deputies.
23     Q.  Are you saying that if he wouldn't have fired shots
24 at you, you wouldn't have fired at him?
25     A.  No.

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 98

EXAMINATION
1   EXAMINATION
2   BY MS. ESQUIVEL:
3       Q.   I just want to make sure because I don't think I
4   understood your testimony on some of the questions that
5   Mr. Galipo was asking you.
6            If you would have still shot Mr. Puga -- so let me
7   just ask.
8            Would you still have shot Mr. Puga had he not fired
9   his gun at you?
10      A.   Yes.
11      Q.   Why would you have still shot at him if he had not
12  fired his gun?
13      A.   Because he reached for his handgun and pointed it at
14  us, and he's still a threat towards us.
15      Q.   Is there anything that you're aware of either your
16  trainings or CHP policies or POST training that requires you
17  to wait until a suspect actually pulls a trigger after you
18  see him reach for a gun?
19      A.   No.
20      Q.   So you viewed Mr. Puga as a threat when he reached
21  for his weapon or the gun in his waistband; is that
22  correct?
23      A.   Yes.
24           MR. GALIPO:  Objection.  Leading.
25  BY MS. ESQUIVEL:

Page 99

1       Q.   Let me show you, and this video's just produced on
2   Friday, and it's Plaintiff 0241.
3            I'm not going to turn on the sound because I can't,
4   but I will -- it's pretty grainy.
5            (Video playing.)
6   BY MS. ESQUIVEL:
7       Q.   I'm going to fast-forward -- well, from this angle,
8   I'm just going to stop it real briefly.
9            This was -- it looks like a bystander video, and
10  this appears to be from the southwest corner somewhere behind
11  you on the southwest corner; is that your understanding of
12  the view?
13      A.   Yes.
14      Q.   And based on what we see here, can you tell who this
15  person is that's -- do you see Mr. Puga with his hands up,
16  and there is a figure right to the right if you're looking at
17  your screen on the right of that?
18           Do you know who that is?
19      A.   I believe that's Sergeant Kee.
20      Q.   Can you see where you're standing?
21      A.   No.
22      Q.   I'm going to play it for a little bit, and then you
23  tell me if you can see where -- if at any point it captures
24  you.
25           (Video playing.)

Page 100

1            (Video paused.)
2   BY MS. ESQUIVEL:
3       Q.   Let me fast-forward it a little bit to see if that
4   will --
5            (Video playing.)
6            MS. ESQUIVEL:  I'm going to stop it at 2:53.
7            (Video paused.)
8            (Video playing.)
9   BY MS. ESQUIVEL:
10      Q.   From here, I'm just going to play it a little bit.
11           Do you see yourself anywhere?
12      A.   No.
13      Q.   So I'll continue to fast-forward.
14      A.   Yeah, I think so.
15      Q.   I'm going to stop it at three minutes in.
16      A.   Behind the driver's side door of the patrol car.
17      Q.   So we're now at 4 minutes in, and I'm going to stop
18  it right here.  It's going to get grainy again.
19           There is a figure over here.
20           Do you know who that is?  I don't know if you can
21  see my mouse, but I'll just describe it.
22           Mr. Puga's in the middle here on the left-hand side
23  of this frame, and then there is a figure to the left if
24  you're looking at the screen, and then there is a figure to
25  the right of Mr. Puga.

Page 101

1            Who is on the left?
2       A.   Sergeant Kee.
3       Q.   And who is on the right?
4       A.   I am.
5       Q.   I'm going to fast-forward again.
6            (Video playing.)
7            (Video paused.)
8   BY MS. ESQUIVEL:
9       Q.   We're now at 5 minutes and 37 seconds in.
10           And there is someone walking up.
11           Do you know who this person is right here?
12      A.   That's me.
13      Q.   And is this where you were -- you testified earlier
14  that you were walking to bring yourself, I guess, parallel
15  perpendicular in line with the front bumper of the white
16  SUV?
17      A.   Yes.
18      Q.   From this angle other than this light post, the
19  light from the post there, could you see any lights in the
20  background?
21      A.   No.
22      Q.   I'll continue playing the video.
23           (Video playing.)
24           (Video paused.)
25  BY MS. ESQUIVEL:

JONATHAN WAYNE BOTTEN SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Bernardo Rubalcava on 11/04/2024

Page 102

1      Q.   Do you recall if at this point you still have your
2  weapon drawn?
3      A.   Yes.
4      Q.   It gets a little fuzzy there.
5           Having seen that, does that in way refresh your
6  recollection in terms of whether you saw any lights or
7  anything that would have indicated to you that there were
8  homes on the northeast corner of the intersection?
9      A.   Yes.
10     Q.   And what did it refresh your recollection?
11     A.   It was dark, and I couldn't see that there's a
12 home.
13     Q.   Okay.  I have no further questions.
14                    EXAMINATION
15 BY MR. GALIPO:
16     Q.   Okay.  Is it generally your experience that in
17 residential neighborhoods, there is homes at the
18 intersections or corners?
19          MS. ESQUIVEL:  Objection.  Vague; overbroad; lacks
20 foundation; calls for speculation.
21 BY MR. GALIPO:
22     Q.   You may answer.
23     A.   Not in that area.
24     Q.   You saw a home on one corner; correct?
25          So you're saying you thought there was just a home

Page 103

1  on one corner, but not the other?
2           Or you didn't know either way?
3      A.   Didn't know either way.
4      Q.   And just so I'm clear, if he had not pointed a gun
5  at you, are you saying you still would have shot him?
6      A.   Can you repeat the question?
7      Q.   Sure.  If he had not pointed a gun at you -- forget
8  about the shots, shooting the gun -- if he had not pointed a
9  gun at you, are you saying you wouldn't have shot him?
10     A.   No.
11          MS. ESQUIVEL:  Calls for speculation.
12 BY MR. GALIPO:
13     Q.   So you would have shot him even if he didn't point a
14 gun at you; is that what you're saying?
15     A.   If he wouldn't have pointed a gun, I would not have
16 shot him.
17     Q.   And that's based on your training?
18     A.   Yes.
19     Q.   That's all I have.
20          MS. ESQUIVEL:  Any other questions from anyone?
21          MR. GALIPO:  I don't have any other, and I think
22 Shannon has no questions, I think.
23          MS. GUSTAFSON:  Yeah, I don't have any questions.
24          Sorry.  I was having trouble turning my mic on.
25          MS. ESQUIVEL:  Madam Court Reporter, the witness

Page 104

1  will review, but you don't need to send him a transcript.
2  I'll order electronic only, and I'll provide him a copy of my
3  transcript.
4           MS. GUSTAFSON:  I will like a copy of the
5  transcript.
6           MR. GALIPO:  Great.  Off the record.
7           (Deposition proceeding concluded at 1:19 p.m.)
8                         *  *  *
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 105

1               DECLARATION UNDER PENALTY OF PERJURY
2
3  Case Name:  Jonathan Wayne Botten, et al. vs. State of
4  California, et al.
5  Date of Deposition:  November 4, 2024
6  Job No.:  112646
7
8           I, _____, hereby certify
9  under penalty of perjury under the laws of the State of
10 California that the foregoing is true and correct.
11          Executed this _____ day of _____,
12 20____, at _____, California.
13
14
15
16
17
18          _____
                 BERNARDO RUBALCAVA
19
20
21
22
23
24
25

# Exhibit U

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    JONATHAN WAYNE BOTTEN, SR.; TANJA          )
     DUDEK-BOTTEN; ANNABELLE BOTTEN; and        )
5    J.B., a minor by and through his           )
     guardian JONATHAN WAYNE BOTTEN, SR.,       )
6                                               )
                     Plaintiffs,                )
7                                               )
                     vs.                        ) Case No.
8                                               ) 5:22-CV-00949-KK-SHK
     STATE OF CALIFORNIA; COUNTY OF SAN         )
9    BERNARDINO; ISAIAH KEE; MICHAEL            )
     BLACKWOOD; BERNARDO RUBALCAVA; ROBERT )
10   VACCARI; JAKE ADAMS; and DOES 1-10,        )
     inclusive,                                 )
11                                              )
                     Defendants.                )
12   _____)

13

14

15

16            REMOTE VIDEOCONFERENCE DEPOSITION OF

17                    TIMOTHY JONG, M.D.

18                 THURSDAY, JANUARY 2, 2025

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  127502

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 22

1    Q.   And one of the reasons that was fatal was because it
2    went through major organs and the internal bleeding?
3    A.   Yes.
4    Q.   I take it with the wound like that, death is not
5    instantaneous; it happens over minutes in part because of the
6    loss of blood?
7    A.   Yes.  There is also the possibility that air could
8    have gotten into the left chest cavity which I previously
9    mentioned which could also compress the lung.
10   Q.   Which could also add to the cause of death?
11   A.   Yes.
12   Q.   And then you have something called Other Injuries on
13   Page 7 of your report towards the bottom.
14        Do you see that section?
15   A.   Yes.
16   Q.   Item one, were you describing something in your
17   opinion that was consistent with the decedent being struck by
18   a Taser dart?
19   A.   Yes.
20   Q.   And where on the body generally was that?
21   A.   That was on the right upper back.
22   Q.   And item two, what were you describing there?
23   A.   I was describing a puncture on the mid right back.
24   Q.   Do you know if that was consistent with a Taser or
25   some other less-lethal ammunition?

Page 23

1    A.   It could be consistent with a Taser or a conductive
2    energy device as we call it.
3    Q.   How about item three, what were you describing
4    there?
5    A.   I was describing another puncture wound.
6    Q.   Item four as well?
7    A.   That's correct.
8    Q.   And three and four were also to the back?
9    A.   That's correct.
10   Q.   Also consistent with Taser wounds?
11   A.   Yes.  It could be consistent with it.
12   Q.   And then you documented numerous abrasions to the
13   body?
14   A.   Yes.
15   Q.   And then going to Page 10, is this where you're kind
16   of doing a synopsis or summary diagnosis of all the injuries?
17   A.   Yes.
18   Q.   And again, without going through all this, this is
19   much of the information we've already been discussing; is
20   that fair?
21   A.   Yes.
22   Q.   Do you recall if you were ever provided with any of
23   the video of the shooting itself?
24   A.   I don't know if I saw video, but my recollection is
25   I did not.

Page 24

1    Q.   Okay.  And then in terms of the clothing, I noticed
2    you have some documentation or diagrams with respect to
3    clothing.
4        Did you have an opportunity to look at some of the
5    decedent's clothing?
6    A.   Yes.
7    Q.   And did you examine the clothing yourself, or did
8    someone else do that, if you recall?
9    A.   I examined the clothing myself.
10   Q.   And were there bullet defects in the clothing that
11   were consistent with at least some of the wounds you saw to
12   the body?
13   A.   Yes.
14   Q.   Okay.  Thank you, Doctor.
15        That's all the question I have.
16        But I think other counsel may have some questions.
17        So let's find out.
18   A.   Sounds good.
19        MS. ESQUIVEL:  Yes.  I do have a couple of
20   questions, Doctor.
21             EXAMINATION
22   BY MS. ESQUIVEL:
23   Q.   I apologize because I am not as learned as Mr.
24   Galipo is.  So I'm going to be asking some more basic
25   questions looking from more layman terms on some of these.

Page 25

1        As far as -- just going through the -- some wounds
2    that you have identified here starting on Page 3 of your
3    report, the one of the entry wound K to the mid left, other
4    than the lung -- well, first of all, did the bullet -- did
5    the -- did the gunshot -- did the bullet puncture more than
6    one lung?
7    A.   No.
8    Q.   Other than the lung, were there any other major
9    organs that were injured based on the trajectory or the
10   travel track of the bullet?
11   A.   No.
12   Q.   And here you describe the entry point as 17 and
13   one-eighth inches from the top of the head and nine inches
14   left of the posterior midline.
15        Can you tell me generally -- I know size makes a
16   difference, but just on your body can you tell me where that
17   would be, generally, what would be that general area?
18   A.   Clarification:  Are you referring to the measurement
19   17 and one-eighth inches from the top of the head?
20   Q.   Right.  Where that would be, or if looking on your
21   diagram, if you can tell me which one it is.
22        Because I'm looking at it, and I don't see a K.
23        I see a number.  So I don't know if that's
24   different.  So whichever one would be easier for you to tell
25   me, just point to me where on the back that entry point is

**JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Timothy Jong, M.D. on 01/02/2025**

Page 26

1  for the bullet -- the gunshot that you identified as K.
2      A.   So based on my diagram, it's near -- it's on the
3  left back near the arm pit area.
4      Q.   So if looking at the bottom, I don't think yours is,
5  but just for identification purposes for the rest of us, it's
6  Bates stamp ending in 846.
7           And this is your diagram at the top.  It just has
8  San Bernardino Sheriff/Coroner, and at the bottom it says
9  male, anterior/posterior.
10          It -- maybe using that, can you tell me where that
11 entry point is for the gunshot identified as K?
12     A.   Sure.
13          MR. GALIPO:  Diana, it might help you.
14          Do you have Bates stamp 848?
15          Because he actually has it written in.
16          MS. ESQUIVEL:  Okay.  So let me just enlarge.
17          Give me a minute.
18 BY MS. ESQUIVEL:
19     Q.   So I see now, we're looking at 848 which I don't
20 know what page that would be on your report, Doctor, but are
21 you looking at the same diagram we are now instead of
22 numbers --
23          MR. GALIPO:  I'm holding it up just so the doctor
24 can see which diagram I'm referring to.
25          THE WITNESS:  Yes.

Page 27

1           MR. GALIPO:  Yes.
2  BY MS. ESQUIVEL:
3      Q.   Okay.  So I see one that says "GSWK."
4           Is that what you're referring to on Page 3 as the K
5  entry, gunshot wound K?
6      A.   That's correct.
7      Q.   And that's up by the arm -- behind the arm pit
8  area?
9      A.   Yes.
10     Q.   Okay.  Based on your observation on the size or
11 trajectory, all the information that was available to you,
12 could you make any kind of determination as to the distance
13 that the gun was from the time from where the gun was shot to
14 that -- this bullet to where it struck Mr. Puga?
15     A.   So the distance is indeterminate.
16     Q.   And Mr. Galipo was asking you earlier whether the
17 trajectory that you noted of the bullet, the direction that
18 it traveled, would it be consistent with Mr. Puga bending
19 over, and you said it's possible.
20          Is that correct?
21     A.   Yes, it's possible.
22     Q.   Would -- could you, again, based on all the
23 information available to you that you saw, could you make any
24 kind of determination as to the angle that Mr. Puga was bent
25 over, meaning, whether he was bent at 90 degree at the waist,

Page 28

1  45 degree bend at the waist?
2      A.   No.  I can only answer in hypotheticals.
3      Q.   Okay.  Can you rule -- given that it was going
4  left-to-right in an upward trajectory, could you tell whether
5  Mr. Puga at the time that he was shot at entry K, whether his
6  back was directly to the shooter, or if it was at an angle,
7  meaning, the left side was to the shooter?
8      A.   So just for clarification, you're asking if he was
9  completely faced straight on, or at an angle?
10     Q.   Correct.  Based on all the information you have, can
11 you rule out that Mr. Puga's back was directionally towards
12 the shooter?
13     A.   The possibility does exist, that he could have been
14 straight back or at an angle.
15     Q.   So it could have been both either his left -- the
16 left side facing the shooter, or his entire back facing the
17 shooter?
18     A.   Yes.
19     Q.   Is there any information that you would need to rule
20 out that Mr. Puga's back was directly facing the shooter?
21     A.   If there was a clear video, then it might clarify
22 things.
23     Q.   And I don't know if, again, not being familiar with
24 the entire forensic autopsy procedure, is there any way to
25 tell either by the level of coagulation or I don't know if

Page 29

1  there is something else in the tissue that would indicate
2  whether this was -- a K was a first gunshot or a last
3  gunshot?
4      A.   So that depends, and to explain that, I would say
5  that if it all occurred and the person's bleeding, generally
6  speaking, if the person's heart is still beating, there will
7  be hemorrhage throughout the wound track.
8           In some cases, and it's not covering 100 percent,
9  in some cases if a person is shot after death, there will be
10 no hemorrhage in the wound track.
11     Q.   And here it says you noted that there was hemorrhage
12 throughout the track.
13          You're able to conclude that he was alive when he
14 sustained gunshot K?
15     A.   That's the most likely explanation, yes.
16     Q.   And you indicated earlier that death would not have
17 been instantaneous because of the amount of blood loss
18 required and the hemorrhaging throughout the track; is that
19 correct?
20     A.   Yes.
21     Q.   Do you know if this type of gunshot wound would have
22 immediately immobilized Mr. Puga?
23     A.   I would say that based on his prior physical
24 examination of him, it would most likely not have immediately
25 incapacitated him or caused death if that's what you're

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 34

1  facing the officer -- the shooter directly, could the path
2  become upward just based on the material and tissue that the
3  bullet struck upon entry?
4          MR. GALIPO:  Objection.  Incomplete hypothetical.
5          THE WITNESS:  So would you be able to reword that,
6  please.
7  BY MS. ESQUIVEL:
8      Q.  I'm sorry.  Your sound muffled a little bit.
9      A.  Oh, would you be able to reword that question,
10  please.
11     Q.  Sure.  Can you make any kind of determination as to
12  whether the officer or who the shooter or shooters that
13  struck -- who shot the bullets that struck from A to E on
14  your report  -- strike that.  That's a bad question.
15         Let me see if I could phrase it a little better
16  without going through each one.
17         Can you -- that Mr. Puga was not facing the shooter
18  or shooters that -- for gunshots A through E did not shoot
19  directly at him as he was facing the shooter or shooters, and
20  that the upward trajectory was caused by the tissue or other
21  material that the bullet might have struck as it entered the
22  body or the leg in this case?
23         MR. GALIPO:  Objection.  Vague and ambiguous as
24  phrased.
25         THE WITNESS:  So to clarify, you're asking if it

Page 35

1  could have ricocheted within the body and it changed the
2  trajectory?
3  BY MS. ESQUIVEL:
4      Q.  Correct.  Causing the upward trajectory that you
5  observed during your autopsy.
6          MR. GALIPO:  Objection.  Incomplete hypothetical.
7          THE WITNESS:  Based on my description of the wounds,
8  it seems that does not seem like a possibility.
9  BY MS. ESQUIVEL:
10     Q.  Okay.  Is it possible that Mr. Puga had raised his
11  leg when he sustained gunshots A through E that resulted in
12  the upward trajectory that you observed during your
13  autopsy?
14     A.  Yes, that's a possibility.
15     Q.  I'm sorry.  I think that might be all the questions
16  I have.  I'm just taking a quick look at my notes.
17         Okay.  I have no further questions.
18         Thank you, Doctor.
19     A.  Thank you.
20         MR. GALIPO:  Amy, do you have any questions today?
21         MS. MARGOLIES:  I do.  I have a few just to make sure
22  that I'm also understanding what we've heard.  I probably
23  understand forensic science the least of our group.
24                  EXAMINATION
25  BY MS. MARGOLIES:

Page 36

1      Q.  Let's start with -- it's going to be the fifth
2  gunshot wound listed on your report.
3          So the anterior left thigh, COSB E3E.
4          I think you already confirmed that this was a
5  non-fatal wound; is that right?
6      A.  Yes.
7      Q.  And anterior essentially means the front; would that
8  be accurate?
9      A.  Yes.
10     Q.  And so that this wound is to the front of Mr. Puga's
11  left thigh?
12     A.  Yes.
13     Q.  And it traveled front-to-back?
14     A.  Yes.
15     Q.  And projectile was recovered?
16     A.  Yes.
17     Q.  And Doctor, I'm going to ask you to assume for a
18  moment here since I know you weren't on the scene.
19         Assume that Hector Puga was found lying faced-down
20  on the ground.
21         Okay?
22     A.  Sure.
23     Q.  Would you agree that to a reasonable degree of
24  medical probability Puga was not in this face-down position
25  when he sustained the fifth gunshot wound that we discussed,

Page 37

1  and I believed you've identified as H, the front anterior
2  left thigh?
3          MR. GALIPO:  I'll object.
4          It's an incomplete hypothetical.
5          THE WITNESS:  Yes, that's likely.
6  BY MS. MARGOLIES:
7      Q.  Was there something you wanted to add?
8      A.  No.
9      Q.  Okay.  Would you further agree that it had to be in
10  some other position than lying faced-down on the ground to
11  sustain the anterior left thigh gunshot wound?
12     A.  Sorry.  Can you repeat the question.
13     Q.  Sure.  Would you further agree then that Hector Puga
14  had to be in some other position other than lying faced-down
15  on the ground when he sustained the gunshot wound to the
16  anterior left thigh?
17         MR. GALIPO:  I'll object as an incomplete
18  hypothetical.  Again, depends on the position and angle of
19  the shooter.
20         THE WITNESS:  Yes, that's a possibility.
21  BY MS. MARGOLIES:
22     Q.  To confirm, Hector Puga would have to be in some
23  position other than lying faced-down to sustain the anterior
24  left thigh gunshot wound?
25     A.  Yes.

JONATHAN WAYNE BOTTEN, SR., ET AL. vs STATE OF CALIFORNIA, ET AL.
Timothy Jong, M.D. on 01/02/2025

Page 46

1  indicated in the questioning, many of the shots to the back,
2  the buttocks, et cetera, have a back-to-front trajectory;
3  correct?
4      A.   Yes.
5      Q.   And there were a few with an upward trajectory with
6  the body in an anatomical position that counsel pointed out.
7           Do you recall that?
8      A.   Yes.
9      Q.   And I think a couple that you pointed out was wound
10 H was with the anterior left thigh, and then C which was the
11 right lower leg number one, D was the right lower leg number
12 two, and F was the right foot.
13          Do you generally recall that?
14     A.   Yes.
15     Q.   Would those upward trajectories to the thigh, lower
16 right leg, and toe at least be consistent in your mind with
17 Mr. Puga going down to the ground having the front of his
18 legs exposed to the shooters and hitting his lower legs and
19 traveling upward?
20          MS. ESQUIVEL:  Objection.  Incomplete and improper
21 hypothetical.
22          Go ahead.
23          THE WITNESS:  So to clarify, you're saying that Mr.
24 Puga is face-down on the ground with one of his legs up?
25 BY MR. GALIPO:

Page 47

1      Q.   No.  Not faced-down, just down on the ground, even
2  on his back or side with his legs out in front of him.
3      A.   That possibility does exist, yes.
4      Q.   And I think you answered the question before, but
5  you wouldn't expect the bullet to hit someone in the ankle
6  and travel straight up the leg if someone was standing
7  upright, would you?
8          MS. ESQUIVEL:  Same objection.
9  BY MR. GALIPO:
10     Q.   So if the shooter and the decedent were on the same
11 ground plane both standing up, and the shooters were shooting
12 from chest level, you wouldn't expect the bullet to hit him
13 in the ankle and travel up his leg, would you?
14     A.   Highly unlikely.  That's very highly unlikely.
15     Q.   And in terms of a ricochet, sometimes you describe
16 in your reports bullets hitting intermediary objects
17 potentially?
18     A.   That's correct.
19     Q.   And when a bullet hits a intermediary object, you
20 sometimes see an irregular entry wound; is that fair?
21     A.   Yes, you can.
22     Q.   And then you note that in your report when you see
23 that?
24     A.   Yes.
25     Q.   Did you indicate anywhere in your report that you

Page 48

1  thought these bullets hit intermediary objects or ricochet?
2      A.   I did not.
3      Q.   Okay.  Thank you.
4           That's all that I have.
5           MS. ESQUIVEL:  I'm sorry, Doctor.
6           I just have a few follow-ups.
7                     EXAMINATION
8  BY MS. ESQUIVEL:
9      Q.   Did you order the toxicology report on Mr. Puga?
10     A.   Yes.
11     Q.   Is that something that you normally do in the course
12 of your work as a forensic pathologist?
13     A.   Yes.
14     Q.   Do you rely on the results of the toxicology report
15 to make your final determination as to cause of death?
16          MR. GALIPO:  Vague and ambiguous; incomplete
17 hypothetical.
18          You mean in this case?
19          MS. ESQUIVEL:  I'm just asking him in general.
20 BY MS. ESQUIVEL:
21     Q.   Do you rely on toxicology reports to make a
22 determination as to cause of death?
23          MR. GALIPO:  Vague and ambiguous; incomplete
24 hypothetical.
25          THE WITNESS:  Yes.

Page 49

1  BY MS. ESQUIVEL:
2      Q.   Do you rely on toxicology reports to rule out a
3  cause of death?
4      A.   I would have to -- it depends, but yes.
5      Q.   Now, what was the purpose of ordering the toxicology
6  report in this case of Mr. Puga's blood?
7      A.   So toxicology is something I generally order on
8  pretty much all my cases.
9           So it's part of my protocol and procedure.
10     Q.   Would it be fair to say that it was also to rule out
11 the possibility that he died related to any kind of intake,
12 whether it would be alcohol or drugs?
13     A.   In this case no because there is obvious cause of
14 death.
15     Q.   And Mr. Galipo asked you about whether there is
16 intermediary -- well, something changes a trajectory of a
17 bullet causing an irregular wound.
18          Based on your observations during Mr. Puga's
19 autopsy, is there any way that you were able to tell whether
20 there was -- I'm sorry, strike that.
21          Based on your observations that you saw, can you
22 rule out that -- that the bullets that struck Mr. Puga did
23 not ricochet off the ground or other object?
24     A.   I would probably have to look at each gunshot wound
25 picture, but to answer your question, based on what I

**Page 50**

1    remember of the wounds, I can't say whether something
2    ricocheted or not.
3        Q.    Thank you, Doctor.  No further questions.
4              MS. MARGOLIES:  I just have a couple follow-ups.
5                        EXAMINATION
6    BY MS. MARGOLIES:
7        Q.    Doctor, earlier Plaintiff's counsel asked you if
8    certain bullet entries were consistent with Mr. Puga either
9    leaning forward or falling down.
10             Do you remember some of those questions?
11       A.    Vaguely.  Yes.
12       Q.    And I believe your answers were generally something
13   to the effect of that's a possibility or this is a
14   possibility; is that right?
15       A.    Yes.
16       Q.    Earlier you also testified that there were very many
17   scenarios that could have occurred; is that right?
18       A.    Yes.
19       Q.    And do you say that because you don't know for
20   certain what scenario actually occurred as to each bullet
21   entry wound?
22             MR. GALIPO:  Objection.  Vague as phrased.
23             THE WITNESS:  Yes.
24   BY MS. MARGOLIES:
25       Q.    You are able to testify because you have written

**Page 51**

1    your report on the way or the direction, rather, that a
2    bullet traveled once in Mr. Puga's body.
3              Would that be accurate?
4        A.    Yes.
5        Q.    But you're not a ballistics expert; right?
6        A.    That's correct.
7        Q.    And you are not able to say as you sit here today
8    what position an officer or even Mr. Puga was in at the time
9    of each bullet entry; is that right?
10             MR. GALIPO:  Objection.  Vague and ambiguous as
11   phrased; depending on the hypothetical question posed.
12             THE WITNESS:  Yes, that's correct.
13   BY MS. MARGOLIES:
14       Q.    For example, you don't know whether or not Mr. Puga
15   was a lethal threat to officers at the time he sustained
16   these bullet entry wounds; right?
17       A.    That's correct.
18       Q.    You can't rule out if Mr. Puga was pointing a gun at
19   officers when he sustained these bullet entry wounds;
20   right?
21       A.    That's correct.
22       Q.    I don't have any another questions.
23             Thank you.
24             MR. GALIPO:  It sounds like what you're saying,
25   Doctor, is based on the trajectory of the bullets within the

**Page 52**

1    body, if you're given hypothetical questions, specific
2    hypotheticals, you may be able to say whether or not the
3    trajectory is consistent or inconsistent with that
4    hypothetical; is that what you're generally saying?
5              THE WITNESS:  Yes.
6              MR. GALIPO:  Any other questions from Diana or Amy?
7              MS. ESQUIVEL:  No further questions.
8              Thank you, Doctor, for your time.
9              MS. MARGOLIES:  No further questions.
10             MR. GALIPO:  Yes.  Thank you, Doctor, for your time.
11             Let's go off the record.
12             (Deposition proceeding concluded at 3:34 p.m.)
13                            *  *  *
14
15
16
17
18
19
20
21
22
23
24
25

**Page 53**

1                    DECLARATION UNDER PENALTY OF PERJURY
2
3    Case Name:  Jonathan Wayne Botten, et al. vs. State of
4    California, et al.
5    Date of Deposition:  January 2, 2025
6    Job No.:  127502
7
8            I, _____, hereby certify
9    under penalty of perjury under the laws of the State of
10   California that the foregoing is true and correct.
11           Executed this _____ day of _____,
12   20____, at _____, California.
13
14
15
16
17
18                            _____
                                    TIMOTHY JONG
19
20
21
22
23
24
25

# Exhibit Z

```
 1                  UNITED STATES DISTRICT COURT

 2                  CENTRAL DISTRICT OF CALIFORNIA

 3                           --oOo--

 4   JONATHAN WAYNE BOTTEN, SR.;
     TANJA DUDEK-BOTTEN;
 5   ANNABELLE BOTTEN; and J.B., a
     minor by and through his guardian
 6   JONATHAN WAYNE BOTTEN,

 7           Plaintiffs,

 8   vs.                        Case No.  5:23-cv-00257-JGB-SHK

 9   STATE OF CALIFORNIA;
     COUNTY OF SAN BERNARDINO;
10   ISAIAH KEE; MICHAEL BLACWOOD;
     BERNARDO RUBALCAVA;
11   ROBERT VACCARI; JAKE ADAMS;
     and DOES 1-10 inclusive,

12
             Defendants.
13   _____/

14

15           STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16                 DEPOSITION OF GREG MEYER

17               WEDNESDAY, FEBRUARY 12, 2025

18

19

20

21   Reported Stenographically by:

22   KIMBERLY D'URSO, CSR 11372, RPR

23   Job No.  00135667

24

25
```

JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 02/12/2025

Page 4

```
 1                        --oOo--

 2            BE IT REMEMBERED, that set on Wednesday, the

 3  12th day of February, 2025, commencing at the hour of

 4  10:04 a.m., thereof, GREG MEYER appeared remotely in

 5  Glendale, California, before me, Kimberly E. D'Urso, an

 6  RPR and Certified Shorthand Reporter of the State of

 7  California, the following deposition was stenographically

 8  reported by me:

 9            (Whereby the Certified Shorthand Reporter

10            introduced herself on the record and

11            administered the oath to the deponent.)

12

13                      EXAMINATION

14  BY MR. GALIPO:

15      Q.   Can you please state your name?

16      A.   My name is Greg Meyer.

17      Q.   How long have you been serving as an expert

18  witness in the field of police practices?

19      A.   A little over 35 years.

20            THE WITNESS:  Give me a moment, please, to

21  adjust my volume.  I think in the heat of battle I made

22  it much too loud on my end.

23            MR. GALIPO:  Okay.

24            THE WITNESS:  Okay.  There we go.

25            MR. GALIPO:  Are you able to hear me okay so
```

**JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 02/12/2025**

Page 72

1  it was very, very hard to see him while he's falling to

2  the ground, and you'd have to ask the officers what they

3  perceived after he was on the ground, when and why did

4  they stop shooting at that point -- or why did they

5  continue to shoot him and why did they decided to stop

6  shooting.

7         So these things become very complex, especially

8  when there's this type of scenario where they have --

9  they start out with an immediate defense of life

10  shooting, and within split seconds, it transfers to a

11  fleeing felon shooting.

12         But the answer, with respect to the

13  re-assessment is, you're kind of reassessing all the

14  time.  We're, generally, looking at rapid fire here.

15  It's -- it's humanly impossible to re-assess bullet by

16  bullet, in -- in a rapid-fire situation, which I believe

17  Mr. Galipo's expert is flat wrong about.

18         But at some point during the shooting, the

19  officers, when they perceived that the threat is

20  diminished, that's when they're supposed to stop

21  shooting.

22         Sorry about that long sentence, again.

23  BY MS. ESQUIVEL:

24     **Q.   And another question that you were asked by**

25  **Mr. Galipo was whether the officers had evacuated the**

JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 02/12/2025

Page 73

1    homes during the -- I want to call it the standoff,

2    while Mr. Puga was inside the vehicle.  And then,

3    obviously, once he stepped out and then moved to the

4    front of the car, where several more minutes went by.

5    Is there anything in the CHP policy or POST that

6    requires officers in a standoff situation to evacuate

7    residents if the incident occurs in a residential area?

8         A.   No.  And that becomes a judgment call.  If it

9    becomes a SWAT situation, then it's part and parcel of a

10   SWAT situation to secure the surrounding area, perhaps

11   perform some evacuations, if there's time, and if

12   there's resources to do so.

13        In this case, it's evident to me that during

14   this standoff situation, that minute by minute, the

15   officers are attempting to de-escalate this thing

16   through all of the verbal and even nonlethal weapons

17   usage -- which is part of de-escalation in a case like

18   this -- to end it, like, this minute.  But it keeps

19   going on, and it keeps going on, and it keeps going on

20   in this case.  That's point one.

21        Point two is, let's assume somebody decided at

22   that scene:  Okay, we're going to have ti get a whole

23   lot more officers and deputies here and -- and secure

24   the neighborhood and evacuate some of the houses, the

25   practical question becomes:  Where do you get those

JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 02/12/2025

Page 74

1   people?

2          This is a graveyard shift.  There's not that

3   many officers and deputies out there.  Even if you

4   wanted to, as a practical matter, it's not going to

5   happen.  You don't have the resources.

6          Q.   And I know you were not asked to opine as to

7   the reasonableness of the deputies' use of force,

8   specifically, Sergeant Vaccari's use of the pepper

9   balls.  But I have a question, just in terms of the

10   failure to intervene.

11          Was -- did you see any evidence that would have

12   indicated to either -- to any of the CHP officers that

13   Sergeant Vaccari's use of the pepper balls was excessive

14   or unreasonable, such that they should have intervened

15   in his use of the pepper ball?

16          A.   No, not at all.  In fact, Sergeant Kee,

17   himself, attempted -- I think it was -- he shot four

18   beanbag projectiles at the rear windshield, trying to

19   break it.  That didn't work.  And it was some time after

20   that -- I don't remember the timing -- that Sergeant

21   Vaccari used pepper balls, and some of the pepper balls

22   were glass breakers, apparently to do -- to accomplish

23   the -- the same thing.

24          In both cases, what they're doing is they're

25   encouraging Mr. Puga to, you know, submit -- I mean, get

JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 02/12/2025

Page 75

```
 1  out of the car and submit to arrest.  I don't find that
 2  there's excessive force in play at all in that situation.
 3       Q.   And is it possible for you to give us a brief
 4  summary of any disputes or disagreements you have with
 5  Mr. Clark's opinions that he offered in his report?  And
 6  this is Roger Clark, the plaintiff's expert.
 7       A.   Yes, I can do that, if you give me a minute.
 8  If I may look at my notes?
 9       Q.   Yes, please.
10            (Pause.)
11            THE WITNESS:  In Mr. Clark's -- page 11, at the
12  bottom of his first paragraph, he -- he -- he says
13  there's -- in the video, it's video COSB 1459, he says he
14  doesn't see the handgun in the waistband.  I do.
15            In page 13, paragraph 1 of his report, where
16  he's listing a number of witnesses talking about not
17  seeing Puga being armed and all that, he -- he more or
18  less, conveniently, I guess, leaves out the fact that
19  witness Annabelle Botten, said that she saw Puga with a
20  gun and that he shot at the officers, which is detailed
21  in my report, both my reports.
22            On page 14, in the first paragraph, apparently,
23  Mr. Clark says he does not see Puga running away with the
24  gun in his hand.  But my viewing of the videos, he --
25  clearly shows him running with the gun in his hand, on
```

JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.
Greg Meyer on 02/12/2025

Page 76

1  multiple occasions.  Also documented in my report.

2        His opinion 2, which is on page 15 of his

3  report, again, dealing with video COSB 1459 -- and I have

4  to interrupt and actually look at his report in order to

5  understand my own note, if I may have a moment.

6        (Pause.)

7        THE WITNESS:  Let's see.  Page -- I'm almost

8  there.  This is almost a repeat of a note I had earlier.

9        But in his opinion number 2, which appears on

10  the 15th PDF page of the expert disclosure, and probably

11  eight lines down he refers to the cell phone video COSB

12  1459.  And Mr. Clark writes that:  "It shows Mr. Puga's

13  front side as he exits the car, and there appears to be

14  no weapon on or near Mr. Puga's waistband."

15        I disagree.  I see the butt of a handgun on his

16  waistband, on the right side of his waistband there.

17        Also, on page 15, opinion number 3, the third

18  line -- well, the whole opinion, he says he violated

19  police practices and training when they shot at Puga

20  while he was running away.  He said:  "It's my opinion

21  that even if Mr. Puga had initially presented a threat

22  when the officers first opened fire" -- thank you for

23  that -- "Mr. Puga did not present an immediate threat of

24  death or serious bodily injury while he was running

25  away."

**JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 02/12/2025**

Page 98

```
 1  STATE OF CALIFORNIA)
                      ) ss:
 2  COUNTY OF ALAMEDA  )

 3

            I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5          That the witness named in the foregoing

 6  deposition was present remotely and duly sworn to testify

 7  to the truth in the within-entitled action on the day and

 8  date and at the time and place therein specified;

 9          That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12          That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15          Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [x] was [ ] was not requested.

19          That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21          IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 25th day of February, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```

# Exhibit AA

DR 192101044  H# 024-2021
Typed By: Dawn
Reviewed By / Date:  Detective S. Abernathy / 03-04-21

| | | |
|---|---|---|
| 1 | | |
| 2 | KEE: | Oh, I'd say about, I'm about, about 20 about 25 feet, yeah about 25. |
| 3 | | |
| 4 | ABERNATHY: | So, you are directly between the patrol car and that light pole or |
| 5 | | somewhere around that area? |
| 6 | | |
| 7 | KEE: | Ex, exactly.  Um, exactly between um it's probably like a 45-degree |
| 8 | | angle um from the patrol car, but yes, it is, it is between that, that light |
| 9 | | pole. |
| 10 | | |
| 11 | ABERNATHY: | Okay. |
| 12 | | |
| 13 | KEE: | Well, I was between the light pole and the car. |
| 14 | | |
| 15 | ABERNATHY: | Did you ever see anybody else around the area besides the law |
| 16 | | enforcement officers and the suspect and the passenger? |
| 17 | | |
| 18 | KEE: | No, Sir. |
| 19 | | |
| 20 | ABERNATHY: | Okay.  Do you remember what was behind the suspect when you fired |
| 21 | | during both volleys? |
| 22 | | |
| 23 | KEE: | Um, when, when I was approaching him only thing I saw was just a |
| 24 | | street, which is Catalpa, I just remember seeing the, the backdrop being |
| 25 | | the street, and of course I could see you know residences on both sides |
| 26 | | but pretty much it's like I had an alley way to shoot now when I um fired |
| 27 | | the first time. |
| 28 | | |

50

COSB000700

DR 192101044  H# 024-2021
Typed By: Dawn
Reviewed By / Date:  Detective S. Abernathy / 03-04-21

| | | |
|---|---|---|
| 1 | | |
| 2 | ABERNATHY: | Okay. |
| 3 | | |
| 4 | KEE: | And um and then you said the second one, um so the second one, it |
| 5 | | was the same thing. Um it was like just shooting up, shooting up in the |
| 6 | | alley way cause there was nothing behind, where in front of him |
| 7 | | because he is running north. |
| 8 | | |
| 9 | ABERNATHY: | Okay.  I know you said you, you remembered firing about 12 rounds is |
| 10 | | that right? |
| 11 | | |
| 12 | KEE: | A total, yes. |
| 13 | | |
| 14 | ABERNATHY: | Okay.  And how many of those were during the first volley and then how |
| 15 | | many during the second? |
| 16 | | |
| 17 | KEE: | So, it was probably like about five or six, 5 about five or six on the first |
| 18 | | one and then probably about another five or six on the second. |
| 19 | | |
| 20 | ABERNATHY: | Okay.  Um and can you describe the cadence of both of the volleys, the |
| 21 | | fire? |
| 22 | | |
| 23 | KEE: | Yeah, the first one it, it was, it was rapid, I mean you know boom, |
| 24 | | boom, boom, boom, boom.  And then I, I ran back then I got in a prone |
| 25 | | position but that one was more calm, because there was dust and then |
| 26 | | as soon as it settled I could see the gun, I saw him, he is still running |
| 27 | | and then I just took, then it was like boom, boom, boom.  You know it |
| 28 | | |

COSB000701

# Exhibit BB

R 192101044
H# 2021-024
Typed By: Terry
Reviewed By / Date: Detective Edward Hernandez G4629 / March 5, 2021

| | | |
|---|---|---|
| 1 | RUBALCAVA: | Correct. |
| 2 | | |
| 3 | WEAVER: | …shoot backwards while running forwards? |
| 4 | | |
| 5 | RUBALCAVA: | Correct. |
| 6 | | |
| 7 | WEAVER: | So, did you think the suspect was still firing at you? |
| 8 | | |
| 9 | RUBALCAVA: | It's a possibility, yes. |
| 10 | | |
| 11 | WEAVER: | Did that make you feel unsafe? |
| 12 | | |
| 13 | RUBALCAVA: | Yes. |
| 14 | | |
| 15 | WEAVER: | And were you in fear for your life then? |
| 16 | | |
| 17 | RUBALCAVA: | Yes. |
| 18 | | |
| 19 | WEAVER: | So, is that why you might have discharged your gun? |
| 20 | | |
| 21 | RUBALCAVA: | Yes. |
| 22 | | |
| 23 | HERNANDEZ: | Okay. Did you see any muzzle flashes at that point… |
| 24 | | |
| 25 | RUBALCAVA: | No. |
| 26 | | |
| 27 | | |
| 28 | | |

55

COSB000454

R 192101044
H# 2021-024
Typed By: Terry
Reviewed By / Date:  Detective Edward Hernandez G4629 / March 5, 2021

| | | |
|---|---|---|
| 1 | HERNANDEZ: | …coming from the….? Okay.  Did you have a clear view when you shot |
| 2 | | your second volley? |
| 3 | | |
| 4 | RUBALCAVA: | Yes. |
| 5 | | |
| 6 | HERNANDEZ: | Okay. Could you describe your backdrop at the time of your uh, well |
| 7 | | let's go back to the first volley, can you describe your backdrop, what |
| 8 | | was behind the suspect? |
| 9 | | |
| 10 | RUBALCAVA: | I didn't see anything because it was dark. |
| 11 | | |
| 12 | HERNANDEZ: | Okay. Uh, no lighting in the distance, anything like that? |
| 13 | | |
| 14 | RUBALCAVA: | No. |
| 15 | | |
| 16 | HERNANDEZ: | Okay. Could you describe your backdrop during your second volley? |
| 17 | | |
| 18 | RUBALCAVA: | Um, just the Peach, Peach um Peach and the dirt shoulder. |
| 19 | | |
| 20 | HERNANDEZ: | Okay. And how many rounds did you fire in your second volley? |
| 21 | | |
| 22 | RUBALCAVA: | Um, at least three, three to five. |
| 23 | | |
| 24 | HERNANDEZ: | Three to five. Uh can you recall what shooting platform you had at that |
| 25 | | point? |
| 26 | | |
| 27 | | |
| 28 | | |

56

COSB000455

# Exhibit HH

```
                UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA


L.C., a minor by and through  )
her guardian ad litem Maria   )
Cadena; et al.,               )
                              )
              Plaintiff,      )
                              )
       vs.                    ) Case No.
                              ) 5:22-cv-00949-KK-(SHKx)
STATE OF CALIFORNIA; COUNTY   )
OF SAN BERNARDINO; et al.,    )
                              )
              Defendants.     )
_____)




        VIDEOCONFERENCE DEPOSITION OF BETZABETH GONZALEZ
        Taken on Monday, December 30, 2024, at 10:20 a.m.




REPORTED BY:
NICOLE JOHNSON
CSR No. 13030
```

```
1                UNITED STATES DISTRICT COURT
2                CENTRAL DISTRICT OF CALIFORNIA
3
4
5  L.C., a minor by and through  )
   her guardian ad litem Maria   )
6  Cadena; et al.,               )
                                 )
7                Plaintiff,      )
                                 )
8         vs.                    ) Case No.
                                 ) 5:22-cv-00949-KK-(SHKx)
9  STATE OF CALIFORNIA; COUNTY   )
   OF SAN BERNARDINO; et al.,    )
10                               )
                 Defendants.     )
11 _____)
12
13
14
15
16        Deposition of BETZABETH GONZALEZ, taken on
17 behalf of the defendants, via Zoom videoconferencing, at
18 10:20 a.m., Monday, December 30, 2024, before Nicole
19 Johnson, CSR #13030, as a Certified Shorthand Reporter
20 within and for the County of Orange, State of California.
21
22
23
24
25
```

```
1  APPEARANCES:
2
3  For the Plaintiffs:
4    LAW OFFICES OF DALE K. GALIPO
     BY: Marcel Sincich
5    21800 Burbank Boulevard
     Suite 310
6    Woodland Hills, California 91367
     (818) 347-3333
7    msincich@galipolaw.com
8
9  For the Defendants
   County of San Bernardino, Vaccari, Adams:
10
     LYNBERG & WATKINS
11   BY: Amy Margolies
     1100 Town & Country Road
12   Suite 1450
     Orange, California 92868
13   (714) 937-1010
     amargolies@lynberg.com
14
15
16 For the Defendants
   State of California, Kee, Blackwood, Rubalcava:
17
     OFFICE OF THE ATTORNEY GENERAL
18   BY: Diana Esquivel
     1300 I Street
19   Suite 125
     Sacramento, California 95814
20   (916) 210-7320
     diana.esquivel@doj.ca.gov
21
22
23
24 The Videographer: Ed Gallo
25
```

```
1                      INDEX
2  Examination                    Page
3  Attorney Margolies             6, 110
4  Attorney Esquivel              63, 121, 132
5  Attorney Sincich               87, 130
6
7
8                    EXHIBITS
9  Exhibit      Description       Page
10 52 Notice of Deposition, 7 pgs          7
11 15 Bates-stamped COSB105, 1 pg (previously marked)  29
12 16 Bates-stamped COSB3236, 1 pg (previously marked) 31
13 53 Video                        48
14 54 Color Photograph, 1 pg              69
15
16
17          CONFIDENTIAL TRANSCRIPT
18             (Separately Bound)
19                Page 112
20
21
22
23
24
25
```

1 (Pages 1 to 4)

1    Monday, December 30, 2024
2        ooOoo
3
4        THE VIDEOGRAPHER:  We are on the record.  My
5    name is Ed Gallo.  I'm contract by Dean Jones.  Today is
6    December 30th of 2024.  The time is 10:20 a.m. Pacific
7    Time.  This video deposition is taken via Zoom.
8        The name of the case is L.C. versus State of
9    California filed in United States District Court, Central
10   District of California.  Case Number CV-00949 [sic].  This
11   is Volume 1 in the videotaped deposition of Betzabeth
12   Gonzalez.
13       The deposition is taken by attorney Amy
14   Margolies.  Would the attorneys introduce themselves and
15   state who you represent.
16       ATTORNEY MARGOLIES:  Amy Margolies from Lynberg
17   and Watkins on behalf of the County of San Bernardino and
18   Deputy Adams and Vaccari.
19       ATTORNEY SINCICH:  Good morning.  My name is
20   Marcel Sincich.  I'm from the law offices of Dale K.
21   Galipo, and I represent the plaintiffs in this matter.
22       ATTORNEY ESQUIVEL:  Good morning.  Diana
23   Esquivel on behalf of defendant State of California by and
24   through the California Highway Patrol, Officers Blackwood,
25   Kee, and Rubalcava.

5

1        THE VIDEOGRAPHER:  The court reporter today is
2    Nicole Johnson.  Would reporter please swear in the
3    witness.
4
5        ooOoo
6        BETZABETH GONZALEZ,
7    was called as a witness, and having been
8        first duly sworn by the Certified
9        Shorthand Reporter in accordance with
10       CCP Section 2094, testified as follows:
11
12       THE WITNESS:  Yes.
13       THE REPORTER:  Thank you.
14
15       EXAMINATION
16   BY ATTORNEY MARGOLIES:
17       Q.  Good morning, Ms. Gonzalez.  Thank you for being
18   here today.
19       A.  Good morning.
20       Q.  I'm going to show you a notice of deposition.
21   If you could just confirm for me that this is the same
22   notice that you received to be here today.
23       I do not know what exhibit number we left off
24   on.  According to my notes I believe we are on 52.  If
25   either counsel knows?

6

1        ATTORNEY ESQUIVEL:  That's my understanding as
2    well, that the next number in line should be 52.
3        ATTORNEY MARGOLIES:  Thank you, Ms. Esquivel.
4    We're going to mark this as Exhibit 52 then.  It
5    will be your notice of deposition.
6        (Exhibit 52 was marked for identification
7        by the shorthand reporter.)
8    BY ATTORNEY MARGOLIES:
9        Q.  Do you see a deposition on your screen,
10   Ms. Gonzalez?  I think you're muted.
11       A.  I do.
12       Q.  Thank you.  I'm going to scroll down.  And does
13   this appear to you to be the same notice of deposition
14   that you received to be here today?
15       A.  It is.
16       Q.  I'm going to stop sharing my screen now.
17       Ms. Gonzalez, have you ever had your deposition
18   taken before?
19       A.  No.
20       Q.  Have you ever testified in court before?
21       A.  No.
22       Q.  You're doing a great job of this.  There's just
23   a few ground rules I want to go over with you.  One is
24   that you answer audibly with yes or no, instead of shaking
25   and nodding of the head because we have a court reporter

7

1    here.  Does that make sense?
2        A.  Yes.
3        Q.  And also because we have a court reporter, it
4    really helps if just one of us is speaking at a time.  So
5    if you could allow the attorneys to finish their question
6    before giving your answer.
7        A.  Okay.
8        Q.  And then we will try our best to make sure that
9    we allow you to finish your answer before we ask our next
10   question.  Okay?
11       A.  Okay.
12       Q.  Okay.  The only other rule is that you're honest
13   and truthful today.  You just took an oath.  And you
14   understand that even though we are on Zoom, the oath that
15   you gave carries the same weight as if you were in a court
16   of law and that you're obligated to tell the truth today.
17       A.  I understand.
18       Q.  Is there any reason that you would not be able
19   to tell us the truth today?
20       A.  No.
21       Q.  One final thing, we know that this was many
22   years ago and so we don't want any guesses, but we are
23   entitled to your best recollection and best estimates.
24   Does that make sense?
25       A.  Yes.

8

1    don't remember how soon I saw the GoFundMe after
2    everything happened.  But, yeah.
3        Q.  Okay.  And did you make any contributions to
4    that GoFundMe page?
5        A.  I don't believe so.  I don't remember, to be
6    honest.
7        Q.  And you mentioned that the neighbor in front of
8    you, if you're facing northbound on Peach Street, is
9    Clarita Snell; correct?
10       A.  Yes.
11       Q.  And I understood you to say that you did ask her
12   about the incident; is that correct?
13       A.  Yes.
14       Q.  Okay.  And is she the one that slept through the
15   whole incident?
16       A.  Yes.
17       Q.  Okay.  Other than Ms. Snell, did you talk to any
18   of your other neighbors around you?
19       A.  No.
20           ATTORNEY ESQUIVEL:  So I'm going to show you,
21   and we'll mark this as -- I believe the next in line is
22   54.  And I'm going to share my screen with you so you can
23   take a look at this.
24           (Exhibit 54 was marked for identification
25            by the shorthand reporter.)

69

1    BY ATTORNEY ESQUIVEL:
2        Q.  So there should be a photograph up on your
3    screen.  Do you see that?
4        A.  Yes.
5        Q.  And for identification purposes, this is
6    COSB001570.  That's the Bates-stamp number.
7            On this photograph, it's my understanding that
8    this is a photograph of Ms. -- of the house on the corner
9    of -- I'm going to say the southwest corner of the
10   intersection of Peach and Catalpa.  Is this immediately
11   right at the -- I would say, center right side of the
12   photograph, is that Ms. Snell's house?
13       A.  Yes.
14       Q.  And behind that, I see two buildings and then a
15   white house.  Are the two small buildings -- I don't know
16   if you can see my cursor?
17       A.  I can.
18       Q.  It's crosshairs.  Can you see that?
19       A.  Yes.
20       Q.  There's a small building with the brown pitched
21   roof.  And then there's another same color, kind of like a
22   tannish brown building, but this has what looks like those
23   terra cotta type tiles.  Are these two buildings part of
24   Ms. Snell's residence?  Or are those your buildings of
25   your residence?

70

1        A.  Only the first -- the first shed with the brown
2    roof, it's in her property.  That's hers.  And then the
3    shed with the lighter gray roof, that's in my property.
4    And then the house that you're referring to, that's behind
5    my house.  So my -- huh?
6        Q.  I'm sorry.  So the building that has the terra
7    cotta tile type roofing, the one that I have the
8    crosshairs on, is that your residence?
9        A.  No.  That's the house behind me.
10       Q.  Oh, okay.  So it's just a bad angle.  To me it
11   looks like it's in a row.  But you're saying it's actually
12   behind your house?
13       A.  Correct.
14       Q.  Okay.  And then the white one that looks like
15   it's behind it -- but, again, it just might be the angle
16   with the two windows where the crosshairs are on it now
17   and with the brown roof, that's your house?
18       A.  Yes.
19       Q.  Okay.  From this angle, can you see the bathroom
20   window that you were filming through?
21       A.  You can see it slightly right above the -- the
22   police car's siren, the white police car siren.  Right
23   there where you're pointing at.
24       Q.  Okay.
25       A.  You can see it slightly there.

71

1        Q.  Okay.  So there's a vent near the pitch of the
2    roof.  So just below that, there's a little dark spot.
3    You're saying that's the bathroom window?
4        A.  Correct.
5        Q.  Okay.  I am going to -- I think I have to stop
6    sharing -- show you another angle.  So before I show you
7    the next photograph, you testified earlier that about
8    somewhere between five to ten minutes after the shooting
9    stopped, you exited your house and looked northbound on --
10   looked down northbound on Peach Street; correct?
11       A.  Yes.
12       Q.  Did you walk -- I mean, I don't know if there
13   are well-defined sidewalks in this area.
14       A.  No.
15       Q.  How far down did you walk down your -- I don't
16   know if you want to call it a walkway or -- to get a
17   better view of what was happening down the street on Peach
18   Street?
19       A.  Just to the first fence that's inside my house.
20   So, like, maybe, like, I don't know, like, ten steps out
21   of my house.
22       Q.  Okay.  So I am going to share my video -- my
23   screen with you again.  And I'm not going to have this
24   marked because it's a very lengthy video.  But I'm going
25   to identify it.  So do you see a picture up on your

72

18  (Pages 69 to 72)

```
 1                    REPORTER'S CERTIFICATION

 2      .

 3   I, Nicole Johnson, do hereby certify:

 4           That I am a licensed Certified Shorthand

 5   Reporter, duly qualified and certified as such by the

 6   State of California.

 7           That prior to being examined, the witness named

 8   in the foregoing deposition was duly sworn to testify

 9   under oath.

10           That the preceding deposition was recorded

11   stenographically by me at the time and place herein

12   mentioned; and that the preceding pages constitute a

13   complete and accurate record of the testimony given by the

14   aforementioned witness.

15           That I am a neutral party, in no way interested

16   in the outcome of said action, and that I am not related

17   to or otherwise connected with any of the parties involved

18   with this matter, or their respective counsel.

19

20   Dated:  January 10, 2025

21

22

23   _____

24   Nicole Johnson, CSR No. 13030

25
```

139



exhibitsticker.com

EXHIBIT

54