# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

L.C., a minor by and through  )
her guardian ad litem Maria   )
Cadena; et al.,               )
                              )
            Plaintiff,        )
                              )
      vs.                     ) Case No.
                              ) 5:22-cv-00949-KK-(SHKx)
STATE OF CALIFORNIA; COUNTY   )
OF SAN BERNARDINO; et al.,    )
                              )
            Defendants.       )
_____)

VIDEOCONFERENCE DEPOSITION OF BETZABETH GONZALEZ

Taken on Monday, December 30, 2024, at 10:20 a.m.

REPORTED BY:

NICOLE JOHNSON

CSR No. 13030

**Gonzalez, Betzabeth**
**L.C., a minor v. State of California**

```
 1              UNITED STATES DISTRICT COURT
 2              CENTRAL DISTRICT OF CALIFORNIA
 3
 4
 5   L.C., a minor by and through )
     her guardian ad litem Maria  )
 6   Cadena; et al.,              )
                                  )
 7                 Plaintiff,     )
                                  )
 8            vs.                 ) Case No.
                                  ) 5:22-cv-00949-KK-(SHKx)
 9   STATE OF CALIFORNIA; COUNTY  )
     OF SAN BERNARDINO; et al.,   )
10                                )
                   Defendants.    )
11   _____)
12
13
14
15
16          Deposition of BETZABETH GONZALEZ, taken on
17   behalf of the defendants, via Zoom videoconferencing, at
18   10:20 a.m., Monday, December 30, 2024, before Nicole
19   Johnson, CSR #13030, as a Certified Shorthand Reporter
20   within and for the County of Orange, State of California.
21
22
23
24
25
```

```
 1   APPEARANCES:

 2

 3   For the Plaintiffs:

 4       LAW OFFICES OF DALE K. GALIPO
         BY:  Marcel Sincich
 5       21800 Burbank Boulevard
         Suite 310
 6       Woodland Hills, California  91367
         (818) 347-3333
 7       msincich@galipolaw.com

 8

 9   For the Defendants
     County of San Bernardino, Vaccari, Adams:
10
         LYNBERG & WATKINS
11       BY:  Amy Margolies
         1100 Town & Country Road
12       Suite 1450
         Orange, California  92868
13       (714) 937-1010
         amargolies@lynberg.com
14

15

16   For the Defendants
     State of California, Kee, Blackwood, Rubalcava:
17
         OFFICE OF THE ATTORNEY GENERAL
18       BY:  Diana Esquivel
         1300 I Street
19       Suite 125
         Sacramento, California  95814
20       (916) 210-7320
         diana.esquivel@doj.ca.gov
21

22

23

24   The Videographer:  Ed Gallo

25
```

```
 1                          INDEX
 2   Examination                                        Page
 3   Attorney Margolies                              6, 110
 4   Attorney Esquivel                         63, 121, 132
 5   Attorney Sincich                               87, 130
 6
 7
 8                         EXHIBITS
 9   Exhibit           Description                     Page
10   52   Notice of Deposition, 7 pgs                     7
11   15   Bates-stamped COSB105, 1 pg (previously marked)  29
12   16   Bates-stamped COSB3236, 1 pg (previously marked) 31
13   53   Video                                           48
14   54   Color Photograph, 1 pg                          69
15
16
17                  CONFIDENTIAL TRANSCRIPT
18                     (Separately Bound)
19                        Page 112
20
21
22
23
24
25
```

```
 1                    Monday, December 30, 2024
 2                              ooOoo
 3
 4            THE VIDEOGRAPHER:  We are on the record.  My
 5    name is Ed Gallo.  I'm contract by Dean Jones.  Today is
 6    December 30th of 2024.  The time is 10:20 a.m. Pacific
 7    Time.  This video deposition is taken via Zoom.
 8            The name of the case is L.C. versus State of
 9    California filed in United States District Court, Central
10    District of California.  Case Number CV-00949 [sic].  This
11    is Volume 1 in the videotaped deposition of Betzabeth
12    Gonzalez.
13            The deposition is taken by attorney Amy
14    Margolies.  Would the attorneys introduce themselves and
15    state who you represent.
16            ATTORNEY MARGOLIES:  Amy Margolies from Lynberg
17    and Watkins on behalf of the County of San Bernardino and
18    Deputy Adams and Vaccari.
19            ATTORNEY SINCICH:  Good morning.  My name is
20    Marcel Sincich.  I'm from the law offices of Dale K.
21    Galipo, and I represent the plaintiffs in this matter.
22            ATTORNEY ESQUIVEL:  Good morning.  Diana
23    Esquivel on behalf of defendant State of California by and
24    through the California Highway Patrol, Officers Blackwood,
25    Kee, and Rubalcava.
```

5

```
 1            THE VIDEOGRAPHER:  The court reporter today is
 2   Nicole Johnson.  Would reporter please swear in the
 3   witness.
 4
 5                            ooOoo
 6                     BETZABETH GONZALEZ,
 7         was called as a witness, and having been
 8            first duly sworn by the Certified
 9          Shorthand Reporter in accordance with
10          CCP Section 2094, testified as follows:
11
12            THE WITNESS:  Yes.
13            THE REPORTER:  Thank you.
14
15                         EXAMINATION
16   BY ATTORNEY MARGOLIES:
17       Q.   Good morning, Ms. Gonzalez.  Thank you for being
18   here today.
19       A.   Good morning.
20       Q.   I'm going to show you a notice of deposition.
21   If you could just confirm for me that this is the same
22   notice that you received to be here today.
23            I do not know what exhibit number we left off
24   on.  According to my notes I believe we are on 52.  If
25   either counsel knows?
```

6

```
 1   tell me.  Do you know what direction these vehicles are
 2   facing?
 3        A.   They're facing north.
 4        Q.   Okay.  So if I refer, then, to these houses on
 5   the corner of each of the four-way stops, the house on the
 6   top and to the right, right at that corner being the
 7   northeast house.  And then below that, being the southeast
 8   house.  And then at the bottom of the photo, this being
 9   the southwest house.  Do you see those three houses?
10        A.   I do.
11        Q.   Which of these houses would be Clarita Snell's
12   house, if any?
13        A.   The northwest house, the one you're pointing --
14   the other one.  The northwest house.  Not that one.  That
15   one.  You said northwest on that one; right?
16        Q.   I did.  You're correct.  My mouse and I were
17   wrong.  So on the bottom of the photograph, there is a
18   northwest house.  You can see some solar panels on the
19   roof.  Is that right?
20        A.   Yes.
21        Q.   Okay.  This is Clarita Snell's house?
22        A.   Correct.
23        Q.   Which house, then, is your house?
24        A.   The one that's out of the picture frame.  So
25   next to hers over to the south.
```

30

```
 1        Q.   Could you describe for us where the bathroom
 2   window is that you went to?
 3        A.   Like, from the -- the bedroom?  Or, like --
 4   well, it faces the north side.
 5        Q.   Is your bathroom connected to your bedroom?
 6        A.   It is.
 7        Q.   So you have a bathroom inside your bedroom.  And
 8   there's a window that faces the north side up toward
 9   Catalpa?
10        A.   Yes.
11        Q.   And do you see your neighbor Clarita's house?
12   Like, the side of her house from your bathroom window?
13        A.   Yes.  Like the -- the front.  So, like, not the
14   back of her house.  Like the -- like the side of her
15   house.  Like the front side.  So I can see all the way
16   down to the four-way -- the four -- the four-way
17   intersection.
18        Q.   I understand.  Okay.  Thank you for that.
19             Okay.  And so you get your phone and you start
20   recording; is that right?
21        A.   Yes.  I didn't record -- like, record
22   everything.  Because, like I said, it took a long time.  I
23   remember using the phone to be able to see.  And then I
24   did record once he was stepping out of the vehicle.
25        Q.   Okay.  So if I'm understanding you correctly,
```

1   you used your phone, the camera view in your phone to kind
2   of zoom in to see what was happening up the street?
3        A.   Yes.
4        Q.   But you didn't immediately start recording.  You
5   were just using it as a viewer, kind of like binoculars?
6   Would that be fair to say?
7        A.   Yes.
8        Q.   Okay.  And at some point you start recording the
9   actual incident; is that right?
10       A.   Yes.
11       Q.   Okay.  When you got out of your bed and walked
12  over to the bathroom, what is it that you saw happening
13  out on the street?
14       A.   The police was, like, trying to get him to come
15  out of the car.  And just, like, back and forth
16  conversation.  And he would talk to them.  And -- so it
17  was back and forth conversation between them two.  And
18  then I could hear a female, I thought, on the passenger
19  side, but I couldn't see her at all.
20       Q.   Did you --
21            (Simultaneous speakers)
22       A.   You want me to go through the whole thing or --
23  I didn't -- I didn't understand if you wanted me to,
24  like -- I don't know, like, what did I see initially or --
25       Q.   No, that's a great clarification.  I'm going to

39

```
 1    SUV, could you see all of Hector's body?
 2         A.   I don't remember.  I just -- I remember being
 3    able to see, like, part of his body.  Not his entire body.
 4    But, like, the side of his body.  So -- but, yeah.
 5         Q.   Could you see the front of his waistband?
 6         A.   I don't remember.
 7              ATTORNEY MARGOLIES:  I'm going to show you what
 8    has been marked as plaintiffs' 241.  Which this would be
 9    Exhibit 53, I believe.
10              (Exhibit 53 was marked for identification
11              by the shorthand reporter.)
12    BY ATTORNEY MARGOLIES:
13         Q.   Do you see a video on your screen?
14         A.   Yes.
15         Q.   And do you recognize this video?
16         A.   Yeah.
17         Q.   What is it?
18         A.   It looks like the video that I recorded.  Well,
19    kind of looks like the beginning of it.
20         Q.   Okay.  Would it be fair to say that when you
21    were taking a video of the incident, similar to how when
22    you were watching through your view finder, you had to
23    zoom in to capture this?
24         A.   Yes.
25         Q.   I'm going to just play it.  The video is
```

48

```
 1    and 14 seconds.  Actually, make that two minutes and
 2    12 seconds of the video.
 3             Up at the top a little bit to the right of your
 4    screen, we can still see your house; is that correct?
 5        A.   Yes.
 6        Q.   Okay.  And there, there's a window on this side
 7    of the house that faces Mrs. Snell's residence.  Is that
 8    the bathroom window that you were looking out of and
 9    videotaping through?
10        A.   Yes.
11        Q.   Given your familiarity with your neighborhood,
12    having lived there for probably -- I'm sorry, I should
13    have asked you.  How long have you lived at that
14    residence?
15        A.   I think like 19 years.
16        Q.   Okay.  Given that you've lived there for
17    19 years, can you estimate the distance from your house to
18    the intersection?
19             ATTORNEY MARGOLIES:  Asked and answered.
20             THE WITNESS:  Yeah, I can't.  I -- I'm not very
21    good at that.
22    BY ATTORNEY ESQUIVEL:
23        Q.   Okay.  That's fine.  Could you -- do you
24    remember how much zoom you had to use on your phone that
25    captures the video that was marked as Exhibit 53?
```

75

1       A.   I'm guessing I used all of it.  Like, the
2  furthest I could get.
3       Q.   Okay.  So the best of your recollection is that
4  you zoomed it as high as possible?
5       A.   Correct.
6       Q.   And I know Ms. Margolies asked you this
7  question, but let me just ask you a little bit more about
8  the phone that you had at that time, the Samsung Note.
9  Even if you don't remember what exact model or generation
10 it is, how long had you had that phone before
11 February 2021?
12      A.   I don't remember.
13      Q.   If you recall.
14      A.   I don't.
15      Q.   Do you know if you remember if it was a
16 brand-new phone at the time that you had it back at --
17 back when this incident occurred?
18      A.   I don't remember.
19      Q.   Do you know if it was already considered like
20 a -- you thought of it as an older phone?
21      A.   I don't think it was an older phone, no.
22      Q.   Okay.  The carrier that you had back in February
23 of 2021; is that the same carrier you have today?
24      A.   Yes.
25      Q.   And who -- what carrier is that?

76

```
 1       Q.    Is it kind of like a tank top T-shirt?
 2       A.    Yes.
 3       Q.    Okay.  Do you know anything about Mr. Puga's
 4   background?
 5       A.    No.
 6       Q.    Okay.  Had you ever met him or spoken to him
 7   before?
 8       A.    No.
 9       Q.    Okay.  Did you ever hear anything about him or
10   his past from anybody else?
11       A.    No.
12       Q.    And just to be clear, I know -- you probably
13   weren't referencing this.  But when you said the
14   wifebeater shirt, you weren't referring to him potentially
15   beating his wife, or anything like that; is that fair?
16       A.    No.  No, not at all.
17       Q.    Okay.  Okay.  So at some point you said that he
18   had taken the -- the T-shirt off?
19       A.    I believe so, yes.
20       Q.    And he was still in the car when he took the
21   T-shirt off?
22       A.    I believe so.
23       Q.    Okay.  Did you ever hear officers break out one
24   of windows of the truck that he was in?
25       A.    Yes.  I think it was the passenger one.
```

```
 1   cooperate and come out.
 2       Q.   When you say the officers that were
 3   communicating with him aggressively, those were the
 4   officers that were kind of behind the white truck?
 5       A.   Yeah.
 6       Q.   Those officers, did they have on black uniforms?
 7       A.   I couldn't tell.
 8       Q.   Okay.  How many officers were behind the truck
 9   that were communicating aggressively with Mr. Puga?
10       A.   I want to say it was three of them.  But, yeah,
11   I think it was three of them.
12       Q.   Were they yelling at Mr. Puga?
13       A.   Yeah.
14       Q.   When Mr. Puga was responding to the officers,
15   what was his tone of voice like?
16       A.   It just seemed like -- I don't know if I want to
17   say helpless, but like -- like he knew he was going to get
18   shot.  Like, it just seemed like he just knew, like, if he
19   got out, like, he was going to get shot.
20            ATTORNEY ESQUIVEL:  Objection.  Move to strike
21   as speculative.  Lacks foundation.
22   BY ATTORNEY SINCICH:
23       Q.   And when you say that Mr. Puga believed that he
24   was going to get shot, you don't mean to say that you know
25   what was going on inside of his mind; right?
```

```
 1       A.   Correct, no.  Just from what he was saying and
 2  the tone of his voice.
 3       Q.   Right.  So from what you were able to see and
 4  hear from the tone of his voice and how he was acting, did
 5  it appear to you that Mr. Puga was scared of the police?
 6            ATTORNEY ESQUIVEL:  Objection.  Lacks
 7  foundation.  Calls for speculation.
 8            THE WITNESS:  Well, he didn't have -- he didn't
 9  believe that they were going to, like -- going to take him
10  gently and just put him in the back of the car.
11            ATTORNEY MARGOLIES:  Same objections.
12  BY ATTORNEY SINCICH:
13       Q.   When you heard Mr. Puga say, "You're going to
14  shoot me, you're going to shoot me," was he still in the
15  car when he said that?
16       A.   I believe so, yes.
17       Q.   When he said that, in your opinion, was his tone
18  of voice scared of the police?
19       A.   Yeah, scared --
20            ATTORNEY ESQUIVEL:  Same objections.
21  BY ATTORNEY SINCICH:
22       Q.   I'm sorry, did you say yes?
23       A.   I said yes, yeah.
24       Q.   And the officer that was communicating with him
25  kind of from the front left of the vehicle, you said that
```

103

```
 1    Hopefully not more.  I'm sorry.
 2         A.   It's okay.
 3         Q.   When you had your phone on the windowsill,
 4    approximately where on your body was -- was that base of
 5    the --
 6              ATTORNEY ESQUIVEL:  Sorry about that.
 7              ATTORNEY SINCICH:  No problem.
 8    BY ATTORNEY SINCICH:
 9         Q.   For instance, like, where was the phone in terms
10    of its height related to your body as you were watching?
11         A.   So the phone would be, like, at my -- between,
12    like, my -- my chin and my -- my chest area.  Because I --
13    like I said, I have, like, a little stool thing that I can
14    stand on.  So I remember going from, like, standing on the
15    stool to, like, leaning on the -- on the toilet to be able
16    to see.
17              So the whole time my head is above, like, where
18    the phone would be.
19         Q.   Okay.
20         A.   You would hear my voice more than you would hear
21    Jacob.
22         Q.   And my last question is, did you ever see
23    Mr. Puga shoot at any police officer?
24         A.   No.
25         Q.   Okay.  Thank you.
```

132

```
 1            ATTORNEY SINCICH:  I have no further questions
 2   at this time.  You're muted.  There we go.
 3            ATTORNEY MARGOLIES:  I don't have any other --
 4            ATTORNEY ESQUIVEL:  I'm sorry.  I'm sorry, Amy.
 5   I thought you were saying you didn't have any further
 6   questions.
 7            ATTORNEY MARGOLIES:  I don't have any other
 8   questions, Ms. Gonzalez.  But we're going to do a couple
 9   housekeeping matters, and I do want to give you my email
10   address.
11            ATTORNEY ESQUIVEL:  I'm sorry.  I do have one
12   follow-up question.  I'm sorry.
13
14                    FURTHER EXAMINATION
15   BY ATTORNEY ESQUIVEL:
16       Q.   I'm sorry, I didn't -- I guess I didn't catch
17   that.  So you were standing on a stool at some point while
18   you were looking out your bathroom window?
19       A.   Yes.
20       Q.   And then you said at other times you -- you had
21   your knee on the commode?
22       A.   Yeah.  I would lean on it.  Because, I mean, I
23   was standing there for a long time.
24       Q.   Okay. If you didn't -- if you weren't standing
25   on the stool, where would the bottom ledge of the bathroom
```

133

REPORTER'S CERTIFICATION

I, Nicole Johnson, do hereby certify:

    That I am a licensed Certified Shorthand Reporter, duly qualified and certified as such by the State of California.

    That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify under oath.

    That the preceding deposition was recorded stenographically by me at the time and place herein mentioned; and that the preceding pages constitute a complete and accurate record of the testimony given by the aforementioned witness.

    That I am a neutral party, in no way interested in the outcome of said action, and that I am not related to or otherwise connected with any of the parties involved with this matter, or their respective counsel.

Dated: January 10, 2025

_____

Nicole Johnson, CSR No. 13030

139