# EXHIBIT B

```
                UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF CALIFORNIA
```

L.C., a minor by and through )
her guardian ad litem Maria )
Cadena, individually and as )
successor-in-interest to )
Hector Puga; I.H., a minor by)
and through his guardian ad )
litem Jasmine Hernandez, )
individually and as )
successor-in-interest to ) CASE NO. 5:22-cv-00949-KK
Hector Puga; A.L., a minor by)         (SHKx)
and through her guardian ad )
litem Lydia Lopez, )
individually and as )
successor-in-interest to )
Hector Puga; and ANTONIA )
SALAS UBALDO, individually, )
                             )
            Plaintiffs, )   ORAL AND VIDEOTAPED
                             )       DEPOSITION OF
       vs.                   )        ROGER CLARK
                             )     IN EXPERT CAPACITY
STATE OF CALIFORNIA; COUNTY ) VIA WEB VIDEOCONFERENCE
OF SAN BERNARDINO; S.S.C., a ) TUESDAY, MARCH 11, 2025
nominal defendant; ISAIAH )          VOLUME I
KEE; MICHAEL BLACKWOOD; )
BERNARDO RUBALCAVA; ROBERT )
VACCARI; JAKE ADAMS; and )
DOES 6-10, inclusive, )
                             )
            Defendants. )
_____)


Volume I of oral and videotaped deposition taken
remotely on behalf of Defendants, commencing at 1:04
p.m. on Tuesday, March 11, 2025 before Erika "Rik"
Rutledge, Certified Shorthand Reporter No. 13774 for the
State of California.

1

```
 1   APPEARANCES OF COUNSEL:
 2
     FOR PLAINTIFFS:
 3
         LAW OFFICES OF DALE K. GALIPO
 4       BY:  HANG D. LE
              ATTORNEY AT LAW
 5       21800 Burbank Boulevard
         Suite 310
 6       Woodland Hills, California 91367
         818.347.3333
 7       hlee@galipolaw.com
 8
 9   FOR DEFENDANTS State of California by and through the
     CHP, and Officers Michael Blackwood, Isaiah Kee, and
10   Bernardo Rubalcava:
11       STATE OF CALIFORNIA
         TORT & CONDEMNATION SECTION
12       OFFICE OF ATTORNEY GENERAL
         BY:  DIANA ESQUIVEL
13            DEPUTY ATTORNEY GENERAL
         1300 "I" Street
14       Sacramento, California 95814
         916.210.7320
15       diana.esquivel@doj.ca.gov
16
17   FOR DEFENDANTS County of San Bernardino, Robert Vaccari,
     and Jake Adams:
18
         LYNBERG & WATKINS
19       BY:  SHANNON GUSTAFSON
              ATTORNEY AT LAW
20       1100 West Town & Country Road
         Suite 1450
21       Orange, California 92868
         714.937-1010
22       sgustafson@lynberg.com
23
24   LEGAL VIDEOGRAPHER:
25       Blake Jones - Dean Jones Legal Videos, Inc.
```

```
 1                          INDEX
 2   DEPONENT              EXAMINATION                    PAGE
 3   Roger Clark           Ms. Gustafson                     5
 4                         Ms. Esquivel                    100
 5
 6
 7                         EXHIBITS
 8   Exhibit               Description                    Page
 9   EXHIBIT 58            Rule 26 Testimony Case List       7
10   EXHIBIT 59            Fee Schedule                     15
11   EXHIBIT 60            Curriculum Vitae                 17
12   EXHIBIT 61            Expert Opinions Report           42
13
14
15
                      QUESTIONS NOT ANSWERED
16
                              (None)
17
18
19
20                     INFORMATION REQUESTED
21                            (None)
22
23
24
25
```

|  |  |
|---|---|
|  | 1    REMOTE VIA WEB VIDEOCONFERENCE |
|  | 2    TUESDAY, MARCH 11, 2025 1:04 P.M. |
|  | 3                    oo0Ooo |
|  | 4 |
| 13:05:01 | 5         THE VIDEOGRAPHER:  Good morning.  This is the |
|  | 6    video deposition of Roger Clark, taken remotely on |
|  | 7    Tuesday, March 11th, 2025, in the matter of L.C., et |
|  | 8    al., versus the State of California, County of San |
|  | 9    Bernardino, case No. 5:22-CV-00949 KK-(SHKx.) |
| 13:05:49 | 10        This case is being heard in the United States |
|  | 11   District Court in the Central District of the State of |
|  | 12   California. |
|  | 13        My name is Blake Jones, legal videographer, |
|  | 14   contracted through Dean Jones Legal Videos, Incorporated |
| 13:06:02 | 15   of Los Angeles and Santa Ana, California. |
|  | 16        Because we're not in person, the videographer |
|  | 17   will have to interrupt the proceedings if the deponent |
|  | 18   drifts out of frame or should any connectivity issues |
|  | 19   with Zoom occur. |
| 13:06:02 | 20        This deposition is commencing at 1:06 p.m. |
|  | 21   Would all present please identify themselves, beginning |
|  | 22   with the deponent. |
|  | 23        THE WITNESS:  Roger Clark. |
|  | 24        MS. GUSTAFSON:  Shannon Gustafson for the |
| 13:06:21 | 25   County defendants.  And also just to clarify for the |

4

```
              1   record, this deposition is also being taken in the
              2   consolidated for discovery of Botten, et al. versus
              3   State of California, et al., and that case number is
              4   5:23-CV-00257-KK-SHK.
13:06:50      5          MS. ESQUIVEL:  Diana Esquivel on behalf of the
              6   State defendants, appearing from Sacramento.
              7          MS. LE:  Hang Le on behalf of the plaintiffs in
              8   L.C., et al. versus State of California, and on behalf
              9   of the plaintiffs in Botten, et al. versus State of
13:07:04     10   California, et al.
             11          THE VIDEOGRAPHER:  Would the court reporter
             12   please administer the oath.
             13          THE REPORTER:  You do solemnly swear that the
             14   testimony you are about to give in this deposition shall
13:07:20     15   be the truth, the whole truth, and nothing but the
             16   truth, so help you God?
             17          THE WITNESS:  I do.
             18          THE REPORTER:  Thank you.
             19                      EXAMINATION
13:07:23     20   BY MS. GUSTAFSON:
             21     Q    Mr. Clark, how many times have you been
             22   deposed?
             23     A    Around 1,400 times.  Well, depositions only
             24   would be 1,000 times.
13:07:35     25     Q    So we can dispense with all the reading of the
```

5

```
              1       Q    And so that was my question.  Is there a
              2   requirement that you have -- when you have a high-risk
              3   traffic stop, that there must also be an evacuation, or
              4   is it dependent on the circumstances?
13:46:49      5       A    Well, thank you for that little piece.  Yes, it
              6   depends on circumstances.
              7       Q    During the time you were involved in a
              8   high-risk traffic stop, did you always have an
              9   evacuation that occurred as well?
13:47:16     10       A    No.
             11       Q    Were pepper-ball launchers utilized as a tool
             12   when you were in law enforcement?
             13       A    No.
             14       Q    Have you ever used a pepper-ball launcher in
13:47:33     15   any capacity?
             16       A    Not as a law enforcement officer.
             17       Q    In any capacity?
             18       A    As an expert I did in a case that went to the
             19   9th Circuit.
13:47:44     20       Q    What case was that?
             21       A    Nelson versus Davis.  It's listed in my
             22   qualifications.  It's a pepper-ball injury.  It's Nelson
             23   versus Davis.
             24       Q    So as part of your role as an expert in that
13:48:09     25   case, you actually fired a pepper-ball launcher?
```

27

```
 1      A   Yes.  And I evaluated and tested the velocity,
 2   and it was all accepted by the court.
 3      Q   Is that the only time that you've ever fired
 4   pepper-ball launcher?
 5      A   A law enforcement pepper ball-launcher.
 6      Q   Is there a different type?  I'm sorry.
 7      A   Oh, yeah.  It's a knock-off -- my term -- from
 8   the paintball weapon.  It's just that the projectile is
 9   configured to meet a law enforcement need.  And there
10   are a variety of them, two of which were used in this
11   case.
12          So one is instead of paint, it's filled with a
13   chemical agent, irritant.  And then the other can be
14   solid glass (indecipherable) as a kinetic energy device
15   to break glass or windows.  Then there are other
16   projectiles also.  But it's a variant -- my term -- of a
17   paintball toy.
18      Q   But in terms of using a pepper-ball launcher
19   that actually expels a pepper ball, is it fair to say
20   that you've only done that once in connection with this
21   Nelson case?
22      A   As a consultant on a case, yeah, correct.  The
23   others would be during playtime with grandkids.
24      Q   I'm assuming when you were playing with
25   grandkids, you were using paintballs, not pepper
```

28

```
 1   balls?
 2       A   Right.  It's the same type of weapon.  But, as
 3   you know, these venues, they have requirements for
 4   velocity.  You can rent the weapon, and they come in a
 5   number of configurations, or you can provide your own.
 6           It has to be tested.  You have to have certain
 7   degree of armament, eye protection, and so forth.
 8   Because they're -- it's kinetic energy; it hurts, and it
 9   can cause injury.
10       Q   We're getting pretty far afield from my
11   question.  The only time you've used the weapon where
12   pepper balls were expelled was as an expert, because
13   when you're talking about your grandkids, you're talking
14   about a weapon where you're expelling paintballs.  Do I
15   have that right?
16       A   Correct, yeah.
17       Q   Are you aware of any differences between the
18   pepper-ball launcher utilized by law enforcement, in
19   particular, the San Bernardino County Sheriff's
20   Department, and a paintball gun?
21       A   Well, there are a lot of differences.  And then
22   there have been refinements in the law enforcement
23   pepper-ball weapon.  And it's continuing to evolve.  And
24   they're demonstrated at the conventions and so forth.
25           However, I only saw an offering in the reports
```

Timestamps: 13:50:10, 13:50:29, 13:50:44, 13:50:58, 13:51:28

29

```
 1   about this particular weapon, and I was -- one of the
 2   noteworthy ones would be Kenneth Hubbs's report on page
 3   25.
 4        Q    But my question was --
 5        A    And in his report he illustrates the San
 6   Bernardino training document about this particular
 7   weapon.
 8        Q    So my question, though, was, Are there
 9   differences between the pepper-ball launcher used by
10   San Bernardino and a paintball gun?  And I believe your
11   answer was yes to that; did I get that right?
12        A    Yeah, there would differences in that one is --
13        Q    No, no.  What I was going to ask is, What are
14   those differences?
15        A    Well, I don't know for sure.  But I took it
16   from the documents that it's modified to meet law
17   enforcement needs.
18        Q    Can you tell me what those modifications are to
19   meet law enforcement needs?
20        A    Well, the projectiles are a modification.
21        Q    Aside from the projectiles being pepper balls
22   as opposed to paintballs, any other modifications that
23   you're aware of?
24        A    I'm not aware of the velocity standards for San
25   Bernardino, and I can't recall the velocity standards
```

30

```
 1  for recreational use.
 2      Q   I'm sorry -- I didn't mean to interrupt you.
 3      A   I paused.  As I sit here, I don't recall.  But
 4  there is an industry standard for velocity.  Now,
 5  whether that's authorized more than that for law
 6  enforcement use by San Bernardino, I don't know.  But
 7  it's adjustable.  The velocity is adjustable with the
 8  weapon.
 9      Q   But is it fair to say as you sit here today,
10  you can't tell me what the differences are between the
11  San Bernardino pepper-ball launcher and a paintball gun,
12  other than that projectiles would be different?
13      A   Correct.
14      Q   Have you ever taken a class in a law
15  enforcement setting regarding the use of a pepper-ball
16  launcher?
17      A   No.
18      Q   When was the last time you underwent any law
19  enforcement training related to the use of a firearm?
20      A   Well, law enforcement training would be '93
21  before I retired out.
22      Q   Are you currently an active firearms trainer
23  for law enforcement?
24      A   No.
25      Q   Have you ever provided training in firearms to
```

31

```
15:07:20

15:07:32

15:07:49

15:08:12

15:08:25
```

1   A   No.  I took it that he did have a gun.
2   Q   And that he had a gun when he was running?
3   A   I assumed that based on recovery of a gun and
4 the gun that was where he went down, that that was his
5 gun.
6   Q   **You're aware that witnesses,**
7 **non-law-enforcement witnesses, testified to seeing**
8 **Mr. Puga with a gun?**
9   A   I'm not aware -- I don't recall that
10 specifically.  The videos don't show him -- I couldn't
11 tell that he had a gun in the videos.
12   Q   You would agree that the quality of the videos
13 is not the best; right?
14   A   There are some problems, and I haven't seen any
15 enhancements.  They're typical grainy, low-quality
16 videos.
17   Q   Are you aware of any witnesses as you sit here
18 today that -- not law enforcement -- that testified that
19 they saw Mr. Puga with a gun in his hand before he fell
20 down?
21   A   Let me look at some notes here.  Just a minute.
22 I don't recall as I sit here.
23       Do you want me to try to take a look?
24   Q   If you don't recall, that's fine.
25   A   I don't recall it.  I took the physical

66

```
 1   evidence as that -- the most important.
 2      Q   Do you have an opinion one way or the other as
 3   to whether Mr. Puga was holding a gun when he was
 4   running away?
 5      A   I looked for that.  I couldn't tell that he had
 6   anything in his hands when he was pumping his arms
 7   running full blast away getting shot at.
 8      Q   That's based on your review of the video;
 9   right?
10      A   Yes.
11      Q   Which video are you referring to?
12      A   So there are videos from the police, the police
13   videos, and then there are some cell phone videos from
14   across the street that show him -- really good views,
15   the best viewing of him, at the front of his vehicle.
16      Q   If there were witnesses that testified that she
17   saw Mr. Puga running with a gun in his hand, it's not
18   for you to make any credibility determinations there;
19   you wouldn't substitute your review of the video for
20   their witness testimony, would you?
21      A   No.  I thought it would be -- and my commentary
22   is that there was a gun where he went down, there's a
23   shell casing where he went down, and that's the best I
24   could opine on in terms of what actually scientifically
25   could be established.
```

```
 1          A   Yes.
 2          Q   Can a suspect still be a threat when they are
 3   on the ground?
 4          A   In the realm of possibilities, yes.
 5          Q   Is there evidence that Mr. Puga actually fired
 6   a gun while he was on the ground?
 7          A   I didn't see Mr. Puga firing a gun, period.
 8   So -- nonetheless -- so I didn't see it.  And if he was
 9   on the ground when he fired the gun, I didn't see that
10   either.
11          Q   And by you didn't see that, are you referring
12   to you watching the video?
13          A   Watching the videos, plural, yes.
14          Q   Based on the videos, you did not see any
15   evidence that Mr. Puga fired the gun while he was on the
16   ground?
17          A   I didn't see it.  I did not see it.
18          Q   Were you aware that there was a fired casing
19   found near the gun?
20          A   I think I mentioned it three or four times
21   during my deposition.
22          Q   And that there was evidence then that Mr. Puga
23   had fired the gun at some point?
24          A   Yes.
25          Q   Do you know when it was that Mr. Puga fired his
```

Timestamps: 15:19:21 (line 5), 15:19:36 (line 10), 15:20:01 (line 15), 15:20:17 (line 20), 15:20:34 (line 25)

73

```
              1  apparently.
              2     Q   Do you have any opinions as to where Mr. Puga
              3  was when any of the 10 rounds that hit him actually
              4  struck him?
15:25:47      5     A   No.
              6     Q   Can you say with any certainty if any of those
              7  10 rounds struck Mr. Puga after he was on the ground?
              8     A   No, I can't.  Other than that there were
              9  rounds, I think something like 15 perhaps, after he was
15:26:14     10  down still firing at him.
             11     Q   Can you state with any certainty which officers
             12  were still firing after Mr. Puga was on the ground?
             13     A   No.
             14     Q   I'll move to Opinion 5 in your report.
15:26:56     15         You've opined here that:
             16             "Officers had time to provide Mr. Puga with
             17         a warning that deadly force was going to be
             18         used prior to the shooting."
             19         Did I read that correctly?
15:27:09     20     A   Yes.
             21     Q   At the point in time -- you did see Mr. Puga
             22  take his right arm and move it down towards his
             23  waistband area when he was in the front of the car?
             24     A   Yes.
15:27:25     25     Q   And that happened before shots were fired?
```

77

```
 1   reach for that," and then the shooting begins?
 2       A   Right.
 3       Q   So are you saying there was an opportunity to
 4   give a warning during that interaction right before the
 5   shooting starts?
 6       A   No.  I would consider that adequate.
 7       Q   What about during the second volley?  Do you
 8   believe there was opportunity to give warnings after
 9   Mr. Puga started running?
10       A   After -- yes, there would be shouted warnings.
11   But you have the sound of the gunfire, so I did not
12   consider that would be an opportunity.
13       Q   Turning to your Opinion No. 4, when you state
14   that:
15           "The officers violated standard police
16           practices and training when they shot at
17           Mr. Puga after he had fallen to the ground."
18       Then I just wanted to make sure I understood
19   your testimony earlier.  Is there anything in the
20   evidence that you can point to to support that -- your
21   opinion that any of the CHP officers shot at Mr. Puga
22   once he was already down on the ground?
23       A   There were something like 15 rounds fired after
24   he was -- after he fell to the ground.
25       Q   In terms of those 15 shots, how do you know
```

124

```
 1    there were about 15 shots fired after he fell to the
 2    ground?
 3        A   That's in a sequence -- it's in -- just a
 4    minute.  The composite video, Item 12, page three.
 5        Q   Is that Mr. Kimmins's video and report that
 6    you're referring to in No. 12?
 7        A   Yes, the composite video.
 8        Q   Have you been provided with Mr. Kimmins's
 9    deposition testimony?
10        A   No.
11        Q   Okay.  I'll represent to you that Mr. Kimmins
12    testified that he cannot verify the accuracy of the 15
13    shots because it was hard to separate the echo from the
14    actual gunshots.
15        A   Right.  That's why I said approximate.
16        Q   If that were true, wouldn't you want to have
17    some means to more accurately measure how many shots
18    were actually fired after Puga was on the ground?
19        A   I don't contest any changes.  What you hear --
20    what you hear is -- or what you see in the video is that
21    he's shot at after he falls to the ground.
22        Q   So are you basing this on when Mr. Puga falls
23    to the ground or stops moving?
24        A   After he falls to the ground.
25        Q   Okay.  And you saw the cell phone video showing
```

Timestamps: 16:52:10 (line 5), 16:52:27 (line 10), 16:52:52 (line 15), 16:53:18 (line 20), 16:53:42 (line 25)

125

```
 1              STATE OF CALIFORNIA    )
 2                                     )    ss.
    COUNTY OF ORANGE          )
 3
 4
 5              I, Erika "Rik" Rutledge, Certified
 6   Shorthand Reporter, Certificate No. 13774, for the State
 7   of California, hereby certify:
 8              I am the deposition officer that
 9   stenographically recorded the testimony in the foregoing
10   deposition;
11              Prior to being examined, the deponent was
12   by me first duly sworn;
13              The foregoing transcript is a true and
14   accurate record of the testimony given.
15
16   Dated:  April 1, 2025
17
18                          [signature: Rik Rutledge]
19                          _____
20                          Erika "Rik" Rutledge
21
22
23
24
25
```

129

```
 1           DEPOSITION ERRATA SHEET
 2
 3      Jilio-Ryan Job No.: 134476
 4      Case Caption:  L.C., et al.
 5      vs.  State of California, County of San Bernardino
 6
 7          DECLARATION UNDER PENALTY OF PERJURY
 8
 9           I declare under penalty of perjury
10      that I have read the entire transcript of
11      my Deposition taken in the captioned matter
12      or the same has been read to me, and
13      the same is true and accurate, save and
14      except for changes and/or corrections, if
15      any, as indicated by me on the DEPOSITION
16      ERRATA SHEET hereof, with the understanding
17      that I offer these changes as if still under
18      oath.
19           Signed on the _____ day of
20      _____, 2025.
21
22      _____
23              ROGER CLARK
24
25
```

130