UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

L.C., a minor by and through her guardian ad litem Maria Cadena, individually and as successor-in-interest to Hector Puga; I.H., a minor by and through his guardian ad litem Jasmine Hernandez, individually and as successor-in-interest to Hector Puga; A.L., a minor by and through her guardian ad litem Lydia Lopez, individually and as successor-in-interest to Hector Puga; and ANTONIA SALAD UBALDO, individually,

        Plaintiffs,

vs.   Case No. 5:22-cv-00949-KK-(SHKx)

STATE OF CALIFORNIA; COUNTY OF SAN BERNARDINO; S.S.C., a nominal defendant; ISAIAH KEE; MICHAEL BLACKWOOD; BERNARDO RUBALCAVA; ROBERT VACCARI; JAKE ADAMS; and DOES 6-10, inclusive,

        Defendants.

REMOTE VIDEOTAPED DEPOSITION OF MATTHEW KIMMINS
MARCH 4, 2025

REPORTED BY: RACHAEL RAMIREZ
Certified Shorthand Reporter
License No. 13098

---

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

L.C., a minor by and through her guardian ad litem Maria Cadena, individually and as successor-in-interest to Hector Puga; I.H., a minor by and through his guardian ad litem Jasmine Hernandez, individually and as successor-in-interest to Hector Puga; A.L., a minor by and through her guardian ad litem Lydia Lopez, individually and as successor-in-interest to Hector Puga; and ANTONIA SALAD UBALDO, individually,

        Plaintiffs,

vs.   Case No. 5:22-cv-00949-KK-(SHKx)

STATE OF CALIFORNIA; COUNTY OF SAN BERNARDINO; S.S.C., a nominal defendant; ISAIAH KEE; MICHAEL BLACKWOOD; BERNARDO RUBALCAVA; ROBERT VACCARI; JAKE ADAMS; and DOES 6-10, inclusive,

        Defendants.

REMOTE VIDEOTAPED DEPOSITION OF MATTHEW KIMMINS, taken remotely via Zoom, on Tuesday, March 4, 2025, at 2:01 p.m., before Rachael Ramirez, Certified Shorthand Reporter, in and for the State of California.

---

APPEARANCES

FOR THE PLAINTIFFS:

    LAW OFFICES OF DALE K. GALIPO
    By: Renee Masongsong, Esq.
    21800 Burbank Boulevard, Suite 310
    Woodland Hills, California 91367
    (818) 347-3333
    hlee@galipolaw.com

FOR THE DEFENDANTS COUNTY OF SAN BERNARDINO, ROBERT VACCARI AND JAKE ADAMS:

    LYNBERG & WATKINS
    By: Amy R. Margolies, Esq.
    1100 W. Town & Country Road, Suite 1450
    Orange, California 92868
    (714) 937-1010
    amargolies@lynberg.com

FOR THE DEFENDANTS STATE OF CALIFORNIA BY AND THROUGH CALIFORNIA HIGHWAY PATROL AND MICHAEL BLACKWOOD:

    OFFICE OF THE ATTORNEY GENERAL
    By: Diana Esquivel, Esq.
    1300 I Street, Suite 125
    Sacramento, California 95814
    (916) 210-7320
    diana.esquivel@doj.ca.gov

ALSO PRESENT: Gigi Fadich, Videographer

---

I N D E X

| EXAMINATION | PAGE |
|---|---|
| BY MS. MARGOLIES | 6 |
| BY MS. ESQUIVEL | 102 |

E X H I B I T S

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 55 | Notice of Deposition | 8 |
| Exhibit 56 | Requested Expert Report | 17 |
| Exhibit 57 | List of Previous Depositions | 30 |

## Page 5

```
                    TUESDAY, MARCH 4, 2025, 2:01 P.M.

02:01:49        THE VIDEOGRAPHER:  Good afternoon.  This is
           the remote deposition of Matthew Kimmins taken on
           Tuesday, March 4, 2025, in the matter of L.C., et
           al. versus State of California, et al., Case
           Number 5:22-cv-00949-KK-(SHKx).  This case is being
           heard in the United States District Court, Central
           District of California.
02:02:13        This deposition is on behalf of the
           defendant.  My name is Gigi Fadich, legal
           videographer, contracted through Dean Jones Legal
           Videos, Incorporated, of Los Angeles and Santa Ana,
           California.  Because we are not in person, I will
02:02:24   have to interrupt proceedings if deponent drifts out
           of frame or there should be any connectivity issues.
                This deposition is commencing at 2:02 p.m.
           Pacific time.  All present please identify
           themselves beginning with the deponent.  You are
02:02:42   muted.
                THE WITNESS:  Sorry about that.  My name is
           Matthew Kimmins, and I am the creative director for
           Trial Template.
                MS. MARGOLIES:  Amy Margolies on behalf of
02:02:53   County defendants.
```

## Page 6

```
02:02:56        MS. ESQUIVEL:  Diana Esquivel on behalf of
           the State defendants.
                MS. MASONGSONG:  Renee Masongsong on behalf
           of the plaintiffs.
02:03:01        THE VIDEOGRAPHER:  Would the court reporter
           please introduce herself and administer the oath.
                THE REPORTER:  My name is Rachael Ramirez.
           I am a California Certified Shorthand Reporter.  My
           license number is 13098.
02:03:07        MATTHEW KIMMINS,
             having been first duly sworn, was examined
                   and testified as follows:

02:03:07             EXAMINATION

           BY MS. MARGOLIES:
                Q    Good afternoon, Mr. Kimmins.  My name is
           Amy Margolies, and I represent the County
02:03:34   defendants, and I'll be asking you some questions
           today.
                A    Certainly.
                Q    I do apologize for the quality of my voice
           and quite possibly the quality of my questions as we
02:03:46   move forward today.  If you have any trouble hearing
```

## Page 7

```
02:03:50   me or understanding me, I would just ask that you
           let me know that so that I have time to rephrase and
           ask you a question that you do understand.
                Is that okay?
02:04:01        A    Of course.
                Q    Would you please state your name one more
           time for us?
                A    Certainly.  And it's okay.  I understand.
           Talk slow, and we'll make sure that your voice isn't
02:04:14   wiped out.  My name is Matthew Kimmins, and that's
           M-a-t-t-h-e-w K-i-m-m-i-n-s.
                Q    Mr. Kimmins, have you had your deposition
           or otherwise sworn testimony taken before?
                A    I have.
02:04:31        Q    Are you comfortable enough with the
           deposition process that I can do away with the
           normal admonitions of a deposition?
                A    Yes.  Actually, I am.  For the -- for the
           sake of expediency, yes.
02:04:44        Q    I'm going to show on my screen a notice of
           deposition that is titled "Notice of Deposition of
           Plaintiff's Expert Matthew Kimmis" [sic].  And I
           apologize.  It should say Kimmins.
                A    It's all right.
02:05:13        Q    Are you seeing that notice on your screen
```

## Page 8

```
02:05:15   now?
                A    I certainly am.
                Q    Have you seen this document before?
                A    I have.
02:05:28        MS. MARGOLIES:  I want to mark this notice
           next in line.  And I apologize.  I don't know what
           exhibit we are on, but at the next break, I can make
           a note and try to identify what exhibit we are on.
              (Exhibit 55 was marked for identification.)
02:05:45   BY MS. MARGOLIES:
                Q    You'll notice at the bottom of page 2 it
           says "attachment A, document request."
                Do you see that?
                A    Yes, I do see that.
02:05:58        Q    And if I scroll down, there was a number of
           requests for production of materials 1 through 8,
           and I don't believe that we were provided any
           materials.  So I just want to ask you right now if
           you have any materials for us today in response to
02:06:20   this request for production of documents.
                A    The only documents that I were provided
           were the documents that actually came from Dale
           Galipo's office.  So I would ask that any --
           anything that I provide Dale Galipo, I want them to
02:06:40   share with you, but I would prefer that Dale
```

**Page 45**

```
03:06:46  1   R6"; true?
          2       A  Yup. True.
          3       Q  It's approximately a 50-minute video
          4   compilation of the incident itself with some
03:06:58  5   timestamp descriptions at the bottom; true?
          6       A  Yes.
          7       Q  The second video is what I believe you were
          8   just referring to, which is titled "Post Fall Bullet
          9   Count Video R1."
03:07:16 10       A  That is correct.
         11       Q  And in that second video, that does not
         12   have at the bottom timestamp descriptions like the
         13   first video does; right?
         14       A  No. It does not.
03:07:30 15       Q  The second video that you were just
         16   describing has at the top right numeric counter.
         17       A  Correct.
         18       Q  Okay. And so when I'm reading from your
         19   report on page 6 that it was important to note that
03:07:52 20   all timestamp descriptions are what is visually and
         21   audibly present in the video --
         22       A  Correct.
         23       Q  -- I'm just trying to understand that what
         24   you are saying is in your first video, the 50-minute
03:08:09 25   video with the bottom descriptions, that those
```

**Page 46**

```
03:08:13  1   descriptions come from what you are observing and
          2   hearing in the video?
          3       A  Yes. That is correct and --
          4       Q  And then --
03:08:26  5       A  Purely from observation. Yes.
          6       Q  And then just talking about that first
          7   video, would it be fair to say that on those
          8   timestamp descriptions at the bottom of that video,
          9   that you are describing what the average juror or
03:08:41 10   judge would see and hear when watching the video?
         11       A  Yeah. I would -- yeah. The compilation
         12   video. Yeah. That's correct.
         13       Q  On that compilation video, do you believe
         14   that you can see things in that video that the
03:08:59 15   average juror or judge could not see?
         16       A  That's asking me to be able to look into
         17   the minds of other people. I couldn't say with any
         18   clarity. I mean, it depends on how carefully they
         19   go into this video. I assume it's going to be --
03:09:26 20   it's going to be examined as carefully as I was
         21   examining it. So every time you look at a video,
         22   every time, no matter how many times you look at a
         23   video, you're going to see something slightly new,
         24   something different, small details.
03:09:43 25          So I couldn't say what people -- other
```

**Page 47**

```
03:09:47  1   people would or would not see or whether -- do I
          2   believe that I'm going to be a little more intensive
          3   in my examination? Yes, I do. Do I believe that
          4   there's a lot of haze, smoke, fog, blurriness and
03:10:01  5   other things that could create a sense of confusion?
          6   Yeah, I do. Do I think your question is do I think
          7   I'm noticing some things that the average person
          8   would not? Yes. I do believe so.
          9       Q  So to clarify, you believe that you can see
03:10:21 10   things in this video that the average juror and
         11   judge would not be able to see with their own eyes?
         12       A  Again, that's -- the average. That's a
         13   very difficult -- I cannot say what other people can
         14   or cannot see. I will say that when you ask someone
03:10:44 15   who has a better understanding to examine something
         16   that other people when they lack that understanding,
         17   that understanding's going to give someone a little
         18   more of an insight. So I -- yeah. I think that I'm
         19   more detailed and more careful with what I'm -- what
03:11:07 20   I'm looking for or what I'm looking into.
         21          I cannot say whether that could be more or
         22   less than what an average person would, but I do
         23   believe that the amount of technical training that
         24   I've had, the time that I've been working within
03:11:21 25   digital video, yeah, can offer me a little more
```

**Page 48**

```
03:11:25  1   understanding and detail and clarity.
          2       Q  You're not testifying as to the facts of
          3   this case; right?
          4       A  Not at all.
03:11:37  5       Q  You are not making any factual
          6   determinations as to what took place?
          7       A  Not at all. That is not what I was hired
          8   to do.
          9       Q  How did you decide when you were going to
03:11:52 10   start syncing your videos? Does that make sense?
         11       A  How did I decide? When you have anyone
         12   seeing that has a variety of different types of
         13   cameras, it's really, really important to start to
         14   put those together to be able to better understand
03:12:12 15   what you're looking at.
         16          Different cameras are going to -- each
         17   camera was going to have a wide variety of different
         18   bits of information that other perspectives may
         19   lack. Might have a different point of view. Might
03:12:29 20   be able to see something clearer. There could be a
         21   smudge in the lens of one camera. There could be a
         22   lens flare or something -- a light that fuzzes out
         23   the video of another camera. Some areas, some
         24   cameras may have greater clarity. One camera might
03:12:44 25   have rotten visuals but very clear audio. So all of
```

**Page 89**

```
04:31:30  1   watching the videos.  Yes.
           2        Q    The next description is at --
           3        A    You can see the point when he drops.
           4        Q    The next description is at 42 minutes and
04:31:41   5   50 seconds.
           6        A    Yup.
           7        Q    The description reads "3:50 screams are
           8   heard.  Three people have been shot."
           9        Is that true?
04:32:02  10        A    That is what that says.
          11        Q    That is what that says?  And that's just
          12   based on your observation of the videos?
          13        A    I'm not sure -- that's based on the
          14   observation of the videos.  I'm pretty sure -- hold
04:32:16  15   on for a second.  It's based on the CAD report.
          16   That description is based on the CAD report.
          17        Q    And then the final one is at 43 minutes and
          18   41 seconds.
          19        A    Yes.
04:32:48  20        Q    The timestamp description that you have at
          21   the bottom says "3:51 son, mom and dad have been
          22   shot," quote, "blood everywhere," end quote.
          23        A    Yes.  Yes.
          24        Q    Could you tell us where that --
04:33:03  25        A    Say again.
```

**Page 90**

```
04:33:07  1        Q    Could you tell us where that description
          2   comes from?
          3        A    CAD report.
          4        Q    And you put the words "blood everywhere" in
04:33:22  5   quotes.  Why did you do that?
          6        A    I believe that's what was in the CAD
          7   report, I think.  Hold on.  Yeah.  It's from the CAD
          8   report.  It's 3:50 -- 3:51:22, "mom and dad blood
          9   everywhere" from the CAD report.
04:34:20 10        Q    And that's just based on what you read from
         11   the CAD report; right?
         12        A    That is based on what the CAD report
         13   states.
         14        Q    Okay.  I want to turn now to your second
04:34:32 15   video.  Mr. Kimmins, would you agree that there is
         16   some limitations to video evidence?
         17        A    100 percent.
         18        Q    And you were not asked to reach any
         19   opinions in this matter as to the appropriateness of
04:35:02 20   the individual defendants' use of force?
         21        A    No.  No.  I was not asked -- I was not
         22   presented this as something that was in any way
         23   either portraying the police or Mr. Puga in a
         24   derogatory lens.
04:35:24 25        Q    According to your report -- I'm going to
```

**Page 91**

```
04:35:25  1   pull that up again, and I'm on page 6 of your
          2   report.
          3        A    I assume you're referring to the shot count
          4   paragraph.
04:35:51  5        Q    I am.  The first sentence -- so on page 6,
          6   last paragraph there's a header that reads "shot
          7   count."
          8        A    Uh-huh.
          9        Q    And the first sentence under "shot count"
04:36:04 10   states "Based on the files we have reviewed, we
         11   cannot with any amount of clear specificity
         12   determine how many shots were fired in total because
         13   the audio is so overlapping with loud punctuated WAV
         14   forms of audio."
04:36:27 15        A    Correct.
         16        Q    Did I read that correct?
         17        A    That is correct.
         18        Q    And if I'm understanding your report, then,
         19   you state that each audio WAV form that indicates a
04:36:42 20   shot could be representative of either the gunshot
         21   itself or an echo of the gunshot; is that right?
         22        A    That is correct.  However, may I share
         23   my -- my screen with you and share something?
         24        Q    I'm happy to have you share something.
04:37:16 25   Just give me one second.  I just want to make sure
```

**Page 92**

```
04:37:18  1   that I'm reading your report correctly.
          2        A    Okay.
          3        Q    I'm on your report, page 6, the final
          4   paragraph, shot count.  I just read the first
04:37:31  5   sentence.  And then the second sentence says "Prior
          6   to Mr. Puga falling to the ground, each one of these
          7   audio WAV forms that indicate a shot could be
          8   representative of either the gunshot itself, or an
          9   echo of the gunshot or the WAV form is shown to be a
04:38:02 10   solid block of audio with no clear peaks to use to
         11   identify a gunshot."
         12        Did I read that correctly?
         13        A    That is correct, but I would like -- I
         14   would like to kind of amend that, and here's why.
04:38:22 15   May I share my screen?
         16        Q    Sure.
         17        A    Okay.  Sometimes when you view audio, you
         18   use audio as kind of like a single WAV form; right?
         19   And you can see the peaks and valleys, and it
04:38:35 20   represents the way that sound basically created
         21   vibrations within the ear.  That's what an audio WAV
         22   form is.  Now, when the police use their audio,
         23   oftentimes their audio is split.  It is split
         24   between the exterior of what is going on outside of
04:38:57 25   the vehicle and then there's an interior channel
```

Kimmins, Matthew
L.C., a minor v. State of California

---

**Page 93**

that goes on inside the vehicle.

These two audio forms are put together, but there's a difference within them, and this is what I'd like to show you. If I open up that audio WAV form, here it is; right? Now, if you look at the left and right channel and I were to zoom in, you'll notice on the right channel there's just this static.

And if I were to isolate the left audio channel, you hear something very, very distinct. You can hear -- it sounds like -- it sounds kind of -- you know, it sounds just -- it's almost impossible really to make out.

However, when you isolate the right audio channel, something different comes up. You'll notice that the WAV forms up top are kind of a blur; right? You can't find anything distinctive. Well, the WAV forms on the bottom are much more distinctive, and you can actually split like this these different pops-off.

Now, this is the exact same audio file. The prob -- the difference is that the right channel is different than the left channel. So when I said that initially, we were looking at these channels cooperatively and together. I wasn't quite

**Page 94**

isolating them.

When you isolate the right audio channel, you can actually hear something a little bit different. You can actually hear a lot of more distinctive sounds coming out of it. Here, I'll play this first one. Now I'm going to play the exact same point in the exact same place from the right audio channel.

Did you hear the difference? It is a very, very, very different audio form. Here we go. This is the right one. Boom, boom, boom, boom, boom, boom. I can count that. Top audio form, can't copy that. So I can't -- I can't distinctly understand.

So since I wrote that report, okay, as I've gone into the audio files, I have discovered that there is a clear separation between the left and the right audio channel. The right audio channel gives a lot more clarity as to how many shots were being fired. So, again, here's an example playing the left audio form.

Q  Mr. Kimmins, I'm going to just stop you right here with the presentation. Thank you for that. What I need to know is: Is your report accurate?

A  Yes. I would -- I -- the one thing that I

**Page 95**

did conclude as far as the audio -- trying to examine the audio files is that you really do need a forensic audio expert, and I stand by that. I really do. This needs further scrutiny, and it is a level of scrutiny that I do not believe I have the technology or the professional experience to really go into further detail on. So this is requiring a little bit more attention to examine the audio form.

Q  Thank you for that.

In your report you wrote in the middle there of that same paragraph, "the audio from these sources could not be clear enough for us to distinctly count shots fired with accuracy."

A  That is true. Although the right and left audio channels do give me greater understanding and do provide more definition, it is still very difficult for us to understand how many shots are fired at the end of it. I cannot with any amount of specificity state the number of shots that were fired.

Q  Do you have any training and experience on firearms?

A  Training, yes.

Q  What training do you have in using firearms?

**Page 96**

A  Well, I grew up using firearms. I grew up around firearms. I was -- received my first firearms training and certification when I was 13 years old. I was recertified when I was 16 years old. I'm actually going in for a recertification again on firearm safety. I own a couple of firearms. I have been familiar with gun ranges. So I've had some experience. Nowhere near to the level of technical expertise and training that a police officer has but some.

Q  From your training and experience, are you able to differentiate the sounds of different firearms?

A  Yes, but not in this recording.

Q  For example, in this recording you cannot distinguish between the sound of an AR-15 and a Glock 9-millimeter?

A  That is correct. No, I could not.

Q  From the audio that you have here, are you able to distinguish between the sound of the law enforcement pistol and the non-law enforcement pistol?

A  No. I could not tell the difference between them. No.

Q  Do you have training and experience, then,

---

24 (Pages 93 to 96)

**Page 97**

```
04:44:40  1   in being able to distinguish the sound from a lethal
          2   versus a less lethal shotgun?
          3       A   No, because the shotguns are the -- kind of
          4   the same.  It's just there's nonlethal rounds which
04:44:55  5   are basically like bean bags that are propelled out
          6   in a shotgun shell.  But no.  I cannot differentiate
          7   between lethal and nonlethal.  I can differentiate
          8   between the pepper ball sounds and the firearms.
          9   That was clear to be able to differentiate.
04:45:11 10       Q   But in regards to a 40-millimeter less
         11   lethal shotgun verse a lethal shotgun, you could not
         12   differentiate between those sounds?
         13       A   No.  No.  Not by audio.  Not by WAV files.
         14       Q   In your experience having operated guns,
04:45:26 15   you're aware that guns can misfire?
         16       A   Certainly.
         17       Q   And what I mean by "misfire," I am not a
         18   gun person.  So what I mean by misfire is that you
         19   can pull the trigger, you can hear a bang but a
04:45:41 20   bullet actually does not eject.
         21       A   Well, a misfire is more like a jam than if
         22   you hear -- if you hear a bang, a bullet has come
         23   out of the barrel.  If the cartridge may not have
         24   ejected from the chamber.  But if you hear a bang,
04:46:06 25   then it's been fired.
```

**Page 98**

```
04:46:09  1       Q   Thank you for clarifying.  So you could
          2   hear a bang, but a bullet might not actually come
          3   out of the gun into the air?
          4       A   I do not know of any instance where a
04:46:24  5   firearm would make a bang and not discharge a
          6   bullet.
          7       Q   Have you ever heard of a squib round?
          8       A   A squib?
          9       Q   Yes.
04:46:32 10       A   Yes.  I have.  That's a nonlethal round.
         11   Yes.  Yes.
         12       Q   No.  When I'm referring to a squib round,
         13   I'm referring to when the bullet -- the trigger is
         14   pulled, bullet comes out but does not actually eject
04:46:52 15   out of the gun.  It's stuck in the gun in that squib
         16   round.
         17       A   The bullet or the casing?  Because there's
         18   two different components.  If there's a fire, that
         19   means the primer has ignited, and that means that
04:47:03 20   the gun powder inside the shell is ignited.  That
         21   means that the lead round has been ejected as a
         22   result of that compression, but the casing -- is
         23   that what you're referring to?  Because that's not
         24   the bullet.  That's just the casing round.
04:47:19 25       Q   Yes.
```

**Page 99**

```
04:47:20  1       A   Okay.
          2       Q   Okay.  So I just want to make sure.  Is it
          3   your testimony that you can hear a bang from a gun
          4   and that a bullet will have ejected out of that gun?
04:47:39  5       A   You're using the term "ejected."
          6   There's -- the bullet could be fired from the
          7   barrel, but the casing, you know -- the shell is
          8   ejected.  So there are many instances where a round
          9   is fired and comes out of the barrel but the casing
04:47:54 10   is not ejected.  There's -- oftentimes there's jams
         11   and things like that that happen.  Yes.
         12       Q   Okay.  Fair enough.  But you are not an
         13   expert in ballistics; correct?
         14       A   No.  Not at all.  Nope.  Not at all.
04:48:09 15       Q   In your video that you have, you title the
         16   video "post-fall bullet count video."
         17       A   Yes.
         18       Q   Right?
         19       A   Yes.
04:48:24 20       Q   But you don't know how many bullets were
         21   actually fired; true?
         22       A   Not with any amount of absolute
         23   specificity.  What we did notice was when I was
         24   isolating the left and right audio channels, what
04:48:46 25   became clear was that the right audio channel
```

**Page 100**

```
04:48:48  1   contained a lot more definition and being able to
          2   hear the shots, and it made -- it made that counting
          3   a little bit easier but by no means 100 percent.  I
          4   cannot say unless, you know -- this needs to go in
04:49:05  5   front of an audio expert really.
          6       Q   And if I'm understanding your words
          7   correctly, are you equating the gunshot sounds to be
          8   the same as bullet count?
          9       A   Shots fired is what I would -- it's not
04:49:21 10   bullet count.  It's just shots fired is the way that
         11   I would title it based on, you know, the -- but
         12   initially it is hard to separate is this a shot?  Is
         13   it -- they're firing so quick, it really is
         14   difficult.  I think that I can actually -- I can
04:49:45 15   accurately narrow down the shots.  I can't say
         16   100 percent.  I believe I can bring it -- you know,
         17   I believe I can count it, but I cannot say with
         18   100 percent that is absolutely certain.  So I can
         19   give a best educated guess, which is my best count,
04:50:05 20   and it's based on what I can see in the audio files.
         21       Q   And you cannot say who fired --
         22       A   Not at all.
         23       Q   -- the gunshots?
         24       A   Not in the least.
04:50:20 25       Q   You couldn't say whether it was CHP, the
```

25 (Pages 97 to 100)

## Page 101

```
04:50:22  1   deputies or Mr. Puga?
          2       A   Not at all. Well, I can say that it was
          3   not Mr. Puga based on what I can see. I mean, when
          4   he ran out in front of his vehicle, there was
04:50:39  5   nothing -- he was not carrying any gun that I could
          6   see, that I could see; that the video shows me that
          7   I could see. I -- you know, I can only go by the
          8   evidence that I am made available. So I cannot go
          9   past that. I didn't see him turn. I didn't see any
04:51:02 10   muzzle flash come from his direction. I didn't see
         11   him turn around when he started running. He just --
         12   he just hightailed it.
         13       Q   You cannot say who fired the gunshots --
         14       A   I cannot say who fired the gunshots at all.
04:51:20 15   No. I cannot.
         16       Q   You cannot say which of any of the gunshots
         17   that we hear resulted in bullets striking Mr. Puga?
         18       A   Cannot.
         19       MS. MARGOLIES: I don't have any other
04:51:39 20   questions. I don't know if now would be a good time
         21   to break or if co-defense counsel would like to --
         22       THE WITNESS: Well, if I may, I am actually
         23   on the East Coast time zone right now, and it's
         24   rounding up to 8:00 o'clock at night. How long do
04:51:58 25   you think this deposition's going to continue?
```

## Page 102

```
04:52:03  1       MS. ESQUIVEL: I'm sorry. I probably have
          2   about maybe 10, 15 minutes worth of questions. It
          3   just all depends on your responses.
          4       THE WITNESS: No problem. I will try and
04:52:11  5   grind this out. No problem. I want to be as
          6   accommodating as I can.
          7       MS. ESQUIVEL: Do we want to take a quick
          8   five-minute break before I ask my questions, or
          9   should we just proceed?
04:52:21 10       THE WITNESS: No. I would love it if we
         11   could just keep moving through if you don't mind.
         12   Would that be possible? Would you guys be opposed
         13   to that.
         14       MS. ESQUIVEL: No. I just don't know if
04:52:30 15   the court reporter needs a quick break because she's
         16   doing a lot of work.
         17       THE WITNESS: She is doing a lot of work.
         18   Rachael, do you need a break?
         19       THE REPORTER: I'm okay. Thanks.
04:52:41 20           EXAMINATION
         21   BY MS. ESQUIVEL:
         22       Q   Okay. So, Mr. Kimmins, your report does
         23   not say. What exactly were you asked to do by the
         24   retaining the legal office? What were you tasked to
04:52:59 25   do?
```

## Page 103

```
04:53:04  1       A   Specifically try -- take a series of videos
          2   and try and come up with sort of a compilation
          3   within a certain period of time. That was Request
          4   1. Request 2 was see if I couldn't determine the
04:53:15  5   amount of shots that were fired following Mr. Puga
          6   collapsing to the ground.
          7       Q   Okay. So I guess I just -- can you kind of
          8   clarify? When you say that you were asked to
          9   compile the videos within a specific amount of time,
04:53:34 10   was it just to take the different videos like you
         11   did and the video called "Puga compilation" and just
         12   show the same point in time from the different
         13   angles caught by the various videos?
         14       A   That is exactly correct. Yes.
04:53:52 15       Q   Okay. Did the Galipo office ask you to do
         16   anything else, other than that?
         17       A   No. I was not -- we did not enhance them,
         18   blow them up, change them, alter them, filter them.
         19   No.
04:54:06 20       Q   Okay. That was going to be my next
         21   question was when you were viewing these videos, did
         22   you -- I noticed that in your report, you said that
         23   all the videos were put together in 1920 by 1080
         24   pixels, otherwise being full HD, and that's on
04:54:28 25   page 6 under the exporting process paragraph.
```

## Page 104

```
04:54:33  1       A   That is -- it is -- that is the resolution
          2   that the compilation of video was exported out as.
          3   Yes.
          4       Q   Okay. Did -- were all the videos that you
04:54:44  5   received from plaintiffs' counsel, were they all
          6   1920 by 1080 videos?
          7       A   No. They were not. There was a wide
          8   variety of different types of formats. They were
          9   vertical cell phones of different cell phone makes
04:55:01 10   and models. You know, every camera has a different
         11   diameter lens. They shoot at different rates. It
         12   depends, but 1920 by 1080 was kind of the most kind
         13   of standardized way to export this video as.
         14       Q   Do you recall if there were any videos that
04:55:25 15   were greater than 1920 by 1080 resolution?
         16       A   I'm sure there were.
         17       Q   Were there -- no. I'm asking you do you
         18   know which ones were greater? I'm sorry. Which
         19   ones were greater than 1920 by 1080?
04:55:52 20       A   I could not -- I could not offhand -- I
         21   could not say offhand. I can look at the videos
         22   that we have used, and I could quickly see the
         23   parameters on them. So I can see that the cell
         24   phone videos, albeit vertical format, were still at
04:56:15 25   1920 by 1080 in their native formats. So --
```

**Page 105**

04:56:20
Q   What about the video that you were -- I'm sorry. I'm just going to scroll up to page 4 of your report. Plaintiff -- that's Bates stamp plaintiff 0241. Do you recall what that native resolution was?

04:56:39
A   That native resolution -- that's sitting at 1920 by 1080 as well. We were provided that video.

Q   Okay.

A   And I'm pretty certain -- yeah.

04:57:07
Q   And you understand that the video Bates-stamped at 241, that that was -- it was an extremely zoomed-in video such that much of the details got blurred because of the amount of zoom used?

04:57:25
A   Yeah. I mean, it was blown up and -- yeah. It's just -- it's just really zoomed. Yeah. It's not enhanced. It's just, you know --

Q   Did you use any program to -- when you viewed the video in its native format to try to clear it up a bit?

04:57:51
A   Extrapolate detail, no. I didn't use any program, any AI, anything that changes the details that were contained within the video.

Q   Did you -- in terms of the -- you have two videos, one from the patrol vehicle on the driver

**Page 106**

04:58:16
side of Mr. Puga's car and then the other one from the patrol vehicle on the passenger side. Do you recall whether those videos from those patrol vehicles, whether they were 1090 by 1080 -- I'm sorry, 1920 by 1080?

04:58:37
A   I've got COSB ending in 1465. The resolution to that initial video I see sitting at 480 by 480.

Q   And on 9200, COB 009200?

04:59:05
A   Hold on for a second, please. I do not know what that native resolution is offhand. That's a DVD video format. It's slightly different. So it's -- let me see here. Hold on for a second. Yeah. I don't know offhand. I apologize. I don't

04:59:51
know what resolution that is offhand.

Q   In terms of 1465 where you said it was less than the 1920 by 1080 high definition that you used to create the video entitled "Puga Compilation," are you aware that when you increased the resolution of

05:00:15
a video that's less than the resolution to which it's transferred, that some -- it creates distortion?

A   There is a change in some things when you change the video format, especially going from

05:00:37
smaller video to a larger video. Yes. There is --

**Page 107**

05:00:41
there are certain small changes that do occur. Yes. But the -- since we were syncing up the videos, we weren't looking for anything we couldn't see. We were only looking for the things we could see. So

05:00:59
examination of all videos within their native format is always step one. So --

Q   You would agree with me that in order -- it would be better when you're trying to look at detail to look at the original video and obviously observe

05:01:16
as much detail as possible because it's not distorted when you convert it to a higher resolution; correct?

A   Yes. But as video files and formats are changing and as the nature of televisions are

05:01:30
changing, so is the software that actually enlarges video. So -- or actually blows it up. So what's happening right now is that because there is a huge push now for a high resolution television, 4K and things like that, a lot of the video software that

05:01:51
actually scales video up is significantly improving. So I don't disagree with you.

    Yes. There are alterations that occur when you change a native video file size and format. Yes, there is. No doubt. But there are many

05:02:09
different video software systems that are actually

**Page 108**

05:02:13
allowing for the increase in resolution that is actually pulling out further detail. So there is some video systems that are starting to change that dynamic, but that does not apply in this case in

05:02:30
this video.

Q   Okay. Perfect. I just wanted to make sure that you didn't do anything to enhance any of the video quality; correct?

A   No. I did not. Not at all.

05:02:39
Q   Okay. So my other questions go back to -- and I know we've already gone through this quite a bit, but I still -- I'm confused because if your -- if you were hired and tasked by the Galipo office to compile the video that's Puga compilation that shows

05:03:02
a certain portion of the incident, I'm trying to understand what exactly is the purpose of the comments that we've already gone through in terms of where you put the line -- the little banner in terms of the time, if that's not something that the Galipo

05:03:27
office asked you to do.

A   That is something that we discussed with them about a small time bar that could basically, you know, indicate moments in time starting from point A and ending in point B. They didn't

05:03:48
specifically ask for it. We discussed it when we

27 (Pages 105 to 108)

**Page 109**

```
05:03:51  1   were discussing the nature of this project with
          2   them, and when we did our initial, we kind of showed
          3   them the way it was going to look and whether or not
          4   that might interest them.  And they kind of nodded,
05:04:03  5   and we sort of moved forward with that.
          6       So it is the kind of thing that we could
          7   easily remove, so if they wanted the same video with
          8   that red bar removed.  But we create our materials
          9   so that we can edit or change them quickly, you
05:04:22 10   know, based on what our clients need.  So I -- I'm
         11   now clearly aware of your concerns with that
         12   timeline.  The little titles down below were really
         13   just to indicate the things we were -- or I was
         14   observing.  It wasn't meant to create a bias or a
05:04:49 15   biased response and wasn't my intention at all --
         16     Q   You know, that's part of my question is, I
         17   guess, I'm just trying to understand what the
         18   purpose is, if it's your interpretation of what is
         19   being seen on the video at that point in time.  So
05:05:09 20   if it's your interpretation of what you're seeing
         21   and what's happening at that point in time, I don't
         22   see how that fits into the -- your task of simply
         23   putting together the videos of the same point in
         24   time just from different angles.
05:05:30 25     So that's why I kept asking why did you
```

**Page 110**

```
05:05:35  1   decide to add that -- those comments about what is
          2   being depicted at -- in the videos at that specific
          3   time when that's not something you were tasked with?
          4     A   I'm tasked with trying to make the video as
05:05:50  5   clear and understandable as possible.  Any titles or
          6   anything I use is only in furtherance to try to
          7   create a sense of clarity.  It wasn't for any other
          8   reason outside of that.  It's just --
          9     Q   Okay.
05:06:07 10     A   -- this is what's happening.  This is what
         11   I see.  Here's the time frame when these things
         12   begin.  This is how we think.  Now, this is -- there
         13   are gaps.  There is gaps in the CAD report.  There's
         14   gaps in the videos.  There's gaps all over the
05:06:21 15   place.  It was kind of a complicated task, but our
         16   end goal is only not to interpret what we see.  Our
         17   job is to just show what we're able to see, and I
         18   wasn't drawing or trying to draw any type of
         19   conclusion, just note what we were observing.
05:06:47 20     Q   Okay.  So -- and, again, I'm not accusing
         21   you of any malfeasance here.  I'm just wondering how
         22   you made the decision as to what you were going to
         23   write down at any specific given time.  So just by
         24   way of example, when Ms. Margolies had asked you to
05:07:09 25   listen for about a minute at 37 and 40 seconds into
```

**Page 111**

```
05:07:15  1   the video using the marker up on the upper
          2   right-hand corner, when she asked you count how many
          3   times the officer ordered Mr. Puga to back up, and
          4   just using that as an example, is that something
05:07:33  5   that you chose not to comment on by putting a little
          6   banner at the bottom but yet you chose to comment
          7   that he complied with commands to put his hands up?
          8       So I'm just wondering how did you make a
          9   decision to comment on certain conduct that is being
05:08:00 10   depicted in the video but not on others?
         11     A   Well, there wasn't any -- there wasn't any
         12   attempt of bias.  There really wasn't.  We were
         13   being focused -- we were being tasked to focus on
         14   Puga.  We were being tasked to focus on what he was
05:08:17 15   doing, what he was -- what was going on from his
         16   perspective.  That was -- Mr. Puga was my focus.
         17   What Mr. Puga was doing was my focus.  How Puga was
         18   reacting was my focus.
         19       My focus was not, Hey, can you please tell
05:08:32 20   me how many times officers did this?  Could you
         21   please tell me where the officers moved to and did
         22   that?  Could you please tell me where, you know --
         23   my focus was I was not being asked to focus on what
         24   the officers were doing.  I was being asked to focus
05:08:45 25   on what Mr. Puga was doing, and I wasn't -- I was
```

**Page 112**

```
05:08:49  1   only trying to respond with what I was able to
          2   observe Mr. Puga doing, and that's, you know --
          3   that's the only answer I have to that question.
          4     Q   Okay.  So in terms of what he was doing,
05:09:04  5   would that also include what he was not doing, such
          6   as when they told him to go down to a knee and he
          7   slightly bent forward and you can see like he was
          8   getting ready to kneel but instead walked to the
          9   front of the vehicle?  So, again, there was no
05:09:21 10   commentary as to that.  So again, I'm just trying to
         11   figure out how you made the decision.  I'm trying to
         12   understand the thought process as to why comment on
         13   certain things and not others.
         14     A   I can't comment on anything that wasn't
05:09:36 15   happening.  So that's -- I don't -- I'm sort of
         16   confused by that.  If I were to comment on things
         17   that were not happening, it would be an endless
         18   commentary that wouldn't cease.  I was only asked to
         19   focus on Mr. Puga, focus on what he was doing, how
05:09:56 20   he was responding, what was going on.  So --
         21     Q   But you didn't comment on the fact that he
         22   was going down to one knee.  So why wasn't that in
         23   there?  That's something he was doing.
         24     A   Yes.
05:10:04 25     Q   So why was that not a banner on the video?
```

28 (Pages 109 to 112)

**Page 113**

```
05:10:08   1      A  I also didn't make a lot of notes that he
           2   was constantly reaching for his face and his eyes in
           3   an agitated state.  I didn't note the fact that he
           4   was having a hard time, you know -- I said he was
05:10:21   5   disoriented, but I didn't, you know, go into
           6   breaking the details of every time I detailed that.
           7      I don't necessarily have the best answer
           8   for your question.  You're trying -- it wasn't out
           9   of bias.  It was because my client asked me to focus
05:10:42  10   on certain aspects of this video and certain
          11   timestamps in this video, and that's what I was
          12   trying to do to fulfill that request.
          13      Q  Did Ms. -- did anybody from Galipo's office
          14   ask you to put those banners that do appear on the
05:11:02  15   video?  Did they specifically ask you to use -- to
          16   use that language in those banners?
          17      A  No.  Not at all.  This is something that I
          18   did more out of, you know -- more innocently than
          19   anything, and it's something that can be changed in
05:11:20  20   a heartbeat.  This file was set up so that it could
          21   be altered.  Video files, once they're rendered, you
          22   can't change them.  So it's really important that we
          23   keep native files available so you could make
          24   whatever changes, you know, that we need to.  It was
05:11:35  25   not in any attempt to infer bias, guilt, innocence,
```

**Page 114**

```
05:11:44   1   anything, just what I was going to see.
           2      Q  No.  I understand that.  And, again, that's
           3   why I was asking you what exactly your assignment
           4   was.  The two videos that you primarily rely on,
05:11:53   5   which are the two patrol vehicle -- from the dash
           6   cam we call it MVARS, were you aware that those are
           7   from the CHP patrol vehicles?
           8      A  The -- those files being from the --
           9      Q  Correct.  The two that you see from either
05:12:11  10   side from behind Mr. Puga's vehicle.
          11      A  Yeah.  I was aware -- I was aware that was
          12   a -- yeah.
          13      Q  Okay.  Are you aware that the CAD log that
          14   was provided to you -- and this is at -- just so we
05:12:27  15   know we're talking about the same thing, Bates stamp
          16   730 -- or I'm sorry.  Bates stamp -- that includes
          17   870 -- I'm sorry.  Let me just bring it up here
          18   because I'm looking at the large file and not the
          19   smaller one.  865 to 878, obviously COSB.
05:12:50  20      Are you aware that that's the CAD log for
          21   the San Bernardino County Sheriff's Department?
          22      A  No.  I was not aware what department had
          23   released this CAD log.  No, I was not.
          24      Q  Would you -- are you aware that CHP has its
05:13:18  25   own CAD log?
```

**Page 115**

```
05:13:22   1      A  I would assume that they did, but I was not
           2   made available.
           3      Q  Wouldn't you want to align up the CAD log
           4   from CHP since the video is from CHP?
05:13:37   5      A  I would want to be as accurate as I
           6   possibly can with any information that I'm given.
           7   That's my goal.  And if I'm given more information
           8   that gives me a chance to be more accurate, I would
           9   absolutely seize on that.
05:13:52  10      Q  I was unclear on your testimony earlier
          11   when you said that you did not see Mr. Puga shoot a
          12   gun.  You didn't see any muzzle flash?
          13      A  I didn't.
          14      Q  Did you see based on your -- which I'm
05:14:09  15   assuming you did more than multiple times review of
          16   the videos.  Did you ever see a gun on Mr. Puga?
          17      A  I don't -- no, we did not see any gun.  No.
          18      Q  So I -- I'm going to share with you in a
          19   minute.  Let me just get there.
05:14:43  20      A  Please.
          21      Q  On your Puga compilation video at 14 -- at
          22   42 minutes -- or 42:29:14.
          23      A  42:29:14.  Okay.  42 -- okay.
          24      Q  I'm sorry.  I'm trying to get there.
05:15:15  25      A  No problem.
```

**Page 116**

```
05:15:45   1      Q  Okay.  So I'm just going to share it so we
           2   can all look at the same thing.
           3      A  Thank you.
           4      Q  Can you see the video?
05:16:10   5      A  Yes.
           6      Q  Okay.  So I'm at 42:29:09, and this is
           7   where Mr. Puga is running away.  I am going to play
           8   this so you can see what I'm doing on the slowest
           9   possible that my program will allow me to --
05:16:34  10      A  Perfect.  Okay.
          11      Q  I'm sorry.  That was super fast even though
          12   I tried to but -- on three occasions as he's
          13   running -- and I'll stop it next time -- there's
          14   something that appears to be shining in Mr. Puga's
05:16:50  15   hand, and I'll rewind it.  It keeps coming in and
          16   out as he's running.  Did you make any efforts to
          17   ascertain what that shining thing is?  And I'll run
          18   it again as I ask my question again.  We're looking
          19   at the top video on the right-hand side.
05:17:16  20      MS. MASONGSONG:  I'm going to object for
          21   the record as calls for speculation and lacks
          22   foundation.
          23      You may answer.
          24      THE WITNESS:  I do not see anything that --
          25   ///
```