# Exhibit C

January 29, 2025

Amy Margolies
Lynberg & Watkins
1100 W. Town & Country Rd, Suite 1450
Orange, CA 92868

Re: Re: L.C. et al (Puga) v. State of California, et al.
Case No.: 5:22-cv-00949-KK-(SHKx)
and
Jonathan Botten, et al. v. State of California, et al.
Case No.: 5:23-cv-00257-KK-(SHKx)


Dear Ms. Margolies,

Enclosed is a report of my preliminary findings in the above matter pursuant to Fed. R. Civ. P. 26.  In consideration of my opinions, I have considered or reviewed the following case-specific materials:

- Complaint
- Coroner report for Hector Puga
- Autopsy toxicology report for Hector Puga
- San Bernardino County Sheriff's Department lethal force summary regarding Hector Puga, books 1 and 2

I have also relied upon my clinical and research experience as a board-certified Medical Toxicologist and Emergency Physician, and a thorough review of the medical literature.  In my practice of Emergency Medicine and Medical Toxicology, I see numerous patients every day under the influence of or intoxicated by methamphetamine and alcohol. My team and I have also published book chapters and peer-reviewed studies dealing with methamphetamine and alcohol effects.  I also teach medical students, residents, and other health care providers on a weekly basis about the effects and toxicity associated with methamphetamine, alcohol and other drugs in humans.


*I am informed and believe that I have received all disclosures and discovery responses produced in the case, as well as all deposition transcripts that have been completed prior to the date of this report.  The foregoing list underscores those records to which I devoted substantial*

1

*consideration. In the event that any items reviewed were inadvertently omitted from the foregoing list, this expert will gladly supplement this list upon questioning under oath and reserves the right to supplement this list in a supplemental report.*

1. **Fact Summary:**

Note:   This summary is provided for convenience and does not necessarily itemize every single fact I relied upon in the formation of my opinions-conclusions in this matter: it is based on my review of the aforementioned records-materials.  I do not contend to have direct personal knowledge of the incident facts.

1. On Wednesday, February 17, 2021, at approximately 0142 hours, while near Bear Valley Road, and the 1-15 Freeway, two police officers observed a white Ford Expedition that matched a vehicle description from the previous day of a vehicle driven by Mr. Hector Puga from which a shot was fired at another car. Officers conducted a U-turn and drove behind the Expedition. Mr. Puga pulled over along the road. Officers stopped behind the Expedition and initiated a traffic stop. Mr. Puga did not comply with commands to roll down his window but drove away, and a pursuit ensued. The pursuit traveled through residential neighborhoods at speeds ranging from 50 to 95 miles per hour.  At approximately 0239 hours, Mr. Puga's Expedition came to a stop due to a disabled wheel from spike strips. Officers pointed their duty firearms at Mr. Puga and ordered him to exit the Expedition with his hands up. However, Mr. Puga initially refused to comply with commands to exit.  A standoff followed. A female passenger, later identified as Christina Barrett, exited through the front passenger door of the Expedition during the standoff, and was detained.   Less than lethal rounds were fired at the car, including OC pepper balls, but even after these measures and over 30 minutes of negotiations, Mr. Puga initially failed to comply and exit the vehicle.
2. At approximately 0342 hours, Mr. Puga exited the driver's door of the Expedition with his hands above his head, but did not display the front of his waistband. Approximately four minutes later, Mr. Puga walked to the front of the Expedition, pressed his torso against the hood, and concealed the front of his waistband. Officers continued to negotiate with Mr. Puga to have him comply with their commands. Mr. Puga refused to comply with commands and remained in front of the Expedition.  Officers moved around the Expedition to get a better viewing angle of Mr. Puga. When they did so, Mr. Puga turned to his right and drew a handgun from his waistband with his right hand, pointed the gun at the officers and fired at them.  Officers returned fire as Mr. Puga ran from them. According to the report, Mr. Puga exchanged gunfire with the officers as he fled. Mr. Puga was struck several times by officers in the exchange of gunfire and fell to the

    ground. Paramedics were summoned to administer care to Mr. Puga, but he was declared deceased at the scene.

3. An autopsy was later performed on Mr. Puga that determined his cause of death was a gunshot wound of the back. Toxicology analysis was performed on Mr. Puga's postmortem femoral blood that was positive for methamphetamine, amphetamine (metabolite of methamphetamine), and ethanol. The methamphetamine concentration of Mr. Puga's blood was measured at 1900 ng/mL (equal to 1.9 mg/L), while the quantity of amphetamine in his blood was measured at 86 ng/mL (equal to 0.086 mg/L). Mr. Puga's ethanol concentration was measured at 114 mg/dL (blood alcohol of 0.114 g/100 mL) also from the femoral blood. These methamphetamine and alcohol concentrations are high and show with medical certainty that Mr. Puga was under the influence of and intoxicated by methamphetamine and alcohol at the time of his confrontation with the deputies when he was shot.

2. **Summary of Expert Opinions:**

Based on my review of the evidence in this case, and on my background, training, education, and experience, I have reached the following medical conclusions in this case, to a reasonable degree of medical probability:

1. **Behavior Effects**. Mr. Puga's level of methamphetamine (1900 ng/mL) at autopsy was significantly higher than that often seen in "recreational" users of the drug and is in the range that has been reported with individuals acting violently, with agitation, poor judgment and noncompliant behavior. Mr. Puga's alcohol concentration was measured at 114 mg/dL, a level at which it is illegal to operate a vehicle in California and at which similar noncompliant and violent behavior has been associated in some individuals. The levels of methamphetamine and alcohol measured in Mr. Puga's blood suggests with a reasonable degree of medical certainty that his noncompliant and violent behavior (ex. firing a gun at officers) during his encounter with the officers was caused by or contributed to by intoxication with methamphetamine and alcohol at the time of his encounter with the deputies on February 17, 2021.
1. **Physiological Effects**. Methamphetamine is a dangerous drug. It can be taken into the body by smoking, injection, or consuming it by mouth. Its effects on the body include toxicity to most every organ, but its activities on the brain and heart are the most important. In recreational use of methamphetamine, a person can feel initial euphoria and "disinhibition." They can also be more aggressive and become violent and paranoid more easily. Users describe feeling more energy and strength. Methamphetamine is often used today along with other stimulants, such as cocaine, during events to allow wild dancing or activity for prolonged periods of time without rest. A person's heart rate, blood pressure, and respiratory rate often go up under the influence of these drugs. Users describe being able to go hours

without drinking and days without eating or sleeping if they are high on this agent; furthermore, their judgment is often impaired by this stimulant leading to bizarre and noncompliant behavior and at times reckless driving. This noncompliant and violent behavior is the same as what deputies described in events during the incident with Mr. Puga on February 17, 2021.

2. **Toxic Effects: Background**. Use of methamphetamines can lead to hallucinations, seizures, coma, irregular heartbeats, and death, both in "toxic" and "recreational" levels within the body. Recreational use of methamphetamine can also lead to a condition of severe intoxication sometimes called "toxic psychosis." This condition can occur in any user of these drugs and at any time while under the influence of and intoxicated by the drug even if an overdose has not occurred and may be contributed to by sleep deprivation. For reasons not completely understood, users who develop this abnormal behavior display unpredictable agitation and act erratically often with poor judgement and can be noncompliant while under the influence – they do not have to overdose to get this reaction. For example, individuals under the influence of these drugs will often resist arrest and restraint by police, even when confronted by multiple police officers brandishing service weapons and other devices such as TASERs or pepper/OC spray. In this condition, these individuals may appear to possess superhuman strength or pain tolerance, likely the result of their brains not recognizing pain in the same fashion as when not intoxicated with these drugs. At times, they will commit suicide in this situation (such as running onto a freeway), and others have committed homicide.

3. **Toxic Effects: Ethanol.** Alcohol (ethanol) can have many effects on the body. Not only can alcohol cause the loss of balance, memory impairment and slurred speech, but its "disinhibition" effects are often responsible for disorderly and uncharacteristic behavior, including noncompliance with police orders. The behavior of Mr. Puga described by officers is also consistent with that of someone intoxicated by alcohol. The disinhibition and intoxicating effects of alcohol can lead to individuals resisting arrest or threatening police or other bystanders and can cause the intoxicated individual to use poor judgment and be noncompliant.

4. **Conclusions: Summary**. Based on my knowledge of this case and the disciplines of Medical Toxicology and Emergency Medicine and review of records, I believe with a reasonable degree of medical certainty that Hector Puga was intoxicated by methamphetamines and alcohol at the time he was shot on February 17, 2021, and the effects of these drugs contributed to or led to his agitated, noncompliant, violent behavior during his interaction with officers. The concentration of methamphetamine and alcohol found in Mr. Puga's blood at autopsy was in the range or above that which has led to this type of behavior in some individuals. For these reasons I conclude with a reasonable degree of medical certainty that the influence of these drugs contributed to or led to Mr. Puga's behavior with officers resulting in his death.

I reserve my right to amend this report based on plaintiffs' expert reports or testimony or forthcoming depositions or any additional evidence. I will make myself available for deposition in San Diego or otherwise (upon advance payment of my travel expenses and time) on a mutually-agreeable date and time prior to the applicable discovery cut-off.

My CV, testimony list, and fee schedule are attached to this report and incorporated here by reference.

Please let me know if you have any questions.

Sincerely,

*Richard F. Clark*

Richard F. Clark, M.D.
Director, Division of Medical Toxicology

5