# Exhibit D

JONATHAN WAYNE BOTTEN Sr. et al.

Case No: 5:23-cv-00257

&

(Puga) L.C., I.H., A.L., and ANTONIA SALAS UBALDO et al.

Case No: 5:22-cv-00949

v.

STATE OF CALIFORNIA et al.

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

REPORT BY

KEN HUBBS

40335 Winchester Road Ste E130
Temecula, CA 92591
Ken.ProTac@gmail.com

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

## TABLE OF CONTENTS

| | |
|---|---|
| Incident Background | 3 |
| Potential Limitations of Video Evidence | 4 |
| Opinions | 4 |
| Basis for Opinions | 7 |
| Opinion 1 | 7 |
| High-Risk Vehicles Stops | 10 |
| Purpose of the Stop | 10 |
| Opinion 2 | 13 |
| Opinion 3 | 15 |
| Opinion 4 | 18 |
| March 13, 2015 Incident Puga with LA Sheriff's | 23 |
| PepperBall Less-Lethal System | 25 |
| Gun Found Under Puga | 35 |
| Synopsized Timeline of Events | 35 |
| Synopsized Statements | 37 |
| Numbers of Less-Lethal and Gunshots Fired | 46 |
| Use of Force by Sgt. Vaccari and Deputy Adams | 47 |
| Opinion 5 | 64 |
| Opinion 6 | 67 |
| Opinion 7 | 73 |
| Expert's Background | 79 |
| Published Articles | 82 |
| Fee Schedule | 82 |
| Expert cases most recent 4 years | 83 |
| Documents and Materials Reviewed | 87 |

2

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

**INCIDENT BACKGROUND**

On February 16, 2021, at approximately 1745 hours, Mr. Salvador Pacheco was driving north on Interstate 15 in the Victorville area. In his mirror, Pacheco noticed a white Ford Expedition with black rims driving erratically. The Expedition partially veered into Pacheco's lane, causing Pacheco to have to drive onto the freeway's west shoulder. The driver of Expedition yelled "Fucking punk" to Pacheco, then racked a round into the chamber of a pistol and fired one shot at Pacheco, hitting Pacheco's vehicle. Pacheco drove to a 99 Cents store to report the incident to law enforcement.

On February 17, 2021, at approximately 0141 hours, California Highway Patrol (CHP) officers Michael Blackwood and Bernardo Rubalcava were patrolling the area of Bear Valley Road and the I 15 freeway. They noticed a white Ford Expedition with black rims. Officers Blackwood and Rubalcava had been advised that approximately eight hours earlier, a car-to-car shooting had occurred on Interstate 15 near Roy Rogers Drive. The victim of the shooting described the shooter as a Hispanic male, heavyset, bald, and driving a white Ford Expedition with large black rims and a funeral procession sticker on the back window.

Officers Blackwood and Rubalcava attempted to pull over the white Expedition resulting in an hour-long high-speed vehicle pursuit. The CHP officers requested the assistance of the San Bernardino County Sheriff's Department. Deputies used spike strips and deflated the front passenger tire, but the Expedition continued the pursuit until becoming disabled facing north on Peach Avenue at Catalpa Street in Hesperia, California.

Officers and deputies positioned for a high-risk vehicle stop, but the driver, Hector Puga, did not comply with orders to exit the vehicle. After less-lethal bean bag rounds, failed to break the driver's side door window, a female passenger (Christina Barrett) exited the passenger side of the vehicle. PepperBall rounds were fired into the Ford Expedition, but Puga still failed to exit the vehicle for over an hour.

At approximately 0342 hours, Puga exited the vehicle, but instead of following commands, he walked to the front of the expedition, concealing the front of his waistband area. Negotiations continued for several minutes until an officer-involved shooting occurred, and Puga was killed. Three members of the Botten family (located at 17994 Catalpa Street) were reportedly hit by gunfire. In this report, I focus on the actions of members of the San Bernardino County Sheriff's Department, but to maintain continuity and clarity in this report, some actions and observations combined with CHP members are included.

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

This incident was captured on multiple video cameras. The following should be noted:

## POTENTIAL LIMITATIONS OF VIDEO EVIDENCE

My training and experience have shown that video evidence of a police use-of-force incident is generally very valuable to an investigation, but it has several significant limitations that investigators and adjudicators must be aware of:

- Videos are made with two-dimensional technology, but we live in a three-dimensional world.
- Videos do not always capture the involved officer's point of view.
- Videos may capture objects and events that the officer did not see.
- Videos may not capture objects and events that the officer did see.
- Video cameras do not capture objects and movements that are blocked from the camera lens.
- Videos may document very different lighting conditions than the human eye.
- Some videos have a low frame rate; thus, they do not capture real-time.
- Bystander cell phone videos tend not to capture the entire incident.
- Bystander cell phone videos are not always pointed at the action.
- Video cameras are neutral, inanimate objects; thus, videos do not experience the bio-mechanical, physiological, and psychological aspects that the involved human beings experience under stress in terms of perception, fear, adrenalin-influenced physiological changes (such as breathing, heart rate, and blood pressure), interpretation of contextual cues, narrowly focused attention ("tunnel vision"), time distortion, sound distortion, memory (formation, storage, and retrieval), and other human performance phenomena.
- Videos of police use-of-force incidents tend to cause emotion-based (not fact-based) reactions by viewers, because police use of force is generally not pleasant to view.
- Videos are not "the ultimate truth." Investigators and adjudicators must determine what the officer perceived at the time and apply the totality of the circumstances along with policy, training and the law to determine whether the officer's perceptions and actions were objectively reasonable.


## <u>OPINIONS</u>

Interactions between police officers and citizens often result in conflicting opinions concerning what occurred. In such circumstances, and for an expert to offer opinions involving police practices, certain assumptions must be made concerning the information provided, in combination with and in consideration of, the totality of the expert's knowledge, training, and experience. I do not make determinations of credibility where the descriptions of events differ between the defendants and the plaintiffs. It is for the trier of fact to determine the more believable witnesses. Accordingly, I reach my conclusions by objectively reviewing and considering the material

4

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

provided, making assumptions when necessary, concerning an issue in dispute, and then drawing upon the totality of my knowledge, training, and full-time police experience.

Statements in this report regarding information known by, observed by, or stated by the involved parties are based on the documented statements referenced in the footnotes provided. Upon this review and consideration, I offer the following:

1. The San Bernardino County Sheriff's deputies' involvement in the high-speed vehicle pursuit of Hector Puga on February 17, 2021, was consistent with generally accepted police training, policy, and practice and with that of prudent, experienced, and professionally trained law enforcement officers facing these or similar circumstances.
    a. Hector Puga was driving a vehicle that CHP officers suspected was involved in a recent car-to-car shooting.
    b. Hector Puga led CHP officers on a high-speed, failure-to-yield vehicle pursuit.
    c. CHP Sergeant Isaiah Kee requested the assistance of the San Bernardino County Sheriff's Department.

2. The California Highway Patrol was the primary investigating agency for the original freeway shooting incident, high-speed, failure-to-yield vehicle pursuit, and high-risk vehicle stop of Hector Puga.

3. De-Escalation methods employed by members of the San Bernardino County Sheriff's Department were consistent with generally accepted police training, policy, and practice and consistent with that of prudent, experienced, and professionally trained law enforcement officers facing these or similar circumstances.
    a. CHP and San Bernardino County Sheriff's Department personnel used de-escalation strategies and techniques, including distance, negotiations, and less-lethal munitions.
    b. Sergeants Lee and Vaccari both attempted to communicate with Puga using a calm voice at an appropriate volume, tone, and pace.
    c. Both Sergeants Lee and Vaccari appeared to use an empathetic approach while talking with Puga.

4. The use of less-lethal force by Sergeant Robert Vaccari and deadly force by Deputy Jake Adams of the San Bernardino County Sheriff's Department was consistent with generally accepted police training, policy, and practice and with that of prudent,

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

experienced, and professionally trained law enforcement officers facing these or similar circumstances.

    a. Hector Puga was driving a vehicle believed to be involved in a car-to-car shooting, and led CHP officers and San Bernardino County Sheriff's deputies on a dangerous high-speed failure-to-yield pursuit.

    b. Hector Puga drove in a highly dangerous manner, posing an imminent threat of serious injury or death to other persons in his path.

    c. After spike-strips deflated Hector Puga's right front tire, the vehicle became disabled in the roadway.

    d. Sergeants from both the CHP and the Sheriff's Department attempted to convince Puga to surrender.

    e. Sergeant Robert Vaccari deployed PepperBalls to force Hector Puga out of the vehicle.

    f. Sergeant Robert Vaccari fired one 40mm less-lethal impact round when Hector Puga drew and pointed a pistol at the CHP Officers.

    g. Deputy Jake Adams fired his Glock pistol when Hector Puga drew and fired a pistol.

    h. Deputy Jake Adams, Sgt. Robert Vaccari, along with CHP Officers Blackwood and Rubalcava, and Sgt. Kee, each observed Puga's actions and nearly simultaneously reacted to what each believed to be an imminent deadly threat.

    i. Sergeant Robert Vaccari tasered Hector Puga when Puga concealed his hands and pistol under his chest while lying on the ground.

    j. Citizen witnesses, Edward Mangerino and Annabelle Botten saw Hector Puga shoot at the officers.

    k. Hector Puga was a continuous deadly threat to the officers, deputies, and citizens in the area from the time he drew the gun from his pants area up to the time he was disarmed.

5. Professional medical support was pre-staged and rapidly summoned to provide medical aid to Hector Puga.

    a. An ambulance and medics had been pre-staged nearby while negotiations continued with Puga.

    b. Hector Puga fell face-down with both hands under his chest area, preventing officers and deputies from seeing the pistol he possessed.

    c. Hector Puga did not respond to commands to show his hands.

    d. The ambulance that was pre-staged nearby for a rapid response was diverted to treat three family members at a house nearby.

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

     e.  During triage, medics determined Hector Puga was the least viable patient.

6.  Hector Puga's actions were consistent with chronic drug abuse.
    a.  Hector Puga displayed symptoms of stimulant use.
    b.  Hector Puga displayed symptoms of methamphetamine psychosis.
    c.  A sample of blood taken from Hector Puga tested positive for the presence of methamphetamine.

7.  Injuries sustained by John Botten Sr., John Botten Jr., and Tanja Botten, did not result from bullets fired by members of the San Bernardino County Sheriff's Department.
    a.  Sgt. Robert Vaccari used less-lethal force in the form of PepperBall rounds, a 40mm impact projectile, and a taser.
    b.  Deputy Jake Adams fired nine or ten 9mm bullets at Hector Puga. These bullets were fired in a westerly direction and not in the direction of the Botten home.
    c.  If, by chance, any bullets fired by Deputy Adams had traveled in the direction of the Botten home, it (they) would have been the unintended result of defensive gunfire directed at Hector Puga.

**Basis for Opinions**

**Opinion 1**

The San Bernardino County Sheriff's deputies' involvement in the high-speed vehicle pursuit of Hector Puga on February 17, 2021, was consistent with generally accepted police training, policy, and practice and with that of prudent, experienced, and professionally trained law enforcement officers facing these or similar circumstances.
    a.  Hector Puga was driving a vehicle that CHP officers suspected was involved in a recent car-to-car shooting.
    b.  Hector Puga led CHP officers on a high-speed, failure-to-yield vehicle pursuit.
    c.  CHP Sergeant Isaiah Kee requested the assistance of the San Bernardino County Sheriff's Department.

**Basis for Opinion 1**

On February 16, 2021, at approximately 1745 hours, Mr. Salvador Pacheco was driving north on Interstate 15 in the Victorville area. In his mirror, Pacheco noticed a white Ford Expedition with black rims driving erratically (unsafe lane changes and following too close to other vehicles). The Expedition was driven by a Hispanic male. Pacheco was in the number one lane when the Expedition passed another vehicle and moved from the number three lane into the number two lane. The Expedition partially veered into the number one lane, causing Pacheco to have to drive onto the west shoulder of the freeway. The driver's window on the Expedition was down, and the driver yelled "Fucking punk" to Pacheco, then racked a round into the chamber of a pistol and

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

fired one shot at Pacheco, hitting Pacheco's vehicle. Pacheco followed the Expedition off the freeway and took a photo of the Ford Expedition. Pacheco drove to a 99 Cents store to report the incident to law enforcement.[1]

Approximately 8 hours later, on February 17, 2021, at 0141 hours, California Highway Patrol (CHP) officers Michael Blackwood and Bernardo Rubalcava were patrolling the area of Bear Valley Road and the I-15 freeway and noticed a white Ford Expedition with black rims. Officers Blackwood and Rubalcava had been advised of the earlier car-to-car shooting that had occurred approximately 4.6 miles away, on Interstate 15 near Roy Rogers Drive, see Figure 1.



Figure 1
Approximately 4.6 miles per Google Maps

The victim of the shooting described the shooter as a Hispanic male, heavyset, bald, and driving a white Ford Expedition with large black rims and a "Funeral" sticker on the back window. [2,3,4,5]

Officers Blackwood and Rubalcava were driving a black and white CHP Dodge Charger and were wearing full CHP uniforms. Officers Blackwood and Rubalcava noticed the white Ford Expedition eastbound onto Bear Valley Road from the I-15 Freeway. The officers were traveling in the opposite direction and turned around to follow behind the Expedition.

_____

[1] Shooting victim statement, Salvador Pacheco, COSB000952 - 959
[2] Shooting victim statement, Salvador Pacheco, COSB000959
[3] Interview of CHP Officer Michael Blackwood COSB000553
[4] Interview of CHP Officer Bernardo Rubalcava, COSB000409
[5] [4-44C] B. Summary of Incident Confidential.pdf, AG04

8

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Prior to the officers activating their emergency lights, the driver of the Expedition (Hector Puga) activated his right turn signal, pulled over to the right side of the road, and turned on his "hazard" lights. Officers Blackwood and Rubalcava noticed a "Funeral" sticker on the upper left portion of the rear window of the Expedition. This further matched the description of the vehicle from the earlier shooting on the freeway. Officer Blackwood activated his overhead emergency red light, to initiate a stop of the Expedition. Puga then accelerated away at a high rate of speed.[6,7,,8]

Figure 2 is a screenshot from dashcam video, showing sparks coming from Puga's right front wheel and a "Funeral" sticker on the rear window, and the funeral sticker found in the vehicle after the rear window was broken out.





| Cropped screenshot from Dashcam video showing a "Funeral" sticker on the left side of rear window, and sparks coming from deflated right front wheel.[9] | Funeral sticker located in Puga's vehicle after rear window broken out. COSB004313 |
|---|---|
| Figure 2 | |

Officer Rubalcava advised over the police radio that they were in pursuit. CHP Sergeant Isaiah Kee responded to assist and requested that the San Bernardino County Sheriff's helicopter and patrol deputies also respond. Sgt. Kee had responded to the earlier shooting, examined a bullet hole in the victim's Honda Civic, and witnessed the recovery of a bullet projectile from the vehicle.

At approximately 0204 hours, San Bernardino County Sheriff's Deputy Isaac Vega deployed a spike strip on northbound Balsam Avenue, south of Bear Valley Road. This successfully deflated

_____

[6] Interview of CHP Officer Michael Blackwood COSB000553 - 554
[7] Interview of CHP Officer Bernardo Rubalcava, COSB000465
[8] [4-44C] B. Summary of Incident Confidential.pdf, AG04
[9] Dashcam video Blackwood & Rubalcava COSB001464 @ 08:51

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

the right front tire of the Ford Expedition. Puga did not stop but continued to lead the officers and
deputies in the pursuit. At 0208 hours, Sgt. Kee took over as the second unit in the pursuit, behind
Officers Blackwood and Rubalcava. At 0239 hours, the Expedition came to a stop, facing north
on Peach Avenue at Catalpa Street.[10] CHP Officers and Sheriff's deputies were positioned for a
"high-risk" vehicle stop.

High-Risk Vehicles Stops

A "High-Risk Vehicle Stop" is a law enforcement technique used when the officers believe one or
more occupants of the vehicle being stopped are armed with a dangerous weapon, have been
involved in dangerous criminal activity, or may be a danger to the officers. During a "high-risk
vehicle stop" officers position their patrol vehicles in locations to observe the suspect vehicle and
occupants. Rather than approaching the suspect vehicle, the officers maintain tactical positions
at or near their patrol vehicles to provide protection in the form of cover and concealment. The
"contact" officer would then use a vehicle PA or voice commands to direct the vehicle occupants
to exit one at a time to be taken into custody.[11]

Hector Puga rolled down his driver's side window and looked back at the officers. An officer can
be heard on dashcam video, telling Puga to *"Put your hands out the window." "Put your hands out
the window."* Puga did not follow the officer's orders, then Puga rolled the window back up.[12]
Officer Rubalcava used his patrol vehicle PA to give commands to the occupants of the Ford
Expedition. The driver, Hector Puga, did not comply with orders to exit the vehicle.[13] During the
nearly one-hour failure-to-yield pursuit, vehicle traffic was light, there appeared to be no
pedestrians, residential homes were described as being far off the roadway, and the suspect was
likely a dangerous felon who had already shot at a citizen driving on the freeway.[14]

Purpose of the Stop

Police officers are trained that a detention must be based on *reasonable suspicion* that criminal
activity has taken place or is about to take place and that the person detained is connected to that
activity. Reasonable suspicion is the standard used to determine whether a detention is legal.
Reasonable suspicion exists when a peace officer is aware of facts and circumstances to make it
reasonable for the officer to suspect that criminal activity may be occurring, and the person
detained is connected to that activity. Reasonable suspicion may be based on the following:
observation, personal training and/or experience, information from eyewitnesses, victims, and/or
other officers.[15]

_____

[10] [4-44C] B. Summary of Incident Confidential.pdf AG04-06
[11] Hubbs, K. 34 years law enforcement, SWAT supervisor and trainer, 20 years Training Director CATO
[12] Dashcam video Blackwood & Rubalcava COSB001464 @ 09:24-09:35
[13] Interview of CHP Officer Bernardo Rubalcava, COSB006210
[14] Interview of CHP Officer Michael Blackwood COSB006173
[15] POST Learning Domain 21, Patrol Methodologies and Tactics, 2- 31

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Officers Blackwood's and Rubalcava's attention was originally drawn toward the vehicle being
driven by Hector Puga due to their knowledge of a shooting that had occurred approximately eight
hours earlier. That shooting had taken place on the I-15 Freeway near Roy Rogers Drive. The
victim of the shooting described the shooter as a Hispanic male, heavyset, bald, and driving a
white Ford Expedition with large black rims and a funeral procession sticker on the back window.
Hector Puga was driving a white Ford Expedition with black rims and a funeral procession sticker
on the back window. Even if Puga had not originally volunteered to pull over and stop on his own,
properly trained peace officers could have believed they had reasonable suspicion to conduct an
investigative stop to determine if Puga, other occupants, or the vehicle were involved in the earlier
shooting incident.

California Penal Code Section 245(a), states in part:

> (2) Any person who commits an assault upon the person of another with a firearm shall be
> punished by imprisonment in the state prison for two, three, or four years, or in a county
> jail for not less than six months and not exceeding one year, or by both a fine not exceeding
> ten thousand dollars ($10,000) and imprisonment.

Once Puga sped away and led CHP officers and San Bernardino County Sheriff's deputies on the
high-speed, failure-to-yield pursuit, a properly trained peace officer could believe Puga had
committed multiple misdemeanor and felony violations. According to the CHP investigation:

> The pursuit traveled 52 miles, at speeds ranging from 50 to 80 miles per hour and lasted
> 57 minutes. Mr. Puga failed to stop at numerous red lights, failed to stop at numerous stop
> signs, drove in opposing traffic lanes and drove with an excessive amount of speed. Mr.
> Puga drove with a wanton and willful disregard for the safety of the motoring public. [16]

California Vehicle Code Section 2800.2 states:

> (a) If a person flees or attempts to elude a pursuing peace officer in violation of Section
> 2800.1 and the pursued vehicle is driven in a willful or wanton disregard for the safety of
> persons or property, the person driving the vehicle, upon conviction, shall be punished by
> imprisonment in the state prison, or by confinement in the county jail for not less than six
> months nor more than one year. The court may also impose a fine of not less than one
> thousand dollars ($1,000) nor more than ten thousand dollars ($10,000), or may impose
> both that imprisonment or confinement and fine.

> (b) For purposes of this section, a willful or wanton disregard for the safety of persons or
> property includes, but is not limited to, driving while fleeing or attempting to elude a
> pursuing peace officer during which time either three or more violations that are assigned
> a traffic violation point count under Section 12810 occur, or damage to property occurs.

_____

[16] [4-44C] B. Summary of Incident Confidential.pdf AG07

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

California Vehicle Code Section 22350 states:

> 22350  No person shall drive a vehicle upon a highway at a speed greater than is reasonable or prudent having due regard for weather, visibility, the traffic on, and the surface and width of, the highway, and in no event at a speed which endangers the safety of persons or property.

California Vehicle Code Section 22450 states:

> 22450 (a) The driver of any vehicle approaching a stop sign at the entrance to, or within, an intersection shall stop at a limit line, if marked, otherwise before entering the crosswalk on the near side of the intersection.
> If there is no limit line or crosswalk, the driver shall stop at the entrance to the intersecting roadway.

California Vehicle Code Section 23103 states:

> 23103 (a)  A person who drives a vehicle upon a highway in willful or wanton disregard for the safety of persons or property is guilty of reckless driving.

The California Commission on Peace Officers Standards and Training (POST) Learning Domain 19, Vehicle Operations, states in part: [17]

> Pursuits may be initiated when a suspect clearly exhibits an intention to avoid arrest by using a vehicle to flee.

> When a suspect is aware of a peace officer's signals to stop but ignores them and continues to flee, peace officers may initiate a vehicle pursuit if:

> - They have reason to believe the suspect presents a clear and immediate threat to the safety of others
> - The suspect has committed or attempted to commit a violation of the law
> - The necessity of immediate apprehension outweighs the level of danger created by the pursuit

The San Bernardino County Sheriff's Department Policy Manual states in part:

### 1.664. Cooperation with Other Law Enforcement Agencies

---

[17] California POST Learning Domain 19 V6.3 Chapter 3 Vehicle Pursuits 3-4

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Members shall cooperate with, support, and assist officers from other law enforcement agencies in the same manner the Department would seek cooperation from that agency.

**3.166.40 Vehicle Pursuits Into Other Jurisdictions**

Generally, when a pursuit crosses into another law enforcement agency jurisdiction, the deputy in charge or the pursuit supervisor shall retain control of the pursuit, at least initially.

In all cases, when practicable, the other jurisdiction shall be notified of the pursuit and may be requested to assume full control, assist, or provide traffic control of the pursuit. The allied agency also may be requested to assume the secondary unit position in order to broadcast the location and direction of the pursuit while in its jurisdiction. Whichever agency is in supervisory control of the pursuit shall be fully responsible for management of the pursuit and coordination with other assisting agencies.


**Opinion 2**

The California Highway Patrol was the primary investigating agency for the original freeway shooting incident, high-speed, failure-to-yield vehicle pursuit, and high-risk vehicle stop of Hector Puga.

**Basis for Opinion 2**

The California Highway Patrol was the primary investigating agency for the original freeway shooting incident. The CHP was also the agency that discovered the possible suspect vehicle and initiated the high-speed pursuit.

When asked over the radio if the San Bernardino County Sheriff's Department would take over the pursuit, Sgt. Vaccari denied the request but advised that sheriff's personnel would assist. CHP Sgt. Kee acknowledged that the Sheriff's Department was not taking over the pursuit.[18] While Sgt. Kee and Sgt. Vaccari were both the same rank, as the Primary Investigating Agency, Sgt. Kee would have been the Incident Commander (IC).

When investigators asked who was in command of the incident on February 17, 2021, Deputy Adams said the CHP sergeant was running the scene.[19]

_____

[18] [4-44C] B. Summary of Incident Confidential.pdf AG05
[19] Interview Deputy Michael Adams, page 58, COSB006469

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Sgt. Vaccari told investigators that the CHP sergeant had control of the scene. Sgt. Vaccari said he was assisting the CHP sergeant.[20] In deposition, Sgt. Kee stated that he directed Sgt. Vaccari to deploy the PepperBall launcher.[21]

The California Law Enforcement Guide for Emergency Operations Red Book states in part:

> Initial response to an emerging situation may consist of one or two officers in a patrol car. Generally, the senior officer assumes the role of the Incident Commander (IC). As IC, this officer is responsible for the accomplishment of all the applicable functions under the ICS organization.[22]

**Unified Command Structure:**

Unified Command is a procedure that allows all agencies with significant geographical, legal or functional responsibility over an incident to avoid operational conflicts, economize resources by collocating at a single Incident Command Post and communicate their operational goals and strategies to each other during structured planning meetings.

Unified Command is not a committee process. Rather, it is a cooperative process by which agencies share their objectives and operational plans in a structured process, thereby facilitating timely communication of accurate information and avoiding operational conflicts. Agencies do not relinquish their lawful authority, responsibility or jurisdiction and retain appropriate accountability.[23]

**Action Planning:**

An Action Plan is also referred to as "Incident Action Plan, Consolidated Action Plan, or Operations Plan."

Every incident requires an action plan. Though not always accomplished in a documented format for small incidents of short duration, a written action plan should be developed and implemented when:

- Resources from multiple agencies are used.
- Multiple jurisdictions are involved.
- The incident will require a change in shifts of personnel and/or equipment.

The plan should cover all tactical and support activities. The Incident Commander (or Unified Command) will establish goals and determine strategies for the incident based

_____

[20] Interview Sgt. Robert Vaccari, page 50, COSB006370
[21] Deposition Transcript Sgt. Isaiah Kee, November 5, 2024, page 21-22
[22] California OES Law Enforcement Guide for Emergency Operations Red Book 2019, Page 15
[23] California OES Law Enforcement Guide for Emergency Operations Red Book 2019, Page 25

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

upon the requirements of the jurisdiction. Within the Unified Command, the incident objectives must adequately reflect the policy needs of participating agencies.[24]

### Incident Commander (IC):

The Incident Commander is responsible for all incident activities including the development of strategies and tactics and the ordering of and the release of resources. The Incident Commander has complete authority and responsibility for the conduct of overall operations.[25]

The San Bernardino County Sheriff's Department Policy Manual states in part:

### 3.166.40 Vehicle Pursuits Into Other Jurisdictions

In all cases, when practicable, the other jurisdiction shall be notified of the pursuit and may be requested to assume full control, assist, or provide traffic control of the pursuit. The allied agency also may be requested to assume the secondary unit position in order to broadcast the location and direction of the pursuit while in its jurisdiction. Whichever agency is in supervisory control of the pursuit shall be fully responsible for management of the pursuit and coordination with other assisting agencies.


## Opinion 3

De-escalation methods employed by members of the CHP and San Bernardino County Sheriff's Department were consistent with generally accepted police training, policy, and practice, and consistent with that of prudent, experienced, and professionally trained law enforcement officers facing these or similar circumstances.
  a. CHP and San Bernardino County Sheriff's Department personnel used de-escalation strategies and techniques, including distance, negotiations, and less-lethal munitions.
  b. Sergeants Lee and Vaccari both attempted to communicate with Puga using a calm voice at an appropriate volume, tone, and pace.
  c. Both Sergeants Lee and Vaccari appeared to use an empathetic approach while talking with Puga.

## Basis for Opinion 3

CHP and San Bernardino County Sheriff's Department personnel used de-escalation strategies, including distance, negotiations, and less-lethal munitions. This allowed the officers and deputies to isolate Puga to the interior of the vehicle while attempting to convince Puga to surrender. Sgt.

_____

[24]California OES Law Enforcement Guide for Emergency Operations Red Book 2019, Page 26-27
[25]California OES Law Enforcement Guide for Emergency Operations Red Book 2019, Page 30

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Lee and Sgt. Vaccari both used a calm voice at an appropriate volume, tone, and pace to attempt to communicate with Puga. Both Sergeants Lee and Vaccari appeared to use an empathetic approach while talking with Puga.[26,27]

Officer Rubalcava described Sergeant Kee as attempting to de-escalate the situation through his negotiating with Hector Puga.[28] Officer Rubalcava told investigators:

> *"Sergeant Kee begins talking to the driver by his first name, he was trying to de-escalate the situation he continued probably another half hour, he was trying to get the suspect to exit the vehicle. The suspect asked if he could call his wife so the suspect gave Sergeant Kee the, a phone number and I attempted calling his wife, but she didn't answer."*[29]

When asked by investigators how he attempted to de-escalate the situation, Sgt. Kee stated:

> *"Yes, Sir, so urn so I talked to him, I allowed him to do certain things that normally I wouldn't do like just smoking cigarettes so he smoked several cigarettes, he smoked some marijuana, he was drinking beer, tossing the cans out and I was just trying to be patient with him with the mind set of well maybe if I just let him do these things maybe he'll finally calm down and just come to a peaceful resolution urn I even called, I even had Officer Rubalcava actually call his wife twice urn but we couldn't get through so those are some of the things that I did besides just, just talking to him in ah general conversation."*[30]

Sgt. Vaccari can be heard on dashcam video attempting to convince Puga to exit the vehicle. Sgt. Vaccari said:

> *"Hector, this is Sergeant Vaccari from the San Bernardino County Sheriff's Department. Is there anything I can say or do that can get you to come out of that car? We want you to step out, we are not going away."*[31]

"Hector, is there anything I can say to get you to cooperate with us and step out of that car?

"Is there anything I get you?" "Hector, is there anything I can say or do?"[32]

_____

[26] Dashcam video Blackwood & Rubalcava, 125. COSB001464 @ 22:40 – 34:01
[27] Transcript of audio on dashcam video, COSB007730 - 31
[28] Interview Officer Rubalcava, COSB007126 - 27
[29] Interview Officer Rubalcava, COSB007135
[30] Interview Sgt. Kee, COSB007419
[31] Transcript of audio on dashcam video, COSB007730
[32] Transcript of audio on dashcam video, COSB007731

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

The San Bernardino County Sheriff's Department Policy 3.606.10 De-Escalation, states in part:

> 3.606.10 De-Escalation
>
> Gaining voluntary compliance enhances officer and public safety, helps officers to defuse a situation, mitigates unintended consequences, and establishes law enforcement legitimacy and community trust.
>
> Safety members shall use de-escalation techniques, crisis intervention tactics and other alternatives to force, as per their training, when feasible. Alternatives to force are not required by a member when the member reasonably believes that immediate action must be taken to prevent injury to themselves, another member or the public.
>
> It is necessary for members to utilize crisis intervention tactics when applicable to a situation. If a member, based on their training and experience, determines a subject might be experiencing a crisis, the member shall consider crisis intervention tactics as an available means of de-escalation.
>
> De-escalation techniques may include:
>
> - Creating distance and a buffer zone between the officer and the subject;
> - Establishing an effective line of communication with the subject, considering factors such as mental illness, possible intoxication, and potential medical or physical conditions; and
> - Considering other available resources, including specialized units, psychiatric emergency response team clinicians, and negotiators.

De-escalation strategies and techniques utilized by members of the CHP and San Bernardino County Sheriff's Department on February 17, 2021, were consistent with California Commission on Peace Officer Standards and Training (POST) De-escalation Strategies and Techniques for California Law Enforcement 2020, which states in part:

> There is no all-inclusive list that identifies all the methods and techniques officers might employ to de-escalate an incident. Some de-escalation methods might work for some officers and not others or in specific situations, but not all situations. Such a list might contain a broad array of options, countless approaches, and hundreds of methods that may be wholly dependent on the situation at hand, which could change in an instant. Some techniques may be based on an officer's communications skills or the assistance of a Police Chaplain. Other successful de-escalation may be achieved based on the officer's experience or confidence that other officers might not possess.
>
> De-escalation techniques that might effectively diffuse one situation very quickly might take time and prolonged efforts for the next. The most successful officers possess situational

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

flexibility and spontaneous adaptability. Their techniques and methods are not an assortment of preplanned actions; they don't react, they respond and do so in a fluid manner. They revise their approach on the fly and continually adapt, assess, and reassess until something starts to work.[33]

## Opinion 4

The use of less-lethal force by Sergeant Robert Vaccari and deadly force by Deputy Jake Adams of the San Bernardino County Sheriff's Department was consistent with generally accepted police training, policy, and practice and with that of prudent, experienced, and professionally trained law enforcement officers facing these or similar circumstances.

   a. Hector Puga was driving a vehicle believed to be involved in a car-to-car shooting and led CHP officers and San Bernardino County Sheriff's deputies on a dangerous high-speed failure-to-yield pursuit.
   b. Hector Puga drove in a highly dangerous manner, posing an imminent threat of serious injury or death to other persons in his path.
   c. After spike-strips deflated Hector Puga's right front tire, the vehicle became disabled in the roadway.
   d. Sergeants from both the CHP and Sheriff's Department attempted to convince Puga to surrender.
   e. Sergeant Robert Vaccari deployed PepperBalls to force Hector Puga out of the vehicle.
   f. Sergeant Robert Vaccari fired one 40mm less-lethal impact round when Hector Puga drew and pointed a pistol at the CHP Officers.
   g. Deputy Jake Adams fired his Glock pistol when Hector Puga drew and fired a pistol.
   h. Deputy Jake Adams, Sgt. Robert Vaccari, along with CHP Officers Blackwood and Rubalcava, and Sgt. Kee, each observed Puga's actions and nearly simultaneously reacted to what each believed to be an imminent deadly threat.
   i. Sergeant Robert Vaccari tasered Hector Puga when Puga concealed his hands and pistol under his chest while lying on the ground.
   j. Citizen witnesses Edward Mangerino and Annabelle Botten saw Hector Puga shoot at the officers.
   k. Hector Puga was a continuous deadly threat to the officers, deputies, and citizens in the area from the time he drew the gun from his pants area up to the time he was disarmed.

## Basis for Opinion 4

Hector Puga drove in a highly dangerous manner, posing an imminent threat of serious injury or

_____
[33] CA POST De-escalation Strategies and Techniques for California Law Enforcement 2020, page 116

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

death to other persons in his path. During the high-speed, failure-to-yield pursuit, Puga drove
through multiple "stop sign" and traffic light, controlled intersections without stopping or hardly
even slowing. Puga frequently made erratic movements and drove across the solid double lines
in the roadway and into the oncoming lanes of traffic. This is compounded during the hours of
darkness when any pedestrians, bicyclists, or other innocent citizens would be difficult to see. [34]
Sheriff's deputies made several attempts to deflate the tires on Puga's vehicle with the use of
"spike strips." At approximately 0230 hours, a spike strip was successfully deployed in the path of
Puga's vehicle, and the right front tire was deflated. Puga continued to drive on the flat tire, and
at 0239 hours, after leading law enforcement on a high-speed pursuit for nearly an hour, Puga's
vehicle came to a stop in the roadway facing north on Peach Avenue at Catalpa Street.[35] This
area is a high desert residential community with homes spaced relatively far apart from each
other, see Figure 3.

The CHP and San Bernardino County Sheriff's vehicles behind Puga's vehicle were clearly
marked law enforcement patrol vehicles, see Figure 4. The CHP and Sheriff's personnel involved
were clearly identifiable as law enforcement. Sgt. Kee and officers Rubalcava and Blackwood
were in CHP uniforms. Sgt. Vaccari and Deputy Adams were in San Bernardino County Sheriff's
uniforms,.





| Figure 3.    Overview of neighborhood where Puga stopped. COSB004274 | Figure 4. Officers Blackwood and Rubalcava's patrol vehicle as CHP-1, Sgt. Kee's vehicle as CHP-2, Deputy Adams vehicle as SB-1, Sgt. Vaccari's vehicle as SB-2, and Puga's vehicle as Puga. COSB000398 |
|---|---|

_____

[34] Several uninvolved citizens in vehicles are observed on dash cam videos, COSB001463 - 64
[35] [4-44C] B. Summary of Incident Confidential.pdf AG04-06

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Photos of officers and deputies

    

| Sgt. Vaccari L2J5A00W.pdf | Dep. Adams L2J5A004.pdf | Sgt. Kee L2J5A03W.pdf | Off. Blackwood L2J5A036.pdf | Off. Rubalcava L2J5A029.pdf |
|---|---|---|---|---|

Figure 4. Photos of the Sheriff's deputies and CHP officers in readily identifiable law enforcement uniforms.

Officers and deputies were positioned for a "high-risk" vehicle stop, but the driver, Hector Puga, did not comply with orders to exit the vehicle.

CHP Officers Blackwood and Rubalcava's black and white patrol vehicle was positioned behind and to the left of Puga's Expedition. Sergeant Kee's patrol vehicle was positioned further behind Puga Expedition but to the right and closer to the side of the road. Both Sheriff's vehicles are white in color and were stopped side-by-side in the roadway, behind both CHP vehicles. Figure 4 depicts  Officers Blackwood and Rubalcava's patrol vehicle as CHP-1, Sgt. Kee's vehicle as CHP-2, Deputy Adams's vehicle as SB-1, Sgt. Vaccari's vehicle as SB-2, and Puga's vehicle as Puga.

Officer Rubalcava gave commands to Puga to "Put your hands out the window." And to "Get out of the vehicle." Puga would roll down the driver's window, look back, and yell something inaudible back at the officers. Sgt. Kee directed Officer Rubalcava to continue giving commands to Puga, and Sgt. Kee asked if the Sheriff's had a K-9 available. Sgt. Vaccari advised that they did not have a K-9 available. Puga refused multiple commands to exit the vehicle. He did roll down the window and yelled back that he was going to call his wife and rolled the window back up. At 0243 hours, Sgt. Kee fired five 12-gauge bean bag rounds in an attempt to break out the driver's door window of the Ford Expedition. The bean bags did not break the window, but the front passenger door opened, and a female passenger (Christina Barrett) exited.[36,37,38]

Christina Barrett complied with commands, walked back, and was detained by Deputy Adams. Barrett told Deputy Adams that she did not know if Puga had a gun and that he was out (of jail)

_____

[36] Dashcam video Blackwood & Rubalcava COSB001464 @ 14:35-15:26
[37] [4-44C] B. Summary of Incident Confidential.pdf AG07 - 08
[38] Interview of CHP Sgt. Isaiah Kee COSB006018

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

on bail, had a baby, and wanted to talk to his wife. Deputy Adams placed Barrett in his sheriff's vehicle. [39] From Christina Barrett, the officers and deputies learned Puga's first name was Hector and began attempting to establish a rapport with him by calling him by his first name. Barrett did not provide Puga's last name.[40,41] Still, Puga did not exit the vehicle as ordered, and he reached over to the right and closed the right passenger-side door that Barrett had left open.

## Hector Puga was a Very Dangerous Career Criminal

Unknown to the officers and deputies at the time, Hector Puga was a very violent and dangerous criminal. His listed criminal history extended way back to 2005 and included various violent crimes,[42] See Figure 5. Additionally, numerous warrants of arrest and protective orders had been issued for Hector Puga. [43]

| Date | Criminal Charges | Description |
|------|------------------|-------------|
| 7/16/05 | 484(A) PC | Theft |
| | 148.9(A) PC | False ID to Peace Officers |
| 12/29/06 | 12020(A)(1) PC | Manufacture/Poss Dangerous Weapon |
| 8/27/07 | 148(A)(1) PC | Obstructing a Peace Officer |
| | 21201(D) CVC | Bike headlight violation |
| 4/14/08 | 459 PC | Burglary |
| | 496(A) | Knowingly Receiving Stolen Property |
| 4/30/08 | 12316(B)(1) PC | Possession of Ammo by Prohibited Person |
| | 11364 HS | Possession of a Controlled Substance |
| | 186.22(A) PC | Participation in a Criminal Street Gang |
| 5/9/08 | 459 PC | Warrant for Burglary |
| 1/9/10 | 273.5(A) PC | Spousal Abuse |
| | 422 PC | Making Terrorist Threats |
| | 594(A)(2) PC | Vandalism |
| 4/27/11 | 459 PC | Warrant for Burglary |
| 7/4/11 | 243(E)(1) PC | Battery on Spouse |
| | 148(A)(1) PC | Obstructing a Peace Officer |
| | 273.6(A) PC | Violation of a Protective Order |
| 10/13/12 | 243(E)(1) PC | Warrant for Battery on Spouse |
| 1/27/13 | 243(E)(1) PC | Warrant for Battery on Spouse |

---

[39] COSB000039 - 000729  Confidential Material Subject to Protective Order, 0340
[40] COSB000039 - 000729  Confidential Material Subject to Protective Order, 0324
[41] Deposition Transcript Jake Adams, November 12, 2024, page 13
[42] COSB000072 - 80
[43] COSB000081 - 93

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

| 7/6/14 | 23247(E) CVC | Driving w/out Interlock Device |
|---|---|---|
| 9/5/14 | 14601.2(A) CVC | Driving while license suspended |
| 3/23/15 | 187 (A) PC | Attempted Murder on a Peace Officer |
| | 207(A) PC | Kidnapping |
| | 2800.2(A) CVC | Evading a Peace Officer |
| | 25800(A) PC | Possession Loaded Firearm during Felony |
| | 245(A)(1) PC | Assault with a Deadly Weapon - non firearm |
| | 14601.1(A) CVC | Warrant Driving while license suspended |
| 7/5/18 | 243(B) PC | Battery on a Peace Officer |
| | 3056 PC | Parole Violation |
| 1/12/19 | 594(A)(2) PC | Vandalism |
| 12/5/20 | 29800(A)(1) PC | Felon/Addict Possession of Firearm |
| | 30305(A)(1) PC | Possession of Ammo by Prohibited Person |
| 3/16/14 | 23247(E) CVC | Driving w/out Interlock Device |
| 5/12/14 | 14601.2(A) CVC | Driving while license suspended |
| 6/6/14 | 14601.2(A) CVC | Driving while license suspended |

Figure 5.
Hector Puga's prior criminal arrests listed, COSB000072 - 80

On March 13, 2015, Hector Puga led Los Angeles County Sheriff's deputies on a high-speed, failure-to-yield vehicle pursuit. The deputies attempted to stop Puga when they were alerted that the vehicle he was driving was associated with a recent kidnapping with a firearm. According to the Los Angeles District Attorney's Office:

*March 13, 2015, at approximately 1700 hours, LASD Deputies attempted a traffic stop on a vehicle driven by Mr. Puga. The license plate attached to the vehicle Mr. Puga was driving returned as a felony armed and dangerous wanted vehicle. The vehicle Mr. Puga was driving was associated with a recent kidnapping with a firearm in the Lakewood, California area. A pursuit ensued and at the termination point of the pursuit, Mr. Puga exited his vehicle, removed a silver handgun from his waistband area, and walked toward the LASD Deputies. Mr. Puga pointed the gun at the LASD Deputies, briefly pointed the weapon towards the ground, and racked the slide of the gun as if chambering a round. Mr. Puga gestured angrily at the LASD Deputies, while still holding the handgun he extended his arm, pointed the handgun at LASD Deputies, and fired his handgun several times. LASD Deputies returned fire and struck Mr. Puga. Mr. Puga was taken into custody and survived the injuries he sustained. No LASD Deputies were injured during the incident. Mr. Puga was armed with a silver and black colored EKOL Frat Magnum 9-millimeter P.A.K. The handgun was a blank gun. It did not shoot bullets, but resembled a firearm, ejected spent casings like a real firearm, and had a muzzle flash similar to a real firearm. Investigators found five spent casings from Mr. Puga's gun near his vehicle. The kidnapping victim told investigators Mr. Puga previously said he was going to kill her, kill himself, kill the police and, "Go at it" with cops. Mr. Puga told investigators he pulled out a*

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

> *fake gun and ultimately admitted pointing the gun at LASD Deputies. Mr. Puga explained*
> *that he wanted police to kill him because he had, "Nothing to live for."* [44]

Figure 6 shows screenshots from a news video showing Hector Puga pointing and firing a pistol
at Los Angeles County Sheriff's deputies on March 13, 2015, at the conclusion of a high-speed
failure-to-yield vehicle pursuit. The closeup view shows the flash of the pistol as it's fired. [45]



Figure 6.
Screenshots from news video, 151. [COSB006733 at 06:20 from March 13, 2015 incident.



Figure 7.
Screenshot from news video, 151. [COSB006733 at 06:56 from March 13, 2015 incident.

Figure 7 shows the proximity of Puga's vehicle to the Los Angeles County Sheriff's deputies. Puga
had already fired at deputies from his white SUV, was shot and was located in the front yard of
the adjacent house.

_____

[44] [4-44C] B. Summary of Incident Confidential.pdf, AGO14 - 15
[45] 151. [COSB006733] Confidential Subject to protective order. Car Chase Ends In A Shootout.mp4

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

---

CHP Sgt. Kee continuously told Puga to exit the vehicle, but Puga replied that he was going to smoke another cigarette or was not ready yet. He tossed out beer cans, smoked another cigarette, and even said he was going to smoke a marijuana joint. Sgt. Kee asked Sgt. Vaccari if he could call out the Sheriff's SWAT team. Sgt. Vaccari believed it was premature to request SWAT and told Sgt. Kee that he was not sure SWAT would come out yet and suggested they try firing PepperBalls into the vehicle. [46],[47]  Sgt. Kee asked Sgt. Vaccari if a K-9 would be available. Sgt. Vaccari informed Sgt. Kee that the sheriff's department only had search or drug dogs.[48]

A SWAT team is an option and resource that can be available to law enforcement, such as the San Bernardino County Sheriff's Department. If an incident exceeds the capabilities of the on-scene personnel, Patrol supervisors can request the assistance of a SWAT team. If the SWAT command determines the incident meets the general guidelines and "call-out" policies, a SWAT team may be dispatched to the incident. Sgt. Vaccari's decision to attempt the use of PepperBalls prior to requesting a SWAT team was a viable and appropriate option. Patrol personnel often handle similar types of incidents up to the point they determine the incident may exceed the capabilities and equipment available to the on-scene personnel.[49]

Puga began telling Sgt. Kee that he was a "2 Striker" and would be going to prison for life. After Puga stated he would be going back to prison for life, Office Sgt. Kee requested CHP dispatch to have Medical (an ambulance) staged nearby at Peach and Bear Valley.[50]

Sgt. Kee attempted to calm Puga by telling him the justice system had changed and to give it a chance. Sergeants Kee and Vaccari discussed the use of PepperBalls and decided if an attempt to call Puga's wife failed, then the PepperBalls would be used.[51] The officers were unable to contact Puga's wife and Sgt. Kee told Sgt. Vaccari to go ahead with deploying the PepperBalls into the vehicle.[52],[53]

PepperBall launchers and PepperBalls are similar to recreational Paintballs see Figures 8 & 9. The PepperBall projectiles, however, are filled with powdered Pelargonic acid vanillylamide (PAVA), a synthetic capsaicinoid (analog of capsaicin), the active ingredient in Oleoresin Capsicum used in OC sprays. The PepperBalls break on impact, and the Pava is released on and around the target.

---

[46] Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 26
[47] Interview of SBSD Sgt. Robert Vaccari COSB000237
[48] Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 44
[49] Hubbs, K. 34 years law enforcement, SWAT supervisor and trainer, 20 years Training Director CATO
[50] Interview of CHP Sgt. Kee COSB000671
[51] Belt recording, Sgt. Vaccari, (Vaccari) PUMA2008.wma @ 1:03:40 - 1:04:27
[52] Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 29
[53] Interview of CHP Sgt. Isaiah Kee COSB006021 - 6022

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al. Report of Ken Hubbs

_____

Photos of Pepperball projectiles and launcher, bean bag shotgun and bean bag ammo.

 

| 262. 12-13 T2 Vaccari attended 12-20-2013 PepperBallSgt2012.pdf, page 11 | 262. 12-13 T2 Vaccari attended 12-20-2013 PepperBallSgt2012.pdf, page 30 |
|---|---|
| Figure 8 | |



Figure 9. PepperBalls, launcher and 12 ga beanbag shotgun.   COSB000108

Oleoresin Capsicum (OC) is classified as an inflammatory agent. It can cause pain and a burning sensation to any contaminated skin, localized heat sensation, redness and swelling. Some may experience feelings/reactions such as: tightness in the chest, shortness of breath, nasal discharge coughing, The two primary physiological effects of OC exposure are involuntary closure of the eyes, a burning sensation in the upper respiratory tract, and to the skin.[54,55] PepperBalls are similar to "paintballs" used recreationally by children and adults in paintball combat games.

The PepperBall system consists of compressed air-powered launchers and proprietary projectiles. PepperBall launchers operate similarly to paintball launchers and deploy projectiles

_____

[54] Hubbs, K. 34 years law enforcement, Chemical Agent Instructor, 20 years Training Director CATO
[55] OC Aerosol Projector Instructor Manual, Safariland Training Academy, pg 27

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

---

that release an approximately 12-foot cloud of 2% to 5% PAVA powder – a powerful organic
irritant – on impact. In most individuals, this irritant produces an immediate and debilitating
reaction in the mucus membranes that encourages subjects to change their behavior and comply
with an officer's instructions without causing permanent injury. This experience dissipates in
roughly five minutes so that the subject is back to normal without inducing any harmful side
effects.[56]

Sgt. Vaccari loaded the Pepperball launcher with "glass breaking" rounds. Sgt. Vaccari asked
Puga if there was anything they could say or do that would get him to come out of the car. Puga
replied, "Call my wife, call my mom." There was no answer at the phone number Puga provided,
Sgt. Vaccari fired three glass-breaking rounds, shattering the rear window of the Ford Expedition.
Sgt. Vaccari was able to see into the vehicle. He unloaded the remaining glass-breaking rounds
and reloaded with OC Pepperball rounds. Sgt. Vaccari again called out to Puga to exit the vehicle
and told Puga he would fire PepperBalls into the car if Puga did not exit. Puga did not exit the
vehicle. Sgt. Vaccari fired PepperBalls into the Ford Expedition, aiming for the front windshield
area between the rearview mirror and the driver's side A pillar. Sgt. Vaccari specifically targeted
this area in an effort to get the OC powder in the air, where it could have an effect on Puga. The
OC may have had some effect on Puga as he stuck his head out of the window but still refused
to exit. Sgt. Vaccari warned Paga that he would fire five more if he did not exit. Puga did not exit,
and the sergeant fired five more PepperBalls into the car. This went on for about 30 minutes. At
times, Puga would crack the driver's door and say that he was coming out but did not exit.[57] Sgt.
Vaccari estimated that he fired a total of approximately 120 to 150 PepperBalls into the vehicle.[58]

Puga began smoking a cigarette and drinking a beer and told the officers and deputies:

> *"This is a three-strike case. I'm a 25 to life'r, I'm going down all day."*[59]

Puga's reference to a *"three-strike case"* indicates he believed that he could be going back to
prison for the rest of his life. Puga also threw out from the vehicle a torch lighter and a glass blub
pipe, commonly used for smoking methamphetamine.[60]

Up to that point, Sgt. Vaccari had not fired any PepperBalls directly at Puga, only at hard areas of
the vehicle interior in order to break the OC balls to get the OC airborne. Sgt. Vaccari decided to
fire directly at Puga's back to use pain compliance. Sgt. Vaccari fired, and Puga yelled back that
he was shot in his eye and asked for medical attention. Puga was told that they already had

---

[56] Saving lives and regaining public trust by employing nonlethal Pepperball, Police1, Sept. 25, 2023
[57] Interview of SBSD Sgt. Robert Vaccari COSB000239-240
[58] Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 31
[59] Interview of SBSD Sgt. Robert Vaccari COSB000244
[60] AG11

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

medical support on-scene and all he had to do was exit the vehicle. Still, Puga did not exit the vehicle. [61,62] Puga placed his head out through the window to get air and used an inhaler. [63]

Approximately 10 or 15 minutes later, Puga opened the driver's door.[64]  Sgt. Kee described Puga as becoming more erratic. Puga tossed clothing, made yelling noises, wiped his face with clothing, washed his face with beer, continued to yell, and placed a wig on his head. [65]  For the next 11 minutes, Puga was positioned in the driver's seat or partially stepping out of the vehicle but not following Sgt. Kee's directions. Puga appeared to complain his eye was injured. Puga opened the front passenger side door but still did not exit.[66]

A CHP Investigator wrote:

> *Investigators Notes: It is the Investigator's opinion Mr. Puga used stalling techniques in an attempt to force law enforcement personnel to approach his vehicle, putting them at a tactical disadvantage.*[67]

I agree with this assessment. Further, by opening the passenger side door, Puga forced the officers and deputies to divide their attention between both open doors and the possibility of an armed gunman suddenly presenting a deadly threat from either side of the vehicle.

Sgt. Kee told Puga, *"Come out, and we will get you medical attention."* Puga finally exited the vehicle. [68]

Once completely out of the vehicle, Puga was still uncooperative and failed to follow directions. On the dashcam video from time marker 35:58 – 37:50,[69]  Puga stepped both feet out of the vehicle onto the roadway. He is wearing light-colored pants, dark underwear, shoes, and no shirt. Sgt. Kee gave very clear instructions to Puga, such as: "Start walking back, please." "The quicker you start walking back, the quicker we can get you medical attention." "Close the door." "Go ahead and close the door for me, please." "Come on back, walk backward." "Walk backward." Multiple and varied commands were given to Puga, each consistent with Puga's actions and lack of compliance. The commands were not given in a confusing or conflicting manner. Puga was provided with the opportunity to comply with the commands but failed to do so.[70]

_____

[61] Interview of SBSD Sgt. Robert Vaccari COSB000245-246
[62] AG11
[63] Interview of SBSD Sgt. Robert Vaccari COSB000242
[64] 257. [816C] Kee MVARS p2 VTS_01_2.VOB @ 30:45
[65] Interview of SBSD Sgt. Robert Vaccari COSB000246
[66] 257. [816C] Kee MVARS p2 VTS_01_2.VOB @ 32:58
[67] [4-44C] B. Summary of Incident Confidential.pdf, AG11
[68] Dashcam video Blackwood & Rubalcava COSB001465 @ 24:44 – 35:58
[69] Dashcam video Blackwood & Rubalcava COSB001465
[70] Hubbs, K. 34 years law enforcement, 40+ years tactical training instructor

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Puga adjusted his pants and reached his right hand to the front of his pants. This appears to be
Puga adjusting something (such as a gun) in his front waistband or pocket area.[71] Puga started
to lower into a kneeling position but stood back up and would not submit to arrest. Instead of
walking back to the officers as directed by Sgt. Kee, Puga lowered his hands and walked forward
to the front of the Ford Expedition. Puga said, "I heard a click, you guys are trying to shoot me."
Sgt. Kee said, "No Hector, we're not trying to shoot you, just surrender."[72] This placed the large
vehicle between himself and the officers, providing Puga with a tactically advantageous position
with cover and concealment.[73] This was concerning to Sgt. Vaccari, who told investigators:

> *"He ran around the front of the car and or he moved quickly around the front of the car now
> I was concerned, because if he is armed, he's upright, he's got the engine compartment of
> that vehicle to use as cover, uh he's mobile and he's shooting from a better platform."* [74]

Once Puga was no longer inside the disabled vehicle, he was no longer contained and could
possibly run in any direction or toward any residence. Puga was suspected to have been involved
in an earlier shooting incident with a handgun. While outside of the vehicle, Puga was
conspicuously careful not to turn or show his front, specifically his front pants area, toward the
officers and deputies. This was likely in an effort to keep concealed a full-size 9mm pistol.

On the dashcam video, Puga moved mostly out of view behind the vehicle. His hands are up at
some points, but he does not follow Sgt. Kee's directions to "Come over here, come over here."
"Get over here where we can see you." and "Put your hands on your head," "Come over here in
the light." Puga's hands move up and down, and he appeared to fain some level of compliance
but refused multiple orders from Sgt. Kee. [75]

Sgt. Kee, armed with a Sig Sauer .223 caliber rifle, and Officer Rubalcava armed with his pistol,
moved wide to the dirt area on the west side of the roadway to "pie" (incrementally improve) their
view of Puga's location. Sgt. Kee continued to try to convince Puga to move away from the vehicle,
turn to show that he did not have any weapons in the front of his pants area, and surrender
peacefully.[76]

As Sgt. Kee and Officer Rubalcava positioned themselves on the west dirt shoulder of the road,
Sgt. Vaccari believed they needed to block off Puga's avenue of escape to the east (passenger
side) of the white Expedition.[77] Deputy Adams and Sgt. Vaccari discussed less-lethal options.
Both Sgt. Vaccari and Deputy Adams had department issued Tasers, but they chose the 40mm

_____

[71] Dashcam video Blackwood & Rubalcava COSB001465 @ 36:47 – 36:58
[72] Interview of CHP Sgt. Isaiah Kee COSB006027
[73] Dashcam video Blackwood & Rubalcava COSB001465 @ 37:16 – 37:51
[74] Interview of SBSD Sgt. Robert Vaccari COSB000248 - 0249
[75] Dashcam video Blackwood & Rubalcava COSB001465 @ 38:24 – 39:19
[76] Interview of CHP Sgt. Isaiah Kee COSB006027 - 6028
[77] Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 39

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

less-lethal system based on its greater effective range. [78],[79],[80] This was a sound tactical decision due to Puga being suspected of possessing a firearm used in the earlier shooting.[81]

Sgt. Vaccari armed himself with a 40mm less-lethal launcher, and Deputy Adams was his cover officer armed with his duty pistol. Sgt. Vaccari briefed one of the CHP officers that they were going to approach.[82] Sgt. Vaccari and Deputy Adams approached on the passenger side of the Ford Expedition as Sgt. Kee and Officer Rubalcava approached Puga from the west dirt shoulder of the road. Officer Blackwood was armed with a .223 caliber rifle and positioned near the front passenger door of his patrol car.



Figure 9.   Overview photo showing approximate positions of Officers and Deputies, AG0676
B – Off. Blackwood, R- Off. Rubalcava, K- Sgt. Kee, V- Sgt. Vaccari, A- Deputy Adams, S- Puga

While Puga's attention was focused on Sgt. Kee, Sgt. Vaccari and Deputy Adams approached along the east side of the roadway to the passenger side of the Ford Expedition. See Figure 9.

The movements of Sgt. Kee and Officer Rubalcava advancing on the west dirt shoulder, and Sgt. Vaccari and Deputy Adams approaching on the passenger, east side of the Ford Expedition were sound and appropriate tactics.[83] Puga was in a position of tactical advantage while he was standing at the front hood area of the Expedition. He was suspected of being armed with a firearm; he was partially concealed, not following orders and directions from Sgt. Kee, and the vehicle

_____

[78] Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 40
[79] Deposition Transcript Jake Adams, November 12, 2024, page 28
[80] Taser X2 has a max. range of 25 feet, 40mm exact impact round has max. effective range of 120 feet
[81] Hubbs, K. 34 years law enforcement, 40+ years tactical training instructor
[82] Interview of SBSD Sgt. Robert Vaccari COSB000251
[83] Hubbs, K. 34 years law enforcement, 40+ years tactical training instructor

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

could protect him from gunfire. Puga could run toward any of the nearby homes to the east, northeast, or northwest. Sgt. Vaccari and Deputy Adams positioning along the passenger side of the Expedition, provided them with cover and concealment (the Expedition), a blocking angle technique should Puga run east or northeast, and a better view of Puga and his actions, as well as the less-lethal option of the 40mm. Prior to approaching, Sgt. Vaccari told the nearby CHP officer that they would advance on the passenger side of the Expedition.[84] As the Incident Commander, Sgt. Kee could have directed Sgt. Vaccari and Deputy Adams to other positions or duties if he felt their actions were not consistent with his overall goals.

Nearly simultaneously, Deputy Adams, Sgt. Vaccari, Sgt. Kee, Officers Rubalcava, and Blackwood independently observed a deadly threat displayed by Hector Puga, and each fired their weapon at Puga.

Deputy Adams told investigators he heard gunshots and observed Puga pointing a gun at him.[85] Deputy Adams ducked for cover and then saw Puga running across the intersection, northbound on Peach Avenue. Deputy Adams could see that Puga still had the gun and that Puga was pointing the gun back at Deputy Adams. Deputy Adams fired his pistol at Puga. [86]
Deputy Adams testified in deposition that:

> "When I approached on the east side of the vehicle, Mr. Puga looked at me, and I saw his hands dive down into his waistband area.  I don't know if it was waistband or pockets. And I saw a gun, and then I heard shots, and then I returned·fire." [87]

Sgt. Vaccari said that Puga drew a gun extremely fast. Before hearing any gunshots, Sgt. Vaccari saw Puga draw the gun from his waistband area. [88, 89] Sgt. Vaccari tried to fire one round but was not sure if he fired the 40mm less-lethal at Puga.[90] Sgt. Vaccari saw Puga running and pointing his gun at the CHP officers.[91] Sgt. Vaccari heard multiple gunshots and he believed Hector Puga fired at officers.[92] Puga ran to the northwest corner while gunshots were fired.

_____

[84] Interview of SBSD Sgt. Robert Vaccari COSB000251
[85] Interview of Deputy Jake Adams, COSB000329
[86] Interview of Deputy Jake Adams, COSB000330
[87] Deposition Transcript Deputy Jake Adams, November 12, 2024, page 36
[88] Interview of SBSD Sgt. Robert Vaccari COSB000226 & 0251 - 0252
[89] Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 64
[90] Interview of SBSD Sgt. Robert Vaccari COSB000226 & 0251 - 0252
[91] Interview of SBSD Sgt. Robert Vaccari COSB006387
[92] Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 48

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

---

Deputy Adams was wearing an audio "belt recorder." On the recording, a male voice can be heard saying: *"He's still breathing. If you move for that gun, I will shoot you."* [93,94] *"We gotta take him guys, lets go. That guns gonna be underneath him."* [95,96]

On a 911 call into the Sheriff's call center, a neighbor (Mr. Miranda) told the call-taker, *"There's gunfire at Peach and Catalpa. I looked out my slider and I seen somebody running with a gun."* [97]

<u>Dashcam, cellphone, and residential surveillance video</u>

The shooting was captured by multiple video cameras from several different angles. None of the videos reviewed individually provides a clear or complete view of Puga, and the officers and deputies. None of the videos captured all the events from the angles and perspectives of the officers and deputies attempting to arrest Puga.

CHP Officers Blackwood & Rubalcava's patrol car was equipped with a forward viewing dashcam video video recorder and positioned slightly offset to the west and closest to Puga's white Expedition. CHP Sgt. Kee's patrol car was equipped with a forward viewing dashcam video recorder and positioned slightly offset to the east and behind Officers Blackwood & Rubalcava's patrol car, see Figure 9. A neighbor, Erin Mangerino, viewed and used her cellphone to video record portions of the incident from her parent's bedroom window at 11498 Peach Avenue (NW corner of Peach Avenue and Catalpa Street).

Sgt. Vaccari and Deputy Adams arrived along the passenger side of the Ford Expedition as Sgt. Kee and Officer Rubalcava moved out wide on the west side dirt shoulder of Peach Avenue. Puga suddenly moved and then gunfire is heard.[98,99,100]

On Dashcam video and video captured by a citizen, Sgt. Kee was pleading with Puga to surrender. At 40:45 on the dashcam video, Sgt. Kee's says to Puga:  "We are not going to shoot you," "We want to see the front of your pants." "Let me see the front of your pants, "Do you have any weapons on you?" "You promise, you promise" "Ok, I'll tell you what then, you put your hands up in the air and me and my partner will come over there and put you in cuffs." "Ok, keep your hands up in the air." "Raise them high right now." "Lets go." "Raise them high now." "Keep um up." "Keep um up." "Keep um up."  "I can't see your waist." "we can't see your waist man." "Keep up all the way up." "Don't, don't don't reach, Get your hand up! (**shots are fired**). Puga can be seen running away.[101]

---

[93] 062. COSB001401 Confidential Material Subject to Protective Order Deputy Jake Adams.wma @ 1:10:24-1:10:34
[94] Puga, COSB001401.Deputy Jake Adams belt.pdf, page 17
[95] 062. COSB001401 Confidential Material Subject to Protective Order Deputy Jake Adams.wma @ 1:12:30-1:12:34
[96] Puga, COSB001401.Deputy Jake Adams belt.pdf, page 19
[97] 028. COSB001367 Confidential Material Subject to Protective Order HE210480014 SPR2100041 DC04 DC53.wav
[98] Erin Mangerino cellphone video, COSB001470 @ 00:51 - 00:54
[99] Dashcam video Blackwood & Rubalcava COSB001465 @ 42:25 – 42:28
[100] Sgt. Kee Dashcam video VTS_01_2.VOB @ 46:47 – 46:49
[101] Dashcam video Blackwood & Rubalcava COSB001465 @ 40:45 – 42:39

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

In Erin Mangerino's cellphone video, Puga can be seen standing facing the hood of the Expedition with his hands raised above his head. Sgt. Kee can be heard telling Puga to "keep them up," as Puga moves his hands about and down to the front of his torso. Sgt. Kee told Puga that they needed to see his waist area. Sgt. Kee tells Puga to keep his hands up as Sgt Vaccari and Deputy Adams can be seen approaching on the passenger side of the Expedition. Sgt. Kee tells Puga "Don't, don't, don't reach, Get your hand up!" Puga suddenly reaches his right hand (or both) down to his waistband area and appears to be removing an object. Gunfire can be heard as Puga turns to run in a northwest direction.[102]

I reviewed a 1-minute and 40-second video that appears to be a residential surveillance video from the area of a home on Catalpa Street, east of Peach Avenue. This video starts with Puga already standing at the front of the white Expedition, facing the hood. Sgt. Kee's voice can be heard as he is telling Puga to keep his hands all the way up, but the video quality is poor and Puga's hands are hardly visible. Just prior to any gunfire, Puga appears to move suddenly, and Sgt. Kee can be heard saying, "Don't, don't, don't reach for that…" then yells, "Get your hands up!" Puga's hands are not clearly visible on the video, but he turns and runs away from the Expedition. Gunfire can be heard, and Puga runs out of view.[103] I watched this video at half-speed but was still unable to clearly see Puga's hands just prior to and during the shooting.

Puga's actions of concealing the front area of his pants from the officer's view and moving to the front of the Expedition would place officers on high alert that Puga was likely armed with a weapon (likely the gun used earlier in the evening) and placing himself in a tactical position. Puga's continual movements of his hands, even after being told repeatedly to keep his hands up, is a common practice of seasoned criminals to keep pushing the limits of what they can get away with, even with police pointing firearms at them and allowing their hand movements to proceed a deadly attack.[104]

During his interview with investigators, Deputy Adams made a post-incident analysis of Puga's actions. Deputy Adams said that he believed Puga was delaying, stalling, and looking for a way to run and get to a position where he could fire his gun at deputies and officers.[105] **I agree with Deputy Adam's assessment and would include that I believe Puga was attempting to manipulate the officers and deputies into a position where he could ambush and shoot the officers and deputies.**

Officer Rubalacava told investigators that he believed Puga was attempting to get Sgt. Kee to approach by himself and that Puga was going to ambush Sgt. Kee.[106] Officer Rubalacava believed

_____

[102] Erin Mangerino cellphone video, COSB001470 @ 00:51 - 00:54
[103] 283. PLTFS 00345.MOV @ 00:14 – 00:20
[104] Hubbs, K. 34 years law enforcement, SWAT supervisor and trainer, 20 years Training Director CATO
[105] Interview of Deputy Jake Adams, COSB000383
[106] Interview of CHP Officer Bernardo Rubalacava COSB000445

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Puga was preparing for a gunfight and planned to go down with gunfire to avoid being sent back to prison.[107] **I also agree with these assessments.**

Officer Blackwood felt that Puga was attempting to manipulate Sgt. Kee into a position where Puga had an advantage and could shoot Sgt. Kee. [108] **I agree with this conclusion.**[109]

Sgt. Kee told investigators he saw Puga reaching his right hand toward a gun located in Puga's front waistband area. Sgt. Kee fired his rifle at Puga.[110] Puga ran toward a house at the northwest corner and was pointing the gun back at Sgt. Kee. Sgt. Kee fired another two or three rounds from his rifle, and Puga fell.[111] Sgt. Kee testified in deposition that after his first volley of fire at Puga, he and Officer Rubalcava repositioned closer to the driver's door of the nearby CHP vehicle, and Sgt. Kee fired again from a prone position.[112] During Sgt. Kee's first volley of fire, he saw Puga remove a weapon from his waistband, point the gun at Sgt. Kee and Officer Rubalcava, and Sgt. Kee saw two muzzle flashes. [113] This would indicate that Puga was shooting at Sgt. Kee and Officer Rubalcava.

Officer Rubalcava saw Puga turn to his right, pulling a gun with his right hand from his waistband, and shot two times at him and Sgt. Kee. Officer Rubalcava heard the gunshots and saw muzzle flashes from the pistol. Officer Rubalcava fired three to five rounds from his .40 caliber pistol at Puga. Officer Rubalcava saw Sgt. Kee return fire, and as he and the sergeant retreated to the patrol car, Officer Rubalcava saw Sgt. Kee fall to the ground. [114],[115],[116]  From the patrol car, Officer Rubalcava saw Puga running northbound with the pistol. Officer Rubalcava described Puga as running away while pointing the gun over his shoulder back in Officer Rubalcava's direction. Officer Rubalcava fired a second volley of three to five rounds at Puga.[117],[118]

Officer Blackwood saw Puga was holding a black handgun in his right hand pointed at Sgt. Kee and Officer Rubalcava[119]. Officer Blackwood fired his (Sig Sauer M400) .223 caliber rifle at Puga. Puga crunched down a little, then ran. Officer Blackwood did not see the gun fall to the ground

_____

[107] Interview of CHP Officer Bernardo Rubalcava  COSB000536
[108] Interview of CHP Officer Michael Blackwood COSB006156
[109] Hubbs, K. 34 years law enforcement, 40+ years tactical training instructor
[110] Interview of CHP Sgt. Isaiah Kee COSB006028 & 6062
[111] Interview of CHP Sgt. Isaiah Kee COSB006028
[112] Deposition Transcript Sgt. Isaiah Kee, November 5, 2024, page 42-43
[113] Deposition Transcript Sgt. Isaiah Kee, November 5, 2024, page 78-79
[114] Interview of CHP Officer Bernardo Rubalcava  COSB000447- 455
[115] Interview of CHP Officer Bernardo Rubalcava  COSB000486
[116] Interview of CHP Officer Bernardo Rubalcava  COSB000490 - 491
[117] Interview of CHP Officer Bernardo Rubalcava  COSB000447- 455
[118] Interview of CHP Officer Bernardo Rubalcava  COSB000502
[119] Interview of CHP Officer Michael Blackwood COSB006146

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

and could not see Puga's hands. Officer Blackwood continued to fire until Puga appeared to fall but kept running. Officer Blackwood fired again until Puga fell and was no longer moving.[120],[121]

Annabelle Botten lived at 17994 Catalpa Street, which was across the street from where Puga's vehicle stopped in the roadway. Annabelle saw Puga lower his right hand toward the front of his waist and raise what she described as a black handgun. Annabelle saw Puga shoot at the CHP officers who stood on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle flash from his handgun. Officers fired back as Puga ran north on Peach Avenue. Puga fell to the ground just north of the intersection.[122]

Puga ran northwest toward the residence at 11498 Peach Avenue and fell to the ground on the dirt shoulder. Sergeants Kee and Vaccari, Officers Rubalcava and Blackwood, and Deputy Adams approached Puga. Puga's hands were concealed under his torso, his handgun could not be seen, and he did not comply with commands to display his hands. Sgt. Vaccari could see that Puga was breathing and did not appear to be bleeding. Sgt. Vaccari thought Puga was still holding the gun and would roll over and shoot. Sgt. Vaccari deployed his taser at Puga, and struck him on his back to determine if Puga was conscious. Puga's body tensed, but he did not move or respond to the officer's commands. Sgt. Vaccari activated his taser again, but Puga did not react to the second taser activation. Sgt. Vaccari assisted in handcuffing Puga, rolled him over, and observed the handgun under Puga's torso.[123],[124]

A 9mm pistol was found under Puga's body, and a fired 9mm cartridge with headstamp "L.A.X. 9mm LUGER"[125] was located inches from the pistol,[126] see Figure 10. This would indicate Puga likely fired the pistol while he was lying on the ground. The pistol then ejected the spent cartridge directly down into the dirt. The pistol had no serial number and no discernable markings. The pistol had one unfired round, headstamped "L.A.X. 9mm LUGER" in the chamber." The primer was not struck. A 17-round "KCI USA" magazine was partially inserted into the magazine well of the pistol but not fully seated into the gun. [127] Puga had 13 additional live 9mm cartridges in this pants pocket. Two of these had "L.A.X. 9mm LUGER" headstamps. [128]

Puga's pistol was found to contain one live round in the chamber and 13 in the magazine. The magazine had the capacity to hold 18 rounds.[129] It is conceivable that Puga may have fired as many as five rounds.

_____

[120] Interview of CHP Officer Michael Blackwood COSB006102
[121] Interview of CHP Officer Michael Blackwood COSB006150
[122] Interview Annabelle Botten  COSB000749 - 750
[123] Interview of SBSD Sgt. Robert Vaccari COSB000254 - 256
[124] 005. [COSB000039-000729] H2021-024 BOOK 1 Subject to Protective Order.pdf , COSB000046
[125] COSB001053
[126] COSB000143 - 144
[127] COSB000143
[128] COSB000832
[129] AG01037

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____



| L2M1E0EY.pdf, COSB002031 | L2M1E0F8.pdf, COSB002041 |
| --- | --- |

Figure 10.
Photos of pistol and fired cartridge

Synopsized Timeline of Events (approximate)

1745 hours(2/16/21), a shooting occurred on the freeway. [130]

0141 hours (2/17/21), CHP Officers Blackwood and Rubalcava located a white Expedition matching the suspect vehicle description, with a "Funeral" sticker on the rear window.[131,132,133,134]

0142 hours, CHP Officers Blackwood and Rubalcava attempted to stop the white Expedition driven by Hector Puga. Puga led CHP and Sheriff's deputies on a high-speed, failure-to-yield pursuit for 57 minutes and traveled 52 miles. Once the right front tire was deflated, Puga's vehicle came to a stop just south of the intersection of Peach Avenue at Catalpa Street. Puga refused officers' and deputies' orders and requests to exit the vehicle for another hour after coming to a stop. [135,136,137,138,139,140]

0243 hours, approximately five and a half minutes after Puga's vehicle came to a stop and after numerous attempts to get the occupants to exit the vehicle, Sgt. Kee fired 12-gauge bean-bag

[130] Shooting victim statement, Salvador Pacheco, COSB000952 - 959
[131] Shooting victim statement, Salvador Pacheco, COSB000959
[132] Interview of CHP Officer Michael Blackwood COSB000553
[133] Interview of CHP Officer Bernardo Rubalcava, COSB000409
[134] [4-44C] B. Summary of Incident Confidential.pdf, AG04
[135] Dashcam video Blackwood & Rubalcava COSB001464 @ 09:09-37:30
[136] Dashcam video Blackwood & Rubalcava COSB001465 @ 00:00-35:50
[137] [4-44C] B. Summary of Incident Confidential.pdf AG04-06
[138] [4-44C] B. Summary of Incident Confidential.pdf, AG04
[139] [4-44C] B. Summary of Incident Confidential.pdf, AG05
[140] [4-44C] B. Summary of Incident Confidential.pdf, AG07

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

projectiles at the vehicle in an attempt to break out the side window. The bean-bags failed to break the window, but the front passenger door opened and Christina Barrett exited. Barrett was taken into custody and told deputies that the only person still in the vehicle was "Hector" (Puga). Officers continued to order and request Puga exit the vehicle.[141, 142,143]

0329 hours, Medics are requested to respond and stand by at Peach Ave. and Bear Valley Road.[144]

0303 hours, Sgt. Vaccari asked Puga if there was anything they could say or do to get him to exit the vehicle. Puga did not exit. Sgt. Vaccari fired a PepperBall glass-breaking round, breaking out the rear window of the Expedition. Sgt. Vaccari yelled to Puga, requesting he exit the vehicle. Puga remained inside of the vehicle, and Sgt. Vaccari fired PepperBall projectiles containing powered OC into the vehicle through the broken rear window. [145,146]

Puga remained in the vehicle for an additional – minutes. During this time, Sgt. Vaccari fired additional PepperBall projectiles into the vehicle and Puga complained that he was hit in the eye. Puga opened the driver's door, but did not exit, but reached over to open the front passenger door. [147]

0342 hours,[148, 149] Puga exited the driver's side, facing the open driver's door, standing with his back to the officers. Puga appeared to cautiously avoid showing the front of his body and waistband area, (likely area to conceal a weapon). Puga held his hands above his head and his pants were sagging down. When told to walk back to the officers Puga dropped his hands and pulled up his under pants and pants. Puga kept his left hand above his head but again reached down, this time to the front waist band area that was out of view of the officers and deputies. Puga put his hands to his face and bent forward. Puga stood up with his back to the officers and closed the driver's door. Puga appeared to make an attempt to kneel down but instead of following Sgt. Kee's instructions to walk back to the officers or go down to the ground, Puga moved to the front of the Expedition.[150]

Puga failed to follow officers' orders and refused officers' requests to show his front waistband area (likely area to conceal a weapon). Officers told Puga to keep both of his hand up where the

_____

[141] [4-44C] B. Summary of Incident Confidential.pdf, AG07-08
[142] Dashcam video Blackwood & Rubalcava COSB001464 @ 09:09-14:41
[143] Dashcam video Blackwood & Rubalcava COSB001464 @ 14:21-16:03
[144] [4-44C] B. Summary of Incident Confidential.pdf, AG11
[145] [4-44C] B. Summary of Incident Confidential.pdf, AG11
[146] Dashcam Sgt. Kee, VTS_01_2.VOB @ 01:15-02:15
[147] Dashcam Sgt. Kee, VTS_01_2.VOB @ 02:15-33:00
[148] Cad 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf COSB000871
[149] Based on time elapsed from glass breaking round to Puga standing at the driver's door on Sgt. Kee dashcam
[150] Dashcam video COSB001465 @ 37:50 – 37:50

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

---

officers could see them. Puga would move his hands from above his head and back down several times.

0348 hours,[151] Sgt. Kee and Officer Rubalcava approached Puga from a wide angle on the dirt shoulder of the west side of Peach Street as Sgt. Vaccari and Deputy Adams approached the passenger side of the Expedition.

0348 hours,[152] Shooting occurs and Puga runs northwest and falls on the dirt shoulder. Officers and deputies approach Puga, who was facedown with both hands concealed under his abdomen area. Sgt. Vaccari fired his taser two times at Puga on the ground, then officer R handcuffed and rolled Puga over. A gun was found under where Puga was laying.

0353 hours, Medics were requested to respond from their nearby staging location.[153]
Sgt. Vaccari learns that neighbors at the northwest corner were injured by gunfire.

0354 hours, Fire department advises they are about to arrive.[154]
Ambulances begin to arrive and are diverted to provide aid to the Botten family at the northwest corner.[155],[156] A firetruck arrives and medic – pronounces Puga as deceased.[157]

## Synopsized Statements

Statements from Sgt. Robert Vaccari

Sgt. Vaccari told investigators that the bean bag rounds fired by Sgt. Kee were ineffective, so he used Pepperball glass breaker rounds to break out the rear window of the Expedition. Sgt. Vaccari then fired OC Pepperball rounds into the Expedition in an effort to get Puga to exit the vehicle.[158] Prior to firing the PepperBalls, Sgt. Vaccari used his PA system to provide announcements to Puga.[159] Sgt. Vaccari estimated that he fired a total of three glass-breaking rounds and 150 red PepperBalls.[160] Sgt. Vaccari was very familiar with the Pepperball launcher system and aware that PepperBalls are not always fired on every trigger pull.[161] In the last two volleys, Sgt. Vaccari specifically aimed for the front windshield area of Puga's vehicle, between the rearview mirror and passenger side "A" pillar. Sgt. Vaccari believed this would have the greatest effect on Puga.[162]

---

151 [4-44C] B. Summary of Incident Confidential.pdf, AG13
152 Cad 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf COSB000871
153 Cad 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf COSB000871
154 Cad 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf COSB000871
155 Dashcam video Blackwood & Rubalcava COSB001465 @ 48:43 – 49:01
156 Dashcam 257. [816C] Kee MVARS p2 VTS_01_2.VOB @ 52:58-53:26
157 Dashcam 258. [817] Kee MVARS p3 VTS_01_3.VOB @ 01:46-04:01
158 Interview of SBSD Sgt. Robert Vaccari COSB000237 - 238
159 Interview of SBSD Sgt. Robert Vaccari COSB000238
160 Interview of SBSD Sgt. Robert Vaccari COSB000226
161 Interview of SBSD Sgt. Robert Vaccari COSB000241
162 Interview of SBSD Sgt. Robert Vaccari COSB000241

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Sgt. Vaccari stated that he wanted to use less-lethal munitions and tactics to see if he could get Puga out of the vehicle.[163] Puga continued to smoke cigarettes, drink beer, and said "This is a 3 strike case," and that he was a "25 to lifer." [164]

Sgt. Vaccari first used the OC contained within the PepperBalls to make the interior of the vehicle uncomfortable for Puga to remain. While the OC likely had some effect on Puga, it did not immediately force him to exit the vehicle. For about 30 minutes, Puga did crack open the drive's door several times and said he was coming out but did not exit.[165] Next Sgt. Vaccari used the PepperBalls as impact munitions to gain pain compliance from Puga. Sgt. Vaccari could see Puga's back and fired to hit Puga in his back with the PepperBalls. Puga yelled out, that he was hit in the eye.[166] The CHP sergeant told Puga that medical attention was available if he exited the vehicle. Puga finally did exit the vehicle, and the CHP was trying to get him to comply with a "felony traffic stop." Puga would not follow the instructions, he would turn side to side, but he always kept his right side towards the vehicle, and he refused to turn all the way around. Sgt. Vaccari said, "I believe in hindsight, I believe now because he was concealing something on his right side, concealing something somewhere, he would not turn all the way around." [167] Puga moved quickly from the driver's door area to the front of the vehicle and yelled, "I heard a click." "I heard a click." This was concerning to Sgt. Vaccari, who told investigators:

> *"He ran around the front of the car and or he moved quickly around the front of the car now I was concerned, because if he is armed, he's upright, he's got the engine compartment of that vehicle to use as cover, uh he's mobile and he's shooting from a better platform."* [168]

Sgt. Vaccari armed himself with a 40mm less-lethal launcher, and Deputy Adams was his cover officer armed with his duty pistol. Sgt. Vaccari briefed one of the CHP officers that they were going to approach. As Sgt. Vaccari and Deputy Adams approached on the passenger side of the Ford Expedition, Sgt. Vaccari told Puga to get on the ground. Sgt. Vaccari said that Puga drew a gun extremely fast. Sgt. Vaccari had originally thought Puga already had the gun in his hand, but after viewing video of the incident, it appeared to Sgt. Vaccari that Puga drew the gun from his waistband. Sgt. Vaccari was unfamiliar with the safety switch and tried to fire one round but was not sure if he fired the 40mm less-lethal at Puga.[169],[170] Before hearing any gunshots, Sgt. Vaccari saw Puga draw a firearm from his waistband area.[171] Sgt. Vaccari saw Puga pointing his gun at the CHP officers as he ran.[172] Puga ran to the northwest corner while gunshots were fired. Puga

_____

163 Interview of SBSD Sgt. Robert Vaccari COSB000242
164 Interview of SBSD Sgt. Robert Vaccari COSB000244
165 Interview of SBSD Sgt. Robert Vaccari COSB000243
166 Interview of SBSD Sgt. Robert Vaccari COSB000245
167 Interview of SBSD Sgt. Robert Vaccari COSB000246
168 Interview of SBSD Sgt. Robert Vaccari COSB000248 - 0249
169 Interview of SBSD Sgt. Robert Vaccari COSB000226 & 0251 - 0252
170 Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 52
171 Deposition Transcript Sgt. Robert Viccari, November 14, 2024, page 64
172 Interview of SBSD Sgt. Robert Vaccari COSB006387

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

fell to the ground, face down with both hands under his chest. Sgt. Vaccari could see that Puga was breathing and did not appear to be bleeding. Sgt. Vaccari thought Puga was still holding the gun and would roll over and shoot. Sgt. Vaccari discharged his taser at Puga. Puga tensed up from the taser but would not respond to the officer's commands. Sgt. Vaccari discharged the taser a second time, but Puga did not respond. Sgt. Vaccari was not sure who handcuffed Puga, but he assisted in rolling Puga over. Sgt. Vaccari heard screaming coming from the house across the street and walked over to find that members of a family had been hit by gunfire. Sgt. Vaccari requested medical aid be dispatched to assist this family.[173]

Statements from Deputy Jake Adams

Deputy Adams told investigators that he and Sgt. Vaccari approached Puga's vehicle on the passenger side. As they reached the front passenger side door area, Deputy Adams saw Puga "jerk his hand down and up." Deputy Adams yelled to Puga, "Get on the ground." Almost simultaneously, Deputy Adams heard gunshots. Deputy Adams observed Puga looking at him and holding a gun in his hand.[174] Deputy Adams ducked for cover and then saw Puga running across the intersection, northbound on Peach Avenue. Deputy Adams could see that Puga still had the gun and Puga was pointing the gun back at Deputy Adams. Deputy Adams fired his pistol at Puga.[175]  Deputy Adams told investigators:

> "..I saw the suspect um jerk his hand down and up um and when it came up um I remember yelling uh get on the ground um and almost simultaneously um I remember hearing gunshots um and it looked like he was facing me um and I could tell he had a gun in his hand. Um I don't know if I flinched or if I blinked or closed my eyes if I was um I, I, I don't recall seeing a muzzle flash, but I remember when I saw the gun in his hand um I also heard gunshots." "..in my own head thought oh shit um this guy's trying to kill me."[176]

> "I saw him running northbound um, but I saw the gun still pointed in my direction. Um and I engaged him um from the dirt on the east side of the curb line um I believe with um two or three rounds u and at that point I was thinking well I don't want to get shot, I don't want to die, I don't sarge to get shot, I don't want him to die, I don't want CHP officers to get shot, I don't want them to die uh I also still knew we were in residential area um and God forbid anything happen to innocent civilians as well."[177]

> "his hand came out um I remember seeing a, a gun in his, in his right hand. Um I would have thought it was, I thought it was black um, um, but it was pointing at me um and then he tried to kill me."[178]

_____

[173] Interview of SBSD Sgt. Robert Vaccari COSB000254 - 256
[174] Interview of Deputy Jake Adams, COSB000329
[175] Interview of Deputy Jake Adams, COSB000330
[176] Interview of Deputy Jake Adams, COSB000329
[177] Interview of Deputy Jake Adams, COSB000330
[178] Interview of Deputy Jake Adams, COSB000354

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

In deposition, Deputy Adams stated:

> "When I approached on the east side of the vehicle, Mr. Puga looked at me, and I saw his
> hands dive down into his waistband area.  I don't know if it was waistband or pockets.
> And I saw a gun, and then I heard shots, and then I returned fire." [179]

Deputy Adams moved to a position of cover and could see Puga was still running and pointing
the gun in his direction. Deputy Adams re-engaged (fired at) Puga. Deputy Adams described the
gun Puga pointed at him as a black handgun.[180]

Deputy Adams fired three volleys of gunfire at Puga. He saw Puga pointing the gun in his direction
each time Deputy Adams fired at Puga. In the first volley, Deputy Adams estimated he fired two
or three shots. The second volley, he estimated he fired four shots. In the third volley, he estimated
he fired three shots. [181]

In the second volley, Puga ran northwest from the vehicle with his right arm placed backward.
In the third volley, Deputy Adams described Puga has having gotten to the northwest corner, was
facing the other direction and shooting backward toward Deputy Adams. Deputy Adams fired
three shots and saw Puga fall.

Statements from Sgt. Isaiah Kee

Sgt. Kee told investigators that he and Officer Rubalcava were on the west side of the roadway.
Sgt. Kee was telling Puga to get his hands up and asked Puga if he had a weapon. Puga said
that he did not have a weapon. As soon as Sgt. Kee was able to the front side of Puga, he saw
Puga had a gun. Sgt. Kee saw Puga reaching his right hand toward a gun located in Puga's front
waistband area. Sgt. Kee fired his (Sig Sauer) AR15 at Puga.[182] Sgt. Kee believed he fired five
to eight shots as Puga was reaching his hands towards the gun in his waistband.[183] Sgt. Kee could
see Puga flinching so he thought Puga was being hit by the gunfire. Sgt. Kee saw two muzzle
flashes (from Puga). Sgt. Kee dropped down to a prone position on the ground and saw Puga
running northbound and switched the gun to his left hand. Sgt. Kee saw that Puga was running
toward a house at the northwest corner and Puga was pointing the gun back at Sgt. Kee. Sgt.
Kee fired another two or three rounds from his AR15 at Puga and Puga fell.[184] Sgt. Kee believed
he first fired approximately three rounds, saw Puga get the gun out of his waistband, then Sgt.
Kee fired three more rounds while moving to his left. Sgt. Kee sees two muzzle flashes from

[179] Deposition Transcript Deputy Jake Adams, November 12, 2024, page 36
[180] Interview of Deputy Jake Adams, COSB000362
[181] Interview of Deputy Jake Adams, COSB000331
[182] Interview of CHP Sgt. Isaiah Kee COSB006028 & 6062
[183] Deposition Transcript Sgt. Isaiah Kee, November 5, 2024, page 10
[184] Interview of CHP Sgt. Isaiah Kee COSB006028

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Puga's gun. From a prone position, Sgt. Kee fired another five or six rounds as Puga ran northwest. [185],[186]

Sgt. Kee said he looked at Blackwood and motioned and pointed that they were going to approach, then he looked across at the Sheriffs and motioned that they were getting ready to approach.[187] Sgt. Kee testified in deposition that during the shooting, he experienced "tunnel vision," and could not hear.[188] Sgt. Kee stated that he did not fire at Puga once Puga went to the ground as he believed the "threat has been neutralized." Sgt. Kee did see rounds hitting the ground while Puga was on the ground.[189]

Statements from Officer Bernardo Rubalcava

Officer Rubalacava believed Puga was preparing for a gunfight and planned to "go down" with gunfire to avoid being sent back to prison. Officer Rubalacava heard Puga say "He wasn't going back to jail," he referenced being a Third-Striker, the 16 years he spent in prison, and that he was going to show them what he went to prison for.[190] Officer Rubalcava moved from the CHP vehicle to the west side of the roadway with Sgt. Kee. Officer Rubalcava was assigned to be the arresting officer and armed with his pistol. Sgt. Kee was armed with an AR15 rifle and attempted to convince Puga to walk out to them. Puga would not even turn to show the front waist area of his pants to the officers. Officer Rubalcava saw Puga turn to his right, pulling a gun with his right hand from his waistband and shot two times at him and Sgt. Kee. Officer Rubalcava heard the gun shots and saw muzzle flashes from the pistol. Officer Rubalcava fired three to five rounds from his pistol at Puga. Officer Rubalcava saw Sgt. Kee return fire, as and he and the sergeant retreated to the patrol car Officer Rubalcava saw Sgt. Kee fall to the ground.[191],[192],[193] Officer Rubalcava testified in deposition that Puga turned and fired in his direction, then Officer Rubalcava returned fire at Puga. Puga turned and started running, and Officer Rubalcava fired again at Puga.[194] Officer Rubalcava stated that he heard two gunshots and a saw a flash.[195] Officer Rubalcava believed he fired a total of approximately 10 – 15 rounds total (3 to 5 in the first volley, reloaded, and five to 10 in the second).[196] Officer Rubalcava stated that he fired the second volley because Puga was still armed with the gun and was running away.[197], [198] Prior to the shooting, Officer Rubalcava

_____

[185] Interview of CHP Sgt. Isaiah Kee COSB006054
[186] Interview of CHP Sgt. Isaiah Kee COSB006066 - 67
[187] Interview of CHP Sgt. Isaiah Kee COSB006079
[188] Deposition Transcript Sgt. Isaiah Kee, November 5, 2024, page 30-31
[189] Deposition Transcript Sgt. Isaiah Kee, November 5, 2024, page 37-38
[190] Interview of CHP Officer Bernardo Rubalcava  COSB000536
[191] Interview of CHP Officer Bernardo Rubalcava  COSB000447- 455
[192] Interview of CHP Officer Bernardo Rubalcava  COSB000486
[193] Interview of CHP Officer Bernardo Rubalcava  COSB000490 - 491
[194] Deposition Transcript Officer Bernardo Rubalcava, November 4, 2024, page 17-19
[195] Deposition Transcript Officer Bernardo Rubalcava, November 4, 2024, page 80-81
[196] Deposition Transcript Officer Bernardo Rubalcava, November 4, 2024, page 45
[197] Interview of CHP Officer Bernardo Rubalcava  COSB000453
[198] Deposition Transcript Officer Bernardo Rubalcava, November 4, 2024, page 55

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

said he was not aware that the sheriff's deputies were approaching Puga on the passenger side of the Expedition, later in his deposition, Officer Rubalcava recalled some discussion of the sheriff's approaching with a Taser.[199, 200]  From the patrol car, Officer Rubalcava saw Puga running northbound with the pistol. Officer Rubalcava described Puga as running away while pointing the gun over his shoulder, back at Officer Rubalcava. Officer Rubalcava fired a second volley of three to five rounds at Puga. [201,202] Officer Rubalcava said he handcuffed and turned Puga over, and located a gun under Puga. [203]

Statements from Officer Michael Blackwood

During the high-risk vehicle stop, Officer Blackwood was positioned at the driver's door of his and Officer Rubalcava's CHP patrol car. Sgt. Kee was next to Officer Blackwood, talking with Puga and attempting to get him to surrender. Puga told Sgt. Kee that he did not like where Officer Blackwood was located. Sgt. Kee directed Officers Blackwood and Rubalcava to switch places.[204] **Note, it has been my experience that some career criminals will use this type of tactic to test how much they can manipulate the police.**[205]

After the PepperBalls were fired into the vehicle and Puga exited, Puga stood facing the open door, not following the officers' commands. Sgt. Kee told Puga to close the car door and walk backward to the sound of the officer's voice. Puga instead, closed the car door and walked to the front of the car. Officer Blackwood could only see Puga's upper body. Puga had his hands up but dropped them down about three times to his pants area, potentially to pull up his pants.[206] Officer Blackwood told investigators that Puga made a movement "that just didn't look right." While facing away from the officers, Puga bent over and reached down like he was preventing something from falling from this waist, beltline area.[207]  This movement can be seen on dashcam video.[208]

Puga's attention was focused on Sgt. Kee.[209] Officer Blackwood saw Sgt. Kee and Officer Rubalcava moved to the west, and the Sheriff's moved up along the east side of the roadway. As the sheriffs got alongside the suspect's vehicle, Sgt. Kee's voice changed as he yelled, "Don't do that." "Don't do that." "Let me see your hands." Officer Blackwood saw Puga was holding a black handgun in his right hand (pointed at Sgt. Kee and Officer Rubalcava[210] ).[211] Officer Blackwood

_____

[199] Deposition Transcript Officer Bernardo Rubalcava, November 4, 2024, page 46-47
[200] Deposition Transcript Officer Bernardo Rubalcava, November 4, 2024, page 52-53
[201] Interview of CHP Officer Bernardo Rubalcava  COSB000447- 455
[202] Interview of CHP Officer Bernardo Rubalcava  COSB000502
[203] Interview of CHP Officer Bernardo Rubalcava  COSB000458
[204] Interview of CHP Officer Michael Blackwood COSB006096 - 6097
[205] Hubbs, K. 34 years law enforcement, 40+ years tactical training instructor
[206] Interview of CHP Officer Michael Blackwood COSB006100 - 6101
[207] Interview of CHP Officer Michael Blackwood COSB006100 - 6101
[208] Dashcam video COSB001465 @ 36:45 – 36:57
[209] Interview of CHP Officer Michael Blackwood COSB006146
[210] Interview of CHP Officer Michael Blackwood COSB006146
[211] Deposition Transcript Officer Michael Blackwood, November 4, 2024, page 53

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

fired his (Sig Sauer M400) AR15 at Puga. Puga crouched down a little, then ran. Officer Blackwood did not see the gun fall to the ground and could not see Puga's hands. Officer Blackwood continued to fire until Puga appeared to fall but kept running. Officer Blackwood fired again until Puga fell and was no longer moving.[212,213] Officer Blackwood believed he fired 20 rounds.[214] During his deposition, Officer Blackwood testified that he heard two or three gunshots prior to firing his rifle. Some of those gunshots appeared to have come from the area of Sgt. Kee and Officer Rubalcava.[215]

Officer Blackwood approached Puga along with the sheriffs. Puga was breathing and making small movements. The sheriff sergeant told Puga to "Show your hands," but Puga did not respond. The sheriff sergeant tasered Puga two times. As they turned Puga over, Officer Blackwood saw a gun fall from Puga's hand and land next to him. Officer Rubalcava handcuffed Puga and medical aid was called in. [216]

At the time he fired his weapon at Hector Puga, Officer Blackwood felt he needed to stop Puga from shooting Sgt. Kee, Officer Rubalcava, the Sheriff deputies, and he was concerned for the safety of the citizens in the nearby homes. [217] Officer Blackwood felt that Puga was attempting to manipulate Sgt. Kee into a position where Puga had an advantage and could shoot Sgt. Kee. [218] **I agree with this conclusion.** [219] Officer Blackwood testified that he could not see Puga's hands during the time he ran from his vehicle to where he fell to the ground.[220] Officer Blackwood heard approximately five shots being fired after he had fired his last round, and Puga was on the ground.[221] When Officer Blackwood fired his rifle at Puga, he was firing from near his patrol car, in a north to northeast direction.[222] Officer Blackwood testified that Puga appeared desperate and erratic during the entire incident. When Puga ran toward the residence at the northwest corner, Officer Blackwood was concerned he would barricade himself or take hostages in that residence.[223]


Citizen Witnesses


Citizen Witness Annabelle Botten

_____

212 Interview of CHP Officer Michael Blackwood COSB006102
213 Interview of CHP Officer Michael Blackwood COSB006150
214 Interview of CHP Officer Michael Blackwood COSB006103
215 Deposition Transcript Officer Michael Blackwood, November 4, 2024, page 20-21
216 Interview of CHP Officer Michael Blackwood COSB006147
217 Interview of CHP Officer Michael Blackwood COSB006180
218 Interview of CHP Officer Michael Blackwood COSB006156
219 Hubbs, K. 34 years law enforcement, 40+ years tactical training instructor
220 Deposition Transcript Officer Michael Blackwood, November 4, 2024, page 24
221 Deposition Transcript Officer Michael Blackwood, November 4, 2024, page 25
222 Deposition Transcript Officer Michael Blackwood, November 4, 2024, page 27
223 Deposition Transcript Officer Michael Blackwood, November 4, 2024, page 55

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Annabelle Botten lives at 17994 Catalpa Street, which was across the street from where Puga's vehicle stopped in the roadway. Annabelle saw Puga reach his right hand to his waistband, raised a black handgun, and fired the gun at officers.

Annabelle Botten told investigators that she did not continually watch the incident, when she looked out the kitchen window she saw Puga standing outside of the Expedition, next to the driver's door. Annabelle heard officers yelling at Puga to keep his hands up, because they could not see Puga's waistband. Puga said, "I have nothing, just come over here." The officers asked Puga to walk backward toward them, but Puga said he could not see and would not comply with the commands. Annabelle heard Puga yell to the officers that he heard a click noise, Puga then ran to the front of the Expedition and faced the officers. Puga did not comply with officer's commands and promised that he did not have a gun. However, Puga would not show the officers his waistband as they requested. Annabelle saw two officers walk north along the driver's side of the Expedition. Annabelle saw Puga lower his right hand toward the front of his waist and raised what she described as a black handgun. Annabelle saw Puga shoot at the CHP officers who stood on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle flash from his handgun. Officers fired back as Puga ran north on Peach Avenue. Puga fell to the ground just north of the intersection. [224]

Witness Interviews 11498 Peach Avenue, Mangerino family

Edward Mangerino, his wife Wendy, son Ryan, and daughter Erin, live at 11498 Peach Avenue. They were awakened on February 17, 2020, at approximately 0200 hours by the sounds of sirens and high-speed vehicles. At about 0240 hours, the sirens and vehicles returned and stopped in the intersection of Peach Avenue and Catalpa Street.

Citizen Witness Edward Mangerino

Edward Mangerino watched the police activity from the window in the den of the house. Edward recorded the events with his cellphone. Vehicles in his driveway partially blocked his view. Edward heard an officer yelling for Puga to exit the SUV. Puga did not comply. Edward saw a female exit and walk back to the officers. Edward said Puga would not comply and remained in the SUV. An officer fired PepperBalls into the SUV, and powder floated inside, and Puga coughed. Edward was familiar with less-lethal munitions because his father was a law enforcement officer for 36 years. Edward told investigators that the officer who negotiated with Puga did not sound aggressive and called Puga by his first name "Hector." Edward saw Puga exit the SUV. Edward thought Puga was hiding something in his waistband because he did not display the right side of his waistband as he exited the driver's door. Officers yelled and asked Puga to walk backward to them, but Puga did not comply. Instead, Puga ran to the front of the SUV. Edward's cellphone lost power and he was unable to continue recording. As officers approached Puga, Edward glanced down at his cellphone. When he looked back up, he saw Puga with one of his hands extended

_____

[224] Interview Annabelle Botten  COSB000749 - 750

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

toward the officers on the southwest corner of Peach Avenue and Catalpa Street. Edward saw a puff of smoke expel from Puga's extended hand and believed Puga shot at the officers. The officers returned fire in rapid succession. A few minutes after the shooting, Edward saw three ambulances arrive.[225] During his deposition, Edward said that he was proficient with firearms[226] and did not see a gun in Puga's hand, but Puga had his hand around something, and smoke came from the front of this hand, which gave the impression that he had a gun. Edward was viewing and video recording the incident from the south door of his residence, along the garage facing south.[227] From this location, Edward was not able to see Sgt. Kee and Officer Rubalcava.[228] The officers returned fire at Puga, and he ran to the north. Edward lost sight of Puga as he ran north. Edward moved into the house and viewed the incident from his bedroom window. Edward saw a firetruck park next to where Puga fell and one of the paramedics checked on Puga with a defibrillator.[229] Prior to the shooting, Edward described the officers as being very calm and trying to de-escalate the situation. Edward described Puga as being "cagey" and agitated.[230]

Citizen Witness Wendy Mangerino

Wendy Mangerino watched the police activity from her bedroom window. Wendy saw the female exit the SUV and walk back to officers and heard officers tell Puga to put his hands up. Puga did not comply with the commands. Wendy saw the PepperBalls fired into the SUV and heard officers advise Puga they would provide him medical aid if he peacefully surrendered. Puga refused to exit the SUV. After about an hour, Puga exited and walked to the front of the SUV. Officers yelled for Puga to put his hands up because they could not see his hands when Puga brought them down toward his waistband. Puga repeatedly brought his hands down toward his waistband, and officers continued to yell for him to bring them back up. The final time, Wendy saw Puga reach down toward his waistband, and she thought Puga was about to remove his pants. Wendy saw two officers move to the east of Puga, and she thought they startled him. Puga ran in a northwestern direction toward the dirt berm in front of Wendy's fence line. Wendy believed Puga was hit by gunfire while running and then fell onto the dirt berm with his arms tucked under his body. Wendy did not see Puga with a gun.[231]

Citizen Witness Erin Mangerino

Erin Mangerino watched and video recorded the police activity from her parent's bedroom window. Erin saw the female exit the passenger side of the white vehicle and walk back to the officers. During the standoff, Erin saw Puga throw items from the vehicle and yell at officers. At approximately 0340 hours, Puga opened the driver's door and hung his feet out of the vehicle.

_____

[225] Witness statement Edward Mangerino COSB000760 - 762
[226] Deposition Transcript Edward Mangerino, November 25, 2024, page 26-27
[227] Deposition Transcript Edward Mangerino, November 25, 2024, page 35
[228] Deposition Transcript Edward Mangerino, November 25, 2024, page 56
[229] Deposition Transcript Edward Mangerino, November 25, 2024, page 39-40
[230] Deposition Transcript Edward Mangerino, November 25, 2024, page 42-43
[231] Witness statement Wendy Mangerino COSB000753 - 754

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

---

Officers ordered Puga to turn around and put his hands up. Puga appeared he would comply but ran forward toward the front of the car. Puga acted erratically and held his hands up, then placed them on the hood or down near his waist several times. An officer ordered Puga to return to the side of the vehicle and put his hands up because they could not see his waist. The officer repeated the order several times over the next two minutes. Two officers approached from the east side of the vehicle with weapons drawn. Puga ran north on Peach Avenue about five feet, then northwest towards Erin's house. Erin heard approximately 15 to 20 gunshots. Erin saw Puga fall to the ground. His hands and arms moved, but she could not tell their positioning.[232] Erin stated that at the time of the shooting, she ducked which affected her view and her cellphone video. Her focus was "all over the place," and she was not able to see anything in Puga's hands. She was able to see officers shoot but did not see Puga fire a gun.[233]

Citizen Witness Ryan Mangerino

Ryan Mangerino watched the police activity from her parent's bedroom window. Ryan told deputies that he was not injured and did not have any additional information.[234]

Citizen Witness Tammy Goodson

Tammy Goodson lives at 11516 Peach Avenue (one block north of the incident, at the corner of Peach Ave. and Birch St). On February 17, 2020, at approximately 0240 hours, she was woken by the sounds of sirens and a low-flying helicopter. Goodson watched the standoff through her east-facing window and recorded the incident on her cellphone. Goodson said she saw an unknown person exit the rear passenger door of the vehicle and ran east on Catalpa Street, however no officer pursued this person. Goodson saw PepperBalls fired into the vehicle and a female exit from the front passenger door. This female walked back to the officers. Goodson saw Puga throw items out of the vehicle, taunt officers, open the driver's door, and run to the front of the vehicle. Puga refused to follow orders to put his hands up and show the officers his hands. Puga suddenly ran north on Peach Avenue for approximately five feet before heading in a northwest direction toward the west dirt shoulder of Peach Avenue. Goodson heard 25 to 30 gunshots.[235]

**Numbers of less-lethal and gunshots fired**

| Sgt. Kee | 12 gauge Bean-bags | 5 |
|---|---|---|
| Sgt. Kee | .223 rounds | * |
| Officer Rubalcava | .40 Cal rounds | 13 |
| Officer Blackwood | .223 rounds | * |

---

[232] Witness statement Erin Mangerino COSB000757 - 758
[233] Deposition Transcript Erin Mangerino, November 25, 2024, page 35-37
[234] COSB000926
[235] Witness statement Tammy Goodson COSB000764 - 765

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

| Sgt. Vaccari | PepperBall glass brakers | 1 |
|---|---|---|
| Sgt. Vaccari | PepperBall OC rounds | 100 - 150 |
| Sgt. Vaccari | 40mm less lethal | 1 |
| Officer Adams | 9mm rounds | 10 |
| Hector Puga | 9mm rounds | up to 5 |

   * (37). 223 caliber rounds were fired between Sgt. Kee and Officer Blackwood.[236]

Three 9mm fired cartridge casings were found in the center cup holder of the Expedition, and one
live 9mm cartridge was found under the driver's seat. [237]

## Use of Force by Sgt. Vaccari and Deputy Adams

On February 17, 2020, Hector Puga was a fleeing felon that officers could have reasonably
believed was armed with a deadly weapon. Puga had led CHP officers and Sheriff's deputies on
an hour-long high-speed, failure-to-yield vehicle pursuit. Dashcam video shows that Puga drove
at excessive speeds through residential neighborhoods, and failed to stop or hardly slow when he
drove through multiple intersections controlled by stop signs and traffic lights. Puga drove on the
wrong side of the roadway and continued to flee from law enforcement even after his right front
tire was deflated. Officers pursuing Puga were aware that the vehicle Puga was driving matched
the description, including a "Funeral" sticker on the rear window, of a vehicle involved in a car-to-
car shooting that took place about eight hours earlier and approximately 4.6 miles away, see
Opinion 1 and Figure 2.

## Sgt. Vaccari's use of the less-lethal PepperBall launcher on Hector Puga

The use of the less-lethal PepperBall launcher by Sgt. Vaccari was consistent with generally
accepted police training, policy, and practice and with that of prudent, experienced, and
professionally trained law enforcement officers facing these or similar circumstances. Sgt. Vaccari
had attended numerous use-of-force trainings.[238] The San Bernardino County Sheriff's
Department training includes the use of the PepperBall system, OC projectiles, and glass-
breaking rounds during "vehicle standoff" situations.[239,240]

Prior to firing the glass breaker rounds to break out the rear window of Puga's vehicle, Sgt. Vaccari
announced to Puga, "Hector is there anything I can say or do to get you to cooperate with us and
step out of the car?" Prior to firing the OC PepperBall rounds into the vehicle, Sgt. Vaccari
announced to Puga, "Hector is there anything I can say or do? "Is there anything I can say or do,

---

[236] A total of (37) .223 caliber FFC's were found at the scene, COSB001052

[237] 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf COSB000817

[238] 176. [COSB008767-008771] Vaccari Pathlore.pdf

[239] 262. 12-13 T2 Vaccari attended 12-20-2013 PepperBallSgt2012.pdf, pages 47-50 & 56-57

[240] 265. 17-18 T1 Vaccari attended 7-12-2017 Less Lethal  Review.pdf, pages 18-33

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Hector?" "Get out of the car." [241] Sgt. Vaccari first used the OC contained within the PepperBalls to make the interior of the vehicle uncomfortable for Puga to remain. While the OC likely had some effect on Puga, it did not immediately force him to exit. Next Sgt. Vaccari used the PepperBalls as impact munitions to gain pain compliance from Puga. Sgt. Vaccari could see Puga's back and fired to hit Puga in his back with the PepperBalls. Puga yelled out, that he was hit in the eye.[242] It should be noted that post-incident photos of Puga do not show an eye injury that would be expected from a direct impact from a PepperBall. The autopsy report does list a "small abrasion above his right eyebrow." [243] It is likely that Puga may have feigned the eye injury to draw in the officers and deputies in for ambush.

San Bernardino County Sheriffs Policy 3.625 Pneumatic Launchers states in part:

3.625. PNEUMATIC LAUNCHERS

For purposes of this section, a pneumatic launcher is defined as a less-lethal impact chemical agent delivery system, which utilizes compressed air to propel a projectile during law enforcement actions. A pneumatic launcher projectile may be utilized as a direct impact weapon and/or a chemical agent delivery system. Safety members may utilize the pneumatic launcher for defensive purposes or to gain compliance when verbal commands have failed, and a physical confrontation appears reasonably imminent, or when the circumstances reasonably indicate that any attempt of physical control would be futile or endanger the safety member or others.

Generally, a verbal announcement of the intended use of the pneumatic launcher shall be given prior to discharge. This announcement serves to provide other safety members and individuals with the warning that a pneumatic launcher may be deployed. No verbal announcement is required prior to the deployment of the pneumatic launcher if making such an announcement would endanger the safety members or others, or if an announcement is otherwise impractical.

3.625.10. PNEUMATIC LAUNCHERS – OPERATIONAL USE

The Pneumatic Launcher may be utilized when objectively reasonable to accomplish the following:

1. To reduce violence
2. To minimize property damage and protect the public
3. To disperse individuals during riots or incidents of unlawful civil disobedience,

_____

[241] Belt recording, Sgt. Vaccari, (Vaccari) PUMA2008.wma @ 1:05:19 - 1:06:10
[242] Interview of SBSD Sgt. Robert Vaccari COSB000245
[243] COSB008047

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

---

4.  To apprehend offenders or suspected offenders who refuse to submit to arrest and/or lawful orders.

The Pneumatic Launcher may be deployed to overcome resistive or assaultive behavior prior to hands on control if a physical confrontation appears unavoidable and injury may result.

Deployments can be in close proximity and may be effective at ranges up to 150 feet. Safety members shall make every effort to avoid deploying projectiles to the face, eyes, neck or groin unless objectively reasonable and shall not deploy projectiles as punishment.

3.625.15. PNEUMATIC LAUNCHERS – APPROVED MUNITIONS

Only Department issued and approved pneumatic OC and inert training launcher projectiles supplied from the Sheriff's Range shall be utilized for deployments. OC based projectiles are not considered "Special Use" chemical agents as outlined in section 3.624.10 of this manual. "Glass-shattering" projectiles or "Marking" projectiles, shall not be approved for Department use; however, the Specialized Enforcement Division (SED) is exempt from this restriction.

While Sgt. Vaccari's use of the "Glass-shattering" projectiles may not have been in compliance with 3.625.15 above, department policies are generally considered as "guidelines." In order for Sgt. Vaccari to get the OC PepperBalls inside of Puga's vehicle, a window had to be broken. The PepperBall "Glass-shattering" projectiles are designed for that purpose. Sgt. Vaccari had been trained in the use of the glass-shattering projectiles[244] and they were included with his department-issued PepperBall equipment. **I would also have used the** "Glass-shattering" projectiles.[245]

PepperBall Technologies defines PepperBall as:

What is PepperBall?
*   Non-Lethal chemical agent delivery system that uses High-Pressure Air (large capacity hoppers), and CO2 (limited capacity magazines) to deliver PAVA powder Projectiles from a safe distance.
*   Combines chemical agent exposure with kinetic impact and pain.
*   Effective on individuals a well as large groups of people for riot and crowd control.[246]

California Peace Officer Standards and Training (POST) Learning Domain 20, Use of Force, states in part:

---

[244] 262. 12-13 T2 Vaccari attended 12-20-2013 PepperBallSgt2012.pdf, page 47
[245] Hubbs, K. 34 years law enforcement, 40+ years tactical training instructor
[246] PepperBall Technologies, User certification course, 2012, slide 6

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

### Force options tools and techniques[247]

The following list includes tools and techniques which are the most common force options available to peace officers, but it is not all inclusive. Peace officers should recognize that the risk of injury created by a particular force option may vary depending upon how the force option is applied.

| |
|---|
| Professional/command presence |
| Interpersonal communication techniques/warnings |
| Control Holds/Takedowns/Handcuffing |
| Handcuffing and Temporary Restraints |
| **Chemical agents** |
| Electronic Control Weapons |
| Impact Weapons |
| **Impact Projectile Weapons** |
| Canine |
| Personal Body Weapons |
| Improvised weapons or techniques |
| Firearms |

### Sgt. Vaccari's use of the less-lethal 40mm launcher on Hector Puga

The use of the less-lethal 40mm launcher by Sgt. Vaccari was consistent with generally accepted police training, policy, and practice and with that of prudent, experienced, and professionally trained law enforcement officers facing these or similar circumstances.

Sgt. Vaccari was holding the 40mm launcher when Hector Puga drew a 9mm pistol from his waistband. Sgt. Vaccari quickly responded to Puga's deadly threat by firing the weapon most readily available (the 40mm). While Sgt. Vaccari was not sure if his 40mm fired, it appears he fired one 40mm less-lethal eXact impact round.  A photo of the scene shows a 40mm multi-launcher loaded with three live cartridges and one expended cartridge.[248] This would indicate one 40mm less-lethal impact round was fired. One 40mm projectile was located in the roadway on Catalapa Street, see Figures 12 & 13. The rapid response to Puga's deadly threat would have made it difficult or impossible for Sgt. Vaccari to have given a verbal announcement prior to discharging the 40mm.

_____

[247] POST LD-20 Use of Force, Chapter 3, Force Options, 3-10
[248] [986-1038] SBSD CH31C Photos p1.pdf AG01029.  COSB001620

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____



Figure 12

40mm Less-lethal launcher and ammo. AG01025 & AG01029

One 40mm less-lethal eXact impact projectile was located in the roadway of Catalpa Street, see Figure 13. There was no obvious sign of Puga being hit by the 40mm impact projectile, it is likely that Sgt. Vaccari fired the 40mm at Puga with the white Expedition between them, and possible that the projectile bounced off of the Expedition and came to rest in the roadway of Catalpa Street.



Figure 13

**Placard 52** consisted of one expended 40mm "eXact impact" round. The round was located on the westbound lane of Catalpa Street, approximately 4" south of the north asphalt cur. **Placard 52** was approximately 76'2" southeast of **Placard 51.**

San Bernardino County Sheriffs Policy 3.628 states in part:

3.628.10 Less-lethal Weapon Systems: Preparation for Use

When the decision is made to have the less-lethal shotgun or 40mm launcher available as a force option, the following procedures shall be followed:

51

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Generally, a verbal announcement of the intended use of the less-lethal shotgun or less-lethal launcher shall be given prior to discharge. This announcement serves to provide other safety members and individuals with the warning that a less-lethal shotgun or less-lethal launcher may be deployed.

No verbal announcement is required prior to the deployment of less-lethal munitions if making such an announcement would endanger the safety members or others, or if an announcement is otherwise impractical.[249]

The San Bernardino County Sheriff's Department Policy 3.628.15 Less-lethal Weapon Systems: Restriction in Use states in part:

Target Areas/Point of Aim:

The target areas for less-lethal munitions should be
the extremities (i.e. arms and legs), buttocks, thigh, calf or abdominal area.

Less-lethal munitions shall not be intentionally
aimed at the head, neck, spine, groin, or chest, unless-lethal force is justified.

Deployment Distances:

The optimal distance for deployment of the less
lethal "drag stabilized bean bag" munitions is 20 feet to 50 feet.

The optimal distance for deployment of the less-lethal "fin stabilized bean bag" munitions is 15 feet to 35 feet.

The optimal distance for deployment of the less-lethal 40mm "exact impact standard range sponge round" munitions is 5 feet to 131 feet. The optimal distance for deployment of the less-lethal 40mm "blunt impact projectile collapsible gel round" munitions is 5 feet to 131 feet.

Less-lethal munitions should not be used in the apprehension of the following individuals, unless-lethal force is justified:

1. Women who are obviously or known to be pregnant.
2. People known to have diseased hearts.
3. Obviously debilitated or elderly people who are at greater risk from medical injuries or coronary problems.

_____

[249] COSB 003267

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

4. Children who appear or who are known to be under the age of twelve.
5. People in danger of falling to their death or being caught in dangerous equipment or machinery.

California Peace Officer Standards and Training (POST) Learning Domain 20, Use of Force, states in part:

**Force options tools and techniques**[250]

The following list includes tools and techniques which are the most common force options available to peace officers, but it is not all inclusive. Peace officers should recognize that the risk of injury created by a particular force option may vary depending upon how the force option is applied.

| |
|---|
| Professional/command presence |
| Interpersonal communication techniques/warnings |
| Control Holds/Takedowns/Handcuffing |
| Handcuffing and Temporary Restraints |
| Chemical agents |
| Electronic Control Weapons |
| Impact Weapons |
| **Impact Projectile Weapons** |
| Canine |
| Personal Body Weapons |
| Improvised weapons or techniques |
| Firearms |

## Sgt. Vaccari's use of the less-lethal Taser on Hector Puga

The use of the less-lethal Taser by Sgt. Vaccari was consistent with generally accepted police training, policy, and practice and with that of prudent, experienced, and professionally trained law enforcement officers facing these or similar circumstances.

Sgt. Vaccari was in possession of his department-issued Taser Model X2.[251]

_____

[250] POST LD-20 Use of Force, Chapter 3, Force Options, 3-10
[251] 005. [COSB000039-000729] H2021-024 BOOK 1 Subject to Protective Order.pdf COSB000196

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs



Taser X2

The Taser is a class of electronic control devices which discharge probes and deliver an electronic charge to an individual for the purpose of controlling violent or potentially violent subjects who pose an immediate threat to a law enforcement officer or other member of the public.[252]

After shooting at officers and deputies, Hector Puga was lying face down with both of his hands concealed under his torso, his handgun could not be seen, and he did not comply with commands to display his hands. Sgt. Vaccari could see that Puga was breathing and did not appear to be bleeding. Sgt. Vaccari thought Puga was still holding the gun and would roll over and shoot. Multiple commands were given to Puga to "show your hands," "Put your hands out," and an officer told Puga, "If you move for that gun, I will shoot you." Sgt. Vaccari said, "Tas, let me see your hands," then deployed his taser at Puga and struck him on his back to determine if Puga was conscious. Puga's body tensed, but he did not move or respond to the officer's commands. Sgt. Vaccari activated his taser again, but Puga did not react to the second taser activation. Sgt. Vaccari assisted in handcuffing Puga, rolled him over, and located the handgun under Puga's torso. Sgt. Vaccari then requested medical aide to roll in. [253,254,255]

The San Bernardino County Sheriff's Department Policy 3.630 The Taser, states in part:

**3.630. The Taser**

The term "Taser," as used in this manual, refers to a class of electronic control devices which discharge probes and deliver an electronic charge to an individual for the purpose of controlling violent or potentially violent subjects who pose an immediate threat to a law enforcement officer or other member of the public.

Appropriate use of the Taser is intended to help reduce the risk of injury to suspects, safety members, and the general public.

---

[252] 10-30-20 SheriffsDepartmentManual.pdf page 685 - 86
[253] Interview of SBSD Sgt. Robert Vaccari COSB000254 - 256
[254] 005. [COSB000039-000729] H2021-024 BOOK 1 Subject to Protective Order.pdf , COSB000046
[255] Belt recording, Sgt. Vaccari, (Vaccari) PUMA2008.wma @ 1:51:16 - 1:54:22

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Safety members are authorized to carry and use Tasers in accordance with current Departmental training, and in compliance with the Department's Use of Force Policy. The Taser shall not be used as a means or method of punishment.

**3.630.25 Taser: Verbal Warning**

Generally, a verbal announcement of the intended use of the Taser shall be given prior to the application of the Taser. This announcement serves to:

- Provide the individual with a reasonable opportunity to voluntarily comply with the deputy's direction.
- Provide other safety members and individuals with the warning that a Taser may be deployed.

   No verbal announcement is required prior to application of the Taser if making such an announcement would endanger safety members or others, or if an announcement is otherwise impractical.

**3.630.45. Taser: Limitations of Use.**

A Taser may only be used when objective facts indicate that the suspect poses an immediate threat to a safety member or other member of the public.

Generally, the Taser should not be used:

- To overcome passive resistance.
- Over a prolonged period of time. Minimize repeated, continuous or simultaneous exposures. Near flammable liquids or fumes; or, when the safety member knows that a subject has recently come in contact with flammable liquids likely to be on his person.
- In conjunction with the application of chemical agents which contain flammable material.
- When a subject is operating a moving vehicle.
- When the subject is likely to fall from a precarious position, such as at the top of a staircase, on a balcony or ledge, in a tree, or in or next to a body of water.
- When the subject is obviously pregnant, or known to be pregnant.
- When the subject is visibly enfeebled due to advanced age or illness.
- When subjects are handcuffed or otherwise restrained, absent overtly assaultive behavior that cannot be reasonably overcome by any other less intrusive manner.

California Peace Officer Standards and Training (POST) Learning Domain 20, Use of Force, states in part:

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

### Force options tools and techniques[256]

The following list includes tools and techniques which are the most common force options available to peace officers, but it is not all inclusive. Peace officers should recognize that the risk of injury created by a particular force option may vary depending upon how the force option is applied.

| |
|---|
| Professional/command presence |
| Interpersonal communication techniques/warnings |
| Control Holds/Takedowns/Handcuffing |
| Handcuffing and Temporary Restraints |
| Chemical agents |
| **Electronic Control Weapons** |
| Impact Weapons |
| Impact Projectile Weapons |
| Canine |
| Personal Body Weapons |
| Improvised weapons or techniques |
| Firearms |

## Use of Deadly Force by Deputy Adams

When Deputy Adams and Sgt. Vaccari approached Puga's vehicle on the passenger side, Deputy Adams saw Puga "jerk his hand down and up." Deputy Adams yelled to Puga, "Get on the ground." Almost simultaneously, Deputy Adams heard gunshots. Deputy Adams observed Puga looking at him and holding a gun in his hand.[257] Deputy Adams ducked for cover and then saw Puga running across the intersection, northbound on Peach. Deputy Adams could see that Puga still had the gun and Puga was pointing the gun back at Deputy Adams. Deputy Adams fired his pistol at Puga.[258]

Deputy Adams told investigators he was thinking:

*"This guy is trying to kill me."* [259]

*"I was thinking well I don't want to get shot, I don't want to die, I don't sarge to get shot, I don't want him to die, I don't want CHP officers to get shot, I don't want them to die uh I*

_____

[256] POST LD-20 Use of Force, Chapter 3, Force Options, 3-10
[257] Interview of Deputy Jake Adams, COSB000329
[258] Interview of Deputy Jake Adams, COSB000330
[259] Interview of Deputy Jake Adams, COSB000329

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

*also still knew we were in residential area um and God forbid anything happen to innocent civilians as well."* [260]

Deputy Adams moved to a position of cover and could see Puga was still running and pointing the gun in his direction. Deputy Adams re-engaged (fired at) Puga. Deputy Adams described the gun Puga pointed at him as a black handgun.[261]

Deputy Adams fired three volleys of gunfire at Puga. He saw Puga pointing the gun in his direction each time Deputy Adams fired at Puga. In the first volley, Deputy Adams estimated he fired two or three shots. The second volley, he estimated he fired four shots. In the third volley, he estimated he fired three shots. [262]

Deputy Adams believed he fired nine or 10 rounds from his Glock 9mm pistol. An examination of his pistol showed one live round in the chamber and seven live rounds in the magazine. This pistol, when fully loaded, holds 18 rounds, which would indicate that Deputy Adams fired 10 rounds.[263]

Based on Deputy Adams's statement to investigators, he fired his pistol at Hector Puga in defense of himself and to defend Sgt. Vaccari and the CHP officers from death or serious injury. Hector Puga's actions of shooting at the officers and deputies and running with the gun in the direction of an occupied residence could present to a reasonably trained peace officer as the appearance of a continuous imminent deadly threat to the officers, deputies, and citizens in the area from the time he drew the gun from his pants area up to the time he was disarmed.

When asked in deposition, if he gave Puga any verbal warning that he was going to shoot, Deputy Adams answered:

*No, sir. There was not ample time to give verbal warning or anything like that. I was already fired at, and I need to act."* [264]

When asked in deposition if Puga was running when Deputy Adams first fired, Deputy Adams stated:

*"I think he was -- after he pulled the gun up and I heard the shots and I saw the gun, when I made the decision to return fire, he was still in front of that vehicle. I couldn't tell if he was moving or not.· I think it's likely, you know, that he had started to move northbound."·*

*"To the best of my knowledge, I saw the gun; I heard shots; he was facing me; when I returned fire he was still in front of the vehicle.· I don't know that I can sit here today and*

_____

[260] Interview of Deputy Jake Adams, COSB000330
[261] Interview of Deputy Jake Adams, COSB000362
[262] Interview of Deputy Jake Adams, COSB000331
[263] 005. [COSB000039-000729] H2021-024 BOOK 1 Subject to Protective Order.pdf, COSB000193
[264] Deposition Transcript Deputy Jake Adams, November 12, 2024, page 39

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

*tell you if I specifically remember him being just in front of the vehicle or if he had actually started his movement northbound. I know he had started moving northbound.· I don't know when I pulled the trigger if he had started that direction or not, but I believe that's true."* [265]


## Autopsy of Hector Puga

During an autopsy on Hector Puga, it was noted that he received 10 gunshot wounds.[266]
1. Mid left back
2. Left lower back
3. Right buttock
4. Trangential wound
5. Left thigh anterior
6. Left thigh posterior
7. Left knee
8. Right lower leg anterior
9. Right lower leg anterior
10. Right foot


Thirteen live 9mm cartridges were found in Puga's right front pants pocket.[267]
Five bullets were removed from Puga's body (left pelvis, right flank, mid abdomen, left chest, left thigh). [268]


## Law Enforcement Use of Force

Peace officers are trained they are granted the authority to use objectively reasonable force to:

- effect an arrest,
- to overcome resistance,
- to prevent escape,
- and in the defense of self or others,
- and to gain control of the situation.[269]

_____

[265] Deposition Transcript Deputy Jake Adams, November 12, 2024, page 49
[266] 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf COSB000843-44
[267] 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf COSB000863
[268] 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf COSB001086
[269] California POST Learning Domain – 20 V5, Use of Force, Chapter 3, Force Options 3-3

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

───────────────────────────────

The authority to use force is bestowed upon peace officers through the California Penal Code.

<u>California Penal Code Section 835a.</u>

It should be noted, prior to January 1, 2020, peace officers in California were provided with relatively clear and concise guidance, training, and policy relating to the authority to use force. After January 1, 2020, this legislative guidance was changed.

California Penal Code Section 835a (Pre January 1, 2020), stated:

> Any officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use reasonable force to effect an arrest, to prevent escape or to overcome resistance.

> A peace officer who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being arrested; nor shall such officer be deemed an aggressor or lose his right to self-defense by the use of reasonable force to effect the arrest or to prevent escape or to overcome resistance.[270]

On January 1, 2020, California Penal Code Section 835a was change to:

> 835a**.** (a) The Legislature finds and declares all of the following:

> (1) That the authority to use physical force, conferred on peace officers by this section, is a serious responsibility that shall be exercised judiciously and with respect for human rights and dignity and for the sanctity of every human life. The Legislature further finds and declares that every person has a right to be free from excessive use of force by officers acting under color of law.

> (2) As set forth below, it is the intent of the Legislature that peace officers use deadly force only when necessary in defense of human life. In determining whether deadly force is necessary, officers shall evaluate each situation in light of the particular circumstances of each case, and shall use other available resources and techniques if reasonably safe and feasible to an objectively reasonable officer.

> (3) That the decision by a peace officer to use force shall be evaluated carefully and thoroughly, in a manner that reflects the gravity of that authority and the serious consequences of the use of force by peace officers, in order to ensure that officers use force consistent with law and agency policies.

───────────────────────

[270] PC 835a pre 2020

59

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

(4) That the decision by a peace officer to use force shall be evaluated from the perspective of a reasonable officer in the same situation, based on the totality of the circumstances known to or perceived by the officer at the time, rather than with the benefit of hindsight, and that the totality of the circumstances shall account for occasions when officers may be forced to make quick judgments about using force.

(5) That individuals with physical, mental health, developmental, or intellectual disabilities are significantly more likely to experience greater levels of physical force during police interactions, as their disability may affect their ability to understand or comply with commands from peace officers. It is estimated that individuals with disabilities are involved in between one-third and one-half of all fatal encounters with law enforcement.

(b) Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect the arrest, to prevent escape, or to overcome resistance.

(c) (1) Notwithstanding subdivision (b), a peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary for either of the following reasons:

(A) To defend against an imminent threat of death or serious bodily injury to the officer or to another person.

(B) To apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury, if the officer reasonably believes that the person will cause death or serious bodily injury to another unless immediately apprehended. Where feasible, a peace officer shall, prior to the use of force, make reasonable efforts to identify themselves as a peace officer and to warn that deadly force may be used, unless the officer has objectively reasonable grounds to believe the person is aware of those facts.

(2) A peace officer shall not use deadly force against a person based on the danger that person poses to themselves, if an objectively reasonable officer would believe the person does not pose an imminent threat of death or serious bodily injury to the peace officer or to another person.

(d) A peace officer who makes or attempts to make an arrest need not retreat or desist from their efforts by reason of the resistance or threatened resistance of the person being arrested. A peace officer shall not be deemed an aggressor or lose the right to self-defense by the use of objectively reasonable force in compliance with subdivisions (b) and (c) to effect the arrest or to prevent escape or to overcome resistance. For the purposes of this subdivision, "retreat" does not mean tactical repositioning or other deescalation tactics.

(e) For purposes of this section, the following definitions shall apply:

60

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

(1) "Deadly force" means any use of force that creates a substantial risk of causing death or serious bodily injury, including, but not limited to, the discharge of a firearm.

(2) A threat of death or serious bodily injury is "imminent" when, based on the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed.

(3) "Totality of the circumstances" means all facts known to the peace officer at the time, including the conduct of the officer and the subject leading up to the use of deadly force. *(Amended by Stats. 2019, Ch. 170, Sec. 2. (AB 392) Effective January 1, 2020.)*[271]

California Peace Officer Standards and Training (POST) Learning Domain 20, Use of Force, states in part:

Peace officers are often forced to make split – second judgments about the correct course of action to take in a given circumstance in conditions that are tense, uncertain and rapidly evolving. The actions described herein should not be considered as the only reasonable options available to an officer to effectively handle a given situation. Unless it is specifically stated as such, actions do not necessarily need to occur in the order that they are written. It is incumbent on the officer to select and use a response that is objectively reasonable under the totality of the facts and circumstances confronting the officer at the time. [272]

The goal for the use of force by a peace officer in any enforcement situation is to gain **control** of the situation or individual(s) encountered, when reasonable.[273]

It is the role of the peace officer to protect and serve the public. Peace officers who make or attempt to make an arrest may use reasonable force when faced with a threat or resistance.[274]

The Court noted that determining the objective reasonableness for the use of force must be fact specific, based on the totality of the circumstances confronting the officer at the

_____

[271] PC 835
[272] California POST Learning Domain – 20 V5, Use of Force, iii
[273] California POST Learning Domain – 20 V5, Use of Force, Chapter 1, Intro to the Use of Force 1-3
[274] California POST Learning Domain – 20 V5, Use of Force, Chapter 1, Intro to the Use of Force 1-7

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

time that the force is used. The determination of reasonableness must allow for the fact that peace officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving. The reasonableness of a particular use of force must be judged from the perspective of a **reasonable officer** on the scene, rather than with the 20/20 vision of hindsight. The evaluation should be based on the facts and circumstances confronting the officer without regard to the officer's underlying intent or motivation.[275]

Officers are trained that the "reasonable officer standard" includes:

- Would another officer
- Facing like or similar circumstances,
- Act in the same way or similar judgment? [276]


Chapter 2, Resistance – Subjects actions

The subject's actions and the practical considerations involved in a situation are major factors in determining the type of force the officer may lawfully use in order to gain or maintain control of the subject or the situation.

| Life-threatening | Any action likely to result in serious bodily injury or death of the officer or others | Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |
|---|---|---|

Hector Puga's actions of pointing a pistol at Deputy Adams could appear to a properly trained peace officer as presenting a "Life Threatening" situation as outlined above, in Chapter 2 of the California Peace Officer Standards and Training (POST) Learning Domain 20, Use of Force,[277] as well as Chapter 4 below, of POST Learning Domain 20, Use of Deadly Force.

Chapter 4, Use of Deadly Force

A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary... to defend against an imminent threat of death or serious bodily injury to the officer or to another person. (*Penal Code Section 835a(c)(1)(A)*) [278]

_____

[275] California POST Learning Domain – 20 V5, Use of Force, Chapter 1, Intro to the Use of Force 1-4
[276] California POST Learning Domain – 20 V5, Use of Force, Chapter 1, Intro to the Use of Force 1-6
[277] California POST Learning Domain – 20 V5, Use of Force, Chapter 3 – Force Options 3-7
[278] California POST Learning Domain – 20 V5, Use of Deadly Force, Chapter 4 – Force Options 4-4

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

San Bernardino County Sheriff's Department policy provides clear guidance relating to the use of force. The San Bernardino County Sheriff's Department Policy 3.608, The Use of Lethal Force, states in part:

> The use of lethal force is justified in the following circumstances:
>
> - A deputy may use lethal force to protect himself or others from what he reasonably believes to be an immediate threat of death or serious bodily injury.

San Bernardino County Sheriffs Policy 3.604 states in part:

> Use of Reasonable Force: Defined
>> Deputies shall use only that amount of force that reasonably appears necessary, given the facts and circumstances perceived by the deputy at the time of the event, to accomplish a legitimate law enforcement purpose.
>>
>> The "reasonableness" of the force used must be judged from the perspective of a reasonable deputy on the scene at the time of the incident. Any interpretation of "reasonableness" must allow for the fact that deputies are often forced to make split-second decisions about the amount of force that is necessary in circumstances that are tense, uncertain and rapidly evolving.

The San Bernardino County Sheriff's Department Policy 3.604 and 3.606 Reasonable Force, states in part:

> 3.604. Use of Reasonable Force: Defined
>
> Any safety member who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect the arrest, to prevent escape or to overcome resistance.
>
> The "reasonableness" of the force used shall be evaluated from the perspective of a reasonable safety member in the same situation, based on the totality of the circumstances known to or perceived by the safety member at the time, rather than with the benefit of hindsight. The totality of the circumstances shall account for occasions when safety members may be forced to make quick judgments about using force, and the amount of force that is necessary, in circumstances that are tense, uncertain and rapidly evolving.
>
> A safety member who makes or attempts to make an arrest need not retreat or desist from his efforts by reason of the resistance or threatened resistance of the person being

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

arrested. A safety member shall not be deemed an aggressor or lose his right to self-defense by the use of objectively reasonable force to effect the arrest or to prevent escape or to overcome resistance.

3.606. Factors Determining Reasonable Force

When determining whether or not to apply any level of force and evaluating whether a deputy has used reasonable force, a number of factors shall be taken into consideration. These factors include, but are not limited to:

- The seriousness of the suspected offense or reason for contact with the individual.
- The behavior of the individual being confronted (as reasonably perceived by the deputy at the time).
- The age, size, relative strength, skill level, and number of subjects vs. deputies.
- The level of injury and/or exhaustion of the deputy. o The level of drug/alcohol influence exhibited by the subjects involved (mental capacity).
- The proximity or availability of weapons.
- The availability of options (what resources are reasonably available to the deputy under the circumstances).
- The training and experience of the deputy.
- The potential for injury to citizens, deputy and suspects. o The risk of escape.
- The existence of other exigencies.

A deputy is frequently required to make split-second decisions and the amount of time available to evaluate and respond to changing circumstances may impact the decision-making process.

While various degrees of force exist, each deputy is expected to use only the amount of force reasonable under the circumstances to successfully complete the arrest, to prevent escape, or to overcome resistance.


**Opinion 5**

Professional medical support was pre-staged and rapidly summoned to provide medical aid to Hector Puga.
   a. An ambulance and medics had been pre-staged nearby while negotiations continued with Hector Puga.
   b. Hector Puga fell face down with both hands under his chest area, preventing officers and deputies from seeing the pistol he possessed.
   c. Hector Puga did not respond to commands to show his hands.

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

d. The ambulance that was pre-staged nearby for a rapid response was diverted to treat three family members at a house nearby.

e. During triage, medics determined Hector Puga was the least viable patient.

**Basis for Opinion 5**

While Sgt. Kee attempted to talk Hector Puga into exiting the vehicle and surrender, Puga began telling Sgt. Kee that he was a "2 Striker" and would be going to prison for life. After Puga stated he would be going back to prison for life, Sgt. Kee requested CHP Dispatch to have Medical staged nearby at Peach and Bear Valley.[279] A computer-aided dispatch (CAD) report indicates that Fire Department (medics) were requested and staging at 0259 hours.[280]

After the shooting, and as soon as Puga was handcuffed and the gun located under his body, both sergeants Vaccari and Kee, requested medical aid to respond.[281,282] Officer Blackwood stated that as they turned Puga over, he saw a gun fall from Puga's hand. Officer Rubalcava handcuffed Puga, and medical aid was called in. [283]

Sgt. Vaccari's attention was drawn to the house across the street where neighbors were yelling to him. After Puga was handcuffed, Sgt. Vaccari walked over to the neighboring home and found three family members had been hit by gunfire.

Sgt. Kee had requested over the CHP radio for medical personnel to roll in. The ambulance was already pre-staged and arrived quickly but was diverted to the neighboring house where three family members were wounded. Sgt. Kee noticed a fire engine parked next to the suspect, and a firefighter named Pendergrass had already pronounced Puga deceased at 0445 hours.[284,285]

While medical aid was pre-stagged nearby and summoned as soon as Hector Puga and the gun were secured, this ambulance and crew were diverted to provide medical aid to three family members at a neighboring residence who were injured by gunfire.

On Wednesday, February 17, 2020, at approximately 0301 hours, San Bernardino County Fire Department (SBCFD) Emergency Medical Technician (EMT) Andrew Walk and his partner, Paramedic Michael Doucette, received a request to stage from the San Bernardino County Sheriff's Department for a barricaded suspect in a vehicle. Medics Walk and Doucette responded with an ambulance from their station and staged at approximately 0315 hours in the area of Peach

[279] Interview of CHP Sgt. Isaiah Kee COSB006024
[280] 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf, COSB000870
[281] 005. [COSB000039-000729] H2021-024 BOOK 1 Subject to Protective Order.pdf , COSB000046
[282] Belt recording, Sgt. Vaccari, (Vaccari) PUMA2008.wma @ 1:51:16 - 1:54:22
[283] Interview of CHP Officer Michael Blackwood COSB006147
[284] Interview of CHP Sgt. Isaiah Kee COSB006029 – 6030
[285] Interview of CHP Sgt. Isaiah Kee COSB006042

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

Avenue and Donert Street (five blocks north of the Puga incident). Both Medics Walk and Doucette heard the sound of gunshots, then they were advised to respond to the scene at 7994 Catalpa Street. (The shooting occurred at approximately 0348 hours).[286] The medics arrived after about one minute and stopped at the northwest corner of Peach Avenue and Catalpa Street. Medics Walk and Doucette observed Puga lying on the ground. Both Medics told investigators that Puga did not display signs of life. Medic Doucette determined Puga was the least viable patient and responded to 17994 Catalpa Street, where they treated the three family members who were hit by gunfire.[287,288]

On February 17, 2021, paramedic Carlos Topete was assigned to Medic Engine 22 with Captain Brett Marshall and Engineer Jeremy Pendergraft. At 0302 hours, Topete, Marshall and Pendergraft responded in the fire truck to Peach Avenue and Catalpa Street to assist with multiple persons with gunshot wounds. Medic Topete told investigators that when they arrived, Medic 22 was already on the scene, and Medics Walk and Doucette told Topete that the suspect (Puga) was deceased.[289]

Paramedic Jeremy Pendergraft told investigators that members of Medic Ambulance 22 were near the residence on the northeast corner of Peach Avenue and Catalpa Street. The members of Medic Ambulance 22 were treating three people who had been shot at the residence. Pendergraft believed there was enough medical personnel at the residence, so he evaluated the suspect, who was later identified as Hector Puga. Puga was lying supine, handcuffed with his hands behind his back, near the intersection of Peach Avenue and Catalpa Street. A black handgun was on the ground, approximately two feet from Puga's right hand. Puga appeared to be obviously deceased because he had a penetrating wound to his upper left chest, he had lividity, and he appeared to not be breathing. Pendergraft checked for a carotid pulse but did not feel one. To ensure his analysis of Puga was correct, Pendergraft connected a heart monitor to him, but the monitor showed pulseless electric activity. At approximately 0405 hours, Pendergraft pronounced Puga deceased.[290]

California POST Learning Domain 34, First Aid, CPR, and AED V6.1, states in part:

Chapter 3 Basic Life Support 3-5

A victim is clinically dead the moment breathing and circulation stop. **Clinical death** may be *reversible* if basic life support techniques such as CPR are initiated immediately.

When a victim's breathing and circulation stop *and* brain cells die due to lack of oxygen, *irreversible* changes begin to take place, and vital organs begin to deteriorate. At this

_____

[286] CAD printout, COSB000871
[287] 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf, COSB000789
[288] 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf, COSB000792
[289] 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf, COSB000792
[290] 006. [COSB000730-001345] H2021-024 BOOK 2 Subject to Protective Order.pdf, COSB000776

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

point, a victim is biologically dead. **Biological death** usually takes place within four to six minutes after breathing and circulation stop.

NOTE: If any doubt exists as to whether or not the victim is alive, CPR should be started.

NOTE: The point at which a victim is considered to be biologically dead may be defined by specific agency guidelines and policy.

San Bernardino County Sheriff's Department Policy 3.226, Determining Death, states:

Except when a person is obviously dead, emergency medical aid shall be summoned, and it shall be the responsibility of the ambulance crew, paramedics, or other competent medical personnel to determine if death has occurred.

Members shall resolve any doubt of life or death in favor of an assumption of life and provide the appropriate medical assistance.


## Opinion 6

Hector Puga's actions were consistent with chronic drug abuse.
  a. Hector Puga displayed symptoms of stimulant use.
  b. Hector Puga displayed symptoms of methamphetamine psychosis.
  c. A sample of blood taken from Hector Puga tested positive for the presence of methamphetamine.

## Basis for Opinion 6

On February 16 & 17, 2021, Hector Puga was acting in an irrational and violent manner. Puga was the likely suspect in a car-to-car shooting on the I-15 Freeway on February 16, 2021. During that incident, Puga was driving in a dangerous and very aggressive manner. He made unsafe lane changes, followed too close to other vehicles, and nearly collided with another vehicle, then produced a pistol and shot at the driver of this other vehicle. Then, in the early morning hours of February 17, 2021, Puga led CHP and Sheriff's deputies on a high-speed, failure-to-yield vehicle pursuit, diving in a reckless, dangerous, erratic manner, then refused to exit his vehicle when it was disabled via the use of "spike strips." While CHP officers attempted to communicate with Puga, he would not cooperate nor participate in a rational conversation. Puga continually rolled his window up and down, smoked cigarettes, drank beer, threw objects out of his vehicle, and ultimately engaged in a gunfight with five law enforcement officers.

These actions are consistent with some persons involved in drug use.

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

---

A postmortem toxicology analysis was conducted on blood samples taken from Hector Puga. This analysis revealed the presence of Ethanol (Alcohol), Methamphetamine and Amphetamine, see Figure 14 .[291]

| Positive Findings: | | | |
|---|---|---|---|
| Compound | Result | Units | Matrix Source |
| Ethanol | 114 | Mg/dL | Femoral Blood |
| Blood Alcohol Concentration (BAC) | 0.114 | g/100 mL | Femoral Blood |
| Amphetamine | 86 | ng/ml | Femoral Blood |
| Methamphetamine | 1900 | ng/ml | Femoral Blood |

Figure 14

Postmortem toxicology analysis on blood samples taken from Hector Puga.  COSB000849

Methamphetamine is a dangerous, insidious, and illicit drug. It can take over the lives of chronic users and result in bizarre and dangerous behavior with many users.[292] Erratic and violent behavior is consistent with some of the effects of methamphetamine use.[293,294] Hector Puga also appeared to have been experiencing psychosis and hallucinations, as demonstrated by his lack of compliance with simple instructions, and statement *"I heard a click, you guys are trying to shoot me."* These are some of the effects of long-term methamphetamine use.[295,296]

Police officers are tasked with the mission of public safety through the enforcement of statutory laws. Methamphetamine is a Controlled Substance as outlined in California Health and Safety Codes 11377(a) and 11550, as well as California POST Learning Domaine 12 – Controlled Substances.

Police officers with experience dealing with both chronic methamphetamine users and persons experiencing mental illness recognize similarities in signs and symptomology.[297] Clinical

---

[291] Toxicology Report COSB000849
[292] Hubbs, 34-years law enforcement experience and Drug Recognition Expert (DRE)
[293] https://drugabuse.com/drugs/crystal-meth/effects-use/
[294] Short term effects of meth, https://www.caron.org/addiction-101/drug-use/what-is-crystal-meth-and-meth
[295] Long term effects of meth, https://www.caron.org/addiction-101/drug-use/what-is-crystal-meth-and-meth
[296] https://nida.nih.gov/publications/research-reports/methamphetamine/what-are-long-term-effects-methamphetamine-misuse
[297] Hubbs, 34-years law enforcement experience and Drug Recognition Expert (DRE) and training received from the California Narcotics Officers Association (CNOA), Department of Justice, Gavilan College, and the San Diego County Integrated Narcotics Task Force in the areas of Methamphetamine Manufacturing & Lab Safety, Methamphetamine and Rock Cocaine, Opiates use and abuse, and Cocaine use and abuse, Narcotic Enforcement & Influence, as well as Designer Drugs training.

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

---

psychologists have also noted these similarities and suggest "chronic Methamphetamine psychosis may be clinically similar to primary psychotic disorders."[298] The symptoms of meth-induced psychosis resemble those of paranoid schizophrenia. They include delusional thoughts, aggressive behavior and seeing, hearing or feeling things that aren't there. Additionally, people who abuse methamphetamine experience changes to their brain, making them susceptible to a wide range of mental health problems.[299]

Peace officers are trained in California about the dangers of, and officer safety concerns with, dealing with drug users. Drug use can have varying degrees of effect based on the drugs' potency, dosage, and purity, as well as the users' drug habits and built-up tolerance. Law enforcement personnel are also cautioned that stimulant users (such as methamphetamine) are often armed.[300] See Figures 15 and 16.

| Figure 15 | **Controlled Substance Terminology,** Continued |
|---|---|
| | **Controlled substances**     **Controlled substances** are any one of a number of drugs or other substances which are strictly regulated because of their potential for abuse or addiction. These substances are included in the Health and Safety Code as Schedules I-V. These include drugs classified as narcotics, depressants, stimulants, hallucinogens, and cannabis. <br><br> Examples of controlled substances include: <br><br> • Stimulants (e.g., methamphetamines) <br> • Hallucinogens (e.g., LSD) <br> • Opiates (e.g., heroin) <br> • Depressants (e.g., Xanax and Valium) |

---

[298] Frontiers in Psychiatry, Oct. 2018, Article 491
[299] Drug Rehap.com Meth Psychosis https://www.drugrehab.com/addiction/drugs/crystal-meth/psychosis/
[300] California POST Learning Domain – 12, Chapter 2, Drugs, 2-42

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

| Figure 16 | **Officer Safety Guidelines** |
|---|---|
| | **Introduction** — Peace officer may encounter drug users. Drug users may behave differently based on the type of drug the user has taken. Drugs affect on a body may cause the user to become dangerous and violent. Officers should always exercise special caution in situations involving drugs. |
| | **Officer safety** — In the identification and apprehension of drug users under the influence of stimulants, some situations require special caution. Peace officers should be aware that: <br><br>• Clandestine labs where certain stimulants are manufactured are extremely dangerous <br>• Many chemicals are dangerous to touch or breathe <br>• Drug-induced psychotic behavior can be dangerous <br>• Stimulant users are often armed <br>• They should avoid touching any substance with their hands (always wear rubber gloves), and avoid sniffing the drugs <br>• They need to watch for exposed syringes and blood from fresh puncture wounds |
| | **Safety precautions** — The apprehension of drug users under the influence of any drug may require special caution. Peace officers should be aware that suspects could have suicidal tendencies. |

California Commission on Peace Officer Standards and Training (POST) Learning Domain 12, Controlled Substances, states in part:

Examples of controlled substances include:

- stimulants (e.g., methamphetamines)
- hallucinogens (e.g., LSD)
- opiates (e.g., heroin)
- depressants (e.g., Xanax and Valium)[301]

Stimulants increase the activity of the brain and other parts of the central nervous system (CNS) by temporarily increasing the body's functional activity.

A *synthetic stimulant* is a controlled substance made from a combination of ingredients that are not of natural origin.

_____

[301] California POST Learning Domain – 12, Chapter 1, Drugs in the Body, 1-3

70

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

An *organic stimulant* is a controlled substance made from a plant. The principle active ingredient of cocaine is derived from the coca plant, grown primarily in Central and South America. Cocaine is the strongest stimulant of natural origin.[302]

Stimulants

An *organic stimulant* is a controlled substance.

Some indicators of stimulant use include:[303]

- Paranoia
- increased alertness
- insomnia or restlessness
- rapid speech
- agitation

Many methamphetamine users are drawn to the illicit drug due to its stimulating high. Along with the desired high of methamphetamine use comes the very unpleasant effects of the "crash" or "comedown." Methamphetamine crash or comedown symptoms can include: [304,305]

- Fatigue.
- Hunger.
- Difficulty concentrating.
- Meth cravings.
- Sleeping too much or being tired but unable to sleep.
- Depression.
- Slowed heart rate.
- Paranoia.
- Psychosis.

## Suicide by Cop

During my 34-year law enforcement career, I had been involved in over 2,000 SWAT operations, (conservative estimate), involving armed and dangerous persons, in addition to hundreds of non-SWAT, patrol incidents involving suicidal persons. I received a Life Saving Award for successfully talking a man down from attempting to hang himself, and I have had a female shoot and kill herself while I was talking with her. Hector Puga's actions on February 17, 2021, and his prior actions on March 13, 2015, were similar to the actions of suicidal persons I have had experience with, who attempted or successfully created a situation where police officers would shoot them in an effort

---

[302] California POST Learning Domain – 12, Chapter 2, Drugs 2-10
[303] California POST Learning Domain – 12, Chapter 2, Drugs 2-16
[304] Hubbs, 34-years law enforcement experience and Drug Recognition Expert (DRE)
[305] Coming Down from Meth, Oxford Treatment Center,  James Regan 2023

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

to commit suicide. California Peace Officer Standards and Training identifies a "**Suicide by Cop**" when a subject "engages in behavior which poses an apparent risk of serious injury or death, with the intent to precipitate the use of deadly force by law enforcement personnel towards that individual." [306]

Puga's erratic behavior while inside the disabled vehicle at Catalpa Street and Peach Avenue and insistence on wanting to talk to his wife and mother prior to exiting the vehicle further support the conclusion that Puga may have been intent on dying in a shoot-out with law enforcement. This coupled with his actions of March 13, 2015, when Puga led Los Angeles Sheriff's deputies in a high-speed vehicle pursuit and ultimately pointed a very real-looking replica pistol at deputies and was shot, would suggest that Puga's goal was to be killed by law enforcement. In the 2015 incident, Puga was wounded, survived, and sent to prison. Puga's reference to being a 3-striker while Sgt. Kee attempted to gain his compliance demonstrated his wish not to go back to prison. Officer Rubalacava believed Puga was preparing for a gunfight and planned to "go down" with gunfire to avoid being sent back to prison. Officer Rubalacava heard Puga say "He wasn't going back to jail," he referenced being a Third-Striker, the 16 years he spent in prison, and that he was going to show them what he went to prison for.[307]

Peace officers in California are trained that safety is a priority when interacting with persons who are experiencing a mental health crisis or using drugs or alcohol.

California POST Learning Domain 37 People with Disabilities, states in part:

> People with disabilities are capable of committing crimes. They are not relieved from their obligation to obey the law.

> Officers should treat a person who has a disability with the same caution that they would use with any other suspect regarding judgments about enforcement of the law and personal safety. Although the individual may have a disability, that individual may still be capable of injuring the officer. [308]

> People affected by mental illness can be unpredictable and sometimes violent. Officers should never compromise or jeopardize their own safety or the safety of others when dealing with individuals who display symptoms of a mental illness.[309]

> Peace officers must also recognize that individuals in crisis can pose potential officer safety concerns. [310]

_____

[306] Suicide by Cop Among Officer-Involved Shooting Cases, Kris Mohandie, Ph.D. et.al J Forensic Sci, 3/ 2009
[307] Interview of CHP Officer Bernardo Rubalcava  COSB000536
[308] POST LD 37 V-6 Chapter 1 Disability Laws 1-7
[309] POST LD 37 V-6 Chapter 4 Persons with Mental Illness 4-13
[310] POST LD 37 V-6 Chapter 5 Welfare and Institutions Code 5-3

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

*Danger to others* as a result of a mental health disorder often involves words or

Indicators that might lead an officer to believe that a person may be a danger to others
include, but are not limited to the individual's:

- use of words or actions that indicate the intent to cause bodily harm to another
  person
- appearance of being agitated, angry or explosive (even when not focused at a
  particular person)
- engagement in or intent to engage in acts or behavior of such an irrational,
  impulsive or reckless nature as to put others directly in danger of harm (e.g., the
  destruction of property or misuse of a vehicle)
- acts or words regarding an intent to cause harm to another person being based on
  or caused by the individual's mental state which indicated the need for psychiatric
  evaluation and treatment. [311]

## Opinion 7

Injuries sustained by John Botten Sr., John Botten Jr., and Tanja Botten, did not result from bullets
fired by members of the San Bernardino County Sheriff's Department.

a. Sgt. Robert Vaccari used less lethal force in the form of PepperBall rounds, a 40mm impact
   projectile, and a taser.
b. Deputy Jake Adams fired nine or 10 9mm bullets at Hector Puga. All of these bullets were
   fired in a northwesterly direction and not in the direction of the Botten home.
c. If, by chance, any bullets fired by Deputy Adams had traveled in the direction of the Botten
   home, it (they) would have been the unintended result of defensive gunfire directed at
   Hector Puga.

## Basis for Opinion 7

John Botten Sr., his wife Tanja, daughter Annabelle, and son, John Jr. live at 17994 Catalpa
Street. This is the residence located at the northeast corner of Catalpa Street and Peach Avenue.
In the early morning hours of February 17, 2020, the family was awakened by the sounds of sirens
and high-speed vehicles. The police pursuit of Hector Puga had ended in the roadway
approximately 120 feet from the front door of the Botten home. John Sr. and Tanja woke Annabelle
and John Jr. and had them move to the living room as a precaution in the event of a shooting.[312]

Figure 17 below is an overhead view of the intersection of Catalpa Street and Peach Avenue,
including the approximate positions of the officers and deputies, Hector Puga, and the Botten

_____

[311] POST LD 37 V-6 Chapter 5 Welfare and Institutions Code 5-5
[312] Interview John Botten Sr. COSB000737

residence, where three family members were injured by gunfire. Figure 18 depicts the approximate locations and directions of fire of the officers and deputies.



Figure 18
Area between red arrows indicates approximate directions of fire for CHP officers Kee & Rubalcava
Area between red arrows indicates approximate directions of fire for CHP Officer Blackwood
Area between green arrows indicates approximate directions of fire for SBSD Deputies Vaccari & Adams
Photo AG0677



Figure 17
Google map view. Large red X indicates the intersection of Peach Ave. and Catalpa St., and showing relationships of Mangerino, Goodson, and Botten homes.

John Sr. told investigators that from the front door of his home, he could see a CHP or Sheriff's deputy fire a paintball gun with hopper on top (PepperBall launcher) into the white SUV. John Sr. used his cellphone to record videos of the event. These videos include Christina Barrett exiting the front passenger side of the SUV and being detained by deputies, as well as officers and deputies giving verbal commands to the driver of the SUV (Puga) to exit the vehicle. Puga did not comply. The traffic stop went on for about 50 minutes, John Sr. did not watch continuously.

At approximately 0315 hours, John Sr. had gotten ready for work and looked out the front door. He saw Puga standing on the street next to the driver's door of the SUV. Puga said, "Don't shoot me." Sgt. Kee told Puga, "Just keep your hands up; we don't want to shoot you; just walk backward toward us." Puga complained about being shot in the eye with a PepperBall, and Sgt. Kee told Puga, "We can't get medical attention to you until we have you in handcuffs; we have an ambulance standing by, don't worry." Sergeant Kee told Puga he could not see Puga's waistband and asked if Puga had a weapon. Puga told Sergeant Kee that he did not have a weapon. Puga said, "I heard a click," and Puga moved to the front of the SUV and faced south toward the officers. Tanja and John Jr. watched from the front door, along with John Sr. [313]

John Sr. saw two CHP officers walk north on the dirt shoulder, west of the SUV. The CHP officers

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

pointed their guns toward Puga as they moved north. One CHP officer told Puga to keep his hands
up and asked Puga if he had a weapon Puga replied no I don't have any weapons. One CHP
officer continuously asked Puga to keep his hands up but Puga turned to his left and the two CHP
officers shot several rounds in rapid succession. John Sr. described the sound of the CHP officer's
firearms as one being louder than the other. John Sr. did not see if Puga had a weapon in his
hands or waistband. John Sr. saw a spark on his closed security door and realized gunfire hit their
front door and house. Tanja yelled that she had been shot. John Jr. and John Sr. had also been
shot. John Sr. yelled to the deputies outside, and paramedics arrived to provide medical aid to
the family. [314]

Tanja Botten told investigators that while watching the standoff, she gained the impression that
Puga wanted to force the officers to shoot him, did not appear to have any intention to peacefully
surrender, nor did he make any attempts to. Tanja believed the standoff would not be resolved
peacefully. Tanja thought Puga was not in his right mind because he would not cooperate with
the officer's commands. Tanja thought she and her family were safe behind the security screen
door. Tanja appeared to have been struck by bullet fragments or metal from the security door, in
her face, nose, right shoulder, neck, and upper chest. [315]

Annabelle Botten told investigators that she did not continually watch the incident; when she
looked out the kitchen window, she saw Puga standing outside of the Expedition, next to the
driver's door. Annabelle heard officers yelling at Puga to keep his hands up, because they could
not see Puga's waistband. Puga said, "I have nothing, just come over here." The officers asked
Puga to walk backward toward them, but Puga said he could not see and would not comply with
the commands. Annabelle heard Puga yell to the officers that he heard a "click noise." Puga then
ran to the front of the Expedition and faced the officers. Puga did not comply with officers'
commands and promised that he did not have a gun. However, Puga would not show the officers
his waistband as they requested. Annabelle saw two officers walk north along the driver's side of
the Expedition. Annabelle saw Puga lower his right hand toward the front of his waist, and raised
what she described as a black handgun. Annabelle saw Puga shoot at the CHP officers who stood
on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she
saw a muzzle flash from his handgun. Officers fired back and Annabelle's residence was hit by
gunfire. Puga ran north on Peach Avenue as the officers continued to shoot, and Puga fell to the
ground just north of the intersection. Annabelle described three ambulances responding to her
home to treat her father, mother, and brother. [316]

Investigators interviewed John Botten Jr. at the hospital shortly after he underwent surgery. John
Jr. told investigators he watched the standoff for about an hour from behind their security screen
door. He saw that Puga was not cooperative, did not comply with the officer's commands, and
refused to show his hands. John Jr. saw a female exit the SUV and walk to the officers, and John

_____

[314] Interview John Botten Sr. COSB000738 - 739
[315] Interview Tanja Botten COSB000744 - 745
[316] Interview Annabelle Botten  COSB000749 - 750

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

Jr. saw officers fire PepperBalls into the SUV and Puga coughing from the PepperBalls. John Jr. saw Puga exit the SUV and walked to the front bumper. Officers gave Puga commands to show his hands. Puga ran from the SUV in a northern direction, and officers fired their weapons at him. John Jr. was behind the security door, looked down, and saw his shirt was saturated in blood. John Jr. also saw his mother was bleeding profusely from her nose.[317]

CHP Officer Blackwood, and Sgt. Kee were both armed with Sig Sauer .223 caliber rifles, and Officer Rubalcava was armed with a Smith and Wesson .40 caliber pistol.[318]

Sgt. Vaccari did not fire any lethal munitions. Deputy Adams fired nine or ten 9mm rounds from his Glock pistol, in a northwesterly direction. These 9mm rounds would not have traveled north and east, toward the Botten family home. If, by chance, any bullets fired by Deputy Adams had traveled in the direction of the Botten home, it (they) would have been the unintended result of defensive gunfire directed at Hector Puga.

The Botten family home, at 17994 Catalpa Street in Hesperia, is located at the northeast corner of Peach Avenue and Catalpa Street. The residence is a single-story structure and sits lower than the street level of Peach Avenue. The southwest corner of the structure is approximately 3 to 4 feet below the adjacent street level of Peach Avenue. Figures 19 and 20 show the approximate locations and views of the officers and deputies (photos taken during daylight).



Figure 19
Adams & Vaccari approximate location and view. AG0974



Figure 20
Kee & Rubalcava approximate location and view. AG0926

During the incident of February 17, 2024, the area of the Botten home was poorly lighted, and the front was barely visible. A street light is located on a utility pole located on the southwest corner of the intersection of Peach Avenue and Catalpa Street. Dashcam video at the time of the shooting shows a light on in the front of the Botten home, but the area is very dark. Figures 21 and 22 show the approximate positions of the officers and deputies at the time of the initial shooting in relationship to the Botten home.

---

[317] Interview John Botten Jr. COSB000746 - 747
[318] COSB000045

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs



Figure 21    Overview photo showing approximate positions of Officers, Deputies and lines of fire. COSB000398
K- Sgt. Kee    R- Off. Rubalcava
V- Sgt. Vaccari    A- Deputy Adams    B – Off. Blackwood
S- Puga



Figure 22
Positions of Deputy Adams and Sgt. Vaccari, and Officer Blackwood at the time the first shots were fired. This video shows a porch light on and the dark front of the Botten home. @46:49

The following dashcam, cellphone, and surveillance camera videos support my opinion that Deputy Adams fired his 9mm pistol only in the direction of Hector Puga, and not in the direction of the Botten home:

    257. [816C] Kee MVARS p2 VTS_01_2.VOB @46:48-47:21,
    COSB001470 Confidential Material Subject to Protective Order.mov @00:51-00:54,
    283. PLTFS 00345.mov @00:15-00:44.

Tanja Botten told investigators:

> "the deputies who helped her were nice and what happened was not their fault, and they just did their job." [319]

According to the CHP Summary of the Incident, the bullets that struck the Botten residence and injured the Botten family members were fired by CHP Sgt. Kee and CHP Officer Rebalcava.

> *Investigator's Notes: The SBCSD criminal investigation revealed Sergeant Kee fired his .223 caliber rifle and Officer Rubalcava fired his .40 caliber pistol in a northeasterly direction toward Mr. Puga. Officer Blackwood fired his .223 caliber rifle at Mr. Puga in a northerly direction. SBCSD Officer Adams fired his 9mm pistol at Mr. Puga in a northwesterly direction. SBCSD detectives determined the rounds which struck Mr. Botten Jr. were .223 caliber. It was also determined .40 caliber rounds struck the residence located at 17994 Catalpa Street.* [320]

---

[319] COSB000730 - 001345 Confidential Material Subject to Protective Order.pdf COSB000745
[320] [4-44C] B. Summary of Incident Confidential.pdf page AG016

(Puga) L.C., I.H., A.L. and Antonia Salas Ubaldo et al. & Botten et al. v. State of California et al.
Report of Ken Hubbs

_____

It is anticipated that additional information is forthcoming for review. Should that information cause me to alter the opinions put forth above, or form additional opinions, I will document any changes or additions and provide them as soon as possible.

_____                    January 30, 2025
                Ken Hubbs                                      _____
                                                                        Date

78