# Exhibit F

```
 1                  UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                          --oOo--

 4  JONATHAN WAYNE BOTTEN, SR.;
    TANJA DUDEK-BOTTEN;
 5  ANNABELLE BOTTEN; and J.B., a
    minor by and through his guardian
 6  JONATHAN WAYNE BOTTEN,

 7          Plaintiffs,

 8  vs.                         Case No.  5:23-cv-00257-JGB-SHK

 9  STATE OF CALIFORNIA;
    COUNTY OF SAN BERNARDINO;
10  ISAIAH KEE; MICHAEL BLACWOOD;
    BERNARDO RUBALCAVA;
11  ROBERT VACCARI; JAKE ADAMS;
    and DOES 1-10 inclusive,
12
            Defendants.
13  _____/

14

15        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

16              DEPOSITION OF GREG MEYER

17            WEDNESDAY, FEBRUARY 12, 2025

18

19

20

21  Reported Stenographically by:

22  KIMBERLY D'URSO, CSR 11372, RPR

23  Job No.  00135667

24

25
```

```
 1                       APPEARANCES

 2

 3   FOR THE PLAINTIFFS:

 4           LAW OFFICES OF DALE K. GALIPO
             BY:  DALE K. GALIPO, ESQ.
 5                COOPER MAYNE, ESQ.
             21800 Burbank Boulevard, Suite 310
 6           Woodland Hills, California 91367
             818.347.3333
 7           dalekgalipo@yahoo.com
             cmayne@galipolaw.com
 8
     FOR THE DEFENDANTS:
 9
             LYNBERG & WATKINS
10           BY:  AMY R. MARGOLIES, ESQ.
             1100 W. Town & Country Road, Suite #1450
11           Orange, California 92868
             amargolies@lynberg.com
12           714.937.1010

13   FOR THE DEFENDANTS STATE OF CALIFORNIA, BY AND THROUGH
     THE CALIFORNIA HIGHWAY PATROL:
14

15           DEPUTY ATTORNEY GENERAL
             BY:  DIANE ESQUIVEL, ESQ.
16           1300 I Street, Suite 125
             P.O. Box 944255
17           Sacramento, CA 94244-2550
             diana.esquivel@doj.ca.gov
18           916.445.9555
                        --oOo--
19

20

21

22

23

24

25
```

1   A.   I do not.  There was some before and -- and
2   some after.  Some before he ran away and some while he
3   was running away, I guess I could say.
4   **Q.   How about after he went to the ground?  Do you**
5   **have an estimate as to how many shots were fired after**
6   **he went to the ground?**
7   A.   And I don't have an estimate as to the number.
8   I know that there was some shooting going on for a few
9   seconds after he went to the ground.
10  **Q.   You could hear that on the audio from the**
11  **videos?**
12  A.   Yeah.  You could hear it on the audio.  You
13  know, the -- the ultimate issue there is, you know,
14  you've got an armed suspect running away.  You can see
15  the gun in his hand in the video.  The officers are
16  shooting at him.  He finally goes down.
17       But as he's going down, the video shows that
18  it's -- it's so hazy, you know, cloudy in the picture,
19  you can't really see him hit the ground and what he is
20  doing.  Therefore, there's a reasonable fear in play
21  about whether he's still shooting -- or he's shooting at
22  them, if he's still got the gun in his hand, if he's
23  been subdued yet.
24       And you factually just don't know until it's
25  time to, you know -- the gunfire stops and it's time to

Page 36

1  move up there and you see.  And then we get into what
2  you and I both know is, you know, after the whole
3  physical and psychological or biomechanical process of
4  when your brain tells you that it's time to stop
5  shooting, in rapid fire, you're still going to get off a
6  few more shots, typically, before your finger gets the
7  message from your brain to stop shooting.
8         So the -- but the biggest thing to me in the
9  shooting after the ground that continued is, from the
10 video camera's angle that I saw, it's cloudy.  You
11 cannot see what he's doing on the ground.  And he may
12 still be -- he may be shooting at you or pointing the
13 gun back towards you.
14        You just don't know until you -- until you go
15 up there and find out.  That was a short sentence.  I
16 apologize.
17    Q.  At least you weren't speaking too fast.
18    A.  No.  I try to respect the rights of the court
19 reporter to have a good day.
20    Q.  I know that's very much appreciated.  I try to
21 do the same thing.
22        Would your opinions at all in this case change
23 if, hypothetically, the officers never saw a gun in
24 Mr. Puga's hand at any time?
25    A.  Yeah.  It's -- it's -- it's possible that they

 1         And basically -- and basically, we're talking
 2   about the fleeing felon shooting under Tennessee versus
 3   Garner, so I -- I totally disagree with him on that.
 4   This was a Garner shooting after the -- after he ran
 5   away.
 6         And on page 16, also continuing in opinion 3,
 7   near the top, he writes -- or at the top he writes:
 8   "Officers are trained that deadly force can only be used
 9   in an immediate defense of life situation and only as a
10   last resort."
11         That is not in California POST training.  What
12   they are trained is -- well, no.  That's not what I'm
13   trying to say.
14         Next, still in opinion 3 -- and I mentioned
15   this when Mr. Galipo was questioning me earlier and when
16   Ms. Esquivel was questioning me a little while ago -- let
17   me see where he finds it.
18         Oh, yeah.  The very next sentence after:  "The
19   last resort" sentence at the top.  He says:  "Officers
20   are trained they are responsible for every shot" --
21   that's true" -- "and to re-assess the threat or danger
22   before firing the next shot."
23         That's just false.  We've talked about three
24   assessment process a couple of times, especially in a
25   rapid-fire, breaking situation.

1    And also on page 16, in opinion 4, we talked

2 about this all.  That's -- the studies have shown that

3 when you decide that it's time to stop shoot in a

4 rapid-fire situation, very often you'll fire additional

5 shots before your -- your brain signal gets to your

6 finger and you actually physically stop shooting.

7           And, again, the issue for me is when I look at

8 the video that's entitled "Post fail" -- whatever it

9 is -- "Post fail" -- I can't remember the name of it

10 right now.  The video plaintiff provided -- the

11 plaintiff's video expert, I guess, provided called "Post

12 fail" -- some name.

13          You can't even see Mr. Puga after, you know,

14 he's starting to fall.  And so it's a very smoky, cloudy

15 environment.

16          And opinion 5 -- still on page 16, on opinion

17 5, Mr. Clark wrote:  "It is my opinion that the officers

18 had time to provide Mr. Puga with a warning that deadly

19 force was going to be used prior to the shooting."

20          Well, I think -- I think not just the

21 officers's statements and witness' statements, but the

22 videos themselves, clearly depict that there was no time

23 for such a warning.  It happened right now, split second.

24          And, in fact, before that, the officers had

25 spent considerable time telling Mr. Puga during the

Page 81

1    A.    I couldn't hear the name.

2    Q.    Mr Kimmins.  I believe it's Kimmins, the
3    videographer --

4          (Simultaneous speakers.)

5    A.    Oh, oh.

6    Q.    -- who prepared the --
7          In terms of the compilation video, do you have
8    any dispute with what Mr. Kimmins did with the videos,
9    putting them side by side?

10         MR. GALIPO:  I'm going to object, only because
11   it's beyond his expertise, and he didn't issue any
12   rebuttal reports in this case, even to Mr. Clark, and
13   certainly, didn't issue any rebuttal reports to the
14   videographer.

15         MS. ESQUIVEL:  And just for the record,
16   rebuttal reports are due tomorrow.

17         MR. GALIPO:  Okay.  Maybe he's got one coming.
18   I don't know.  I'll ask him.

19         THE WITNESS:  So -- my only significant note
20   about my review of the report of plaintiff's expert
21   Kimmins is in the video labeled "Post fall bullet count
22   video R1."

23         As I've mentioned before, you can't see
24   Mr. Puga as he falls.  As he starts to fall -- you can
25   see he starts to fall, and then he kind of disappears on

Page 82

1  that video because of whatever smokey haze was there.
2         And the other thing -- oh, yeah.  And in the
3  Puga -- I'm sorry -- the video from Mr. Kimmins that's
4  labeled "Puga compilation video R6," I was very concerned
5  about the reliability of -- somebody is -- at the bottom
6  of the video, there's -- there's, like, narrative labels
7  that somebody made, purporting to describe what's going
8  on, and some of those didn't seem to be particularly
9  accurate or valid.
10        I'm not sure where they came from or who put
11 them on or where that narrative came from, but I was kind
12 bothered by that.  The videos speak for themselves.  I
13 don't know why they would need a narrative like that,
14 especially if there's some inaccuracies in it.
15        So that's all I have on the Kimmins' report and
16 videos.
17        MS. ESQUIVEL:  Okay.  I believe that's all the
18 questions I have.  Thank you very much, Mr. Meyer.
19        THE WITNESS:  Thank you.
20        MR. GALIPO:  Okay, Kimberly.  I think Diana
21 went about a half hour or a little bit shorter.  I have
22 ten minutes.  Are you able to do it now, or would you
23 like a short break?
24        THE CERTIFIED STENOGRAPHER:  Yes, I'm okay for
25 now.  Thank you for asking.

**JONATHAN WAYNE BOTTEN, ET AL. vs STATE OF CALIFORNIA, ET AL.**
**Greg Meyer on 02/12/2025**

Page 98

```
 1  STATE OF CALIFORNIA)
                       ) ss:
 2  COUNTY OF ALAMEDA  )

 3
               I, KIMBERLY E. D'URSO, do hereby certify:
 4

 5             That the witness named in the foregoing

 6  deposition was present remotely and duly sworn to testify

 7  to the truth in the within-entitled action on the day and

 8  date and at the time and place therein specified;

 9             That the testimony of said witness was reported

10  by me in shorthand and was thereafter transcribed through

11  computer-aided transcription;

12             That the foregoing constitutes a full, true and

13  correct transcript of said deposition and of the

14  proceedings which took place;

15             Further, that if the foregoing pertains to the

16  original transcript of a deposition in a federal case,

17  before completion of the proceedings, review of the

18  transcript [x] was [ ] was not requested.

19             That I am a certified stenographic reporter and

20  a disinterested person to the said action;

21             IN WITNESS WHEREOF, I have hereunder subscribed

22  my hand this 25th day of February, 2025.

23  _____

24  KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```