# EXHIBIT K

Case 5:22-cv-00949-KK-SHK     Document 147-12     Filed 04/24/25     Page 2 of 15     Page
ID #:3550
Case 2:20-mj-06231-DUTY     Document 1     Filed 12/24/20     Page 1 of 14     Page ID #:1

AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)  ☐ Original  ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California



LODGED
CLERK, U.S. DISTRICT COURT
12/24/2020
CENTRAL DISTRICT OF CALIFORNIA
BY: ___ cc ___ DEPUTY

United States of America

v.

HECTOR JAVIER PUGA,

Defendant.

Case No.

2:20-mj-06231

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of December 5, 2020 in the county of Los Angeles in the Central District of California, the defendant(s) violated:

*Code Section*

18 U.S.C. § 922(g)(1)

*Offense Description*

Felon in Possession of Ammunition

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Dylan Lobascio, FBI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: December 24, 2020

*Judge's signature*

City and state: Los Angeles, California

Hon. Karen L. Stevenson, U.S. Magistrate Judge
*Printed name and title*

COSB009484

## AFFIDAVIT

I, Dylan Lobascio, being duly sworn, declare and state as follows:

### I. PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint and arrest warrant against Hector Javier PUGA, also known as "Silent," for a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition.

2. This affidavit is also made in support of an application for a warrant to search one digital device (the "SUBJECT DEVICE"), in the custody of the Long Beach Police Department ("LBPD"), in Long Beach, California, as described more fully in Attachment A.

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of Title 18, United States Code, Section 922(g) (Felon in Possession of a Firearm or Ammunition) (the "Subject Offense"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint, arrest warrant, and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

Case 5:22-cv-00949-KK-SHK   Document 147-12   Filed 04/24/25   Page 4 of 15   Page
ID #:3552
Case 2:20-mj-06231-DUTY   Document 1   Filed 12/24/20   Page 3 of 14   Page ID #:3

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5. I am a police officer employed by the City of Long Beach in the State of California, and a Task Force Officer ("TFO") for the Federal Bureau of Investigation. I have been a police officer since December of 2003, and am currently assigned to the Long Beach Police Gang and Violent Crime Division and the FBI's South Los Angeles Violent Crime Task Force. I have worked as a Gang Enforcement Detective and a Narcotics Detective for approximately 11 years.

6. As a Gang Detective, I investigated numerous violent crimes, including stabbings, shootings, murders and assaults. I have participated in the investigation of numerous gang related incidents and have interviewed numerous admitted gang members about gang culture and its activities. During my time as a police officer, I have developed experience in the daily operations of criminal activities through personal observations and interactions with career criminals, gang members, parolees, probationers, and narcotic offenders.

## III. SUMMARY OF PROBABLE CAUSE

7. On December 5, 2020, uniformed officers with the LBPD saw a grey BMW with no license plates and tinted windows, driving erratically. The officers conducted an investigative traffic stop and contacted the driver--later identified as PUGA, a documented East Side Longo gang member--and a female passenger. The female passenger, who appeared nervous, told the

COSB009486

officers that there was a gun in the car. The officers detained PUGA, and in a search of the car, found in the back seat area an AR-15 assault rifle and a magazine for the weapon loaded with multiple live rounds of ammunition. During a search of PUGA, an officer found in PUGA's right front pocket one round of ammunition of the same manufacturer and caliber as the ammunition recovered from the car. In a Mirandized interview, PUGA admitted to possessing the firearm and the magazine.

8. PUGA is a convicted felon, with prior felony convictions for: (1) domestic violence in violation of California Penal Code § 273.5; (2) obstructing a police officer, in violation of California Penal Code § 69; and (3) vandalism, in violation of California Penal Code § 594(A). At the time of this arrest, PUGA was on parole from his felony conviction for obstructing a police officer, which was based on an incident in 2015--captured by television news cameras--in which PUGA, facing arrest for domestic violence, led police officers on a car chase, and at the end of the pursuit, stopped his car, got out, and fired shots toward officers using some type of handheld gun. Officers returned fire, and PUGA was shot and eventually arrested.

### IV. STATEMENT OF PROBABLE CAUSE

9. Based on my review of law enforcement reports, conversations with other law enforcement agents, my review of body camera footage, and my own knowledge of the investigation, I am aware of the following:

10. On December 5, 2020, LBPD Officers D. Reyes #6268 and J. Salazar #6179 were assigned to conduct uniformed patrol in the central part of the City of Long Beach, in response to an increase in gang-related violent crime in the area.

11. At around 6:11 p.m., the officers were driving eastbound on 4th Street, near Atlantic Avenue, when their attention was drawn to a grey BMW sedan traveling southbound on Atlantic Avenue. The officers saw the BMW make a wide right turn off Atlantic Avenue onto the westbound lane of 4th Street. The BMW took the turn too fast, causing the car to veer into the eastbound lane of traffic as it turned. The officers noted that the BMW had tinted windows, in violation of California Vehicle Code § 26708, and had paper dealer plates instead of license plates, in violation of California Vehicle Code § 5200.

12. The officers made a U-turn to follow the BMW. As officers completed the U-turn, the BMW turned right onto Linden Avenue. Officers followed the BMW onto Linden Avenue, where they found it stopped in the northbound lane of traffic. Officers pulled up behind the BMW and activated the patrol car's light and siren to conduct a traffic stop. The driver of the BMW, later identified as PUGA, exited the BMW, leaving the driver's side door open and the engine running.

13. Officer Reyes detained PUGA at the front of the patrol car, where PUGA was then questioned by Officer Salazar. PUGA informed Officer Salazar that he was on parole.

14. While Officer Salazar spoke with PUGA, Officer Reyes approached the BMW where he saw a female in the front passenger

seat, later identified as Claudia Gonzalez. Gonzalez told Officer Reyes that the BMW was registered to her ex-husband. When asked where she and PUGA were going, Gonzalez said they were on the way to a downtown clothing store called Jean Machine, which Officer Reyes knew was not located in the direction they were heading. During the exchange with Officer Reyes, Gonzalez was looking at her hands and avoiding eye contact, causing Officer Reyes to conclude that she was nervous and that there was something in the vehicle that was of concern to her. When Officer Reyes asked Gonzalez what was bothering her, Gonzalez pointed to the back seat. Officer Reyes asked if there was a gun in the car, and Gonzalez nodded yes.

15. At that point, Officer Reyes ordered Gonzalez out of the car and away from the weapon. Officer Reyes told Officer Salazar about the gun and placed PUGA in handcuffs. Officer Salazar placed PUGA in the back of the patrol car, and ran a records search that confirmed that PUGA was on parole for his 2015 conviction for obstructing an officer, and also revealed that PUGA had been driving with a suspended license, in violation of California Vehicle Code § 12500.

16. Officer Reyes returned to the BMW, where he looked inside to find an AR-15 assault rifle with no serial number (commonly referred to as a "ghost gun") lying on the back seat. In a further search of the vehicle, officers found a forty-five-round magazine for the AR-15 on the back portion of the center console, with multiple rounds of Frontier 5.56x45 caliber

COSB009489

ammunition loaded inside, as well as one round of FC .223 caliber ammunition.

17. While seated in the patrol car, PUGA told Officer Salazar that he had a "bullet" in his pocket that he found. Officer Salazar reached into PUGA's pocket and retrieved a single live round of Frontier 5.56x45 caliber ammunition, matching the manufacturer and caliber size of the Frontier ammunition found in the magazine in the car.

18. The SUBJECT DEVICE was found during the search of the car. PUGA confirmed to Officer Salazar that the SUBJECT DEVICE belonged to him.

19. PUGA was transported to Long Beach Jail. After being read his Miranda rights and affirming he understood them, PUGA stated in sum and substance, that he has owned the AR-15 for about five years; that a friend had kept it for him while he was in jail; that PUGA had picked the weapon up earlier that day from the friend's house; and that PUGA had planned to take the weapon home after he and Gonzalez went out. PUGA denied that the AR-15 was loaded, acknowledging that the magazine was in the car, but saying that the magazine was never on the AR-15.

### A. PUGA's Criminal History

20. On December 14, 2020, I reviewed certified conviction documents for PUGA and learned that PUGA has previously been convicted of the following felony crimes punishable by a term of imprisonment exceeding one year:

    a. On or about March 23, 2015, a violation of (1) California Penal Code § 69, Obstruct/Resist Executive Officer;

COSB009490

and (2) California Penal Code § 273.5, Domestic Violence, both in the Superior Court for the State of California, County of Los Angeles, Case Number BA434828;

    b.    On or about February 14, 2014, a violation of California Penal Code § 594(a), Vandalism, in the Superior Court for the State of California, County of Los Angeles, Case Number BA474545.

**B. Interstate Nexus**

21.  On December 23, 2020, FBI Interstate Nexus Expert Special Agent Trevor Twitchell examined photographs of the Frontier ammunition recovered from the magazine and PUGA's pocket, as well as the single round of FC ammunition recovered from the magazine, and determined that each type of ammunition was manufactured outside of the State of California. Because the ammunition was found in California, there is probable cause that it has traveled in and affected interstate commerce.

**V. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES**

22.  From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

    a.    Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms

illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

  b. Many people also keep mementos of their firearms, including digital photographs or recordings of themselves possessing or using firearms on their digital devices. These photographs and recordings are often shared via social media, text messages, and over text messaging applications.

  c. Those who illegally possess firearms often sell their firearms and purchase firearms. Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices. This includes sending photos of the firearm between the seller and the buyer, as well as negotiation of price. In my experience, individuals who engage in street sales of firearms frequently use phone calls, e-mail, and text messages to communicate with each other regarding firearms that the sell or offer for sale. In addition, it is common for individuals engaging in the unlawful sale of firearms to have photographs of firearms they or other individuals working with them possess on their cellular phones and other digital devices as they frequently send these photos to each other to boast of their firearms possession and/or to facilitate sales or transfers of firearms.

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

23. As used herein, the term "digital device" includes the SUBJECT DEVICE.

24. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

 25. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

COSB009494

Case 5:22-cv-00949-KK-SHK   Document 147-12   Filed 04/24/25   Page 13 of 15   Page
ID #:3561
Case 2:20-mj-06231-DUTY   Document 1   Filed 12/24/20   Page 12 of 14   Page ID #:12

may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.  Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

26.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.  Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.  In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress PUGA's thumb- and/or fingers on the device; and (2) hold the device in front of PUGA's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

27. In addition to what has been described herein, the United States has attempted to obtain this data by seeking a state search warrant for the SUBJECT DEVICE. On December 11, 2020, the warrant was signed by the Honorable Laura Laesecke, Superior Court Judge. The information received from an initial review of the SUBJECT DEVICE pursuant to execution of the warrant included a photograph dated November 20, 2020, which, based on my initial review, appears to be a photograph of the AR-15 and magazine found in PUGA's possession on December 5, 2020.

## VII. CONCLUSION

27. For all of the reasons described above, there is probable cause to believe that PUGA committed a violation of 18 U.S.C. § 922(g)(1): Felon in Possession of Ammunition. There is also probable cause that the items to be seized described in

COSB009496

Attachment B will be found in a search of the SUBJECT DEVICE described in Attachment A

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 24th day of December, 2020.

*[signature]*

HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE