# Exhibit 4

# Roger Clark
Police Procedures Consultant, Inc.
10207 Molino Road.  Santee, CA 92071
Phone: (208) 351-2458,  Fax: (619) 258-0045
rclark9314@aol.com

January 30, 2025

Mr. Dale K. Galipo, Esq,
Ms. Hang D. Le, Esq.
Law Offices of Dale K. Galipo
21800 Burbank Boulevard, Suite 310
Woodland Hills, CA 91367

***Regarding:***   ***L.C., et al. v. State of California, et al., case no. 5:22-cv-00949-KK-SHK***
***Botten, et al. v. State of California, et al., case no.5:23-cv-00257-KK-SHK***

Dear Mr. Galipo and Ms. Le:

Thank you for retaining me to analyze and render opinions regarding the February 17, 2021 officer-involved use of force and shooting of Hector Puga ("Mr. Puga") by California Highway Patrol ("CHP") Sergeant Isaia Kee ("Sergeant Kee"), Officer Michael Blackwood ("Officer Blackwood"), Officer Bernardo Rubalcava ("Officer Rubalcava"), and San Bernardino County Sheriff's Department ("SBSD") Deputy Jake Adams ("Deputy Adams") and Sergeant Robert Vaccari ("Sergeant Vaccari"). Pursuant to the requirements of Rule 26, I have studied the police reports, SBSD policies, CHP policies, transcripts, and other materials (as listed below) provided to me thus far regarding this case.  Please be advised that if/when any additional information is submitted, a supplemental report may be necessary.

## Materials Provided and Reviewed Thus Far:

1. Plaintiffs L.C., I.H., A.L., and Antonia Salas Ubaldo's Third Amended Complaint for Damages

2. Plaintiffs Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, Annabelle Botten, and J.B.'s First Amended Complaint

3. San Bernardino County Sheriff's Department Lethal Force Encounter Report

giving a verbal warning prior to deploying the Taser. At the time of the initial Taser deployment, it was clear that Mr. Puga had been struck and fallen by gunfire, was clearly incapacitated, and was no longer an immediate threat to anyone. Additionally, according to percipient witness Erin Mangerino, Mr. Puga's hands were not concealed but visibly next to his body. Officers are also trained on the concept of "cuffing under power" in which an officer can safely go in and handcuff a suspect while the suspect is under effects of the neuromuscular incapacitation of the Taser. Thus, it is my opinion that the second Taser deployment violated standard police practices and training because it was clear from the first Taser deployment that Mr. Puga was incapacitated when his muscles responded to the Taser deployment but he did not respond, no verbal warning was given prior to the second Taser deployment, and Sergeant Vaccari admits that the second deployment would have been unnecessary had he considered at the time to go in and handcuff Mr. Puga while he was under the power of the Taser during the first Taser deployment.

8.     It is my opinion that a reasonably trained officer facing the same facts and circumstances as the involved shooting officers would understand that the officers' intentional shooting in the direction of the Bottens' residence would cause a reasonable person in the Botten's position to believe that they were not free to leave their property while the officers were apprehending Mr. Puga in front of the Botten home and that the officers intended to restrain their freedom of movement while attempting to apprehend Mr. Puga. Officers are trained that a detention is an assertion of authority by a peace officer that would cause a reasonable person to believe they are not free to leave. Such a belief may result from physical restraint, unequivocal verbal commands, or other conduct by an officer. A reasonable officer facing the facts and circumstances confronting the involved officers knew or should have known that there were innocent bystanders inside the residential homes surrounding the incident location in the middle of the night. Additionally, reasonably trained officer facing the same facts and circumstances as the involved officers would understand that the officers' ongoing flashing lights, commands, and deployments of force, would cause a reasonable person residing in the nearby residences to believe that they were not free to leave their residence.

9.     Officer Rubalcava, Officer Blackwood, Sergeant Kee, and Deputy Adams violated standard police practices and training when they failed to consider their background prior to utilizing deadly force, resulting in the serious injuries of innocent bystanders Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B. Police officers are trained to consider their background prior to utilizing deadly force. The Los Angeles Police Department utilizes an acronym for required considerations before using a firearm: B.A.L.K.S.: Background (who and what is behind your target), Age of suspect (adult vs. juvenile, elderly, etc.), Last resort

(all other options have been depleted or would not be practical, Knowledge of the crime (how certain you are about the crime and the suspect's connection to the crime), and Seriousness of the crime (felony vs. misdemeanor). Here, the officers knew or should have known that they were stopped in a residential neighborhood with houses on four corners of the intersection. They failed to consider their background when they fired several volleys of shots at Mr. Puga. This tactical failure resulted in the serious injuries of Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, and J.B., who were inside their home at the time of the shooting.

10.  The officers violated standard police practices and training in failing to request backup to set up a perimeter and evacuate uninvolved individuals from the area in order the ensure the safety of these uninvolved individuals. It is my opinion that the officers' failure to follow standard practices and training in responding to high-risk situations involving barricaded suspects by requesting backup, setting up a perimeter, and evacuating all uninvolved individuals from the area contributed to the injuries suffered by the Botten family. In addition to requesting specialized units and establishing a perimeter to address barricaded subject(s), POST Learning Domain 23 advises officers that the safety of uninvolved individuals must be the principal concern to officers who respond to high-risk situations involving barricaded suspects. Thus, POST Learning Domain 23 advises officers to systematically evacuate all uninvolved individuals from the area, relocate them to a safe location, determine the identification of each, and debrief those individuals who could provide additional information relevant to the situation. Here, although the officers were dealing with Mr. Puga for over an hour in the residential neighborhood, they failed to take steps to ensure the safety of the residents of that neighborhood. The officers failed to request additional backup to set up a perimeter and systematically evacuate the residents in the surrounding houses despite dealing with a potentially armed, barricaded subject who they believed to have been involved in an earlier freeway shooting. A reasonably trained officer facing the same circumstances would have requested backup and additional resources in order to deal with a potentially armed, barricaded subject in order to ensure the safety of all uninvolved individuals in the area.

### **The Basic Rules Regarding the Use of Deadly Force:**

Peace officers and Deputies are trained that by accepting their badges and guns they must act at all times in consideration of the extreme value our society places on all human life.  Firing a firearm at a human being is different from all other police uses of force.  While there are other police tactics and tools that can qualify as deadly force, none carry the same high probability of death as the use of the officer's firearm.  Accordingly, Officers are trained that they can only use firearms under the most extreme circumstances.  These situations are very rare. In fact, studies indicate that only a very few police officers in the United States ever fire their weapons in the field during their