SHANNON L. GUSTAFSON (SBN 228856)
sgustafson@lynberg.com
AMY R. MARGOLIES (SBN 283471)
amargolies@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 W. Town & Country Road, Suite #1450
Orange, California 92868
(714) 937-1010 Telephone
(714) 937-1003 Facsimile

Attorneys for Defendant, COUNTY OF SAN BERNARDINO,
ROBERT VACCARI, and JAKE ADAMS

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.C., a minor by and through her guardian *ad litem* Maria Cadena, individually and as successor-in-interest to Hector Puga; I.H., a minor by and through his guardian *ad litem* Jasmine Hernandez, individually and as successor-in-interest to Hector Puga; A.L., a minor by and through her guardian *ad litem* Lydia Lopez, individually and as successor-in-interest to Hector Puga; and ANTONIA SALAS UBALDO, individually, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE OF CALIFORNIA; COUNTY OF SAN BERNARDINO; S.S.C., a nominal defendant; ISAIAH KEE; MICHAEL BLACKWOOD; BERNARDO RUBALCAVA; ROBERT VACCARI; JAKE ADAMS; and DOES 6-10, inclusive, <br><br> Defendants. | CASE NO. 5:22-cv-00949-KK-(SHKx) <br><br> *Assigned for All Purposes to:* <br> *Hon. Kenly K. Kato – Courtroom 3* <br><br> **COUNTY DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW** <br><br> Date: May 15, 2025 <br> Time: 10:30 a.m. <br> Dept.: 3 <br><br> *Trial Date: June 2, 2025* <br><br> *Complaint filed: 06/07/2022* <br> *FAC filed: 10/18/22* <br> *SAC filed: 01/13/23* <br> *TAC filed: 05/12/23* |

# **TABLE OF CONTENTS**

I.      CLAIMS AND DEFENSES (L.R. 16-4.1) ........................................................9

II.     BIFURCATION OF ISSUES (L.R. 16-4.3) ...............................................41

III.    JURY TRIAL (L.R. 16-4.4) ......................................................................43

IV.     ATTORNEYS' FEES (L.R. 16-4.5) ...........................................................43

V.      ABANDONMENT OF ISSUES (L.R. 16-4.6)............................................43

# TABLE OF AUTHORITIES

Page(s)

Cases

999 v. C.I.T. Corp.,
   776 F.2d 866 (9th Cir. 1985) ................................................................42

A. K. H ex rel. Landeros v. City of Tustin,
   837 F.3d 1005 (9th Cir. 2016) .............................................................11

A.K.H. by and through Landeros v. City of Tustin,
   2014 WL 12672480 (C.D. Cal. 2014) .................................................19

Andrews v. City of Henderson,
   35 F.4th 710 (9th Cir. 2022) ...............................................................11

Ashcroft v. al-Kidd,
   563 U.S. 731 (2011) .............................................................................29

Ault v. Speicher,
   634 F.3d 942 (7th Cir. 2011) ...............................................................28

Baldridge v. City of Santa Rosa,
   1999 WL 66141 (N.D. Cal. 1999) .......................................................12

Barnes v. City of Pasadena,
   508 Fed.Appx. 663 (9th Cir. 2013) .....................................................11

Brown v. Ransweiler,
   171 Cal.App.4th 516 (2009) ................................................................25

City of Tahlequah, Oklahoma v. Bond,
   142 S.Ct. 9 (2021) ...............................................................................30

Cornell v. City and County of San Francisco,
   17 Cal.App.4th 766 (2017) ..................................................................27

County of Sacramento v. Lewis,
   523 U.S. 833 (1998) .............................................................................19

Cruz v. City of Anaheim,
   765 F.3d 1076 (9th Cir. 2014) .............................................................12

District of Columbia v. Wesby,
  138 S.Ct. 577 (2018)................................................................29

Donaldson v. United States,
  2018 WL 1089986 (S.D. Cal. 2018)..........................................25

Earley v. Pacific Elec. Ry. Co.,
  176 Cal. 79 (1917) ....................................................................22

Estate of Moppin-Buckskin v. City of Oakland,
  2010 WL 147976 (N.D. Cal. 2010).............................................13

Estate of Nunez by and through Nunez v. County of San Diego,
  2019 WL 2238655 (S.D. Cal. 2019).............................................42

Fewell v. California,
  2017 WL 6043080 (C.D. Cal. 2017) ..........................................19

Foster v. City of Fresno,
  392 F.Supp.2d 1140 (E.D. Cal. 2005) .......................................13

Geddes v. United Financial Group,
  559 F.2d 557 (9th Cir. 1977) .....................................................42

George v. Morris,
  736 F.3d 829 (9th Cir. 2013) .....................................................12

Gonzalez v. City of Anaheim,
  747 F.3d 789 (9th Cir. 2014) ..............................................11, 19

Graham v. Connor,
  490 U.S. 386 (1989)........................................................9, 11, 12

Hamby v. Hammond,
  821 F.3d 1085 (9th Cir. 2016) ........................................28, 29, 30

Hangarter v. Provident Life and Acc. Ins. Co.,
  373 F.3d 998 (9th Cir. 2004) .....................................................41

Hayes v. County of San Diego,
  57 Cal. 4th 622 (2013)...........................................................25, 26

Hayes v. v. Co. of San Diego,
  736 F.3d 1223 (9th Cir. 2013) ...................................................20

**4**

**COUNTY DEFENDANTS' MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

Hernandez v. City of Pomona,
    46 Cal. 4th. 501 (2009) ........................................................................22

Hyde v. City of Willcox,
    23 F.4th 863 (9th Cir. 2022) ................................................................12

Johnson v. Breeden,
    280 F.3d 1308 (11th Cir. 2002) ...........................................................40

Justus v. Atchison, l,
    9 Cal.3d 564 (1977) .............................................................................22

Kisela v. Hughes,
    138 S.Ct. 1148 (2018)..........................................................................29

Lampkins v. Thompson,
    337 F.3d 1009 (8th Cir. 2003) .............................................................40

Marvin Johnson, P.C. v. Shoen,
    888 F.Supp. 1009 (D. Ariz. 1995) .......................................................42

Moore v. City of Berkley,
    2016 WL 6024530 (N.D. Cal. 2016) ..............................................23, 25

Moreland v. Las Vegas Metro. Police Dep't.,
    159 F.3d 365 (9th Cir. 1998) ...............................................................19

Mullenix v. Luna,
    136 S. Ct. 305 (2015)...........................................................................29

Ortiz v. Jordan,
    562 U.S. 180 (2011) .............................................................................28

Peck v. Montoya,
    51 F.4th 877 (9th Cir. 2022) ................................................................19

Porter,
    546 F.3dat 1139 ...................................................................................20

Reese v. Cty. of Sacramento,
    888 F.3d 1030 (9th Cir. 2018) .............................................................27

Reynolds v. County of San Diego,
    858 F.Supp. 1064 (S.D. Cal. 1994) .....................................................12

**5**
**COUNTY DEFENDANTS' MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

Rivas-Villegas v. Cortesluna,
    142 S.Ct. 4 (2021)........................................................................30

S.B. v. County. of San Diego,
    864 F.3d 1010 (9th Cir. 2017) ...............................................12, 29

Sandoval v. Cty. of Sonoma,
    912 F.3d 509 (9th Cir. 2018) ......................................................27

Saucier v. Katz,
    533 U.S. 194 (2001).....................................................................29

Scott v. Harris,
    550 U.S. 372 (2007)......................................................................11

Shafer v. County of Santa Barbara,
    868 F.3d 1110 (9th Cir. 2017) ...............................................12, 28

Sharp v. County of Orange,
    871 F.3d 901 (9th Cir. 2017) ......................................................29

Smith v. City of Hemet,
    394 F.3d 689 (9th Cir. 2005) ......................................................12

Smith v. Lightening Bolt Production, Inc.,
    861 F.2d 363 (2nd Cir. 1988) .....................................................42

Sorgen v. City & County of San Francisco,
    2006 WL 2583683 (N.D. Cal. 2006) ......................................23, 25

Stephenson v. Doe,
    332 F.3d 68 (2d Cir. 2003) .........................................................40

Tatum v. City & Cty. of San Francisco,
    441 F.3d 1090 (9th Cir. 2006) ......................................................9

Tennessee v. Garner,
    471 U.S. 1 (1985)..........................................................................11

Terry v. Ohio,
    392 U.S. 1 (1968).........................................................................13

Torres v. City of Los Angeles,
    548 F.3d 1197 fn. 9 (9th Cir. 2008).............................................28

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

United States v. Reese,
  2 F.3d 870 (9th Cir. 1993) ....................................................................27

Watkins v. City of San Jose,
  2017 WL 1739159 (N.D. Cal., 2017) ...............................................25

White v. Pauly,
  137 S.Ct. 548 (2017)........................................................................28, 29

Wilkinson v. Torres,
  610 F.3d 546 (9th Cir. 2010) ........................................................11, 13

Statutes

42 U.S.C. § 1983................................................................................passim

42 U.S.C. § 1988...........................................................................................43

Cal. Civil Code § 52.1 ...........................................................................26, 27

California Government Code § 815.2(a) ....................................................24

California Government Code § 820.2.........................................................34

California Government Code § 820.4.........................................................35

California Penal Code §§ 835 ...................................................................36

Code of Civil Procedure § 377.32 ..............................................................22

Code of Civil Procedure §§ 377.22, 377.60 ..............................................22

Rules

Federal Rule of Civil Procedure 42(b) ...............................................41, 43

Regulations

TAC ¶¶ 48, 107(d), 117, 118, and 119 ........................................................9

---

**7**

**COUNTY DEFENDANTS' MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

Other Authorities

BIFURCATION OF ISSUES,
L.R. 16- ...................................................................................................41

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

## I.    CLAIMS AND DEFENSES (L.R. 16-4.1)[1]

    **(a)    Claim 1: Fourth Amendment – Excessive Force (42 U.S.C. § 1983)**

    Plaintiffs L.C., I.H., and A.L., as successors-in-interest to Decedent Hector Puga, County Defendants Sgt. Robert Vaccari and Deputy Jake Adams used excessive force when they shot Decedent.

    **(b)    Elements Required for Claim 1 – Fourth Amendment – Excessive Force (42 U.S.C. § 1983)**

    Elements for an "Excessive Force" claim against County Defendants are:

        1.    Defendants Vaccari and Adams acted under color of state law;

        2.    Defendants Vaccari and Adams intentionally used force against Decedent;

        3.    The use of force was objectively unreasonable under all of the circumstances;

        4.    The use of force caused Decedent harm; and

        5.    Plaintiffs L.C., I.H., and A.L., are Decedent's successors-in-interest.

    See, Ninth Circuit Model Civil Jury Instructions Nos. 9.3, 9.25; see also, Graham v. Connor, 490 U.S. 386, 395 (1989); Tatum v. City & Cty. of San Francisco, 441 F.3d 1090, 1100 n.2 (9th Cir. 2006) ("[T]he decedent's 'successor in interest' may prosecute [a section 1983] survival action if the person…satisfies the requirements of California law.").

---

[1] Plaintiffs stipulated to dismiss their First Claim for Fourth Amendment – Detention and Arrest against County Defendants, Third Claim for Fourth Amendment – Denial of Medical Care against County Defendants, and Fourth Claim – Substantive Due Process as to Vaccari only, and to strike allegations concerning medical care in other claims in the TAC ¶¶ 48, 107(d), 117, 118, and 119.  (Dkt. 101).  Therefore, this Memorandum only addresses the claims still at issue and not yet ruled on as County Defendants' Motion for Summary Judgment is still under submission.

In determining whether either Defendant used excessive force in this case, the jury is to consider all of the circumstances known to the Defendants on the scene, including:

    1.    the nature of the crime or other circumstances known to the Defendants at the time force was applied;

    2.    whether Decedent posed an immediate threat to the safety of the Defendants or to others;

    3.    whether Decedent was actively resisting arrest or attempting to evade arrest by flight;

    4.    the amount of time the Defendants had to determine the type and amount of force that reasonably appeared necessary, and any changing circumstances during that period;

    5.    the relationship between the need for the use of force and the amount of force used;

    6.    the extent of Decedent's injury;

    7.    any effort made by Defendants to temper or to limit the amount of force;

    8.    the number of lives at risk and the parties' relative culpability; i.e., which party created the dangerous situation, and which party is more innocent;

    9.    whether it was practical for Defendants (or one of them) to give warning of the imminent use of force, and whether such warning was given;

    10.    whether the Defendants were responding to a domestic violence disturbance;

    11.    whether there was probable cause for a reasonable officer to believe that the suspect had committed a crime involving the infliction or threatened infliction of serious physical harm.

Claims of excessive force, deadly or not, are analyzed under the objective

reasonableness standard of the Fourth Amendment as applied in <u>Scott v. Harris</u>, 550

U.S. 372 (2007), <u>Graham v. Connor</u>, 490 U.S. 386  (1989), and <u>Tennessee v.</u>

<u>Garner</u>, 471 U.S. 1 (1985).  The Ninth Circuit has stated that "the Fourth

Amendment does not require omniscience, and absolute certainty of harm need not

precede an act of self-protection."  <u>See</u>, <u>Wilkinson v. Torres</u>, 610 F.3d 546, 553 (9th

Cir. 2010) (internal quotation omitted).  Accordingly, peace officers may reasonably

use deadly force whenever they have "probable cause to believe that [a] suspect

poses a threat of serious physical harm, either to the officer or to others."  <u>Garner</u>,

<u>supra</u>, 471 U.S. at 11.  It is the potential for injury which justifies the use of deadly

force.  <u>See</u>, <u>Wilkinson</u>, <u>supra</u>, 610 F.3d at 553; <u>see</u>, <u>A. K. H ex rel. Landeros v. City</u>

<u>of Tustin</u>, 837 F.3d 1005, 1011 (9th Cir. 2016) (the "relevant question for the

purposes of qualified immunity is whether [the officers] could reasonably have

believed that [the suspect] posed" a significant threat of death or serious physical

injury to the officers or others); <u>Gonzalez v. City of Anaheim</u>, 747 F.3d 789, 794

(9th Cir. 2014) ("The key issue...is whether a reasonable jury would necessarily find

that [an officer] perceived an immediate threat of death or serious physical injury at

the time" the officer used deadly force); <u>Barnes v. City of Pasadena</u>, 508 Fed.Appx.

663, 665 (9th Cir. 2013) ("Even if an issue of fact existed about the presence of a

gun, the determinative issue was whether the officers reasonably believed [suspect]

had a gun and posed an immediate threat to safety.").  "[T]he critical inquiry is what

[the officer] perceived."  <u>Wilkinson</u>, <u>supra</u>, 610 F.3d at 551.

  "[T]he 'reasonableness' of a particular use of force must be judged from the

perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

hindsight."  <u>Graham</u>, <u>supra</u>, 490 U.S. at 396; <u>see</u>, <u>Andrews v. City of Henderson</u>, 35

F.4th 710, 715 (9th Cir. 2022) ("All determinations of unreasonable force must

embody allowance for the fact that police officers are often forced to make split-

second judgments—in circumstances that are tense, uncertain, and rapidly

**11**

**COUNTY DEFENDANTS' MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

1  evolving—about the amount of force that is necessary in a particular situation.")

2  (internal quotations omitted).  Further, the "analysis is not static, and the

3  reasonableness of force may change as the circumstances evolve."  Hyde v. City of

4  Willcox, 23 F.4th 863, 870 (9th Cir. 2022).  The Ninth Circuit has repeatedly

5  emphasized that the most important factor is "whether the suspect posed an

6  immediate threat to the safety of the officers or others."  See, S.B. v. County. of San

7  Diego, 864 F.3d 1010, 1013 (9th Cir. 2017).  An officer's subjective intent or

8  motivation is not relevant to the reasonableness inquiry.  See, Graham, supra, 490

9  U.S. at 397; see also, Shafer v. County of Santa Barbara, 868 F.3d 1110, 1116 (9th

10  Cir. 2017).

11      The Ninth Circuit has also emphasized that an armed suspect represents the

12  paradigm threat to officer safety.  See, Smith v. City of Hemet, 394 F.3d 689, 704

13  (9th Cir. 2005) ("[W]here a suspect threatens an officer with a weapon…, the officer

14  is justified in using deadly force."); George v. Morris, 736 F.3d 829, 838 (9th Cir.

15  2013) ("If the person is armed—or reasonably suspected of being armed—a furtive

16  movement, harrowing gesture, or serious verbal threat might create an immediate

17  threat.").  Thus, "where the totality of the circumstances could cause a reasonable

18  police officer to conclude that a suspect is reaching for a gun, the officer's use of

19  deadly force in self-defense is justified."  Baldridge v. City of Santa Rosa, 1999 WL

20  66141, at *7 (N.D. Cal. 1999); see, Reynolds v. County of San Diego, 858 F.Supp.

21  1064, 1072 (S.D. Cal. 1994) (citing cases "support[ing] the general principle that an

22  officer may reasonably use deadly force when he or she confronts an armed suspect

23  in close proximity whose actions indicate an intent to attack.").

24      Consistent with these principles, courts have repeatedly held that an

25  actionable threat justifying the use of deadly force may take the form a suspect *even*

26  *appearing* to reach for a *potential* gun.  See, Cruz v. City of Anaheim, 765 F.3d

27  1076, 1078 (9th Cir. 2014) ("It would be unquestionably reasonable for police to

28

**12**
**COUNTY DEFENDANTS' MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

shoot a suspect in [Decedent's] position if he reaches for a gun in his waistband, or even if he reaches there for some other reason. Given [Decedent's] dangerous and erratic behavior up to that point, the police would doubtless be justified in responding to such a threatening gesture by opening fire."); Estate of Moppin-Buckskin v. City of Oakland, 2010 WL 147976, at *4 (N.D. Cal. 2010) ("The officers shot Mr. Moppin only after he failed to come toward them, as ordered, dropped his hands and then made a movement toward his waist area as though reaching for a weapon. All three officers who could see Mr. Moppin unequivocally thought that he was reaching for a gun and feared for their safety.  Therefore, in this case, the test for objective reasonableness is met."); Foster v. City of Fresno, 392 F.Supp.2d 1140, 1157 (E.D. Cal. 2005) (where suspect "moved his arm down toward his waistband area…a reasonable officer in Officer Cornelison's position would have believed that [the suspect] posed an immediate threat of serious harm. Officer Cornelison's application of deadly force was thus objectively reasonable."); accord Wilkinson, supra, 610 F.3d at 553 ("'the Fourth Amendment does not require omniscience,' and absolute certainty of harm need not precede an act of self-protection.") (citation omitted); Terry v. Ohio, 392 U.S. 1, 23-24 (1968) (Constitution does not "require that police officers take unnecessary risks in the performance of their duties.").

**(c)     Key Evidence in Opposition to Claim 1 – Fourth Amendment – Excessive Force (42 U.S.C. § 1983)**

- Testimony by Officer and Deputy Defendants
- Testimony by Civilian Witnesses
- Evidence gathered including audio, videos, Puga's gun, Puga's fired cartridge casing, photographs, scene and defendant processing, Puga's criminal records, autopsy materials and toxicology.
- Testimony by experts and non-retained experts, expert reports, and

1    expert materials.

2    Decedent Hector Puga is the cause of his own injuries.  Specifically,

3    Decedent was wanted, in part, for shooting a gun at a complete stranger, led law

4    enforcement in an hour-long pursuit through residential neighborhoods at speeds

5    ranging from 50 – 90 mph, then orchestrated an hour-long standoff wherein law

6    enforcement exhausted less lethal force and employed various negotiation tactics to

7    no avail.  Decedent then eventually exited his vehicle, only to lure defendants in,

8    and then pulled a gun and fired at defendants; Defendants returned fire and yet

9    Decedent, an armed felon, while firing, ran toward a residence.  Despite being

10   struck by gunfire, Decedent still armed with his gun on the ground, attempted again

11   to use his gun while on the ground.  But, Defendants were able to

12   To begin with, Sgt. Vaccari never used deadly force and never fired a lethal

13   weapon.  And, the undisputed evidence establishes that at the time Deputy Adams

14   fired his weapon, Puga, who was wearing baggy jeans, suddenly dropped his hands

15   where the officers could not see, despite commands to keep his hands up, and reached

16   towards his waistband, pulling out a firearm.  Case law is clear that when Decedent

17   reached for his waistband and withdrew a gun, Defendants were justified in shooting.

18   Further, the evidence established Puga was wanted for being involved in a

19   shooting and according to the ***video*** evidence, when the shooting occurred, his hand

20   went to his waistband.  All law enforcement officers in a position to see this have

21   testified that Puga drew a firearm from his waistband.  The shooting began, and within

22   a moment, Puga turned to run, straight towards residences.  A witness video from Erin

23   Mangerino clearly shows Puga's hand dropped a second before the shooting.  An

24   additional video from CHP dash cam shows Puga running with a shiny object in his

25   hand.  And these videos also show Puga was running straight towards residences,

26   specifically Erin Mangerino and her family.  Under these circumstances Deputy

27   Adams was not required to wait until Puga discharged his firearm to react.

28

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

Simply put, Puga reached for his waistband and drew a firearm at officers who then used deadly force.  Following the incident, Puga's firearm was found underneath his body, not in a pocket or a holster, supporting exactly what the law enforcement officers testified to – Puga pulled a gun and ran with it in his hand.  To dispute facts that Puga had a firearm out, he drew it, etc. is ignoring the obvious physical evidence of the gun that was found.

Additionally, although Deputy Adams may have fired when Puga was turning to run and bullets made contact with Puga, one to the front of his leg and the other to his buttocks, Plaintiffs have provided no evidence that Deputy Adams continued firing on Puga after he was on the ground or that Puga was no longer a threat on the ground with the gun still underneath him

As to Vaccari, the undisputed facts are that Vaccari never discharged his firearm.  Vaccari deployed a single 40mm less lethal sponge round which there is no evidence to support it even struck Puga; rather, our expert has opined that based on the evidence, it more than likely hit the vehicle, and bounced off the car, landing on the street.

As to Vaccari's use of pepper balls, Plaintiffs' excessive force claim falls short. It has been held that officers are entitled to qualified immunity for use of chemical agents to extract a barricaded suspect potentially armed with a lethal weapon.  And similarly, this was the exact situation presented to Vaccari – a suspect was refusing to leave his vehicle who was involved in a shooting earlier and was believed to still be armed.  Nothing prohibited Vaccari from using less lethal pepper balls under these circumstances.

As to Vaccari's taser, the taser was used when Puga had fallen with his hands and gun concealed under him and he was still moving.  Again, Vaccari used less lethal despite Mr. Puga having just pulled a gun on officers and because Puga's hands were not visible nor was the gun underneath him, it was reasonable to believe Puga was

still armed, which he in fact was. Given Puga's already brazen conduct of shooting at a stranger on the freeway then opening fire on law enforcement, it was reasonable for Vaccari to believe Puga still presented a threat despite being on the ground. Was Puga playing possum only to turn over and shoot the officers? The law does not require Defendants to wait to see what action the Puga would take next. Further, Puga's gun was found with a round in the chamber and a fired cartridge casing next to the gun under him.

<u>The Civilian Witnesses Support Puga Pointed a Gun</u>

Aside from **_all_** five law enforcement officers who were on scene and the closest to Puga, a number of civilian witnesses also reported that Puga had a gun and fired at officers. For example, witness Edward Mangerino, who was watching and recording on his cell phone from his home on the northwest corner (where Puga eventually ran to), told detectives and reiterated at deposition, that while he could not see a "gun," he is familiar with guns, and observed **Puga extend his arm, with his hand wrapped around an object, and then saw smoke emanate from his hand, believing Puga to have had a gun and fired at officers.**

And, although neighbor Tammy Goodson did not mention Puga with a gun during her interview with detectives, at deposition she testified that **Puga grabbed for something from his waistband that appeared to be a gun, and he caused the entire shooting incident.**

Also, Annabelle Botten (a Plaintiff in the related *Botten* case), was a neighbor in the northeast home. When she called 911, she reported that **a man had pulled a gun on officers and that he shot at officers**. In her interview with detectives, Botten described that **just prior to the shooting, she saw Puga lower his right hand toward the front of his waist and raise a black handgun, then he shot once at the CHP officers. Botten stated she knew Puga fired because she saw a muzzle flash from Puga's gun; then CHP officers shot back.**

1    Finally, another neighbor, Arthur Miranda, advised 911 after he heard shots
2    fired, that when he looked out his slider, he saw someone running with a gun.

3    Thus, at least four additional civilian witnesses, in addition to the five law
4    enforcement officers, as well as the available audio and video evidence, all support
5    Puga was armed with a gun and pulled a gun causing the lethal force encounter.

6    <u>Physical Evidence Corroborates Puga Fired his Gun</u>

7    As to the physical evidence, it is undisputed that a gun was found under Puga
8    as well as a fired cartridge casing ("FCC") next to the gun. An examination of the
9    pistol revealed Puga's gun to be a Personally Manufactured Firearm, "PMF," often
10   referred to as a "Ghost gun." Again, there is no dispute that the gun belongs to Puga.
11   Not only was it found underneath him, but  ammunition matching the gun was found
12   inside Puga's pants' pocket, and FCCs fired from the gun were also found in the cup
13   holder of Puga's vehicle.

14   Further, Defense experts report, and it is undisputed, that the FCC located next
15   to Puga's gun also came from Puga's gun. And the existence of the FCC on the
16   ground, supports that Puga either fired while on the ground or, based on additional
17   evidence, Puga's gun jammed earlier while he was at the front of his vehicle firing at
18   law enforcement, but that his ghost gun could not fire due to a malfunction and
19   therefore the FCC under Puga, supports that Puga was either firing or attempting to
20   make the gun operational to fire, while on the ground; all evidence that Puga was still
21   a threat even on the ground, again justifying defendants' use of force including
22   Vaccari's taser deployments.

23   There is even further evidence of Puga using his gun. A forensic exam of the
24   gun revealed a live round in the chamber of the gun. Importantly, the crime lab
25   identified a "squib round" in Puga's gun. A squib round is a firearm malfunction in
26   which a fired projectile does not have enough force behind it to exit the barrel and
27   thus becomes stuck. This is a critical piece of evidence. Per our expert, again

28

**17**
**COUNTY DEFENDANTS' MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

1  undisputed by Plaintiffs, the discovery of the squib round lodged in the barrel of
2  Puga's gun establishes an unsuccessful attempt to fire the gun.  And further, experts
3  will testify that a squib discharge is very likely to leave the fired cartridge case in the
4  chamber or jammed in the pistol.

5       Therefore, per the ballistics expert, the discovery of the squib round supports
6  the testimony of the officers, deputies, and civilian witnesses Mangerino, Goodson,
7  Botten, and Miranda, that Puga was firing his gun at the front of his vehicle and/or
8  while running.  The expert will explain the following sequence of events: Puga fired
9  his gun at officers near the front of his vehicle, the gun jammed, meaning, although
10 Puga fired his gun, no bullets ejected, and the cartridge casing was also not able to
11 eject at the time.  It was only after Puga was trying to make his gun operational, while
12 running and then on the ground, that Puga was able to vigorously retract the slide of
13 the gun, a purposeful act, to remove and expel the cartridge casing.  Thus, the physical
14 evidence of the gun, with a live round chambered, a squib round lodged in the barrel,
15 and the FCC found under Puga, all support that Puga fired his weapon.  And despite
16 having fallen to the ground with multiple gunshot wounds, Puga was still attempting
17 to fire his gun.  Simply Puga presented a persistent and lethal threat from beginning
18 to end.  And, thus neither Adams lethal force nor Vaccari's less-lethal force were
19 excessive.

20       **(a)   Claim 2: Fourteenth Amendment – Substantive Due Process as to**
21       **Deputy Jake Adams (42 U.S.C. § 1983)**

22 Plaintiffs Ubaldo, L.C., I.H., and A.L., as individuals, claim County Defendant
23 Deputy Jake Adams violated their respective relationships with Decedent.

24       **(b)   Elements Required for Claim 2 – Fourteenth Amendment –**
25       **Substantive Due Process as to Deputy Jake Adams**
26       **(42 U.S.C. § 1983)**

27 Under the due process clause of the Fourteenth Amendment, liability is found
28

1  only where the plaintiff can show that police conduct "shocks the conscience."

2  *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998). For the aforementioned

3  reasons, Plaintiffs have no evidence Deputy Adams' use of force was not objectively

4  reasonable, let alone conscience shocking. *See*, *Moreland v. Las Vegas Metro. Police*

5  *Dep't.*, 159 F.3d 365, 371 (9th Cir. 1998) ("[I]f the district court correctly determined

6  [the officer]'s actions were objectively reasonable, it follows that his conduct did not

7  offend the more stringent standard applicable to substantive due process claims.").

8      "[W]here a law enforcement officer makes a snap judgment because of an

9  escalating situation, his conduct may only be found to shock the conscience if he acts

10  with a ***purpose to harm*** unrelated to legitimate law enforcement objectives." *A.K.H.*

11  *by and through Landeros v. City of Tustin*, 2014 WL 12672480, at *6–7 (C.D. Cal.

12  2014). "Where, [ ] the officers did not have time to deliberate, a use of force shocks

13  the conscience only if the officers had a "purpose to harm" the decedent for reasons

14  unrelated to legitimate law enforcement objectives." *Gonzalez v. City of Anaheim*,

15  747 F.3d 789, 797 (9th Cir. 2014). "'Legitimate law enforcement objectives [include]

16  arrest, self-defense, or the defense of others." *Fewell v. California*, 2017 WL

17  6043080, at *6 (C.D. Cal. 2017) (internal quotation omitted).

18      "The 'shocks the conscience' standard is applied to evaluate whether the

19  actions of law enforcement during situations that require quick decision-making—

20  such as a traffic stop—were driven by a purpose to harm that is unrelated to

21  legitimate law enforcement objectives. This standard is particularly stringent and

22  requires showing that the officers' actions were directed intentionally to cause harm,

23  rather than merely acting negligently or unreasonably." *Peck v. Montoya*, 51 F.4th

24  877, 893 (9th Cir. 2022) (internal citations omitted). "We apply the purpose-to-

25  harm standard when officials were required to make "repeated split-second

26  decisions" about how best to respond to a risk, such as during a high-speed car chase

27  or when confronting a threatening, armed suspect." *Peck v. Montoya*, 51 F.4th 877,

28

---

**19**
**COUNTY DEFENDANTS' MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

893 (9th Cir. 2022) citing Porter, 546 F.3d at 1139 (citation omitted); *Hayes v. v. Co. of San Diego*, 736 F.3d 1223, 1230 (9th Cir. 2013).

        (c)      **Key Evidence in Opposition to Claim 2 – Fourteenth Amendment – Substantive Due Process as to Deputy Jake Adams (42 U.S.C. § 1983)**

- Testimony by Officer and Deputy Defendants
- Testimony by Civilian Witnesses
- Evidence gathered including audio, videos, Puga's gun, Puga's fired cartridge casing, photographs, scene and defendant processing, Puga's criminal records, autopsy materials and toxicology.
- Testimony by experts and non-retained experts, expert reports, and expert materials.
- Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

      To begin, Deputy Adams was not the cause of Decedent's death, based on the autopsy protocol, the Coroner's testimony and ballistics expert report and testimony. Therefore, Deputy Adams did not interfere with Plaintiffs' relationships. More specifically, the undisputed evidence is that the fatal shot was caused by ammunition only utilized by Defendants Kee and Blackwood, an AR-rifle not the 9mm weapon Deputy Adams fired. Stated otherwise, the undisputed evidence from the coroner, autopsy, and ballistics expert, firmly establishes that Deputy Adams only struck Puga twice, with non-fatal shots, one to the front of his leg and the other to his buttocks which the ballistics expert described as the bullet first ricocheting off the ground and then impacting Puga. Accordingly, Deputy Adams cannot be liable to the Puga family members for depriving them of their relationship as he quite plainly did not cause Puga's death.

      Further, Deputy Adams' actions were entirely related to the legitimate law enforcement objective of apprehending Decedent, a suspect in a freeway shooting

1  and then a fleeing felon at the time force was used based on the above described

2  evidence.

3       Finally, as to Plaintiff L.C. the undisputed evidence is that she did not have a

4  relationship with her father that could be subject to interference based on the written

5  discovery and deposition testimony.  Specifically, Plaintiff L.C.'s mother testified

6  that to her knowledge Puga never saw L.C. since L.C. was born in 2013 up to

7  Puga's death.  And, L.C.'s mother took deliberate steps to never have Puga meet

8  L.C. because of her concern for Puga's drinking and abusive behavior, even going

9  so far as to not have Puga listed on L.C.'s birth certificate, for which Puga did not

10  rebut.  She further testified that there were no future plans for Puga to become

11  involved in L.C.'s life.  Thus the evidence supports Plaintiff L.C. is unable to

12  maintain her claim.

13       **(a)  Claim 3: Battery (Survival and Wrongful Death)**

14       Plaintiffs Ubaldo, L.C., I.H., and A.L., as individuals, bring forth a battery

15  (survival and wrongful death) claim against all County Defendants alleging

16  unreasonable and excessive force against Decedent.

17       **(b)  Elements Required for Claim 3 – Battery (Survival and Wrongful**

18            **Death)**

19  Elements of Plaintiffs' "battery" claim with respect to non-deadly force are:

20            1.    Defendants intentionally touched Decedent;

21            2.    Defendants used unreasonable force on Decedent;

22            3.    Decedent did not consent to the use of that force;

23            4.    Decedent was harmed; and

24            5.    Defendants use of unreasonable force was a substantial factor in

25  causing Decedent's harm;

26            6.  With respect to Decedent's survivorship claim, Plaintiffs L.C., I.H.,

27  and A.L. are Decedent's successors-in-interest. See, CACI 1305A, "Battery by a

28

1  Peace Officer (Nondeadly Force)."

2      The same <u>Graham</u> factors apply to the reasonableness of the use of force as

3  under a Fourth Amendment claim.  <u>See</u>, CACI 1305A; <u>Hernandez v. City of</u>

4  <u>Pomona</u>, 46 Cal. 4th. 501, 514 (2009).  As with Fourth Amendment claims, a claim

5  for battery is a personal right that may not be vicariously asserted.  <u>See</u>, <u>Code of</u>

6  <u>Civil Procedure</u> § 377.32.  While Plaintiffs may "step into Decedent's shoes" to

7  prosecute this claim on his behalf, they have no standing to do so for themselves

8  because Defendants did not commit a battery against any Plaintiff.  Instead, it has

9  been established that "wrongful death" damages compensate a plaintiff for his or her

10  own independent pecuniary injury suffered by loss of the decedent, and are separate

11  and distinct from any damages recoverable by decedent had he or she survived.  <u>See</u>,

12  <u>Code of Civil Procedure</u> §§ 377.22, 377.60; <u>Earley v. Pacific Elec. Ry. Co.</u>, 176 Cal.

13  79, 81 (1917); <u>Justus v. Atchison</u>, 19 Cal.3d 564, 572, 573 (1977).

14      The elements of Plaintiffs' "battery" claim with respect to deadly force are:

15          1.      That Defendant Adams intentionally touched or caused Decedent

16  to be touched;

17          2.      That Defendant Adams used deadly force on Decedent;

18          3.      That Defendant Adams use of deadly force was not necessary to

19  defend human life;

20          4.      That Decedent was killed;

21          5.      That Defendant Adam's use of deadly force was a substantial

22  factor in causing Decedent's death; and

23          6.      With respect to Decedent's survivorship claim, Plaintiffs L.C.,

24  I.H., and A.L. are Decedent's successors-in-interest.

25      Defendant Adams' use of deadly force was necessary to defend human life if

26  a reasonable officer in the same situation would have believed, based on the totality

27  of the circumstances known to or perceived by Deputy Adams at the time, that

28

**22**

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

deadly force was necessary to defend against an imminent threat of death or serious
bodily harm to Deputy Adams, the other law enforcement Defendants, and/or the
public. <u>See</u>, CACI 1305B "Battery by Peace Officer (Deadly Force) -- Essential
Factual Elements."

Notably, should the Court determine there was no excessive force as a matter
of law, Plaintiffs state law claims also must fail. *Moore v. City of Berkley*, 2016 WL
6024530, at *7 (N.D. Cal. 2016) ("In California, state law claims for wrongful death
and battery at the hands of the police rise and fall with federal Section 1983 claims.
[Citations]. *Sorgen v. City & County of San Francisco*, 2006 WL 2583683, at *9
(N.D. Cal. 2006) ("[T]he law governing Plaintiff's state law claim for assault and
battery/excessive force is the same as that used to analyze Plaintiff's [federal] claim
for excessive force . . . Accordingly, Plaintiffs' claim of battery under state law fails
for the same reasons [as his federal claim]….").

**(c)    Key Evidence in Opposition to Claim 3 – Battery (Survival and
Wrongful Death)**

- Testimony by Officer and Deputy Defendants
- Testimony by Civilian Witnesses
- Evidence gathered including audio, videos, Puga's gun, Puga's fired
cartridge casing, photographs, scene and defendant processing,
Puga's criminal records, autopsy materials and toxicology.
- Testimony by experts and non-retained experts, expert reports, and
expert materials.
- Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

**(a)    Claim 4: Negligence (Survival and Wrongful Death)**

Plaintiffs Ubaldo, L.C., I.H., and A.L., as individuals, bring forth a negligence
(survival and wrongful death) claim against all County Defendants alleging
Decedent died as a result of defendants "negligent conduct."  And, further claim

Defendant County is responsible for the actions of the individual County defendants pursuant to the doctrine of *respondeat superior* under the California <u>Government Code</u>.

**(b)      Elements Required for Claim 4 – Negligence (Survival and Wrongful Death)**

Elements of Plaintiffs' negligence claim with respect to non-deadly force are:

1.      That Defendants used force to arrest and overcome resistance by Decedent;

2.      That the amount of force used by Defendants was unreasonable;

3.      That Decedent was harmed; and

4.      That Defendants' use of unreasonable force was a substantial factor in causing Decedent's harm.

<u>See</u>, CACI 440.

The elements of Plaintiffs' negligence claim with respect to deadly force are:

1.      That Defendant Adams was a peace officer;

2.      That Defendant Adams used deadly force on Decedent;

3.      That Defendant Adam's use of deadly force was not necessary to defend human life;

4.      That Decedent was killed; and

5.      That Defendant Adam's use of deadly force was a substantial factor in causing Decedent's death.

<u>See</u>, CACI 441.

Plaintiffs contend that Defendants are liable for negligence based on alleged tactical mistakes prior to the shooting, citing California Government Code section 815.2(a).

///

///

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

Under California law:

> [W]here the preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the reasonableness of the officers' preshooting conduct should not be considered in isolation. Rather, it should be considered in relation to the question whether the officers' ultimate use of deadly force was reasonable.

Hayes v. County of San Diego, 57 Cal. 4th 622, 632 (2013).

State law "wrongful death" claim is predicated on Defendants' use of force. "[C]laims of excessive force under California law are analyzed under the same standard of objective reasonableness used in Fourth Amendment claims." Donaldson v. United States, 2018 WL 1089986, at *13 (S.D. Cal. 2018). Accordingly, a jury finding of reasonableness of force used dispenses with this concomitant state law claim altogether. Moore v. City of Berkley, 2016 WL 6024530, at *7 (N.D. Cal. 2016) ("In California, state law claims for wrongful death…at the hands of the police rise and fall with federal Section 1983 claims. [Citations]…. So because the arrest and use of force did not violate Moore's Fourth Amendment rights, [the state law] claims fall away."); Watkins v. City of San Jose, 2017 WL 1739159, at *20 (N.D. Cal., 2017) ("The California Court of Appeal has held that a determination that an officer's use of deadly force is objectively reasonable under § 1983 precludes negligence, assault, and battery claims.") (citing Brown v. Ransweiler, 171 Cal.App.4th 516, 533 (2009)); Sorgen v. City & County of San Francisco, 2006 WL 2583683, at *9 (N.D. Cal. 2006) ("[T]he law governing Plaintiff's state law claim for assault and battery/excessive force is the same as that used to analyze Plaintiff's [federal] claim for excessive force…. Accordingly, Plaintiff's claim of assault and battery/excessive force under state law fails for the same reasons [as his federal claim]….").

Plaintiff also contends that Defendants are liable for negligence based on alleged tactical mistakes prior to the shooting. Under California law 815.2(a).

[W]here the preshooting conduct did not cause the plaintiff any injury independent of the injury resulting from the shooting, the reasonableness of the officers' preshooting conduct should not be considered in isolation. Rather, it should be considered in relation to the question whether the officers' ultimate use of deadly force was reasonable.

Hayes v. County of San Diego, 57 Cal. 4th 622, 632 (2013).

 **(c)** **Key Evidence in Opposition to Claim 4 – Negligence (Survival and Wrongful Death)**

- Testimony by Officer and Deputy Defendants
- Testimony by Civilian Witnesses
- Evidence gathered including audio, videos, Puga's gun, Puga's fired cartridge casing, photographs, scene and defendant processing, Puga's criminal records, autopsy materials and toxicology.
- Testimony by experts and non-retained experts, expert reports, and expert materials.
- Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

 **(a)** **Claim 5: Cal. Civil Code § 52.1**

   Plaintiffs L.C., I.H., and A.L., as successors-in-interest, bring forth a Violation of Bane Act pursuant to Cal. Civil Code § 52.1 against all County Defendants alleging interference with Decedent's civil rights by intentionally committing and attempting to commit acts of violence against Decedent or acted in reckless disregard by shooting Decedent without justification or excuse. And, further claim Defendant County is vicariously liable for the actions of County Defendants Sgt. Vaccari and Deputy Adams.

 **(b)** **Elements Required for Claim 5 – Cal. Civil Code § 52.1**

   The elements of a Bane Act claim are:

  1. Defendants acted violently against Decedent to prevent him from exercising his right to be free from unreasonable seizure;

**COUNTY DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

2.    Decedent was unreasonably seized under the Fourth Amendment, i.e., the use of force was objectively unreasonable under all of the circumstances;

3.    Decedent was harmed;

4.    Defendants' conduct was a substantial factor in causing Decedent's harm;

5.    Plaintiffs L.C., I.H., and A.L., are Decedent's successors-in-interest. See CACI 3066.

Defendants must have intentionally "acted to prevent" Decedent from exercising some right.  See, CACI 3066.  In that connection, Plaintiffs must prove not only a constitutional violation, but also "a specific intent to violate [Decedent's] right to freedom from unreasonable seizure."  Reese v. Cty. of Sacramento, 888 F.3d 1030, 1043 (9th Cir. 2018) (quoting Cornell v. City and County of San Francisco, 17 Cal.App.4th 766, 801-802 (2017)); see also, Sandoval v. Cty. of Sonoma, 912 F.3d 509, 519-520 (9th Cir. 2018).  A mere intention to use force that a jury may ultimately find unreasonable is insufficient.  Id. at 1045 (quoting United States v. Reese, 2 F.3d 870, 885 (9th Cir. 1993)).  Rather, Plaintiffs must prove that the Defendants "intended not only the force, but its unreasonableness, its character as 'more than necessary under the circumstances."  Id.

(c)    **Key Evidence in Opposition to Claim 5 – Cal. Civil Code § 52.1**

- Testimony by Officer and Deputy Defendants
- Testimony by Civilian Witnesses
- Evidence gathered including audio, videos, Puga's gun, Puga's fired cartridge casing, photographs, scene and defendant processing, Puga's criminal records, autopsy materials and toxicology.
- Testimony by experts and non-retained experts, expert reports, and expert materials.
- Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

1        (d)    **Affirmative Defense 1:** Defendants Vaccari and Adams are protected

2            by the doctrine of "qualified immunity."

3        (e)    **Elements Required for Affirmative Defense 1**

4        Qualified immunity is a legal defense for the Court to decide when

5    raised by a non-suit or post-verdict motion.  See, Ortiz v. Jordan, 562 U.S. 180, 191

6    (2011) (holding qualified immunity must be raised by a Rule 50 motion following

7    trial where disputed facts precluded resolution on summary judgment); see also,

8    Torres v. City of Los Angeles, 548 F.3d 1197, 1211 fn. 9 (9th Cir. 2008)

9    (identifying qualified immunity as a defense once a case proceeds to trial).

10        The elements are:

11        1.    Defendants Vaccari and Adams did not violate Decedent's

12    constitutional rights, or;

13        2.    The law was not clearly established such that Defendants

14    Vaccari and Adams were not on notice that acting as they did in the factual

15    circumstances presented to them was plainly unlawful.

16        To "defeat...officials' defense of qualified immunity," it is the plaintiff's

17    burden to "show, 'first, [that he] suffered a deprivation of a constitutional or

18    statutory right; and second [that such] right was clearly established at the time of the

19    alleged misconduct.'"  Hamby v. Hammond, 821 F.3d 1085, 1090 (9th Cir. 2016)

20    (internal citation omitted); see, Ault v. Speicher, 634 F.3d 942, 945 (7th Cir. 2011)

21    ("'[I]n a § 1983 claim, the plaintiff bears the burden of proof on the constitutional

22    deprivation that underlies the claim….'"); Shafer v. County of Santa Barbara, 868

23    F.3d 1110, 1118 (9th Cir. 2017) ("It is the plaintiff who bears the burden of showing

24    that the rights allegedly violated were clearly established.").

25        In recent years, the Supreme Court has devoted substantial time and effort to

26    qualified immunity issues—with a particular emphasis on the "clearly established

27    law" aspect of the doctrine.  See, White v. Pauly, 137 S.Ct. 548, 551 (2017) (the

28

**COUNTY DEFENDANTS' MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

Court "has issued a number of opinions reversing federal courts in qualified immunity cases" over "the last five years.").  In this connection, the Supreme Court "[has] repeatedly told [plaintiffs and] courts…not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011).  Instead, the authorities cited "must be particularized to the facts of the case." White, supra, 137 S.Ct. 548 at 552; District of Columbia v. Wesby, 138 S.Ct. 577, 590 (2018) ("The 'clearly established' standard…requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him."); Sharp v. County of Orange, 871 F.3d 901, 911 (9th Cir. 2017) (qualified immunity granted where "[o]ur case differs materially" from the facts in precedent cited by plaintiff.); S.B. v. County of San Diego, 864 F.3d 1010, 1015 (9th Cir. 2017) ("We hear the Supreme Court loud and clear. Before a court can impose liability on Moses, we must identify precedent as of August 24, 2013—the night of the shooting—that put Moses on clear notice that using deadly force in these particular circumstances would be excessive.").

"This requires a high 'degree of specificity'" Wesby, supra, 138 S.Ct. at 590, inasmuch as qualified immunity is a "fact-specific, highly contextualized" inquiry. Hamby, supra, 821 F.3d at 1092; Kisela v. Hughes, 138 S.Ct. 1148, 1153 (2018) (public employees "are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue").  "Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that '[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine [ ] will apply to the factual situation the officer confronts.'" Mullenix v. Luna, 136 S. Ct. 305, 308 (2015) (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001)). "Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert *these* [public employees] *in this case* that *their particular conduct* was unlawful." Sharp, supra, 871 F.3d at 911 (italics original).  As the Ninth Circuit

has explained, "state officials are entitled to qualified immunity so long as 'none of our precedents squarely governs the facts'" they confronted.  <u>Hamby</u>, <u>supra</u>, 821 F.3d at 1091 (citations omitted); <u>see</u>, <u>Rivas-Villegas v. Cortesluna</u>, 142 S.Ct. 4, 8 (2021) (reversing the denial of qualified immunity based on the plaintiff and the Circuit Court's failure to cite "any Supreme Court case that addresses facts like the ones at issue…."); <u>City of Tahlequah, Oklahoma v. Bond</u>, 142 S.Ct. 9 (2021) (finding the Tenth Circuit "contravened [ ]settled principles" when "none of the decisions relied upon by the Court of Appeals" to deny qualified immunity to law enforcement officers who shot and killed a suspect "[came] close to establishing that the officers' conduct was unlawful.").

    **(f)**    **Key Evidence in Support of Affirmative Defense 1**

    Defendants' evidence in support of their affirmative defense includes:

- Testimony by Officer and Deputy Defendants
- Testimony by Civilian Witnesses
- Evidence gathered including audio, videos, Puga's gun, Puga's fired cartridge casing, photographs, scene and defendant processing, Puga's criminal records, autopsy materials and toxicology.
- Testimony by experts and non-retained experts, expert reports, and expert materials.
- Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

    **(d)**    **Affirmative Defense 2:** Self-defense and defense of others against the state law negligence, battery, and Bane Act claims.

    **(e)**    **Elements Required for Affirmative Defense 2**

    The elements of self-defense/ defense of others are:

        1.    Defendants reasonably believed decedent was going to harm them; and

        2.    Defendants only used the amount of force necessary to protect

**COUNTY DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

1 themselves.

2 See, CACI 1304.

3     **(f)**    **Key Evidence in Support of Affirmative Defense 2**

4     Defendants' evidence in support of their affirmative defense includes:

5     • Testimony by Officer and Deputy Defendants

6     • Testimony by Civilian Witnesses

7     • Evidence gathered including audio, videos, Puga's gun, Puga's fired

8     cartridge casing, photographs, scene and defendant processing,

9     Puga's criminal records, autopsy materials and toxicology.

10     • Testimony by experts and non-retained experts, expert reports, and

11     expert materials.

12     • Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

13     **(d)**    **Affirmative Defense 3:** Comparative fault/Contributory negligence of

14 Decedent and/or State Defendants against the state law negligence, battery, and

15 Bane Act claims.

16     **(e)**    **Elements Required for Affirmative Defense 3**

17     The elements of comparative fault are:

18     1.    Decedent and/or State Defendants were negligent; and

19     2.    Decedent's and/or State Defendants' negligence was a

20 substantial factor in causing Decedent's death.

21 See, CACI 406 and 407.

22     **(f)**    **Key Evidence in Support of Affirmative Defense 3**

23     Defendants' evidence in support of their affirmative defense includes:

24     • Testimony by Officer and Deputy Defendants

25     • Testimony by Civilian Witnesses

26     • Evidence gathered including audio, videos, Puga's gun, Puga's fired

27     cartridge casing, photographs, scene and defendant processing,

28

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

Puga's criminal records, autopsy materials and toxicology.

- Testimony by experts and non-retained experts, expert reports, and expert materials.

- Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

(d)    **Affirmative Defense 4:** Plaintiffs' claim for negligence is barred by Superseding Cause, CACI 432.

(e)    **Elements Required for Affirmative Defense 4**

The elements of comparative fault are:

1.    That Decedent and/or State Defendants' conduct occurred after the conduct of Defendant;

2.    That a reasonable person would consider Decedent and/or State Defendants' conduct a highly unusual or an extraordinary response to the situation;

3.    That Decedent and/or State Defendants' did not know and had no reason to expect that Decedent and/or State Defendants' would act in a negligent manner; and

4.    That the kind of harm resulting from Decedent's and/or State Defendants' conduct was different from the kind of harm that could have been reasonably expected from Defendant's conduct

See, CACI 432

(f)    **Key Evidence in Support of Affirmative Defense 4**

Defendants' evidence in support of their affirmative defense includes:

- Testimony by Officer and Deputy Defendants
- Testimony by Civilian Witnesses
- Evidence gathered including audio, videos, Puga's gun, Puga's fired cartridge casing, photographs, scene and defendant processing, Puga's criminal records, autopsy materials and toxicology.
- Testimony by experts and non-retained experts, expert reports, and

**COUNTY DEFENDANTS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

expert materials.

- Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

**(d)    Affirmative Defense 5:** Defendants Vaccari and Adams are not responsible for Hector Puga's harm because of the later criminal and/or intentional conduct of Hector Puga.

**(e)    Elements Required for Affirmative Defense 5**

Individual Defendants are not responsible for Hector Puga's harm if Defendants prove the following:

1.    That Hector Puga committed an intentional or a criminal act;

2.    That Hector Puga's intentional or criminal conduct happened after the conduct of Defendants; and

3.    That Defendants did not know and could not have reasonably foreseen that another person would be likely to take advantage of the situation created by Defendant's conduct to commit this type of act.

See, CACI 433

**(f)    Key Evidence in Support of Affirmative Defense 5**

Defendants' evidence in support of their affirmative defense includes:

- Testimony by Officer and Deputy Defendants
- Testimony by Civilian Witnesses
- Evidence gathered including audio, videos, Puga's gun, Puga's fired cartridge casing, photographs, scene and defendant processing, Puga's criminal records, autopsy materials and toxicology.
- Testimony by experts and non-retained experts, expert reports, and expert materials.
- Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

**(d)    Affirmative Defense 6:** Immunity under California <u>Government Code</u> § 820.2.

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

1       (e)    **Elements Required for Affirmative Defense 6**

2          Immunity under California Government Code § 820.2.  The elements

3 for this affirmative defense are:

4          1.    The Defendants exercised discretion in stopping, pursuing,

5 and/or using force on Decedent;

6          2.    The discretion was vested in the defendant officers pursuant to

7 their duties as a peace officers.

8       (f)    **Key Evidence in Support of Affirmative Defense 6**

9          Defendants' evidence in support of their affirmative defense includes:

10     •   Testimony by Officer and Deputy Defendants

11     •   Testimony by Civilian Witnesses

12     •   Evidence gathered including audio, videos, Puga's gun, Puga's fired

13          cartridge casing, photographs, scene and defendant processing,

14          Puga's criminal records, autopsy materials and toxicology.

15     •   Testimony by experts and non-retained experts, expert reports, and

16          expert materials.

17     •   Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

18    **(d)Affirmative Defense 7:** Immunity under California Government Code

19 § 820.2.

20       (e)    **Elements Required for Affirmative Defense 7**

21          Immunity under California Government Code § 820.2.  The elements

22 for this affirmative defense are:

23          1.    The Defendants exercised discretion in stopping, pursuing,

24 and/or using force on Decedent;

25          2.    The discretion was vested in the defendant officers pursuant to

26 their duties as a peace officers.

27 ///

28

1  **(f)    Key Evidence in Support of Affirmative Defense 7**

2  Defendants' evidence in support of their affirmative defense includes:

3  - Testimony by Officer and Deputy Defendants

4  - Testimony by Civilian Witnesses

5  - Evidence gathered including audio, videos, Puga's gun, Puga's fired

6  cartridge casing, photographs, scene and defendant processing,

7  Puga's criminal records, autopsy materials and toxicology.

8  - Testimony by experts and non-retained experts, expert reports, and

9  expert materials.

10  - Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

11  **(d)    Affirmative Defense 8:** Immunity under California <u>Government Code</u>

12  § 820.4.

13  **(e)    Elements Required for Affirmative Defense 8**

14  Immunity under California <u>Government Code</u> § 820.4.  The elements

15  for this affirmative defense are:

16      1.    The Defendants were exercising due care;

17      2.    The Defendants were enforcing the law.

18  **(f)    Key Evidence in Support of Affirmative Defense 8**

19  Defendants' evidence in support of their affirmative defense includes:

20  - Testimony by Officer and Deputy Defendants

21  - Testimony by Civilian Witnesses

22  - Evidence gathered including audio, videos, Puga's gun, Puga's fired

23  cartridge casing, photographs, scene and defendant processing,

24  Puga's criminal records, autopsy materials and toxicology.

25  - Testimony by experts and non-retained experts, expert reports, and

26  expert materials.

27  - Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

28

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

1        **(d)     Affirmative Defense 9:** Immunity under California <u>Penal Code</u> §§ 835,

2   835a.

3        **(e)     Elements Required for Affirmative Defense 9**

4               Immunity under California <u>Penal Code</u> §§ 835, 835a.  The elements for

5   this affirmative defense are:

6               1.     Defendants Vaccari and Adams had reasonable cause to believe

7   Decedent committed a public offense;

8               2.     The force used was reasonable to effect an arrest and/or

9   overcome Decedent's resistance, and in protection for the life and safety of the

10  Defendants and others;

11              3.     Decedent was subject to the restraint/force reasonable to

12  overcome his resistance and in protection of the life and safety of the Defendants

13  and others.

14       **(f)     Key Evidence in Support of Affirmative Defense 9**

15              Defendants' evidence in support of their affirmative defense includes:

16       • Testimony by Officer and Deputy Defendants

17       • Testimony by Civilian Witnesses

18       • Evidence gathered including audio, videos, Puga's gun, Puga's fired

19         cartridge casing, photographs, scene and defendant processing,

20         Puga's criminal records, autopsy materials and toxicology.

21       • Testimony by experts and non-retained experts, expert reports, and

22         expert materials.

23       • Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

24       **(d)     Affirmative Defense 10:** Immunity under California <u>Government Code</u>

25  § 820.8.

26  ///

27  ///

28

1    **(e)    Elements Required for Affirmative Defense 10**

2    The elements for this affirmative defense are:

3    1.    Defendants Vaccari and Adams are not liable for any injury

4  caused by the act or omission of another person, including but not limited to

5  Decedent.

6    **(f)    Key Evidence in Support of Affirmative Defense 10**

7    Defendants' evidence in support of their affirmative defense includes:

8    • Testimony by Officer and Deputy Defendants

9    • Testimony by Civilian Witnesses

10    • Evidence gathered including audio, videos, Puga's gun, Puga's fired

11    cartridge casing, photographs, scene and defendant processing,

12    Puga's criminal records, autopsy materials and toxicology.

13    • Testimony by experts and non-retained experts, expert reports, and

14    expert materials.

15    • Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

16    **(d)    Affirmative Defense 11:** Immunity under California Government Code

17  § 845.8(b)(3).

18    **(e)    Elements Required for Affirmative Defense 11**

19    The elements for this affirmative defense are:

20    1.    Decedent was resisting arrest at the time he was injured.

21    **(f)    Key Evidence in Support of Affirmative Defense 11**

22    Defendants' evidence in support of their affirmative defense includes:

23    • Testimony by Officer and Deputy Defendants

24    • Testimony by Civilian Witnesses

25    • Evidence gathered including audio, videos, Puga's gun, Puga's fired

26    cartridge casing, photographs, scene and defendant processing,

27    Puga's criminal records, autopsy materials and toxicology.

28

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

1    • Testimony by experts and non-retained experts, expert reports, and
2    expert materials.

3    • Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

4    **(d)    Affirmative Defense 12:** Immunity under California <u>Penal Code</u> §
5    196(b).

6    **(e)    Elements Required for Affirmative Defense 12**

7    The individual Defendants are not liable for the death of Decedent so
8    long as:

9    1.    Defendants Vaccari and Adams had reasonable cause to believe
10    Decedent committed a public offense;

11    2.    The force used was reasonable to effect an arrest and/or
12    overcome Decedent's resistance and in protection for the life and safety of the
13    individual Defendants and others; and

14    3.    Decedent was subject to the restraint reasonable to overcome his
15    resistance and in protection of the life and safety of the individual Defendants and
16    others.

17    **(f)    Key Evidence in Support of Affirmative Defense 12**

18    Defendants' evidence in support of their affirmative defense includes:

19    • Testimony by Officer and Deputy Defendants

20    • Testimony by Civilian Witnesses

21    • Evidence gathered including audio, videos, Puga's gun, Puga's fired
22    cartridge casing, photographs, scene and defendant processing,
23    Puga's criminal records, autopsy materials and toxicology.

24    • Testimony by experts and non-retained experts, expert reports, and
25    expert materials.

26    • Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

27    **(d)    Affirmative Defense 13:** Immunity under California <u>Government Code</u>

28

**COUNTY DEFENDANTS' MEMORANDUM
OF CONTENTIONS OF FACT AND LAW**

§ 815.2(b).

**(e)    Elements Required for Affirmative Defense 13**

The elements of this affirmative defense are:

1.    If Defendants Vaccari and Adams are immune from liability on Plaintiffs' state law claims, then their corresponding employer, Defendant County, is also immune.

**(f)    Key Evidence in Support of Affirmative Defense 13**

Defendants' evidence in support of their affirmative defense includes:

- Testimony by Officer and Deputy Defendants
- Testimony by Civilian Witnesses
- Evidence gathered including audio, videos, Puga's gun, Puga's fired cartridge casing, photographs, scene and defendant processing, Puga's criminal records, autopsy materials and toxicology.
- Testimony by experts and non-retained experts, expert reports, and expert materials.
- Testimony by Plaintiffs, Puga's sisters, and minor Plaintiffs' GALs.

**(g)    Third Parties**

There are no third parties asserting claims or defenses in this matter.

**(h)    Evidentiary Issues**

Defendants have filed and/or joined in the following Motions in Limine:

1.    **Motion in Limine No. 1** to exclude portions of the testimony of Plaintiffs' Expert Matthew Kimmins and to exclude his videos. (Dkts. #132-133);

2.    **Motion in Limine No. 2** to exclude testimony, evidence, argument regarding portions of Roger Clark's opinions. (Dkts. #129-129.8);

3.    **Motion in Limine No. 3** to exclude evidence and testimony concerning shooting and injuries of third parties during the subject incident. (Dkts. #140-140.2);

4.  **Motion in Limine No. 4** to exclude "Sal's" unauthenticated black and white video. (Dkts. #130-130.6);

5.  **Motion in Limine No. 5** to limit the testimony of medical examiner Timothy Jong, M.D. (Dkts. #141-141.3 and 145)

6.  **Motion in Limine No. 6** to exclude lay witness' opinion as to Hector Puga's state of mind. (Dkts. #126-126.4) and corresponding Ex Parte application to allow this sixth Motion in Limine. (Dkts. #127-127.8)

### (i)   Issues of Law

If Defendants' pending Motion for Summary Judgment is not successful, Defendants plan to raise the defense of qualified immunity by Rule 50 motion.  If raised after the close of evidence, the qualified immunity defense may require special interrogatories. "In a proper case, the use of special jury interrogatories going to the qualified immunity defense is not discretionary with the court." Johnson v. Breeden, 280 F.3d 1308, 1318 (11th Cir. 2002).  "Because a public official who is put to trial is entitled to have the true facts underlying his qualified immunity defense decided, a timely request for jury interrogatories directed toward such factual issues should be granted." Id.; see also Lampkins v. Thompson, 337 F.3d 1009, 1014 (8th Cir. 2003) (holding district court properly allowed special interrogatories relating to facts underpinning qualified immunity defense); Stephenson v. Doe, 332 F.3d 68, 81 (2d Cir. 2003) ("We believe that use of special interrogatories in this case resolves the difficulty of requiring the jury to decide 'what the facts were that the officer faced or perceived' and requiring the court to make the ultimate legal determination of whether qualified immunity attaches on those facts.").

At the time Deputies Vacari and Adams acted, there was no factually analogous case telling them that Decedent could not be stopped, apprehended, and later shot for his ultimately life-threatening conduct.  No "clearly established" case

1  required Deputy Vaccari and Adams to allow Decedent to further threaten them or

2  others, any longer than he actually did.  There is not a robust consensus of cases of

3  persuasive authority on this issue, either.  To the contrary, as set forth above,

4  deputies are on notice that they are permitted to use deadly force when there is

5  probable cause to believe there is an immediate threat of serious bodily injury or

6  death, which was the case here.

7  **II.    BIFURCATION OF ISSUES (L.R. 16-4.3)**

8         **<u>Punitive Damages</u>**

9         Plaintiffs have requested punitive damages in this case.  <u>Federal Rule of Civil</u>

10  <u>Procedure</u> 42(b) allows the court to bifurcate a trial for purposes of convenience, to

11  avoid prejudice, and/or to expedite trial.  Further, Rule 42(b) "confers broad

12  discretion upon the district court to bifurcate at trial, thereby deferring costly and

13  possibly unnecessary proceedings."  <u>Hangarter v. Provident Life and Acc. Ins. Co.</u>,

14  373 F.3d 998, 1021 (9th Cir. 2004).  Bifurcation of punitive damages issues is

15  appropriate here.

16         Although Defendants Vaccari and Adam's respective net worth is relevant to

17  the issue of punitive damages, it would prejudice the Defendants if Plaintiffs were

18  permitted to litigate their financial condition during the trial on the issue of liability

19  and compensatory damages.  Recognizing the prejudice to Defendants, one court

20  has stated:

22         The preferred method of accommodating the various interests is to
           delay trial as to the amount of award of punitive damages until the
23         usual issues of liability and compensatory damages have been tried,
           along with the matter of whether the defendants' conduct warrants any
24         award of punitive damages at all.  If the jury finds in favor of the
           claimant on all of these issues, the parties should then be allowed to
25         present evidence with respect to the amount of the punitive damage
           award.
26

1  Smith v. Lightening Bolt Production, Inc., 861 F.2d 363, 374 (2nd Cir. 1988).

2      In short, evidence of the Defendants' net worth should be precluded until and

3  unless the jury finds that punitive damages should be assessed against them (or

4  either of them).  999 v. C.I.T. Corp., 776 F.2d 866, 872 (9th Cir. 1985) (holding that

5  presentation to the jury of evidence of defendant's net worth was "distracting and

6  prejudicial" unless there was a showing on the predicate facts for an award of

7  punitive damages, and noting that where such evidence is improperly introduced, it

8  necessitates reversal and remand for a new determination of compensatory damages

9  "untainted by the net worth evidence").

10     Separating any portion of trial directed toward an amount of punitive damages

11  to be awarded against Defendants Vaccari and Adams, if any, facilitates an orderly

12  procession of trial, and spares the Defendants of the needless embarrassment of

13  having their net worth aired in a public setting—particularly where the jury may

14  find that no such award is appropriate after hearing the evidence in Plaintiffs' case-

15  in-chief.  See, Smith, supra, 861 F.2d at 374 (2nd Cir. 1988); see also, Geddes v.

16  United Financial Group, 559 F.2d 557, 560 (9th Cir. 1977) ("It has been widely

17  held…that the financial standing of the defendant is inadmissible as evidence in

18  determining the amount of compensatory damages to be awarded."); Marvin

19  Johnson, P.C. v. Shoen, 888 F.Supp. 1009, 1013 (D. Ariz. 1995) ("The financial

20  standing of a defendant is ordinarily inadmissible as evidence in determining the

21  amount of compensatory damages to be awarded").

22     Finally, permitting Plaintiffs to raise evidence regarding the individual

23  Defendants' financial circumstances prior to proving the issue of liability and

24  compensatory damages may waste time and confuse the jury.  See, Estate of Nunez

25  by and through Nunez v. County of San Diego, 2019 WL 2238655, at *5 (S.D. Cal.

26  2019) ("Here, the Court is persuaded that the financial information raised by

27  Defendant Naranjo is likely to take up at least some time and could lead to jury

28

**42**
**COUNTY DEFENDANTS' MEMORANDUM**
**OF CONTENTIONS OF FACT AND LAW**

1  confusion.  Thus, the motion to bifurcate trial as to separate liability

2  and punitive damages phases is GRANTED.").  Thus evidence of, or examination

3  regarding, Defendants Israel and Duran's financial circumstances should be properly

4  excluded at trial unless and until the jury finds that punitive damages should be

5  assessed against them (or either of them).  See, Fed. R. Civ. Proc. 42(b).

6  **III.    JURY TRIAL (L.R. 16-4.4)**

7       A jury trial has been timely requested by Defendants.

8  **IV.    ATTORNEYS' FEES (L.R. 16-4.5)**

9       Attorneys' fees are requested by Defendants pursuant to 42 U.S.C. § 1988.

10  **V.    ABANDONMENT OF ISSUES (L.R. 16-4.6)**

11       Defendants have not abandoned any affirmative defenses.

12

13  DATED:  April 24, 2025              **LYNBERG & WATKINS**
                                       A Professional Corporation

14

15

16                            By:  /s/ *Amy R. Margolies*
                                    _____
17                                 **SHANNON  L. GUSTAFSON**
                                   **AMY R. MARGOLIES**
18                                 Attorneys for Defendant,
                                   COUNTY OF SAN BERNARDINO
19                                   ROBERT VACCARI, and JAKE ADAMS

20

21

22

23

24

25

26

27

28