**LAW OFFICES OF DALE K. GALIPO**
Dale K. Galipo, Esq. (Bar No. 144074)
dalekgalipo@yahoo.com
Hang D. Le, Esq. (Bar No. 293450)
hlee@galipolaw.com
21800 Burbank Boulevard, Suite 310
Woodland Hills, California, 91367
Telephone: (818) 347-3333
Facsimile: (818) 347-4118

Attorneys for Plaintiffs
L.C., I.H., A.L., and Antonia Salas Ubaldo

**UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA**

L.C., a minor by and through her guardian *ad litem* Maria Cadena, individually and as successor-in-interest to Hector Puga; I.H., a minor by and through his guardian *ad litem* Jasmine Hernandez, individually and as successor-in-interest to Hector Puga; A.L., a minor by and through her guardian *ad litem* Lydia Lopez, individually and as successor-in-interest to Hector Puga; and ANTONIA SALAS UBALDO, individually;

Plaintiffs,

vs.

STATE OF CALIFORNIA; COUNTY OF SAN BERNARDINO; S.S.C., a nominal defendant; ISAIAH KEE; MICHAEL BLACKWOOD; BERNARDO RUBALCAVA; ROBERT VACCARI; JAKE ADAMS; and DOES 6-10, inclusive,

Defendants.

Case No. 5:22-cv-00949-KK-SHK

*Honorable Kenly Kiya Kato*

**PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW**

FPTC: May 15, 2025
TIME: 10:30 a.m.
CTRM: 3

TRIAL: June 2, 2025

## TABLE OF CONTENTS

I. SUMMARY OF FACTUAL CONTENTIONS ..... 1
II. CONTENTIONS OF LAW ..... 7
A. Claim 2: Fourth Amendment—Excessive Force ..... 7
B. Claim 4: Fourteenth Amendment—Interference with Familial Relationship ..... 7
C. Claim 5: Battery (Survival and Wrongful Death) ..... 8
D. Claim 6: Negligence (Survival and Wrongful Death) ..... 9
E. Claim 7: Violation of Cal. Civ. Code § 52.1 ("Bane Act") ..... 10
III. ANTICIPATED EVIDENTIARY ISSUES ..... 11
IV. ANTICIPATED ISSUES OF LAW ..... 12
V. BIFURCATION ..... 13
VI. JURY TRIAL ..... 13
VII. ATTORNEYS' FEES ..... 13
VIII. ABANDONMENT OF ISSUES ..... 13

# TABLE OF AUTHORITIES

## Cases

*Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014) .......... 10

*Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766 (2017) .......... 11

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) .......... 13

*Nelson v. City of Davis*, 709 F. Supp. 2d 978 (E.D. Cal. 2010) .......... 13

*Reese v. County of Sacramento*, 888 F.3d 1030 (9th Cir. 2018) .......... 11

## Statutes

42 U.S.C. § 1988 .......... 13

Cal. Code Civ. Proc. § 1021 1021 .......... 13

Cal. Code Civ. Proc. § 377.34 .......... 8, 9

Cal. Code Civ. Proc. § 377.60 .......... 8, 9

Cal. Gov. Code § 815.2(a) .......... 9, 10

## Other Authorities

CACI 1305A .......... 9

CACI 1305B .......... 9

CACI 401 .......... 10

CACI 440 .......... 10

CACI 441 .......... 10

Ninth Circuit Manual Model of Civil Jury Instructions, No. 9.2 .......... 12

Ninth Circuit Manual of Model Civil Jury Instructions, No. 9.32 .......... 8

Ninth Circuit Manual of Model Jury Civil Instructions, No. 9.25 .......... 7

# PLAINTIFFS' MEMORANDUM OF CONTENTIONS OF FACT AND LAW

## I. SUMMARY OF FACTUAL CONTENTIONS

On February 16, 2021, CHP Sergeant Isaiah Kee received information from dispatch regarding a freeway shooting on the 15 Northbound Freeway between Palmdale and Roy Rogers. He received information that someone driving a white Expedition with 22" black rims, with the word "funeral" on a sticker in the left rear corner of the back window had fired one shot at a black Honda Civic as a result of a roadway dispute. The driver of the black Honda Civic had taken a picture of the white Expedition but was unable to obtain the white Expedition's license plate. After an investigation at the scene, Sergeant Kee returned to the office where he briefed two graveyard-shift officers, Officer Michael Blackwood and Officer Bernardo Rubalcava, about the earlier freeway shooting. He authorized the officers to perform a felony stop on the white Expedition of they came across the vehicle during their patrol.

At approximately 1:45 a.m. on February 17, 2021, Officer Blackwood and Officer Rubalcava were traveling west on Bear Valley and entering the freeway when they observed a white Expedition that matched the description of the vehicle involved in the earlier freeway shooting. The officers turn their vehicle around to follow the white Expedition and observe the Expedition self-yield before the officers have a chance to turn on their lights or sirens. Officer Blackwood started giving the occupant(s) of the white Expedition to roll down their windows and turn off the car and observed the driver of the vehicle put his hands out the window, wave, and take off. The officers pursued the vehicle. Sergeant Kee was contacted by dispatch during that time, informing him that a unit had the vehicle stopped near Bear Valley. As Sergeant Kee headed out, he was informed that a pursuit had started. Sergeant Kee requested an air unit and requested that the San Bernardino

Sheriff's Department (SBSD) take over the pursuit. He then responded towards the pursuit.

Sergeant Robert Vaccari was the first from SBSD to join the pursuit. As Sergeant Vaccari broadcasted the directions, more of SBSD deputies joined the pursuit. During the pursuit, Sergeant Vaccari made a request for an air unit as well. Sergeant Vaccari characterized the Expedition's speeds as "fast," "but not outrageous." At some point during the pursuit, SBSD deployed spike strips, deflating the right front tire of the Expedition. As the tire disintegrated, the vehicle slowly came to a stop on Peach Avenue, south of Catalpa Street. Officer Blackwood positioned his patrol vehicle off to the left of the driver's side of the expedition while Sergeant Kee positioned his patrol vehicle off to the right. Sergeant Vaccari and Deputy Adams positioned their vehicles behind the CHP vehicles.

The officers exited their vehicles. Sergeant Kee exited his vehicle with his AR-15 and positioned himself on the driver's side of Officer Blackwood's patrol vehicle and started giving the occupants of the Expedition commands. At that point, the officers realized that there were two people inside the Expedition. It appeared to the officers that the driver was refusing to exit the Expedition, and at that point, the officers believed that the driver was still armed and dangerous.

Sergeant Kee decided to deploy the beanbag shotgun to break open the Expedition's window, but was unsuccessful. After the deployment, the passenger of the Expedition, a female, exited the vehicle and complied with the officers' commands to put her hands up and walk backward towards the officers, allowing the officers to handcuff her and take her into custody. The female informed the officers that the driver's name was Hector, later identified as the decedent, Hector Puga.

Officer Kee continued to communicate with Mr. Puga, requesting that he exit the vehicle. During this period of fifteen to twenty minutes of negotiation, the SBSD air unit that was circling above with its spotlight informed the officers that it had to leave to refuel. Also during this time, Sergeant Kee asked Sergeant Vaccari to

request for SBSD SWAT to respond to the scene. According to Sergeant Kee, Sergeant Vaccari responded that he wasn't sure SWAT would respond but that he would check, and Sergeant Kee observed Sergeant Vaccari go back to his vehicle and get on a cell phone. However, according to Sergeant Vaccari, he had forgotten his cell phone at the station, and because he was new to the station, did not know the number for SWAT. Instead, he decided on his own, without communicating with the other officers, that they should try to further negotiate with Mr. Puga before attempting to call SWAT.

Sergeant Kee then requested that Sergeant Vaccari break open the Expedition's back window, which he did so with less-lethal glass breaker rounds. Sergeant Vaccari then gave Mr. Puga commands to get out of the vehicle, which Mr. Puga refused. Mr. Puga then requested that the officers call his "wife." It should be noted that at the time of his death, Mr. Puga was not married. Mr. Puga gave the officers a phone number to call. The officers tried the number, but no one picked up on the other end. Mr. Puga then requested that the officers call his family but was unable to provide phone numbers for his family. At that point, Sergeant Vaccari then deployed pepper ball rounds into the Expedition.

The officers testified that Sergeant Vaccari fired a volley of pepper balls into the Expedition approximately every five minutes, for about 45 minutes, for a total of 75 to 100 pepper balls. During this time, Sergeant Vaccari considered contacting dispatch to contact SWAT but ultimately decided to continue deploying pepper balls despite Mr. Puga still refusing to get out of the vehicle.

At one point, Sergeant Vaccari decided that he would try to intentionally strike Mr. Puga with a pepper ball in order to motivate him to exit the vehicle. Several witnesses testified that they heard Mr. Puga exclaim, "My eye," after Sergeant Vaccari's last volley of pepper ball deployment. Officer Blackwood stated that after hearing Mr. Puga say, "My eye," he observed blood around Mr. Puga's eye area and believed that a pepper ball had hit his eye. He later testified that he

observed a cut above Mr. Puga's eye that he associated with him being hit by pepper balls. Mr. Puga then requested medical attention and agreed to exit the vehicle. Before the exited the vehicle, several witnesses testified that they heard Mr. Puga express concern that he was going to be shot if he exited the vehicle.

As Mr. Puga slowly exited the Expedition, several witnesses, including officers and percipient witnesses, observed Mr. Puga rubbing his eyes and tending to his eyes. This action was also captured on video by a bystander's cell phone. Mr. Puga was shirtless and wearing long pants as he exited the vehicles. The officers testified that Mr. Puga exited the vehicle without showing his front side to the officers, leading the officers to believe that Mr. Puga was attempting to conceal a weapon in the front of his waistband. However, a bystander captured Mr. Puga's exit out of the Expedition on video and the video does not show any object in the front of Mr. Puga's waistband as he exited the vehicle.

Mr. Puga's exit from the vehicle and the subsequent shooting was captured on video, from multiple angles, by the CHP unit's dashcam and bystander cell phone videos. As Mr. Puga exited the vehicle he raised his hands in the air, over his head, showing his empty hands. Sergeant Kee can be heard giving Mr. Puga commands as he exited the vehicle. He occasionally dropped his hands to pull up his pants or to wipe his face but would then put his hands up again. After Mr. Puga closed the door to the Expedition, he walked to the front of the Expedition. Mr. Puga told Sergeant Kee that he heard a click and believed that the officers were going to shoot him.

Mr. Puga stood in front of the Expedition with his hands up. He complied with Sergeant Kee's commands to keep his hands up and subsequent commands to put his hands on his head, but did not comply with Sergeant Kee's commands to come towards Sergeant Kee. Mr. Puga stood in front of the Expedition for a few minutes, alternating between putting his hands up above his head and placing his hands on his head or using them to pull up his pants. Deputy Adams later testified that he also observed Mr. Puga reaching down several times and thought it looked

like Mr. Puga was adjusting his pants, pulling up his pants, or reaching into his pockets.

During this time, Sergeant Kee and Officer Rubalcava decided to approach from the driver's side of the Expedition to take Mr. Puga into custody. At around the same time, Sergeant Vaccari and Deputy Adams decided to approach from the passenger's side of the Expedition to take Mr. Puga into custody. The CHP officers and the SBSD deputies did not communicate with each other regarding a plan or their intention to approach before they did so. The CHP officers were not aware that the SBSD deputies were approaching Mr. Puga on the other side of the Expedition.

As the officers approached Mr. Puga, Mr. Puga dropped his hands and started to run. Sergeant Kee testified that he shot at Mr. Puga as soon as he saw Mr. Puga drop his right hand, and that he believes he was the first one to shoot. Officer Rubalcava and Officer Blackwood discharged their firearms almost immediately after Sergeant Kee started shooting. Deputy Adams testified that he did not shoot while Mr. Puga was at the front of the vehicle and only started shooting after Mr. Puga had started to run away.

While Mr. Puga ran, his hands were visible as they moved back and forth in a running motion. Videos that captured the incident do not show Mr. Puga ever looking back or turning towards the officers while he was running, nor does it show Mr. Puga ever pointing his hand or object back towards the officers while he is running. After running a few feet, Mr. Puga fell to the ground as a result of being struck by the officers' gunshots. Videos capturing the incident show that numerous shots were fired at Mr. Puga after he had fallen to the ground, with his head directed away from the officers' direction. Plaintiffs' video expert did an analysis of the audio peaks of the videos that captured the shooting and estimated that a total of fifteen shots were fired after Mr. Puga fell to the ground. Sergeant Kee and Deputy Adams testified that after Mr. Puga fell to the ground, he was no longer an immediate threat of death or serious bodily injury.

After the shooting, the officers approached Mr. Puga to take him into custody. Deputy Adams testified that he observed Mr. Puga still breathing and that he had fallen on his hands in a prone position. Deputy Adams and Sergeant Vaccari gave Mr. Puga commands but there was no compliance. Sergeant Vaccari then deployed his Taser at Mr. Puga's back. It appeared to Sergeant Vaccari that the Taser made contact as he could see Mr. Puga tensing up. Sergeant Vaccari then deployed the Taser a second time. In his initial interview, Sergeant Vaccari conceded that he did not consider handcuffing Mr. Puga while he was under the power of the Taser, and that that would have been a much better option than deploying the Taser a second time. After the second Taser deployment, Mr. Puga was handcuffed and taken into custody.

The officers claim that after the officers turned Mr. Puga over onto his back, they observed a gun underneath Mr. Puga. The scene was processed after the incident and revealed that there were no bullet impacts or casings found near the area of the initial shooting that would support the allegation that Mr. Puga fired a weapon at anyone while he was at the front of the SUV or while he was running.

The residents of 17994 Catalpa Street, Hesperia, California were struck by gunfire as a result of the officers' use of lethal force. The family of four, consisting of Jonathan Wayne Botten, Sr., Tanja Dudek-Botten, Annabell Botten, and J.B., were inside their house, intermittently watching the police activity outside. Plaintiff J.B., a minor male at the time, sustained serious gunshot wounds to the chest that required surgery and hospitalization. Plaintiff Jonathan Wayne Botten, Sr. sustained gunshot wounds to the right arm, left hand, and right arm. Plaintiff Tanja Dudek-Botten sustained gunshot wounds to her chest, chin, face, and right arm. Ms. Botten also metal shrapnel in her eye that required removal.

//
//
//

# II. CONTENTIONS OF LAW

## A. Claim 2: Fourth Amendment—Excessive Force

This survival claim, brought by Plaintiffs L.C., I.H., and A.L, contends that Defendants Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, and Robert Vaccari used excessive force against Hector Puga in violation of his Fourth Amendment rights and 42 U.S.C. § 1983. Plaintiffs seek survival damages and attorneys' fees under this claim.

Elements:

1. Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, and/or Robert Vaccari acted under color of law;
2. Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, and/or Robert Vaccari used excessive force against Hector Puga;
3. The excessive force caused injury, damage, loss, or harm to Hector Puga.

*See* Ninth Circuit Manual of Model Jury Civil Instructions, No. 9.25.

Key Evidence: (1) testimonies of plaintiffs; (2) testimonies of lay witnesses; (3) testimonies of plaintiffs' expert witnesses; (4) videos capturing the incident; (5) photographs of the incident scene; (5) forensic evidence, including autopsy report and related photos and evidence found at the scene; (6) testimonies of defendants; and (7) photographs of plaintiffs and the decedent.

## B. Claim 4: Fourteenth Amendment—Interference with Familial Relationship

This wrongful death claim, brought by all Plaintiffs, contend that Defendants Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, and Jake Adams violated Plaintiffs' rights from governmental interference with their relationship with their father and son, Hector Puga, under the Fourteenth Amendment and 42 U.S.C. § 1983 when they shot and killed Hector Puga. Official conduct "shocks the

conscience" where an officer acts with a purpose to harm unrelated to a legitimate law enforcement objective or, if actual deliberation is practical, where the officer acts with deliberate indifference. Plaintiffs seek wrongful death damages and attorneys' fees under this claim.

Elements:

1. Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, and/or Jake Adams acted under color of state law;
2. Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, and/or Jake Adams unlawfully interfered with Plaintiff's and Mr. Puga's parent/child relationship.

*See* Ninth Circuit Manual of Model Civil Jury Instructions, No. 9.32; *Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010); *Porter v. Osborn,* 546 F.3d 1131, 1137 (9th Cir. 2008).

Key Evidence: (1) testimonies of plaintiffs; (2) testimonies of lay witnesses; (3) testimonies of plaintiffs' expert witnesses; (4) videos capturing the incident; (5) photographs of the incident scene; (5) forensic evidence, including autopsy report and related photos and evidence found at the scene; (6) testimonies of defendants; and (7) photographs of plaintiffs and the decedent.

**C. Claim 5: Battery (Survival and Wrongful Death)**

Plaintiffs L.C., I.H., and A.L. bring this claim individually and as Hector Puga successors-in-interest against Defendants Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, Robert Vaccari, the State of California, and the County of San Bernardino. Plaintiff seeks survival damages for Mr. Puga's pre-death pain and suffering, loss of life, and loss of enjoyment of life. *See* Cal. Code Civ. Proc. § 377.34. Plaintiff also seeks wrongful death damages for the loss of Mr. Puga's love, companionship, comfort, care, assistance, protection, affection, society, and moral support. *See* Cal. Code Civ. Proc. § 377.60. Plaintiffs also seek punitive

damages. The State of California is vicariously liable for the conduct of Isaiah Kee, Bernardo Rubalcava, and Michael Blackwood, and the County of San Bernardino is vicariously liable for the conduct of Jake Adams and Robert Vaccari. *See* Cal. Gov. Code § 815.2(a).

1. Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, and/or Robert Vaccari used unreasonable force against Mr. Puga;
2. Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, and/or Robert Vaccari's use of unreasonable force was a cause of injury or death to Mr. Puga.

*See* CACI 1305A, 1305B (2024 edition).

<u>Key Evidence</u>: (1) testimonies of plaintiffs; (2) testimonies of lay witnesses; (3) testimonies of plaintiffs' expert witnesses; (4) videos capturing the incident; (5) photographs of the incident scene; (5) forensic evidence, including autopsy report and related photos and evidence found at the scene; (6) testimonies of defendants; and (7) photographs of plaintiffs and the decedent.

**D. Claim 6: Negligence (Survival and Wrongful Death)**

Plaintiffs L.C., I.H., and A.L. bring this claim individually and as Hector Puga successors-in-interest against Defendants Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, Robert Vaccari, the State of California and the County of San Bernardino. Plaintiff seeks survival damages for Mr. Puga's pre-death pain and suffering, loss of life, and loss of enjoyment of life. *See* Cal. Code Civ. Proc. § 377.34. Plaintiff also seeks wrongful death damages for the loss of Mr. Puga's love, companionship, comfort, care, assistance, protection, affection, society, and moral support. *See* Cal. Code Civ. Proc. § 377.60. The State of California is vicariously liable for the conduct of Isaiah Kee, Bernardo Rubalcava, and Michael Blackwood, and the County of San Bernardino is vicariously liable for the conduct of Jake Adams and Robert Vaccari. *See* Cal. Gov. Code § 815.2(a).

1. Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, and/or Robert Vaccari were negligent;
2. The negligence of Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, and/or Robert Vaccari was a cause of injury or death to Mr. Puga.

*See* CACI 401, 440, 441 (2024 edition).

Key Evidence: (1) testimonies of plaintiffs; (2) testimonies of lay witnesses; (3) testimonies of plaintiffs' expert witnesses; (4) videos capturing the incident; (5) photographs of the incident scene; (5) forensic evidence, including autopsy report and related photos and evidence found at the scene; (6) testimonies of defendants; and (7) photographs of plaintiffs and the decedent.

**E. Claim 7: Violation of Cal. Civ. Code § 52.1 ("Bane Act")**

Plaintiffs L.C., I.H., and A.L. bring this claim against Defendants Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, Robert Vaccari, the State of California and the County of San Bernardino. Plaintiffs bring this claim as Hector Puga's successors-in-interest and seek survival damages for Mr. Puga's pain and suffering, loss of life, and loss of enjoyment of life, and punitive damages. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096 (9th Cir. 2014). The State of California is vicariously liable for the conduct of Isaiah Kee, Bernardo Rubalcava, and Michael Blackwood, and the County of San Bernardino is vicariously liable for the conduct of Jake Adams and Robert Vaccari. *See* Cal. Gov. Code § 815.2(a).

1. Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, and/or Robert Vaccari used excessive force against Mr. Puga;
2. Isaiah Kee, Bernardo Rubalcava, Michael Blackwood, Jake Adams, and/or Robert Vaccari intended to violate Mr. Puga's rights, demonstrated by these Defendants acting with reckless disregard for Mr. Puga's right to be free from excessive force;
3. The use of excessive force was a cause of injury, damage, harm, or death

to Mr. Puga.

*See Reese v. County of Sacramento*, 888 F.3d 1030, 1043 (9th Cir. 2018) (citing *Cornell v. City and County of San Francisco*, 17 Cal. App. 5th 766, 801-802 (2017)).

Key Evidence: (1) testimonies of plaintiffs; (2) testimonies of lay witnesses; (3) testimonies of plaintiffs' expert wit nesses; (4) videos capturing the incident; (5) photographs of the incident scene; (5) forensic evidence, including autopsy report and related photos and evidence found at the scene; (6) testimonies of defendants; and (7) photographs of plaintiffs and the decedent.

## III.  ANTICIPATED EVIDENTIARY ISSUES

Plaintiffs have filed the following motions *in limine*:

1. Plaintiffs' Motion *in Limine* No. 1 to Exclude Evidence of Decedent's Criminal History, Prior Contacts with Law Enforcement, Periods of Incarceratoin, Alleged Gang Affiliation, and Potential Charges and Sentencing Had Decedent Survived;

2. Plaintiffs' Motion *in Limine* No. 2 to Exclude Evidence Regarding Decedent's Alleged History of Drugs and Alcohol Use that was Unknown to the Officers;

3. Plaintiffs' Motion *in Limine* No. 3 to Exclude Any Evidence That Was Untimely Disclosed or Produced After the Fact Discovery Cutoff;

4. Plaintiffs' Motion *in Limine* No. 4 to Preclude Certain Opinions and Testimony of Defendants' Police Practices Expert Greg Meyer and Ken Hubbs;

5. Plaintiffs' Motion *in Limine* No. 5 to Exclude Evidence of State of California and County of San Bernardino's Findings That the Officers' Uses of Force Was not Criminal, Was Reasonable, Justified, and/or Was Within Policy.

## IV. ANTICIPATED ISSUES OF LAW

The parties are in disagreement regarding the issue of causation as it relates to Plaintiffs' federal Fourth and Fourteenth Amendment claims. The Ninth Circuit Manual of Model Civil Jury Instructions does not include a model instruction for causation. Instead, the Manual simply provides authority discussing "General Principles" of causation. Defendants contend that in order for the jury to find the officers liable under Plaintiffs' federal claim, the Plaintiffs must prove that the officer(s)' use of force was the actual cause of Mr. Puga's injury or death and that neither the concept of concurrent causation or alternative causation are applicable or legally appropriate under Plaintiffs' federal claims. Plaintiffs contend that both concurrent causation and alternative causation are appropriate and applicable with regards to the issue of causation under Plaintiffs' federal claims. The Ninth Circuit Manual's discussion regarding causation recognizes that

> In *Jones v. Williams*, the Ninth Circuit affirmed a defense verdict in a § 1983 case in which the district court gave the following "concurrent cause" instruction to address allegations of supervisory and group liability: "[M]any factors or things or the conduct of two or more persons can operate at the same time either independently or together to cause injury or damage and in such case each may be a proximate cause." *Jones v. Williams*, 297 F.3d 930, 937 n.6 (9th Cir. 2002).

Ninth Circuit Manual Model of Civil Jury Instructions, No. 9.2. Moreover, the fact that the fatal bullet likely came from only one of the officers does not absolve all the officers from liability if Plaintiffs are unable to show which officer fired which bullet, and which officer(s) caused the gunshot wounds sustained by Decedent or the fatal gunshot wound. In *Nelson v. City of Davis*, the district court found that even though the plaintiff was unable to show which officer fired the pepperspray bullet that hit the plaintiff, since excessive force liability may be predicated on an officer's "integral participation" and every officer who participated in firing pepperball launchers participated in a meaningful way, all officers may be held liable for the

plaintiff's injuries. *Nelson v. City of Davis*, 709 F. Supp. 2d 978, 987 (E.D. Cal. 2010), *aff'd*, 685 F.3d 867 (9th Cir. 2012). Similarly here, because all of the shooting officers intentionally used lethal force and shot at Decedent, they may all be held liable for Decedent's gunshot injuries and death.

**V. <u>BIFURCATION</u>**

Plaintiffs request that the issue of the amount of punitive damages to be awarded, if any, be bifurcated from the remainder of the trial. At this time, Plaintiffs do not request bifurcation of any other issues. However, subject to the Court's rulings on Plaintiffs' pending Motions *in Limine*, Plaintiffs may request bifurcation of liability and damages if the Court allows admission of certain prejudicial evidence solely on the basis that such evidence is relevant only to damages.

**VI. <u>JURY TRIAL</u>**

The issues herein are triable to a jury as a matter of right. The parties made a timely demand for trial by jury.

**VII. <u>ATTORNEYS' FEES</u>**

If Plaintiffs prevail at trial, they are entitled to attorneys' fees under 42 U.S.C. § 1988, *Hensley v. Eckerhart*, 461 U.S. 424, 429 (1983), and under state law pursuant to California Civil Code Section 1021, *et seq*.

**VIII. <u>ABANDONMENT OF ISSUES</u>**

Plaintiffs have voluntarily dismissed their Fourth Amendment—Detention and Arrest claim, Fourth Amendment—Denial of Medical Care claim, and all Plaintiffs' *Monell* claims for Unconstitutional Custom, Practice, or Policy, Ratification, and Inadequate Training.

//

//

//

//

DATED: April 24, 2025

LAW OFFICES OF DALE K. GALIPO

By /s/ Hang D. Le

Dale K. Galipo
Hang D. Le
Attorneys for Plaintiffs

**Certificate of Compliance**

The undersigned, counsel of record for Plaintiffs L.C., I.H., A.L., and Antonia Salas Ubaldo, certifies that this memorandum contains 4,050 words, which complies with the 7,000 word limit of L.R. 11-6.1.

DATED: April 24, 2025 LAW OFFICES OF DALE K. GALIPO

By */s/ Hang D. Le*
Dale K. Galipo
Hang D. Le
Attorneys for Plaintiffs