ROB BONTA
Attorney General of California
NORMAN D. MORRISON
Supervising Deputy Attorney General
DIANA ESQUIVEL
Deputy Attorney General
State Bar No. 202954
  1300 I Street, Suite 125
  P.O. Box 944255
  Sacramento, CA 94244-2550
  Telephone: (916) 210-7320
  Facsimile: (916) 322-8288
  E-mail: Diana.Esquivel@doj.ca.gov
*Attorneys for Defendants State of California, by and
through the California Highway Patrol, Blackwood,
Kee, and Rubalcava*

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

EASTERN-RIVERSIDE DIVISION

| | |
|---|---|
| **L.C.,** | No. 5:22-cv-00949 KK-SHKx |
| Plaintiffs, | **DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION IN LIMINE NO. 4 TO EXCLUDE CERTAIN OPINIONS AND TESTIMONY OF EXPERTS MEYERS AND HUBBS; SUPPORTING DECLARATION** |
| v. | |
| **STATE OF CALIFORNIA, et al.,** | |
| Defendants. | Date:          May 15, 2025<br>Time:          9:30 a.m.<br>Courtroom:  3 (3rd Floor)<br>Judge:         Honorable Kenly Kiya Kato<br>Trial Date:    June 2, 2025<br>Action Filed: June 7, 2022 |

## INTRODUCTION

Plaintiffs seek to exclude certain opinions and testimony by the State

Defendants' police practices expert Greg Meyer. Although Plaintiffs do not

challenge Meyer's qualifications to serve as an expert, they contend he offers

several opinions beyond his expertise. Plaintiffs are wrong. Meyer's opinions are

1  based on his review and interpretation of the evidence as he is permitted to do under

2  Federal Rule of Evidence 702. The Court should therefore deny this motion.

3      Outright denial of this motion is warranted because it violates the Court's

4  Civil Trial Scheduling Order which limits each side to five motions in limine. In

5  particular, the Court's Order requires that each motion address only one witness

6  "[i]f common grounds for exclusion or admission apply to multiple items of

7  evidence or witnesses." (Standing Civil Trial Scheduling Order at 6:17-19.)

8  Plaintiffs' motion addresses two different expert witnesses retained by different

9  Defendants.

10  **ARGUMENT**

11      Federal Rule of Evidence 702 authorizes the use of expert testimony where the

12  testimony "will assist the trier of fact to understand the evidence or to determine a

13  fact in issue." In *Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 589-90

14  (1993), the Supreme Court held that expert scientific testimony is admissible under

15  Rule 702 if it is both relevant and reliable. *See also, Kumho Tire Co., Ltd. v.

16  Carmichael*, 526 U.S. 137, 147-48 (1999) (extending *Daubert* to all expert

17  testimony where the testimony is based on technical and other specialized

18  knowledge). "The expert's testimony must be based on 'scientific knowledge'

19  which implies 'a grounding in the methods and procedures of science,' that is, it

20  must connote 'more than subjective belief or unsupported speculation.'" *Daubert*,

21  at 590. "The reliability threshold requires that the expert's testimony have 'a

22  reliable basis in the knowledge and experience of the relevant discipline.'" *Messick

23  v. Novartis Pharm. Corp*., 747 F.3d 1193, 1197 (9th Cir. 2014), quoting *Kumho

24  Tire Co., Ltd*., 526 U.S. at 149. Expert opinion or evidence is deemed reliable if the

25  principles and methodology used by the expert proffering it are grounded in the

26  methods of science. *Daubert*, 509 U.S. at 592-95. The relevant prong for expert

27  testimony is satisfied if the testimony "logically advances a material aspect of the

28  proposing party's case." *Daubert v. Merrell Dow Pharm., Inc.*, 43 F.3d 1311, 1315

1   (9th Cir. 1995). An expert's testimony must assist the trier of fact and relate to, or

2   "fit," the underlying facts of the case. *Daubert*, 509 U.S. at 591. Critical to the

3   determination of whether expert testimony is relevant is whether it is helpful to the

4   jury. *U.S. v. Rahm*, 993 F.2d 1405, 1413 (9th Cir. 1993); *U.S. v. Gwaltney*, 790

5   F.2d 1378, 1381 (9th Cir. 1986) ("The general test regarding the admissibility of

6   expert testimony is whether the jury can receive 'appreciable help' from such

7   testimony.").

8   **I.    MEYER MAY TESTIFY ABOUT WHAT HE SEES IN THE VIDEO FOOTAGE
        TO SUPPORT HIS OPINIONS THAT DEFENDANTS' USE OF LETHAL FORCE**
9   **    WAS REASONABLE**

10      Contrary to Plaintiffs' contention, Meyer is not offering opinions as a video

11  expert, nor is he offering opinion about what the video footage of the shooting

12  incident shows. Plaintiffs take his comments in his report about the video footage

13  out of context. Like any expert, Meyers is describing his review of the relevant

14  evidence and what he observed in that piece of evidence to draw his conclusion and

15  opinions about the reasonableness of State Defendants' use of lethal force.

16      For example, Meyer's report states that based on his review of Edward

17  Mangerino's video, he "can see what appears to be a handgun in Mr. Puga's

18  waistband." (Meyer Report at 11, attached here as Ex. A.) When discussing his

19  review of Blackwood dashcam (MVARS) video, he states that he can see a "shiny

20  object" in Puga's hand on three occasions. (*Id*.) Based on Meyer's review of the

21  video footage and other evidence listed and discussed in his report, he concludes

22  that "if under the totality of the circumstances [the State Defendants] reasonably

23  perceived that the actions of suspect Puga created an imminent/immediate danger of

24  death or serious bodily injury to himself or others, then [the State Defendants'] use

25  of deadly force conformed with contemporary law enforcement training and

26  procedures, and any reasonable officer could have done the same thing." (*Id*. at 6,

27  11, 16.)

28

Nothing in Meyer's report or deposition testimony rises to the level of analyzing the videos or telling the jury what the video footage shows. The video footage is simply one piece of evidence, like deposition transcripts, reports, photographs, and other documents he reviewed, that Meyer relies on to form his opinions. It is up to the jury to determine whether his interpretation of the evidence, including the video footage, is credible and supports his opinions.

## II.    MEYER WILL NOT OFFER REBUTTAL OPINIONS TO KIMMINS' TESTIMONY

Meyer does not intend to offer rebuttal opinions to Plaintiffs' video analyst and graphics expert, Matthew Kimmins. Defendants filed a motion in limine to exclude Kimmins' unreliable and irrelevant testimony and video. (ECF No. 132.)

## III.    MEYER WILL NOT OFFER EXPERT OPINION ON PERCEPTION AND REACTION TIME UNLESS PLAINTIFFS' EXPERT OPENS THE DOOR

Meyer was timely disclosed as a rebuttal expert to the opinions Plaintiffs' police-practices expert, Roger Clark, intends to offer at trial. Meyer does not intend to offer opinions about reaction time. However, Meyer is permitted to address and rebut Clark's opinions, including whether failed to timely reassess the need for lethal force or that there was time to provide Puga with a verbal warning between rounds.

/ / /

/ / /

/ / /

/ / /

/ / /

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

For the reasons stated above, the Court should deny Plaintiffs' motion

Dated:  April 24, 2025                    Respectfully submitted,

ROB BONTA
Attorney General of California
NORMAN D. MORRISON
Supervising Deputy Attorney General


*/s/ Diana Esquivel*

DIANA ESQUIVEL
Deputy Attorney General
*Attorneys for Defendants State,*
*Blackwood, Kee, and Rubalcava*

LA2022603031
38974679.docx

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Defendants State of California, Blackwood, Kee, and Rubalcava, certifies that this brief contains 1,267 words, which complies with the word limit of L.R. 11-6.1.


Dated:  April 24, 2025                                     */s/ Diana Esquivel*
                                                                    Diana Esquivel

**DECLARATION OF DIANA ESQUIVEL**

I, Diana Esquivel, declare:

1.  I am admitted to practice law in California and before this Court, and am a Deputy Attorney General with the Office of the Attorney General for the State of California, attorneys of record for Defendants State of California, by and through the California Highway Patrol, Michael Blackwood, Isaiah Kee, and Bernardo Rubalcava (State Defendants).

2.  Exhibit A is a true and correct copy of Roger Clark's expert report produced in this matter.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing statements are true and correct.

Dated:  April 24, 2025                              */s/ Diana Esquivel*
                                                    Diana Esquivel

# Exhibit A

**L.C., a minor,** *et al.*

**v.**

**STATE OF CALIFORNIA,** *et al.*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**Case No.  5:22-cv-00949-JGB-KK**

**EXPERT WITNESS REPORT**

**by**

**GREG MEYER**

**January 30, 2025**

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

## INTRODUCTION and QUALIFICATIONS

As requested by defense counsel for the State of California and California Highway Patrol (CHP) Sergeant Isaiah Kee, Officer Michael Blackwood, and Officer Bernardo Rubalcava, I have reviewed and analyzed case documentation for this incident by applying my combined 48 years of knowledge, skills, education, training, and experience as a law enforcement officer and my continuing involvement as a police procedures expert.

My opinions are based on my analysis of the documentation and evidence in this case, then applying my knowledge and understanding of generally accepted professional standards and practices in law enforcement. My opinions are offered with a reasonable degree of professional certainty and are based on:

1. My 49 years of law enforcement experience including 36 years as a sworn police officer, detective, sergeant, lieutenant, captain, reserve officer, and specialist volunteer at the Los Angeles Police Department (LAPD) combined with more than 35 years as a police tactics and procedures consultant; particularly including my experience as captain at the LAPD Academy in charge of training, including tactical training to include lethal and nonlethal Use of Force                                      .

2. I chaired LAPD's Use of Force Best Practices Work Group and LAPD's Tactics Training Review Committee, and I continued to serve on both committees for several years after I retired.

3. My personal experience with respect to the investigation, administrative review, and adjudication at the supervisory and command levels at the LAPD for police Use of Force incidents including officer-involved shootings.  For example, I conducted reviews of dozens of police shootings for the LAPD Deputy Chief in charge of the LAPD Use of Force Review Board; and as a captain, I reviewed and presented such cases for adjudication by the LAPD Use of Force Review Board.

4. For two years (2015-2017) I was the designated independent law enforcement expert for the United States Department of Homeland Security's Division of Civil Rights and Civil Liberties where I conducted special investigations involving Use of Force by such agencies as the Border Patrol, ICE, and the Federal Protective Service.

5. On 21 occasions (including 13 police shootings) I have conducted outside reviews of police Use of Force cases as requested by four District Attorney offices that were considering whether to file criminal charges against police officers; and on one occasion for a federal prosecutor after the officer was charged.  In addition, I have conducted outside reviews of seven incidents (including three police shootings) as requested by chiefs of police of local agencies.

6. I wrote the tactical "Lessons Learned" sections of a series of books authored by a former Los Angeles County District Attorney detailing the murders of two dozen peace officers in Los Angeles County.

2

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

7. I hold the Force Science Analyst certification from the Force Science Institute (FSI) and have held the Certified Litigation Specialist credential from Americans for Effective Law Enforcement (AELE).

8. I have taught law enforcement and other professionals (including lawyers and judges) about police Use of Force on more than 50 occasions throughout the United States.

9. I am a member of and receive frequent professional education updates from the International Association of Chiefs of Police (IACP, life member), the Police Executive Research Forum (PERF, life member), the Peace Officers Association of Los Angeles County (POALAC, life member), the International Law Enforcement Educators and Training Association (ILEETA), the California Force Investigators Association (CALFIA), and the Association of Force Investigators (AFI).

10. On numerous occasions I produced and instructed at Use of Force and Police Video Evidence and other seminars for POALAC, where I have been a board member for 20 years and chaired the Training Committee for 10 years.

11. I was a member of the design committee and taught classes for the revised California Peace Officer Standards and Training (POST) course on the investigation of officer-involved shootings and arrest-related deaths.

12. I have prior and ongoing work as an expert witness on police procedures, training, equipment, tactics, supervision and review processes, in federal, state, and local courts, both civil and criminal, as well as at arbitrations.

13. I have been an expert witness or consultant for more than 450 cases in the past 35 years, mostly involving police officers making arrests and mostly involving lethal and nonlethal Use of Force.  More than 100 of my cases have involved officer-involved shootings.

14. I have testified in court on police procedures matters more than 70 times, and I have been deposed in such matters more than 90 times.

15. While the majority of my work involves the defense of police officers, I have worked on cases adverse to police officers (criminal, civil, arbitrations/hearings) on more than 40 occasions.

## LIMITATIONS
1. If, after submission of this report, I am asked to consider other relevant materials and/or documents, I may either modify my stated conclusions or offer additional opinions via a supplemental report, as deemed appropriate.

2. I reserve the right to review and to respond if I deem it appropriate to any Plaintiff's police procedures expert report that I might receive in the future.

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

3.  I do not offer legal conclusions.  To the extent that my report may refer to statutes or case law, it is in the context of law enforcement training that refers to such matters.

4.  When there are factual disputes among the parties and witnesses regarding their memories of specific events during the incident, I do not make determinations of the credibility of parties and witnesses, for that is the purview of the trier of fact.

5.  When my report documents quotations and timings from audio/video evidence, I made my best effort to document those things accurately.

**LIST OF DOCUMENTS**

1.  See **EXHIBIT NO. 1** – List of Documents Provided to Greg Meyer
2.  California Peace Officer Standards and Training (POST) Learning Domain No. 20 Use of Force/Deescalation, Version 5.3

**PLAINTIFF'S FIRST AMENDED COMPLAINT re CHP**
- False detention/arrest
- Excessive force
- Denial of medical treatment
- Negligence
- Failure to intervene.

**INCIDENT OVERVIEW**
On February 17, 2021 at approximately 0141 hours (1:41am), California Highway Patrol (CHP) Officers Blackwood and Ruvalcava observed a vehicle that matched the description of a vehicle that had early been involved in a freeway shooting in the Victorville area.  When the officers attempted to stop the vehicle, suspect Puga attempted to elude them, and a high-speed pursuit occurred involving CHP officers and deputies from the San Bernardino County Sheriff's Department (SBCSD).  At approximately 0239 hours (2:39 am), the hour-long pursuit ended northbound Peach Avenue at Catalpa Street in Hesperia.  A stand-off between suspect Puga and the CHP officers and SBCSD deputies lasted for more than an hour.  Led by CHP Sergeant Kee, CHP officers continuously engaged in verbal de-escalation and negotiation attempts with suspect Puga in an effort to get suspect Puga to surrender.  At approximately 0348 hours (3:48am), as suspect Puga was out of his vehicle but hiding from view his waistband, two CHP officers (Sergeant Kee and Officer Ruvalcava) and two SBCSD deputies approached him from two angles.  Suspect Puga pulled a 9mm semi-automatic pistol from his waistband and reportedly fired a shot at the CHP officers.  As suspect Puga turned and fled toward a residential area, multiple officers and deputies returned fire.  Suspect Puga fell to the ground and was pronounced dead at the scene.

Detailed summaries of the incident are found at Bates AGO4-44C and COSB000044-47.

4

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

## POTENTIAL LIMITATIONS OF VIDEO EVIDENCE

This case involves video evidence. My training and experience are that video evidence of a police use of force incident is generally very valuable to an investigation, but it has several significant, potential limitations that investigators and adjudicators must be aware of:

- Videos are made with two-dimensional technology, but we live in a three-dimensional world.
- Videos do not always capture the involved officer's point of view.
- Videos may capture objects and events that the officer did not see.
- Videos do not always capture objects and events that the officer did see.
- Videos may capture more information than an officer's brain can process because of the psychological stress experienced in the moment.
- Video cameras do not capture objects and movements that are blocked from the camera lens.
- Videos may document lighting conditions, depth perception, and peripheral fields of view that are different than the human eye.
- Some videos have a low frame rate, thus they do not capture real time.
- Bystander cell phone videos tend not to capture the entire incident.
- Video devices are not always pointed at the action.
- Video devices often capture voices and other sounds that are more valuable to the investigation than what is seen on the video.
- Video cameras are neutral, inanimate objects; thus, videos do not experience the bio-mechanical, physiological and psychological aspects that the involved human being experiences under stress in terms of perception, fear, adrenalin-influenced physiological changes (such as breathing, heart rate, and blood pressure), interpretation of contextual cues, narrowly focused attention ("tunnel vision"), time distortion, sound distortion, memory (formation, storage, and retrieval), and other human performance phenomena.
- Videos of use-of-force incidents tend to cause emotion-based (not fact-based) reactions by viewers, because use of force is generally not pleasant to view.
- In some cases it is advisable to engage the services of a certified forensic video analyst.
- Officers experience events in real time, and only once. Officers do not have the luxury of repeated viewings of videos or manipulating videos (such viewing videos in slow motion or making freeze frame photographs of isolated events, for example) as investigators and adjudicators commonly do.
- Videos are not "the ultimate truth." Investigators and adjudicators must determine what the officer perceived at the time and apply the totality of the circumstances along with policy, training and the law to determine whether or not the officer's perceptions and actions were objectively reasonable.

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

## OPINIONS

I was retained to issue Opinions about the police procedures used by CHP Sergeant Kee, Officer Blackwood, and Officer Rubalcava.

### Opinion No. 1
**Based on my training and experience along with my review of the evidence in this case, if under the totality of the circumstances CHP Sergeant Kee reasonably perceived that the actions of suspect Puga created an imminent/immediate danger of death or serious bodily injury to himself or others, then CHP Sergeant Kee's use of deadly force conformed with contemporary law enforcement training and procedures, and any reasonable officer could have done the same thing.**

Video evidence clearly shows Puga's noncompliance with the officers' control commands, and it shows extensive de-escalation efforts that went on for more than a half-hour before the shooting.[1]

CHP Sergeant Kee fired his rifle during the incident when Puga pulled a handgun from his waistband and reportedly fired at officers.

Based on my review of a video taken by Edward Mangerino (COSB0001459) at counter 00:32, I can see what appears to be a handgun in Mr. Puga's right waistband.

Based on my review of the Blackwood MVARS video (Bates 814C), I can see a shiny object in Puga's hand on three occasions: (1) once at counter 42:28 as he steps away from the front of his SUV and the officer-involved shooting commences; (2) twice as he's running away, at counters 42:30 and 42:32.

Witness Annabelle Botten stated that she observed suspect Puga fire a shot from his handgun toward the CHP officers:[2]

> Annabelle saw Puga run to the front of his Expedition and faced the officers. The unidentified officer negotiated with Puga, and asked him to step away from the front of the SUV. Puga did not comply and remained in front of the Expedition. Puga promised the officers he did not have a gun. However, Puga would not show the officers his waistband as they requested. Annabelle saw two unidentified CHP officers walk north along the driver's side of the Expedition. Annabelle saw Puga lower his right hand toward the front of his waist, and raised what she described as a black handgun. Annabelle saw Puga shoot once at the CHP officers, who stood on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle flash from his handgun. After Puga shot, the CHP officers shot back at Puga, and that is when numerous bullets struck Annabelle's residence. Puga ran north on Peach Avenue as the officers continued to shoot him.

---

[1] Document [814c] Blackwood MVARS Fragment 04
[2] SBSCD report of interview of Annabelle Botten, COSB000750, para. 1

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

Witness Edward Mangerino testified at deposition that before the police started shooting, he
observed smoke coming from the front of Hector's hand, although he did not see the gun; and he
assessed that before the shooting the officers were attempting to de-escalate the situation.

> Page 35
> 10 And I can't really recollect what the police
> 11 were saying. But if you want to go on, at some point
> 12 while he was standing there. But his arm was raised
> 13 up -- and I could not see a gun, so we'll be clear on
> 14 that, I couldn't see a gun.
> 15 But his arm was up, he had his hand around
> 16 something, and smoke came from the front of his hand,
> 17 which gave me the impression that he had a gun.
> …
> Page 39
> -- a puff of smoke come from that hand. And
> 4 based on your impression of his movement and the smoke
> 5 and the way his arm is raised, you believed he had a
> 6 gun?
> 7 A Yes, I do.
> 8 Q And then what happened after that?
> 9 A The officers started returning fire, and he
> 10 just took off turning -- going north up Peach, and
> 11 that's when I lost sight of him.
> …
> Page 42
> 5 Q Mr. Mangerino, how would you describe law
> 6 enforcement's demeanor from what you saw during this
> 7 encounter?
> 8 A Just from listening to them -- because I didn't
> 9 see them -- they seemed calm. They were trying to be
> 10 helpful to get him out of the car. There was no
> 11 aggression, that I can recollect, in their voices.
> 12 They got panicky when he went in front of the
> 13 car; their voices then changed then. But it was
> 14 still -- I didn't see any real aggression, like, you
> 15 know. They were trying to be very calm. They were
> 16 trying to de-escalate the situation.
> …
> Page 50
> 24 Q Do you remember, to the best you can, whether
> 25 that puff from Hector's hand, if that came before or
> Page 51
> 1 after you heard gunshots that you might have suspected
> 2 came from the officers?
> 3 A The puff of smoke was before I heard
> 4 gunshots.

L.C., a minor, *et al.* v. State of California, *et al.*          Greg Meyer's Rule 26 Report

All California peace officers must attend and pass training provided by the Commission on Peace Officer Standards and Training (POST).  Following are excerpts from what California POST teaches peace officers regarding deadly force:[3]

> In some instances, peace officers may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions must be made. …

> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect arrest, to prevent escape, or to overcome resistance. (Penal Code Section 835a(b))

> A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary. (Penal Code Section 835a(c))

> Imminent means: a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)) …

> Force options that officers may use in Life Threatening situations:

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Life-threatening | Any action likely to result in serious bodily injury or death to the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

If CHP Sergeant Kee reasonably believed that deadly force was necessary, CHP Sergeant Kee complied with CHP policy HPM 70.6, 2.e which states:

> e. Deadly Force. An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life. In determining whether deadly force reasonably appears to be necessary, officers shall evaluate each situation in light of the particular circumstances of each case. If reasonably safe and feasible to do so, officers shall use other available resources and techniques.

---

[3] POST Learning Domain No. 20 Use of Force/Deescalation, Version 5.3, p. 3-7, 4-3, 4-7, 4-13 and 3-7

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

Officers are trained that the purpose of shooting at a subject is to stop the threat.  In a dynamic situation, it often takes multiple rounds to stop the threat.  The United States Supreme Court has recognized that reality:

> "It makes sense that, if officers are justified in firing at a suspect in order to end a severe threat to public safety, **they need not stop shooting until the threat has ended.**"
> *Plumhoff v. Rickard* 134 US 2012 (2014) *[emphasis added]*

Based upon my training and experience, a person holding a handgun in any position and point and shoot at a target in ¼ second or less, which is faster than any police officer or any other person can react to the deadly threat.  This fact is easily demonstrated in the courtroom, and I have done so on several occasions.

Police officers in the United States are universally taught that the legal standard used to determine the lawfulness of a Use of Force is the Fourth Amendment to the United States Constitution.  See *Graham v. Connor* 490 U.S. 386 (1989).  *Graham* states in part*, "*The reasonableness of a particular Use of Force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation.  The test of reasonableness is not capable of precise definition or mechanical application."

Officers are taught that "reasonableness" is assessed using *Graham* and from the articulated facts from the perspective of a peace officer with similar training and experience placed in generally the same set of circumstances.  In determining the appropriate level of force, officers evaluate each situation in light of facts and circumstances of each particular case.  Those factors may include (but are not limited to) the following factors, with my [**bracketed comments**] as they pertain to my analysis of the issues in this case:

> The seriousness of the crime or suspected offense **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.]***;*

> The level of threat or resistance presented by the subject **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.]***;*

> Whether the subject was posing an imminent threat to officers or a danger to the community **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.]***;*

9

The potential for injury to citizens, officers or subjects **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.]***;*

The risk or apparent attempt by the subject to escape [**If suspect Puga escaped capture, the armed suspect (whom the officers knew was wanted for the prior freeway shooting, and Puga had already reportedly fired a shot at the officers just before he turned and ran toward the residential area) would put the community at great risk.**];

The conduct of the subject being confronted (as reasonably perceived by the officer at the time) **[According to CHP Sergeant Kee, Puga pulled a handgun from his waistband and shot at officers.]***;*

The time available to an officer to plan **[The officers needed to act immediately when Puga presented a deadly threat.]**;

The availability of other resources **[Multiple officers from CHP and SBCSD were at the scene.]**;

The training and experience of the officer **[CHP Sergeant Kee had 20 years of experience as a peace officer. His training record documents that he regularly performed qualification shooting and attended training classes on tactics.]**

The proximity or access of weapons to the subject **[Suspect Puga was armed with and held a handgun, and he reportedly fired it at officers.]**;

The environmental factors and/or other exigent circumstances **[The incident occurred during pre-dawn hours in a residential neighborhood as CHP and SBCSD officers attempted to arrest suspect Puga at the end of a lengthy pursuit. The following quote from the District Attorney's report (at Bates AGO 1681) that analyzed this case is instructive: "In this case, Sergeant Kee, Officer Blackwood, Officer Rubalcava, Sergeant Vaccari, and Deputy Adams each had an honest and objectively reasonable believe that Puga posed an imminent risk of serious bodily injury or death. Each law enforcement officer was aware to some degree that the vehicle that they were pursuing matched the description of an armed suspect at large. Puga led law enforcement on a high-speed pursuit throughout city streets for approximately one hour followed by a one-hour standoff. At the end of the standoff Puga acted evasive, specifically hiding the front of his waistband. Puga pulled a firearm and pointed and fired it at law enforcement."]**

As of January 1, 2020 (in effect on the date of this incident), Subsections (b) and (c) of Section 835a of the California Penal Code sets forth criteria for the use of force by peace officers. POST requires that this law revision be taught to peace officers throughout California. Here are my **[bracketed comments]** as they pertain to the Section 835a (b and c) issues in this case:

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

- (b) Were the officers using force to effect an arrest, or prevent escape, or to overcome resistance?  **[Yes, all three criteria apply.]**  N

- (c) (1) (A) Was deadly force used to defend against an imminent threat of death or serious bodily injury to the officer or to another person? **[According to multiple officers and witnesses, Mr. Puga was armed with a handgun and he fired it at officers.]**

- (c) (1) (B) Was deadly force used to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury?  **[Officers fired at an armed wanted felony suspect who had reportedly fired at officers and who was running in the direction of nearby houses.]**

- (c) (2) Was deadly force used against a person based on the danger that person poses to themselves when the person did not pose an imminent threat of death or serious bodily injury to the peace officer or to another person. **[No.]**

**Opinion No. 2**
**Based on my training and experience along with my review of the evidence in this case, if under the totality of the circumstances CHP Officer Blackwood reasonably perceived that the actions of suspect Puga created an imminent/immediate danger of death or serious bodily injury to himself or others, then CHP Officer Blackwood's use of deadly force conformed with contemporary law enforcement training and procedures, and any reasonable officer could have done the same thing.**

Video evidence clearly shows Puga's noncompliance with the officers' control commands, and it shows extensive de-escalation efforts that went on for more than a half-hour before the shooting.[4]

CHP Officer Blackwood fired his rifle during the incident when Puga pulled a handgun from his waistband and reportedly fired at officers.

Based on my review of a video taken by Edward Mangerino (COSB0001459) at counter 00:32, I can see what appears to be a handgun in Mr. Puga's right waistband.

Based on my review of the Blackwood MVARS video (Bates 814C), I can see a shiny object in Puga's hand on three occasions: (1) once at counter 42:28 as he steps away from the front of his SUV and the officer-involved shooting commences; (2) and twice as he's running away, at counters 42:30 and 42:32.

Witness Annabelle Botten stated that she observed suspect Puga fire a shot from his handgun toward the CHP officers:[5]

> Annabelle saw Puga run to the front of his Expedition and faced the officers. The unidentified officer negotiated with Puga, and asked him to step away from the front of

---

[4] Document [814c] Blackwood MVARS Fragment 04
[5] SBSCD report of interview of Annabelle Botten, COSB000750, para. 1

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

the SUV. Puga did not comply and remained in front of the Expedition. Puga promised
the officers he did not have a gun. However, Puga would not show the officers his
waistband as they requested. Annabelle saw two unidentified CHP officers walk
north along the driver's side of the Expedition. Annabelle saw Puga lower his right hand
toward the front of his waist, and raised what she described as a black handgun.
Annabelle saw Puga shoot once at the CHP officers, who stood on the southwest corner
of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle
flash from his handgun. After Puga shot, the CHP officers shot back at Puga, and that is
when numerous bullets struck Annabelle's residence. Puga ran north on Peach Avenue as
the officers continued to shoot him.

Witness Edward Mangerino testified at deposition that before the police started shooting, he
observed smoke coming from the front of Hector's hand, although he did not see the gun; and he
assessed that before the shooting the officers were attempting to de-escalate the situation.

    Page 35
    10 And I can't really recollect what the police
    11 were saying. But if you want to go on, at some point
    12 while he was standing there. But his arm was raised
    13 up -- and I could not see a gun, so we'll be clear on
    14 that, I couldn't see a gun.
    15 But his arm was up, he had his hand around
    16 something, and smoke came from the front of his hand,
    17 which gave me the impression that he had a gun.
    …
    Page 39
    -- a puff of smoke come from that hand. And
    4 based on your impression of his movement and the smoke
    5 and the way his arm is raised, you believed he had a
    6 gun?
    7 A Yes, I do.
    8 Q And then what happened after that?
    9 A The officers started returning fire, and he
    10 just took off turning -- going north up Peach, and
    11 that's when I lost sight of him.
    …
    Page 42
    5 Q Mr. Mangerino, how would you describe law
    6 enforcement's demeanor from what you saw during this
    7 encounter?
    8 A Just from listening to them -- because I didn't
    9 see them -- they seemed calm. They were trying to be
    10 helpful to get him out of the car. There was no
    11 aggression, that I can recollect, in their voices.
    12 They got panicky when he went in front of the
    13 car; their voices then changed then. But it was

12

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

> 14 still -- I didn't see any real aggression, like, you
> 15 know. They were trying to be very calm. They were
> 16 trying to de-escalate the situation.
> …
> Page 50
> 24 Q Do you remember, to the best you can, whether
> 25 that puff from Hector's hand, if that came before or
> Page 51
> 1 after you heard gunshots that you might have suspected
> 2 came from the officers?
> 3 A The puff of smoke was before I heard
> 4 gunshots.

All California peace officers must attend and pass training provided by the Commission on Peace Officer Standards and Training (POST).  Following are excerpts from what California POST teaches peace officers regarding deadly force:[6]

> In some instances, peace officers may have time to evaluate and assess all aspects of a situation. In most situations, split-second decisions must be made. …

> Any peace officer who has reasonable cause to believe that the person to be arrested has committed a public offense may use objectively reasonable force to effect arrest, to prevent escape, or to overcome resistance. (Penal Code Section 835a(b))

> A peace officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary. (Penal Code Section 835a(c))

> Imminent means: a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)) …

> Force options that officers may use in Life Threatening situations:

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Life-threatening | Any action likely to result in serious bodily injury or death to the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

---

[6] POST Learning Domain No. 20 Use of Force/Deescalation, Version 5.3, p. 3-7, 4-3, 4-7, 4-13 and 3-7

13

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

If CHP Officer Blackwood reasonably believed that deadly force was necessary, CHP Sergeant Kee complied with CHP policy HPM 70.6, 2.e which states:

> e. Deadly Force. An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life. In determining whether deadly force reasonably appears to be necessary, officers shall evaluate each situation in light of the particular circumstances of each case. If reasonably safe and feasible to do so, officers shall use other available resources and techniques.

Officers are trained that the purpose of shooting at a subject is to stop the threat. In a dynamic situation, it often takes multiple rounds to stop the threat. The United States Supreme Court has recognized that reality:

> "It makes sense that, if officers are justified in firing at a suspect in order to end a severe threat to public safety, **they need not stop shooting until the threat has ended.**"
> *Plumhoff v. Rickard* 134 US 2012 (2014) *[emphasis added]*

Based upon my training and experience, a person holding a handgun in any position and point and shoot at a target in ¼ second or less, which is faster than any police officer or any other person can react to the deadly threat. This fact is easily demonstrated in the courtroom, and I have done so on several occasions.

Police officers in the United States are universally taught that the legal standard used to determine the lawfulness of a Use of Force is the Fourth Amendment to the United States Constitution. See *Graham v. Connor* 490 U.S. 386 (1989). *Graham* states in part, "The reasonableness of a particular Use of Force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation. The test of reasonableness is not capable of precise definition or mechanical application."

Officers are taught that "reasonableness" is assessed using *Graham* and from the articulated facts from the perspective of a peace officer with similar training and experience placed in generally the same set of circumstances. In determining the appropriate level of force, officers evaluate each situation in light of facts and circumstances of each particular case. Those factors may include (but are not limited to) the following factors, with my [**bracketed comments**] as they pertain to my analysis of the issues in this case:

L.C., a minor, *et al.* v. State of California, *et al.*                Greg Meyer's Rule 26 Report

The seriousness of the crime or suspected offense **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]***;*

The level of threat or resistance presented by the subject **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]***;*

Whether the subject was posing an imminent threat to officers or a danger to the community **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]***;*

The potential for injury to citizens, officers or subjects **[Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]***;*

The risk or apparent attempt by the subject to escape **[If suspect Puga escaped capture, the armed suspect (whom the officers knew was wanted for the prior freeway shooting, and Puga had already reportedly fired a shot at the officers just before he turned and ran toward the residential area) would put the community at great risk.]**;

The conduct of the subject being confronted (as reasonably perceived by the officer at the time) **[According to CHP Officer Blackwood, Puga pulled a handgun from his waistband and shot at officers.]***;*

The time available to an officer to plan **[The officers needed to react immediately when Puga presented a deadly threat.]**;

The availability of other resources **[Multiple officers from CHP and SBCSD were at the scene.]**

The training and experience of the officer **[CHP Officer Blackwood had more than four years of experience as a peace officer. His training record documents that he regularly performed qualification shooting and attended training classes on tactics.]**

The proximity or access of weapons to the subject **[Suspect Puga was armed with and held a handgun, and he reportedly fired it at officers.]**;

The environmental factors and/or other exigent circumstances **[The incident occurred during pre-dawn hours in a residential neighborhood as CHP and SBCSD officers attempted to arrest suspect Puga at the end of a lengthy pursuit. The following quote from the District Attorney's report (at Bates AGO 1681) that analyzed this case is instructive: "In this case, Sergeant Kee, Officer Blackwood, Officer Rubalcava, Sergeant Vaccari, and Deputy Adams each had an honest and objectively reasonable believe that Puga posed an imminent risk of serious bodily injury or death. Each law**

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

**enforcement officer was aware to some degree that the vehicle that they were pursuing matched the description of an armed suspect at large. Puga led law enforcement on a high-speed pursuit throughout city streets for approximately one hour followed by a one-hour standoff. At the end of the standoff Puga acted evasive, specifically hiding the front of his waistband. Puga pulled a firearm and pointed and fired it at law enforcement."]**

As of January 1, 2020 (in effect on the date of this incident), Subsections (b) and (c) of Section 835a of the California Penal Code sets forth criteria for the use of force by peace officers. POST requires that this law revision be taught to peace officers throughout California. Here are my **[bracketed comments]** as they pertain to the Section 835a (b and c) issues in this case:

- (b) Were the officers using force to effect an arrest, or prevent escape, or to overcome resistance? **[Yes, all three criteria apply.]**

- (c) (1) (A) Was deadly force used to defend against an imminent threat of death or serious bodily injury to the officer or to another person? **[According to multiple officers and witnesses, Mr. Puga was armed with a handgun, and he fired it at officers.]**

- (c) (1) (B) Was deadly force used to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury? **[Officers fired at an armed wanted felony suspect who had reportedly fired at officers and who was running in the direction of nearby houses.]**

- (c) (2) Was deadly force used against a person based on the danger that person poses to themselves when the person did not pose an imminent threat of death or serious bodily injury to the peace officer or to another person. **[No.]**

**<u>Opinion No. 3</u>**
**Based on my training and experience along with my review of the evidence in this case, if under the totality of the circumstances CHP Officer Rubalcava reasonably perceived that the actions of suspect Puga created an imminent/immediate danger of death or serious bodily injury to himself or others, then CHP Officer Rubalcava's use of deadly force conformed with contemporary law enforcement training and procedures, and any reasonable officer could have done the same thing.**

Video evidence clearly shows Puga's noncompliance with the officers' control commands, and it shows extensive de-escalation efforts that went on for more than a half-hour before the shooting.[7]

CHP Officer Rubalcava fired his handgun during the incident when Puga pulled a handgun from his waistband and reportedly fired at officers.

---

[7] Document [814c] Blackwood MVARS Fragment 04

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

Based on my review of a video taken by Edward Mangerino (COSB0001459) at counter 00:32, I can see what appears to be a handgun in Mr. Puga's right waistband.

Based on my review of the Blackwood MVARS video (Bates 814C), I can see a shiny object in Puga's hand on three occasions: (1) once at counter 42:28 as he steps away from the front of his SUV and the officer-involved shooting commences; (2) and twice as he's running away, at counters 42:30 and 42:32.

Witness Annabelle Botten stated that she observed suspect Puga fire a shot from his handgun toward the CHP officers:[8]

> Annabelle saw Puga run to the front of his Expedition and faced the officers. The unidentified officer negotiated with Puga, and asked him to step away from the front of the SUV. Puga did not comply and remained in front of the Expedition. Puga promised the officers he did not have a gun. However, Puga would not show the officers his waistband as they requested. Annabelle saw two unidentified CHP officers walk north along the driver's side of the Expedition. Annabelle saw Puga lower his right hand toward the front of his waist, and raised what she described as a black handgun. Annabelle saw Puga shoot once at the CHP officers, who stood on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle flash from his handgun. After Puga shot, the CHP officers shot back at Puga, and that is when numerous bullets struck Annabelle's residence. Puga ran north on Peach Avenue as the officers continued to shoot him.

Witness Edward Mangerino testified at deposition that before the police started shooting, he observed smoke coming from the front of Hector's hand, although he did not see the gun; and he assessed that before the shooting the officers were attempting to de-escalate the situation.

> Page 35
> 10 And I can't really recollect what the police
> 11 were saying. But if you want to go on, at some point
> 12 while he was standing there. But his arm was raised
> 13 up -- and I could not see a gun, so we'll be clear on
> 14 that, I couldn't see a gun.
> 15 But his arm was up, he had his hand around
> 16 something, and smoke came from the front of his hand,
> 17 which gave me the impression that he had a gun.
> …
>
> Page 39
> -- a puff of smoke come from that hand. And
> 4 based on your impression of his movement and the smoke
> 5 and the way his arm is raised, you believed he had a

---

[8] SBSCD report of interview of Annabelle Botten, COSB000750, para. 1

L.C., a minor, *et al.* v. State of California, *et al.*                   Greg Meyer's Rule 26 Report

6 gun?
7 A Yes, I do.
8 Q And then what happened after that?
9 A The officers started returning fire, and he
10 just took off turning -- going north up Peach, and
11 that's when I lost sight of him.
…
Page 42
5 Q Mr. Mangerino, how would you describe law
6 enforcement's demeanor from what you saw during this
7 encounter?
8 A Just from listening to them -- because I didn't
9 see them -- they seemed calm. They were trying to be
10 helpful to get him out of the car. There was no
11 aggression, that I can recollect, in their voices.
12 They got panicky when he went in front of the
13 car; their voices then changed then. But it was
14 still -- I didn't see any real aggression, like, you
15 know. They were trying to be very calm. They were
16 trying to de-escalate the situation.
…
Page 50
24 Q Do you remember, to the best you can, whether
25 that puff from Hector's hand, if that came before or
Page 51
1 after you heard gunshots that you might have suspected
2 came from the officers?
3 A The puff of smoke was before I heard
4 gunshots.


All California peace officers must attend and pass training provided by the Commission on Peace
Officer Standards and Training (POST).  Following are excerpts from what California POST
teaches peace officers regarding deadly force:[9]

> In some instances, peace officers may have time to evaluate and assess all aspects of a
> situation. In most situations, split-second decisions must be made. …

> Any peace officer who has reasonable cause to believe that the person to be arrested has
> committed a public offense may use objectively reasonable force to effect arrest, to
> prevent escape, or to overcome resistance. (Penal Code Section 835a(b))

> A peace officer is justified in using deadly force upon another person only when the
> officer reasonably believes, based on the totality of the circumstances, that such force is
> necessary. (Penal Code Section 835a(c))

---

[9] POST Learning Domain No. 20 Use of Force/Deescalation, Version 5.3, p. 3-7, 4-3, 4-7, 4-13 and 3-7

L.C., a minor, *et al.* v. State of California, *et al.*                Greg Meyer's Rule 26 Report

Imminent means: a threat of death or serious injury is "imminent" when, based upon the totality of the circumstances, a reasonable officer in the same situation would believe that a person has the present ability, opportunity, and apparent intent to immediately cause death or serious bodily injury to the peace officer or another person. An imminent harm is not merely a fear of future harm, no matter how great the fear and no matter how great the likelihood of the harm, but is one that, from appearances, must be instantly confronted and addressed. (Penal Code Section 835a(e)(2)) …

Force options that officers may use in Life Threatening situations:

| Subject's Actions | Description | Possible Force Option |
|---|---|---|
| Life-threatening | Any action likely to result in serious bodily injury or death to the officer or others | - Utilizing firearms or any other available weapon or action in defense of self and others to stop the threat |

If CHP Officer Rubalcava reasonably believed that deadly force was necessary, CHP Sergeant Kee complied with CHP policy HPM 70.6, 2.e which states:

e. Deadly Force. An officer is justified in using deadly force upon another person only when the officer reasonably believes, based on the totality of the circumstances, that such force is necessary in defense of human life. In determining whether deadly force reasonably appears to be necessary, officers shall evaluate each situation in light of the particular circumstances of each case. If reasonably safe and feasible to do so, officers shall use other available resources and techniques.

Officers are trained that the purpose of shooting at a subject is to stop the threat. In a dynamic situation, it often takes multiple rounds to stop the threat. The United States Supreme Court has recognized that reality:

"It makes sense that, if officers are justified in firing at a suspect in order to end a severe threat to public safety, **they need not stop shooting until the threat has ended.**"
*Plumhoff v. Rickard* 134 US 2012 (2014) *[emphasis added]*

Based upon my training and experience, a person holding a handgun in any position and point and shoot at a target in ¼ second or less, which is faster than any police officer or any other person can react to the deadly threat. This fact is easily demonstrated in the courtroom, and I have done so on several occasions.

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

Police officers in the United States are universally taught that the legal standard used to determine the lawfulness of a Use of Force is the Fourth Amendment to the United States Constitution.  See *Graham v. Connor* 490 U.S. 386 (1989).  *Graham* states in part, "The reasonableness of a particular Use of Force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments -- in circumstances that are tense, uncertain and rapidly evolving -- about the amount of force that is necessary in a particular situation.  The test of reasonableness is not capable of precise definition or mechanical application."

Officers are taught that "reasonableness" is assessed using *Graham* and from the articulated facts from the perspective of a peace officer with similar training and experience placed in generally the same set of circumstances.  In determining the appropriate level of force, officers evaluate each situation in light of facts and circumstances of each particular case.  Those factors may include (but are not limited to) the following factors, with my [**bracketed comments**] as they pertain to my analysis of the issues in this case:

    The seriousness of the crime or suspected offense [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway. According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**];

    The level of threat or resistance presented by the subject [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**];

    Whether the subject was posing an imminent threat to officers or a danger to the community [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**];

    The potential for injury to citizens, officers or subjects [**Prior to the pursuit, Mr. Puga was suspected of shooting a gun at someone on the freeway.  According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**];

    The risk or apparent attempt by the subject to escape [**If suspect Puga escaped capture, the armed suspect (whom the officers knew was wanted for the prior freeway shooting, and Puga had already reportedly fired a shot at the officers just before he turned and ran toward the residential area) would put the community at great risk.**];

    The conduct of the subject being confronted (as reasonably perceived by the officer at the time) [**According to CHP Officer Rubalcava, Puga pulled a handgun from his waistband and shot at officers.**];

    The time available to an officer to plan [**The officers needed to act immediately when Puga presented a deadly threat.**];

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

The availability of other resources **[Multiple officers from CHP and SBCSD were at the scene.]**;

The training and experience of the officer **[CHP Officer Rubalcava had one year of experience as a peace officer.  His training record documents that he regularly performed qualification shooting and attended training classes on tactics.]**

The proximity or access of weapons to the subject **[Suspect Puga was armed with and held a handgun, and he reportedly fired it at officers.]**;

The environmental factors and/or other exigent circumstances **[The incident occurred during pre-dawn hours in a residential neighborhood as CHP and SBCSD officers attempted to arrest suspect Puga at the end of a lengthy pursuit. The following quote from the District Attorney's report (at Bates AGO 1681) that analyzed this case is instructive: "In this case, Sergeant Kee, Officer Blackwood, Officer Rubalcava, Sergeant Vaccari, and Deputy Adams each had an honest and objectively reasonable believe that Puga posed an imminent risk of serious bodily injury or death. Each law enforcement officer was aware to some degree that the vehicle that they were pursuing matched the description of an armed suspect at large. Puga led law enforcement on a high-speed pursuit throughout city streets for approximately one hour followed by a one-hour standoff. At the end of the standoff Puga acted evasive, specifically hiding the front of his waistband. Puga pulled a firearm and pointed and fired it at law enforcement."]**

As of January 1, 2020 (in effect on the date of this incident), Subsections (b) and (c) of Section 835a of the California Penal Code sets forth criteria for the use of force by peace officers.   POST requires that this law revision be taught to peace officers throughout California. Here are my **[bracketed comments]** as they pertain to the Section 835a (b and c) issues in this case:

- (b) Were the officers using force to effect an arrest, or prevent escape, or to overcome resistance?  **[Yes, all three criteria apply.]**

- (c) (1) (A) Was deadly force used to defend against an imminent threat of death or serious bodily injury to the officer or to another person? **[According to multiple officers and witnesses, Mr. Puga was armed with a handgun and he fired it at officers.]**

- (c) (1) (B) Was deadly force used to apprehend a fleeing person for any felony that threatened or resulted in death or serious bodily injury?  **[Officers fired at an armed wanted felony suspect who had reportedly fired at officers and who was running in the direction of nearby houses.]**

- (c) (2) Was deadly force used against a person based on the danger that person poses to themselves when the person did not pose an imminent threat of death or serious bodily injury to the peace officer or to another person. **[No.]**

L.C., a minor, *et al.* v. State of California, *et al.*          Greg Meyer's Rule 26 Report

**Opinion No. 4**
**Based upon my training and experience, it was appropriate police procedure for the CHP officers to detain and arrest Mr. Puga under these circumstances.**

The officers had been briefed at the beginning of their shift that there was a vehicle wanted for a freeway shooting that had occurred earlier.

CHP Officer Blackwood testified at deposition:
> p. 51
> 13· · · ·A.· ·We were told that there was a car-to-car shooting
> 14· ·involving a white Ford Expedition with black rims that had a
> 15· ·yellow sticker in the back windshield that said Funeral, and
> 16· ·that that shooting resulted from a road rage incident; that
> 17· ·the victim of that shooting followed the Expedition for a
> 18· ·little bit, and then lost sight of it, and the officers
> 19· ·during the day attempted to locate that vehicle, and they
> 20· ·didn't locate the vehicle.

CHP Officer Rubalcava testified at deposition:
> p. 78
> 6· · · ·A.· ·A white SUV was the suspect's vehicle of a freeway
> ·7· ·shooting, and it was described as a white Ford SUV with black
> ·8· ·rims, no plates, with the Funeral statement in the back, and
> ·9· ·black tinted windows.

Mr. Puga's vehicle matched that description, he was wanted for a violent crime, he engaged in a high-speed pursuit in an effort to evade capture, and he resisted detention/arrest, he produced a handgun and reportedly fired at officers at the pursuit termination scene.


**Opinion No. 5**
**The CHP officers ensured that Mr. Puga was provided medical treatment.**

Paramedics were staged nearby during the standoff.  After the shooting and Puga was secured, paramedics responded in a timely manner to where Puga had fallen.[10]


**Opinion No. 6**
**Based upon my knowledge, education, training and experience, the CHP officers did not fail to intervene.**

CHP policy states in relevant part:[11]
> 8. INVOLVEMENT IN OR WITNESSING EXCESSIVE FORCE.

---

[10] Bates AGO817, at counter 2:00
[11] CHP policy, Bates AGO1568

L.C., a minor, *et al.* v. State of California, *et al.*                     Greg Meyer's Rule 26 Report

a. Officer Responsibility. When officers are involved in or witness an incident in which
they believe excessive force is currently or may have been used by any peace officer,
they shall take immediate action to stop the excessive force.

I am a strong believer in the duty for officers to intervene if they see that one or more other
officers are clearly using excessive force, and they are in a position and have time to attempt to
stop it. In this case, it is my opinion that excessive force was not occurring (see Opinions No. 1,
2, and 3, above).

## Opinion No. 7
**I have seen no evidence that CHP officers were negligent during this incident.**

Based upon my training and experience, the CHP officers performed their duties well during this
challenging tactical incident.

The CHP officers were part of a multi-agency incident. The combined agency efforts included
extensive de-escalation efforts that lasted approximately 45 minutes before the shooting occurred.

De-escalation is the hoped-for outcome of the process of verbally engaging with a resisting
suspect if time permits, to lower the intensity of a standoff situation, and to persuade the suspect
to peacefully submit. It involves deploying nonlethal tools and tactics if verbal communications
are not effective.

De-escalation efforts in this case included extensive verbalization with the uncooperative Puga
and the use of a variety of nonlethal weapons (beanbag shotgun, 40mm launcher, and Pepper Ball
launcher) to attempt to control the situation and bring it to an end without the use of deadly force.

When Mr. Puga suddenly produced a handgun and reportedly fired at officers, there was no
feasible opportunity to provide a lethal-force warning before the officers fired.

Mr. Puga chose to shoot at someone on a freeway, then to engage in a high-speed pursuit, then to
resist arrest, then to arm himself with a handgun, then to shoot at officers, thus Mr. Puga set in
motion a series of events that resulted in the police shooting.

Mr. Puga chose to shoot at someone on a freeway, then to engage in a high-speed pursuit, then to
resist arrest, then to arm himself with a handgun, then to shoot at officers, thus Mr. Puga set in
motion a series of events that resulted in the police shooting.

Had Mr. Puga merely obeyed the law and surrendered when the officers attempted to detain and
arrest him at the pursuit-termination scene, the shooting incident would not have occurred.

L.C., a minor, *et al.* v. State of California, *et al.*                    Greg Meyer's Rule 26 Report

## EXHIBITS

1. List of documents provided to me by defense counsel
2. Curriculum Vitae (Greg Meyer)

## EXPERT QUALIFICATIONS, PUBLICATIONS, AND OTHER CASES

My *curriculum vitae* (see **EXHIBIT NO. 2**) documents my qualifications, the relevant publications I have authored in the past 10 years (per Rule 26), and it lists all cases in which I have testified at trial or deposition in the past 4 years (per Rule 26). A brief summary of my qualifications appears on pages 2-3 of this report.

## COMPENSATION

My normal fee for work including document review, research, meetings, and reports is $450 per hour. Travel within California is charged at $150 per hour (one-way only), plus IRS mileage rate, plus direct expenses (hotel, food, etc., if any). In-court days are charged at $3,000 flat per day.

**Depositions are charged at $450 per hour payable at the time of deposition; if remote, I or the counsel I am working for must receive a check made out to Greg Meyer for the anticipated number of hours in advance of the deposition, per California Code of Civil Procedure § 2034.450.** (If the amount of time for the deposition is less than the prepaid amount, I will quickly refund the pro-rated difference; if the deposition takes longer than the number of prepaid hours, the deposing side must pay the difference within five days of receiving my invoice.)

Executed on January 30, 2025 at Glendale, California.

GREG MEYER