# Exhibit F

**KRIS MOHANDIE, PH.D., ABPP**
**LICENSED PSYCHOLOGIST**
**LICENSE# PSY12105**
**P.O. BOX 88**
**PASADENA, CALIFORNIA 91102**
**(626) 627-8388**

January 30, 2025

Amy R. Margolies, Partner
Lynberg & Watkns
1100 W. Town & Country Rd., Suite 1450
Orange, CA 92868

**Re : L.C. et al (Puga) v. State of California, et al. & Jonathan Botten, et al. v. State of California, et al.**

Dear Ms. Margolies:

Pursuant to your request, this is a psychological report of my findings and opinions in the matter of **L.C. et al (Puga) v. State of California, et al. & Jonathan Botten, et al. v. State of California, et al.** It is noted that any information not available or reviewed at the time of this report might alter the opinions included herein. A copy of my resume and forensic fees statement is attached.

## EXPERTISE AND QUALIFICATIONS

I am a California licensed psychologist (PSY12105) trained in clinical, police, and forensic psychology. I am a Board-Certified Specialist in Police and Public Safety Psychology through the American Board of Professional Psychology. The following experience, training, and skills qualify me to offer testimony in this particular case (Please see a copy of my curriculum vitae which has been attached):

    a. Research and Publication Pertaining to Officer Involved Shootings and Uses of Force shootings and suicide by cop, including *Forensic Issues in Officer Involved Shootings, Use of Force, and Suicide by Cop Cases (2008), Suicide by Cop Among Officer Involved Shooting Cases (2009), Hostage and Barricade Incidents Within An Officer Involved Shooting Sample: Suicide by Cop, Intervention Efficacy, and Descriptive Characteristics (2010), and Suicide by Cop Among Female Subjects in Officer Involved Shooting Cases (2011).*

    - Primary researcher of a large empirical North American study of officer involved shooting cases with an emphasis upon investigating suicide by cop. One important aspect of this research is the factor of subject precipitated injury or death related to police use of deadly force encounters. Within this data set and study, numerous shooting subjects had mental health and addiction issues, and were intoxicated with an array of substances, including alcohol, cocaine, opiates, and methamphetamine.

1

*b.*   Reviews of Shooting and Use of Force Incidents

- Dozens of pre- and post-conviction interviews and reviews of individuals and witnesses to shooting, suicide by cop, use of force, and subject precipitated events in a variety of police intervention situations, as well as similar incidents involving civilians.

*c.*   Demonstrated Crisis Management Expertise in Consultation and Training Activities

- LAPD crisis/hostage negotiation and SWAT team from 1990-2003- On-site response to hostage and barricade incidents, assessing hostage taker/hostages/victims, assessing for high risk, including violence, subject precipitation, and suicide by cop potential, interviewing and assessing witnesses to these events and crimes, and offering input to reduce risk and lead to safe apprehension/capture of suspects, and safe rescue of any hostages.  Many of these incidents involved subjects who had mental disorders, substance dependence and abuse problems, and were under the influence of intoxicants, including methamphetamine, cannabis, and other hallucinogens, and alcohol.
- Consultation with other domestic and federal law enforcement agencies to present day.
- Pre-event consultation regarding strategy and threat assessment for potentially high risk law enforcement interventions, including pending arrests of armed individuals.
- Hostage negotiation and SWAT teams nationwide since 1993- Training to police departments nationwide in the arena of crisis/hostage negotiation, teaching blocks of instruction on crisis management and negotiation theory and practice, communication skills, psychological aspects of negotiation and first responder issues, substance abuse and dependence issues, and suspect behavior in these situations, including suspect aggression, subject-precipitated aggression, and suicide by cop.
- Contributed as expert on panel to 1999 Police Officer Standards and Training (POST) Suicide By Cop curriculum and law enforcement training video.
- Contributed as an expert on panel to 2001 POST Police Response to People with Mental Illness or Developmental Disability curriculum.
- Contributed as an invited subject matter expert to a national symposium and task force on suicide by cop: Suicide by Cop: Averting the Crisis held at the University of Virginia December 7th-9th, 2008.
- Forensic consultation and review of numerous cases involving police shootings, use of force, suicide by cop, subject-precipitation, and victimology issues.
- Professional presentations in the arena of suspect aggression, mental disorders and behavior among subjects, suicide by cop, hostage and barricade incidents, and victim-perpetrator dynamics for the National Tactical Officers Association.
- Editorial board of the International Journal of Police Crisis Negotiations since 1995.

*d.*   Clinical Work Related to Officer Involved Shootings and Uses of Force, and Civilians Involved in Violent and Other Traumatic Events

- Counseling of hundreds of officer victims of shootings, suicide by cop events, assaults, use of force, other traumatic events.
- Intervention and assessment of hundreds of civilian victims of violent and other traumatic events.

2

*e.* Ⓖeneral Clinical Work and Assessment of Individuals
- Assessment of, and intervention to, thousands of individuals related to substance abuse and dependence, aggression, severe mental illness (thought disorder and bipolar disorders), suicidal thinking and impulses, violence, personality disorder, and other issues that can lead to high-risk circumstances.

*f.* Threat Assessment Expertise in Consultation and Training Activities
- Regular consultation on threat issues in the public and private sector.
- Invited guest reviewer to various peer reviewed journals including Journal of the American Academy of Psychiatry and the Law, Homicide Studies, Journal of Police and Criminal Psychology, Journal of Forensic Sciences, Criminal Justice and Behavior, Behavioral Sciences and the Law, Journal of Interpersonal Violence, Psychological Medicine, and Health Policy.
- LAPD Threat Management Unit 1994 thru 2003.
- Professional presentations pertaining to threat assessment in many venues including the annual Association of Threat Assessment Professional Training Conferences (1997-2015, 2017-19, 2023), California District Attorneys' Association, International Criminal Investigative Analysis Fellowship Seminar, California Homicide Investigators' Conference (2002), National Center for the Analysis of Violent Crime Seminar (2001, 2002), Alberta Crown Attorney's Association Annual Conference (1999).

*g.* Relevant Training
- Attendance to Association of Threat Assessment Professionals training conferences from 1997 through 2015, 2017-2019, 2023.
- LAPD Crisis Negotiation Training in 1989.
- FBI two-week Crisis Negotiation Training in 1994.
- Attendance to California Association of Hostage Negotiator's training conference in 1992-1999, 2001, 2007, 2009, and 2018.

*h.* Membership in Relevant Professional Organizations
- Member of Society of Police and Criminal Psychology since 1995.
- Association of Threat Assessment Professionals since 1995. Distinguished Achievement Award 2010.
- California Association of Hostage Negotiators since 1992, Honorary Lifetime Member since 2008.

i. Forensic consultation/testimony in other use of deadly force cases, including:
- Defendis v. the City of Fresno.
- Neville v. City of Fresno.
- Martinez v. City of Downey, et al.
- Ellis v. County of Los Angeles, et al.
- Tovar v. Baca et al.
- DJ Allen v. City of Chula Vista
- Aguilar v. County of Fresno
- Maria Lopez v. County of Los Angeles.

3

- Espinosa et al. v. City and County of San Francisco et al.
- State of Oklahoma v. Betty Jo Shelby.
- Deckard v. City of Anaheim.
- Rodarte v. City of Victorville.
- Shirar v. State of California.
- Tucker v. County of Riverside et al.
- Lam v. City of Los Banos
- Ely v. County of Santa Barbara
- Zaragoza v. County of Riverside

## **DATABASE**
*Court Documents*
- Third Amended Complaint, dated 5/12/23
- Plaintiffs' Responses
- County's Responses

*DA Investigative Reports*
- LA DA Officer Involved Shooting Report, dated 11/3/16
  - LASD non-fatal shooting of decedent on 3/13/15

*Police Reports*
- CAD, dated 2/17/21
- Incident Detail Report, dated 2/17/21
- Incident Detail Report, dated 2/16/21
- CHP Investigative Report, dated 2/16/21
  - Attempt murder (664 PC/187 PC), ADW (245 A 2), and discharge of a firearm (246PC)
- LA County Sheriff's Department Incident Report, dated 2/16/21
  - Possession of a firearm by convicted felon, evading a police officer, driving with a suspended license
- Records check, dated 2/15/21- suspended license
- San Bernardino County Sheriff's Department Lethal Force Encounter Book
  - SBCSD Incident Summary by Detective Edward Hernandez, dated 5/18/21
  - SBCSD Crime Report by Detective Edward Hernandez, dated 2/19/21
  - SBCSD Miscellaneous Crime Reports
  - CLETS DMV, dated 3/18/21
  - CLETS Criminal, dated 3/15/21
  - SBCSD Crime Report by Detective Ripley, dated 2/19/21
  - SBCSD Crime Report by Detective Ripley, dated 3/31/21
    - Interview of Deputy Jake Adams
  - SBCSD Crime Report by Detective Hernandez, dated 3/16/21
    - Interview of CHP Officer Bernardo Rubacalva
  - SBCSD Crime Report by Detective Bustamante, dated 3/22/21
    - Attempted murder of a police officer (Deputy Jake Adams)
    - Interview of CHP Officer Michael Blackwood

- o SBCSD Crime Report by Detective Abernathy, dated 3/4/21
  - ▪ Interview of Sergeant Isaiah Kee
- o SBCSD Crime Report by Detective Hernandez, dated 3/8/21
  - ▪ Interview of Christina Barrett, dated 2/17/21
- o SBCSD Crime Report by Detective Hernandez, dated 3/8/21
  - • Interview of John Botten, Sr., dated 2/17/21
- o SBCSD Crime Report by Detective Bustamante, dated 3/10/21
  - ▪ Interview of Tanja Botten, dated 2/17/21 @ Loma Linda
  - ▪ Interview of Jonathan Botten, Jr. dated 2/17/21 @ Loma Linda
  - ▪ Interview of Annabelle Botten, dated 2/17/21 @ Loma Linda
- o SBCSD Crime Report by Detective Bustamante, dated 3/10/21
  - ▪ Interview of Wendy Mangerino, dated 3/1/21
  - ▪ Interview of Erin Mangerino, dated 3/11/21
  - ▪ Interview of Edward Mangerino, dated 3/11/21
  - ▪ Interview of Tammy Goodson, dated 2/17/21
- o SBCSD Lethal Force Encounter Review by Detective Hernandez, dated 3/2/22
- o SBCSD Crime Report by Detective Hernandez, dated 3/9/21
  - ▪ Interview of Reserve Deputy III Kevin Henry, dated 3/9/21
- o SBCSD Crime Report by Detective Hernandez, dated 3/9/21
  - ▪ Interview of Detective Greg Hanrahan, dated 3/9/21
- o Search Warrant Receipt
- o SBCSD Crime Report by Detective Hernandez, dated 3/8/21
  - ▪ Next of Kin Notification of Gabriela Salas, dated 2/19/21 by phone
- o Miscellaneous Additional SBCSD Crime Reports
- o Miscellaneous Search Warrants
- o TRO by Yobana Puga, dated 8/21/14

*LAPD Police Reports*
- LAPD Investigative Report, dated 8/20/14
  - o Domestic battery-Yobana Puga is victim.
- LAPD Investigative Report, dated 2/4/15
  - o Cohabitant abuse.
  - o EPO, dated 2/4/15.
  - o Was on summary probation ending 7/7/15.
- LAPD Investigative & Arrest Report, dated 1/21/19
  - o 594 (A)(2), felony vandalism
- EPO, dated 1/22/19
- LAPD Follow-Up Investigative Report, dated 1/24/19
- Restraining Orders
  - o DV-110 Temporary Restraining Order by Yobana Puga, dated 8/21/14
    - ▪ Declaration by Yobana Puga, dated 8/21/14
    - ▪ TRO granted by the court
  - o TRO by Yobana Puga, dated 2/4/15
    - ▪ Declaration of Yobana Puga, dated 2/3/15
    - ▪ DV-130 Restraining Order Granted, dated 4/22/15 (five year R/O)
  - o DV-130 Restraining Order by Maria Cadena, dated 3/7/13 (expire 3/6/16)

5

o DV-100 Request for Domestic Violence Restraining Order, dated 1/25/13
- Declaration by Maria Cadena, dated 1/25/13
o DLU 1/9/16, expire 1/23/22 by Linda Rangel.

*Audio/Video*
- Video Footage of 3/13/15 Shooting
- 911 Dispatch Recordings
- 911 Dispatch call by the Bottens (Annabelle Botten)
- 911 Dispatch Call by Arthur Miranda
- Plaintiff Provided Video 0256-0258, 0345
- Betzabeth Gonzalez Videos
- Video 1416
- Multiple additional videos

*Transcripts*
- Belt Recording of Deputy Jake Adams, dated 2/17/21
- Belt Footage of CHP Officer Isaiah Kee, dated 2/17/21
- Belt Footage of CHP Officer Isaiah Kee #2, dated 2/17/21
- Belt Recording of Sergeant Robert Vaccari, dated 2/17/21

*Interview Transcripts*
- Adams, Deputy Jake, dated 3/2/21 with lawyer Russell Perry
- Blackwood, Officer Michael, dated 2/22/21 with lawyer Brien Gabriel
- Kee, Sergeant Isaiah, dated 2/22/21 with lawyer Brian Gabriel
- Rubacalva, Officer Bernardo, dated 2/22/21 with lawyer Brian Gabriel
- Vaccari, Sergeant Robert, dated 3/3/21 with lawyer Michael Schwartz

*Photographs*
- Inside Puga Vehicle
- Body of Puga
- Facebook Post

*Other Reports*
- Autopsy Report by Timothy Jong, MD, dated 3/5/21
- NMS Toxicology Report, dated 3/29/21

*Injured Bystander Medical Records*

*Other Records*
- LA County Sheriff's Department Incarceration Records
  o Inmate Information Summary
- Long Beach Police Incarceration Records
- LAPD Incarceration Records
  o LAPD Incident Recall, dated 2/4/15
    ▪ Spousal abuse, "assaulted RP last night." Spouse abuse report

- o LAPD Incident Recall, dated 1/22/19
  - ▪ Prior history of DV, knocking on windows
- o LAPD Investigative Report, dated 8/18/14
  - ▪ Domestic battery Yobana Puga is victim
- o LAPD Investigative Report, dated 2/4/15
  - ▪ DV report, Yobana Puga is victim
- CDC Records
  - o Parole Conditions, dated 4/7/20
  - o CDC Parole Discharge Review Report, dated 3/13/15

*Depositions*
- Adams, Officer Jake, dated 11/12/24
- Blackwood, Officer Michael, dated 11/4/24
- Botten, Annabelle, dated 12/16/24
- Botten, Jonathan, dated 12/16/24
- Botten Jr., Jonathan, dated 12/13/24
- Botten, Tonja, dated 12/13/24
- Cadena, Maria, dated 12/11/24
- Gonzalez, Betzabeth, dated 12/30/24
- Goodson, Tammy, dated 11/26/24
- Hernandez, Jasmine, dated 12/11/24
- Jong MD, Timothy, dated 1/2/25
- Juarez, Nancy, dated 12/19/24
- Kee, Sergeant Isaiah, dated 11/5/24
- Lopez, Lidia, dated 12/4/24
- Mangerino, Edward, dated 11/25/24
- Mangerino, Erin, dated 11/25/24
- Ripley, Sergeant Robert, dated 1/2/25
- Rubalcava, Officer Bernardo, dated 11/4/24
- Salas, Gabriela, dated 12/19/24
- Ubardo, Antonia, dated 12/3/24
- Vaccari, Sergeant Robert, dated 11/14/24

*Other Reports*
- Joshua Visco, Esquire, dated 1/27/25

*Site Visit, dated 1/6/25 with Defense Counsel Amy Margolies*

*References*
American Psychiatric Association.  (2022).  *Diagnostic and statistical manual of mental disorders, fifth edition, text revision (DSM-5-TR).*  American Psychiatric Association: Washington, DC.
Hare, R.D. (2003*).  Hare Psychopathy Checklist-Revised (PCL-R): 2ⁿᵈ Edition*.  NY: MHS.

McMains, M & Mullins, W.  (2015).  *Crisis negotiations: Managing critical incidents and hostage situations in law enforcement and corrections (5th Edition).* New York: Routledge.

Mohandie, K.  (2010). *The Psychology of Hostage Taking, Suicidal, and Barricaded Subjects.* In R. Rogan and F. Lanceley (Eds.), <u>Contemporary Theory, Research, and Practice of Crisis/Hostage Negotiations</u> (pp.155-175). NJ: Hampton Press.

Mohandie, K., Meloy, JR, & Collins, P.I.  (2009).  *Suicide by cop among officer involved shooting cases.*  Journal of Forensic Sciences, 54, 456-462.

Mohandie, K. & Meloy, J.R. (2010).  *Hostage and Barricade Incidents Within an Officer Involved Shooting Sample: Suicide by Cop, Intervention Efficacy, and Descriptive Characteristics.*  Journal of Police Crisis Negotiations, 10, 101-115.

Mohandie, K. & Meloy, J.R. (2000).  *Clinical and forensic indicators of suicide by cop.*  Journal of Forensic Sciences, 45, 390-395.

Shneidman, E.S. (1996). *The Suicidal Mind.* New York: Oxford University Press.

**FINDINGS AND OPINIONS**

1. **The decedent, Mr. Puga, committed suicide by cop during the incident.  Suicide by cop is a *method* of suicide that occurs when an individual engages in threatening (actual, apparent, and/or feigned) behavior to cause law enforcement to use deadly force against them as part of their intent to commit suicide, and in this case, in tandem with their attempt to murder police officers (meta goal, homicide-suicide from Mohandie & Meloy, 2000, p. 384).  Mr. Puga purposefully and deliberately provoked his death at the hands of law enforcement while attempting to shoot the first responding officers.  He sought to kill police officers and himself using this method of suicide.  His death is subject precipitated by definition and fact pattern.**

   **Foundation for Opinion:**
   a. Prior suicide by cop attempt that almost exactly paralleled the facts of this case, except this time Mr. Puga had a loaded handgun capable of killing the police.  This earlier event from 3/13/15 amplifies and informs the meaning of Mr. Puga's actions in the incident at hand.
      i. Mr. Puga was shot during this earlier attempted suicide by cop that was video recorded.  Mr. Puga was a felony suspect wanted for kidnapping, noted as armed and dangerous and driving a white Chevy Tahoe SUV on 3/13/15.  He exited the car initially, the deputies told him to get on the ground, and he said, "fuck you."  He got back in, fled, leading to a police pursuit driving with him driving at excessive speeds, running stop signs, driving on the wrong side of street etc.  At the end of the pursuit, he exited, approached deputies, racked the handgun (consistent with chambering a round), and pointed and shot it in their direction several times, before fleeing and collapsing on a neighboring porch while still retaining the firearm. Three officers fired at him a total of 37 rounds, and he collapsed nearby.  He was using a blank gun that resembled a real gun, even ejecting casings. His wife at the time reported she thought that gun was real-he had pistol whipped her with it prior to these events.  Yobanna

Puga told the investigators he told her he was going to kill her, kill himself, and kill the cops, and "go at it" with the cops.  When Mr. Puga was later interviewed by investigators, he admitted he pulled the fake gun because he wanted the police to kill him because he had nothing to live for.  LA DA Officer Involved Shooting Report, dated 11/3/16, 8058-8059; Video Footage of 3/13/15 Shooting

b. Mr. Puga indicated that he was not going back to prison.

   i. "Uh that impression gave me um uh he was what was his plan to go down with gunfire. Uh he wasn't gonna go to jail, he was making statements and say he did 16 years um he's a third striker he doesn't want to go back. Um Sergeant Kee asked him to come out, he was I just want to smoke one last cigarette before I come out, I just want to make one more phone call before I come out. Um when <u>Sergeant Kee started um taking to him by his first name the suspect stated well you know my name, you know who I am, right and Sergeant Kee was like no. Um, he stated you know what I went in for right? And Sergeant Kee was like no. *Well I'm gonna show you guys what I went in for.*</u> So, at that time by that statement um I felt like he was, he was ready for gun fight." Rubacalva, Officer Bernardo interview transcript, dated 2/22/21, 536

      1. Note: this is a powerful statement made by Mr. Puga to the first responders that underscores Mr. Puga's suicide by cop and accompanying homicidal intentions because he references the earlier shooting he went to prison for, *drawing the connection himself* with this SBC prior event of 3/13/15.

   ii. Ms. Hernandez testified that "he didn't want to go back to jail because he didn't want to give that example to his son." Hernandez, Jasmine depo, dated 12/11/24, 44, 56

   iii. At the time of the shooting, Mr. Puga was subject to a 1/12/21 absconding parole no bail warrant related to his 7-year prison  and for PC69 resisting and 273.5 (F)(2) spousal abuse, convicted 8/17/15 with 186.22 enhancement (street gang). "Parolee Puga was arrested on 12/5/20 by Long Beach Police Department for PC 29800(a)(1) Firearm Access. Puga was released from Los Angeles County Jail on bond on 12/11/20 and he reported to the Compton Parole Office and met with the agent of record {AOR} on 12/15/20. Parolee stated that he had court on 12/28/20 for his current arrest and is currently on bond."  He failed to appear on 1/29/20. The CDC noted: currently, parolee Puga's whereabouts are unknown. All reasonable efforts to locate the parolee have been exhausted. Puga is a known East Side Longo gang member who has a history of gun violence. His last arrest involved an AR-15 assault rifle in his car and he has a prior conviction for shooting' at law enforcement, making him a serious threat to the community. Therefore, this agent is requesting that parolee Puga's parole be suspended, as well as an arrest warrant be issued, until the parolee can be located."  His parole conditions (4/7/20) were that he was "subject to search and seizure any time day or night… no weapons, no drugs, no alcohol."  CDC Records, 11, 13, 52-54, 60, 66-67

    iv.  Note: given the array of charges during that 24-hour time period, as well as his criminal history and parole status, and the additional charges stemming from the events of this incident, it was a virtual certainty that Mr. Puga was going back to prison and that he would never get out, something he expressed awareness of to the first responders.

        1.  "He said, 'Hey, so since you know my name it seems like you know a lot about me, you know I got two strikes, right and this means I go back for life,' I said, 'Man,' I said, 'You know what I don't, I don't know man, you don't know the justice system is changing you know it may help you, you don't know you're going to go back for life. I think you should give it a shot and give them a chance.' 'Nope, I'm going back for life,' so he rolls up the window." Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 669

            a)  "He's like this is um this is my third strike… ah he says something like this is my third strike." Blackwood, Officer Michael interview transcript, dated 2/22/21, 559-560

            b)  "So, now I done took all of his information, his behavior on the scene um him being armed and dangerous ah when he told me he was a two striker he's going to have to do life, asking us to call family, I, I just had you know, just an inclination that this may not go well."  Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 671

        2.  "Based on a review of Mr. Puga's conduct on February 16 and 17, 2021, it is likely that he would have spent the rest of his life in state prison. Given his maximum exposure of 91 years determinate plus 28 – life indeterminate, he would not have been eligible for parole for 78 years under current calculations. This would have been the most likely sentence after trial in San Bernardino County."  Joshua Visco, Esquire report, dated 1/27/25

c.  Mr. Puga called (attempted to call) multiple family members, ex-intimates, and loved ones consistent with saying goodbye-final communication.  He knew the police were looking for him and that he would be violated back to prison.

    i.  Ms. Cadena reported seeing Mr. Puga the Friday prior to the incident-she had not seen him in two years. He followed her bus.  "The only thing that he said, how was I doing, how was my daughter doing, and I said, fine, and I just walked away." Cadena, Maria depo, dated 12/11/24, 16

        1.  Note-as indicated elsewhere in this report, he had been subject to a past restraining order obtained by Ms. Cadena.

    ii.  "Salas last saw Puga on Monday, February 15, 2021, sometime in the morning in Bellflower. Puga visited her and said the police were looking for him, but did not say why. Salas believed the police were looking for Puga because he did not appear in court. Puga asked Salas for a ride to Long Beach, and told her he wanted to leave quickly. Salas told Puga to turn himself into the police, but Puga asked for a ride to Long Beach

instead…When Salas arrived home, unidentified Los Angeles County Sheriffs Department (LASD) deputies were at Salas' residence looking for Puga. Salas told the deputies Puga was not there because she gave him a ride to Long Beach, so the deputies left. Approximately an hour after the LASD deputies left, Puga returned to Salas' residence. Puga took his vehicle keys from within the residence, and left in his Expedition." SBCSD Crime Report by Detective Hernandez, dated 3/8/21, Next of Kin Notification of Gabriela Salas, dated 2/19/21 by phone, 824

    iii. "Puga rolled all of the vehicle windows up, but his driver's window was down. <u>During the pursuit, Puga told Barrett to telephone his mother and Claudia. Barrett tried to telephone Puga's mother (Antonia Salas) and Claudia, but neither one answered.</u> "SBCSD Crime Report by Detective Hernandez, dated 3/8/21, dated 3/8/21, 7 SBCSD Crime Report by Detective Hernandez, dated 3/8/21, 734

    iv. "As Puga continued to drive, he asked Barrett to call Claudia again. Barrett called Claudia, but no one answered." SBCSD Crime Report by Detective Hernandez, dated 3/8/21, dated 3/8/21, 7 SBCSD Crime Report by Detective Hernandez, dated 3/8/21, Interview of Christina Barrett, dated 2/17/21, 734

    v. "A: So the whole interaction (dialogue between decedent and officers) appeared to be -- I guess desperate would be the right word.  He demanded to call his   sister, his mom.  He was drinking.  He was throwing stuff out the window, seemed very erratic." Blackwood, Officer Michael depo, dated 11/4/24, 55

    vi. "I felt like that he was um that those were gonna be his last phone calls that he was expecting to make tonight that night." Blackwood, Officer Michael interview transcript, dated 2/22/21, 595

    vii. "So, now I done took all of his information, his behavior on the scene um him being armed and dangerous ah when he told me he was a two striker he's going to have to do life, asking us to call family, I, I just had you know, just an inclination that this may not go well." Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 671

        1. CLETS had Mr. Puga noted as "armed and dangerous" on a no bail parole warrant.  CLETS Criminal, dated 3/15/21, 86

d. The decedent was armed with an illegally possessed ghost gun which officers and civilian witnesses observed, and was ultimately found on scene in Mr. Puga's possession.

    i. "When I approached on the east side of the vehicle, Mr. Puga looked at me, and I saw his hands dive down into his waistband area.  I don't know if it was waistband or pockets. And I saw a gun, and then I heard shots, and then I returned fire." Adams, Officer Jake depo, dated 11/12/24, 36

        1. "A. It looked like he was facing me; I saw the gun and heard gunshots.  That situation unfolded very rapidly, and all of those things were going on almost what felt like from what I remember to be simultaneously." Adams, Officer Jake depo, dated 11/12/24, 47

2. "I think he was -- after he pulled the gun up and I heard the shots and I saw the gun, when I made the decision to return fire, he was still in front of that vehicle. I couldn't tell if he was moving or not. I think it's likely, you know, that he had started to move northbound.  I think that's a fair statement on the chain of events there."  Adams, Officer Jake depo, dated 11/12/24, 49

   a) Note: this inability for Officer Adams to identify whether the subject was moving or not is consistent with the psychophysiological effects of a deadly force encounter and resultant tunnel vision, something I would intend to offer opinions about as appropriate, necessary, and allowed.

ii. "Q.  Sure. Before you started firing the first volley, did you ever see a gun in Mr. Puga's hand?  A. I did." Blackwood, Officer Michael depo, dated 11/4/24, 53

   1. "Right of the vehicle um I hear Sergeant Kee ah yelling like 'don't do that don't do that let me see your hands' um and ah his voice ah changes at this point um and ah I see um and then at that point um I see a black handgun ah in th driver's ah right-hand…and then I start to fire.." Blackwood, Officer Michael interview transcript, dated 2/22/21, 564

iii. SBSD Sergeant Vaccari saw the gun Mr. Puga wielded "Q. Before you heard the shots, based on your position were you able to see him lower his hand and grab at anything in his waist and waistband area? A. Yes. Q. Did you see anything in his hand after he made that motion? A. Yes. He drew a firearm. Q. And you saw the firearm? A. Yes. " Vaccari, Sergeant Robert depo, dated 11/14/24, 64

iv. "When Vaccari and Adams stopped moving, Puga turned to his right and drew a handgun from his waistband with his right hand."  SBCSD Incident Summary by Detective Edward Hernandez, dated 5/18/21, 46

v. "Vaccari and another officer handcuffed Puga, rolled him over, and located Puga's handgun under his torso. Puga's handgun was not marked with a make or model, but resembled a Polymer P80 9mm handgun." SBCSD Incident Summary by Detective Edward Hernandez, dated 5/18/21, 46

vi. "Q. Prior to firing your first shot did you see a handgun in Mr. Puga's waistband? A. Yes." Kee, Sergeant Isaiah depo, dated 11/5/24, 9

vii. Evidence Placard 49 "was a semi-automatic pistol chambered in 9mm. The pistol rested on the west dirt shoulder of Peach Avenue. The pistol was black polymer with a silver slide. The pistol had no serial number and no discernable markings. The pistol had one unfired round, headstamped 'L.A.X. 9mm LUGER" in the chamber.' The primer was not struck. A 17 round "KCI USA" magazine was partially inserted into the magazine well of the pistol but not fully seated into the gun. The magazine contained 13 rounds of ammunition. The barrel pointed in a southwest direction. Bloodstained dirt was 100" south of the pistol. Placard 49 was approximately 1'9" southwest of Placard 48, Puga's body. The magazine

contained 9mm ammunition with the following headstamps: (2) LAX 9mm LUGER, (1) G.F.L. 9mm LUGER, (1) SPEER 9mm LUGER, (3) TSA 9mm LUGER, (3) WIN 9mm LUGER, (1) F C 9MM LUGER, (2) FC 9MM LUGER." SBCSD Crime Report by Detective Ripley, dated 2/19/21, SBCSD Crime Report by Detective Ripley, dated 2/19/21,143; Photo 1527 of firearm with extended magazine.

    1. Sergeant Ripley, who investigated the shooting, noted that Mr. Puga's firearm had 13 in the magazine and one in the chamber-the magazine was a 17-round magazine. One 9 mm casing associated with his weapon was found near his weapon. Ripley, Sergeant Robert depo, dated 1/2/25, 23-24, 30-31, 43

viii. "Q: Do you know about how long that interaction was happening, how long law enforcement was trying to get him out of the car for? A I think like 30 minutes. And then when he finally did get out, he took something out of his waistband, it looked like a gun, and I think that's when he shot at the cops. And then that's when that whole fire thing went on." Goodson, Tammy depo, dated 11/26/24, 26-27

ix. In her phone call to 911, Ms. Annabelle Botten indicated that Mr. Puga had a gun, which he shot at the police. In her 911 dispatch call, Ms. Botten twice indicated that Mr. Puga pulled a gun (to two separate dispatchers): "There was a high speed chase and this guy pulled a gun on the officers and they shot us." 911 Call Audio by Ms. Annabelle Botten, 12:44 & 14:40 time stamps

x. "As Annabelle watched from the kitchen window, approximately 120 feet from the stop, Puga yelled out to the officers he heard a click noise. <u>Annabelle saw Puga run to the front of his Expedition and faced the officers. The unidentified officer negotiated with Puga,and asked him to step away from the front of the SUV. Puga did not comply and remained in front of the Expedition. Puga promised the officers he did not have a gun. However, Puga would not show the officers his waistband as they requested. Annabelle saw two unidentified CHP officers walk north along the driver's side of the Expedition. Annabelle saw Puga lower his right hand toward the front of his waist, and **raised what she described as a black handgun.** Annabelle saw Puga shoot once at the CHP officers, who stood on the southwest corner of the intersection. Annabelle knew Puga shot his handgun, because she saw a muzzle flash from his handgun. After Puga shot, the CHP officers shot back at Puga, and that is when numerous bullets struck Annabelle's residence.</u> Puga ran north on Peach Avenue as the officers continued to shoot him. Annabelle saw Puga fall to the ground, just north of the intersection. Annabelle described Puga's actions as, 'Stupid, and he (Puga) deserved what he got.' Annabelle was not sure how many officers fired at Puga, but believed she heard two to three different types of gunfire. Annabelle described the sounds of the gunfire as very loud and not so loud." SBCSD Crime Report by Detective Bustamante, dated 3/10/21, Interview of Annabelle Botten, dated 2/17/21, 750

1. Note, at time of deposition, within the context of this litigation, Ms. Botten does not recall making this phone call to 911- something which does not comport with trauma-based recall issues nor her age at the time: "Q. Okay. So your testimony today is that your entire interview that you had later that day with the Sheriff's detectives and deputies, you don't remember that, correct? A. To this day I do not, no. Q. Okay. Do you recall making the 911 phone call after you saw your mother had been injured? A. No...Q. Okay. I don't want to play it for you because it is very -- and I know you mentioned you don't want to hear that, so I'm going to represent to you that during that phone call, you stated that you saw Hector Puga shoot at the police. Do you have any reason to believe that you would have lied to the 911 operator when you made that statement? A. No. Q. Do you think you were telling the truth when you made that statement to the 911 operator? A. I think whatever was happening at that moment, I was terrified, and I don't think I really knew what was going on, because like I said, I was only 17. I was still in high school. I -- I didn't know -- you can't prepare a kid to explain what they're seeing, let alone know what they're seeing. Q. Would you agree that even though you were 17 years old and a minor, you knew what a gun looked like, correct? A. Yes." Botten, Annabelle depo, dated 12/16/24, 109

    xi. Civilian witness Arthur Miranda called 911 and stated: "I looked to my slider and I seen somebody running out there with a gun." 911 Dispatch Call by Arthur Miranda

    xii. Ms. Gonzalez, who watched the incident from a bathroom window (2X3 feet) diagonally positioned behind the police vehicles, two houses away (approximately 100 yards), while perched on a "squatty potty" toilet seat, testified that she did not remember seeing a gun but also stated, "I remember being able to see, like, part of his body. Not his entire body. But, like, the side of his body." She could not remember if she could see the front of his waistband. She also noted that despite him being shirtless, she could not tell if he had tattoos (Mr. Puga's upper body was covered extensively in tattoos) Gonzalez, Betzabeth depo, dated 12/30/24, 48, 83, 113, 134

        1. Having visited the site, her vantage point was clearly hampered by all of the above variables. Site Visit, dated 1/6/25 with Defense Counsel Amy Margolies

    xiii. Ms. Salas, Mr. Puga's sister testified that she saw him with a gun the day prior. Salas, Gabriela depo, dated 12/19/24, 38

e. When asked by first responders, Mr. Puga lied and denied about having a firearm and attempted to manipulate Sergeant Kee into a position of tactical advantage underscoring his murderous agenda.

    i. "Botten saw Puga's back and left side. Puga kept his hands in the air as he spoke with the officers. John Sr. told Tanja, the officers were going to arrest Puga. Tanja walked to the front door and stood behind John Sr. John

Jr. walked up to the front door and stood behind Tanja, on her right side. Annabelle remained in the living room. Approximately four minutes later, John Sr. saw two unidentified CHP officers in blue uniforms, side by side, walk north on the dirt shoulder, west of the SUV. The CHP officers pointed their handguns toward Puga as they moved north. One CHP officer told Puga to keep his hands up, and asked Puga if he had a weapon. Puga replied, 'No, I don't have any weapons.'" SBCSD Crime Report by Detective Hernandez, dated 3/8/21, Interview of John Botten, Sr., dated 2/17/21, 738

ii.   "So he's, 'Okay, I'm coming out…' I think this thing is going to get wrapped up, maybe he will finally come to his senses, but that all changed on how he got out of the vehicle. I said, 'Ah man,' so I'm kind of whispering to Rubalcava who is still next to me, I said, 'Ah man, see the way he slid out?' um ah so now he's about from his where he got out of the vehicle to me you are looking at probably about twenty, probably about 20 feet, 15 to 20 feet. So, he, he slides out and he would never allow his front side to face us…"   Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 673-674

iii.  He's like, 'Okay, don't shoot, I, I don't got nothing.' I said, 'You promise you don't have no weapon?' 'No, I don't, I don't have a weapon.' I said, 'Okay, so now and he said come and he says, 'I remember him telling me um okay, turn the spot light out so I can see you guys,' and then I said, 'No, Hector um we can't do that man,' I said, 'I've been fair dealing with you ah I told, I made, I'm a man of my word, I made a promise, I'm going to cuff you, but you got to do what I say, you know just turn around and face us,' and then urn, no, no, and then it looks like he is going to go to his knees to kneel down and then all of a sudden he springs up and he runs to the front of the car…"  Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 673-674

iv.   "Rubalcava was to my right so we slowed and I'm like, 'Get your hands up.' Um, now I got the AR-15, Rubalcava got his .40 cal displayed and I say, 'Hey, keep your hands up Hector where we can see them.' 'Oh, I got my hands up.' I said, 'You got a weapon?' 'No.' 'You promise you don't?' 'No I don't have a weapon'" So, we keep working over, working over and as soon as his front side, he, he turned slightly enough to us while I saw the gun, I didn't have time to say and, and, and as soon as his hand came down towards us I just started shooting, boom, boom, boom, boom, boom and urn and ah and he still was able to get it out and then um ah he was, I could see his you know his silhouette and I can see his frame um and the gun was in his right in the front, right over his crotch area and I could see the handle and he came down with his right hand. Came down with his right hand towards the gun and ah, and ah and like I like I said I just started shooting, boom, boom, boom and then and then he's urn, and then I could see him flinching so I know I'm hitting him but then he was still able to get the gun out and I saw two muzzle flashes, boom, boom and I was

like oh shoot, so now that kind of messed me up, threw me for a loop because I'm like, why ain't he going down I was able to get two shots, so now we retreat back towards the car…"  Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 675-676

   v.  "The suspect was trying to bait Sergeant Kee to go up there and arrest him, um I believe he was trying to ambush Sergeant Kee because he was requesting Sergeant Kee to go up go up to arrest him by himself, um I think that was his game plan." Rubacalva, Officer Bernardo interview transcript, dated 2/22/21, 444

      1.  "He exited the vehicle slowly; it took him a couple of minutes to exit the vehicle. At one point he had half-way out, had driver's side door open, left foot out, left hand out, right hand inside up um his right hand and right foot were still inside the vehicle so we couldn't see anything, finally when he fully exited the vehicle he had his back turned um towards us with his waistband facing away from us, we couldn't see anything." Rubacalva, Officer Bernardo interview transcript, dated 2/22/21, 443

         a)  Note: Mr. Puga's repeated lies that he did not have a weapon, and the way he maneuvered his body (seen on multiple videos to avoid showing is weapon) as well as wanting the light out "so I can see you guys" was consistent with an agenda of murdering police officers in tandem with his own death wish (SBC).

   f.  Mr. Puga retrieved the firearm from his waistband, then pointed and fired his gun at first responding deputies and officers.

      i.  "Puga pointed his handgun at Kee and Rubalcava,and fired one round at them. Keeand Rubalcava fired at Puga. Vaccari fired one 40mm less lethal round, and Adams fired his handgun at Puga. Puga ran north from the Expedition, pointed his handgun toward Kee and Rubalcava around his left shoulder, and fired as he ran. Puga was struck by gunfire and fell face-down onto the northwest dirt shoulder of the intersection."  SBCSD Incident Summary by Detective Edward Hernandez, dated 5/18/21, 46

      ii.  "When I approached on the east side of the vehicle, Mr. Puga looked at me, and I saw his hands dive down into his waistband area.  I don't know if it was waistband or pockets. And I saw a gun, and then I heard shots, and then I returned fire." Adams, Officer Jake depo, dated 11/12/24, 36

         1.  "I saw the suspect um jerk his hand down and up um and when it came up um I remember yelling uh get on the ground um and almost simultaneously um I remember hearing gunshots um and it looked like when he pulled his arm up it looked like he was facing me um and I could tell he had a gun in his hand. Um I don't know if I flinched or if I blinked or closed my eyes if I was um I, I, I don't recall seeing a muzzle flash, but I remember when I saw the gun in his hand um I also heard gunshots. Urn and at that point urn my, my initial reaction was to duck um I for a lack of better term in

16

my own head thought oh shit um this guy's trying to kill me."
Adams, Deputy Jake interview transcript, dated 3/2/21, 329

iii.  SBSD Sergeant Vaccari saw the gun Mr. Puga wielded "Q. Before you heard the shots, based on your position were you able to see him lower his hand and grab at anything in his waist and waistband area? A. Yes. Q. Did you see anything in his hand after he made that  motion? A. Yes. He drew a firearm. Q.   And you saw the firearm? A. Yes. " Vaccari, Sergeant Robert depo, dated 11/14/24, 64

1.  "I was extremely surprised at how fast he drew. I thought maybe even he had the gun in his hand already and nobody could see it, but uh from the videos he obviously drew from his waistband. Uh it surprised me when I came around the corner at just how fast he, he drew his weapon. Uh listening to the recordings and from the cellphone video it sounds like from the CHP they're already telling him don't reach I'm, I'm going, this is not what I heard this is what I gained or I gained from the videos, that the CHP officers telling him, somebody's telling him don't reach, don't reach and then he screams at him get your hands up and he's already drawing then that's when I get a full view on him and I say get on the ground that's what it appeared to me, he drew so fast, he was already in the process of drawing his gun. At least that's the way I remember um I'm getting it from the video. I just remember from my own independent recollection when I came around that corner uh I was shocked at how fast he drew, I think he was already in the process of drawing."  Vaccari, Sergeant Robert interview transcript, dated 3/3/21, 251-252

iv.  "Rubalcava was to my right so we slowed and I'm like, 'Get your hands up.' Um, now I got the AR-15, Rubalcava got his .40 cal displayed and I say, 'Hey, keep your hands up Hector where we can see them.' 'Oh, I got my hands up.' I said, 'You got a weapon?' 'No.' 'You promise you don't?' 'No I don't have a weapon'" So, we keep working over, working over and as soon as his front side, he, he turned slightly enough to us while I saw the gun, I didn't have time to say and, and, and as soon as his hand came down towards us I just started shooting, boom, boom, boom, boom, boom and um and ah and he still was able to get it out and then um ah he was, I could see his you know his silhouette and I can see his frame um and the gun was in his right in the front, right over his crotch area and I could see the handle and he came down with his right hand. Came down with his right hand towards the gun and ah, and ah and like I like I said I just started shooting, boom, boom, boom and then and then he's urn, and then I could see him flinching so I know I'm hitting him but then he was still able to get the gun out and I saw two muzzle flashes, boom, boom and I was like oh shoot, so now that kind of messed me up, threw me for a loop because I'm like, why ain't he going down I was able to get two shots, so now we retreat back towards the car…"  Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 675-676

17

v. "Could you describe for us what exactly you saw that led you to believe he had a gun and that he was shooting? Is it something you saw, or heard, or both? A Both. It's like he got out of his vehicle all of a sudden, grabbed something from his waistband that looked to appear as a gun from where I could see. He started shooting, at least what I know. And then that's when all the gunfire started happening. Q And so your recollection is that the suspect fired his gun at law enforcement before law enforcement fired their weapons? Exactly yes." Goodson, Tammy depo, dated 11/26/24, 31-32

vi. "So my question to you is, at what point did you see the muzzle flash? A. Yes. So when I contacted Mr. Puga at the front of his vehicle, and upon firing my weapon at Mr. Puga, he was able to remove the weapon from his waistband and point the gun in myself and Officer Rubalcava's direction. And I saw two muzzle flashes…He was standing turning towards us, and what I remember is just him turning towards us; he got the gun out, and it was like he was cringing. As he was firing he was cringing, and but he was still able to turn towards us and fire twice in our direction." Kee, Sergeant Isaiah depo, dated 11/5/24, 78-79, 82-83

1. "Q. Well, you were asked by Mr. Galipo that during the first volley, the first shot from your weapon, whether you heard a shot. And your response was that you did not hear a shot, but that you saw muzzle flash. A. Yes." Kee, Sergeant Isaiah depo, dated 11/5/24, 78

a) Note: Sergeant Kee had testified that he had tunnel vision and his hearing was impacted, which is consistent with the psychophysiological effects of trauma during deadly force encounters, something I would be qualified and prepared to testify about as necessary.

vii. Sergeant Rubalcava testified: "Q. And do you remember indicating in your statement that you believe that Mr. Puga had fired two rounds? A. Yes." Rubalcava, Officer Bernardo depo, dated 11/4/24, 60

1. "Um at that point I grabbed my service weapon again urn and I continued just waiting for him to come out. Um and then one point my sergeant um called me to proceed to um just triangulate towards the left, we were gonna go cuff him. Um at that point the suspect pulled out a handgun, he shot twice towards me and my sergeant which far, fired back and retreated back towards cover. Um once behind cover the, I saw the suspect running northbound on Peach towards the northwest corner and I continued, continued firing until he was down." Rubacalva, Officer Bernardo interview transcript, dated 2/22/21, 411

2. "Once we're here what he does next is he just turns around pulls out his gun from his waistband he sh um he shoots twice at me and Sergeant Kee um me and Sergeant Kee return fire and we retreat back behind cover. Once we retreat behind cover the suspect starts running northbound on Peach towards this corner right here urn,

hmm, that's where he was gunned down." Saw two muzzle flashes. Rubacalva, Officer Bernardo interview transcript, dated 2/22/21, 450, 502

viii. "Well, when they asked him to step out of the vehicle, they wanted him to open the at some point while he was standing there. But his arm was raised up -- and I could not see a gun, so we'll be clear on that, I couldn't see a gun. But his arm was up, he had his hand around something, and smoke came from the front of his hand, which gave me the impression that he had a gun." Mangerino, Edward depo, dated 11/25/24, 35, 39

ix. Video 1416- Mr. Puga can be seen reaching to his waistband.

x. "Placard 50 consisted of an orange traffic cone and one bloodstained FCC. The FCC was headstamped with "L.A.X. 9mm LUGER." Placard 50 was on the west dirt shoulder of Peach Avenue, approximately 4" northwest of Placard 49. The FCC was approximately 2" away from the top of the pistol's slide." SBCSD Crime Report by Detective Ripley, dated 2/19/21, 144

1. Sergeant Ripley, who investigated the shooting, noted that Mr. Puga's firearm had 13 in the magazine and one in the chamber-the magazine was a 17-round magazine.  One 9 mm casing associated with his weapon was found near his weapon. Ripley, Sergeant Robert depo, dated 1/2/25, 23-24, 30-31, 43

g. Mr. Puga maintained possession of that firearm while running away from the officers underscoring his continued imminent threat to the officers, and resolved homicidal and suicidal intent.

i. "Also, during that time as he was running, I remember seeing the gun again as he turned towards me and the other officers." Adams, Officer Jake depo, dated 11/12/24, 38

1. "I remember having to step over the curb line urn as I ducked and I saw the suspect had turned towards me and when the gunshots started um he started to run northbound on Peach across the intersection of uh Catalpa Street urn and that's when urn I saw him running northbound um, but I saw the gun still pointed in my direction. Urn and I engaged him um from the dirt on the east side of the curb line um I believe with um two or three rounds um and at that point I was thinking well I don't want to get shot, I don't want to die, I don't want sarge to get shot, I don't want him to die, I don't want CHP officers to get shot, I don't want them to die uh I also still knew we were in residential area um and God forbid anything happen to innocent civilians as well. Uh and so I stepped back over the curb uh closer to the suspect vehicle um and I was trying to get a position of cover at that point urn and as I got close to his door uh I still, he was still running and this is a matter of probably two, three, four seconds u smtill running and I had seen him pointing the gun at me, I re-engaged him…Um so I fired a second volley and got closer to the door urn and as he got towards

the opposite side of the street or the northwest corner of Peach and Catalpa um he had still, he, it had almost like he, he kept twisting and turning urn and at one point it looked like he had turned to his left and fired back and at one point I, I could have sworn I, that he turned to his right and fired backwards towards me um and right when he, that's when I had engaged uh, but when he got to the northwest corner um is when I think I fired my final uh three rounds. I think I shot two or three, four and then three, I think that was. Um at that point in time urn I stopped firing because I saw the suspect fall to the ground. Um I saw um there were a couple of rounds that either hit him or hit the ground around him, I remember seeing the dirt fly up um as uh as I was looking from the door, the passenger door of the vehicle that I was using as cover." Adams, Deputy Jake transcript, dated 3/2/21, 330-331

ii. "Q. Why did you continue to fire if he was running away from you? A. Because I knew he initially had a firearm, and I didn't see him drop the firearm.  At that time part of my reassessment was tracking from where he was at to where -- where he initially started to where he was at that point, and I didn't see a firearm on the ground up until that point. So that's why I continued to fire." Blackwood, Officer Michael depo, dated 11/4/24, 54

iii. "Well, the way he was running, he -- from what I recall, I saw the gun in his hand as he's pulling back. So in essence his left arm was raised with the gun pointing back as he was running.  So basically, the only exposure was like the left rib, his left side, like the rib cage area." Kee, Sergeant Isaiah depo, dated 11/5/24, 36, 66

    1. "Rubalcava goes in the door jamb, I go to the prone position just in front of the, just in front of the door, cause I'm like man he is going to get shot so if I'm going to a low position, so now, by the time I could re-gather myself and I'm looking up, now, he, he down switched gun in the left hand and he is running in northern, in a northern direction up Peach, up Peach Street um towards the, he is running towards the north ah northwest corner and there is a house up there and ah and he's got a gun pointed back as he is running so I regain, I regain my bearings and then ah I remember firing like two or three more shots, boom, boom, boom and then he just falls." Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 675-676

iv. While decedent was running: "He wasn't shooting he was just twisting uh pointing the gun towards us, right, over his right shoulder." Rubacalva, Officer Bernardo interview transcript, dated 2/22/21, 525

v. "As he was running um I could hear the gunfire and he was holding his gun, he's running northwest, he was holding his, the gun in the right hand and it looked like he was trying to reach around his body to shoot." Vaccari, Sergeant Robert interview transcript, dated 3/3/21, 284-285

vi. Civilian witness Tammy Goodson reported: "Well, because, um, it looked like he was shooting and running away. And that's what made them shoot at him, to make him stop." Goodson, Tammy depo, dated 11/26/24, 31

20

  vii. "Edward looked down at his cellular telephone for a second, and when he looked up, he saw Puga with one of his hands extended towards the officers on the southwest corner of Peach Avenue and Catalpa Street. Edward saw a puff of smoke expel from Puga's extended hand, and believed Puga shot at the officers. The officers returned fire and shot at Puga. The officers' gunfire was in rapid succession." SBCSD Crime Report by Detective Bustamante, dated 3/10/21, Interview of Edward Mangerino, dated 3/11/21, 761

  viii. Placard 49 "was a semi-automatic pistol chambered in 9mm. The pistol rested on the west dirt shoulder of Peach Avenue. The pistol was black polymer with a silver slide. The pistol had no serial number and no discernable markings. The pistol had one unfired round, headstamped 'L.A.X. 9mm LUGER' in the chamber. The primer was not struck. A 17 round "KCI USA" magazine was partially inserted into the magazine well of the pistol but not fully seated into the gun. The magazine contained 13 rounds of ammunition. The barrel pointed in a southwest direction. Bloodstained dirt was 100" south of the pistol." Placard 49 was approximately 1'9" southwest of Placard 48, Puga's body. The magazine contained 9mm ammunition with the following headstamps: (2) LAX 9mm LUGER, (1) G.F.L. 9mm LUGER, (1) SPEER 9mm LUGER, (3) TSA 9mm LUGER, (3) WIN 9mm LUGER, (1) F C 9MM LUGER, (2) FC 9MM LUGER." SBCSD Crime Report by Detective Ripley, dated 2/19/21, SBCSD Crime Report by Detective Ripley, dated 2/19/21,143

  ix. Note in our study of SBC subjects, we found that among the 60% armed with a firearm, nearly half fired their weapon at police (Mohandie et al., 2009, 458-459).

 h. The decedent was noncompliant.

  i. "Puga and Barrett were stopped by the police on Bear Valley Road, after exiting the 1-15. Puga pulled over along the south curb-line and faced east. Puga said, 'Fuck. Why am I being pulled over?' Barrett only saw a bright white light from the police vehicle, but Puga told her the police had stopped behind them. Barrett did not know what police agency stopped them, but described the police vehicle as a car, not a sports utility vehicle. Barrett did not notice the color of the police vehicle. The officers yelled commands for Puga and Barrett to place their hands out of the vehicle windows. According to Barrett, Puga did not hear what the officers said…Barrett told Puga the officers wanted him to place his hands out of the driver's window. Puga placed his hands out of the driver's window, but the officers ordered Puga to put all of the vehicle windows down. Puga lowered Barrett's passenger window electronically, and Barrett placed her hands out of the window. Puga did not place his hands out of his window again, and told Barrett, 'Fuck this, sorry fool, but I'm leaving.' Puga drove away from the traffic stop and did not yield to the police vehicle's emergency lights and siren." SBCSD Crime Report by Detective Hernandez, dated 3/8/21, dated 3/8/21, 7 SBCSD Crime Report by

Detective Hernandez, dated 3/8/21, Interview of Christina Barrett, dated 2/17/21, 734

ii. "After a minute went by, the officers behind Puga's vehicle shouted commands for him to exit, but Puga told them to wait until he called his mother. Barrett told Puga he should listen to the officers and exit the vehicle, but Puga did not want to get out of the vehicle yet." SBCSD Crime Report by Detective Hernandez, dated 3/8/21, dated 3/8/21, Interview of Christina Barrett, dated 2/17/21, 735

iii. "He was telling him to step out of the vehicle and to show his hands. Uh probably said that 50 times or more. Um step out of the vehicle, show your hands.  The CHP sergeant…Sergeant Vaccari was telling him it was the Sheriffs Department uh asked him if there's anything that he could say or do to get him out of the vehicle urn the suspect continued to say something about talking to his wife um he kept just wanting, the only thing I remember hearing him say was he wanted to talk to his wife. Um and uh Sergeant Vaccari told him step out of the vehicle, the CHP sergeant told him to step out of the vehicle um and um that was and that was probably said I don't know 50 to 75 times." Adams, Deputy Jake transcript, dated 3/2/21, 337, 342

iv. "Uh and then uh while he was complaining about his eye hurting uh he was screaming uh just making a lot of noises, not any words uh and uh he kept saying alright, alright, I'm gonna come out, I'm gonna come out, I'm gonna come out um, but that seemed like it took a really long time, he kept saying it, but he wasn't doing it." Adams, Deputy Jake transcript, dated 3/2/21, 327

v. "At various times he would put his hands up, but then he would put them down.  They were never up for an extended period of time. He was not compliant at any point in time."  Adams, Officer Jake depo, dated 11/12/24, 31

1. "And then he did step out of the vehicle um and again I was um behind the door, passenger door of the CHP unit, the CHP officer to my left and there was two CHP officers on the driver's side of the vehicle um and uh when he stepped out urn he was facing away urn, but it seemed like he was twitchy, he put his hands up, but then bring them back down um it wasn't full compliance, it was, it looked like he was delaying, it looked um he didn't step out and get on the ground, he didn't step back and walk towards uh the officers or us um and um it, it seemed like he was doing something with his hands or adjusting every time he bring them down, bring them up to his head, bring them to his waist and he bring them out, he did enough to where we couldn't see them all the time um, but he would show them to us some of the time. Um and then I think as he stood next to the driver's side of the door I think that was for a couple of minutes, maybe two or three minutes uh he made a quick movement and went to the front of the vehicle um and urn was now positioned in directly in front of the vehicle he had been

driving um where I no longer had a clear or direct line of sight of him." Adams, Deputy Jake transcript, dated 3/2/21, 327

2. "I couldn't hear what suspect was saying, but I could see the suspect um would show his hands briefly and then hide his hands. Um whether it was you know he put them behind him to pull up his pants or adjust his waist or reach in his pockets uh again I couldn't see uh I was blinded from uh just my line of sight." Adams, Deputy Jake interview transcript, dated 3/2/21, 383

vi. "It actually it took like 15 minutes for him to get out of the car, he gets out of the car and he uh he steps out facing almost like west uh and he doesn't have a shirt on, he's wearing baggy shorts or baggy pants, doesn't have uh he doesn't have a shirt on. Throws a bunch of, before he gets out of the car, he throws a bunch of stuff into the street and gets out of the car, and CHP is trying to get him to comply with a felony traffic stop. Turn around uh and he's not doing it. He would turn side to side, he would, but he always kept his, his uh his right side towards the vehicle. Urn never, he would turn back and forth, but he would never turn all the way around. Uh it, it concerned me that he wouldn't turn all the way around, that he wouldn't turn and he wouldn't turn and face us either or face the chippies, and I believe in hindsight, I believe now because he was concealing something on his right side, concealing something somewhere, he would not turn all the way around." Vaccari, Sergeant Robert interview transcript, dated 3/3/21, 247

vii. "According to Goodson, Puga taunted officers by opening the driver's door, throwing items outside then closing the door several times through the incident. Halfway through the incident, Puga opened the driver's door and ran to the vehicle's front. Puga faced south toward officers and was 'acting crazy.' According to Goodson, Puga refused to follow orders to put his hands up and show the officer's his hands multiple times. Goodson estimated that Puga remained at the front of the vehicle for 30 minutes while officers negotiated with him." SBCSD Crime Report by Detective Bustamante, dated 3/10/21, Interview of Tammy Goodson, dated 2/17/21, 765

1. Q: Do you recall anything else that you heard law enforcement say? A: 'Get out of the vehicle.' 'Get out of the vehicle.' 'Show your hands.' 'Get out of the vehicle.' 'Show your hands.' Constantly. And then when he finally did get out of the vehicle, he didn't want to show his hands; instead, showed a weapon." Goodson, Tammy depo, dated 11/26/24, 33-34

viii. "According to Wendy, CHP officers gave Puga repeated commands to exit the vehicle and surrender peacefully, but he refused. Wendy described Puga as stubborn because officers gave him so many opportunities to comply and he would not." SBCSD Crime Report by Detective Bustamante, dated 3/10/21, Interview of Wendy Mangerino, dated 3/1/21, 754

23

1. When Puga exited the SUV he was shirtless. Puga stood in front of the front bumper of the SUV, facing the SUV. The standoff continued for approximately 20 minutes while Puga stood in front of the SUV. <u>Wendy heard CHP officers yell for Puga to put his hands up because they could not see his hands when Puga would bring them down toward his waistband. Puga repeatedly brought his hands down toward his waistband, and officers continued to yell for him to bring them back up. Puga periodically kept his hands up but also brought them back down toward his waistband.</u> SBCSD Crime Report by Detective Bustamante, dated 3/10/21, Interview of Wendy Mangerino, dated 3/1/21, <u>754</u>

ix. Civilian witness Edward Mangerino testified that the decedent was noncompliant. Mangerino, Edward depo, dated 11/25/24, 20

1. "He was cagey. I would say agitated, is the word maybe. And I do believe that if he had complied, there would not have been the result that they ended up with." Mangerino, Edward depo, dated 11/25/24, 43

2. "He opened the front door, driver's side. He came out. They asked him to close the door. He didn't close the door at that time period. They asked him to put his hands up; he wouldn't do that at that time period." Mangerino, Edward depo, dated 11/25/24

3. "Approximately 30 minutes later, Edward saw Puga exit from the driver's door of the SUV. Puga displayed both of his feet first, lifted his left hand in the air, lifted his right hand in the air, and turned his back toward the officers as he stepped out. Puga did not display the front of his body to the officers. According to Edward, Puga probably hid something in his waistband, because he did not display the right side of his waistband as he exited the driver's door. The SUV's driver's door remained open. The officers yelled and asked Puga to walk backwards toward them, but Puga did not comply. The officers asked Puga to close the driver's door, but Puga did not comply. Approximately five minutes later, Puga closed the driver's door with his right hand, ran to the front of the SUV, and faced the officers." SBCSD Crime Report by Detective Bustamante, dated 3/10/21, Interview of Edward Mangerino, dated 3/11/21, 761

x. "Jonathan Jr remembered the officers shouted toward the occupant of the SUV, later identified as Puga, to show his hands. Puga did not cooperate with officers' commands. Jonathan Jr estimated there were approximately three to five officers outside during the standoff with Puga. Jonathan Jr knew CHP officers were outside and saw their lights on top of their vehicles, but he did not mention seeing any SBCSD personnel. Jonathan Jr remembered CHP officers gave Puga commands to exit the SUV with his hands up through the public address speaker from their CHP unit. Puga was not cooperative to commands given by officers, by refusing to exit

and show his hands." SBCSD Crime Report by Detective Bustamante, dated 3/10/21, Interview of Jonathan Botten, Jr. dated 2/17/21, 746

    xi. "Puga refused to obey commands from Kee, not to reach for his waistband. Kee and Rubalcava were approximately 35 feet east of Puga and the Ford. Kee yelled at Puga, 'Don't, don't, don't, don't reach, hey, don't, get your hands up,' because Puga reached into his waistband. Within one second, Puga quickly lowered his right hand down to the front of his waistband, and produced a dark semi-automatic handgun from the front of his waistband. Less than one second later, Puga pointed the handgun at Kee and Rubalcava and fired a shot, but the shot missed." SBCSD Lethal Force Encounter Review by Detective Hernandez, dated 3/2/22, 1286

    xii. "One CHP officer continuously asked Puga to keep his hands up, but Puga turned to the left and the two CHP officers shot several rounds in rapid succession. John Sr. described the sound of the CHP officers firearms, as one being louder than the other, but he did not know what CHP officers fired. John Sr. could not see if Puga had a weapon in his hands or waistband. John Sr. saw a spark on his closed security door and realized gunfire hit their front door and house." SBCSD Crime Report by Detective Hernandez, dated 3/8/21, Interview of John Botten, Sr., dated 2/17/21, 738-739

i. Despite the use of less lethal, Mr. Puga, as noted above, escalated. Highly resolved SBC subjects will increase their efforts to draw deadly force as opposed to deescalate.

j. He had engaged in high risk, very reckless, dangerous behavior during the incident-leading police on a high-speed pursuit, which showed lack of regard for his well-being and safety (and that of others).

    i. Blackwood and Rubalcava observed a white Ford Expedition, with black rims, which matched Puga's vehicle from the car-to-car shooting. The Expedition was driven by Puga, and traveled east on Bear Valley Road, while Blackwood and Rubalcava traveled west. Blackwood conducted a U-turn and drove behind the Expedition. Puga immediately pulled over along the south curb-line of Bear Valley Road, near Balsam Avenue, prior to Blackwood and Rubalcava initiating a traffic stop. "Blackwood and Rubalcava stopped behind the Expedition and initiated a high-risk traffic stop. Puga did not comply with commands to roll down his windows, drove away, and a pursuit ensued." SBCSD Incident Summary by Detective Edward Hernandez, dated 5/18/21, 44

    ii. "Rubalcava told CHP Dispatch to request assistance from the San Bernardino County Sheriffs Department (SBCSD), and this request was broadcasted to the Hesperia Station deputies. Initially, SBCSD deputies could not locate the pursuit, due to the time delay of relayed information between CHP Dispatch and SBCSD Dispatch. At approximately 0157 hours, SBCSD Sergeant Robert Vaccari located and joined the pursuit on Peach Avenue at Main Street, Hesperia. The pursuit traveled through residential neighborhoods in Hesperia and Victorville at speeds ranging

from 50 to 95 miles per hour." SBCSD Incident Summary by Detective Edward Hernandez, dated 5/18/21

   iii.  "He was calling uh the pursuit as far as what streets we were on, uh the traffic conditions, the weather conditions urn, uh ve, uh vehicle code violations um speeds in excess of 50, 60, 70, 80 miles an hour, running through stop signs um driving on the wrong side of the road um he was calling that out as long as, the entire time he was calling the pursuit." Adams, Deputy Jake transcript, dated 3/2/21, 335

        1.  "Um and then um and north and south on multiple uh streets throughout. Um I just remember thinking this guy's driving absolutely crazy, he's going super-fast um blowing stop lights and stop signs urn not stopping for CHP or us at this time urn going through the res, when he got off the majors then he was in residential neighborhoods um speeds were still pretty high urn upwards of you know 50 to 80 miles an hour um through residential neighborhoods. Um and he showed no signs of slowing down or stopping. Um and uh it was that way the entire pursuit." Adams, Deputy Jake interview transcript, dated 3/2/21, 377

   iv.  He kept going until his vehicle was disabled. "Officers were in pursuit of a suspect, later identified as Hector Puga, who was wanted for shooting at occupants in a vehicle, which occurred on Tuesday, February 16, 2021, at approximately 1750 hours. Puga's vehicle, a white Ford Expedition, exited the Interstate-15 (1-15) freeway at Bear Valley Road. Puga continued driving at high speeds throughout city streets and struck a spike strip in the area of Bear Valley Road and Cottonwood Avenue, but Puga continued driving and entered the southbound 1-15. Puga exited at Main Street and continued to flee from officers despite having one flattened tire. Puga stopped in the area of Peach Avenue and Catalpa Street when the vehicle became disabled."  SBCSD Crime Report by Detective Edward Hernandez, dated 2/19/21, 54

   v.  "Puga drove erratically and failed to stop for posted stops signs, red traffic control signals, and drove on the wrong side of the roadway. Puga drove at high rates of speeds for the conditions present, estimated at approximately 70 miles per hour. Henry and Hanrahan flew over the pursuit for approximately 10 minutes."  SBCSD Crime Report by Detective Hernandez, dated 3/9/21, Interview of Reserve Deputy III Kevin Henry & Interview of Detective Greg Hanrahan, dated 3/9/21, 767, 771

k.  Requested the primary communicator-the sergeant, a person of higher authority-be the sole person to apprehend him.  This is a variable noted in Mohandie & Meloy, 2000

   i.  "For whatever reason wanted me to cause I was next Kee ah Sergeant Kee um he didn't want me where standing next to Sergeant Kee I I had the rifle um and ah so he tells Sergeant Kee that um he he says, 'I only want you to arrest me.'" Blackwood, Officer Michael interview transcript, dated 2/22/21, 558

    ii. "Just all the requests that he was making that it seemed like he was trying to give himself the advantage to um ah to shoot Kee." Blackwood, Officer Michael interview transcript, dated 2/22/21, 618

    iii. "He sticks his head out again, 'Okay man, I'm going to come out, but here's the deal um I want you, specifically to come and handcuff me so when I surrender I want you to handcuff me, you, you tell them other guys stay away, I want you to handcuff me,' I said, 'Okay, you got my word if I got yours so you come out peacefully.'" Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 668

        1. "I said, 'Okay, let me give him one more chance.' So, I said, 'Hey Hector um you, you're done man did you smoke your last cigarette,' and he was like, 'Yeah,' but um look so he would try to convince me that he's not armed, he always would stick his hands out, 'Look see I just got cigarette and beer, lighter, look I just got…'" Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 669

l. Several of the first responding officers and one of the civilian witnesses perceived that Mr. Puga's intentions were to end his life violently in a police deadly force encounter (suicide by cop with meta goal of murder suicide). Mr. Puga himself contextualized the meaning of his actions with his on-scene statement described by Officer Rubacalva below.

    i. "Uh that impression gave me um uh he was what was his plan to go down with gunfire. Uh he wasn't gonna go to jail, he was making statements and say he did 16 years um he's a third striker he doesn't want to go back. Um Sergeant Kee asked him to come out, he was I just want to smoke one last cigarette before I come out, I just want to make one more phone call before I come out. Um when <u>Sergeant Kee started um taking to him by his first name the suspect stated well you know my name, you know who I am, right and Sergeant Kee was like no. Um, he stated you know what I went in for right? And Sergeant Kee was like no. *Well I'm gonna show you guys what I went in for.*</u> So, at that time by that statement um I felt like he was, he was ready for gun fight." Rubacalva, Officer Bernardo interview transcript, dated 2/22/21, 536

        1. Note: this is a powerful statement made by Mr. Puga to the first responders that underscores Mr. Puga's suicide by cop and homicidal intentions because he references the earlier shooting he went to prison for, *drawing the connection himself* with his 3/13/15 prior suicide by cop attempt.

    ii. "So, we left the window alone and I went back to putting pepper balls in through the rear window. Um he uh it's not all for not, he's saying that he's gonna get out of the car, he's opening the door at some points, but then he would close the door. He's smoking cigarettes during this, um he's drinking beer, and uh just doing he's saying I'm a this is a three-strike case, I'm a 25 to lifer uh I'm going down all day. And, on one side I think well maybe um he is gonna take it all the way, but on the other side I dealt with

more people in that aspect that yeah they're gonna smoke their whole pack of cigarettes, and they're gonna drink all their beer because this is the last pack of cigarettes they're gonna get over the counter and this is the last beers they're gonna drink um going into before they go into jail."_Vaccari, Sergeant Robert interview transcript, dated 3/3/21, <u>244</u>

 iii. "So I mean those statements and then with him just keep still smoking cigarettes and drinking beers um I I felt that he was not going to wanna come out without a fight.  Felt he was going to force a confrontation." Blackwood, Officer Michael interview transcript, dated 2/22/21, 595

 iv. Sergeant Kee perceived that during the incident: "I think he was kind of coming to grips with himself on is he, is he going to um um, you know go back to prison or is he just going to shoot it out and um that, that's, that's what I feel." Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 686

 v. "Puga's refusal to exit the SUV, and respond to CHP and SBCSD personnel's commands gave Tanja the impression he wanted to force officers to shoot him. Puga did not appear to have any intention to peacefully surrender, nor did he make any attempts. Puga's lack of cooperation made Tanja believe the standoff with Puga would not be resolved peacefully. SBCSD Crime Report by Detective Bustamante, dated 3/10/21, Interview of Tanja Botten, dated 2/17/21 @ Loma Linda, 745

m. Under the influence of alcohol and had an alcohol use disorder. Puga tested positive for alcohol at a level above the legal limit.  He drank throughout the incident leading up to the shooting, consistent with building up "chemical courage" for SBC (Mohandie & Meloy, 2000, 388), and empirically associated with SBC (Mohandie et al., 2009).

 i. Femoral blood Ethanol 114 mg/dL; BAC .114 NMS Toxicology Report, dated 3/29/21, 849

 ii. Puga opened a small bottle of Hennessy cognac and drank it as he drove. After Puga drank the Hennessy, he threw the bottle out of the driver's window, opened a Modelo beer and drank that." SBCSD Crime Report by Detective Hernandez, dated 3/8/21, dated 3/8/21, 7 SBCSD Crime Report by Detective Hernandez, dated 3/8/21, 734

 iii. "The suspect I think threw a plastic bag out of the car um and it looked like he drank um what I thought was beer and finished, chugged a couple of beers or finished them off or whatever was in the car and threw those beer cans out of the vehicle as well out of the driver's side window." Adams, Deputy Jake transcript, dated 3/2/21, 327

 iv. "He is just sitting there smoking a cigarette um drinking beer he's throwing beer cans out the window." Blackwood, Officer Michael interview transcript, dated 2/22/21, 560

 v. "Okay so now while as we are waiting for him to finish his second cigarette he is still tossing out beer cans, he even tossed out like the case,

28

like when you buy a 12-pack of beer he tossed out that case…" Kee, Sergeant Isaiah interview transcript, dated 2/22/21, 668

vi. "Placard 30 was located west of the driver's door of the Expedition… an 18 pack of Modelo beer, one open Modelo beer can…" SBCSD Crime Report by Detective Ripley, dated 2/19/21, 130

vii. "Placard 34, an empty Four Loko beer can, rested on the southbound roadway of Peach Avenue. Placard 34 was located approximately 13' 3" northeast of Placard 33." SBCSD Crime Report by Detective Ripley, dated 2/19/21, 132

viii. Inside the Explorer: "Four empty beer cans rested on the front passenger's floorboard. The beer cans appeared new, and the interior of the Expedition smelled of alcoholic beverages." SBCSD Crime Report by Detective Ripley, dated 2/19/21, 140

ix. According to the DSM-5-TR (APA, 2022, p. 563), "acute alcohol use, independent of chronic use, increases the risk of a suicide attempt, with each drink raising the risk by 30%." In particular, firearms related suicides are more prevalent among heavy drinkers in the US (APA, 2022, p. 560).

n. Under the influence of methamphetamine. Mr. Puga tested positive for recent and significant methamphetamine use, consistent with intoxication and a significant and severe methamphetamine addiction.

i. The autopsy toxicology indicated a high level of Meth.

1. Femoral blood Amphetamine 86 ng/mL; Methamphetamine 1900 ng/mL. NMS Toxicology Report, dated 3/29/21, 849

2. Dr. Jong testified that "these levels we usually see in people who or almost always see in people who are either abusing illicit methamphetamine or, for example, if they have the drugs in their body to transport it." Jong MD, Timothy depo, dated 1/2/25, 43

ii. "Placard 33, a glass pipe suspected to have been used to smoke methamphetamine, rested on the dirt shoulder, approximately 2'8" west of Peach Avenue. Placard 33 was located approximately 3'5" southwest of Placard 32." SBCSD Crime Report by Detective Ripley, dated 2/19/21, 131

iii. Two syringes were found in the Expedition. Search Warrant receipt, 822

iv. Addiction has a strong association with suicidal behavior, as does withdrawal from methamphetamine, (the crash). Meth in particular has an association with aggressive and violent behavior.

v. According to the DSM-5-TR (APA, 2022, p. 636), "threats or acting out behavior may occur. Depression, suicidal ideation, irritability, anhedonia, emotional lability, or disturbances in attention and concentration commonly occur during withdrawal…depressive symptoms with suicidal ideation or behavior can occur and are generally the most serious problems seen during stimulant withdrawal."

vi. "Aggressive or violent behavior is common when high doses are smoked, ingested, or administered intravenously…. Withdrawal states are associated with temporary but intense depressive symptoms that can

29

resemble a major depressive episode; the depressive symptoms usually resolve within 1 week." (APA, 2022, p. 635-636)

vii. The newest DSM, DSM-5-TR(APA, 2022, p. 638) in their diagnostic chapter on Substance-Related and Addictive Disorders, specifically Stimulant Use Disorder, in recognition of the association between stimulant abuse and suicide, now has a special section titled "Association with Suicidal Thoughts or Behavior." The DSM-5-TR (APA, 2022, p. 638) notes: "one systematic review found that regular or problem amphetamine use (examining primarily individuals who inject amphetamines and/or individuals admitted to treatment for use of amphetamines) is associated with increased suicide mortality. A general population study of adults in the United States found an association of prescription stimulant use disorder with suicidal thoughts…In a study of both men and women in the US Veteran's Administration health care system, cocaine and amphetamine use disorders were each associated with increased rates of suicide deaths."

o. Recent relationship conflict.

i. "On Wednesday, February 17, 2021, at approximately 0010 hours, Puga called Barrett while she was inside her residence. Puga wanted to return and pick up Barrett, so they could hang out and drink beer. According to Barrett, Puga had domestic problems with Claudia, so he did not have a good day." SBCSD Crime Report by Detective Hernandez, dated 3/8/21, dated 3/8/21, 7 SBCSD Crime Report by Detective Hernandez, dated 3/8/21, 33

ii. Mr. Puga's sister was upset with him over the issues about the police looking for him the day prior, as well as the gun. She blocked him from calling. "Q. Did you have any missed calls from Hector on your cell phone from the last time you saw him to the time that you were at the neighbor's house? A. I blocked his number that night when he came to the house. I was very upset with him and I blocked his number. So he couldn't call me. I wish I never would have blocked it." Salas, Gabriela depo, dated 12/19/24,50

p. Overall, Mr. Puga demonstrated numerous empirical indicators that reliably categorize this incident as suicide by cop: past suicidal ideation, a past suicide attempt (substantially mirroring the current incident facts) and suicide by cop ideation, behavioral threats to harm others, shoots at police, noncompliance with the police, drug addiction, and under the influence of alcohol, and armed with a gun. Mohandie et al., 2009

**2. At the time of his confrontation with the first responders, Mr. Puga was an extremely violent, dangerous absconded parolee who was imminently dangerous to the first responders, and generally dangerous to the community, as well as to anyone in his life.**

**Foundation for Opinion:**

a. Earlier in the day on 2/16/21, Mr. Puga was wanted for another incident-
possession of a firearm by a convicted felon, evading a police officer, and driving
with a suspended license. This stemmed from the following incident: "While
driving in my marked black and white patrol vehicle westbound on Artesia
Boulevard approaching Lakewood Boulevard, I observed a white Ford Expedition
(License plate #4NOM967) without a proper working license plate light (a
violation of 24601VC). I conducted a traffic stop to either warn/cite…The vehicle
noticed my flashing red lights/presence behind him and pulled over. I approached
the vehicle and saw a male Hispanic driver (the suspect). He had bloodshot red
eyes and I observed an open 'Modelo' beer can in the center console. I asked the
suspect if he has ever been arrested and he stated, 'Yes for DUI.' I asked him if he
had a driver's license and he stated he did not have it on him. I instructed the
suspect to turn off his vehicle and step out of his vehicle in an attempt to detain
him pending a driving under the influence investigation. The suspect then placed
the car in drive and sped off in a high rate of speed northbound on Lakewood
Boulevard. He entered onto the 91 Freeway westbound entrance. I lost sight of the
suspect's vehicle once he entered the on ramp. I attempted to locate the suspect on
the freeway however, was unsuccessful." LA County Sheriff's Department
Incident Report, dated 2/16/21, 1010

   i. During the follow-up investigation, Mr. Puga's sister "told me she was in
her driveway when her brother (the suspect) drove up the driveway in the
white Ford and told her to park the car. He exited the driver's seat and told
her the cops were after him. The suspect then asked her other sister (the
witness) to take him in her car somewhere because the cops were after
him. Nancy stated she knows the suspect is wanted and he told her he was
not going to go back to jail. She stated he is an 'East Side Longo' gang
member and goes by the moniker 'Silent.' I asked her if she knew of
anything illegal in the suspect's vehicle and she stated, 'She did not know.'
Nancy provided Deputy Galindo with the suspect's full name and date of
birth. The suspect returned on active parole. I conducted a parole
compliance check search of the vehicle. I observed two Modelo cans in
the center console. One can was open still containing beer inside of
it…Deputies Contreras and Chavez located Gabriela's vehicle and
contacted her. She was the sole occupant of the vehicle. I responded to
their location and contacted the witness. She told me her brother was in
the driveway and asked her for a ride. She stated he seemed 'desperate' so
she gave him a ride to Long Beach. The suspect jumped into her backseat
and she drove him to the corner of 6th Street and 710 Freeway. She saw
him grab a gun and she asked him, 'What do you have right there?' The
suspect then placed the gun in his waistband and told her, 'Don't worry
about it.' Gabriella described the gun as a silver firearm similar to my
Smith and Wesson .38 revolver, just 'bigger.' Via department resources, I
ran a records check of the suspect and he has an outstanding $100,000
warrant for 29800(A)(1) PC (Possession of a Firearm by a Felon) and a

No Bail warrant for 3000.08(C) PC (Paro e Violation). The suspect is on active Parole for 69 PC (Resist/Assault/Obstruct a Peace Officer). The suspect driver's license status is suspended, (a violation of 14601.1VC). Via department resources, the suspect also returned as a convicted felon (273.5(F)(2)PC, 69 PC, 459 PC). The suspect also has a history of arrest for possession ammunition and firearms." LA County Sheriff's Department Incident Report, dated 2/16/21,1010-1011

b. Mr. Puga was involved in another earlier incident in which-unprovoked-he had attempted to shoot another driver on the freeway: Incident Detail Report, dated 2/17/21, 890

    i. Mr. Puga, already a wanted absconded parolee, attempted to shoot another driver the day prior. The victim "was driving his black Honda Civic, on1-15 northbound, in the #1 lane, at approximately 80 miles per hour. While continuing northbound, from his right-side mirror, Patheco saw a white Ford SUV, making unsafe lane changes across all lanes of I-15 northbound. Pacheco saw the Ford was to the rear of another unknown vehicle and was following too close…As the Ford entered the #2 lane, the Ford partially veered into the #1 lane, causing Pacheco to steer his vehicle to the left, and entered the west asphalt shoulder. Pacheco was able to avoid a collision with the center median wall and re-entered the #1 lane…With the intent of making a statement to the subject driver of the Ford, Pacheco rolled down his right front passenger side window. The driver side window of the Ford was down, and the subject yelled, 'Fucking punk!' Pacheco immediately observed the subject display a black, 9mm pistol, with his right hand. The subject took his left hand off the steering wheel of the Ford and racked the gun. The subject placed his left hand on the Ford's steering wheel and held the pistol in his right hand. The pistol was pointed at Pacheco, and the subject fired the pistol one time." This resulted in a bullet hole to Pacheco's car. CHP Investigative Report, dated 2/16/21, 958, 963

    ii. Mr. Puga was now wanted for attempt murder (664 PC/187 PC), ADW (245 A 2), and discharge of a firearm (246PC). CHP Investigative Report, dated 2/16/21, 954

    iii. "On Tuesday, February 16, 2021, at approximately 1751 hours, the California Highway Patrol (CHP) investigated a car-to-car shooting, which occurred on the Interstate 15 (1-15), near Roy Rodgers Drive. The suspect, later identified as Hector Puga, drove along the passenger side of the victim's vehicle, and fired one shot at the victim. The bullet fired by Puga struck the victim's front passenger door. Puga fled in his vehicle after shooting at the victim. The victim described Puga as a Hispanic male, heavy set, bald, and Puga's vehicle as a white Ford Expedition, with large black rims, and a funeral procession sticker on the back window. Victorville CHP officers were later briefed about the shooting." SBCSD Incident Summary by Detective Edward Hernandez, dated 5/18/21, 44

c.  Had he survived the shooting, Mr. Puga-among his many other charges- would have been charged with attempted murder on a peace officer.  PC 664/187 (a). SBCSD Incident Summary by Detective Edward Hernandez, dated 5/18/21, 44-47

d.  Mr. Puga's violence, criminality, and disregard for others, resulted in the shooting-related injuries to three innocent parties.  Had he simply complied-something required by his parole conditions-no one would have been hurt, including him.

   i.  "Moments after the lethal force encounter, a 911 caller reported three people at a nearby home were struck by gunfire. Medical aid responded to a home on Catalpa Street and found an adult male, an adult female, and a 14-year-old male with injuries. The victims were transported and the 14-year-old remained hospitalized and was expected to recover from his injuries. The adult male and adult female were treated at a local hospital and released." SBCSD Crime Report by Detective Edward Hernandez, dated 2/19/21, 54

e.  Mr. Puga's reckless driving made him a danger to the community.  "Puga drove erratically and failed to stop for posted stops signs, red traffic control signals, and drove on the wrong side of the roadway. Puga drove at high rates of speeds for the conditions present, estimated at approximately 70 miles per hour. Henry and Hanrahan flew over the pursuit for approximately 10 minutes."  SBCSD Crime Report by Detective Hernandez, dated 3/9/21, Interview of Reserve Deputy III Kevin Henry & Interview of Detective Greg Hanrahan, dated 3/9/21, 767, 771

f.  Mr. Puga appeared to have a long-time interest in firearms and fantasies about shooting people, including the police.

   i.  It is also apparent from his criminal record that he harbored significant animosity and hostility towards the police extending back in time to his 8/26/07 arrest which included resisting charges:  "The subject pulled over by 4th St and Cerritos. As soon as he got off the bicycle, he turned to us and began yelling obscenities at us. I ordered him to place his hands behind his neck in order to search him. He stated, 'Fuck no. I've got a mess up wrist.' I told him he did not have a bicycle light and that he was going to be cited for it, he responded, 'I am not going to sign the fucking ticket. I don't care if you call your sergeant here. I am not going to sign it.'" LBPD Arrest Report dated 8/27/27, 24

   ii.  Mr. Puga's sister testified that he was arrested for the first time for shooting a BB gun at another kid around age 13.  He was sent to juvenile hall. Juarez, Nancy depo, dated 12/19/24, 14, 17-18

g.  The decedent had a long history of violence towards others, had been subject to multiple restraining orders, including one active restraining order.

   i.  Maria Cadena reported that he stole her car, broke into her apartment, threatened to kill her if she didn't get back with him.  Stalked her at her work on 7 separate occasions. On 1/24/13 stood outside her home and threatened to kill her in the presence of her husband and youngest child (age 4). "He is irrational and scary…"  DV-100 Request for Domestic Violence Restraining Order, dated 1/25/13 & Declaration by Maria Cadena, dated 1/25/13, 1

   ii.  "On 08/18/14 at approx 1700 hrs she was at her residence with Hector when an argument started. Yobana could not remember what the argument was about. During the argument Hector punched Yobana in her right eye, the left side of her chin and the left side of her torso. Yobana stated that she is in fear of Hector and due to his controlling attitude she was unable to call PD or flee. Yobana added that Hector has a history of physically abusing her but this is the first time she is reporting the crime." LAPD Investigative Report, dated 8/20/14, 2

      1.  "Suspect punched victim and victim fell to the ground. Suspect kicked and stomped victim while victim was on the ground. Slammed her to the floor several times after picking her up. He also strangled her with both hands. Made her sign a paper that victim asked him to kill somebody. Followed her threatening her, 'you're gonna pay for this.' Witness overheard all of it and him saying, 'it doesn't matter to me if you stop breathing, the police can't protect you, I will get out of prison and find you.'" LAPD Investigative Report, dated 8/20/14, 1-3

      2.  8/18/14 Decedent Puga used a "pair of pliers to squeeze and tug at my nipples…he then hit me on my right hand with the metal pliers… he told me 'get your fucking ass upstairs' and abuse continued into our bedroom. Respondent punched me in the face causing me to have a black eye on my right eye…he also punched me on the left side of my chin… again hit me in the face resulting in a busted lip which was bleeding… also punched me multiple times in the ribs." "In the past respondent has kicked me, slapped me, pulled my hair, shoved me into a wall, stabbed me in the arm with a screw driver, tried to burn me with a lighter, pulled knives on me and held them to my neck, and has threatened to kill me multiple times…I am terrified Respondent will continue to harm me and carry out his threat to kill me." DV-110 Temporary Restraining Order & Declaration by Yobana Puga, dated 8/21/14, 1

   iii.  "On, or around, February 3, 2015, Respondent began an argument with me, while I was lying in bed, about why I have been distant towards him. Respondent was accusing me of seeing other people. Respondent was calling me a 'bitch' and threatening to kill me if I tried to get a restraining order again or call the police. Respondent then approached me and began to punch me in the face several times. Respondent grabbed me by the hair and dragged me out of bed and onto the ground. Respondent began to kick me in the ribs and the legs. Respondent got down on his knee on top of me to subdue me and began slapping me over and over in the face. Respondent was yelling the whole time, "bitch' and 'bitch, you always disrespecting me' and 'the police will never do nothing and if I go to jail, believe it bitch, when I get out, I WILL KILL YOU.' Respondent hid my keys and cell phone and locks the doors…respondent closed the door so I could not leave… the whole time my daughter Jocelyn was downstairs in her room. Jocelyn heard what was going on and recorded it on her

phone…in the morning I convinced Respondent to go to work…Respondent was about to leave for work, when he made me write on a piece of paper 'I, Yobana Puga, asked my husband to murder (someone I did not know)' and made me sign it, as his 'insurance' that I would not go to the police…I left to pretend to go to work, but went straight to Jocelyn's school to get her out early so we could go to the police. Respondent had followed me. Respondent was trying to force me out of my car and blocking me from his car. From the car, I called the police and kept driving. The police met me and Respondent drove away." Past abuse: "respondent has punched me, kicked me, pulled my hair, slapped me, pinched my breasts, punches me in my genitals, and has burned me with cigarette lighters…" "Respondent has been verbally abusive the entire relationship. He is derogatory and demeaning and has threatened to kill me on several occasions." TRO and Declaration by Yobana Puga, dated 2/3 and 2/4/15, 1

    iv.  DLU 1/9/16, expire 1/23/22 by Linda Rangel. "The subject is restrained from assaulting, threatening, abusing, PCO/Harassing, following, interfering, or stalking the protected person….prohibited from possessing and/or purchasing a firearm…" Criminal history, 86

    v.  "Suspect slashed victim's vehicle tires/rammed the victim's vehicle with his vehicle causing damage. Under the influence of alcohol, uncooperative when arrested. He was in the car, refused to get out, got on his cell phone and started talking to someone. He had accused her of infidelity and did this while she was two months pregnant with their child. She said he'd tried to strangle her in the past, threatened to kill her, and threatened her with a gun. He has threatened to kill himself in the past, threatened to kill her, and 'threatened to use or used a weapon' against her in the past." LAPD Investigative & Arrest Report, dated 1/21/19, 1-2, 4-6, 8

    *vi.*  "On 03/08/15, parolee forced his wife (victim) Into the vehicle and pistol whipped her and repeatedly hit her with his fists. As parolee proceeded to drive, he fired his gun in the air several times. Parolee told the victim he would not go back to jail and will shoot it out with the cops if arrested. Parolee subsequently was engaged in a vehicle pursuit. Upon coming to a stop, parolee exited his vehicle and shot at Deputies. Parolee then fled and deputies set up containment. After approximately one hour standoff, parolee surrendered without further incident." CDC Parole Discharge Review Report, dated 3/13/15, 72

**3.  Mr. Puga's documented behavior is consistent with his methamphetamine and alcohol intoxication, an alcohol use disorder, as well as his underlying severe antisocial personality disorder and psychopathy. He was violent, impulsive, suicidal, aggressive. Methamphetamine and alcohol intoxication is associated with poor judgment, impulsive, and dangerous, high-risk behavior. Use of methamphetamine and alcohol- whether suicidal or not- can lead a person to behave very impulsively, unpredictably, and aggressively as Mr. Puga did in this case. In this state of mind,**

35

there was no ability to reason with or deescalate Mr. Puga (although first responders attempted to do so). **He was a danger to others as well as himself, and presented a risk of violence and harm to anyone in his immediate surroundings, including first responding officers, and other people on the road while driving under the influence of alcohol and meth.**

**Foundation for Opinion:**

a. As noted in prior opinions, Mr. Puga was under the influence of both methamphetamine and alcohol.
b. Mr. Puga's behavior described under Opinion #1 was impulsive, unpredictable, violent, aggressive, and dangerous to others.
c. According to the DSM-5-TR (APA, 2022, p. 562), "alcohol intoxication is an important contributor to interpersonal violence and suicidal behavior. Among individuals intoxicated by alcohol, there appears to be an increased rate of accidental injury (including death due to behaviors associated with altered judgment, self-harm, and violence), suicidal behavior, and suicide."
d. The DSM-5-TR (APA, 2022, p. 635) indicates that "aggressive or violent behavior is common when high doses are smoked…"
   1. "There may be paranoid ideation, auditory hallucinations….threats or acting out of aggressive behavior may occur…" p. 564
   2. According to the DSM-5-TR (APA, 2022, p. 636), "threats or acting out behavior may occur. Depression, suicidal ideation, irritability, anhedonia, emotional lability, or disturbances in attention and concentration commonly occur during withdrawal…depressive symptoms with suicidal ideation or behavior can occur and are generally the most serious problems seen during stimulant withdrawal."
   3. "Aggressive or violent behavior is common when high doses are smoked, ingested, or administered intravenously…. Withdrawal states are associated with temporary but intense depressive symptoms that can resemble a major depressive episode; the depressive symptoms usually resolve within 1 week." (APA, 2022, p. 635-636)

4. **There were no verbal or other available interventions that would have been successful under the circumstances that Mr. Puga created in this situation.** First responders had already attempted to de-escalate in multiple ways. Time, distance, willingness to talk, and desire to live are essential variables to a peaceful resolution that are determined by the suspect's behavior and motivation. Mr. Puga did not indicate any peaceful method to resolve this incident and forced the confrontation through his actions. There were a number of high-risk indicators present in this case that indicated a low likelihood of a successful verbal outcome, the most significant being Mr. Puga's homicidal and suicidal state of mind (death wish), his

**unwillingness to submit to arrest and return to prison (for an indeterminate or life sentence), fueled by methamphetamine and alcohol intoxication, which rendered him unwilling and incapable of being reasoned with, and having no meaningful demands.**

**Foundation for Opinion:**

a. First responders tried a variety of verbal strategies to try to get Mr. Puga to peacefully surrender.  He appeared to use this dialogue to stall and tried to bait officers into a position of advantage to shoot them.

   i. "Q: Other than telling him to get out of the car, do you remember any other commands that the helicopter gave over its PA system? A: Yeah, they're like, 'Your family needs you.' 'Just get out of the car.' 'It's better for you, better for your family.' 'Just get out of the car.' 'Put your hands up.'" Goodson, Tammy depo, dated 11/26/24, 44

   ii. "Hector, this is Sergeant Vaccari with the San Bernardino County Sheriff's Department. Is there anything I can say or do that will get you to come out of that car? We want you to come out. We want this to end peacefully, but we're not going to wait here all night. See, we're not going away." Belt Recording of Sergeant Robert Vaccari, dated 2/17/21, 25

   iii. "Puga: Call my wife. Sgt. Vaccari: We will. Give your wife's phone number. Belt Recording of Sergeant Robert Vaccari, dated 2/17/21, 25

   iv. "Puga: Don't shoot…Sgt. Vaccari: I am not going to shoot you. Step out. Open the door or I'm going to send in five more." Belt Recording of Sergeant Robert Vaccari, dated 2/17/21, 29

   v. "Sgt. Vaccari: Hector, is there anything I can say or do to get you to come out of that car? Mr. Puga: Call my wife. Call my mom. Officer 7: We've already tried that and they're not answering." Belt Recording of Sergeant Robert Vaccari, dated 2/17/21, 33

   vi. "I think he was delaying, I think he was stalling, I think, I think uh knowing what I know at the end and having that played out I think that stall was the suspect was looking for a way to run um and get in a position where he could fire his gun at uh at deputies and officers." Adams, Deputy Jake interview transcript, dated 3/2/21, 383

   vii. Officers tried and were unable to reach his mom or wife.

b. There were multiple indicators that this situation was not going to be resolved peacefully (McMains & Mullins, 2015). McMains and Mullins observe that not every incident is negotiable (McMains & Mullins, 1996, 25) and that some individuals do not want a peaceful resolution. The presence of any *one* of these issues noted below makes negotiations difficult, if not impossible (McMains & Mullins, 1996, 28).

   i. Mr. Puga was unwilling to return to prison for what he realistically assessed was a lifetime sentence.

   ii. He did not demonstrate or express a need to live.  Without the need to live, the negotiator or first responder's bottom line is removed.

   iii. He had no genuine demands (the requests to talk to his mom and wife were really about making final communications).

1. The decedent kept stalling as far as surrendering, and did not indicate any real demands for resolution, something the first responders accurately noted.

   a) "Um, and then one of the final what appeared to be one of the, what I thought was one of the final volleys of pepper ball uh the suspect said he had been hit in the eye with the pepper ball and he wanted medical attention. Um the CHP sergeant told him that we have medical staged and he would receive medical attention he just needed to step out of the vehicle and show us his hands and comply. He had told, he told the suspect that we worked with him, we tried to call who he wanted us to call um and we done everything on our part uh now he needed to live up to his end and be compliant with us." Adams, Deputy Jake interview transcript, dated 3/2/21, 326

2. "I think he was delaying, I think he was stalling, I think, I think uh knowing what I know at the end and having that played out I think that stall was the suspect was looking for a way to run um and get in a position where he could fire his gun at uh at deputies and officers." Adams, Deputy Jake interview transcript, dated 3/2/21, 383

c. Deputies-as noted elsewhere in this report-took note of Mr. Puga's behavior and presentation and assessed his potential threat. Threat assessment is a critical activity for police responding to calls and they accurately considered him a significant threat.

*Research/Scholarly Work Pertaining to Intervention*

d. In our study of incidents "where crisis negotiation and verbal techniques were attempted with SBC subjects, they made no significant difference in outcome. Length of time also did not decrease risk of injury or death. Behavioral resolve to die on the part of the subject appears to be a key determinant of outcome. Suicide by cop ideation and intent is a high-risk indicator for subject fatality…" (Mohandie and Meloy, 2010, 101)

   i. "A high-risk traffic stop was conducted, but Puga refused to exit the vehicle. For more than an hour, CHP officers and deputies negotiated with Puga to safely exit the vehicle, but he continued to ignore their commands. Less than lethal methods were used in an attempt to gain compliance and resolve the situation, but they were unsuccessful. After more than an hour of negotiating, Puga got out and ran to the front of his vehicle. Puga shot at the officers and ran while he continued to shoot at them…A lethal force encounter occurred and Puga was struck." SBCSD Crime Report by Detective Edward Hernandez, dated 2/19/21, 54

e. The SBC subject does not view the responding officers as a source of help; rather,

they view them as tools to be manipulated in service of their suicidal agenda: "the subject who is contemplating suicide by cop may not be viewing the officer or negotiator in the benevolent or hopeful manner that would allow helpful rapport to develop. Rather, he may be conversing with the officer yet continue to perceive law enforcement, consciously or unconsciously, in the role of suicide weapon, a tool to be used in his self- destruction. As long as this impulse is alive and active, it will impair genuine rapport and progress in the negotiation. It is highly likely that subjects who push their agenda to the point that it escalates into a shooting are more resolved in their suicidal, destructive impulses." (Mohandie & Meloy, 2010, 113)

    i. In this case, Mr. Puga was also motivated to kill police officers, adding another lethal layer to his unwillingness to resolve this situation peacefully.

f. Suicide by cop ideation is a very high-risk indicator for harming others as suspects will do so to compel law enforcement to use deadly force.

    1. One in three suicide by cop subjects will harm others to bring about deadly force against them. Mohandie et al., 2009

    2. They will usually arm themselves and use weapons of opportunity (particularly knives and guns which they actually will use) to draw this deadly force. Mohandie et al., 2009

5. **At the time of his death, Mr. Puga qualified for the DSM-5-TR diagnoses of F60.2, Antisocial Personality Disorder (APA, 2022, p. 748), including prominent psychopathy; methamphetamine intoxication with a likely severe use disorder,** DSM-5-TR, F15.220, (APA, 2022, 632-634, 640-641); and F10.220, alcohol intoxication with a severe use disorder. **Mr. Puga was a chronically violent, dangerous individual with severe, life-threatening addictions.** These disorders are associated with premature death due to overdose, accidents due to high-risk behavior, multiple health conditions that shorten life span and result in sudden death, violence directed towards others, arrest and incarceration, employment difficulties, family and interpersonal relationship disruption, and mortality by suicide (as occurred in this case).

**Foundation for Opinion:**

a. Mr. Puga tested positive for methamphetamine.

    i. As noted elsewhere in this report, the autopsy toxicology indicated a high level of methamphetamine.

b. Mr. Puga was under the influence of alcohol and had a severe alcohol use disorder at the time of his death.

    i. Ms. Cadena testified that Mr. Puga "drank all the time" during their relationship circa 2012-13. She moved when their daughter was born "because Hector drank too much. Hector was always talking, like,

verbally aggressive, and I didn't want that around my daughter." Cadena, Maria depo, dated 12/11/24, 13, 35

    ii. According to the DSM-5-TR (APA, 2022, p. 563), "acute alcohol use, independent of chronic use, increases the risk of a suicide attempt, with each drink raising the risk by 30%." In particular, firearms related suicides are more prevalent among heavy drinkers in the US (APA, 2022, p. 560).

c. According to the DSM-5-TR (APA, 2022, pp. 635, 637), "individuals exposed to amphetamine-type stimulants or cocaine can develop stimulant use disorder as rapidly as 1 week, although onset is not always this rapid…. stimulant use disorder can develop rapidly with intravenous or smoked administration; among primary admissions for amphetamine-type stimulant use, 61% reported smoking…. 'binges' involve continuous high-dose use over hours or days and are often associated with physical dependence. Binges usually terminate only when stimulant supplies are depleted or exhaustion ensues… Stimulant smoking and intravenous use are associated with rapid progression to severe-level stimulant use disorder often occurring over weeks to months…"

d. The DSM-5-TR (APA, 2022, pp. 636-637) identifies a number of negative outcomes from methamphetamine abuse and addiction:

    i. "chaotic behavior, social isolation, aggressive behavior…. Can result from long-term stimulant use disorder…" p. 636

    ii. "threats or acting out of aggressive behavior may occur. Depression, suicidal ideation…." p. 636

    iii. "Individuals who smoke the drugs are at increased risk for respiratory problems (e.g. coughing, bronchitis, and pneumonitis)." p. 639

    iv. "Chest pain may be a common symptom during stimulant intoxication. Myocardial infarction, palpitations, and arrhythmias, sudden death from respiratory or cardiac arrest, and stroke have been associated with stimulant use among young and otherwise healthy individuals. Seizures can occur with stimulant use. Pneumothorax can result from performing Valsalva-like maneuvers done to better absorb inhaled smoke…" p. 639

    v. "Neurocognitive impairment is common among meth users." p. 639

    vi. "Oral health problems include 'meth mouth' with gum disease, tooth decay, and mouth sores related to the toxic effects of smoking the drug and to bruxism while intoxication." p. 639

e. Mr. Puga's addiction to meth made him a greater risk to die by suicide. The newest DSM, DSM-5-TR(APA, 2022, p. 638) in their diagnostic chapter on Substance-Related and Addictive Disorders, specifically Stimulant Use Disorder, in recognition of the association between stimulant abuse and suicide, now has a special section titled "Association with Suicidal Thoughts or Behavior." The DSM-5-TR (APA, 2022, p. 638) notes: "one systematic review found that regular

or problem amphetamine use (examining primarily individuals who inject amphetamines and/or individuals admitted to treatment for use of amphetamines) is associated with increased suicide mortality. A general population study of adults in the United States found an association of prescription stimulant use disorder with suicidal thoughts…In a study of both men and women in the US Veteran's Administration health care system, cocaine and amphetamine use disorders were each associated with increased rates of suicide deaths."

f. "Individuals with antisocial personality disorder are more likely than individuals in the general population to die from natural causes or suicide." (APA, 2022, 750)

g. His history and behavior as noted throughout multiple records is highly consistent with this behaviorally based personality disorder diagnosis. Individuals with Antisocial Personality Disorder are more likely to die prematurely and by violent means like suicide, accidents, and homicide. (APA, 2022, 750)

*Antisocial Personality Disorder*

a. Mr. Puga's diagnosis, F60.2, Antisocial Personality Disorder (APA, 2022, p. 748) is based on the following criteria (while Mr. Puga has never been directly evaluated by me, but this diagnosis is behaviorally based and his history and behavior easily qualify him).

    i. There is a pervasive pattern of disregard for and violation of the rights of others occurring since age 15 years, as indicated by three or more of the following:

        1) Failure to conform to social norms with respect to lawful behaviors as indicated by repeatedly performing acts that are grounds for arrest.  Evidence of this criterion.

            *a)* Mr. Puga had 21 separate bookings (arrests) and incarcerations going back to 1/17/89 (age 16), from one day to over a year between 1/17/89 to 12/11/20 (age 31). LACSD Jail Records, Inmate Information Summary, 14

        2) Deceitfulness, as indicated by repeated lying, use of aliases, or conning others for personal profit or pleasure.  Evidence of this criterion.

        3) Impulsivity or failure to plan ahead.  Evidence of this criteria.

        4) Irritability and aggressiveness as indicated by repeated physical fights or assaults.  Evidence of this criterion.

        5) Reckless disregard for safety of self or others. Evidence of this criterion.

        6) Consistent irresponsibility as indicated by repeated failure to sustain consistent work behavior or honor financial obligations. Evidence of this criterion.

        7) Lack of remorse, as indicated by being indifferent to or rationalizing having hurt, mistreated, or stolen from another. Evidence of this criterion.

    ii.   The individual is at least age 18 years.
    iii.  There is evidence of Conduct Disorder
    iv.   with onset before age 15 years.  Evidence of this.
1) Mr. Puga's sister testified that he was arrested for the first time for shooting a BB gun at another kid around age 13.  He was sent to juvenile hall. Juarez, Nancy depo, dated 12/19/24, 14, 17-18
2) Hector stopped school in 7th grade, "didn't want to go anymore." Ubardo, Antonia depo, dated 12/3/24, 18, 20
*3)* Arrest 12/6/05 for petty theft and false ID to PO.  Age 16.  LACSD Jail Records, Inmate Information Summary*, 104*

- The occurrence of antisocial behavior is not exclusively during the course of Schizophrenia or a Manic Episode.

*Psychopathy*

Mr.  Puga earned a score of 35 on the PCL-R which places him in the severe range in terms of psychopathy and his APD, and at the 97th percentile.  The PCL-R manual (Hare, 2003, p. 19) notes that "ratings based on file reviews are likely to result in lower PCL-R scores than otherwise would be obtained from an integration of interview and file information particularly at the upper end of the spectrum."

- "There is now a respectable body of research indicating that the PCL-R is a robust predictor of criminal behavior, including violence, in a variety of populations and contexts…moderate to strong effect sizes and were good predictors of violence and general recidivism (Hare, 2003, p. 147-148)."

Thank you for the opportunity to review this case.

Sincerely,

Kris Mohandie, Ph.D., ABPP
Licensed Psychologist